UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

    v.                                                    Case No. 1:23-cr-66-ZMF

REBECCA LAVRENZ

    Defendant.

**DEFENDANT'S MOTION**
TO DISMISS DUE TO DELIBERATE SPOILATION OF EVIDENCE BY HOUSE SELECT COMMITTEE, AND REQUEST FOR EVIDENTIARY HEARING.

COMES NOW REBECCA LAVRENZ, the Defendant, by counsel of record, with this motion to

dismiss due to deliberate spoilation of (almost certainly exculpatory) evidence by the House

Select Committee.

      Today, in international news, it is reported that a "bombshell new report alleges that just

days before the GOP took over the House majority in 2022, over 100 encrypted files relating to

the January 6th Capitol riot probe were mysteriously deleted. . . The chairman of the House

Administration Committee's Oversight Subcommittee, Rep. Barry Loudermilk of Georgia says

the "It's obvious that [the Committee] went to great lengths to prevent Americans from seeing

certain documents produced in their investigation. It also appears that Bennie Thompson and

Liz Cheney intended to obstruct our Subcommittee by failing to preserve critical information and

videos as required by House rules." Daily Mail, 1/22/2024. https://www.dailymail.co.uk/news/

us-politics/article-12991471/january-6-committee-deleted-files-republican-probe-house-

majority.html .

### Former Jan. 6 Select Committee 'deleted more than 100 encrypted files from its probe in the days before Republicans took over the House majority'

- The chair of the investigation, Rep. Barry Loudermilk said that the files have been recovered and he's demanding Democrats hand over the passwords

By PAUL FARRELL FOR DAILYMAIL.COM
PUBLISHED: 07:44 EST, 22 January 2024 | UPDATED: 13:25 EST, 22 January 2024

"The Georgia conservative accused the Democratic investigation into the riot as trying to 'prove something that they wanted to be the truth.' "

"He went on to say that liberal's 'cherry-picked' evidence and omitted things that contradicted their narrative."

THESE REVELATIONS ADD TO PREVIOUS REVELATIONS

This follows up on previous reports that the House Committee failed to preserve numerous items of important evidence, including videos of depositions and transcripts.

The Chairman of the Subcommittee on Oversight for the Committee on House Administration, Barry Loudermilk, revealed on or about August 8, 2023:

> The House select committee that investigated the Capitol riot on January 6, 2021 failed to adequately preserve documents, data and video depositions – including communications it had with the Biden White House that are still missing – according to the Republican lawmaker overseeing the GOP investigation into the committee's work.
>
> The now-disbanded "J6" committee, which was run by Democrats and included only two GOP members, has also failed to provide any evidence that it looked into Capitol Hill security failures on the day of the riot, Rep. Barry Loudermilk, R-Ga., chairman of the Subcommittee on Oversight for the Committee on House Administration, told Fox News Digital.
>
> Loudermilk said his staff has had difficulty gathering all the information it needs to investigate Rep. Bennie Thompson's handling of the J6 investigation.

> "Part of our task as this oversight subcommittee is to actually address the security failures, look into how did it happen… how were these folks able to get into the Capitol," Loudermilk said. He said the documents they obtained came over in boxes and was completely unorganized.
>
> "Nothing was indexed. There was no table of contents index. Usually when you conduct this level of investigation, you use a database system and everything is digitized, indexed. We got nothing like that. We just got raw data," he said. "So it took us a long time going through it and one thing I started realizing is we don't have anything much at all from the Blue Team."
>
>                   \* \* \*
>
> What we also realized we didn't have was the videos of all the depositions," Loudermilk added.
>
> Loudermilk said he has been contacted by a defense attorney that needed access to key information in one of the video depositions, and the committee realized it did not have the videos he was seeking.
>
> Loudermilk says Thompson's committee was required by law and House rules to preserve and turn over all data related to their investigation at the end of the congressional term in December, and Loudermilk said as much to Thompson in a letter on June 26.

Andrew Mark Miller,"**J6 Committee failed to preserve records, has no data on Capitol Hill security failures, GOP charges: The J6 Select Committee disbanded in December 2022 and was required to preserve documents from its investigation**," Fox News, August 8, 2023, https://www.foxnews.com/politics/j6-committee-failed-to-preserve-records-has-no-data-on-capitol-hill-security-failures-gop-charges

      Thus, the Committee's failure to provide relevant information, materials and evidence obtained in pursuit of the Committee's goals represents a serious violation of defendants' due process rights.

    **I.**      **THE SELECT COMMITTEE WAS NEVER A VALID OR LAWFUL COMMITTEE**

Although Congress has broad authority to investigate, see *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 504, n. 15 (1975), its authority must be in furtherance of its legislative function. The Supreme Court in *Watkins v. United States*, held that Congress's investigative power is at its peak when the subject is alleged waste, fraud, abuse, or maladministration within a government department. The investigative power, the Court stated, "comprehends probes into departments of the Federal Government to expose corruption, inefficiency, or waste." 354 U.S. 178, 187 (1957).

The Select Committee's composition was in violation of the Rules of the House as well as the rules laid out by the House when the House voted to create the Committee. Section 2 of the Act which created the Committee states:

II. "COMPOSITION. (a) Appointment Of Members.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." Further, Subsection (c) states: "Vacancies.—Any vacancy in the Select Committee shall be filled in the same manner as the original appointment."

III. However, the Select Committee ultimately consisted of just two Republicans, Liz Cheney and Adam Kinzinger, *selected by the Democrats*. Speaker Pelosi refused to seat GOP members nominated by the minority party, and instead picked Republicans who have openly advocated a conspiracy theory that the demonstrators and protestors on Jan. 6 were all insurrectionists.

IV. Additionally, H. Res. 503 requires the chair of the committee to consult with the ranking member before issuing a subpoena for a deposition. But the committee has no ranking Republican member, which could make the committee's subpoenas invalid.

V.

VI. The one-sided political structuring of the Select Committee's website reveals the wholly biased, predetermined nature of the Committee's objectives: "Whereas January 6, 2021, was one of the darkest days of our democracy, during which insurrectionists attempted to impede

>Congress's Constitutional mandate to validate the presidential election and launched an assault on the United States Capitol Complex that resulted in multiple deaths, physical harm to over 140 members of law enforcement, and terror and trauma among staff, institutional employees, press, and Members. . . [etc.]"  Even the name of the Committee, "the Select Committee to Investigate the January 6th *Attack* on the United States Capitol," evidences this bias and pre-determinism.  Many of those who participated in January 6 were engaging in pure advocacy, protected by the First Amendment, not an "attack."

### VII. DESPITE THE COMMITTEE'S UNLAWFUL NATURE, ITS EVIDENCE CONSISTED OF A GREAT DEAL OF MATERIAL EVIDENCE FOR THE DEFENDANTS.

The Defendants were all led to protest, demonstrate, and approach the Capitol by persons unknown.  It is highly likely that the Committee possessed (and has now deleted) exculpatory evidence regarding January 6.

### VIII. THE U.S. CONGRESS AND THE U.S. CAPITOL POLICE ARE THE COMPLAINING WITNESSES AND ALLEGEDLY VICTIMS

Initially, it must be squarely confronted that the U.S. Congress and the U.S. Capitol Police ("USCP") are the primary alleged victims of the crimes charged relating to events on Capitol Hill on or about January 6, 2021.

The Select Committee is not some mere bystander or observer.  The strenuous claims about actions taken by a very, very few out of a mostly peaceful and calm crowd of First Amendment demonstrators are allegations of violence, assaults, property damage and disruption against the U.S. Congress.  The USCP was involved in standing between Congress as the

primary victim and the very few demonstrators who ran amok and became rioters that day.[1]

Congress, if it has not been forgotten among the public, is the Legislative Branch of our Federal Government.  It is not part of the Executive Branch.  Its security is committed to the Legislative Branch's own security force, USCP, evidently to support this independence.  See 2 U.S.C. §§ 1901 to 1982.

Allegations in January 6-related prosecutions and within the Select Committee itself are of an attack upon the Congress.  (It's in the name of the Select Committee.)

While every prosecution has an element of enforcing laws generally, there is almost always a complaining victim or victims or complaining witness.

Therefore, this is not spoliation of evidence by some mere sideline observer.  The victim of the alleged crime has destroyed evidence of that crime.

IX.  **THE CONGRESSSIONAL COMMITTEE AGREED TO PROVIDE THIS INFORMATION TO THE DEPARTMENT OF JUSTICE BUT NOT TO DEFENDANTS**

Recall that the first arrests relating to events of January 6, 2021, were on January 6 and on January 7 as well.  Dozens of indictments had been issued before the Select Committee was ever organized.  By the time the U.S. House of Representatives voted to establish the Select Committee, prosecutions for the same events were already underway.  And these were widely-

---

[1] Because the U.S. Capitol Police estimates that 10,000 demonstrators visited Capitol Hill on January 6, 2021, out of totals demonstrating throughout the District of Columbia in a range disputed (as with every mass demonstration in the city) with estimates of 500,000 to 1 million visitors above what would be normal throughout the City of Washington, the relationship of an individual Defendant to the Congress or USCP will vary from person to person, from Defendant to Defendant, from case to case.  It would be impossible – and completely wrong – to attempt a blanket, or uniform description to apply to all of the roughly 10,000 people at or around the U.S. Capitol on January 6, 2021.  This Motion trying to avoid placing everyone in the same bucket is an attempt at accuracy, not to diminish the few demonstrators who severely misbehaved.

publicized. Again, the purpose of the Select Committee was to investigate and review information, so they would necessarily have to know that these prosecutions were on-going.

Therefore, the deletion of this information occurred with full-awareness by the Select Committee that prosecutions were underway, some convictions already on appeal, and the evidence that the Select Committee was collecting was a parallel criminal investigation and a public trial of guilt or innocence. The deletion of this information would qualify as obstruction of justice or contempt of court (by disrupting the Court, not so much by a direct order).

Neither the Congress nor the DoJ can now minimize the severity of this spoliation of evidence, where the Select Committee already determined and promised to release the information that it subsequently deleted. The Select Committee by its Chairman Bennie Thompson decided and publicly announced that it would be releasing the information publicly.

> The Jan. 6 select committee has formalized a path to share witness transcripts and evidence with the Justice Department, its chair Rep. Bennie Thompson (D-Miss.) told POLITICO Thursday.
>
> "We've put a template together for sharing information, sharing it with Justice. My understanding is, there's general agreement on it," Thompson said.
>
> Agreement on evidence-sharing would mark a significant milestone as the DOJ inquiry into efforts by Donald Trump and others to overturn the 2020 election enters a more public-facing phase. Federal investigators have sought to access the congressional committee's 1,000-plus witness interview transcripts since April, but the select panel has resisted as its probe continued to generate extraordinary new evidence and witness testimony.
>
> Now, though, as DOJ delves even more deeply into the former president's inner circle and the select committee's most significant round of public hearings has concluded, there appears to be greater urgency for prosecutors to obtain evidence the select committee has gathered.

> \* \* \*
>
> Thompson had previously floated the prospect of sharing evidence with DOJ "in camera" — which would require department investigators to visit the select committee offices and review transcripts without keeping them.
>
> But Thompson said Thursday that the new template is unlikely to include in-camera review because it created unworkable complexities. Instead, he said, DOJ would have to provide details about the information it's interested in and the select committee will supply it.
>
> He also expressed an awareness of some tricky calculus for DOJ once it begins obtaining select committee materials. ***Prosecutors are obligated by law to share evidence with defendants that may bear on their cases, a process known as discovery.***
>
> ***"There's a concern — and I'm not a lawyer — if you give them something and there's something in there that impacts a case they're looking at, they have to let the other side know," Thompson noted.***

Kyle Cheney," Jan. 6 committee has a formal path to share investigative material with DOJ, its chair says, Politico Magazine, July 28, 2022, *(emphases added)*, https://www.politico.com/news/2022/07/28/doj-jan-6-panel-evidence-sharing-00048457

### X.  WHY THE DELETED INFORMATION IS EXCULPATORY AND MUST BE DISCLOSED

As Select Committee Chair Bennie Thompson publicly announced, the Department of Justice must share the information – now missing – with Defendants' attorneys in disclosure. The information collected by the Select Committee consists of around 1,000 interviews, mostly

in private depositions, with witnesses of events on January 6, 2021.[2]  Defendant is entitled to know about and to call witnesses in his favor, as guaranteed under the Sixth Amendment to the U.S. Constitution.  We know that the vast majority of these witnesses would be exculpatory and probative of the January 6 Defendants' innocence or guilt for less than what is charged.  The Select Committee's public meetings were partisan political campaign commercials like those of a political action committee (PAC) encouraging election of the Democrats who were in charge of security of the Capitol complex on January 6, 2021.  However, the vast majority of the deposed witnesses were never disclosed by the partisan campaign project of the Select Committee, obviously because those witnesses would debunk the partisan narrative.  Instead, the Committee chose to delete deposition videos and transcripts.  Obviously, those witnesses who would be consistent with the Defendant's guilt were not deleted.

The Select Committee's Chair publicly acknowledged that Defendants would have a right to review the information collected, yet then deleted the information anyway.  This sequence of events evidences a consciousness of guilt or wrongdoing by the Select Committee in hiding the

---

[2]   Astonishingly, the USAO is trying to argue over a Protective Order with regard to former President Donald Trump that Trump would attempt to litigate his case in public.  The Select Committee was a public, partisan, political show trial reminiscent of the infamous Roland Freisler, complete with screaming, crying, outrage, etc.  Whereas Freisler forced defendants to stand before him while he screamed at them, the Select Committee accomplished this through selectively-edited video recordings prejudicing this and other Defendants.  Members tried to call others including Trump.  The purpose and effect of the Select Committee was to try all January 6 Defendants and now Trump in public.  The Judiciary and other agencies of the Government face a crisis of public confidence because – to the surprise of those in Washington, D.C. – the American people are not stupid.  After two-and-a-half years of constant, non-stop pollution of the jury pools and trying the case in public, now there is further hypocrisy.  The Select Committee *was* the trial of these Defendants, leaving this District Court nothing but the sentencing resulting from the feverish lynch mob that the Committee created.  This is all like watching a six-year old perform a magic trick and pretending to be fooled.  The records of the Select Committee are *the most important information* to Defendants' rights.

truth that would help the Defendant's case.

Many of the Defendants' attorneys also helped witnesses appear before the Select Committee. As those in the John Pierce Law Firm know, such as then attorney for Stewart Rhodes Jonathon Moseley, the Select Committee took entire day or days of behind-closed-door testimony but then publicly released only a couple minutes carefully selected to give a misleading and accusatory false impression.

The ability to cross-examine or impeach the Government's witnesses is now impaired by the destruction of the evidence, again a violation of the Sixth Amendment.

The Government will be unable to fulfill its duties under The Jencks Act or *Giglio* much less *Brady v. Maryland.* The Government cannot provide Defendants' counsel with past statements made by the Government witness when the Select Committee has destroyed the transcripts.

Other information collected by the Select Committee would similarly improve the Defendant's ability to impeach witnesses against him, or set the context or circumstances for the events in question.

For example, the USCP is still resisting disclosure of records showing what caused the Joint Session of Congress to begin a recess and evacuation at about 2:00 PM to 2:13 PM on January 6, 2021. The refusal of the USCP to release these documents must lead us to the inference that if the documents were released it would prove the Defendant here innocent. With no reliable, as-it-happened evidence of the reasons for the Joint Session to recess, the Government cannot prove obstruction of the congressional hearing.

Christina Bobb, now a Trump attorney, reports publicly that the Cannon House Office

Building was the only Capitol building to be locked down other than the Capitol, and for a longer time period.³  Cannon of course is closest to where pipe bombs were discovered.  Did the USCP react to the pipe bombs or to this Defendant?  The Defendant is entitled to those records because if the *cause* of the recess *was not him*, then he is innocent of those charges.

The Select Committee was supposed to be investigating the circumstances of the protests gone wrong and the disruption to Congress, including the six (6) demonstration permits issued by the USCP in December for rallies on the Capitol Grounds on January 6, 2021.  Now, however, it appears that those records have been destroyed by Congress.  Therefore, the Government cannot establish that any Defendant disrupted Congress where the Congress (USCP) fervently, desperately resists disclosing the documentation of who, what, when, why and even where any actions caused the disruption of the Joint Session of Congress or delayed its resumption.

### XI.   ALL GOVERNMENT OFFICES, AGENCIES, OFFICERS, AND PERSONNEL MUST BE INCLUDED FOR BRADY DISCLOSURES

Binding precedent clarifies that parts of the government involved in the underlying events or participated in the investigation of them or which the agency or the prosecutor has reason to suspect might have relevant information is subject to the obligation for disclosure.

Here the U.S. Congress and its statutory police force the USCP claim to be victims of the crimes charges relating to January 6, 2021.  In their posture as victims as well as the primary (first, if smaller than the FBI) investigative agency, all documents and information known to the

---

³   Christina Bobb, Stealing Your Vote, Jan. 24, 2023, Skyhorse Publishing, ISBN: 1510776699.

USCP and FBI are subject to disclosure regardless of whether in the prosecutor's hands.

1. Was the recording in the possession of the government?[4]

The government acknowledges that its disclosure obligation extends beyond statements held in the prosecutor's office to statements in the possession of its investigative agencies. As with the due process claim, however, the government asserts that the Department of Corrections is not an investigative agency for this purpose.

"[T]he duty of disclosure affects not only the prosecutor, ***but `the government as a whole, including its investigative agencies,'*** because the Jencks Act refers to evidence gathered by `the government,' and not simply that held by the prosecution." *Wilson v. United States*, 568 A.2d 817, 820 (D.C.1990) (quoting *United States v. Bryant*, 142 U.S.App. D.C. 132, 140, 439 F.2d 642, 650 (1971) ("Bryant I"), on remand, 331 F.Supp. 927, aff'd, 145 U.S.App. D.C. 259, 448 F.2d 1182 (1971) ("Bryant II")).

In *Wilson* we applied *Brady* and *Jencks* requirements to the Washington Metropolitan Area Transit Authority (WMATA), where WMATA police were involved in the investigation and the case arose out of an attempt to enforce WMATA regulations[5]. 568 A.2d at 819-21; see also *Morris v. Washington Metro. Area Transit Auth.*, 251 U.S.App. D.C. 42, 44, 781 F.2d 218, 220(1986) (when the Metro Transit Police are involved, WMATA is considered a governmental entity); *Bryant I*, 142 U.S.App. D.C. at 140, 439 F.2d at 650 (tape recordings in the possession of the Bureau of Narcotics and Dangerous Drugs are in the possession of the government). Appellant urges that the Corrections Department should similarly be considered part of the government for disclosure purposes.

The case before us does not require that we go that far. **This case presents a narrower issue: whether the government has a duty to preserve evidence obviously material which, as the trial court found, the police knew or should have known about, and could have obtained if requested promptly from another government agency.** In *Brooks*, the Court of Appeals explained **courts' willingness to insist on**

---

[4]     Clearly referring to all levels of government.

[5]     This doesn't fully explain that the prosecution arose out of "WMATA regulations" concerning a threatening showdown on a bus against a bus driver.  WMATA security responded to the threatening situation but then turned the investigation over to the D.C. MPD.

> **an affirmative duty of inquiry on the part of the prosecutor, because an "inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure."** See *Brooks*, 296 U.S.App. D.C. at 222, 966 F.2d at 1503 (citing as an example *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir.1975) (*en banc*) (reflecting concern for "inherent fairness")). *Brooks* dealt with information that was already in the hands of the police department, albeit in a different unit than the one that investigated the case, and the law is clear that information in the hands of the police department is considered to be held by the "government" for *Brady* purposes. See *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 (holding prosecutor's Brady obligation to disclose exculpatory evidence to defense applies to facts known to anyone acting on the government's behalf, including the police).
>
> * * *
>
> **Even when the prosecutor does not know about certain evidence, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."** *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.
>
> * * *
>
> **The government does not contend otherwise. Under these circumstances, we agree with the trial court that the police, as an integral part of the prosecution team, had an obligation to secure the tape recording. Thus, the tape recording was in the government's "possession" for both Jencks and Rule 16 purposes.**

*Robinson v. United States*, 825 A.2d 318 326-329, (D.C. 2003) *(paragraph break added for emphasis and bold emphases added).*

> * * * When WMATA is seeking to enforce its regulations or to protect its employees and involves its police force, however, the tort immunity analysis is irrelevant in defining the obligation of the government to disclose evidence. Rather than look to the immunity analysis developed for different purposes, our focus in addressing the Jencks issue must be on the nature of the proceeding and the purpose of the Jencks Act.
>
>   **When the statement being sought by the defense as *Jencks* material is so closely intertwined with a prosecution arising out of an attempt to enforce WMATA regulations and protect a WMATA employee,** *cf.* **United States v. Agurs**, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), **we conclude that production, upon request, is**

> **required.** See *United States v. Deutsch*, supra, 475 F.2d at 57. The prosecution arose as a result of Brady's efforts to assure that bus passengers paid their bus fares. He stopped the bus because some of the passengers were out of control, endangering further operation of the bus. The record suggests that calling his supervisor was the means by which he sought supervisory as well as police assistance.

*Wilson v. United States*, 568 A.2d 817 (D.C. 1990) (paragraph break added for emphasis and bold emphases added).

## XII. LACK OF DISCLOSURE CAN REQUIRE REVERSAL

If an appeal court determines the suppressed evidence is material, that there is a reasonable likelihood the evidence could have impacted the jury's judgment, then a new trial is required. *United States v. Sitzmann*, 74 F.Supp.3d 128, 133-134 (D.D.C. 2014).

A Defendant must raise at least a colorable claim that the material contains evidence "favorable to him and material to his claim of innocence." *Id.*

"[S]uppression by the prosecution of evidence favorable to a Defendant upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Sitzmann*, 74 F.Supp.3d at 134 (*quoting Brady v. Maryland,* 373 U.S. 83, 87 (1963)).

With *Brady*, constructive knowledge matters. In *Youngblood v. West Virginia*, 547 U.S. 867 (2006) the Supreme Court made it clear that "a Brady violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty to disclose extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the government fails to turn over even evidence that is *'known only to police investigator and not to the prosecutor.'* 'Such evidence is material if "there is a reasonable possibility that had the evidence been disclosed to the defense, the result of the proceeding would

have been different",,' although a 'showing of materiality does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.' The reversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"

The requirements of *Brady are* very broad.  For instance, a "prosecutor must disclose information that is inconsistent with any element of any crime charged" and --

> "… must disclose information that either casts a substantial doubt upon the accuracy of any evidence---including but not limited to witness testimony—the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of the evidence.  This information must be disclosed regardless of whether it is likely to make the difference between convictions and acquittal of the defendant for a charged crime."

<u>United States Justice Manual</u> USJMM) § 9-5.001.

The disclosure requirement, "applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence." *Id*.  The Defendant is entitled to documents and evidence, to the extent potentially exculpatory*; See also, USA v Theodore F. Stevens*, No. 1:08-CR-00231-EGS, U.S. District Court for the District of Columbia, Memorandum and Opinion by Judge Emmett Sullivan,  (Docket No. 257, December 22, 2008); *United States v. Sitzmann*, 74 F.Supp.3d 128, 133 (D.D.C. 2014)

An actual conviction can be overturned on appeal for violation of *Brady* if evidence favorable to the accused for exculpatory or impeachment purposes was suppressed by the government which prejudiced the accused. *Id*.   Favorability to the accused means exculpatory or impeachment value. *Id.* Suppression by the government can be an intentional or inadvertent

failure to disclose the evidence. *Id*. at 137. [6]

Courts in in this jurisdiction disfavor narrow readings by prosecutors as to their obligations under *Brady*. *United States v. Saffarinia*, 424 F.Supp.3d 46, 57 (D.D.C.), *supported by United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988).

When the Defendant requests *Brady* materials

> **"The government cannot meet its *Brady* obligations by providing the defendant with access to 600,000 documents and then claiming that the defendant should have been able to find the exculpatory information in the haystack."**

*Saffarinia*, 424 F.Supp.3d at 85.

Under *Brady*, it is relevant that the Defendant explicitly asked for specific information, not passively hoping that the prosecution will notice and think to disclose it:

> "The test of materiality in a case like *Brady* in which specific information has been requested by the defense is not necessarily the same as in a case in which no such request has been made...." [14]

*United States v. Agurs*, 427 U.S. 97, 106, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976)

> "The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the Defendant and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence. * * *"

*Moore v. Illinois,* 8212 5001, 408 U.S. 786,794-795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972)

> "If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice

---

[6]    If the USAO withholds information that is later uncovered by Congress, whistleblowers, the media, FOIA, or other cases, any conviction in this case is vulnerable to being vacated.

of a duty to produce, that duty should equally arise even if no request is made. Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all. The third situation in which the Brady rule arguably applies, typified by this case, therefore embraces the case in which only a general request for "Brady material" has been made."

*United States v. Agurs*, 427 U.S. 97, 107, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976).

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt.[20] Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."

*Agurs* at 112.

March 1, 2024                                RESPECTFULLY SUBMITTED,
                                             John M. Pierce, Esq.
                                             *Counsel for Defendant*

                                             _____/s/ John Pierce_____

                                             JOHN PIERCE LAW
                                             21550 Oxnard Street 3rd Floor, PMB #172
                                             Woodland Hills, CA 91367
                                             jpierce@johnpiercelaw.com
                                             (213) 279-7846

**CERTIFICATE OF SERVICE**

I hereby certify that my law firm is filing the foregoing with the Court by its ECF record-keeping and filing system, which automatically provides a copy to: