UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Case No: 1:23-CR-66-ZMF |
| : | |
| REBECCA LAVRENZ, : | |
| : | |
| Defendant. : | |

### UNITED STATES' OPPOSITION TO DEFENDANT'S
### MOTION TO TRANSFER VENUE

The United States opposes Defendant Rebecca Lavrenz's motion to transfer venue in this case to the District of Colorado. ECF No. 39 at 1. The Defendant, who is charged in connection with events at the U.S. Capitol on January 6, 2021, fails to establish that she "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny her motion.[1]

---

[1] Judges on this Court have denied motions for change of venue in dozens of January 6 prosecutions, and no judge has granted a change of venue in a January 6 case. *See, e.g.*, *United States v. Ballenger*, 640 F. Supp. 3d 34 (D.D.C. 2022) (JEB); *United States v. Nassif*, 628 F.Supp.3d 169, 185-88 (D.D.C. 2022) (JDB); *United States v. Ramey*, 22-cr-184, Minute Entry (D.D.C. Jan. 30, 2023) (DLF); *United States v. Eckerman, et al.*, No. 21-cr-623, Minute Order (D.D.C. Jan. 26, 2023) (CRC); *United States v. Pollock, et al.*, No. 21-cr-447, Minute Entry (D.D.C. Jan. 25, 2023) (CJN); *United States v. Gossjankowski*, No. 21-cr-0123, 2023 WL 395985 (D.D.C. Jan. 25, 2023) (PLF); *United States v. Adams*, No. 21-cr-212, ECF No. 60 (D.D.C. Jan. 24, 2023) (ABJ); *United States v. Rhine*, 652 F. Supp. 3d 38 (D.D.C. 2023) (RC); *United States v. Oliveras*, No. 21-cr-738, 2023 WL 196679 (D.D.C. Jan. 17, 2023) (BAH); *United States v. Sheppard*, No. 21-cr-203, 2022 WL 17978837 (D.D.C. Dec. 28, 2022) (JDB); *United States v. Samsel, et al.*, No. 21-cr-537, ECF No. 227 (D.D.C. Dec. 14, 2022) (JMC); *United States v. Gillespie,* No. 22-cr-60, ECF No. 41 (D.D.C. Nov. 29, 2022) (BAH); *United States v. Barnett*, No. 21-cr-38, ECF No. 90 (D.D.C. Nov. 23, 2022) (CRC); *United States v. Bender, et al.*, No. 21-cr-508, ECF No. 78 (D.D.C. Nov. 22, 2022) (BAH); *United States v. Sandoval*, No. 21-cr-195, ECF No. 88 (D.D.C. Nov. 18, 2022) (TFH); *United States v. Vargas Santos*, No. 21-cr-47, Minute Entry (D.D.C. Nov. 16, 2022) (RDM); *United States v. Nordean, et al.*, No. 21-cr-175, ECF No. 531 (D.D.C. Nov. 9, 2022) (TJK); *United States v. Eicher*, No. 22-cr-38, 2022 WL 11737926 (D.D.C. Oct. 20, 2022) (CKK); *United States v. Schwartz, et al.*, No. 21-cr-178, ECF No. 142 (D.D.C. Oct. 11, 2022) (APM); *United States v. Brock*, 628 F. Supp. 3d 85 (D.D.C. 2022) (JDB),

## BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building. As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

The Defendant arrived on the east side of the U.S. Capitol on the morning of January 6 and eventually joined a crowd standing behind bike racks that had been set up to prevent unauthorized individuals from going onto the East Plaza. At approximately 1:59 p.m., rioters on the east side of the Capitol breached the bike rack barriers and advanced toward the Capitol building. The

---

aff'd, No. 23-3045, 2023 WL 3671002 (D.C. Cir. May 25, 2023); *United States v. Jensen*, No. 21-cr-6, Minute Entry (D.D.C. Aug. 26, 2022) (TJK); *United States v. Seitz*, No. 21-cr-279, Minute Order (D.D.C. Aug. 17, 2022) (DLF); *United States v. Strand*, No. 21-cr-85, ECF No. 89 (D.D.C. Aug. 17, 2022) (CRC); *United States v. Williams*, No. 21-cr-618, ECF No. 63 (D.D.C. Aug. 12, 2022) (ABJ); *United States v. Herrera*, No. 21-cr-619, ECF No. 54 (D.D.C. August 4, 2022) (BAH); *United States v. Garcia*, No. 21-cr-129, 2022 WL 2904352 (D.D.C. July 22, 2022) (ABJ); *United States v. Rusyn, et al.*, No. 21-cr-303, Minute Entry (D.D.C. July 21, 2022) (ABJ); *United States v. Bledsoe*, No. 21-cr-204, Minute Order (D.D.C. July 15, 2022) (BAH); *United States v. Calhoun*, No. 21-cr-116, Minute Order (D.D.C. July 11, 2022) (DLF); *United States v. Rhodes, et al.*, 610 F. Supp. 3d 29 (D.D.C. 2022) (APM); *United States v. Williams*, No. 21-cr-377, Minute Entry (D.D.C. June 10, 2022) (BAH); *United States v. McHugh*, No. 21-cr-453, Minute Entry (D.D.C. May 4, 2022) (JDB); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (D.D.C. April 29, 2022) (TNM); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, 579 F. Supp. 3d 177 (D.D.C. 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158, Minute Order (D.D.C. Dec. 14, 2021) (RC); *United States v. Reffitt*, No. 21-cr-32, Minute Order (D.D.C. Oct. 15, 2021) (DLF); *United States v. Caldwell*, No. 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

Defendant joined in the initial rush of rioters across the East Plaza toward the steps that led up to the Rotunda Doors. At the base of the steps, rioters overran a line of U.S. Capitol Police ("USCP") officers who had attempted to stop them from advancing further toward the Capitol building, forcing the officers to retreat to the top of the steps up against the Rotunda Doors. Again, the Defendant joined the crowd of rioters, advancing to the top of the steps. From there, rioters breached the Rotunda Doors and entered the U.S. Capitol building before USCP officers managed to close the Rotunda Doors. During all of this, the Defendant stood among the crowd of rioters who had gathered outside of the Rotunda Doors, standing mere feet away as several rioters assaulted and pepper sprayed the USCP officers.

At approximately 2:38 p.m., rioters breached the Rotunda Doors for a second time. Minutes after the second breach, the Defendant entered the U.S. Capitol building, standing briefly in the East Foyer before entering the Rotunda. From the Rotunda, the Defendant moved toward the Senate side of the Capitol, where she joined a crowd of rioters who had assembled near a line of police officers preventing rioters from reaching the door to the Senate Chamber. After a few minutes, the Defendant reentered the Rotunda and then the East Foyer, where she exited the U.S. Capitol through the Rotunda Door.

Based on her actions on January 6, 2021, the Defendant was charged in a four-count Information, ECF No. 20, as follows:

| | |
|---|---|
| Count One: | 18 U.S.C. § 1752(a)(1) — Entering and Remaining in a Restricted Building. |
| Count Two: | 18 U.S.C. § 1752(a)(2) — Disorderly and Disruptive Conduct in a Restricted Building. |
| Count Three: | 40 U.S.C. § 5104(e)(2)(D) — Disorderly Conduct in a Capitol Building. |

Count Four:  40 U.S.C. § 5104(e)(2)(G) — Parading, Demonstrating, or Picketing in a Capitol Building.

Trial is scheduled to begin on March 25, 2024. ECF No. 40.

The Defendant now moves for a change of venue to the District of Colorado. ECF No. 39. She contends that such a change is appropriate because of (1) recent polling that supposedly "prove[s], with immense factual data, an insurmountable bias from the Washington DC Residents [sic] against January 6 defendants," *id.* at 1, and (2) the United States' "conviction rate" in other January 6-related trials, *id.* at 5.

## ARGUMENT

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones*

*v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

## I. The Poll Submitted by the Defendant Does Not Support a Change of Venue.

The Defendant relies on a poll of purported Washington, D.C. residents conducted by Triton Polling & Research ("Triton poll") that is available at www.j6changeofvenue.com. For reasons set forth below, this poll does not support the Defendant's request for a venue transfer.

### A. Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire.

The Defendant argues that this Court should find a presumption of prejudice based on a poll of prospective jurors. But "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias." *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005). As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll percentages . . . decide the question of a presumption of prejudice." *In re Tsarnaev*, 780 F.3d 14, 23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of a pre-voir dire survey. *Haldeman*, 559 F.2d at 64. In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. *Id.* at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the

5

district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63–64.  The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43; *see Jones*, 404 F.2d at 1238 (observing that it is "upon the voir dire examination," and "usually only then, that a fully adequate appraisal of the claim [of local community prejudice] can be made" (quotation omitted)).

Other circuits have similarly rejected attempts to elevate polling results over voir dire.  In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were. *United States v. Campa*, 459 F.3d 1121, 1157 (11th Cir. 2006) (en banc) (Birch, J., dissenting).  The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99% of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88% of those respondents believed he was guilty, and about 42% of respondents had a strongly held opinion of his guilt. *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19.  Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions." *Rodriguez*, 581 F.3d at 786.  And the court held that, in any event, the poll did not "demonstrate widespread community prejudice"

because the "media coverage had not been inflammatory," two years had passed since the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors." *Id.*

There are good reasons to rely on voir dire, rather that public-opinion polls, when assessing whether prejudice should be presumed. First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, polls ordinarily inform the court only of the extent to which prospective jurors have heard about a case and formed an opinion about it. But that is not the ultimate question when picking a jury. A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723. But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath. *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice

through court-supervised voir dire rather than through public opinion polls. And the defendant has not offered any reason to depart from that usual practice here. Thus, this Court need not give substantial weight to the polling when considering whether to presume prejudice. But, as explained below, the poll cited by the defendant does not support a presumption of prejudice in any event.

> **B.     The Triton poll does not demonstrate pervasive prejudice in the District of Columbia.**

Contrary to the Defendant's contention, the Triton poll does not support a presumption of prejudice in this District.[2] The poll focuses on irrelevant questions about sentencing and punishment, asks about crimes that the Defendant is not charged with, and fails entirely to offer evidence that the jury pool in Colorado is meaningfully different from that in Washington, D.C.

First, the Defendant's motion rests on two questions in the Triton poll that deal with sentencing and punishment and are, therefore, irrelevant to the question at hand. The first question referenced in the Defendant's motion posed the statement: "The penalty of insurrection, treason, or committing an act of domestic terrorism is life imprisonment or death, which would be a fair punishment for anyone who participated in in any of the events of January 6," and asked the respondent to give an answer ranging from "[s]trongly [a]gree" to "[s]trongly [d]isagree," with the option of saying "[n]ot sure/don't know." ECF No. 39 at 2. The second question cited in the

---

[2] The Defendant has not furnished this Court with a copy of the poll, choosing instead to provide a link to what appears to be a fund-raising web site. Accessing the site provides a view of fourteen pie charts excerpted from the Triton survey report and the site includes a bar for viewers to click "to download raw polling data and results" (capitalization omitted). *See* https://www.j6changeofvenue.com/. The Defendant's motion includes screenshots of only two of the charts that are readily accessible when the site is accessed and none of the material that is not displayed but offered through an additional link. Presumably, the Defendant seeks to rely on the images selected for the motion, ECF No. 39 at 2–3, since those are the only portions of the Triton results presented.

Defendant's motion posed the statement: "Regardless of what they did, anyone who participated in the events at the Capitol on January 6 should serve prison time," and asked the respondent to provide an answer with the same options as the first question. *Id.* at 2. As the Defendant's motion highlights, "[t]he questions and language here are tailored to sentencing and punishment." *Id.* at 4. But questions of sentencing and punishment are not a jury's responsibility; they are instead left to the judge. Indeed, both the government and the Defendant agree that the Court should give the standard instruction that the jury should base its verdict "solely on the evidence in this case, and you should not consider the matter of punishment at all." ECF No. 35-2 at 43; ECF No. 36 at 41–42. Poll questions focused entirely on "sentencing and punishment," ECF No. 39 at 4, then, are irrelevant to the jury's task of adjudicating guilt and provide no basis to transfer venue.

Second, the Triton poll questions that the Defendant relies on ask about criminal offenses and conduct that are not implicated in this case. As mentioned above, the first poll question referenced in the Defendant's motion asks about "insurrection, treason, [and] committing an act of domestic terrorism," *id.* at 2, none of which are charged in this misdemeanor case. The jury, therefore, will never be asked to decide whether the Defendant committed insurrection, treason, or domestic terrorism, and instead, will only be asked to consider misdemeanor offenses that could not be more removed from those addressed in the Triton survey. The second poll question, which asked about "anyone who participated in the events at the Capitol on January 6," *id.* at 3, is likewise irrelevant because it encompasses far broader criminal conduct than the four counts that the Defendant is charged with. For instance, a respondent asked about "participat[ion] in the events at the Capitol on January 6" may reasonably think of rioters assaulting law enforcement officers or attempting to break into the House Chamber while members of Congress were still inside. But that conduct differs from what the Defendant is charged with. Such imprecise wording makes the

question a poor barometer for whether a jury can be fair and impartial in this case. Given the case law disfavoring polling as a basis to transfer venue, far greater precision in the polling questions should be expected if the Defendant expects to transfer venue based on polling data alone.

Third, the Defendant's motion makes no attempt to say why Colorado is the proper district to try this case. Beyond the unadorned request to transfer her case to the District of Colorado, *id.* at 1, the Defendant does not discuss why a Colorado jury would be any different from a Washington, D.C. jury. Instead, she cites a "recent *nationwide* opinion poll conducted jointly by USATODAY [sic] and Suffolk University," *id.* at 1 (emphasis added), and argues that the nationwide polling "shows that the jury pool(s) available outside DC [sic] are overwhelmingly more fair," *id.* at 2. Nationwide polling, however, does not explain why a jury in *Colorado* would be any different than a jury in Washington, D.C. Moreover, the Defendant's motion does not even cite to the USA Today poll itself, but rather a press release about the poll. Even setting that issue aside, the nationwide polling conducted by USA Today and Suffolk University asked different questions than those asked in the Triton poll of purported Washington, D.C. residents that the Defendant cites. For example, according to the Defendant's motion, the USA Today poll asked about whether respondents "thought the rioters were 'criminals'"—which goes to guilt or innocence—whereas the Triton poll questions excerpted in the motion asked about punishment and sentencing, as explained above. Thus, the Defendant's apples-to-oranges comparison of the USA Today poll and the Triton poll does not even support the argument that Washington, D.C. respondents are meaningfully different than nationwide respondents.

Beyond the motion's failure to provide sufficient support for a change of venue, there is substantial reason to question the bias, accuracy, and methodology of the poll. According to the website listed in the Defendant's motion—j6changeofvenue.com—the poll "was designed to be

10

included in Jake Lang's latest Change of Venue Motion." *See* How Was This Survey Conducted, j6changeofvenue.com (last visited Mar. 8, 2024). Edward "Jake" Lang is a defendant charged with participating in the Capitol Riot on January 6. *See United States v. Lang*, No. 1:21-cr-53 (CJN).[3] According to the very source the Defendant provides for the poll, the survey was not created to objectively search for data about this district's prospective jurors, but was instead "designed" with a specific outcome in mind. Moreover, just below a series of charts summarizing the poll results, the website j6changeofvenue.com has a section titled "WANT TO SUPPORT THE JANUARY 6 POLITICAL PRISONERS?" with a link to the website sponsorj6.com—which appears to be a fundraising website for defendants who participated in the attack on the U.S. Capitol, and offers monthly donation packages ranging from "Bronze Patriot" ($20 per month) up to "Founding Father" ($250 per month).

Suffice it to say, the Court should look skeptically upon the Defendant's claim that the Triton poll offers "irrefutable polling data," ECF No. 39 at 2, a claim that is not sourced to any professional's empirical conclusion but instead derives from a caption on a fundraising site.

Ultimately, in any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and some will have various disqualifying biases. But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling. As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [her] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. *Haldeman*, 559 F.2d at 62.

---

[3] As of this writing, Lang himself has not moved to change venue in his case based on the Triton poll.

## II. The January 6-Related Jury Trials That Have Already Occurred Have Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.

At this point, numerous January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort. *See Murphy v. Florida*, 421 U.S. 794, 802–03 (1975) ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire"). Instead, the judges presiding over nearly all of those trials were able to select a jury in one or two days. *See, e.g.*, *United States v. Nestor*, 22-cr-183, Minute Entry (D.D.C. March 4, 2024); *United States v. Michael Sparks*, No. 21-cr-87, Minute Entry (D.D.C. Feb. 26, 2024); *United States v. Ryan Zink*, No. 21-cr-191, Minute Entry (D.D.C. Sept. 5, 2023); *United States v. Stephen Horn*, No. 21-cr-301 Minute Entry (D.D.C. Sept. 13, 2023); *United States v. Reed Christensen*, No. 21-cr-455, Minute Entries (D.D.C. Sept. 12 & 13, 2023); *United States v. Reffitt*, No. 21-cr-32, Minute Entries (D.D.C. Feb. 28 & Mar. 1, 2022); *United States v. Robertson*, No. 21-cr-34, Minute Entry (D.D.C. Apr. 5, 2022); *United States v. Thompson*, No. 21-cr-161, Minute Entry (D.D.C. Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (D.D.C. Apr. 25, 2022); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (D.D.C. May 23, 2022); *United States v. Anthony Williams*, No. 21-cr-377, Minute Entry (D.D.C. June 27, 2022); *United States v. Bledsoe*, No. 21-cr-204, Minute Entry (D.D.C. July 18, 2022); *United States v. Herrera*, No. 21-cr-619, Minute Entry (D.D.C. August 15, 2022); *United States v. Jensen*, No. 21-cr-6, Minute Entries (D.D.C. Sep. 19 & 20, 2022); *United States v. Strand*, No. 21-85, Minute Entry (D.D.C. Sep. 20, 2022); *United States v. Alford*, No. 21-cr-263, Minute Entry (D.D.C. Sep. 29, 2022); *United States v. Riley Williams*, No. 21-cr-618, Minute Entries (D.D.C. Nov. 7 & 8, 2022); *United States v. Schwartz*, No. 21-cr-178,

Minute Entries (D.D.C. Nov. 22 & 29, 2022); *United States v. Gillespie*, No. 22-cr-60, Minute Entry (D.D.C. Dec. 19, 2022); *United States v. Barnett*, 21-cr-38, Minute Entries (D.D.C. Jan. 9 & 10, 2023); *United States v. Sheppard*, No. 21-cr-203, Minute Entries (D.D.C. Jan. 20 & 23, 2023); *United States v. Eckerman*, No. 21-cr-623, Minute Entry (D.D.C. Jan. 23, 2023). The only exceptions consist of trials involving seditious conspiracy charges. *See United States v. Rhodes, et al.*, No. 22-cr-15, Minute Entries (D.D.C. Sept. 27, 28, 29; Dec. 6, 7, 8, 9, 2022). And, using the first five jury trials as exemplars, the voir dire that took place undermines the defendant's claim that prejudice should be presumed.

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined). *See Reffitt*, No. 21-cr-32, ECF No. 136 at 121. The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror. *Reffitt*, No. 21-cr-32, ECF No. 133 at 23, 30. The Court then followed up during individual voir dire. Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial jurors.[4]

---

[4] For those struck based on a professed inability to be impartial, see *Reffitt*, No. 21-cr-32, ECF No. 133 at 49–54 (Juror 328), 61-68 (Juror 1541), 112–29 (Juror 1046); ECF No. 134 at 41–42 (Juror 443), 43–47 (Juror 45), 71-78 (Juror 1747), 93–104 (Juror 432), 132-43 (Juror 514); ECF No. 135 at 80–91 (Juror 1484). For those struck for other reasons, see *Reffitt*, No. 21-cr-32, ECF No. 134 at 35–41 (Juror 313, worked at Library of Congress); ECF No. 134 at 78–93 and ECF No. 135 at 3 (Juror 728, moved out of D.C.); ECF No. 135 at 6–8 (Juror 1650, over 70 and declined to serve), 62–73 (Juror 548, unavailability), 100–104 (Juror 715, anxiety and views on guns), 120 (Juror 548, medical appointments); ECF No. 136 at 41–43 (Juror 1240, health hardship), 53–65 (Juror 464, worked at Library of Congress), 65–86 (Juror 1054, prior knowledge of facts).

In *Thompson*, the Court individually examined 34 prospective jurors, and qualified 25 of them (or 73%). *See Thompson*, No. 21-cr-161, ECF No. 106 at 170, 172, 181, 190, 193. The court asked the entire venire 47 standard questions, and then followed up on their affirmative answers during individual voir dire. *Id.* at 4–5, 35. Of the nine prospective jurors struck for cause, only three (or about 9% of those examined) were stricken based on an inability to be impartial, as opposed to some other cause.[5]

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined). *See Robertson*, No. 21-cr-34, ECF No. 106 at 73. The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict." *Robertson*, No. 21-cr-34, ECF No. 104 at 14. It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial." *Id.* at 13, 15. The Court followed up on affirmative answers to those questions during individual voir dire. Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated that they had such strong feelings about the January 6 events that they could not be fair or impartial.[6]

---

[5] For the three stricken for bias, see *Thompson*, No. 21-cr-161, ECF No. 106 at 51–53 (Juror 1242), 85–86 (Juror 328), 158–59 (Juror 999). For the six stricken for hardship or inability to focus, see *Thompson*, No. 21-cr-161, ECF No. 106 at 44 (Juror 1513), 45 (Juror 1267), 49–50 (Juror 503), 50–51 (Juror 1290), 86–93 (Juror 229), 109–10 (Juror 1266).

[6] For those struck based on a professed inability to be impartial, see *Robertson*, No. 21-cr-34, ECF No. 104 at 26–34 (Juror 1431), 97–100 (Juror 1567); ECF No. 105 at 20–29 (Juror 936), 35-41 (Juror 799), 59–70 (Juror 696), 88–92 (Juror 429); ECF No. 106 at 27–36 (Juror 1010), 36–39 (Juror 585), 58–63 (Juror 1160). For those struck for other reasons, see *Robertson*, No. 21-cr-34, ECF No. 104 at 23–26 (Juror 1566, hardship related to care for elderly sisters), 83–84 (Juror 1027, moved out of D.C.); ECF No. 105 at 55–59 (Juror 1122, language concerns), 92–94 (Juror

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%), *Webster*, No. 21-cr-208, ECF No. 115 at 6, though it later excused one of those 35 based on hardship, *Webster*, No. 21-cr-208, ECF No. 114 at 217–18. The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster*, No. 21-cr-208, ECF No. 113 at 19. During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly. *See, e.g.*, *id.* at 32–33, 41–42, 54–56, 63, 65–66. Only 10 out of 53 prospective jurors (or about 19%) were stricken based on a professed or imputed inability to be impartial, as opposed to some other reason.[7] The *Webster* Court observed that this number "was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case. *Webster*, No. 21-cr-208, ECF No. 115 at 7.

In *Hale-Cusanelli*, the Court individually examined 47 prospective jurors and qualified 32 of them (or 68%). *Hale-Cusanelli*, No. 21-cr-37, ECF No. 91 at 106, 111. The Court asked prospective jurors questions similar to those asked in the other trials. *See Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 72–74 (Questions 16, 20). Of the 15 prospective jurors struck for cause,

---

505, work hardship); ECF No. 106 at 16–21 (Juror 474, work trip); 50–53 (Juror 846, preplanned trip).

[7] Nine of the 19 stricken jurors were excused based on hardship or a religious belief. *See Webster*, No. 21-cr-208, ECF No. 113 at 46 (Juror 1464), 49-50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951), 78 (Juror 419); *Webster*, No. 21-cr-208, ECF No. 114 at 102–04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror 176), 203–04 (Juror 1262). Of the ten other stricken jurors, three professed an ability to be impartial but were nevertheless stricken based on a connection to the events or to the U.S. Attorney's Office. *See Webster*, No. 21-cr-208, ECF No. 113 at 58–60 (Juror 689 was a deputy chief of staff for a member of congress); *Webster*, No. 21-cr-208, ECF No. 114 at 139–41 (Juror 625's former mother-in-law was a member of congress); 196–98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

11 (or 23% of those examined) were stricken based on a connection to the events of January 6 or a professed inability to be impartial.[8]

In these first five jury trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice." *Irvin*, 366 U.S. at 728. In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner." *Id.* at 727. The percentage of partiality-based strikes in these first five January 6-related jury trials—between 9% and 23% of those examined—is far lower than the 62% in *Irvin*. The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803. *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited. Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first five January 6-related jury trials have confirmed that voir dire can adequately screen out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified

---

[8] *See Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 61–62 (Juror 499), 67–68 (Juror 872), 84–85 (Juror 206), 91-94 (Juror 653); ECF No. 91 at 2–5 (Juror 1129), 32 (Juror 182), 36 (Juror 176), 61–62 (Juror 890), 75–78 (Juror 870), 94–97 (Juror 1111), 97–104 (Juror 1412). For the four jurors excused for hardship, see *Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 77–79 (Juror 1524), 99 (Juror 1094); ECF No. 91 at 12 (Juror 1014), 31 (Juror 899).

16

jurors to hear the case. The Court should deny the Defendant's request for a venue transfer and should instead rely on a thorough voir dire to protect the Defendant's right to an impartial jury.

## **CONCLUSION**

For the foregoing reasons, the Defendant's motion to transfer venue should be denied.

Respectfully submitted:

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

/s/ *Terence A. Parker*
Terence A. Parker
Trial Attorney (Detailee)
U.S. Attorney's Office for the
District of Columbia
NY Bar No. 5775192
Terence.Parker3@usdoj.gov
Phone: (202) 252-7859

/s/ *Brendan Ballou*
Brendan Ballou
Special Counsel (Detailee)
U.S. Attorney's Office for the
District of Columbia
brendan.ballou-kelley@usdoj.gov
Phone: (202) 431-8493