1           UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA

2
    * * * * * * * * * * * * * * * *    )
3   UNITED STATES OF AMERICA,         )    Criminal Action
                                      )     No. 23-00066
4                    Plaintiff,       )
                                      )
5       vs.                           )
                                      )
6   REBECCA LAVRENZ,                  )    Washington, D.C.
                                      )    March 28, 2024
7                    Defendant.       )    9:13 a.m.
                                      )
8   * * * * * * * * * * * * * * * *    )

9

10                  TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE ZIA M. FARUQUI
11            UNITED STATES MAGISTRATE JUDGE

12

13

    APPEARANCES:
14

    FOR THE GOVERNMENT:      BRENDAN BALLOU, ESQ.
15                           TERENCE A. PARKER, ESQ.
                             UNITED STATES ATTORNEY'S OFFICE
16                            FOR THE DISTRICT OF COLUMBIA
                             601 D Street, Northwest
17                           Washington, D.C. 20530

18

    FOR THE DEFENDANT:       JOHN M. PIERCE, ESQ.
19                           JOHN PIERCE LAW, P.C.
                             21550 Oxnard Street
20                           Third Floor
                             Woodland Hills, California 91367
21
                             ROGER ROOTS, ESQ.
22                           LAW OFFICES OF ROGER ROOTS
                             10 Dorrance Street
23                           Suite 700
                             Providence, Rhode Island 02903

24

25

1    REPORTED BY:              LISA EDWARDS, RDR, CRR
                               Official Court Reporter
2                              United States District Court for the
                                 District of Columbia
3                              333 Constitution Avenue, Northwest
                               Room 6706
4                              Washington, D.C. 20001
                               (202) 354-3269
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

|                                        | Direct | Cross | Red. |
|----------------------------------------|--------|-------|------|
| WITNESSES FOR THE GOVERNMENT:          |        |       |      |
| John Edward Jenkins, Jr.               | 35     | 47    |      |
|                                        |        |       |      |
| WITNESSES FOR THE DEFENDANT:           |        |       |      |
| Vickie Tonkins                         | 139    | 144   |      |
| Richard Green                          | 145    |       |      |
| Jennifer Lavrenz                       | 169    |       |      |
| David Sumrall                          | 193    | 235   | 242  |
| Robert Powell                          | 251    |       |      |


| EXHIBITS RECEIVED IN EVIDENCE          | PAGE |
|----------------------------------------|------|
| Government's Exhibit No. 313           | 41   |
| Defendant's Exhibit No. 20-A           | 95   |
| Defendant's Exhibit No. 46             | 204  |
| Defendant's Exhibit Nos. 19, 21, 22    | 229  |

```
 1              THE COURTROOM DEPUTY:  Criminal Case 23-66, the
 2   United States of America versus Rebecca Lavrenz.
 3              And this matter is set for jury trial.
 4              Parties, please introduce yourselves for the
 5   record, starting with the Government.
 6              MR. PARKER:  Good morning, your Honor.  Terence
 7   Parker on behalf of the United States accompanied by
 8   co-counsel, Brendan Ballou; our paralegal, Rachel Marcelin;
 9   and FBI Special Agent John Smith.
10              MR. PIERCE:  Good morning, your Honor.  John
11   Pierce and Roger Roots on behalf of Defendant Rebecca
12   Lavrenz, who is here at trial as well.  And with us is our
13   paralegal, Emily Lambert.
14              THE COURT:  Good morning, everybody.
15              So we're going to start by continuing with the
16   jury instruction conference.  Does that sound right?
17              And as I said, you can stay seated right at your
18   table.
19              So why don't you, Mr. Parker, Mr. Ballou, whoever
20   is taking it, keep us rolling.
21              MR. BALLOU:  Sure.
22              I believe we left off yesterday, your Honor, on
23   the mere presence --
24              THE COURTROOM DEPUTY:  Use the microphone, please.
25              MR. BALLOU:  Maybe I'll move to this side of the
```

Charge Conference

1     table.

2                    THE COURT:  Sure.  No problem.  Thank you.

3                    MR. BALLOU:  Thank you.  How about now?

4             Your Honor, I believe we left off with the mere

5     presence jury instruction.

6             The Government has two concerns with the global

7     instruction as it's currently drafted.  The first is, by the

8     emphasis on mere presence, the emphatic emphasis on mere

9     presence, intentionally or not, the instructions could lead

10    a jury to think that there's a higher knowledge requirement

11    for 1752(a)(1) than there actually is, transforming the

12    statute from a knowing requirement into a willful

13    requirement.

14            The second issue that we have is that in some

15    cases, mere presence can be sufficient for disorderly or

16    disruptive conduct for Counts 2 and 3.  As Inspector Hawa

17    testified back on Tuesday, a single person on the Rotunda

18    just standing there could be disruptive if you don't know

19    who that person is.

20            So I think in some cases mere presence can be

21    disorderly or disruptive.

22            We are conscious, your Honor, of your admonition

23    to think about:  Is there sort of a scope of this mere

24    presence instruction that would be acceptable to the

25    Government?

```
 1              And we did turn to the jury instruction that
 2      Mr. Roots pointed us towards in United States v. Gunby,
 3      G-U-N-B-Y.  We looked at that.
 4              That instruction was different in a crucial way in
 5      that it was an instruction limited to Count 4 -- the
 6      equivalent of Count 4 in this case, so parading or
 7      demonstrating.  The reason it was limited or applied to that
 8      one specifically as I understand it is actually concerns
 9      about the protected First Amendment activity, the idea being
10      the parading statute could be interpreted so broadly as to
11      encompass legitimate First Amendment impression.
12              THE COURT:  Let me interrupt.
13              MR. BALLOU:  Sure.
14              THE COURT:  Who was the judge on that case?  Do
15      you know?  Gunby?
16              MR. BALLOU:  I believe Gunby --
17              MR. ROOTS:  Friedman.
18              MR. BALLOU:  Friedman, your Honor.
19              THE COURT:  Continue.
20              MR. BALLOU:  And so in that case, as I understand
21      it, the instruction was added to address that constitutional
22      concern.  It was also drafted differently than how the
23      defense has proposed it for the global instruction.  It
24      sounds as if you may have already reviewed that.  If you
25      haven't, we have copies and we can give them to you.
```

```
 1                    THE COURT:  That would be great.  Could I see
 2         that?
 3                    MR. BALLOU:  (Tenders document to the Court.)
 4                    MR. ROOTS:  I think, your Honor, we just emailed
 5         it, maybe to Tiffany.  I'm not sure.
 6                    THE COURTROOM DEPUTY:  Yes.
 7                    THE COURT:  I'll just take a minute to read this.
 8                    MR. BALLOU:  Your Honor, the instruction begins at
 9         the bottom of Page 1589.
10                    THE COURT:  I want to turn back to your first
11         argument.  I'll let Mr. Roots or Mr. Pierce or both respond
12         to this.
13                    You believe that Inspector Hawa's testimony is
14         that mere presence in fact could be that she said that?  I
15         just want to hear that again from you.
16                    MR. BALLOU:  Yes, your Honor.
17                    My understanding of the testimony is that a single
18         unauthorized person in the Capitol could be disruptive to
19         their plan because I think the example she had was a person
20         could be carrying a bomb or something like that.  And
21         without knowing specifically what they have, a person's
22         presence, unauthorized presence, at the Capitol could be
23         disruptive.
24                    THE COURT:  Got it.
25                    And then I'll come to them in a second.
```

1          In terms of this *Gunby* instruction, understanding

2     that your preference is still not to have a mere presence

3     instruction, but if it were switched to what is our Count 4,

4     does that -- that addresses that concern.  It's just then

5     maybe that general confusion, et cetera, still is there.

6     But that would address that concern.  Correct?

7          MR. BALLOU:  Yes, your Honor.  For the record, I

8     think the Government thinks that the instruction speaks for

9     itself currently.  But I do believe it addresses the other

10    concerns that we raised.

11         THE COURT:  Mr. Roots?  I'm interested to hear

12    from you on that.

13         MR. ROOTS:  Yeah.  A couple points.

14         Number one, this proposition that, you know,

15    Congress cannot convene if even a single protester is

16    anywhere on the Capitol -- and I believe the Government even

17    says the grounds -- is written nowhere.  That is not a rule

18    that is written down anywhere.  Now, we've seen this

19    testimony in trials where these witnesses say this.  But

20    this is not a rule written down anywhere.  It's just -- it

21    comes out of the mouths of these witnesses who say these

22    things.

23         Number two, I would point out -- now, the

24    Government has provided the transcript where the mere

25    presence instruction immediately follows Count 4 in that

```
1    trial.
2              But that's -- it is not really attached to Count
3    4.  In fact, if you look at the jury instructions as they
4    were published, which is Document 114 in that -- in the
5    Gunby case -- forget the transcript.  It is separated from
6    Count 4.  It is not attached to Count 4.  It's a separate
7    jury instruction.
8              And really, it has to attach to Count 2.  Granted,
9    trespassing in Count 1, entering and remaining in a
10   restricted area, arguably mere presence can -- maybe that's
11   not a defense.
12             But Count 2, Count 3, Count 4, mere presence is a
13   defense.  Someone is not committing disorderly conduct by
14   their mere presence.  So we feel it really should attach to
15   all those three counts.
16             Granted, Count 1 is a little bit, you know -- it's
17   hard to say that mere presence is a defense to trespassing
18   or whatever.  But Count 2, disorderly conduct, mere presence
19   cannot be disorderly conduct.
20             THE COURT:  That's interesting.
21             Well, I'm not going to give you an answer on that
22   yet.  I'd like to come back to it.  Let's go to the next
23   one.
24             Well, actually, sorry.  One more question,
25   Mr. Roots.  To your knowledge, Gunby is the only case where
```

1    that mere presence instruction has been included; is that

2    right?

3            MR. ROOTS:  It's the only one I can think of off

4    the top of my head.  I know we have submitted it in some

5    other cases.  And as I recall, it's been rejected.  I forget

6    by whom.  But also, we have not -- we should have offered it

7    in every trial.  We've had eight or nine cases now, I think;

8    ten, maybe.

9            But anyways, I don't recall, is the answer.

10           THE COURT:  That's okay.  I just wanted to know.

11   We'll come back to it.

12           Sorry, Mr. Ballou.  What do you have next?

13           MR. BALLOU:  Probably the best way to do this

14   would then be to shift gears to ECF 60, which is the

15   instructions on the four counts.  And then we've attempted

16   to identify theories of disagreement in red footnotes.

17           So Footnote 2 is the first area of disagreement.

18   And there are two key sentences here.  So the first one that

19   the defense proposes is, quote, "As applied here, the

20   Defendant must have known that the former vice president was

21   visiting the area and the area was deemed restricted."

22           The second key sentence is, quote, "A person who

23   enters a restricted area with a good-faith belief that he is

24   entering with lawful authority is not guilty of the

25   offense."

1      The first sentence, I believe, has been squarely

2  addressed by our discussions on the motion *in limine* on the

3  restricted area definition.  And it seems fairly clear from

4  your instruction yesterday that the Defendant doesn't need

5  to have known that the former vice president was visiting

6  the area and that the area was deemed restricted.

7      On the second sentence, I think that this is an

8  attempt to essentially mold the statute, 1742(a)(1), to have

9  a higher knowledge requirement so that the person is not

10  just entering a restricted area knowingly, but that they

11  know they are violating the law when they do so.

12      And I don't think the statute supports that

13  addition.

14      THE COURT:  Mr. Roots, do you have anything in

15  response to that second part?  I understand you've got a

16  standing objection and the circuit has taken up the other

17  issue.

18      MR. ROOTS:  This goes more or less to what we

19  argued yesterday afternoon.  We would stand on our proposed

20  language.

21      THE COURT:  You all have set it out pretty clearly

22  here in other cases, I think.

23      I agree.  I'm going to follow the other cases in

24  this jurisdiction that I cited yesterday as to the related

25  element.  But I think that the addition is not necessary.  I

1   think I'll follow Judge Chutkan in *Nestor*, N-E-S-T-O-R, and

2   *Fiola* as well, F-I-O-L-A.  As I look to the instructions

3   there, they didn't add this additional language.

4           I think it is raising the sort of willfulness

5   element, the *mens rea*, to a standard that it's not supposed

6   to be.  So I'll incorporate by reference the judges'

7   decisions there.  I don't need to belabor the point.

8           I'm ready to go to the next instruction.

9           MR. BALLOU:  Your Honor, the next instruction

10  would be Footnote 3.  The defense is really just proposing

11  one additional sentence to the definition of restricted

12  building or grounds.

13          The sentence is that the physical boundaries of

14  the area must have been visibly marked.

15          Again, this is not in the statute and not required

16  by the statute.  And I think practically it just simply

17  isn't required to establish that something is a restricted

18  area.

19          While often a restricted area is visibly marked --

20  in this case, it would be by bike racks, snow fencing, signs

21  and police -- you can imagine a situation where there

22  wouldn't be those sorts of visible markers, but it would

23  still be clear that there was a restricted perimeter.

24  Verbal commands from police, a P.A. announcement system

25  could all be ways to make clear there was a restricted

```
 1    perimeter.
 2            So I don't believe the statute requires a visible
 3    marking element.
 4            THE COURT:  Again, I think this has been
 5    litigated.
 6            I'm happy to hear from you, Mr. Roots.  I know
 7    there's a Fourth Circuit case that supports this.
 8    Obviously, no judges here have used that.  I don't know if
 9    there's anything you want to add, but I'm happy to hear from
10    you.
11            MR. ROOTS:  Yeah.  I would just add that police
12    presence by itself cannot be -- you know, obviously, many
13    places have police presence, a rock concert or a state fair
14    or anything.  There'll be a police presence.  That can't be,
15    you know, an indicator that it's a restricted area.  It has
16    to be marked.  It has to be -- there has to be signs.  There
17    have to be cordoned-off things.
18            THE COURT:  That's not illogical, Mr. Roots.  I
19    understand what you're saying.
20            My concern is just there's not a court here.  I
21    follow -- as I've said, Carpenter I look to generally, and I
22    incorporate by reference Judge Boasberg's decision as to
23    this and all other arguments we've had as -- both at the
24    pretrial conference in terms of instructions.  They're
25    largely covered there.
```

Charge Conference

1          So *Carpenter*, C-A-R-P-E-N-T-E-R, 21-CR-205.  I

2     also incorporate by reference the *United States versus*

3     *Eicher*, E-I-C-H-E-R; *United States versus Lesperance*,

4     L-E-S-P-E-R-A-N-C-E; *United States versus Chwiesiuk*,

5     C-H-W-I-E-S-I-U-K; *United States versus Gietzen*,

6     G-I-E-T-Z-E-N.

7          Cases with this similar question have -- or

8     similar instruction have all used the instruction as

9     proposed and not with the additional language.

10          I know, I think again as to this and some of the

11     other instructions, we're confusing argument for

12     instruction.  I mean, there's argument that can be made

13     that -- about some of these issues.  But I don't think it's

14     as a matter of law -- I know that one of the questions that

15     we had was whether or not -- whether we are looking at this

16     definition:  The term "restricted building or grounds" means

17     any posted, cordoned-off or otherwise restricted area.

18          And when we're looking at this question, there

19     will still be arguments either way, or not, that Ms. Lavrenz

20     may not have seen things.  We've already heard testimony

21     about whether signs were only on the west front or east

22     front.

23          And so I anticipate that, you know, this is part

24     of the argument.  But I don't think it's appropriate as a

25     matter of law as an instruction.  I don't think the Fourth

1    Circuit case is compelling here.

2              So you can continue on to the fourth footnote.

3              MR. BALLOU:  Your Honor, the fourth footnote

4    concerns the definition of a person protected by the Secret

5    Service.

6              The key defense suggestion is the second sentence.

7    Quote:  "Defendant's actions must have occurred while the

8    former vice president was temporarily visiting and not after

9    his temporary visit had terminated."

10             I think the definition of "restricted perimeter"

11   speaks for itself here, but I will note that the language of

12   the statute refers to "visiting" and not "present."

13   "Visiting," I believe, is meant to encompass a sort of

14   broader range of behaviors.  Just to point to some

15   definitions here, I just looked this up in the dictionary.

16             The definition of "present" means existing or

17   occurring now.

18             So you might think that a person needs to be in

19   that building at that moment for the definition of

20   "restricted building" to apply, whereas the definition of

21   "visiting" includes "to reside temporarily as a guest, to go

22   see or stay at a place for a particular purpose or to go or

23   come officially to inspect or oversee."

24             The example given is, quote, "a bishop visiting

25   his parishes."  A bishop can't visit all parishes at the

1    exact same time, the idea being a visit can encompass both

2    when you're physically there and then some of the periods

3    intermediate, before or after.

4           I'll just say why this matters practically.  I

5    believe that the defense's argument seems to be that the

6    vice president's motorcade left the Capitol as the rioters

7    were advancing into the building.

8           There's been no testimony that the vice president

9    was in that motorcade.  But the practical impact, if this

10   instruction were adopted, is that if the rioters were

11   successful in forcing the vice president to flee the

12   Capitol, then it would no longer be a restricted perimeter,

13   the idea being as long as the rioters were successful in

14   taking over the building, it no longer became a crime for

15   them to be there.

16          I think practically that can't be what the

17   intention of the statute is.

18          THE COURT:  Mr. Roots, again, I think you've

19   thoroughly briefed this issue.  I'm happy to hear if you

20   have anything to add.

21          MR. ROOTS:  Yeah.  Well, the Government just said

22   that the phrase "temporarily visiting" is broad.

23          I argued yesterday, again, that it's narrow

24   because it has to be read in construction with the subpart

25   directly above, which mentions the White House.  And so it

1    has to be read with that context.

2           Temporary visiting means temporary staying

3    somewhere, sleeping.  That's a temporary residence, motel,

4    whatever.  It's not somewhere where in this case, for

5    example, where there's an actual office.  That's not

6    temporary visiting.

7           Pence had an office inside the Capitol, and it was

8    protected by armed forces of all kinds at all times.  So,

9    you know, that can't be a part of the definition of a

10   restricted area.

11          THE COURT:  I think it's an argument you made in

12   multiple cases, and I think it's an interesting one.  I

13   mean, it's academic to some extent.

14          Well, let me put it this way:  It's something that

15   circuits, I'm sure, will spend much time thinking about.

16   But I'm looking at my district court colleagues here; and

17   I'll follow *Carpenter*, which does not include this language.

18   I think I'll incorporate the reasoning by Judge Boasberg

19   there.

20          I think that this squarely falls within the

21   question of what is a temporary visit.  I mean, it was

22   not -- although he may have used an office, there's no

23   indication -- it's not something that wasn't a temporary

24   visit.  No one's arguing he was permanently there.  In fact,

25   he was coming through what seemed to be just a very quick

1    trip.

2            I think the definition suggested by the Government

3    indicates that, you know, this is not an appropriate

4    instruction.  So I'm not going to use it.

5            You can go to the next one, which is the

6    knowingly.

7            MR. BALLOU:  Yes.  This is Footnote 5, where the

8    defense proposes an additional sentence, that, quote,

9    '"Knowingly' refers to knowledge of the facts constituting

10   the offense."

11           And just very briefly, I think that the knowing

12   definition that we provided has been used in many cases so

13   far.  It's based on model jury instructions.  It's not clear

14   to me what this additional sentence even adds to the

15   instruction.  And just -- it just isn't necessary here.

16           MR. ROOTS:  I'll just say it really -- this

17   actually should apply here, because the Government's

18   proposition is -- it creates really a dangerous notion that

19   the Government gets to declare almost *sua sponte* at times,

20   Here's this majestic, powerful wizard.  We're going to

21   spread a carpet out, even though no one knows where this guy

22   is.  And you can actually be jailed in America for being in

23   a restricted area because we say so.

24           And this can be so arbitrary.

25           So it has to have a higher degree of knowledge of

1      the Defendant before they actually are arrested for being in

2      a restricted area.  I mean, it would become ridiculous and

3      it becomes tyrannical, where this powerful government just

4      has powerful figures that can just say, Hey, we're throwing

5      out a carpet around me.  I'm so powerful.  Anybody within

6      this area gets arrested for being in a restricted area.

7             It's ridiculous.

8             THE COURT:  So we have within their language --

9      and I think that that language again is sufficient.  It

10     describes what "knowingly" is, that it's purposeful.  I

11     mean, this idea that you have to understand and know the

12     offense, I think it's creating a higher burden that simply

13     no court has imposed.  And I don't know why it's not

14     duplicative of what's already said.

15            I mean, it says in the proposed instruction, "A

16     person acts knowingly if she realizes what she is doing, is

17     aware of the nature of her conduct and does not act through

18     ignorance, mistake or accident."

19            I understand your frustration with the statute.  I

20     hear you.  I think your analogy to sort of the times of the

21     Redcoats and things like that -- I hear you.  It feels a bit

22     royal that you can just sort of say, This now is a protected

23     area, things like that, and people may not know.

24            But I think that's what this instruction goes to,

25     is that it's going to ignorance, mistake or accident.

1          So I think it's duplicative.  And again, citing

2      the cases I did before, it's not an instruction that's been

3      used.  So I will not include it.

4          We can go to Footnote 7, I believe.

5          MR. BALLOU:  Yes, your Honor.

6          The defense is proposing two sentences here that I

7      think are addressed separately.  The first sentence says,

8      "Mere political expression, petitioning for redress of

9      grievances or prayer may not be considered disorderly or

10     disruptive."

11         I think this is squarely addressed by your rulings

12     on the defense's proposed First Amendment instructions.

13         The second is:  "Nor does mere presence by walking

14     or standing with others constitute disorderly conduct."

15         For the reasons that we just discussed, there are

16     situations where a person standing or walking with others

17     could certainly be disorderly or disruptive.

18         So I think it runs contrary to the testimony that

19     we heard and the nature of the statute and the kind of

20     conduct that it's trying to prohibit.

21         Again, the Government would -- does not believe

22     that a mere instruction -- mere presence instruction is

23     necessary at all, but we understand if there is going to be

24     one it would be most appropriate for Count 4.

25         MR. ROOTS:  Yeah.  I think we've argued this.

1        THE COURT:  We did.  Yes.

2        MR. ROOTS:  Quite a bit.  It can't be disruptive

3    or disorderly conduct to be in a place or -- to be in a

4    place to advocate for a political position, especially at a

5    legislative Capitol.

6        THE COURT:  Well, as we started to look into this,

7    my intrepid law clerk here, Ms. Jensen, just sent me the

8    citation from *United States versus Griffith*,

9    G-R-I-F-F-I-T-H.  And that's 2003 Westlaw 3477249 at Page 5.

10        There, Judge Kollar-Kotelly says, "Even mere

11    presence in an unlawful mob or riot is both, one, disorderly

12    in the sense that it furthers the mob's disturbance to the

13    peace and, two, disruptive insofar as it disturbs the normal

14    and peaceful condition of the Capitol grounds and buildings,

15    its official proceedings and the safety of its lawful

16    occupants.

17        "Were it not, it must be said that continued

18    presence in a mob that is being pepper sprayed by police as

19    a measure to control the rioters is disorderly insofar as a

20    person's continued presence clearly impedes law

21    enforcement's efforts to regain control of a particular

22    area.

23        "Additionally, entering a Capitol building without

24    authorization is necessarily not according to order and

25    rule, unruly and may disrupt congressional activity insofar

Charge Conference

1    as Capitol Police would seek out and detain anyone who

2    enters a Capitol building without authorization."

3            She goes on to say, "Thus, even mere presence in

4    these circumstances is, in fact, disruptive.  Even the

5    presence of one unauthorized person in the Capitol is reason

6    to suspend Capitol business."

7            So I still am going to consider the mere presence

8    instruction for the parading, but I think receiving that

9    sort of goes along the lines of what I think Mr. Ballou said

10   earlier.

11           So for that reason, I think it's not appropriate

12   here.  I understand you have a standing objection to that

13   sort of line of argument, though.  I'll let you preserve

14   that.  I'm sure you've had that in other cases.  It's on

15   appeal already.

16           So I will follow both Judge Kollar-Kotelly there

17   in *Carpenter*, where in the transcript of *Carpenter* as to

18   Count 4, Page 12, of the jury instructions, I believe, they

19   don't include this new language.

20           I see that both sides have cited this *Alford*

21   decision, A-L-F-O-R-D, which makes clear that what is

22   disorderly depends on the circumstances and it's a factual

23   determination.

24           So I think this is an argument for you to make, is

25   that Ms. Lavrenz was not there simply in there disrupting

1     anything.  There may have been other people doing horrendous

2     things, but she's not guilty by association.  But I don't

3     think we need an instruction to make your argument.  I think

4     that's what your argument is for.

5             Of course, the Government will respond how they

6     want to.  But it sounds like their argument continues to be

7     one person could be disruptive and that one person when

8     other people are doing things can be disruptive.

9             And so let's leave that for argument.  I don't

10    think that's necessary as an instruction.

11            We can go to the next one.

12            MR. BALLOU:  Your Honor, I believe the next

13    instruction is Footnote 13.  This is a proposed addition to

14    the definition of "willfully."

15            The first sentence says:  As a general matter, a

16    willful act is one undertaken with a bad purpose.

17            Your Honor, I think the phrase "bad purpose" is

18    entirely unclear and is going to confuse the jury.  I don't

19    think that there is legal foundation for using that phrase.

20    I have not seen it.  And I'm not aware of the defense citing

21    any cases that use it.

22            The current definition that's used in many cases

23    is much clearer to a jury, where it says that a person acts

24    willfully if she acts with the intent to do something that

25    the law forbids, that is, to disobey or disregard the law.

1          That's an instruction that the jury can

2    understand.  Trying to divine what a bad purpose is is a

3    matter more for perhaps a theologian.

4          The other proposal that the defense has says that

5    the term "willfully" means the Defendant must have acted

6    with knowledge that his conduct was unlawful.  To find that

7    the Defendant acted willfully, the jury must find the

8    Defendant prayed with an evil-meaning mind, that the

9    Defendant acted with knowledge that the act of praying was

10   unlawful.

11         Your Honor, once again, it's not clear what is

12   meant by "praying with an evil-meaning mind" and that the

13   addition of acting with the knowledge that the act of

14   praying was unlawful -- it's not the Government's contention

15   that the Defendant's actions was prayer.

16         So I think in addition to being confusing to the

17   jury and beyond the scope of the statute, it is simply

18   unnecessary here.

19         THE COURT:  Well, Mr. Roots, I do think of you as

20   a theologian a bit.  I'm happy to hear from you.  It's an

21   interesting instruction.

22         I guess let me just front to you my concerns, just

23   that it is a bit vague.  To be generous, I think it could

24   cause a lot of confusion for the jury to start with the

25   first portion.  I mean, what does it mean -- what's bad

1    purpose?

2            And I think that's really nebulous, hard for me to

3    sort of quantify what that is.  I mean, I understand sort of

4    spiritually what it means, is what I try to explain to my

5    wife every day that my 9-year-old son is doing things

6    willfully and he has no good purpose.  But it's hard for a

7    jury I think in a court of law.  What does that mean?  It's

8    very nebulous.

9            We have already within this instruction the

10   definition that I think provides fertile ground for you to

11   argue, that a person acts willfully with the intent to do

12   something the law forbids, that is, to disobey or disregard

13   the law.

14           So I think that there is already good grounds for

15   you to get in what that means.

16           And then as to the second part here, obviously, I

17   mean, knowing that that conduct was unlawful, I don't think

18   that is an accurate statement of the law.  I mean, the

19   standard instruction has this other component:  Willfully,

20   does not, however, require proof that the Defendant be aware

21   of the specific law or rule that his conduct may be

22   violating.

23           Finally, you state -- you defined "willfulness"

24   as:  You must know that the act of praying was unlawful.

25   And again, I think that there's no sort of -- that's not

1    moored in any case law.  I understand it's an argument and

2    perhaps an argument that you will make.  I don't see any

3    case law to support this.  Perhaps again you'll create that

4    in the future.

5         But I'm hesitant here to see what some -- where

6    there's such vagueness and potential for confusion, it's

7    really hard for me.

8         So I mean, I'm happy to hear from you; but I think

9    you've already kind of laid this out, Mr. Roots.

10        MR. ROOTS:  Yeah.  Now, that language -- I forget

11   where the source was, but that language was -- I'd have to

12   look that up.  But we can just stand on what we're...

13        THE COURT:  I know you were citing to *United*

14   *States versus Brian*.  So we'll know it's not simply from the

15   theologian Roger Roots, one of my favorites, but it is --

16   there is a basis in law to what you're asking for.  It's

17   just that I don't see similar charges that we've had here

18   with other judges considering this.

19        So I follow their direction; again, you know,

20   *Carpenter* and the other cases I've cited.  So I will -- I

21   reject that instruction.

22        We can go to I think the Count 4 addition.

23        MR. BALLOU:  Yes.  This is --

24        THE COURT:  I think the defense proposes the

25   addition "Praying within the Capitol Building does not fall

1    within the terms 'parading, demonstrating or picketing.'"

2    Correct?

3              MR. BALLOU:  Exactly.

4              THE COURT:  Again, I think this -- I don't think

5    that there is case law to support this distinction about

6    prayer.

7              I think there's a fine argument for you to make

8    that your client -- as I've already stated, her conduct may

9    have been different than others' and that -- why you don't

10   believe that she was parading, demonstrating or picketing

11   but that she was doing something totally different, and

12   therefore it doesn't meet the elements.

13             The first element is that the Defendant paraded,

14   demonstrated or picketed and she did so willfully and

15   knowingly.  So this has limited definitions.  Distinct --

16   "parade" and "picket" have their ordinary meanings.  I think

17   that's fairly clear.  I think it's fairly easy for you to

18   note that few, if anyone, would think that praying is

19   parading or picketing; and when it defines demonstration, it

20   talks about disrupting business.

21             So again, that's something that you could argue if

22   you wanted to.  But I don't think it's something that has an

23   instruction that has a basis in law.  I think it would be

24   vague and confusing.

25             But I will continue to consider whether -- I think

1    your mere presence instruction as to Count 4, I'll put a pin

2    on that and come back to it later.

3                 MR. ROOTS:  If I could make one little addition.

4                 THE COURT:  Please, Mr. Roots.

5                 MR. ROOTS:  You know, this statute really doesn't

6    have a lot of case law that's at a high level.

7                 But the case that is always cited is Judge

8    Friedman's case from about 25 years ago, called the *Bynum*

9    case.  And the *Bynum* case involved a question of a prayer

10   group that was going around inside the Capitol praying

11   quietly.  And Judge Friedman -- that was many years ago --

12   wrote that great opinion.  He says -- he concluded that the

13   inside of the Capitol is not a free speech zone or -- you

14   know.

15                But he said that praying quietly as long as it

16   doesn't disrupt Congress is protected under the First

17   Amendment, even inside the Capitol.

18                And so actually, you know, we -- I think where it

19   says the definitions, the terms "parade" and "picket" have

20   their ordinary meanings.  The term "demonstrate" refers to

21   conduct that would disrupt the orderly business of Congress.

22                I think that *Bynum* decision, which is very well

23   written and thought out, really applies to parading and

24   picketing as well; in other words, that there is business of

25   First Amendment protection even inside the building for

1    nondisruptive parading and picketing.

2            As I recall, Judge Friedman even said speaking,

3    speeches in the halls of the Capitol, as long as they don't

4    disrupt anything, have some protection.

5            So I would actually offer that parade and picket

6    should also be in that second sentence.  It should say, "The

7    terms 'parading,' 'picketing' and 'demonstrating' refer to

8    conduct that would disrupt the orderly business of

9    Congress."

10           THE COURT:  So I'm not going to ask for -- we can

11   come back on that.  But that doesn't cause me great

12   violence.  I mean, I think the point is not about

13   demonstrating.  I think demonstrating -- the same thing is

14   true for picketing as for demonstrating.

15           I think they all -- it seems logical to me what

16   Mr. Roots is saying.  They refer to conduct that would

17   disrupt the orderly business of Congress, for example, by

18   impeding or obstructing passageways, hearings or meetings,

19   but it does not include activities such as quiet praying.

20           So in this term here, when we are looking at this,

21   I think that to the extent that we have -- I'm not sure why

22   we're only carving out "demonstrating," to say it has some

23   sort of different function.  I would think that "parade" or

24   "picket" would also refer to conduct that would disrupt the

25   orderly business of Congress.

1        So I'd like you all to kind of think on that,

2  because I understand this is the instruction that's been

3  used in *Barnett*, B-A-R-N-E-T-T, and *Alam*, A-L-A-M.

4        MR. ROOTS:  And by the way --

5        THE COURT:  Mr. Roots, let's not snatch defeat

6  from the jaws of victory here.  But go ahead.  That's our

7  rule in chambers.

8        MR. ROOTS:  Just as support for this, Judge

9  Friedman himself, the author of the *Bynum* decision, in that

10  *Gunby* case, I believe, agreed and instructed that those

11  other terms, picketing and parading, should also be in that.

12  So yes.  As support for this, I think Judge Friedman, the

13  author of the decision, himself agreed.

14        THE COURT:  And maybe we'll take a look at the

15  instructions from ours.  I know you all -- it's harder for

16  you to juggle two things at once; and us, we're less

17  involved in the trial than you are.  So I'll have my law

18  clerks look up that transcript for you as well.

19        But if you have it handy, perhaps we can see what

20  he did in *Bynum*.  But we'll come back to that.  We'll put a

21  pin in it.  But it's just something for the Government to

22  think about.

23        So that's the final on ECF 60; is that right?

24        MR. BALLOU:  Yes, your Honor.

25        THE COURT:  So I had one -- I think maybe we

1    missed one that I saw, which was from ECF 36.  The defense

2    has an extra addition they want for -- or one that Mr. Roots

3    and I have talked about, I'll note for the record a very

4    interesting *Law Review* article written in the *Seton Hall*

5    *Circuit Review* in 2012 by one Roger Roots.

6             It comes as to Instruction 8, the burden of proof.

7    And Mr. Roots and I have discussed this, the *Barron* trial.

8    But this is his question about -- if you have ECF 36 handy

9    or if you want to pull it up, that's on Page 17.

10            He believes that the instruction which typically

11   says "It is your duty to find her guilty of the offense"

12   should be that "you may."

13            Is that right, Mr. Roots?

14            MR. ROOTS:  Yes.  Yeah.

15            THE COURT:  I'll give you all -- if you're able to

16   pull it up, I just want to flag that for you, Mr. Ballou.

17   So we don't do "gotcha" stuff here.

18            So when we're going to talk about the other

19   instructions, can you take a look at that one as well in ECF

20   36, Page 17?

21            MR. BALLOU:  Yes, your Honor.

22            THE COURT:  And I think that's the only one.  I

23   think that one was inadvertently left out of ECF 60.

24            Mr. Roots, are there any other instructions that

25   you think that there's a dispute about?  Sometimes it

```
 1    only -- it becomes clear once we put the clean copy

 2    together.

 3             MR. ROOTS:  We actually would like to propose a

 4    theory-of-the-defense instruction, which would be like a

 5    paragraph, actually, similar to the Gunby.  We just sent the

 6    Gunby jury instructions.

 7             We didn't have a theory-of-the-defense

 8    instruction.

 9             THE COURT:  I'll just ask you this.  Maybe at the

10    end of lunch today we can revisit this.  We're going to

11    revisit the mere presence.  We'll talk about this

12    instruction here, the burden of proof, presumption of

13    innocence, and if you have another instruction I'd like you

14    to get that.  Do you have it ready now to send it?

15             MR. ROOTS:  We could base it on that Gunby

16    instruction.

17             THE COURT:  Can you copy and paste that and send

18    that out to all of us?

19             MR. ROOTS:  Yeah.

20             THE COURT:  I'll give you a couple minutes before

21    we get started.  I'd like to get that email circulated so we

22    can at the end of lunch discuss it.

23             Is there anything else, Mr. Roots, in terms of

24    jury instructions?

25             MR. ROOTS:  Back to that -- this idea that jurors
```

1    have a duty to convict:

2            I do note that was already given to this jury

3    previously in that -- in the jury's first initial

4    instructions the other day.

5            So I think that should be -- there should be a

6    limiting instruction to correct that.

7            THE COURT:  I thought of you when I gave the

8    instruction, Mr. Roots.  So we'll talk about that at the end

9    of lunch.

10           Do you anticipate your testimony from witnesses

11   today will take up the whole day?  More than the whole day?

12   Less?  It sounds like --

13           MR. PIERCE:  More than a whole day, your Honor.

14           THE COURT:  All right, Mr. Pierce.  You said that

15   with great conviction.

16           So are you expecting your remote witnesses today?

17           MR. PIERCE:  One of them, Mr. Sumrall, I believe,

18   will probably be early to midafternoon.

19           THE COURT:  Let's hear from the United States,

20   then.  Any thoughts about -- I understand your general

21   objection.  But setting that aside, anything more specific

22   that you want to raise other than what you told me before?

23           MR. PARKER:  No.  Nothing additional to what we've

24   told your Honor before.

25           We had a point on a number of character witnesses,

1    and we've looked into some case law on that.  I don't know

2    if your Honor would like to cover that now or wait until

3    later.

4              THE COURT:  How many do we think we're going to

5    get, I guess?

6              MR. PIERCE:  Oh, we're only -- well, we're going

7    to have two that speak to character.  One of them is also

8    going to be a little bit of a fact witness.  So one pure

9    just character witness.

10             THE COURT:  Two total?

11             MR. PIERCE:  Two.

12             MR. PARKER:  No problem, then.

13             THE COURT:  The power of deterrence, Mr. Parker.

14             Thank you for keeping it to two.

15             Anything else from the United States?

16             MR. BALLOU:  Yes, your Honor.

17             THE COURT:  Your Capitol Police officer is ready?

18             MR. BALLOU:  Yes.

19             THE COURT:  Do you all need a minute or two to get

20   ready or we're ready to go?

21             MR. BALLOU:  We're ready to go.

22             THE COURT:  Mr. Pierce, Mr. Roots?

23             MR. PIERCE:  Yes, sir.  Ready to rock and roll.

24             MR. BALLOU:  Oh, perhaps just a short bathroom

25   break?

```
 1                THE COURT:  Sure.  That's just fine.  Do you want
 2      to say five minutes?
 3                MR. BALLOU:  Thank you.  Thank you, your Honor.
 4                (Thereupon a recess was taken, after which the
 5      following proceedings were had:)
 6                THE COURT:  You can be seated.
 7                Ready for the jury?
 8                MR. PARKER:  Yes, your Honor.
 9                (Whereupon, the jury entered the courtroom at
10      10:08 a.m. and the following proceedings were had:)
11                THE COURTROOM DEPUTY:  Please be seated.
12                THE COURT:  Thanks for your patience this morning
13      as we handled some legal issues that needed to be resolved.
14      I appreciate you all being patient.
15                If the United States wants to call its next
16      witness.
17                MR. BALLOU:  Thank you, your Honor.
18                The Government calls Lieutenant John Jenkins.
19                THE COURTROOM DEPUTY:  Good morning, sir.
20         JOHN EDWARD JENKINS, JR., GOVERNMENT WITNESS, SWORN.
21                THE COURTROOM DEPUTY:  Thank you.  You may be
22      seated.  Please speak into the microphone.
23                          DIRECT EXAMINATION
24      BY MR. BALLOU:
25      Q.  Good morning.
```

1    A.  Good morning, sir.

2    Q.  Can you please state and spell your name for the record?

3    A.  John Edward Jenkins, Jr.  Do you need the spelling as

4    well?

5    Q.  Maybe just the Jenkins.

6    A.  Sorry.  J-E-N-K-I-N-S.

7    Q.  Where do you work?

8    A.  U.S. Capitol Police.

9    Q.  What is your position?

10   A.  I'm currently a lieutenant with the Capitol division,

11   CVC section.

12   Q.  What's the CVC section?

13   A.  Capital Visitor Center.

14   Q.  How long have you been with the Capitol Police?

15   A.  I was on since 2004.

16   Q.  Have you worked anywhere else?

17   A.  I was in the Virginia National Guard.  I was deployed

18   right after I got out of the academy in 2004, was in Iraq in

19   2007.

20   Q.  How long did you serve in Iraq?

21   A.  Approximately one year.

22   Q.  Did you receive any commendations for your military

23   service?

24   A.  I did, sir, quite a few; but to include the Purple

25   Heart, the Bronze Star for valor in combat.

1    Q.  Were you at the Capitol on January 6th, 2021?

2    A.  Yes, sir, I was.

3    Q.  And for simplicity's sake, when I refer to January 6th,

4    I'm talking about January 6th, 2021.

5    A.  Yes, sir.

6    Q.  What was your role that day?

7    A.  I was a sergeant at the time.  I was in charge of a

8    crowd management unit.  We needed to ensure the police line

9    was secure, which was on the east front of the Capitol for

10   us specifically.

11   Q.  Can you just walk us through your morning that day?

12   A.  Absolutely.

13        Approximately 0700 hours, or 7:00 a.m., we did a

14   roll call, which is just basically making sure everyone's

15   there and briefed up the best we can on what we were

16   expecting that day.

17        Then we went to our area of assignment.  Like I

18   said before, it was the east front.  There was already a

19   crowd there.  From there, we all formed up, lined up along

20   the bike racks that were setting up the perimeter.

21        Approximately 1:00 p.m., or 1300 hours, the crowd

22   got -- seemed to get more agitated, and they did throughout

23   the day, before they ended up breaking through that line.

24   Yes, sir.

25   Q.  When you say "agitated," what do you mean by that?

Jenkins - DIRECT - By Mr. Ballou

1    A.  Just a lot of angry speech and aggressive behaviors.  At

2    one point the crowd -- I could hear a Taser being activated.

3    So it just appeared that they were about to rush, you know.

4    I believe I heard somebody even say that.  Then they broke

5    through our line.

6         A little bit before that, I was accidentally hit

7    by one of the officers in a leg with a baton.  So I was a

8    little less mobile than normal.

9         Once they broke through -- do you want me to keep

10   going, sir?

11   Q.  Please.

12   A.  Once they broke through, we had to fall back into an

13   area which was the steps going into the Rotunda.  Before --

14   just before I could get there, I looked back.  I could see

15   two officers standing by themselves, which I deemed to be

16   very unsafe for obvious reasons.

17        I went back into the crowd that was oncoming to

18   get those officers' attention and then get them to fall

19   back.

20        MR. BALLOU:  Can we pull up Government's Exhibit

21   313, which has not yet been admitted.

22        THE COURT:  Mr. Ballou, we've got it up.

23        MR. BALLOU:  I'm just waiting for her to pull it

24   up.

25        THE COURT:  It's okay.  You don't have it on your

1    screen?  The witness sees it.  I see it.

2              THE COURTROOM DEPUTY:  There is a blue light at

3    the bottom to turn it on.

4              MR. BALLOU:  I see a power button.  Now I can see

5    it.

6              THE COURTROOM DEPUTY:  Perfect.

7    BY MR. BALLOU:

8    Q.  Just looking at this image, do you recognize where this

9    is?

10   A.  The east front of the Capitol.

11   Q.  Do you recognize what day it was?

12   A.  January 6th.

13   Q.  And you were on the east front that day?

14   A.  Yes, sir.

15             MR. BALLOU:  The Government moves to admit 313.

16             MR. ROOTS:  Objection.

17             (Whereupon, the following bench conference was

18   held:)

19             THE COURT:  Go ahead, Mr. Roots.

20             MR. ROOTS:  Yeah.  We just got this exhibit last

21   night.  We reviewed it.  It's got lots of hearsay in it,

22   many different people saying different things, you know,

23   some of which are very both confusing and unfairly

24   prejudicial.

25             You know, there's even violent talk in this, which

1    can't even be remotely associated with Ms. Lavrenz, who's

2    way -- at least, you know, 50 to 100 feet or yards from this

3    area.

4                So we object on relevance and on 403.

5                THE COURT:  Can I just ask, what is this video?

6    Is this a video of the officer making that hand gesture?

7                MR. BALLOU:  It is, your Honor.

8                THE COURT:  We've already covered the hearsay

9    things.  But I'm sensitive to Mr. Roots.  At this point, I

10   mean, I just want to talk about the hand gestures.  Do we

11   really need audio for any reason on this?  Or why is that

12   important?

13               MR. BALLOU:  I think it's important for the jury

14   to understand why he was gesturing to these officers.  He

15   just testified he was worried for their safety.  I think the

16   audio for that helps make clear why they were in danger, not

17   because of any specific phrases or words that are said, but

18   just the general sound and agitation of the crowd.

19               I can say we are not offering this evidence for

20   any specific thing that a person said.  In fact, aside from

21   orienting the witness for when the line broke, we're just

22   going to show him when he gestured to them.  So it's a

23   minute or less of video content.

24               THE COURT:  Well, I don't want him testifying

25   about what people are saying.  I don't think we need to get

1    into that.

2              But we'll overrule the objection and allow it to

3    be shown, again, for the reasons stated yesterday.  I think

4    the same thing.  But both sides have elicited testimony from

5    witnesses about what people are saying in these audio clips.

6    I don't think it's hearsay because it's not for the truth.

7    They're not saying these people said that for any truth.

8    It's simply to set the scene and it was there -- it appears

9    to be present sense impression.

10             So I'll allow it.

11             (Whereupon, the following proceedings were had in

12   open court:)

13             MR. BALLOU:  The Government moves to admit.

14             THE COURT:  Over the objection, I will admit it

15   and publish it with the directions that I gave you.

16             (Whereupon, Government's Exhibit No. 313 was

17   entered into evidence.)

18             MR. BALLOU:  Can we play for just ten seconds to

19   orient the jury about where this is.

20             (Whereupon, segments of Government's Exhibit

21   No. 313 were published in open court.)

22             MR. BALLOU:  Can we advance to 14:50 and play

23   until about 15:20.

24             (Whereupon, segments of Government's Exhibit No.

25   313 were published in open court.)

1    BY MR. BALLOU:

2    Q.  Lieutenant, what just happened here?

3    A.  The people broke through our police line.  You can see

4    the metal bike racks.  The way it's set up, they were

5    intended to block people from entering that area.  Like I

6    said, I mean, you could see it coming just by their

7    behavior, screaming like you heard and things like that.

8    Q.  Do you remember what you were wearing on January 6th?

9    A.  Yeah.  It was really cold that day.  Really cold.  I had

10   my cruiser jacket on and like a knit cap from Capitol

11   Police.  I also had -- COVID was still going on.  I had a

12   mask covering as well.

13   Q.  Okay.

14          MR. BALLOU:  Let's play until 1:39.

15          (Whereupon, segments of Government's Exhibit No.

16   313 were published in open court.)

17   BY MR. BALLOU:

18   Q.  Oh, and let's see if you can identify yourself.  And

19   we'll go back to the key moment here.

20   A.  Sure.

21          (Whereupon, segments of Government's Exhibit No.

22   313 were published in open court.)

23   BY MR. BALLOU:

24   Q.  Did you see yourself there?

25   A.  I did, yes.

```
 1                    MR. BALLOU:  Can we go back to 15:35 and then just
 2        sort of frame forward.
 3                    (Whereupon, segments of Government's Exhibit No.
 4        313 were published in open court.)
 5        BY MR. BALLOU:
 6        Q.  Can you spot yourself here?
 7        A.  The flag's kind of blocking me a little bit.
 8        Q.  On your screen, you can actually circle it where you
 9        are.
10        A.  (Witness indicates.)  I didn't do a very good job.
11        Sorry.
12        Q.  I think you did well enough.
13        A.  Okay.
14                    MR. BALLOU:  We can play until 15:39 again.
15                    (Whereupon, segments of Government's Exhibit No.
16        313 were published in open court.)
17        BY MR. BALLOU:
18        Q.  Did you see yourself doing a waving motion?
19        A.  I did, yes.
20        Q.  Why were you waving?
21        A.  Like I said, prior to that, we had fallen back.  I
22        noticed those two officers.  You can see them approaching
23        me.  They were left by themselves with what I deemed an
24        angry crowd.  They were -- they just broke our police line.
25        I thought they were in danger, so I went back to get them
```

Jenkins - DIRECT - By Mr. Ballou

```
 1    and hopefully get them in a more secure, safer area, like
 2    the well itself.
 3    Q.  Were you waving to the protesters at all?
 4    A.  No.
 5    Q.  Did you see any other officers waving to the protesters
 6    at that point?
 7    A.  No, sir.
 8    Q.  Did you hear any of the officers --
 9    A.  No.
10    Q.  Okay.  And --
11              THE COURT REPORTER:  I didn't get a full question
12    on the record, counsel.
13    BY MR. BALLOU:
14    Q.  Did you hear any of the protesters -- any of the
15    officers welcoming the protesters in?
16    A.  No, sir.
17              MR. BALLOU:  Can we go back to -- well, actually,
18    we'll come back to this.
19              Can we pull up Defense Exhibit 52.  Let's play
20    this in its entirety.
21              (Whereupon, Defendant's Exhibit No. 52 was
22    published in open court.)
23    BY MR. BALLOU:
24    Q.  Do you see yourself in that video?
25    A.  I do, yeah.  Yes, sir.
```

1    Q.  Were you waving in that video?

2    A.  I was.

3    Q.  Was that the same video --

4    A.  Yes.

5    Q.  Was that the same moment?

6    A.  Yes.

7              THE COURT:  Hold on one second.

8              UNIDENTIFIED JUROR:  The screen's not working.

9              THE COURT:  Let's play the video again.

10             (Whereupon, Defendant's Exhibit No. 52 was

11   published in open court.)

12             THE COURT:  I'll just ask if we can make sure if

13   we can all just try to wait until we get the full question

14   out.  I know it's hard.

15             THE WITNESS:  Yes, sir.

16             MR. BALLOU:  I get a little --

17             THE COURT:  You're fine.

18   BY MR. BALLOU:

19   Q.  Was that you waving in that video?

20   A.  Yes, sir.

21   Q.  Was that the same moment?

22   A.  I believe, yes, sir.

23   Q.  And again, who were you waving to at that moment?

24   A.  Two officers.

25   Q.  Were you waving at any protesters at that point?

 1    A.   No, sir.

 2              MR. BALLOU:   Can we go back to Government's

 3    Exhibit 313 and jump to 15:35 and then play until about

 4    15:37.

 5              (Whereupon, segments of Government's Exhibit No.

 6    313 were published in open court.)

 7    BY MR. BALLOU:

 8    Q.   I'm circling what appears to be some sort of green

 9    structure.

10              Do you see that?

11    A.   Yes, sir.

12    Q.   Do you know what that is?

13    A.   I think it's a light that we have out there.

14              MR. BALLOU:   Can we pull up Government's Exhibit

15    104, which has previously been admitted.   Actually, 104-A.

16    Sorry.   And can we advance to 2:20.

17    BY MR. BALLOU:

18    Q.   Do you see the person circled in yellow here?

19    A.   Yes, sir.

20              MR. BALLOU:   We can play until 2:22.

21              (Whereupon, segments of Government's Exhibit

22    No. 104-A were published in open court.)

23    BY MR. BALLOU:

24    Q.   Do you see this green structure here?

25    A.   I do.

1   Q.  Can you just take a look at the video?  Do you see any

2   other green structures in this area here?

3   A.  No, sir.

4   Q.  Lieutenant, have you -- can you say again how long

5   you've worked for the Capitol Police?

6   A.  Since 2004.  July 1st will be 20 years.

7   Q.  Are you familiar with the Capitol grounds?

8   A.  Yes, sir.

9   Q.  Have you had the opportunity to work on the east front

10  before January 6th?

11  A.  Yes.

12  Q.  Very approximately, what is the distance from the green

13  structure to the person circled in yellow?

14  A.  Anywhere -- probably about 100 yards.  It's pretty far.

15          MR. BALLOU:  Nothing further, your Honor.

16          THE COURT:  We'll have cross-examination by

17  defense.

18                     CROSS-EXAMINATION

19  BY MR. ROOTS:

20  Q.  Thank you, Lieutenant Jenkins.  We're getting set up

21  here so we can play those videos again.

22  A.  No problem.

23  Q.  Okay.  Thank you so much for coming.

24          So you are a lieutenant in the Capitol Police?

25  A.  That's correct, sir.

1   Q.  And you were a sergeant on January 6th?

2   A.  That's correct.

3   Q.  So in other words, you got a promotion between then and

4   now?

5   A.  Yes, sir.

6   Q.  How recently was that promotion?

7   A.  It'll be August of 2023, sir.

8   Q.  Okay.  Let me ask, was that promotion based in any way

9   on January 6th?

10  A.  No, sir.

11  Q.  You said you were at the -- you were designated as the

12  CVC, Capitol Visitor Center, lieutenant?

13  A.  Currently, yes, sir.

14  Q.  The Capitol Visitor Center is on the east side also?

15  A.  It is.  At that time, sir, I was with the House

16  division.  Now I am currently with CVC.

17  Q.  House division?  I didn't hear that.

18  A.  It would be like the House buildings.  So at that time I

19  was not assigned to CVC.  Currently I'm with the CVC, just

20  for clarification.

21  Q.  Was there a discussion that you recall on January 6th

22  before the barricades were opened up of police potentially

23  letting the crowd in to go to the steps of the Capitol?

24  A.  I don't recall that.  No.

25  Q.  Were you positioned at the front near those barricades

1    at that time -- before the barricades were opened up?

2    A.  Yes.

3    Q.  Do you recall a megaphone discussion where there was

4    police and the crowd also talking about being allowed to go

5    up to the steps?

6    A.  No, sir.

7              MR. ROOTS:  We'd like to bring up Defense

8    Exhibit 20.

9              MR. BALLOU:  Objection, your Honor.

10             THE COURT:  Let's have a bench conference.

11             (Whereupon, the following bench conference was

12   held:)

13             THE COURT:  Go ahead, Mr. Ballou.

14             MR. BALLOU:  Your Honor, we're getting very

15   quickly outside the scope of this direct testimony, which we

16   deliberately kept very limited to address the issues raised

17   on cross-examination here.

18             It sounds like defense counsel is now trying to go

19   into a completely different direction that wasn't raised;

20   and again, it was not brought up on direct testimony at all.

21             THE COURT:  Can you just proffer for me what the

22   video shows first?  Then you can explain to me why you're

23   bringing it in.

24             MR. ROOTS:  Yeah.  This video shows a megaphone

25   discussion, the confusion of the crowd.  The officers at one

1     point were sort of discussing with members of the crowd

2     about being let in to the Capitol steps area.

3             And so this goes to the confusion of the Defendant

4     and also the reaction of the crowd and their response that

5     is shown on the videos that were just shown by the

6     Government.

7             THE COURT:  Is this witness in this video or no?

8             MR. ROOTS:  Honestly, I think so.  But I don't

9     know.

10            THE COURT:  So, Mr. Ballou, I hear you.  And I

11     appreciate your patience earlier.

12            I mean, ultimately, the remedy to this would

13     simply be -- this is your last witness.  Correct?  If you

14     were to re-call -- he would have to do this in his case in

15     chief.  Is that what you're proposing instead?  Which is

16     fine.  I'm just asking.

17            MR. BALLOU:  Yes.  I think that would be -- we

18     would have to do that.

19            I will say that the witness just testified that he

20     did not hear any conversations with a bullhorn.  So I don't

21     think there's any foundation for this.

22            THE COURT:  Well, I appreciate that.  I think

23     there were -- well, you tell me, Mr. Ballou.  As we saw

24     them, the montage videos and things, there were certain

25     officers that were setting the scene, which I believe was

1    appropriate.  They spoke to things that they did not

2    firsthand observe.  I mean, Inspector Hawa was not with the

3    vice president the whole time and things like that.

4         So if he were to call this in his case in chief

5    just to preview what's going to happen, do you view that as

6    different than what was -- happened before?  Would that be

7    permitted?

8         MR. BALLOU:  Truthfully, your Honor, I think we

9    need to think about that.  I confess I'm not entirely sure

10   how we'd handle this.

11        Perhaps one way to clarify this would be for

12   Mr. Roots to just ask again if the witness heard any sort of

13   bullhorn conversations between Capitol Police and rioters.

14   At the very least, that would help the jury understand how

15   seriously to take this video or the witness's testimony on

16   this.

17        THE COURT:  I'm going to excuse the jury.  I want

18   him to listen to the whole thing and see it, because if he's

19   in there I think that makes it a much easier decision to see

20   it.  We see it now or later.

21        I think it would be helpful.  Or if it's something

22   that he overheard, even if he was not there, perhaps he

23   could hear it.

24        So I think that would be helpful to get his answer

25   to that.

1              Go ahead, Mr. Roots.

2              MR. ROOTS:  Yeah.  Also, this is impeaching.

3    Because this officer -- the witness literally just testified

4    that he was at the front at -- where this video is.

5              So this is impeaching -- if he says, No, I didn't

6    hear anything, well, this impeaches that because he's right

7    at the front where there's this big discussion which is very

8    loud about the question of people being let into the Capitol

9    to go to the steps.

10             THE COURT:  Not sure.  I'm going to think about it

11   while we listen to it.  But I'm not sure if we can impeach

12   him on something that he didn't hear.

13             But I think there's a nuance here that Mr. Roots

14   is making that I want you all to think about, Government,

15   which is that perhaps that's the impeachment, is that he

16   didn't hear it.  So it's not the substance of what's being

17   said; it's that if someone said to come in and you were

18   standing right next to him and said, "I didn't hear it,"

19   then that potentially could be impeachment.

20             So I still want to excuse the jurors because I

21   haven't seen the video.

22             Have you seen the video, United States?

23             MR. BALLOU:  I have not, your Honor.

24             THE COURT:  Great.  So let's excuse the jury and

25   watch the video, and then we can have a discussion without

1    our wonderful landline phones.

2              MR. ROOTS:  And we should also excuse the witness

3    so that --

4              THE COURT:  Yes -- no, no, no.  Well, we can

5    excuse the witness, but I also want him to watch it to, I

6    guess -- you tell me.  I think it would be helpful to know

7    if he's in there.  The only person that's going to know that

8    is him or if he was near there.  I think a limited proffer

9    is helpful.

10             MR. ROOTS:  I think it would be beneficial for the

11   jury to see him impeached about his statement that he just

12   made that he didn't hear this even though he was, in his own

13   words, right up front, where he obviously should have.

14             THE COURT:  Who's going to tell us that this is up

15   front?  I'm not going to rely on the testimony of the

16   attorney.

17             Look, let's just excuse him and the jury.  We

18   don't need them to sit here.  They can take a break.

19             (Whereupon, the following proceedings were had in

20   open court:)

21             THE COURT:  We have some legal issues we want to

22   make sure we get to the bottom of.  I'd rather let you do

23   that in the jury room rather than sitting in those chairs

24   there.  So I'll let you all step out and we can talk about

25   this.

```
1                    (Whereupon, the jury exited the courtroom at 10:32

2        a.m. and the following proceedings were had:)

3                    THE COURT:  So my suggestion is -- you all can be

4        seated.  Thank you.

5                    My suggestion is, first, we excuse the witness.

6        We watch the video once together.

7                    And then we can decide whether or not we want to

8        have you see this video to try to get some sense of it.

9                    THE WITNESS:  Sure.

10                   THE COURT:  Before you go, can I ask -- can the

11       witness -- can I ask the witness about if you recognize

12       this?

13                   Or can you either, Mr. Roots?  If you can just

14       recognize where this is.  How about that?  Does that seem

15       reasonable?  Without playing it.  Hold on.

16                   Mr. Parker, Mr. Ballou, does that seem fair at

17       least?

18                   I got a thumbs-up.  Go ahead.

19       BY MR. ROOTS:

20       Q.  Lieutenant, do you see -- do you recognize this scene

21       here?

22       A.  I recognize where it is, yes.

23       Q.  This was toward the front -- toward that barricaded

24       area?

25       A.  It looks to be the east front.  Yes.
```

1    Q.  And let me ask you:  Do you recall -- can you identify

2    any of these officers in this scene right here?

3    A.  I mean, the screen says Warner, so I'm guessing that

4    would be one of them.  It's the back of their heads.  Not

5    really.

6    Q.  And you were near this situation on January 6th?

7    A.  I don't see myself in that picture.  So the east front's

8    a pretty big area, sir.  That's like a giant football field

9    going across that from there, probably.  I could have been

10   anywhere on the east front.  I wasn't in that picture.  So I

11   couldn't tell you one way or another.

12                THE COURT:  If you were to watch the whole video,

13   do you think you'd be able to recall if you were close or

14   far from here?

15                THE WITNESS:  I mean...

16                THE COURT:  Maybe?

17                THE WITNESS:  Maybe.

18                THE COURT:  I'm going to ask you to step down.

19                THE WITNESS:  Sure.  Without seeing it, it's hard

20   for me to say.

21                THE COURT:  If you can just step outside.  We'll

22   call you back when we're ready.

23                THE WITNESS:  Yes, sir.

24                THE COURT:  Thank you.

25                (Thereupon, the witness retired from the courtroom

1    and the following proceedings were had:)

2            THE COURT:  Let's keep the volume at a low level

3    while we're playing it, please, Ms. Lambert.

4            (Whereupon, Defendant's Exhibit No. 20 was

5    published in open court.)

6            THE COURT:  So I think there's a clear distinction

7    prior to the video and this sort of beginning at the east

8    front.  I mean, I don't think anyone's alleged that this

9    officer -- or discussed this officer being near the door.  I

10   mean, that part of the video, to begin with, there's no

11   basis, I think, for what you've suggested for it to be

12   introduced.

13           Now, if you want to introduce it in your case in

14   chief through a witness or something to suggest that

15   Ms. Lavrenz perhaps was never there or something like that,

16   that's a totally different scenario.

17           So I'm not going to admit that.  But I want to

18   think about this first part of the video, which appears to

19   be at the east front.  And again --

20           MR. ROOTS:  Yeah.  Let me just say, I'll proffer,

21   this shows the reason for the crowd being very confused.

22   And Ms. Lavrenz was, what, 50 feet from there.

23           This was -- some of that was said on loudspeakers.

24   She does have a hearing issue, of course.  But many people

25   in the crowd were under the understanding that there was

1    discussion of the police about letting them in, letting them

2    at least at the steps.  So there was a lot of confusion in

3    the crowd.

4           And this officer's hand motions, waving, he says,

5    at other officers, it's ground for a lot of confusion.

6           The crowd obviously -- I will show that to you;

7    we will cross-examine the officer about this -- if you look

8    at the crowd walking right past this officer, there's no

9    indication that he's not letting them in.  In other words,

10   this cop is not saying, "You stay, but you" -- he's not --

11   it's very confusing.  And Ms. Lavrenz was, you know, a

12   distance away, but she's in that confusion.

13          THE COURT:  I hear you.  That's great argument for

14   closing.  I just want to stay focused here.

15          Can you tell me where you have concerns?  Any

16   video you get needs to be authenticated even on

17   cross-examination.  If someone says, "I have no idea what

18   this is," it can't come in through cross or direct.  So I'm

19   just struggling right now with the first question, which is:

20   Why can't he watch this video to tell us, was he near there?

21   And did he hear this?  That seems plainly relevant to

22   admitting it.

23          MR. ROOTS:  I think it impeaches him, frankly,

24   when he says, No, nobody was talking about that.

25          Well, this is loudspeaker stuff.

1            THE COURT:  But the surprise or gotcha would

2      still -- I mean, he's not off the record here.  If he says,

3      "No; I never heard this; I didn't know," and then we call

4      the jury back and you ask him the same question and he

5      says -- what's going to change?  It's going to be the same

6      answer.  The impeachment value is not mitigated by him

7      hearing -- having heard it for the first time.

8            We rarely in court, if ever, have surprise

9      testimony because things need to be authenticated.

10            And so I want you to think about this.  I want to

11      hear from the Government.  I want you to think further on

12      this, what the harm is in having him hear this, because it

13      helps you a lot if he can say, A, he was near there; B, he

14      heard it; or, C, he was near there and didn't hear it.

15            I agree with you, Mr. Roots.  I think it's

16      potential fertile grounds for impeachment.  It seems like it

17      was -- again, hard for me to say.  I'm not a witness.  But

18      it looks a little bit like it was near where he potentially

19      could have been.

20            And so that first section -- I'm just talking

21      about the first section of the video now, not the second.

22      And we can sort of rewatch this to sort of portion off what

23      are the sections.  But I want you to think about letting him

24      watch it.

25            I want to hear from the Government just the first

1    part before there is the sort of internal dialogue that

2    occurs in the group without the loudspeaker that then leads

3    to a bit of a loudspeaker conversation.  The initial part of

4    the video.  My first question is:  I think you've already

5    stated it, but would you like the witness to see this first?

6    If so, why?

7              MR. BALLOU:  Certainly.  We'd like the witness to

8    see this, primarily to be able to identify both whether he's

9    in the video and then, given his familiarity with the east

10   front, where this video was taken relative to where he was

11   at that time, if he would have ever been in a position to

12   hear something like this.

13             Substantively we have a number of concerns about

14   this video:  on authentication, on hearsay and on relevance.

15   And I'll go through each of those.

16             On authentication, I want to contrast this with

17   what we did with Captain Brooks on the Capitol montage

18   video, which -- you're exactly right, your Honor.  Captain

19   Brooks did not testify that she was at each of the locations

20   where the montage video-recorded.

21             Rather, we introduced the video through her

22   because of her familiarity with the U.S. Capitol Police

23   video recording system and we actually spent some time

24   talking about the accuracy of that system and the

25   accompanying radio runs.

1              That's not the situation that we have here, where

2      a witness is going to be confronted with apparently

3      third-party footage that appears to be highly edited, that

4      he's seeing for the first time and won't be in a position to

5      weigh in on the authenticity of.

6              So I think we've got just a fundamental

7      authentication problem.

8              THE COURT:  So remind me.  Yesterday, who was the

9      Capitol Police officer who testified?  Was that --

10             MR. BALLOU:  Captain Rani Brooks.

11             THE COURT:  That was not for the montage?  That

12     was the first day, right?

13             MR. BALLOU:  Yeah.  The first day was the montage

14     video.  Yes.

15             THE COURT:  That was the captain, right?

16             MR. BALLOU:  Yes.

17             THE COURT:  Yesterday was the -- I thought a --

18             MR. BALLOU:  Van Benschoten.

19             THE COURT:  When he went through and circled what

20     he believed to be Ms. Lavrenz or your case agent circled

21     Ms. Lavrenz -- I think it was actually a case agent that

22     circled Ms. Lavrenz on videos -- was that all off of Capitol

23     Police video or was some of that -- I thought it to be

24     third-party videos as well.

25             MR. BALLOU:  No, your Honor.  But these were

1    videos that the witness had previously been able to review

2    with the Government and was able to assert the authenticity.

3              THE COURT:  Got it.  Perfect.  That's very

4    helpful.

5              Let's go to the next part of your --

6              MR. BALLOU:  The second issue is on hearsay, which

7    is, this is not a video as we -- as far as we can tell

8    purporting to show the breach of the restricted perimeter

9    and the rioters going in, but rather to establish that there

10   was some sort of agreement between the rioters and one or

11   more officers.

12             And so in this case, we're trying to get to the

13   truth of the matter asserted here, which we haven't laid

14   foundation for.  It sounds like the witness has not heard

15   any of this, and so isn't in a position to corroborate or

16   refute it.

17             As my very smart colleague is pointing out, it's

18   actually double hearsay in that it's the hearsay not just in

19   the video, but of the U.S. Capitol Police officer as well.

20             THE COURT:  Then the third was what?  Relevance, I

21   think?

22             MR. BALLOU:  Yeah.  The third is relevance here.

23             It's not clear -- as we said, this is not within

24   the scope of the testimony.  And it seems like the more

25   appropriate witness here to introduce this would be either

1     the man with the bullhorn or this purported Officer Warner.

2             THE COURT:  It sure would be easier.

3             MR. ROOTS:  May I respond?

4             THE COURT:  Yes.  But I want you to respond to two

5     things first that I direct you to, which is, one, have you

6     contacted this speaker here?  Or have you considered

7     subpoenaing this Officer Warner?

8             MR. ROOTS:  Well, I don't think we've done either

9     of those.

10            We don't even know -- well, apparently, we have

11    tried to reach out to Dunfey, the guy with the -- the

12    protester there with the megaphone.  He hasn't responded.

13            The video, by the way, is an absolute open-source

14    video of the same exact quality that the Government just put

15    on.

16            THE COURT:  I'm with you on that.

17            Again, I think that they had their right that they

18    had their agent who had testified and he reviewed the videos

19    before.  And over your objection, then -- well, based on

20    your objection, they then established further foundation of

21    how he knew videos were authentic at times.

22            So I think the same can happen here through this

23    witness.  I think he's perfectly capable of authenticating

24    it.

25            But to simply allow a video in without someone

1    ever seeing it, I don't know how we can authenticate it.  I

2    mean, in a world in which -- right? -- there's deep-fake

3    videos and things, he actually needs to look at it to say,

4    Oh yeah, that looks right, or no.  You're going down a

5    rabbit hole here.  But we don't want a Princess Kate

6    situation here, like, Well, that doesn't add up or that

7    thing looks fake or the tower on the Capitol is not right or

8    the dome is off.  Whatever it is.

9         I mean, why would we not have him authenticate it?

10   I'm still not understanding the prejudice to you, because I

11   think once he does -- I agree with you that what's good for

12   the goose is good for the gander.  They brought in lots of

13   videos from third-party sources after they established

14   authenticity.  And so I think absolutely he could do that

15   here.

16        I also tend to agree with you that there is an

17   impeachment value.

18        Now, the hearsay, I think there's an interesting

19   differentiation here, because up until now I have not heard

20   a single side argue that the substance of what anyone said

21   was what mattered.  It was more creating the scene, that

22   there was chaos or that, as you showed it on one of your

23   cross-examinations, people were saying peaceful and

24   non-peaceful things.  But I don't think you were actually

25   trying to rely on the truth of it.

1          And the -- whereas, here, it is the actual words

2     that he's saying, that "We can go up there" and things like

3     that.

4          Now, I think there still is a path in which you

5     could admit it as impeachment, though, and just saying it

6     still impeaches this witness potentially as to, you know,

7     his credibility if he was standing near here or knew this

8     and didn't hear it.  So, I mean, he's got some sort of

9     audiovisual issues.

10         Go ahead.

11         MR. ROOTS:  Yeah.  Clearly, we're offering it for

12    effect on the listeners.  And the listeners are all that

13    crowd.  The truth doesn't matter.  In fact, we believe that

14    there was -- those cops are basically just lying that

15    they're gonna work to try to get the guys to the steps.

16    That's not the truth.

17         But the effect on the listeners -- and Lavrenz

18    was, you know, a few yards from there.  But the whole crowd

19    is understanding that there's this question about the

20    officers letting them to the steps [sic].  And then when

21    those barricades go down, again, the confusion of the crowd,

22    many believed that, Hey, this was allowed by the police.

23    And then -- because they had heard this discussion in the

24    air through loudspeakers.

25         THE COURT:  Well, again, I think, then, the

1    appropriate witness would be one of those many people that

2    might have heard it.  That would certainly be the cleanest

3    witness.  Let me put it that way.

4            But I'm going to -- so I want to hear finally.

5    It's a yes or no.  Are you objecting to the witness hearing

6    this first part of this video first?  Yes or no.  Are you

7    doing that?

8            MR. ROOTS:  I would like to hear -- I would like

9    him to be questioned in front of the jury because he just

10   told the jury that, no, no such discussion ever --

11           THE COURT:  Mr. Roots, I just want to know, yes or

12   no, as to this question:  You certainly understand, I know,

13   that he could be -- view and questioned about this here

14   first and then afterwards again in front of the jury.  It's

15   not either/or.

16           I just want to know, yes or no, if you're

17   objecting to him watching it first so we can establish

18   authenticity when deciding whether or not the jury can see

19   it.

20           MR. ROOTS:  Sure.  We will, you know, authenticate

21   it through him.  Yes.

22           THE COURT:  I want to do that first outside the

23   presence of the jury because I don't know how we can do that

24   when there's audio without them hearing it.  Okay?

25           MR. ROOTS:  Yeah.

```
 1                THE COURT:  Great.  Let's call your witness in.  I
 2     want to see -- him to see this video.  I'll tell you when to
 3     stop the video.  What is the timestamp?
 4                (Thereupon, the witness entered the courtroom and
 5     the following proceedings were had:)
 6                THE COURT:  Officer, if you'd go back up to the
 7     stand.  As I'm sure you may notice, the jury is not here.
 8                I want you to watch a portion of a video.  I'll
 9     tell the defense when to stop it and I will notice what time
10     it's being stopped.
11                THE WITNESS:  Okay.
12                THE COURT:  Then they're going to ask you some
13     questions about that.  Okay?
14                THE WITNESS:  Yes, sir.  Thank you.
15                THE COURT:  All right, Ms. Lambert.  If you could
16     please play the video.
17                (Whereupon, Defendant's Exhibit No. 20 was
18     published in open court.)
19     BY MR. ROOTS:
20     Q.  If I could just ask you, do you see yourself anywhere in
21     this -- in these scenes?
22     A.  I don't think so.
23                THE COURT:  Start back over.  I should have
24     allowed you to ask that first.
25                So the number one question we want you to consider
```

Jenkins - CROSS - By Mr. Roots

1    is:  Do you see yourself here?  And the second thing I think

2    we're going to be looking into is that question we already

3    asked you:  Is this at or near where you were?  And so as

4    you're watching that, can you think of those two things,

5    please?

6            THE WITNESS:  Sure.  Yes, sir.

7            THE COURT:  Sorry, Mr. Roots.

8            We can go, Ms. Lambert.  Thank you.

9            (Whereupon, segments of Defendant's Exhibit No. 20

10   were published in open court.)

11           THE WITNESS:  I don't see myself here.

12           THE COURT:  I don't need you to answer it.

13           THE WITNESS:  I'm so sorry.  Sorry about that.

14           THE COURT:  That's okay.  I didn't give you

15   directions.  We've going to watch the whole clip and then

16   ask you that question.

17           THE WITNESS:  Got it.

18           MR. ROOTS:  If I could just ask him.

19           THE COURT:  Go ahead.

20   BY MR. ROOTS:

21   Q.  Do you recognize any other officers here?

22   A.  Yeah.  That's Sergeant Reese with -- you see me point.

23   The blue mask and the grayish short hair there, that would

24   be Sergeant Reese.

25           And I can't recognize the other ones, really,

```
 1    especially with the mask and stuff.  At least -- maybe if we
 2    move around a little bit that guy, I may be able to.
 3              THE COURT:  Mr. Roots, what I suggest is we watch
 4    the whole part of the video that I want to watch.  Then we
 5    go back and then we can watch it.  Perhaps if we need to
 6    mute it, we can.  You can go as many frames as you need to
 7    to try to help establish the scene and things like that.
 8    Okay?
 9              MR. ROOTS:  Okay.
10              THE COURT:  But let's watch it the first time,
11    first with that knowledge of what he needs to be thinking
12    about.  Does that make sense?
13              MR. ROOTS:  Sure.
14              THE COURT:  One more time, Ms. Lambert.
15              MR. ROOTS:  With sound or without sound?
16              THE COURT:  With sound.
17              Do you want to start from the beginning,
18    Ms. Lambert?
19              (Whereupon, segments of Defendant's Exhibit No. 20
20    were published in open court.)
21              THE COURT:  Pause it here.
22              What is the time marker on the video?
23              MR. ROOTS:  That is 1:22.
24              THE COURT:  Let's go back to the beginning.
25              First, if you have any questions before we play it
```

1    to take it part by part.

2    BY MR. ROOTS:

3    Q.  The very tall black officer there that was talking, who

4    was that?

5    A.  It looked like Officer Warner.

6    Q.  And you recognize him?

7    A.  I do.

8    Q.  Did you -- so seeing that whole clip, can you orient

9    yourself in terms of your location at that time?

10   A.  Not really.  I know I was up and down that line, so I

11   could have been anywhere.  But I wasn't in that specific

12   area.  No.  Not that I can see.

13   Q.  Were you up there near where -- it seems like from that

14   other video you were close to where that breach happened.

15   A.  I don't know what time was it when the breach happened

16   versus that, for one.

17          Two, again, I was moving.  I wasn't standing

18   still.  And when you saw me in that video, that was after

19   the breach happened, too.  So I could have been anywhere

20   along that line.  I can't say for sure.

21          MR. ROOTS:  We would still move to admit this

22   because I think he's authenticated it enough to, you know --

23   it is --

24   BY MR. ROOTS:

25   Q.  You agree this is -- appears to be what it indicates,

1    that it is a scene of an exchange between the crowd on

2    January 6th and certain officers there and you were also in

3    that area?

4    A.  I didn't say I was in that specific area.  I think I

5    said the opposite of that.  I was on the east front, which

6    is a big area.  I wasn't next to him or anything like that.

7    I don't recall that conversation.  It wasn't an exchange --

8    there were a lot of exchanges that day.  I'm not really sure

9    what you're asking specifically.  But I just said I wasn't

10   in that specific area.

11   Q.  Do you recall these tense conversations between the

12   crowd and --

13   A.  That conversation?

14   Q.  Or those conversations.

15   A.  There was a lot of conversations that day.  What

16   kinds -- what are you referencing?

17   Q.  Let me ask you, that tall, black officer, Officer

18   Warner, was he a high-ranking officer?

19   A.  No.  Not at that time.  He was an officer.

20   Q.  Same level as you or --

21   A.  I believe I outranked him at that time.  I still do.

22          MR. ROOTS:  Well, we offer to admit that, your

23   Honor.

24          THE COURT:  You can stay.  I want to hear from

25   Mr. Ballou.  You can approach the lectern if you have any

1    questions as we try to make sure we get the facts clear

2    here, just to begin with.  I'm not asking for argument yet.

3    If you have any.

4              MR. BALLOU:  Thank you.

5                    VOIR DIRE EXAMINATION

6    BY MR. BALLOU:

7    Q.  How long were you on the east front for?

8    A.  Approximately 7:00 a.m. until whenever the breach

9    happened.

10   Q.  And do you recognize this building here?

11   A.  It looks like the Supreme Court.

12   Q.  Okay.  Where is the Supreme Court in relation to where

13   we saw that video of you?

14   A.  That was probably kind of straight ahead of me at that

15   point.  I could be wrong.

16             MR. BALLOU:  Could we advance to where Mr. Dunfee

17   is talking on the microphone.

18   BY MR. BALLOU:

19   Q.  Do you recognize where this is?

20   A.  That's the east front of the Capitol.  It looks to be

21   pretty close to the center of the building.  I don't know

22   what the --

23   Q.  Where was the green structure that we showed you?

24   A.  Further to -- if you're facing the Supreme Court,

25   further to the left.

1    Q.  Have you seen this video before?

2    A.  No, not in its entirety.  I think I saw a snippet of it,

3    just -- just the very beginning.  But I didn't hear the

4    conversation or anything.  Not here.  My previous trial.

5    But they -- I wasn't there, so they didn't show me the

6    video.  You know what I mean?

7           Like they -- I saw the very beginning from where

8    we were standing there.  I had to think about it for a

9    second.  But I wasn't there or anything, so they didn't show

10   me, like, the whole video or anything like that.  I didn't

11   really see the video.  I just saw the very beginning of

12   Warner standing there.

13   Q.  Understood.

14   A.  Hopefully, that helps.

15          THE COURT:  Any other questions about

16   authenticating this, Mr. Roots?  I'm happy to hear argument.

17   But I want to get --

18   BY MR. ROOTS:

19   Q.  So you can't place yourself at this moment?

20   A.  No, sir.

21   Q.  Okay.  Were you -- can you at least say that you were

22   amongst this group of officers?

23   A.  I don't know, sir.  I don't see myself in the video.  I

24   was walking up and down that line a lot to check on my

25   officers to make sure everybody was okay and ready to be

1    prepared for whatever.  I couldn't tell you that specific

2    moment.  I wasn't looking at my watch to tell me where I was

3    in a specific locations along the east front, which is again

4    a very huge area.  It's a big area.

5              So no.  I can't tell you exactly where I was when

6    this was ongoing.

7    Q.  Does this look like a true and accurate film of that

8    segment of the plaza on January 6th?

9    A.  I'm not a video expert.  But yeah.  It looks okay.  It

10   looks accurate.

11             THE COURT:  I'm going to ask you if you can go

12   back to the hallway again.

13             THE WITNESS:  Sure.

14             (Thereupon, the witness retired from the courtroom

15   and the following proceedings were had:)

16             THE COURT:  I want to hear from the United States

17   first.  Go ahead.

18             MR. BALLOU:  Your Honor, we continue to have very

19   serious concerns about the jury seeing the video even up

20   until the point when the rioters go inside.

21             Two issues.  One goes back to authentication here.

22   The defense has said that they reached out to Dunfee.  It

23   doesn't sound as if they reached out to Officer Warner or

24   subpoenaed either of them.

25             Given this witness did not see the scene on

1    January 6th, given that he has not seen this video aside

2    from apparently a few seconds when counsel previously tried

3    to introduce this, in the *Zink* case before Judge Boasberg,

4    he's not in a position to testify about the accuracy of

5    these bullhorn statements.

6          Our fundamental concern is about the hearsay

7    issue, which is:  This video is going to create the

8    impression that there was an agreement between the officers

9    and the rioters allowing them in.  That is absolutely

10    hearsay.  And this witness is absolutely not in a position

11    to testify about the accuracy of that.

12          To the extent that the defense wants to introduce

13    this merely for impeachment purposes, to say, "Okay.  This

14    officer did not in fact get the extensive experience across

15    the line, did not know what the entire scene was like,"

16    perhaps it would make sense to play up until the 14 seconds

17    here, where Mr. Dunfee appears to start using a bullhorn.

18          And defense counsel can ask:  Did you see somebody

19    using a bullhorn?

20          He can say yes or no.

21          And they can argue that that's impeachment.

22          But as soon as he starts talking about there being

23    an agreement, purported or actual, between the officers,

24    that is -- there's absolutely no evidentiary basis for the

25    jury seeing that at this point.

```
1              THE COURT:  Remind me:  What is the name of the

2      police officer who's speaking?

3              MR. BALLOU:  I believe it's Officer Warner, based

4      according to the video here.

5              THE COURT:  So to start with, I want to know from

6      the defense, this seems like this is an important issue to

7      you.  And I'm struggling with why.  I'm sure the

8      Government -- well, let me ask.

9              The Government will make Officer Warner available,

10     I presume.  Right?  Assuming that he could be -- I think

11     your colleague wants to talk to you.

12             MS. ROCHLIN:  Excuse me, your Honor.

13             THE COURT:  Yes.

14             MS. ROCHLIN:  Deputy Chief Karen Rochlin.

15             Thank you for allowing me to be heard.

16             The United States does not wish to impede defense

17     access in any way, shape or form.

18             I hesitate to have line prosecutors commit to make

19     a Capitol Police officer available.

20             THE COURT:  No, no.  Make an effort to.  I mean,

21     they're not going to just say, Good luck.  Go find him.  We

22     don't know where he is.

23             I'm sure they could reach out to the Capitol

24     Police and let them know that there's a subpoena.

25             MS. ROCHLIN:  It's not quite that simple, your
```

1    Honor, but it's not far.

2          What I would propose is this:  We are talking

3    about a separate branch of government.  And there is an

4    attorney working in that separate branch of government who's

5    counsel for the U.S. Capitol Police who is certainly very

6    protective of her authority in this area.

7          So I'm happy to provide counsel with contact

8    information for the attorney.  But my understanding is the

9    best procedure is for defense counsel to contact counsel for

10    the U.S. Capitol Police and proceed in that fashion.  We

11    cannot speak for her, but that is the appropriate process.

12          THE COURT:  Sure.  Sure.

13          But you'll provide that information?

14          MS. ROCHLIN:  Absolutely, your Honor.  I will

15    start looking it up right now and making sure that defense

16    counsel has that information, assuming they don't have it

17    already from prior cases.

18          THE COURT:  That's fine.  Thanks so much.

19          I want to hear from you, Mr. Roots.  Isn't there a

20    very straightforward solution to this?  I mean, I'm happy to

21    call that attorney for the Capitol Police in here.  I don't

22    think that they'll have a basis to reject a trial subpoena

23    to call this witness.

24          But it does seem this is fairly relevant to your

25    defense.

1          Of course there is potentially other people who

2     are speaking here who may be able to testify potentially.

3     But why not, when we have access to this speaker -- I would

4     maintain that we do; we have no reason at least now to think

5     that we don't -- why not simply just call that witness to

6     start with?

7          MR. ROOTS:  Well, this actually goes to this

8     witness.  This witness is on the stand.  He said this

9     wave -- he's obviously waving.  That's in evidence.  And he

10    said no, no.  He was just waving at two officers.  The crowd

11    could not have interpreted that wave in any other way.  This

12    directly goes to his testimony.

13         So first of all, I would say that we don't even

14    need Warner to make our point, which is that Ms. Lavrenz was

15    in a crowd when there's a lot of confusion, where waves by

16    cops can be interpreted in different ways, especially given

17    the context of all this effect on the listener of a

18    discussion.

19         And, you know, back to that same thing, we don't

20    even contend there was any kind of an agreement.  In fact, I

21    think we believe both sides were bluffing or it was all

22    just, you know, just talk.  There was no agreement of any

23    kind.  It's effect on the listener that is so important

24    here, especially from the perspective of Ms. Lavrenz.

25         THE COURT:  I think that it's very difficult to

 1    impeach somebody when it's hard to say if he was feet or

 2    yards or dozens of yards or feet away.

 3             Impeaching someone with something they didn't

 4    hear, I think, is logical when, in fact, that person could

 5    say, yeah, I was at or around there.  This witness has

 6    indicated -- I'll go back and look.  But I think his

 7    indication was he doesn't know if he was around there.  He's

 8    not sure.  So I'm going to look back at the transcript.  One

 9    moment.

10             You asked:  Were you -- can you at least say that

11    you were amongst this group of officers?

12             And he testified:  I don't know, sir.  I don't see

13    myself in the video.  I was walking up and down that line a

14    lot to check on my officers, to make sure everybody was okay

15    and ready to be prepared for whatever.

16             I couldn't tell you that specific moment.  I

17    wasn't looking at my watch to tell me where I was in

18    specific locations along the east front, which again is a

19    very huge area.  It's a big area.  So no.  I can't tell you

20    where I was when this was ongoing.

21             He further said -- you asked, Mr. Roots:  You

22    agree this is -- appears to be what it indicates, that is, a

23    scene of an exchange between the crowd on January 6th and

24    certain officers there?

25             And you were also in that area?

 1              And he answered:  I didn't say I was in that

 2      specific area.  I think I said the opposite of that.  I was

 3      on the east front, which is a big area.  I wasn't next to

 4      him or anything like that.  I don't recall that

 5      conversation.  It wasn't an exchange.

 6              MR. ROOTS:  Can I say that --

 7              THE COURT:  One moment.

 8              Continuing:  I'm not really sure what you're

 9      asking specifically.  But I just said I wasn't in that

10      specific area.

11              So I mean, I think he has testified he was not in

12      that area.

13              So go ahead.

14              MR. ROOTS:  The waving video shows him very near

15      that area.

16              Now, we understand that that was a few minutes --

17      maybe seconds different.  It was a slightly different time,

18      a few seconds different.

19              THE COURT:  So I want to -- and how do you know

20      that?

21              MR. ROOTS:  It could have been a minute -- well,

22      we do know because this exchange is happening, you know, a

23      few minutes before that barricade went down.  I think we can

24      pinpoint this.  And that wave was in that area.

25              THE COURT:  I mean, I think that's a lot of -- a

1    tremendous amount of speculation that is coming from us, not

2    a witness, when a witness has said that he, in fact, is

3    totally unclear as to that.

4           I'm going to take a couple minutes to think this

5    over.  I will tell you, here's what I'm going to think

6    about:  It's either not to allow this in at all or I think

7    having the witness simply restate on the stand and stopping

8    the video prior to any of the speech by the witnesses for

9    him to say, Did you hear what the officers said on the

10   bullhorn?  And then him saying he doesn't know if he wasn't

11   there, that perhaps that's it.

12          But actually, Ms. Lambert, could you replay the

13   video, but just on mute.  I want to see what it looks like

14   up to 1:22 on mute, please.

15          Thank you.

16          (Whereupon, segments of Defendant's Exhibit No. 20

17   were published in open court.)

18          THE COURT:  We can pause the video.

19          Ms. Lambert, Mr. Pierce, Mr. Roots, do you have a

20   video version of this or -- forgive my technological

21   ignorance.  Do you have one without the closed caption on

22   the bottom?  Are you able to remove that?

23          MR. ROOTS:  This is sort of open source.  And I

24   believe -- well, she's saying she can edit it or probably

25   put a black stripe along the bottom if need be.  It might

```
1    take a minute.
2             THE COURT:  Well, Ms. Lambert, I'm sorry to put
3    you on the spot.  If you could try doing that while I chew
4    on this for a few minutes.  Okay?
5             We'll take a brief recess.  I want you to use this
6    also as an opportunity to -- for a bathroom break or to
7    stretch your legs.  So it's 11:13.  I'll be back by
8    hopefully 11:20.
9             We're in recess.
10            (Thereupon a recess was taken, after which the
11   following proceedings were had:)
12            THE COURT:  I want to make sure we're on the same
13   sheet of music.  So the Federal Rules of Evidence, as we
14   look at them in terms of rules on impeachment, it does allow
15   for certain impeachment testimony that goes to the
16   credibility of a witness or the truthfulness.  I think it's
17   a very close call if this rises to there when the person may
18   not have heard it.
19            And so -- but I think I want to give a somewhat
20   wide berth here to the defense.
21            So what -- Ms. Lambert, were you able to, it looks
22   like, add --
23            MS. LAMBERT:  I cropped the bottom.
24            THE COURT:  That's perfect.  Thank you.  Can we
25   play the video from the beginning, please?  On mute.
```

1              (Whereupon, segments of Defendant's Exhibit No. 20

2      were published in open court.)

3              THE COURT:  Stop right now.  What is that?  What

4      minute mark is that?

5              MS. LAMBERT:  38 seconds.

6              (Whereupon, segments of Defendant's Exhibit No. 20

7      were published in open court.)

8              THE COURT:  Stop there.

9              That's at minute 1:21.

10             So what I'm going to do is I'm going to allow the

11     video without any audio up to minute one and 20 seconds.

12     We'll stop it there.

13             Mr. Roots, you can then inquire of the officer on

14     the questions we asked before.  First, he will watch it and

15     authenticate it as he did before.  He said that he thought,

16     to the best of his ability, it was a -- that it's fair and

17     accurate and that he said he thought that he supposed that

18     it was.  We'll go back to the beginning of it -- oh, we

19     don't need to actually -- sorry -- we can just authenticate

20     it here without the jury here.

21             So let's -- we can authenticate it first.  Then it

22     will be played for the jury and then you can ask him simply

23     the questions you asked him before, which are:  Did he --

24     was he around when this was said or heard?  Did he hear what

25     was being said?  Without going into the substance of it,

1    obviously.

2           You can't ask him, Did you hear this officer say

3    or this speaker say that?  I don't want to say that.  I do

4    agree that it is -- I appreciate your effect on the

5    listener, but I think ultimately it is going for the truth

6    of what is being said and it is not simply the effect on the

7    listener, because I'm not sure who the listener is here that

8    we're talking about.  If it's Ms. Lavrenz, how could it be

9    that when I don't know if she was listening to it?  If it

10   was this speaker, I don't know if it could be him because he

11   has not heard it.

12          So the effect on the listener, when the only

13   relevant listeners are not perhaps people who heard it, I

14   don't think it's sufficient.  And if it's on everyone else

15   that's there, I think you still would be appropriate to

16   bring one of those people in.

17          A large part of my concern here is that you have

18   available to you, and I will certainly make available to

19   you, the Capitol Police officer in question.  I believe it's

20   Warner or whoever it is.  We can figure that out.

21          But it certainly behooves you if this is such an

22   essential portion of your defense to call that witness.  We

23   have all day today and tomorrow.  It sounds like you're

24   going to have witnesses.  So I'm not sure why he wouldn't be

25   available.  I'm happy to have him appear by Zoom if need be.

1    It's very difficult for me to imagine why he couldn't be

2    available and bring into testimony exactly what you have

3    shown here to be what you believe central as an issue to

4    your defense.

5            So if you intend to do that, now is the time to

6    start getting those wheels in motion.

7            You don't obviously have to call him.  But I would

8    think that you would want to start that process if you

9    intend to do so.

10           So understanding that this is my ruling, that your

11   questioning will be limited to whether or not the speaker

12   heard or saw these conversations occurring, which I think we

13   know what he's going to say, I want to first know:  Do you

14   still want to go forward with trying to impeach him in this

15   manner?

16           MR. ROOTS:  Well, his statement specifically was

17   that, no, the crowd was not hearing a discussion like that.

18           And so I want to play this.  And then I'll say:

19   Did you hear that?  Do you recall hearing it on January 6th?

20           You would agree that the crowd seems confused

21   about this question?

22           THE COURT:  But the reason that we're not going to

23   play the audio is because he has already stated that he did

24   not -- he does not know that he was even near when this

25   happened.  In fact, at one point he said he thought it was

1        the opposite from where this occurred.  So I'll let him say

2        that.

3                    If he gives different testimony when he's here,

4        like, Actually, now, yeah, I do remember being near there or

5        something, then that's fair.  And then we can potentially

6        consider if there's a change in the facts as we have it as

7        to what my ruling is.

8                    But I'm not looking for argument on my ruling.  I

9        just want to know:  Are you interested in going forward with

10       this impeachment as I have offered it to you or not?  Or

11       would you prefer to simply just call the speaker here, the

12       police officer, and have him during your case in chief make

13       testimony about this?  Then he can bring in the audio and

14       things like that and properly authenticate everything else.

15                  MR. ROOTS:  The real issue here, without being

16       able to play the audio to the jury, it's not really

17       impeachment.  It just shows people holding up megaphones to

18       their faces and things.  So it's not really -- it doesn't

19       really fully impeach him.

20                  THE COURT:  I think it still goes to whether or

21       not he heard things that other people are saying.  The

22       moment that he says, I don't even know what those folks are

23       doing or saying, you still have your impeachment.  You can

24       make an argument that he doesn't know what was being said on

25       megaphones or microphones.

1     While you can't go into what was being said, if

2  you don't bring in a witness, it still goes to part of your

3  argument that he didn't know what other people were saying

4  and that that's why there was confusion.

5     MR. BALLOU:  I guess we do want to play it even

6  without those restrictions.

7     THE COURT REPORTER:  Even without those

8  restrictions?

9     MR. ROOTS:  Even with those restrictions.

10     THE COURT:  So understanding it's over the

11  Government's objection and your objection, it's fair that

12  it's a double loss.

13     But I'm going to go ahead and allow that.  It's

14  going to be for that tailored purpose.  So again, please do

15  not seek -- I'm going to instruct him before the jury comes

16  in not to talk about what is said on the megaphone, but to

17  simply answer your questions.  Of course, you'll have

18  redirect to the extent that you need it.

19     I want to hear from you right now, Mr. Roots and

20  Mr. Pierce.  Do you want the -- a representative of the U.S.

21  Attorney's Office to get this contact information of the

22  Capitol Police person and to start the process of making

23  that witness available?  I would encourage you to do so.

24  You don't have to call that person.  But what I don't want

25  tomorrow is that you realize actually now it makes sense,

1    because then I'm going to tell you you had your opportunity

2    yesterday and you missed it.

3              So I'm not sure there's any downside and there's

4    only potential upside for you.  So that's what we call a

5    leading question in the business.  Do you want to start this

6    process of getting a subpoena cut to that person?

7              MR. ROOTS:  I think we do.  Yeah.

8              THE COURT:  So we have the contact information?

9              MS. ROCHLIN:  I do, your Honor.

10             THE COURT:  I'd like you to --

11             MS. ROCHLIN:  (Tenders document to Mr. Roots.)

12             MR. ROOTS:  If I could just add something about

13   the white guy on that video, this Dunfee --

14             THE COURT:  That's the Pastor Bill or somebody?

15             MR. ROOTS:  Yeah.  Again, on that other trial, we

16   did reach out to him.  He never responded.

17             There are questions about -- he is not charged.

18   He was a major player, we think, on the east side.  He's

19   almost like the Ray Epps of the east side.  So this is a guy

20   who was not charged or at least undercharged -- Ray Epps was

21   slightly charged.  But this guy's not charged.  And it's

22   fishy.  It's suspicious to us as to why, because he was a

23   major player in some ways.

24             So we just throw that out there, that there's that

25   issue about why.

```
 1              I don't know if the U.S. Attorney's Office wants
 2         to make any statement about that.  But --
 3              MR. PARKER:  Your Honor --
 4              THE COURT:  -- I'm quite sure that they may not
 5         want to or definitely don't want to.  But I don't want to
 6         hear it because it's not relevant.
 7              MR. PARKER:  Your Honor, we need to make a
 8         statement to correct a blatant false statement there.
 9              THE COURT:  Okay.
10              MR. PARKER:  Bill Dunfee was charged.  He went to
11         trial and he was convicted.  And I suspect that defense
12         counsel knows that.
13              MR. ROOTS:  I did not know that.
14              THE COURT:  I'm sure -- I appreciate that,
15         Mr. Parker.  Mr. Roots and Mr. Pierce have a lot of clients.
16         It's hard to juggle them all.  But let's keep looking for
17         the best on both sides.  We're thinking about this.
18              It sounds like he has been convicted and he did go
19         to trial.  So is he incarcerated?  Do you know?  If you
20         don't know --
21              MR. PARKER:  I don't know.
22              THE COURT:  All right.  So I don't think we need
23         to get into any of this still.  Presumably, if he has a
24         case, he's got a lawyer.  So you can take your time during
25         your lunch break to reach out to his lawyer and see if he's
```

1     willing to speak or not.  Look up his docket.

2              But we're going to have this impeachment

3     testimony.  Then you're going to rest, I believe.  Right?

4              MR. BALLOU:  Yes, sir.

5              THE COURT:  I'm just trying to think of scheduling

6     here.

7              I'd like you to step out right now if you need to,

8     do whatever to start this process of letting that attorney

9     know that you want this person to be available.  You can let

10    them know.  Is it an email?  Or what do you have there for

11    their contact or phone?

12             MR. PIERCE:  Ms. Lambert is emailing.  I'll step

13    out and I can make a phone call.

14             THE COURT:  Let's do both.  I'll let you just make

15    the phone call.

16             And you can let them know that I'm happy to speak

17    to her if she has any questions, Mr. Pierce.

18             Ms. Lambert, if you could let her know that as

19    well.

20             And I'll get the subpoena.  You can request it.

21    I'm happy to sign it.  But I want him to be available.  Does

22    it make sense tomorrow for you all?

23             MR. PIERCE:  Sure.

24             MR. ROOTS:  Your Honor, if I can make another

25    little point.

```
 1                    THE COURT:  Please.

 2                    MR. ROOTS:  We just learned the identity of the

 3         police officer that Ms. Lavrenz is seen inside the Capitol

 4         briefly talking to.

 5                    THE COURT:  The one at the end of this clip?

 6                    MR. ROOTS:  No, not in this clip at all.

 7                    In fact, this was an officer that was inside the

 8         Capitol.  And the case agent there during his testimony

 9         asked -- there was several questions about, Did she talk to

10         an officer or something?

11                    I don't even know what point they were making.

12         Maybe it was that she's lying because she has said in a

13         broadcast she talked to an officer or something.  I don't

14         know if that's what they're suggesting.

15                    But in any case, we just learned the identity of

16         that officer.  And maybe we could also get him to come in.

17         We don't know what he would say.  It was a very brief

18         conversation.  But --

19                    THE COURT:  You're saying your client you believe

20         talked to an officer.  Is that correct?

21                    MR. ROOTS:  Yes.

22                    THE COURT:  And you believe there was testimony

23         yesterday about this conversation?

24                    MR. ROOTS:  Yeah.  There was video.  Maybe as she

25         exited or right before she had a brief conversation with an
```

1    officer near the side of the door.

2              THE COURT:  You're welcome to subpoena whoever you

3    want to.

4              But yes.  I think if you're speaking to the

5    Capitol Police lawyer, if there's a second officer that you

6    want, please let them know now.  You can't let them know 15

7    minutes before.  And they can make them available.  If need

8    be, please let them know in your communication with them

9    that I'm available to having them appear remotely given the

10   short notice.

11             Mr. Pierce, were you able to get her on the phone?

12             MR. PIERCE:  I was able to leave a voicemail.

13   Yes, your Honor.

14             THE COURT:  Okay.  Great.

15             MR. PARKER:  One point.

16             THE COURT:  Sure.

17             MR. PARKER:  I know your Honor mentioned on short

18   notice.

19             I just want to state this for the record:  The

20   picture of that officer interacting with the Defendant as

21   she exited the Capitol is quite literally in the statement

22   of facts.  Ms. Lavrenz has talked about that officer and the

23   interaction in numerous pretrial interviews.  So this wasn't

24   a surprise, and I don't understand why this is being raised

25   now.

1           THE COURT:  Well, let's wait to see who this

2    person is.  And if, in fact, they're that person, we can

3    take care of that.  That's tomorrow's problem, not today's.

4           So, Ms. Lambert, you sent that email?

5           MS. LAMBERT:  I already did.

6           THE COURT:  So we're ready to go forward with the

7    impeachment.  Can we re-call your witness before we re-call

8    the jury?

9           (Thereupon, John Edward Jenkins, Jr. entered the

10   courtroom and the following proceedings were had:)

11          THE COURT:  So the record will reflect we've now

12   re-called the witness.  The prior conversations were outside

13   of his presence.

14          And so first I'm going to instruct you that we're

15   going to go over that video again, this time in the presence

16   of the jury.  It'll be without audio.  So I don't want you

17   to be speaking about any of the things that you just learned

18   from the audio.  And we've blacked out the sort of

19   closed-captioned text.  So you'll hear some questions about

20   that.  I want you to only answer the questions as they're

21   posed to you, not about the stuff that we talked about

22   before.

23          THE WITNESS:  Okay.

24          THE COURT:  And you can't be talking about what

25   you now have learned from what was said there.  You need to

```
 1    be thinking again back to what you knew as of that date and

 2    time on January 6th.  Okay?

 3              THE WITNESS:  Okay.  Thank you.

 4              THE COURT:  Does that make sense?

 5              THE WITNESS:  I think so.

 6              THE COURT:  If you have a question, we can

 7    always -- you can push -- let the jury out back out if

 8    you're unsure of something.  But again, that's the lawyers'

 9    job, to ask the questions that will hopefully be clear so

10    they get it.  So if you don't understand something, that's

11    all I need you to do, just say you don't understand it.

12    Okay?

13              THE WITNESS:  Okay.

14              THE COURT:  That goes for me, too.

15              THE WITNESS:  Okay.

16              THE COURT:  So we're going to go ahead and re-call

17    the jury now.

18              (Whereupon, the jury entered the courtroom at

19    11:46 a.m. and the following proceedings were had:)

20              THE COURT:  Thanks for your patience.  I'll

21    congratulate myself for guessing that we might take more

22    time than we needed with the phones to send you back there.

23    Hopefully that was a little more comfortable than sitting

24    out here.

25              All right.  We're going to continue with the
```

1    cross-examination of the witness.

2              MR. ROOTS:   Thank you, your Honor.

3    BY MR. ROOTS:

4    Q.   Lieutenant Jenkins, so you testified that the crowd

5    there at that time was not -- when you were waving, that the

6    crowd was not confused at all?

7    A.   I testified that the crowd was not confused at all?

8    Q.   Is that what you said?

9    A.   I don't recall using those words.   No.

10   Q.   Okay.   Then I asked you, did you hear conversations

11   between officers and the crowd about the question of whether

12   the crowd would be allowed into the plaza, up to the steps?

13   A.   I don't remember those specific conversations.   There

14   was a lot of conversing.   But as far as being asked if they

15   can go in, I don't recall them.   I didn't have any.   I won't

16   condone allowing guests, or whatever you want to call them,

17   demonstrators, through that police line.   No.   Is that what

18   you're --

19   Q.   So you don't recall this -- you don't recall a loud

20   phone -- loudspeaker discussions where people were

21   suggesting that officers would let them go to the steps?

22   A.   No.   I don't recall that.   No.

23   Q.   Okay.

24              MR. ROOTS:   We would like to play this exhibit

25   without the sound.

1          THE COURT:  Just to be clear, can you pause for a

2     moment, Ms. Lambert?  If you can go back to the beginning.

3     This is Exhibit -- I think we should mark it as a new

4     exhibit.

5          MR. ROOTS:  Defense 20-A.

6          THE COURT:  Thank you.  20-A.1?

7          MR. ROOTS:  20-A.

8          THE COURT:  So this is a new exhibit.  We're going

9     to play it up to one minute and 20 seconds, please.

10          And there's no audio.

11          MR. ROOTS:  Let's play this.

12          (Whereupon, Defendant's Exhibit No. 20-A was

13     entered into evidence.)

14          (Whereupon, segments of Government's Exhibit No.

15     20-A were published in open court.)

16          MR. ROOTS:  We can pause right here.

17     BY MR. ROOTS:

18     Q.  Do you recognize this on January 6th, all these

19     officers?  Do you recognize officers in this scene?

20     A.  In this -- these guys here, the four down there or four

21     and a half?  No.  The back of their heads, no.

22          MR. ROOTS:  Okay.  Keep playing.

23          (Whereupon, segments of Defendant's Exhibit No.

24     20-A were published in open court.)

25

1            THE WITNESS:  Him I do.

2            MR. ROOTS:  Let's stop right here at 38 seconds.

3    BY MR. ROOTS:

4    Q.  Did you see in that video where there was -- it looked

5    like a member of the crowd with a megaphone?  He was

6    speaking to the crowd and then it looked like he was going

7    to an officer, a tall officer there, and he was -- there was

8    a discussion.

9            Do you see that?  Did you see that moment?

10   A.  Yes.

11   Q.  Do you recognize that officer?

12   A.  I do.

13   Q.  And who was that?

14   A.  Officer Warner.

15   Q.  What's his first name, if you know?

16   A.  I think it's Mike.  But I could be mistaken on that as

17   well.

18   Q.  And he -- is he a supervisor of any kind?

19   A.  Not at that time.  No.

20   Q.  Okay.  Did you see on that video where it looked like

21   that member of the crowd -- that protester, or whatever he

22   was, at one time was holding up the megaphone for that

23   officer to speak to the crowd?

24   A.  Can you repeat the question?  I'm sorry.

25   Q.  Did you see in that video where that member of the

```
1    public was -- appeared to be holding up the megaphone for

2    that officer to speak to the crowd?

3              MR. BALLOU:  Objection, your Honor.

4              (Whereupon, the following bench conference was

5    held:)

6              THE COURT:  Go ahead, Mr. Ballou.

7              MR. BALLOU:  Your Honor, the clear implication of

8    this line of questioning is that there was some sort of

9    conversation and some sort of agreement or purported

10   agreement between the officers and the rioters at this

11   moment.

12             You were very clear in your instructions that the

13   line of questioning is for impeachment about his location

14   along the east front.  We're going well afield -- far afield

15   from that right now.

16             THE COURT:  I hear you.  I'm nervous.

17             But I think part of this is we've been out for an

18   hour and a half.  That's why the questioning -- an hour.  I

19   don't know the exact time.  But it feels like an eternity.

20             And that's where we were before with the

21   cross-examination.  I don't want there to be where we're

22   implying exactly, as you know, Mr. Ballou, if you ask the

23   one question and then say, Then did you hear this person

24   speak, perhaps there's an inference.

25             But we're not -- we've got to trust the jurors to
```

```
 1        just listen to the testimony.

 2                 So, Mr. Roots, you haven't crossed any line yet.

 3        But let's not even get there.  I think, as you know, we're

 4        just going to ask:  Did he hear?  Does he remember hearing

 5        this person speak or does he remember hearing the police

 6        officer speak or seeing them speak?  That's what we're

 7        limiting it to.

 8                 Okay, Mr. Roots?

 9                 MR. ROOTS:  Okay.  I'm trying to get out the

10        confusion of the crowd.

11                 MR. BALLOU:  Wait.  Sorry, your Honor.

12                 THE COURT:  Go ahead, Mr. Ballou.

13                 MR. BALLOU:  To be very clear, the purpose of this

14        video is to not get at the confusion of the crowd.

15                 THE COURT:  Correct.  The purpose of this only is

16        to impeach this witness.  If you want to bring in something

17        else, you're going to use hopefully one of the officers or

18        people who spoke then.

19                 So all I want you to do is:  Did he hear or see

20        any of these people speaking?  Was he so near or is his

21        hearing sufficient that he could hear it?  But that's all

22        we're doing, is impeaching him saying that he didn't know

23        what was going on.  You're trying to show his credibility is

24        not that great because he was not observing the things that

25        were happening.
```

1          All right, Mr. Roots?

2          MR. ROOTS:  Okay.  Maybe we can just play that a

3     few seconds back, which shows what I just asked about.

4          THE COURT:  Sure.  You can play whatever part up

5     to 1:20 you want to.

6          (Whereupon, the following proceedings were had in

7     open court:)

8          MR. ROOTS:  I want to back up a few seconds.  How

9     about 15 seconds.  Back up a couple more.  Let's play it.

10    Keep playing.

11         (Whereupon, segments of Defendant's Exhibit No.

12    20-A were published in open court.)

13         MR. ROOTS:  Stop right here.

14    BY MR. ROOTS:

15    Q.  Do you recognize this location?

16    A.  Somewhere on the east front.

17    Q.  Would you be more specific?  Does it look like this is

18    sort of the middle area of the east front plaza?

19    A.  That's what it looks like.

20    Q.  And this is that -- sort of that line where officers

21    were sort of lined up and then the crowd was lined up?

22    A.  We had officers lined up across the east front,

23    throughout the whole thing.

24    Q.  And you would agree it appears there's discussion

25    between the officers and the crowd?

 1    A.  It looks like there's discussions, yes.

 2              MR. ROOTS:  Keep playing.

 3              (Whereupon, segments of Defendant's Exhibit No.

 4    20-A were published in open court.)

 5    BY MR. ROOTS:

 6    Q.  Please stop if you see yourself anywhere in this.

 7              (Whereupon, segments of Defendant's Exhibit No.

 8    20-A were published in open court.)

 9    BY MR. ROOTS:

10    Q.  Okay.  We've stopped at one minute, 20.

11              Now, do you recall where you were at that exact

12    time?

13    A.  No.  I was just on the east front.  I was up and down

14    the police line we had, checking on my officers, making sure

15    that everybody was okay and ready to respond to any instance

16    that might occur.  So saying my specific location in our

17    vast area would be pretty difficult.

18    Q.  So there came a time when those barricades came down,

19    and you testified about that.

20              You indicated that your leg or something was hit

21    with a baton.  Is that what you said?

22    A.  Yep.

23    Q.  Let me ask, was that baton by another officer or was

24    that the crowd?

25    A.  It was another officer.  It was accidental.

1   Q.  So you were injured accidentally by another officer?

2   A.  Uh-huh.

3            THE COURT REPORTER:  Yes?

4            THE WITNESS:  Yes.  Sorry, ma'am.

5            MR. ROOTS:  So let's play that video again.  This

6   would be Defense 52.

7            (Whereupon, segments of Defendant's Exhibit No. 52

8   were published in open court.

9            MR. ROOTS:  Let me stop right here.

10  BY MR. ROOTS:

11  Q.  Do you see yourself in this video?

12  A.  I did.

13  Q.  Let me just ask:  The baton injury to your leg, was that

14  before or after this?

15  A.  It's before.

16  Q.  Okay.

17           MR. ROOTS:  Let's play it from the beginning.

18           (Whereupon, segments of Defendant's Exhibit No. 52

19  were published in open court.)

20  BY MR. ROOTS:

21  Q.  So you just testified that you were waving at two

22  officers?

23  A.  Yes, sir.

24  Q.  And clearly your hand movement would be in the

25  traditional way that people wave people to come forward?

1    A.  No.  I'm waving at two specific officers, not at a

2    crowd.

3              MR. ROOTS:  Let's play it again.

4              (Whereupon, segments of Defendant's Exhibit No. 52

5    were published in open court.)

6    BY MR. ROOTS:

7    Q.  Now, you indicated, I believe, you testified that there

8    was this danger, severe danger.  Scary.  It was frightening.

9    Right?

10   A.  I think it's a danger when people cross a police line

11   that's pretty well-established.  Yes.

12   Q.  And you indicated that you feared for the safety of the

13   officers you said you were waving at?

14   A.  Yes.

15             MR. ROOTS:  Let's play it again from the

16   beginning.

17             (Whereupon, segments of Defendant's Exhibit No. 52

18   were published in open court.)

19   BY MR. ROOTS:

20   Q.  Now, you would agree that while you're waving, that

21   there are people walking right past you, arm's length?

22   A.  Yes.

23   Q.  They don't appear to be attacking you in any way?

24   A.  Me, no.

25   Q.  And it's true you're not holding up any -- for example,

```
1    your other hand to, for example, give them a signal to stop?
2    A.  So the bike racks and -- I was pushing back on the bike
3    racks.  I wasn't telling them to stop prior to that.  Is
4    that what you're getting at?
5    Q.  What I'm talking --
6    A.  Is that what you're --
7              THE COURT REPORTER:  I'm sorry.  I'm getting too
8    much speaker overlap here.
9              THE WITNESS:  It sounds like you're asking me if
10   we attempted to stop them.  We did attempt to stop this.  We
11   had a police line that they broke in and then they walked
12   into our area that they weren't supposed to be in.
13             Is that what you're asking me, if I didn't do
14   enough to stop?  I'm just trying to understand the question.
15   BY MR. ROOTS:
16   Q.  Well, I'm asking, isn't it true that you could have
17   indicated a stop or a halt --
18   A.  I think I did for a good chunk of that time, sir.
19             My point -- my question, my concern, was getting
20   those officers off the line.  They're by themselves in an
21   area where people went through the police line.  So I was
22   concerned about that.  That was my main concern.
23   Q.  Were you using --
24   A.  That was my --
25             THE COURT:  Mr. Roots -- I need you both to -- I
```

1    understand it's a sensitive subject.  So I appreciate that.

2    We want to hear your truthful answers to all of these

3    things, as you want to -- as you're able to answer.  We just

4    need to make sure we get the questions out.

5              So, Mr. Roots -- you've got to wait.

6              So, Mr. Roots, ask your question again.

7    BY MR. ROOTS:

8    Q.  You were using -- were you using both hands?

9    A.  It looked like one hand at that point.

10             MR. ROOTS:  Let's play it again.

11             (Whereupon, segments of Defendant's Exhibit No. 52

12   were published in open court.)

13             MR. ROOTS:  Let's pause it at the wave, if

14   possible.  Let's play it again and pause right at the wave.

15             (Whereupon, segments of Defendant's Exhibit No. 52

16   were published in open court.)

17             MR. ROOTS:  Right there about four seconds.  Maybe

18   go back one second.

19             (Whereupon, segments of Defendant's Exhibit No. 52

20   were published in open court.)

21   BY MR. ROOTS:

22   Q.  You would agree people walking past you, for example,

23   these people in the foreground here, they seem fairly calm.

24   Would you agree?

25   A.  Those two people in the giant crowd of people?  I guess

1   so.

2   Q.  Did they seem to indicate that you were telling them to

3   stop?

4   A.  I'm not sure.

5   Q.  From the perspective of this camera, doesn't it indicate

6   that you are waving at people to come forward to the Capitol

7   Plaza?

8   A.  I just -- I want to say this once more, clearly:  We had

9   a police line made of metal bike racks.  That group

10  infiltrated it, and we'd been spending a lot of time

11  stopping them from doing that.

12          At that point, when I went back after we had

13  retreated back to a safer area, I went to those officers.

14  My concern was those officers' safety.  There was a lot

15  of -- a giant crowd of people.  It's strange to me that

16  you're focusing on two people, not a giant crowd of people.

17  My main -- I just want to reiterate, my concern was the

18  safety of my two officers there by themselves versus the

19  giant crowd.

20          MR. ROOTS:  Let's play it again.

21  BY MR. ROOTS:

22  Q.  Before we play it again, what about your own safety?

23  Did you fear those people walking right past you?  What

24  was --

25  A.  My own safety wasn't my concern.  My safety was those

1    two officers [sic].

2              Like I said, I've been in combat before.  I've

3    been in dangerous situations.  I would equate that to combat

4    as far as the danger of it and being surrounded by people

5    that wanted to do harm and break police lines and things

6    like that.  They wanted to storm the Capitol.  It was pretty

7    clear by that.

8              Again, my concern was not my own safety.  My

9    concern was those officers that were there by themselves.

10   Q.  Let me ask, was the crowd confused?

11   A.  I can't speak for --

12             MR. BALLOU:  Objection.

13             THE WITNESS:  -- people --

14             THE COURT:  Hold on.

15             (Whereupon, the following bench conference was

16   held:)

17             THE COURT:  All right, Mr. Ballou.

18             MR. BALLOU:  Your Honor, I think the witness

19   essentially stated the objection.  He's not in a position to

20   state what the mind of the crowd was at that moment.

21             THE COURT:  We talked about this a bit today, very

22   little, but certainly yesterday and before.  I can't have

23   officers speculating what the crowd was thinking.  We need

24   people from the crowd that actually can testify.  And I

25   think, in fact, that's what you intend to do, Mr. Roots.

1    But I don't think I can have officers doing that.

2              Does that make sense?

3              MR. ROOTS:  Yes.

4              (Whereupon, the following proceedings were had in

5    open court:)

6              MR. ROOTS:  I want to play that again a little bit

7    slowed down, if possible.

8              (Whereupon, segments of Defendant's Exhibit No. 52

9    were published in open court.)

10   BY MR. ROOTS:

11   Q.  As this is played in a slower motion, I want you to look

12   at the members of the crowd who are walking past you.

13             (Whereupon, segments of Defendant's Exhibit No. 52

14   were published in open court.)

15             MR. ROOTS:  Let's stop right here.

16   BY MR. ROOTS:

17   Q.  First of all, you talked about breaking through bike

18   racks.  Here's a bike rack someone -- it appears someone is

19   just folding it open.  And there was an opening there.

20   Correct?

21   A.  It looked like they pushed it to me.  It looked like

22   they pushed it open to me, sir.  But you can replay it if

23   you'd like.

24             MR. ROOTS:  Yeah.  Let's replay from the beginning

25   in slow motion.

 1                    (Whereupon, segments of Defendant's Exhibit No. 52

 2          were published in open court.)

 3          BY MR. ROOTS:

 4          Q.  Did any of those people that just walked past you lunge

 5          toward you or appear dangerous to you at that moment?

 6          A.  No.

 7          Q.  And here you are waving, waving someone forward.  You

 8          agree?

 9          A.  I'm waving my two officers forward, as I've testified

10          multiple times now.

11          Q.  Yeah.  Couldn't you have pointed to them and said --

12          maybe with one hand while you waved them forward with the

13          other hand?

14          A.  I pointed at them, I thought, with my arms and waving

15          them forward.  I mean --

16          Q.  And if your intent was to stop the crowd from coming

17          forward, couldn't you have held out one hand in a halt

18          symbol while you waved at the two officers?

19                    MR. BALLOU:  Objection, your Honor.

20                    (Whereupon, the following bench conference was

21          held:)

22                    THE COURT:  Okay, Mr. Ballou.

23                    MR. BALLOU:  Your Honor, this is getting extremely

24          repetitive here.  I think the witness has testified both by

25          his actions and intentions here.  I don't understand what

                            Jenkins - CROSS - By Mr. Roots

1    defense counsel is going to get out of asking this same

2    variation of the question the fifth time here.

3              MR. ROOTS:  I think we've made the point.  I'm

4    almost ready to move on.

5              THE COURT:  I'll give you a little more leeway,

6    Mr. Roots, on this.  Let's get to the end.  We're definitely

7    getting to the cumulative point here.  Thanks, Mr. Roots.

8              (Whereupon, the following proceedings were had in

9    open court:)

10   BY MR. ROOTS:

11   Q.  Did you -- you wrote a police report after this

12   incident, January 6th, didn't you?

13   A.  I believe I wrote some things about my injury.  I don't

14   remember a specific report.

15   Q.  Do you know what an FBI 302 report is?

16   A.  No, sir.

17   Q.  Were you interviewed by FBI at all?

18   A.  I believe I was, yeah, a little bit.

19   Q.  And you did not mention this -- this waving of two

20   scared endangered officers?

21   A.  As I recall, they just asked me about my injuries.  I

22   don't remember them asking me about that whole incident.

23   Q.  Okay.  But you never mentioned in that interview --

24   A.  I wasn't asked.  If they asked me, then I would have

25   answered just like I'm answering you right now.

1    Q.  Let me ask, were those officers injured?  Were they able

2    to walk?

3    A.  Not that I'm aware.

4    Q.  So they could have walked at the same pace as every

5    other member of the crowd?

6    A.  They didn't realize that everybody had fallen back,

7    which is why I went out there to get them.  That's why they

8    didn't walk.  It was very loud and chaotic.

9         You mentioned these two people here.  You keep

10   forgetting about all those people that are up on these

11   steps.  They had already broke through us, the ones that

12   took the bike rack out of my hands, stuff like that.  So it

13   was dangerous and loud and chaotic.

14   Q.  Okay.  Now, you said chaotic.  You would agree that

15   there was a lot of confusion there?

16   A.  Confusion for who?

17   Q.  Well, you said chaotic.  Was there confusion for you?

18   A.  No.

19   Q.  You knew exactly what was going on?

20   A.  As far as that moment right there?  My intent was to get

21   those officers to safety, in a safe area.  So no, I wasn't

22   confused about that.

23   Q.  Is it your testimony that the crowd was --

24             MR. BALLOU:  Objection.

25             MR. ROOTS:  Let me withdraw that.

1    BY MR. ROOTS:

2    Q.  Did you perceive that the crowd necessarily knew?

3              MR. BALLOU:  Objection.

4              MR. ROOTS:  I'm trying to think of a way to ask.

5              THE COURT:  Take a moment.  That's fine.  With my

6    prior instruction.  I know it's tough to walk the line

7    there.  But if you can just try to think about what we

8    discussed.

9    BY MR. ROOTS:

10   Q.  Did you encounter people that day who didn't know --

11             MR. BALLOU:  Objection.

12             (Whereupon, the following bench conference was

13   held:)

14             MR. BALLOU:  Your Honor, he's asking yet again

15   questions about the intentions and knowledge of the crowd,

16   which this witness is not able to testify to that.

17             THE COURT:  I think you understand, Mr. Roots,

18   this is less troubling to me than the prior question, but it

19   still has baked into it, when you say, "Did you encounter

20   people that day who didn't know," he can't speak to what

21   people did or didn't know.  But you could say -- I don't

22   know what you're trying to do -- but perhaps other things:

23   Did you encounter people who pushed through the line or

24   didn't?  I don't know.  Just what he actually observed.

25             But what it is those folks knew or didn't know, he

1    can't testify to that.  And again, you have the opportunity.

2    It sounds like you intend to call witnesses who will speak

3    to those very issues.

4              MR. ROOTS:  Okay.  I think I'm actually done.

5              THE COURT:  All right.

6              (Whereupon, the following proceedings were had in

7    open court:)

8    BY MR. ROOTS:

9    Q.  I guess one final couple questions, maybe.

10             You said that these officers didn't know that the

11   police line had fallen back.  How, then, could these

12   officers have even seen you waving at them?

13   A.  I was trying to get their attention by yelling and

14   waving my hands.  We also had hard squad officers in the

15   area, like the padding you see in some of these pictures,

16   trying to get their attention as well.

17   Q.  So these officers could see you?

18   A.  Eventually they could when I yelled at them and waved

19   and everything else.

20   Q.  So surely they could have seen the police line was

21   falling back.  Correct?

22   A.  I can't speak for those officers, sir.  It appeared they

23   didn't know we had fallen back because they were by

24   themselves.

25             MR. ROOTS:  Thank you so much, Lieutenant.  No

1     further questions.

2                 THE WITNESS:  Thank you.

3                 MR. BALLOU:  No redirect, your Honor.

4                 THE COURT:  Thank you so much.  Please step down.

5                 THE WITNESS:  Thank you.  I appreciate it.

6                 (Witness excused.)

7                 THE COURT:  What's next for the United States?

8                 MR. PARKER:  The United States rests.

9                 THE COURT:  So the United States has concluded its

10    presentation of evidence.

11                We next will hear from the defense.  I'm happy to

12    hear from you all in terms of if you wanted to start with

13    the witnesses or if you have any requests.  Or if you want

14    to just -- we're right at the lunchtime.  So if you want to

15    wait until after lunch...

16                MR. PIERCE:  We'd prefer to wait until after lunch

17    if that's okay, your Honor.

18                THE COURT:  Okay.  So it's 12:12.  I know it feels

19    like from your perspective we're moving a lot slower today

20    than yesterday.  As you can see, we've gotten to the close

21    of evidence from the Government, so we've reached an

22    important benchmark.

23                The defense is going to decide -- again, remember,

24    they don't have any obligation, from my initial

25    instructions, if they want to put on any witnesses or what

1    we're going to do going forward.  So we'll -- they'll, of

2    course, take a lunch break.  But we'll be working before you

3    get back to make sure things are seamless when we got back

4    to keep things moving.

5           So it's 12:13 now.  I'd like you all back at 1:15.

6    Be ready to go at 1:15.

7           For the attorneys, if you can be here, let's say,

8    at 1:05 so we can see if we have any other issues.

9           Thanks again for your patience, members of the

10    jury.

11           (Whereupon, the jury exited the courtroom at 12:13

12    p.m. and the following proceedings were had:)

13           THE COURT:  You can be seated.

14           MR. PIERCE:  Your Honor, just to let you know, we

15    heard back from the counsel at the U.S. Capitol Police.

16           THE COURT:  Okay.

17           MR. PIERCE:  They -- she did indicate that Officer

18    Warner could testify tomorrow morning.

19           THE COURT:  Okay.

20           MR. PIERCE:  She asked that any subpoena from you

21    be sent to her.

22           THE COURT:  Okay.  Great.  We'll coordinate with

23    you if you want to get that subpoena done.

24           MR. PIERCE:  Okay.

25           THE COURT:  Then did you let her know about this

1      other person?  I'm not sure who that is.

2              MR. PIERCE:  Yeah.  Ms. Lambert let her know in an

3      email about the other person.  We haven't heard back from

4      her on that person yet.

5              THE COURT:  Great.  Anything else?

6              MR. PIERCE:  No, your Honor.

7              THE COURT:  Anything from the United States?

8              MR. PARKER:  At the risk of delaying everyone's

9      lunch, at some point I think the United States would like to

10     just, maybe before character witnesses start testifying, so

11     that we're not objecting and we can actually get a flow of

12     some testimony, if we can talk with your Honor and defense

13     counsel on the record about what sort of character evidence

14     is coming in and to ensure that it's proper.

15             I understand that you can give reputation in the

16     community; you can give opinion.  You can't give specific

17     instances.

18             There's some leeway to lay a foundation for how

19     you know the opinion or how you know the reputation.  But I

20     don't want us to venture into specific instances and I don't

21     want us to venture into character that is not at issue here

22     or that's not relevant.  I believe what was proper was

23     peacefulness and law-abidingness.  So I don't want us to get

24     into religiosity, generousness, things like that that are

25     not the character evidence that has been proffered.

```
1            THE COURT:  Okay.  Yeah.  I think we'll -- we can
2       do it after lunch.
3            You're calling at least one of those witnesses
4       today, right, Mr. Pierce?
5            MR. PIERCE:  Yes, your Honor.  They'll be the
6       first two.
7            THE COURT:  So I think before we get started, I'll
8       just go over -- have some guidance that I want to give,
9       along very similar lines.  I think that's very clear what
10      the case law is.
11           Mr. Pierce, I'm sure -- or Mr. Roots?  Who's going
12      to be doing the examination?
13           MR. PIERCE:  I will, your Honor.
14           THE COURT:  All right.  Mr. Pierce.  You've been
15      making Mr. Roots do all the work.  So I'm sure you're
16      familiar from prior trials.  But I'll just remind you of
17      course about that again.  If you have any questions, I'm
18      happy to hear from you.
19           MR. ROOTS:  And, your Honor, we do intend to make
20      a Rule 29 motion that the Government has failed to prove its
21      case.  Maybe right after lunch.
22           THE COURT:  I anticipated you doing that.  If
23      there are any motions, we'll handle it right after lunch.
24      I'd like you to get a break here.  It's been a busy morning.
25      Again, I just remind you --
```

1            I'm sorry, Ms. Lavrenz, because the stakes

2      couldn't be any higher from your perspective, I'm sure.

3      It's hard for me to ever imagine being in that chair.  But

4      it feels hard from both sides.  And it's hard because when

5      both sides are going at it, you feel like one side's trying

6      to do the right thing.  It's the same thing.  They feel like

7      it's hard sometimes to not remember people on both sides are

8      trying to do what they think is right.  And we've got to

9      think for everyone, the best of everyone here, because I do

10     believe that everyone is doing everything with their intent

11     to do things the right way, not playing any games and to be

12     fair.

13           So I appreciate how everyone's handling themselves

14     throughout this process.  I know as the week goes on, it

15     gets harder to keep doing that.  But hopefully with some

16     lunch and a little bit of a break we'll be back in in our

17     best of spirits.

18           So thanks for all your patience this morning, all

19     the argument.  I have great admiration for all of you for

20     the work that you're doing.

21           So we'll return at 1:10, let's say, to give you a

22     couple extra minutes.

23           (Thereupon, a luncheon recess was taken, after

24     which the following proceedings were had:)

25           THE COURT:  Do you have anything -- first let's

1     start with the United States -- before we get to the

2     defense's motions?

3              MR. PARKER:  Nothing to cover from us, your Honor.

4              THE COURT:  Okay.  Go ahead, Mr. Roots.

5              MR. ROOTS:  Thank you.

6              Yeah.  Very briefly, we move under Rule 29 for a

7     directed verdict of acquittal, essentially on all counts.

8              This just -- let's just go count by count.

9     Count 1, this allegation of entering and remaining in a

10    restricted area:  Count 1 is the only close call.  The

11    allegation is that the Defendant entered both the plaza and

12    the interior of the Capitol.  The Government has alleged

13    those were clearly restricted.

14             This is a close call.  Obviously, the evidence

15    showed that she was there.  No question.

16             But the element of knowingly, knowing that it's --

17    that she was in a restricted area, has not been met with any

18    evidence.  The jury has no evidence that she knew that it

19    was restricted.

20             There's videos that the Government has put on that

21    shows the Defendant in different places.  But, you know,

22    ironically, I think the Government actually put on evidence

23    that debunks and refutes and rebuts any claim that she knew

24    that it was restricted because the Government put on a video

25    of her statement in a broadcast interview or a podcast in

1    which it then becomes very clear that she indicated that she

2    did not know, she did not even know how the barricades that

3    had been present at one time, she didn't -- said that she

4    did not even know how they came to go down or open up.

5           So the Government put on no evidence, nothing,

6    that the jury could take away with indicating that she

7    knowingly entered or remained in a restricted area.

8           And I would argue also that the idea of remaining

9    is a separate -- a separate element or sub-element.

10          Nothing that the Government put on indicates that

11   the Defendant knew that -- or that she remained after being

12   told that she had to leave.  The Government put on no

13   evidence of anyone telling her that she had to leave.

14   Nothing.  There's no evidence that the jury can even take

15   away and come to a verdict on that.

16          And like I said, that's the only close count.

17          Count 2 and Count 3 are similar.  They are

18   allegations of disorderly conduct.  Literally, this is a

19   case -- Mr. Pierce and I have had almost a dozen January 6th

20   trials, some of which -- a couple -- two were stipulated

21   trials.

22          This case compared to all of those has the least

23   amount of indicia.  In fact, there's nothing -- nothing,

24   nothing put on by the Government shows the Defendant

25   disorderly behaving, engaging in any action that could be

1    construed under the circumstances of disorderly or

2    disruptive conduct.  Nothing.  The Government has literally

3    put on absolutely nothing.  All the evidence that the

4    Government has shown shows merely that the Defendant was

5    present, that she walked in places and stood in places.

6         There's no evidence that she jumped, that she even

7    moved at any speed that was even above normal.  Nothing

8    about her moving, pushing, jumping, lashing out, reaching

9    out, littering, tossing anything, touching anything.

10   Nothing.  This is a case where there is literally nothing.

11   The Government has not put on enough evidence for the jury

12   to even consider Counts 1 -- I'm sorry -- Counts 2 and 3.

13        And I would add that Count 3 actually has a

14   scienter requirement that is higher than Count 2, and that

15   is "willfully."  "Willfully" means that she knew she was

16   breaking the law by disorderly conduct and disrupting

17   things.

18        The Government put on nothing, literally nothing

19   but mere presence.  Merely standing in places and walking in

20   places.

21        And by no standard in the law, I submit, that --

22   you know, we've all looked up what does "disorderly conduct"

23   mean.  In no case ever published was standing or walking

24   considered to be by any court, as far as I know, disorderly

25   conduct other than perhaps some January 6th courts; and

Rule 29 Arguments

 1    those are an aberration in every way.

 2              Count 4, picketing, parading and/or demonstrating

 3    inside the Capitol:  Again, as with Counts 2 and 3, the

 4    Government has only put on evidence of mere presence inside

 5    the Capitol on the part of the Defendant.

 6              They haven't put on any evidence that she

 7    picketed, demonstrated or paraded.  In fact, the only time

 8    there's any evidence indicating she may have talked to

 9    anyone, I guess two little snippets, one was in that little

10    broadcast interview podcast thing where the Defendant said

11    that she had talked to another person in front of her who

12    said words about Congress is out of session, Congress is not

13    here, so they couldn't even go and, you know, testify before

14    Congress.  There was nothing to do, essentially.

15              So she indicated she had talked to someone there.

16    And I don't know think the Government even displayed that,

17    if that happened, but let's assume that discussion of

18    speaking.

19              And then there was the moment where, shortly

20    before leaving the Capitol Building, the Defendant was

21    pictured briefly having a discussion with a law enforcement

22    officer.

23              Nothing that the Government put on indicates

24    picketing, parading or demonstrating.  She was wearing

25    political things, like a flag, flag-type stuff, a Trump

1    banner and things like that.  But none of that is even

2    outside the realm of what is this normal for members of

3    Congress and staff.

4           So the Government put on no evidence essentially

5    for Count 4.

6           We argue that Count 2, Count 3, Count 4 really

7    cannot go to the jury at all.  The Government clearly did

8    not even meet its burden of persuasion, put on enough

9    evidence even for a fact-finder to go any further.

10          With regard to Count 1, it's a little bit of a

11   closer call.  But, really, taken in the context of what the

12   Government put on of the Defendant's own statements that

13   she, you know, didn't know that -- that she said that

14   barricades had opened up and she went in.  Nothing about

15   knowing.

16          And so even on Count 1 the Government has failed

17   to present any evidence that allows that to even go to the

18   jury.

19          So this trial really needs to stop right now.

20          Thank you.

21          THE COURT:  Thanks, Mr. Roots.

22          I'm happy to hear from the United States.

23          MR. PARKER:  Thank you, your Honor.

24          First of all, we'll start by the standard.  The

25   standard here on a Rule 29 motion is that the Court takes

1    the evidence in the light most favorable to the Government.

2          And if a reasonable jury could conclude the

3    Defendant was guilty beyond a reasonable doubt on all

4    counts, then the Court should deny the motion.

5          The Court should not get into credibility

6    judgements.  That's a task for the jury.  We just

7    objectively look at the evidence that's been presented.

8          Here, a reasonable jury could find the Defendant

9    guilty beyond all -- beyond a reasonable doubt on all

10   counts.

11         I'm happy to go count by count if your Honor

12   thinks that's the most helpful way to do it or if your Honor

13   has particular questions.

14         THE COURT:  Sure.  Count by count.

15         MR. PARKER:  So for Count 1, the Government has

16   proven that the Defendant entered or remained in a

17   restricted area or grounds.

18         Obviously, we've had the discussion about 1752 and

19   the presence of the vice president.  I think Inspector Hawa

20   testified that the vice president was there temporarily

21   visiting for the joint session.

22         We've also presented enough -- a lot of evidence

23   about the restrictions that were in place.  I'll focus

24   mostly on the east front because that's where the Defendant

25   was.

 1          We heard testimony from Captain Brooks, from

 2     Inspector Hawa, from Lieutenant Van Benschoten about the

 3     bike rack barriers that were there.  Lieutenant Van

 4     Benschoten in particular talked about being on that police

 5     line and Lieutenant Jenkins this morning talked about being

 6     on that police line forming the restriction, trying to keep

 7     the crowd back, clearly demonstrating to the members of the

 8     public there that the area was restricted.

 9          If we look at Government's Exhibits 104, 105, 202,

10     that also outlines the restricted area.

11          The Defendant plainly entered the restricted area.

12     We saw her breach the bike racks in a number of exhibits,

13     104, 305.

14          The Defendant did so knowingly.  First, the

15     Defendant in -- I believe it's Government's 504 discusses

16     entering the restricted area and says something along the

17     lines that the crowd got riled up because Vice President

18     Pence was going to certify and then they rushed across the

19     east plaza.

20          The Defendant acknowledged in Government's Exhibit

21     503, I believe -- I believe this is the video that Mr. Roots

22     was referencing -- that she had seen the barriers at one

23     point and that she obeyed the barriers at one point, which

24     suggests that she knew the barriers were something to obey.

25          Obviously, there came a time when she stopped

 1      obeying them.  She knowingly entered the restricted area.

 2           She watched as police lines were overrun.  She

 3      watched as -- at the bike racks, she watched as police lines

 4      were overrun at the base of the steps.  She was standing

 5      feet away from a tremendously violent scene at the top of

 6      the steps and then she entered the United States Capitol.

 7           She left from the --

 8           THE COURT:  You can go to Count 2.

 9           MR. PARKER:  Thank you.

10           For Count 2, it's disorderly or disruptive

11      conduct.

12           Obviously, the restricted grounds is the same.

13      I'll focus on the disorderly and disruptive.

14           Your Honor's already acknowledged and noted

15      reading *Alford*.  I think that clearly -- I think that's

16      completely on point here.

17           The Defendant's conduct was plainly disruptive in

18      that her unauthorized presence within the United States

19      Capitol, as we heard from Inspector Hawa, disrupted the vice

20      president's ability to oversee the joint session.

21           And as *Alford* notes, we look at the entire

22      context.  The context is that a mob invaded the United

23      States Capitol and the Defendant knowingly joined that mob.

24           In terms of intent in this area, the Defendant

25      made her way towards the Senate chamber.  She was stopped by

1    yet another police line.  And in interviews -- I believe

2    that's 505 -- she says, We were headed towards the -- so

3    summarizing, We were headed towards the congressmen.  We

4    wanted -- I wanted to make my presence known, which sounds

5    plainly like demonstrating.

6              So I think Count 2 is met.

7              For Count 3, which is -- it's essentially the same

8    as Count 2, but it's in the Capitol building.  I'll

9    incorporate what I just argued.

10             And then for Count 4, I think it's along the same

11   lines.  She's plainly demonstrating within the Capitol

12   Building, saying, I want to make my presence known and

13   acknowledging that she wants to make her presence known to

14   members of Congress, which plainly sounds like

15   demonstrating.  This was not simple quiet praying.  The

16   Defendant joined a mob that invaded the Capitol.

17             THE COURT:  Thanks so much, Mr. Parker.

18             I'm going to deny the defense's motion.  I

19   appreciate the United States setting out the standard just

20   so we're all on the same sheet of music.

21             It's *United States versus Davis* that sets out that

22   standard, D-A-V-I-S, 562 F.2d at 683, where it is said it is

23   only to be granted when there is no evidence upon which a

24   reasonable mind may fairly conclude guilt beyond a

25   reasonable doubt.

1          In *United States versus Weise*, W-E-I-S-E, the

2    Court stated at 718 F.2d at 437 -- the Court said that the

3    district court may grant a motion for judgment of acquittal

4    only when a reasonable juror must necessarily have a

5    reasonable doubt as to the Defendant's guilt.

6          As Mr. Parker stated, that's the standard.

7          And in evaluating a motion for a judgment of

8    acquittal, the Court must consider the evidence in the light

9    most favorable to the Government.  That's *United States*

10   *versus Wahl*, W-A-H-L, 290 F.3d 370 at Page 375.

11         The standard is also set out in *United States*

12   *versus Treadwell*, T-R-E-A-D-W-E-L-L, 760 F.2d at 333.

13         Let's look at the first charge.  Count 1 is

14   entering or remaining in a restricted building or grounds.

15         I appreciate, Mr. Roots, what makes you effective

16   is you're not just saying everything is open and shut.  You

17   agree this one is the closest call.

18         I think here I disagree that there's no evidence.

19   Truly.  That's what we're talking about.  None or some.

20   Right?  That there is no evidence to knowingly show that it

21   was restricted or that your client knew that it was

22   restricted.  You indicate that she didn't see barricades and

23   nothing to show that she knowingly remained after told.  So

24   two arguments.

25         I think, without relisting every single exhibit, I

1    think the Government thoroughly has answered this and

2    demonstrated that there is quite a volume of exhibits that

3    show that a person could have or maybe should have known

4    that it was restricted.

5          I think they demonstrated not simply based on

6    signage on the west front, but at the front Capitol, given

7    the -- you heard the testimony most recently from the

8    Capitol Police officer this morning that there were

9    barricades up and that there were bike racks.  They

10   described them as being heavy, not easy to move, we've

11   heard.  And so that those alone seems to indicate a very

12   apparent restriction.

13         I think it's a question of fact for the jury to

14   decide whether Ms. Lavrenz actually saw these barricades or

15   not or other evidence of restriction, like a closed door at

16   the Capitol Building, that people are trying to push

17   through.

18         But there certainly is readily apparent facts that

19   a reasonable mind could think, certainly in the light most

20   favorable to the Government --

21         And that's not the standard, Ms. Lavrenz, when

22   they're actually deliberating.  But right now your lawyers

23   have asked that the case be dismissed without going to the

24   jury.  And in this situation, it's the one time that the

25   sort of standard shifts from being everything in your favor,

1    which it should be, because you're presumed innocent.

2    That's what I see when I see you, a presumed-innocent

3    person.  But here I have to look at the light most favorable

4    to the Government.

5              And in this limited stance, I say that, yes, you

6    could look at these things and come to that conclusion of

7    what the Government has said based on the litany of things

8    that they went through.

9              We've been over -- here even, unlike maybe in some

10   other cases, there's an allegation that there was knowledge

11   beforehand that this was a restricted area potentially

12   because of a clip that was played where Sidney Powell

13   discussed the vice president being there.

14             I next want to go to Count 2.  Count 2

15   criminalizes knowingly and with an intent to impede or

16   disrupt the orderly conduct of government business or

17   official functions.  Sorry.  I want to go back to Count 1.

18             Count 1, also part of the basis for the request

19   for the directed verdict is there was nothing shown --

20   there's nothing shown that she knew that she was remaining,

21   i.e., there was not some sort of warning to leave.  I think,

22   again, the Government's evidence that this was a restricted

23   area applies equally.  You don't need to be told to be

24   removed.

25             I think it's clear that the police officers

1    also -- there was evidence from multiple officers here that

2    we heard that they were trying to get people out.  And we

3    saw video showing that they were trying to -- continually

4    trying to hold the line and prevent people from getting

5    further into the Capitol and that every time it was an

6    attempt to stave off further penetration into the restricted

7    grounds.

8            And so I think that there's no requirement that

9    someone be affirmatively told, "You should not stay here;

10   you must go."  I think that there is lots of other things

11   that reasonable jurors could consider in deciding whether or

12   not sufficient direction had been given to tell a person

13   they were in the wrong place and they needed to leave

14   immediately.

15           I think the Government has adduced such evidence.

16           So back to Count 2:  Count 2 criminalizes

17   knowingly and with an intent to impede or disrupt the

18   orderly conduct of government business or official

19   functions, engaging in disorderly or disruptive conduct in a

20   restricted building when or such that the conduct in fact

21   impedes the orderly conduct of government business or

22   official functions.

23           Mr. Roots, I think, makes -- as he knows, this

24   is a -- he believes it to be a stronger argument for

25   defense.  I think it's certainly stronger than Count 1, but

1    I still believe the appropriate response is to deny this

2    request.

3            Although Mr. Roots notes that he believes there

4    was no evidence to show disorderly or disruptive conduct by

5    his client, essentially, and there was nothing to show

6    violence, I will cite again to *Alford*, A-L-F-O-R-D.  I think

7    this is a question for the jury.  I will also cite to a case

8    I quoted earlier, *United States versus Griffith*,

9    G-R-I-F-F-I-T-H.

10           I think Judge Kollar-Kotelly quite eloquently -- I

11   will not repeat what I said then -- indicated that even one

12   person just being present could be disorderly.  And that one

13   unauthorized person in the Capitol is a reason to suspend

14   the Capitol's business.

15           So I don't think there has to be some showing of

16   violence or serious violence to show disorderly or

17   disruptive conduct.  That -- it's clear from *Alford*, but

18   more importantly from Judge Kollar-Kotelly's opinion, that

19   you can demonstrate, as the Government suggests, through a

20   multitude of ways that a single person being there could be

21   disruptive.

22           In the light most favorable to the Government, I

23   think they've presented evidence.  Certainly we heard from

24   Inspector Hawa how the actions of the groups did in fact

25   disrupt the certification of the election.

1          So I think that we have seen sufficient evidence

2     to believe that there is a reasonable juror who could think

3     that there were sufficient facts to meet the elements of

4     this charge.

5          Count 3:  The defense focuses on there's nothing

6     to show willfulness.

7          I think that in terms of Count 3, there's nothing

8     to indicate this was an accident or not purposeful conduct.

9     I think that the jury instructions -- let me pull that up.

10    One moment.  For Count 3, for disorderly conduct in a

11    Capitol building or grounds, they direct that the Defendant

12    had to act willfully and knowingly.

13         "Willfully" is defined as if the act with the

14    intent to do so, to do something that the law forbids, that

15    is, to disobey or disregard the law.  Willfully does not,

16    however, require proof that the defendant be aware of the

17    specific law or rule that her conduct may be violating.

18         So in this instance I think the Government has put

19    together facts that demonstrate willfulness, that this was

20    the restriction of the barricades, the police officers

21    trying to stop people, the firing of teargas, the pepper

22    spray that was in the air, the flash bomb, whatever it's

23    called, the noise, all of these things, the police officers

24    pushing back the line, what was seen at the door, the closed

25    door.  All of these things show that, I think, in a clear

1    argument of willfulness potentially that a juror could

2    decide.  I'm not saying that's how they should rule.  I'm

3    just saying that they could rule that way.  That's all I

4    have to consider, is a reasonable juror could rule that way

5    in the light most favorable to the Government.

6          And I think that they have demonstrated sufficient

7    evidence for disorderly conduct.  They also showed, although

8    not necessarily on the other counts, they've shown here that

9    it was within -- into the inside of the Capitol.  We saw the

10   evidence of the Defendant walking throughout the building

11   with this crowd, which, again, appears the crowd was there

12   to disrupt or was being disruptive of the conduct in there.

13         Finally, as to Count 4, the Defendant states

14   there's no evidence that the Defendant demonstrated or

15   paraded.  It was suggested that she talked to somebody and

16   that essentially she was only present in the Capitol

17   Building.

18         I will cite again to Judge Kollar-Kotelly.  The

19   same logic underpinning that is that I think that even if

20   you potentially could be just one person, if you're caught

21   up in the mob and there's nothing to indicate it was

22   accidental, that she was there before, that you then are

23   part of this raindrop theory.  I think that there is -- it

24   is a logical form to conclude from that that you are part of

25   the picketing, demonstrating or parading.

1          Separate from that and unrelated to any raindrop

2     theory, I don't think there's any dispute, even at the

3     higher level of scienter for either Count 3 or 4, to the

4     extent it's there, that there was any accident or mistake.

5     There was evidence in the light most favorable to the

6     Government that the Defendant entered the Capitol Building,

7     was part of -- I don't know what this could be called,

8     anything other than a demonstration.  It certainly was a

9     parade.  People were walking throughout the building.  As

10    the jury instruction says, the terms "parade" and "picket"

11    have their ordinary meaning.

12         I don't think there's a reasonable juror who could

13    not think that what we saw from what occurred inside the

14    building from the evidence by the Capitol Police officer and

15    the case agent in the videos showed anything other than, at

16    a minimum, parading or picketing.  I think also

17    "demonstration" would apply.

18         I don't think that they need to show -- the

19    Government does not need to show that there were some

20    political statements, verbal statements that were being

21    made.  This could have been done silently.  It still can

22    qualify as parading, picketing or demonstrating.

23         So for those reasons, I'll incorporate of course

24    the judges who have ruled on these questions before,

25    including Judge Boasberg in *Carpenter* and I believe Judge

1    Chutkan in *Nestor*, N-E-S-T-O-R.  So for those reasons, I

2    deny the motion for judgment of acquittal.

3           I think that it is appropriate questions for the

4    jury.

5           Again, at the standard that is most favorable to

6    Ms. Lavrenz, when they're making it, they're considering it

7    has to be proof beyond a reasonable doubt.

8           Anything else from the United States?

9           MR. PARKER:  Not on this topic, your Honor.

10          THE COURT:  Do you have something else?

11          MR. PARKER:  Just a note.  We're prepared to

12   address the reasonable doubt instruction whenever your Honor

13   would like.  It doesn't have to be now.

14          THE COURT:  I don't think we need to do it now

15   because I don't think we're going to -- I think both that

16   and the other instruction --

17          Did you get -- Mr. Roots, did you get that

18   instruction, the other one you wanted out?

19          MR. ROOTS:  I'm almost finished.  I'll email it

20   probably in the next -- before the break.

21          THE COURT:  Okay.  Great.  So I think we can get

22   that later today or first thing tomorrow because we've got

23   what appears to be still a long road ahead of us.

24          Anything else then from the United States?

25          MR. PARKER:  No, your Honor.

1          THE COURT:  Mr. Roots, anything?

2          MR. ROOTS:  There's one little point.  We looked

3    up that case of that guy named Dunfee.  So we owe him an

4    apology.  He was not underprosecuted.  We believe he was

5    overprosecuted like so many others.

6          THE COURT:  You're never satisfied, Mr. Roots, but

7    I hear you.

8          MR. ROOTS:  So we owe him an apology.  He's not an

9    informant or anything.  If we suggested anything like that,

10   we apologize.  He actually was overprosecuted and brutally

11   prosecuted.  He shouldn't have been.

12         THE COURT:  To the extent that -- are you hoping

13   to call him as a witness?

14         MR. ROOTS:  No.

15         THE COURT:  Thank you.

16         So it sounds like we're ready to call the jury

17   back in.

18         It sounds like you have your witnesses ready.  Is

19   that right, Mr. Pierce?  Sorry.  Before we do, I want to go

20   over the character witness.  Just one moment.

21         I think the United States has already sort of laid

22   out largely the question of what we're looking for with

23   character witnesses.  I did look at *United States versus*

24   *Baez*, B-A-E-Z.  That's from Judge Friedman, who we all have

25   learned today I have a great affinity for, 2023 Westlaw

1      6364648 at Pages 10 through 33.  I also looked at *Carpenter*

2      *versus United States*.  That's of course, as I noted multiple

3      times, Judge Boasberg's opinion, where he allowed certain

4      character evidence.

5              I want the evidence to come in to go to

6      law-abidingness, peace and good order, versus criminality.

7      I think that we can talk about -- I'm not looking for

8      specific instances or incidents.

9              I take it, Mr. Pierce, from your -- you're

10     familiar with kind of what we're -- we've already heard from

11     the Government.  It doesn't sound like there was a great

12     delta between what you thought was appropriate and what they

13     do.  But I want to hear from you if you have specific things

14     that you want to flag or -- we'll take it, of course, as it

15     comes up during the actual presentation of evidence.  Does

16     that sound fine?

17              MR. PIERCE:  Yeah.  I think I'm tracking your

18     Honor.  I've done several character witnesses in these cases

19     and really haven't had much of an issue.  So I'm on track

20     with what both you and the Government are saying.

21              One just point of order, just because it struck us

22     as odd, both myself and Ms. Lambert, Ms. Baez hasn't been

23     tried yet.  So it seemed odd that there would be anything

24     from Judge Friedman about character witnesses in her case.

25     But maybe we're just forgetting something.

 1            MR. PARKER:  Your Honor --

 2            THE COURT:  I think it's from the Westlaw cite in

 3     September 2023.  But go ahead.

 4            MR. PARKER:  I believe I can add some clarity.  I

 5     believe that case got incredibly close to trial and then

 6     there was a delay.  So it might be that a lot of the

 7     pretrial stuff had been resolved.

 8            THE COURT:  Okay.  I don't think there're

 9     deepfakes on Westlaw yet.  I don't know.  So I'll rely

10     still, regardless, on *Carpenter*, and I believe that that

11     Westlaw citation was from 2023 WL-636464 --

12            MR. PIERCE:  It is becoming kind of surreal that

13     90 percent of the cases cited in court are the cases that

14     we've, you know, had.

15            THE COURT:  That's why I would say you're the

16     hardest-working men in show business, Mr. Pierce and

17     Mr. Roots.  I don't want to undercut Mr. Roots there.  So

18     yes.  They're all your cases.  I do know that.

19            So it sounds like you feel comfortable.  We'll get

20     to it if we do.  But we talked about the Rules of Evidence,

21     what applies here and what I am kind of expecting in terms

22     of the sort of scope of any character witness testimony.  I

23     want to be careful.

24            MR. PIERCE:  Yeah.  I can just say, your Honor,

25     yes, I am -- I intend -- I know what the -- what the

 1     boundaries are.  To me they are very consistent with what

 2     both the Government and yourself put up.  I know the rule,

 3     and I'm intending fully to stay within the bounds of it.  So

 4     if we stray afield --

 5               THE COURT:  I'm sure Mr. Parker will let us know.

 6     Great.

 7               I think we're ready for the jury, then, right,

 8     Mr. Parker?

 9               MR. PARKER:  Yes.  I think so.

10               THE COURT:  All right.  Ms. Lavigne-Rhodes.

11               THE COURTROOM DEPUTY:  All rise.

12               (Whereupon, the jury entered the courtroom at 1:51

13     p.m. and the following proceedings were had:)

14               THE COURT:  You can be seated.

15               Thank you, members of the jury.

16               Mr. Pierce, if you want to call your first

17     witness.

18               MR. PIERCE:  Yes, your Honor.  The defense calls

19     Ms. Vickie Tonkins.

20               THE COURTROOM DEPUTY:  Good afternoon.

21                         VICKIE TONKINS, SWORN.

22               THE COURTROOM DEPUTY:  Thank you.  You may be

23     seated.  Please speak into the mic.

24                         DIRECT EXAMINATION

25     BY MR. PIERCE:

```
 1    Q.  Good afternoon, ma'am.

 2    A.  Good afternoon.

 3    Q.  Could you please state and spell your name for the

 4    record.

 5    A.  Yes.  Vickie Tonkins, V-I-C-K-I-E, T-O-N-K-I-N-S.

 6    Q.  Thank, Ms. Tonkins.

 7              I'm just going to advise you here, so the court

 8    reporter can get the transcript straight, to let me ask the

 9    question and then you answer and let's not step over each

10    other as we're going back and forth.  Okay?

11              Where are you from, Ms. Tonkins?

12    A.  Colorado Springs, Colorado.

13    Q.  And can you just briefly describe your educational

14    background?

15    A.  I have a bachelor's degree in organizational management

16    and a master's degree in education.

17    Q.  And what do you do professionally?

18    A.  Well, I work for a GAL as a social worker.  And I also

19    work in the El Paso County GOP office.

20    Q.  And the first thing you mentioned, could you repeat

21    that?  You said GAL?

22    A.  Yes.  Guardian ad litem.  We work with young people who

23    are in the foster care system.

24    Q.  Okay.  And do you know the Defendant in this case,

25    Ms. Rebecca Lavrenz?
```

1   A.   I do.

2   Q.   And how did you get to know Ms. Lavrenz?

3   A.   It's actually through my husband.  He was holding a

4   prayer event, and Ms. Lavrenz was there.

5   Q.   And how well do you know Ms. Lavrenz?

6   A.   She's a good friend.

7   Q.   For how long have you known Ms. Lavrenz?

8   A.   About four years.  A little over.

9   Q.   Have you had consistent interactions with her during

10  that entire timeframe?

11  A.   Yes.

12  Q.   How would you describe, generally speaking, your

13  relationship with Ms. Lavrenz?

14  A.   A good one.  We pray together.  We fellowship, eat

15  together, just a normal life.

16  Q.   Okay.  Now, do you feel that you have a sufficient basis

17  to have formed a personal opinion about Ms. Lavrenz's

18  character for law-abidingness?

19  A.   Absolutely.

20  Q.   And what is that opinion?

21  A.   She is a -- I've never heard her raise her voice.  She's

22  always gentle and kind to everyone.  And she's just a

23  pleasant person to be around.  I always characterize her as

24  one of my favorite people.

25  Q.   Okay.  And do you feel that you have a sufficient basis

1    to know the reputation of Ms. Lavrenz in the community for

2    the character of law-abidingness?

3    A.  Yes.

4    Q.  And to your knowledge, what is that reputation?

5    A.  The same I said:  Just about everybody I know that knows

6    Ms. Lavrenz has always said she is the kindest person.  She

7    is so gentle and loving to everyone.

8    Q.  Okay.  And another couple questions related but

9    different.

10          Do you have -- do you feel that you have a

11   sufficient basis to have formed a personal opinion about

12   Ms. Lavrenz's character for peaceability, whether she is

13   generally a peaceful person or not?

14   A.  Always.

15   Q.  And what is that opinion?

16   A.  Always.  I mean, she's always peaceful.  It doesn't

17   matter what's going on around her, what's happening.  She's

18   a peaceful person.  That's just her nature.

19   Q.  And do you feel that you have a sufficient basis to know

20   what her reputation is in the community for the character of

21   peaceability?

22   A.  Yes.

23   Q.  And what is that reputation?

24   A.  Well, just like I said earlier, just being around other

25   people who have spent time with her.  We all say the same

```
 1    thing.  She's -- she's loving.  She's peaceful.  She's
 2    prayerful.  She's always kind.  And I've never heard her say
 3    a cross word to anyone.
 4    Q.  Is Ms. Lavrenz the type of person who would be part of a
 5    violent mob?
 6    A.  No.
 7              MR. PARKER:  Objection.
 8              THE COURT:  We can have a bench conference.
 9              (Whereupon, the following bench conference was
10    held:)
11              THE COURT:  I don't think we can have her
12    speculating.  I think that's outside the scope of what also
13    we're trying to do here with the witness testimony, which is
14    to establish lawfulness, you know, past her sort of
15    reputation, not sort of her hypotheticals.  Okay?
16              MR. PIERCE:  No problem, your Honor.
17              THE COURT:  Mr. Parker, you're good?
18              MR. PARKER:  Yes, your Honor.
19              (Whereupon, the following proceedings were had in
20    open court:)
21              THE COURT:  I'm going to direct the jury to strike
22    the last question and the answer that you may or may not
23    have heard.
24              MR. PIERCE:  I'll withdraw that question.
25    BY MR. PIERCE:
```

1    Q.  Final question, ma'am:  You are not here -- well, strike

2    that.

3              You care very much about what happens in this

4    trial to Ms. Lavrenz.  Is that right?

5    A.  Yes.

6    Q.  You are not here pretending to be an unbiased witness,

7    are you?

8    A.  No.

9              MR. PIERCE:  No further questions.  Thank you very

10   much.

11             THE COURT:  Thank you.

12             MR. PARKER:  Very briefly, your Honor.

13             THE COURT:  Okay.

14                        CROSS-EXAMINATION

15   BY MR. PARKER:

16   Q.  Good afternoon.

17   A.  Hi.

18   Q.  You said you met the Defendant about four years ago.  Is

19   that right?

20   A.  Yeah.  A little over four.  Almost five years, actually.

21   Q.  So by the time January 6th happened, you had only known

22   her for a year, year and a half.  Does that sound roughly

23   right?

24   A.  If that's the timeframe.

25   Q.  You haven't watched any of this trial at all.  Right?

1    A.  No.

2    Q.  And you weren't with the Defendant at the Capitol on

3    January 6th.  Do I have that right?

4    A.  Say that -- I'm sorry?

5    Q.  You weren't with the Defendant at the U.S. Capitol on

6    January 6th?

7    A.  No.

8              MR. PARKER:  No further questions.

9              MR. PIERCE:  No redirect, your Honor.

10             THE COURT:  All right.

11             THE WITNESS:  That's it.

12             THE COURT:  That's it.  Thanks for coming down.

13             (Witness excused.)

14             MR. ROOTS:  Okay.  The defense next calls Rick

15   Green.

16             THE COURTROOM DEPUTY:  Please stand and raise your

17   right hand.  Thank you.

18             RICHARD GREEN, DEFENSE WITNESS, SWORN.

19             THE COURTROOM DEPUTY:  Thank you.  You may be

20   seated.  Please speak into the mic.

21                      DIRECT EXAMINATION

22   BY MR. ROOTS:

23   Q.  Good afternoon.  Would you state and spell your name for

24   the court reporter.

25   A.  Sure.  Richard Green, R-I-C-H-A-R-D, G-R-E-E-N.

1    Q.  And, Mr. Green, where are you from?

2    A.  Austin, Texas.

3    Q.  Okay.  And how long have you lived there?

4    A.  30 years.

5    Q.  And what do you do there?

6    A.  I run a nonpartisan, nonprofit educational organization

7    where we teach citizens of all ages from little kids to

8    great-grandmothers about the Constitution and history and

9    how to be good citizens and treat their neighbors the way

10   they want to be treated.

11   Q.  You said that was a nonprofit organization.  How long

12   has that existed?

13   A.  23 years.  So it's nonprofit and nonpartisan.  So we

14   teach Republicans, Democrats, Libertarians, Green Party,

15   nonparty, anybody.

16   Q.  And you said you teach them to be good citizens.  Can

17   you explain a little bit more about that?

18   A.  Yeah.  Just basically civics and how to live out your

19   citizenship, voting, being involved, learn how to testify at

20   legislative committees or, you know, your local city council

21   or run for office and just, you know, get together with

22   people in your community to be the "We the People," which is

23   the ones ultimately responsible for what our nation looks

24   like.

25   Q.  And are you also an attorney?

1    A.  Yes, sir.

2    Q.  And are you also a former lawmaker?

3    A.  Yeah.  I was a state representative in Texas.

4    Q.  Okay.  Do you happen to know someone named Rebecca

5    Lavrenz?

6    A.  I do.

7    Q.  Do you recognize her in the courtroom?

8    A.  Yes.  Right over there.  One of our Constitution

9    coaches.

10   Q.  Okay.  So yeah.  Go ahead and just -- can you say

11   where -- how did you come to know her?

12   A.  Yeah.  We do our classes all over the country.  We have

13   about 28,000 Constitution coaches.  So I go to conferences

14   around the country where we help train them how to literally

15   hit play on our DVDs when they get people in their living

16   room or local library.  So we got to meet at some event that

17   our group was having in the Colorado Springs area.

18   Q.  About how long have you known Ms. Lavrenz?

19   A.  About three years.

20   Q.  Now, you said a constitutional coach.  You said -- did

21   you say you were one of those or she was one of those?

22   A.  Well, both, actually.  I run the organization.  But we

23   teach all of our members how to host a class.  It's more

24   being a Constitution host than a coach.  But it's a chance

25   to get their neighbors together to study the Constitution.

Green - DIRECT - By Mr. Roots

```
 1                    MR. PARKER:  Your Honor --

 2                    THE COURT:  Yes.

 3                    MR. PARKER:  -- can we just be heard on the phones

 4         briefly?

 5                    (Whereupon, the following bench conference was

 6         held:)

 7                    MR. PARKER:  Thank you, your Honor.

 8                    So the witness just said that he's known the

 9         Defendant for about three years.

10                    If Mr. Roots could ask whether he met the

11         Defendant before or after January 6th because -- the reason

12         I ask is, if he didn't know the Defendant before

13         January 6th, he actually can't speak to her character at

14         that time.  I think that's the relevant -- is the relevant

15         timeframe for character.  I don't think the character is

16         now.  Do you see what I mean?

17                    THE COURT:  I think that he's right.  I think if

18         the person knew her after January 6th, then, I mean, the

19         testimony goes to her actions of what happened that day.

20         And to the extent that there's character evidence from

21         before that day, that can be useful to a trier of fact.  But

22         if someone met them -- a person, you know, let's say a year

23         after they were charged, I don't think, Mr. Roots, that that

24         actually can be admitted.

25                    MR. ROOTS:  Yeah.  This is not a character
```

1    witness; this is a fact witness.

2              THE COURT:  Okay.  What is this person going to be

3    testifying as to?

4              MR. ROOTS:  We're going to get into these classes

5    that formed sort of the state of mind of the Defendant as

6    she went through January 6th.

7              Also, the Government has put on a video of this

8    witness who has that podcast where he interviewed her.

9              THE COURT:  Well, let's take one thing at a time

10   here.

11             So if he is going to be talking still about what

12   he and her -- what he and she learned after January 6th,

13   that can't go to her state of mind prior.  Right?  If she

14   learned something January 30th, that's not -- it doesn't

15   speak to her state of mind on January 6th.  So let's begin

16   with that.

17             Now, in terms of the podcast, I mean, what is it

18   that he's going to talk about?  Does it go to a completeness

19   issue?  I'm not sure.  What is his testimony going to be?

20             MR. ROOTS:  Basically, yes.  Completeness.

21             Also, he's going to fill in the blanks with regard

22   to I guess the background of her state of mind with this --

23   the classes, the civic participation that she focuses on.

24             MR. PARKER:  Your Honor, that sounds like the

25   exact same problem that we've been covering throughout the

1    morning.

2              If the Defendant wants to talk to her state of

3    mind, she obviously doesn't have to testify.  But that's her

4    right.  And I think that's the appropriate individual.

5              But to have this individual come on the stand and

6    testify about her state of mind seemingly from a time after

7    January 6th, I don't think that makes any sense and I don't

8    think that's relevant or appropriate.

9              THE COURT:  Well, I'm hoping that -- we're up here

10   to answer this one question.  Can we get an answer from your

11   client?  Can you talk to her?  When did they meet each

12   other?

13             MR. ROOTS:  It was before January 6th.

14             THE COURT:  Do we know when?

15             MR. ROOTS:  I was just told September of 2020.

16             THE COURT:  Okay.  So we can get him to testify to

17   that.  That certainly would be helpful.

18             So now let's -- all right.  I'd love to do this,

19   but I'm going to ask the jury to leave and we can have a

20   conversation about this.  So why don't we excuse the jury

21   and then we can keep talking.

22             (Whereupon, the following proceedings were had in

23   open court:)

24             THE COURT:  I'm going to excuse you for a few

25   minutes.  We need to discuss something, and I don't think it

Green - DIRECT - By Mr. Roots

 1    makes sense to have you sitting there.

 2                (Whereupon, the jury exited the courtroom at 2:06

 3    p.m. and the following proceedings were had:)

 4                THE COURT:  You may be seated.

 5                If you can pick up the phone again, please.

 6                (Whereupon, the following bench conference was

 7    held:)

 8                THE COURT:  Before we excuse the witness, what I'd

 9    like to do is just have you ask the question of how long

10    he's known the Defendant just so we can make sure we're all

11    on the same sheet of music.  Then I think outside of his

12    presence we can talk about what the purpose of this

13    testimony is.

14                Okay, Mr. Roots.

15                MR. ROOTS:  Okay.

16                (Whereupon, the following proceedings were had in

17    open court:)

18    BY MR. ROOTS:

19    Q.  Mr. Green, can I ask you, how long have you known the

20    Defendant, Ms. Lavrenz?

21    A.  How do you all stay awake with that white noise?  That's

22    what I sleep to every night.  That's hard.

23                About three years.  I don't know that I could give

24    you an exact date, but roughly three years.

25    Q.  Let me ask, when did you first meet her?  What was the

Green - DIRECT - By Mr. Roots

 1   event or what was the occasion?

 2   A.   It was a -- I can't remember if it was the Constitution

 3   coach conference or the seminar that I was speaking at.  It

 4   was in the same -- it was at the same church and the same

 5   community.  So I can't remember which one was first.  But...

 6   Q.   What community was that?

 7   A.   Colorado Springs.

 8   Q.   You journeyed up to Colorado from Texas?

 9   A.   Yes.

10   Q.   And you were putting on a class?

11   A.   Right.  Exactly.

12   Q.   Was that about January 6th, 2021, or after?

13   A.   After.

14   Q.   That was after January 6th, 2021?

15   A.   Right.

16   Q.   Did you meet her before January 6th, 2021?

17   A.   She was part of our database in our organization.  But

18   we hadn't actually met in person.  So she would have been

19   watching my Front Porch -- my live shows.  But I hadn't met

20   her in person yet.

21        And I don't -- I might have had, what do you call

22   it, a chat conversation.  When we do the live show, we have

23   a chat on there.  So I don't remember -- it was a long time

24   ago.  So I don't remember who all I actually talked to

25   because I do that a lot.

1          MR. BALLOU:  I think he has some relevant

2     testimony about this.

3          THE COURT:  I'm going to let you -- if you don't

4     mind standing back out in the hallway for a few minutes.  We

5     just want to talk about a couple legal issues.

6          THE WITNESS:  Sure.

7          THE COURT:  Thank you.

8          THE WITNESS:  At least you didn't play the white

9     noise again.

10         (Thereupon, Richard Green retired from the

11    courtroom and the following proceedings were had:)

12         THE COURT:  So, Mr. Parker, I'm going to put a pin

13    in for right now that question about knowledge from before,

14    because I think there's a bigger issue here.  Perhaps

15    there's -- some of it.

16         But, Mr. Roots, can you help me by proffering what

17    do you anticipate he's going to speak to, again knowing that

18    he can't speak to somebody else's state of mind?  I mean, I

19    can tell you from my schoolteachers that they may have

20    thought that I was learning things or knew things, but that

21    doesn't mean that that was what was going on in my head.

22         So what do you anticipate his testimony to be?

23         MR. ROOTS:  Well, again, I can say there's really

24    two parts.  There's that podcast that the Government has

25    introduced.  He can fill in some of the blanks on that.

1            But really it's about these constitutional classes

2      and this -- the focus of their organization, which

3      Ms. Lavrenz is a member of, the focus is civic

4      participation.  So it stresses -- this is, you could say,

5      the club, the movement she's in, which is participate,

6      participate, participate.  And that led to her going to

7      January 6th.  It led to her understanding that this is what

8      good citizens do, is they go to lawmakers and they make

9      their voices heard.  They participate.

10           So I think this really helps form her state of

11      mind.  And it's exculpatory, because her state of mind going

12      to Washington, D.C., was not anything improper.  It was

13      absolutely proper.  It was what she -- the focus of her

14      organization and her movement.

15           Remember, she herself is a coach of this -- of

16      these ideas.  It's focused on participating in political

17      things.

18           THE COURT:  I want to hear from Mr. Parker.

19           Mr. Parker, before you begin, my concerns, I

20      guess, remain on the speculation front.  But more

21      importantly, I mean, this is sort of a -- I mean, a sort of

22      color-of-law or an entrapment defense, not that this is

23      entrapment, really, but color of law -- it would have to be

24      from a government official or something like that, not a

25      teacher potentially.

 1          Even then, there's -- I don't think him saying

 2     that someone should go attend a rally that -- as you have

 3     established, perhaps there were permits or things for, is

 4     relevant to whether or not she could enter the Capitol

 5     Building, whether she was parading or demonstrating, whether

 6     she went past where the restricted grounds were.

 7          So I'm just struggling.  But I want to hear what

 8     Mr. Parker has to say and then I'll give you a chance to

 9     respond.  Before he does, I want you to know what I'm

10     struggling with.

11          Go ahead, Mr. Parker.

12          MR. PARKER:  Your Honor, we share the same

13     concerns as your Honor.

14          From his testimony just now, it sounds like he

15     didn't interact with the Defendant meaningfully before

16     January 6th.

17          I don't understand how he has anything to offer

18     about January 6th, which, as we said yesterday, we are

19     striving to make this trial about this Defendant on

20     January 6th.

21          If he doesn't have anything to offer and he didn't

22     interact with her, not only should he never be speculating

23     about it, but it doesn't even sound like he would have a

24     real basis to speculate.

25          And if I can maybe touch on the second point

1    about --

2            THE COURT:  Please.

3            MR. PARKER:  -- I know we played videos with this

4    individual.  She's asking questions; the Defendant's making

5    statements.

6            If what filling in the gaps means is that he's

7    going to testify about what other things she said, then

8    we're going to have a hearsay objection to that, because it

9    would be the Defendant offering her own statements for the

10   truth of the matter asserted.

11           So I'm not even -- I think the first category of

12   problems is deeply problematic.  I thing even the

13   filling-in-the-gaps thing is problematic.

14           THE COURT:  Let's start with the first part.  I

15   mean, I don't think his testimony about when he met your

16   client -- he may be wrong.  He may -- his memory may be off.

17   But unfortunately, we're stuck with his memory the way that

18   it is.

19           And I do think that even for what you want to use

20   him for, I'm concerned that there's not a foundation because

21   he's essentially said they had no contact that he remembers,

22   but at most there may have been chats or things, but he

23   doesn't know.  He's entirely speculating.

24           You know, if you had something with which to

25   refresh his recollection, I guess we could look at that.  If

```
 1    you had copies of chats or things prior to January 6th,

 2    then -- but even then, I'm going to go to a larger issue --

 3    I'll let you answer -- the larger issue, which is just that

 4    he and his knowledge about his civic education programming

 5    and Ms. Lavrenz, it sounds like very noble and laudable work

 6    that I appreciate.  I do a lot of civics work myself.  So I

 7    don't know that that goes to any of the elements of the -- I

 8    mean, it's just not relevant, I don't think, here.  I mean,

 9    one could be highly educated about these things, but unless

10    you're trying to say that he coerced her into going or

11    something like that.  But that's not what we're

12    suggesting -- you're suggesting, I should say.

13           I'm just not sure that her knowledge and

14    encouragement in any way goes to elements.  And I think it

15    could be quite confusing to the jury.

16           So let's start with the factual question.  I'm

17    just struggling, given that he only met this witness, he

18    believes, after January 6th in person, I think there's a

19    lack of a factual foundation to begin with for the testimony

20    that you want.

21           MR. ROOTS:  Well, let me just respond.

22           My understanding -- I should have actually asked

23    him some more questions to set this up.  But this -- these

24    courses to become a constitutional coach are hundreds of

25    hours.  So, you know, this idea of when he met or -- he
```

1    really is the -- he's the director of the courses.  He's the

2    author of the courses.  So in many ways, you could say he's

3    directing hundreds of hours.  He's had interactions in that

4    way, at least.  It's not direct; it's indirect.  But she has

5    watched hundreds of hours of his --

6              THE COURT:  Mr. Roots, I hear you.  As someone who

7    very painfully had to educate their kindergartener during

8    remote learning, the one thing I learned is that classes

9    online aren't always ones that people pay attention to.  And

10   so I don't think that he can testify as to what Ms. Lavrenz

11   has done.  I have no idea what Ms. Lavrenz has done or not,

12   nor does he.  Certainly she could.  Again, I'm not

13   encouraging her to testify, but I believe she's the only

14   person who can do that without speculating.

15             So I understand what you're saying.  I think

16   it's -- you're not wrong.  Right?  From the little I know of

17   Ms. Lavrenz, she seems like a very diligent person.  So I'm

18   sure she probably watched all of those videos.  But,

19   unfortunately, that's my assumption, just like it would be

20   his, and that's not evidence.

21             So I think we're just a bit boxed in,

22   unfortunately, by the dates here.

23             So again, I'm not talking about the podcast yet.

24   But my ruling is that I'm going to exclude any testimony

25   that he has because simply I don't think there's a factual

1    predicate.  He can't know the things that you'd like him to

2    testify to because he didn't interact with your client in

3    those times, and that anything that he learned about her

4    after January 6th is simply not relevant testimony.

5              Now, as to the podcast, what is it that you want

6    him to sort of talk about?

7              MR. ROOTS:  Well, he's -- let's put it this way:

8    He's the one person who has had a public interview and has

9    gotten her statement about January 6th.  And so he can, you

10   know, play that and we can, you know, ask him

11   effect-on-the-listener questions, the purpose of that

12   podcast and those sorts of questions.

13             Again, the Government introduced that video

14   already.

15             THE COURT:  No.  I certainly agree.  But the

16   statement of a party opponent.  So this is not -- it's not

17   your opponent; it's your client.  So, I mean, I think

18   there's a problem here, somewhat of a hearsay issue.  But

19   I'm also just not sure what we're getting at.

20             If I can ask the United States, Mr. Parker, can

21   you refresh my recollection?  This was the second video that

22   you played, like, four clips from, as I recall, or something

23   like that.  Is that right?

24             MR. PARKER:  Three clips.  Yes.

25             THE COURT:  Three clips.  It was the second of two

1    videos.  The first one was Sidney Powell talking about sort

2    of -- right on the Facebook page.  And the second was a

3    couple -- a series of clips where more recently a podcaster

4    interviewed Ms. Lavrenz and Ms. Lavrenz sort of talked about

5    stopping at the barricades or things like that.  Is that

6    right?

7              MR. PARKER:  Yes.  I think to make the record

8    clear, we had two videos that were from Facebook and then

9    there was one category.  Then there was three additional

10   videos from this podcast.

11             For the record, it's I think 503, 504 and 505.

12             THE COURT:  Can you refresh my recollection as to

13   what the general nature of that testimony was?

14             MR. PARKER:  Sure.

15             503 is a clip of the interview where the Defendant

16   references seeing the bike racks on January 6th.

17             504 is a clip of the interview where the Defendant

18   references the crowd becoming, I think, as she puts it, a

19   little riled up because they realized that Vice President

20   Pence was going to certify the election.  The barricades, as

21   she put it, come down.  And then the crowd rushes across the

22   east plaza.

23             And 505 is the Defendant discussing being inside

24   the United States Capitol, turning down that hallway, which

25   we understand to be the north hallway, and saying that at

1    some point people started to turn around and an individual

2    in front of her told her that members of Congress had either

3    left the building or been evacuated.

4           THE COURT:  I want to understand from the United

5    States's perspective, I mean, you did play the clip or those

6    clips.  And what sort of -- in terms of their testimony, how

7    about asking things like, Did you ask her if she assaulted

8    anybody or did she -- could you ask that?  Sort of what do

9    you think would be an acceptable purview in response?

10          MR. PARKER:  I think if the question was:  Did you

11   ask, Did you assault anybody?  Maybe it's not hearsay if

12   it's a question.

13          Did she answer?  That's hearsay.

14          THE COURT:  Right.  I understand.

15          So essentially you believe the scope of any

16   examination would be -- I'm just trying to think what it

17   could be.  But it would be simply about things that he said

18   during that interview, that he himself said during that

19   interview potentially?  I'm not asking to waive any

20   objections.  But I'm just trying to --

21          MR. PARKER:  Potentially.  I think it's going to

22   get difficult if the way the questions are asked to the

23   witness about questions he asked suggest the answer of what

24   the Defendant gave.

25          So that's where I guess -- why I say

Green - DIRECT - By Mr. Roots

1    potentially --

2              THE COURT:  Mr. Roots, I'm going to give you five

3    minutes.  I'll stay up here.  I'd like you to sort of think

4    about what other questions you'd like to ask him along those

5    lines.  I don't think he can speak to your client's --

6    that's just the Rules of Evidence.  I don't -- I'm not -- I

7    understand your effect on the listener.  That's not working

8    for me.

9              But if you have something else you want me to

10   think about, take a couple minutes.  Take your time.  I'm

11   staying right here.  But if you all want to talk here or out

12   in the hallway, obviously not to your witness.  But if you

13   want to step out to just sort of confer on what are the

14   scope of questions you want to ask him now that we've sort

15   of pared it down to this one area about the podcast.  Okay?

16             MR. ROOTS:  Okay.  Yeah.  What I was thinking of

17   doing is finishing up with -- showing that -- those same

18   segments the Government has shown.  "Are you the person on

19   that podcast?"  So the jury makes that connection and

20   understands he's that guy.

21             THE COURT:  Sure.

22             MR. ROOTS:  And is this consistent with the

23   training that is part of this civic engagement course and

24   her being a coach?  Is this consistent with that?  Her

25   statement -- what she's describing, is that consistent?

```
1              THE COURT:  So again, you're trying to sort of get
2      into her mind.  We're trying to speculate about that.
3              I mean, perhaps there's a way -- I'm not saying
4      it's relevant, so I'm not saying we'll accept it now.  But
5      right now I'm focused on hearsay because I can only do one
6      thing at a time, as I'm reminded by my wife.
7              So I want you to just think about the hearsay
8      situation.  Perhaps the things that are said you could -- I
9      mean, you could ask:  Are these -- whether or not these are
10     things that are taught here.  But it can't be about what
11     she's thinking or it can't be about what she's saying if
12     it's consistent with that.  I think we're -- this is quite
13     the thicket you're trying to get us into here.
14             I understand why.  It's your job to try to get
15     into everything you can.  But I'm just really struggling to
16     see how this is relevant and also how it's not prejudicial.
17     When she's speaking, she's still speaking about what --
18     herself as she's saying things.  To say that it's consistent
19     with a class that we don't have a foundation because we
20     can't get that she may have taken, I still think we're
21     back-dooring our way into that first one.
22             But I want to give you a couple minutes to just
23     think about this.
24             MR. ROOTS:  Okay.
25             THE COURT:  If you need more time, let me know.
```

Green - DIRECT - By Mr. Roots

```
 1        But why don't you guys chat for about five minutes.  It's
 2        2:23.  We'll start at 2:38.
 3                  We're in recess.
 4                  (Thereupon a recess was taken, after which the
 5        following proceedings were had:)
 6                  THE COURT:  Where are we on this, Mr. Roots?
 7                  MR. ROOTS:  Well, we've had a discussion with the
 8        Defendant.
 9                  Not with him at all.  We haven't even -- not one
10        word.
11                  THE COURT:  You're fine.
12                  MR. ROOTS:  What we want to propose to put on
13        through Mr. Green is it directly rebuts, it rebuts and you
14        could say partially impeaches evidence that the Government
15        has put on.
16                  So the Government has put on, for example, a
17        Facebook share, that the Defendant shared a Facebook
18        broadcast of Sidney Powell, you know, talking about, you
19        know, Mike Pence and, you know, Mike Pence has the power to
20        do this or that.  And there's election fraud from the
21        election and whatnot.
22                  So this will directly rebut that evidence that
23        makes her look like she's doing something wrong.  And it
24        shows that in the context of her civic courses the fact that
25        she is a civic coach, that it's -- her conduct, even as
```

1     fully described by the Government and fully described in

2     that statement on the podcast, is exactly consistent and it

3     is innocent conduct.

4          It shows her innocent state of mind.  So it

5     directly impeaches, you could say, or at least rebuts the

6     evidence that the Government has put on.

7          THE COURT:  So I think that my problem remains

8     that there's no evidence that he can provide that prior to

9     January 6th he had any knowledge about what her state of

10    mind was because outside -- I mean, as he very clearly

11    stated, outside a hypothetical chat that he's not even sure

12    existed, he does not know that he had any contact with

13    Ms. Lavrenz.

14         Now, he can only speculate that she watched the

15    hundreds of hours of videos and from that try to opine.  And

16    that is so far afield in terms of what a witness can do in

17    terms of speculation.

18         I mean, to be clear, I still do not think, setting

19    aside these date restrictions, that what you're saying is

20    admissible testimony.  I don't think that someone could come

21    up here and say, I, a private citizen, directed people and

22    taught them that what you do as a civic person is to go and

23    then be at a parade or demonstration in the Capitol Building

24    or things like that or I told them to do this because --

25    this is not an alibi sort of defense or there's no color of

Green - DIRECT - By Mr. Roots

1    law.  He's not in a position of authority to tell people to

2    do that.

3         I'm quite sure that he would say also he did not

4    tell people to enter restricted areas or parade or

5    demonstrate and that there's not some sort of implication

6    that your client was pressured by him or deceived by him

7    into doing things.  It's that he educated people into doing

8    things and she followed his instruction.

9         But that's not a defense for him to raise.  I

10   don't think, frankly, it's a defense for your client to

11   raise.  But if anything, it's -- it would be something she

12   would have to say, not him.

13        So I think there is a relevance issue; there is a

14   confusion, prejudice issue.  But here, there's more

15   importantly a foundational issue.  So for those three

16   reasons, I'm going to reject the proffered testimony,

17   understanding it's your objection and you'll preserve that

18   objection for the future.

19        So I don't think there's anything at this point

20   that I believe that -- testimony that we could adduce from

21   this witness.

22        So we can call him back up and you can just tell

23   him that you don't have any additional questions in the

24   presence of the jury and he can step down.  Okay?

25             MR. ROOTS:  Okay.

```
 1                THE COURT:  All right.  Let's bring the jury back
 2      in.
 3                (Whereupon, the jury entered the courtroom at 2:37
 4      p.m. and the following proceedings were had:)
 5                (Whereupon, the following bench conference was
 6      held:)
 7                THE COURT:  I should apologize.  You can ask him
 8      the question -- I want to make sure Mr. Parker is okay with
 9      that -- which is that he can come back up here and say he
10      was the person from the video.  I mean, I don't think
11      there's a basis to object to that.
12                Right, Mr. Parker?
13                MR. PARKER:  No.  If that's the only question, we
14      don't object to that.
15                THE COURT:  Mr. Roots, I'll leave that up to you.
16      It doesn't seem very valuable.  So I understand you cut down
17      what you wanted to do here.  But you did ask potentially you
18      wanted to do that.  So is that something that you want to
19      do?  Is that something you want to do?
20                MR. ROOTS:  Yeah.  I'll ask him that question.
21                THE COURT:  Okay.  Thanks.
22                (Whereupon, the following proceedings were had in
23      open court:)
24                THE COURT:  You can re-call your witness.
25                (Thereupon, Richard Green entered the courtroom
```

Green - DIRECT - By Mr. Roots

 1     and the following proceedings were had:)

 2               (Whereupon, the following bench conference was

 3     held:)

 4               MR. ROOTS:  Okay.  Now I'm thinking about how to

 5     ask this.  Can I at least bring up that exhibit with his

 6     picture on it?

 7               THE COURT:  Sure.  If you want to replay -- I'll

 8     hear from the Government.  Do you have any objection to

 9     replaying the video?

10               MR. PARKER:  We don't object to replaying the

11     video so long as the only question is, "Is that you on the

12     left side of the screen?" or something to that effect.

13               THE COURT:  Sure.  Yeah.  If you want to do that,

14     that's fine.

15               MR. ROOTS:  Okay.

16               (Whereupon, the following proceedings were had in

17     open court:)

18     BY MR. ROOTS:

19     Q.  Thank you, Mr. Green.

20               We're going to bring up Government's Exhibit 504.

21     Do you see that on your screen?

22     A.  I do.

23     Q.  Is that a -- are you in that picture?

24     A.  Yes.

25     Q.  And is this a picture of a podcast that you -- or some

Green - DIRECT - By Mr. Roots

```
 1    broadcast that you have, a show?
 2    A.  It is.
 3              MR. ROOTS:  No further questions.  Thank you so
 4    much.
 5              THE WITNESS:  That's it?
 6              MR. ROOTS:  That's it.
 7              THE WITNESS:  Okay.
 8              THE COURT:  Anything from the United States?
 9              MR. PARKER:  No, your Honor.
10              THE COURT:  Thank you.  You're excused.
11              THE WITNESS:  Thanks.
12              (Witness excused.)
13              THE COURT:  Mr. Pierce, do you want to call your
14    next witness?
15              MR. PIERCE:  Yes, your Honor.  The defense will
16    now call Ms. Jennifer Lavrenz.
17              THE COURTROOM DEPUTY:  Good afternoon.
18          JENNIFER LAVRENZ, DEFENSE WITNESS, SWORN.
19              THE COURTROOM DEPUTY:  Thank you.  You may be
20    seated.  Please speak into the mic.
21                         DIRECT EXAMINATION
22    BY MR. PIERCE:
23    Q.  Good afternoon.
24    A.  Hello.
25    Q.  I'll let you get situated there.
```

```
 1    A.   Thanks.   I might be a little nosy.

 2    Q.   Could you please state and spell your name for the

 3    record?

 4    A.   My name is Jennifer Lavrenz, J-E-N-N-I-F-E-R,

 5    L-A-V-R-E-N-Z.

 6    Q.   And where are you from, Ms. Lavrenz?

 7    A.   From Falcon, Colorado.

 8    Q.   And could you please briefly describe your educational

 9    background?

10    A.   I have a high school degree.

11    Q.   Do you know the Defendant in this case, Ms. Rebecca

12    Lavrenz?

13    A.   I do.

14    Q.   And how do you know Ms. Rebecca Lavrenz?

15    A.   She's my wonderful mother.

16    Q.   What do you do professionally?

17    A.   It's kind of a hard title, but kind of help support,

18    which means I do a lot of organizing, admin, property

19    maintenance, basically just help different ones to fill in

20    the gap of what they need done.   So if it's hoarding,

21    cleaning out a house, cleaning, mow the yard.   I travel for

22    that and I also do that part-time for my mom.

23    Q.   So you do that for multiple different people?

24    A.   Multiple different people.   Yeah.   I travel.   I go to

25    different cities and states through word of mouth.
```

1    Q.  And -- but one of your clients is your mother?

2    A.  Yes.

3    Q.  Could you just briefly summarize kind of the scope of

4    what you do for your mother specifically?

5    A.  Sure.  She has several small businesses.  So I do

6    recordkeeping for her booking -- or bookkeeping at her bed

7    and breakfast.  I take care of guests that come and stay, so

8    I'll clean the rooms.  I'll make breakfast.  I mow the

9    property.  She lives on five acres, so I have to keep that

10   up as much as I can.  And I greet the guests and also --

11   yeah.  I guess just admin, property maintenance, such.

12   Yeah.

13   Q.  And I believe one of the things that you said that you

14   did was that you were a dehoarder?

15   A.  Dehoarder, yes.  Not for my mom, but for others.

16   Q.  Okay.

17   A.  I try to keep her organized when she brings stuff in.

18   But for other clients, yes.

19   Q.  Just in a nutshell, what is a dehoarder?

20   A.  A dehoarder is someone who likes to hoard things and

21   they have a hard time letting it go, and they can't either

22   emotionally part with it or they just need support doing it.

23   So I will come in either with them or on my own and I will

24   go through their home, their garage or sheds, their property

25   and help them get rid of things so they have a peaceful,

1    calm place once again.

2    Q.  And during what periods of your life have you lived with

3    your mother?

4    A.  It's been my main residence.  I've had times where I've

5    lived in Minneapolis and in Kansas City, but otherwise that

6    has been a majority of my residence, has been in Colorado

7    with her.

8    Q.  And so would you say you've had consistent interactions

9    with your mother during your entire life?

10   A.  Yes.

11   Q.  And how would you describe the state of your

12   relationship with your mother?

13   A.  She's one of my best friends.  So we're extremely close.

14   We share a lot of personal life stories, commonalities,

15   things that we pursue.  She's super supportive, so I feel

16   like she's a really good friend as well as a mother.

17   Q.  And do you feel that you have a sufficient basis to have

18   formed your own personal opinion about your mother's

19   character for law-abidingness?

20   A.  Absolutely.  Yeah.

21   Q.  And what is that opinion?

22   A.  She's very law-abiding.  I've never seen her do anything

23   that I feel would jeopardize, you know, our friendship or

24   who she is.  She's just very loving and caring and goes out

25   of her way, super friendly, likes to talk to people and

1    interested about their life.  And she's -- she has -- I

2    don't know.  She's -- I can go on and on.  How much more do

3    you want?

4    Q.  I think that's good on that question.

5              Do you feel that you have a sufficient basis to

6    know the reputation of your mother in the community --

7    A.  Yes.

8    Q.  -- for the character of law-abidingness?

9    A.  Yes.

10   Q.  What is that reputation, to the extent you're aware of

11   it?

12   A.  Her law-abiding?  She's never broken any laws that I've

13   ever known.  She's very -- I'm trying to think of the words.

14   Yeah.  She's just very law-abiding.  She's never broken any

15   rules or done anything that's, you know, questionable in

16   that way.

17   Q.  And do you feel that you have a sufficient basis to have

18   formed a personal opinion of your mother's character for

19   peaceability, whether she's a peaceful person or not?

20   A.  Yes.

21   Q.  And what is that opinion?

22   A.  She's very peaceful.  I've never seen her raise her

23   voice at anybody.  I've never, you know, seen her forcefully

24   do anything outside of just being kind and caring and

25   thoughtful towards others.  Very peaceful.

1    Q.  And the same question on that with respect to

2    reputation.  Do you have knowledge about her reputation for

3    being a peaceful person or not?

4    A.  Yes.  Yeah.  I feel like a lot of people love her.  They

5    love her in the community.  They love being around her.

6    Most people if I mention her name, "Oh, Rebecca.  We love

7    Rebecca."  There's a broad group of people who have done

8    that and said that to my face.  If I say her name and who

9    she is and she is my mother, they will go on and on about

10   how great she is and how much she's just a wonderful person.

11   Yeah.

12   Q.  Now, let's talk just a little bit about January 6th,

13   2021.

14   A.  Uh-huh.

15   Q.  Did there come a time when you learned that your mother

16   planned to go to Washington, D.C., for January 6th, 2021?

17   A.  Yes.

18   Q.  How did you learn that?

19   A.  I want to say it was about a day or so before

20   January 6th.  My brother had mentioned to her about

21   potentially going, that she might be able to go.  And so in

22   that conversation, she needed to verify with me if I would

23   stay back and take care of the bed and breakfast and her

24   property.  That's when I heard about her intent of possibly

25   going and praying about that trip.

1    Q.  Did you -- so I think you just started to talk about it.

2    Were there some preparations that were made, that you made

3    in relation to when she was going to be away for

4    January 6th?

5    A.  Yeah.  She had some guests that were going to be staying

6    during that time period.  And so making sure there were

7    accommodations, the food that was needed.  Because she had

8    told me about fasting, we didn't have to pack any food for

9    her in any lunch box, any cooler, because she decided to

10   drive.  And so it was, you know, making sure she had warm

11   clothes and -- it was wintertime.  Because my dad has passed

12   away, I kind of take on that role of making sure the gas is

13   filled; has the oil been changed?  Different practical steps

14   of that nature.

15   Q.  Okay.  So in addition to taking some steps relating to

16   dealing with the business when she was away, you also took

17   some steps with respect to helping her plan to actually go

18   to D.C.?

19   A.  Correct.  Correct.

20   Q.  I think you touched on it a little bit.  But anything

21   you didn't just mention that you helped to do in regard to

22   her -- you know, helping her plan to go to D.C.?

23   A.  That was pretty much it.  I don't think there was any

24   other planning.  Because my sister has lived in D.C., she

25   didn't have to make any accommodations anywhere, hotel,

1    anything like that.  So pretty much just making sure the

2    vehicle was ready to go.  She had the clothes that she

3    needed packed as far as her preparing for her to go,

4    Rebecca, my mom.

5    Q.  Did she ask you to pack anything like body armor or

6    weapons or tactical gear?

7    A.  No.

8                MR. PARKER:  Objection.

9                THE COURT:  Bench conference.

10               (Whereupon, the following bench conference was

11   held:)

12               THE COURT:  I think we're concerned about --

13   I'm -- hearsay.  We've talked about this a couple times

14   before.  I think you could ask this witness, Did she pack

15   body armor, things like that.  But I don't think you can ask

16   her, Did Ms. Lavrenz -- the Defendant, Ms. Lavrenz?  That's

17   one of my first concerns.  I'm happy to hear anything more

18   from the United States.

19               MR. PARKER:  No.  We have the same concerns, your

20   Honor.

21               THE COURT:  So, Mr. Pierce, if you want to make

22   sure we're keeping it to what she did or what the witness

23   did or said and not getting to what the Defendant said.

24   Okay?

25               MR. PIERCE:  Okay.

1              (Whereupon, the following proceedings were had in

2      open court:)

3      BY MR. PIERCE:

4      Q.  Let me withdraw that and rephrase the question.

5              Did you pack a Kevlar helmet for her to go to

6      D.C.?

7      A.  No.

8      Q.  Did you pack an AR-15?

9      A.  No.

10     Q.  Did you pack any knives?

11     A.  No.

12     Q.  Did you pack any body armor?

13     A.  No.

14     Q.  Any other kind of tactical gear?

15     A.  No.

16     Q.  Did you come to any understanding as to -- did you

17     personally come to any understanding as to what her state of

18     mind was in going to Washington, D.C., on January 6th?

19             MR. PARKER:  Objection.

20             THE COURT:  Okay.  Let's have a bench conference.

21             (Whereupon, the following bench conference was

22     held:)

23             THE COURT:  I think this is an issue we discussed

24     before.  I'm trying to be patient.  But, Mr. Pierce, we

25     really can't be adducing testimony about what Ms. Lavrenz's,

1    the Defendant's, state of mind was from anyone other than

2    her.  Everyone else would be speculating.  So I want us to

3    be -- I don't want --

4              MR. PIERCE:  I don't -- I don't -- with respect,

5    your Honor, I don't understand that.  Because in all these

6    cases, the Government adduces state-of-mind testimony with

7    respect to all manner of things that all kinds of other

8    people said aside from the witness on the stand.

9              I mean, so if Ms. Lavrenz, Ms. Rebecca Lavrenz,

10   said to Ms. Jennifer Lavrenz things that go to her state of

11   mind, that's an exception to the hearsay rule.  I mean, if

12   hearsay is the issue.

13             I mean, it's not just -- you don't just

14   have direct -- you know, there's a difference between

15   circumstantial evidence and, like, direct evidence.  Like,

16   she can't get into the mind of Ms. Lavrenz; but if

17   Ms. Lavrenz said something that goes to her state of mind,

18   that's an exception to the hearsay rule.  And that's

19   circumstantial evidence of her state of mind.

20             THE COURT:  Mr. Parker, there's two issues to

21   respond to.  So I'll let you respond.

22             One is on the hearsay, when there is a direct

23   statement that someone's heard.  The other is a question as

24   to whether that witness is asked to speculate what someone

25   might have been thinking when there is no statement.

1              So let's start with the hearsay, Mr. Parker.

2              MR. PARKER:  Your Honor, I think if these are

3       going to be statements by the Defendant, my understanding of

4       this -- an existing state-of-mind exception is it has to be

5       slightly more -- it has to be somewhat specific at least as

6       to a particular moment.

7              If a witness wants to testify about things she saw

8       her mother do, like her own personal observations, that's

9       one thing.

10             But if it's just going to be the Defendant's

11      statements, that's plainly hearsay.  It does not fall into

12      that exception.

13             I understand Mr. Pierce's point.  But the

14      Government hasn't adduced -- every time the Government has

15      adduced some, you know, reference to what's going on in the

16      crowd, it's either not for the truth of the matter asserted

17      or it's present sense impression or it's excited utterances.

18             We've been over this so many times, your Honor.

19      At this point, I don't understand why we're continuing to

20      ask other people to testify about the Defendant's state of

21      mind.  It has been raised so many times in this trial.  I

22      simply don't understand why this would be any different.

23             THE COURT:  So, Mr. Pierce, here's where I am on

24      this.  I don't know what happened in the other trials.  But

25      I know what's happened here.

1              I don't think the Government's been speculating as

2       to Ms. Lavrenz's state of mind at all based on what's going

3       on.  I think they showed her actions in the videos.  They

4       used her own statements to discuss certainly what -- strike

5       that -- they showed the videos in which she speaks.  But

6       they didn't ask people to interpret what was meant by that

7       or speculate as to her state of mind.

8              So I don't think that they have done anything to

9       speak to her state of mind other than present evidence of

10      her actions and statements.

11             Hold on.

12             And I -- in terms of the speculation part, I want

13      to be clear:  I don't think any witness can speculate what's

14      going on in the mind of the Defendant.  That is simply

15      improper for the Government to do, just as it's improper for

16      the defense to do.  So I'm not going to allow anyone to

17      testify as to that.

18             Now, as to the hearsay, were there statements that

19      this witness heard that were -- go to the state of mind of

20      Ms. Rebecca Lavrenz?  It can't simply be that everything

21      Ms. Lavrenz said to this witness would fall into that

22      exception because the exception follows the rule, then.  If

23      there was some moment, right, something that was happening

24      and some particular instance, then perhaps it could go to

25      that.  But this was a very open-ended question.  I'm

```
 1    hesitant --

 2              MR. PIERCE:  Well, can I ask her -- I can ask her

 3    about her personal observations, as long as I can avoid the

 4    hearsay issue.

 5              THE COURT:  Yes.

 6              MR. PIERCE:  Can I ask her if she made any

 7    observations that indicated to her that Ms. Lavrenz was

 8    going to D.C. to harm anybody?  To destroy any property?  To

 9    obstruct in any official proceeding?  I'm asking her what --

10    whether she made any personal observations that would lead

11    her to that conclusion.

12              THE COURT:  Right.  But the problem is, that calls

13    for speculation.  How could she without speculating know

14    what Ms. Lavrenz was intending to do?

15              MR. PIERCE:  I understand.  I'm just going to ask

16    her if she, based on her personal observations, if she

17    observed anything that would -- that makes her believe that

18    that was her intent.

19              THE COURT:  But it leads to speculation.  That's

20    my problem.  How could she have a belief without

21    speculating?  I mean, that's what I don't understand.

22              MR. PIERCE:  I'm saying that Ms. Jennifer Lavrenz,

23    you know -- I mean, it's like any fact witness seeing what's

24    going on in the world.  I'm just asking her if what she

25    observed around the world led for her to believe her mother
```

1     was going there to, you know, commit crimes and hurt people

2     and destroying property and those kinds of things.

3              THE COURT:  I appreciate that, Mr. Pierce.  I'm

4     not going to allow that questioning.

5              What I am saying is that she could simply state, I

6     did not see her, as you said, come with body armor, take

7     weapons.  I did not see her taking instrumentalities used

8     for violence.  That is all she can say.

9              What she can't say is that she then believed in

10    Ms. Lavrenz's heart and mind that she therefore was not

11    going to harm anybody.  That's for you in closing, or

12    Mr. Roots to say, Look, her own daughter prepared her for

13    this trip, saw her; and you can infer -- use your common

14    sense.  If she didn't pack her -- any weapons, she wasn't

15    actually going to do that.

16             But I don't see it --

17             MR. PIERCE:  Okay.

18             THE COURT:  Hold on.  One second.  Go ahead,

19    Mr. Parker.

20             MR. PARKER:  Your Honor, just to follow up on that

21    last point from Mr. Pierce:  So we've already elicited what

22    I think is quite proper character evidence about civility

23    and law-abidingness.

24             If we start asking a lot of questions that

25    Mr. Pierce suggested, it seems to be getting very close, if

1    not all the way there, to being specific instances of

2    peacefulness and law-abidingness.  And it seems to

3    circumvent the proper testimony that's in by getting very

4    close to improper testimony.

5             THE COURT:  I think that you can use her as a dual

6    witness.  I don't have any reason, I guess, to know that you

7    can't do both.  So that ship has already sailed.

8             MR. PIERCE:  So I'll move on, but I want to now

9    flag the next line of questioning so that you don't get

10   upset.

11            THE COURT:  I never get upset, Mr. Pierce.  You're

12   doing your job.  That's your job, to keep fighting every

13   tooth and nail for your client.

14            MR. PIERCE:  So this thing is -- and this is not a

15   long line of questioning, but she did have conversation with

16   her mother on January 6th on the phone.  And it was right

17   whenever Mr. Rebecca Lavrenz was about to -- when the

18   barricades were coming down and she was about to start

19   heading towards the Capitol.

20            And there was conversation that I want to ask her

21   about.  And this is an exception to the hearsay rule under

22   excited utterance and present sense impression.  It's right

23   at the very moment that the most sort of, you know, dramatic

24   aspects of the facts of the case are happening.  So I

25   believe it's both of those things.  And so I want to ask her

1      about that.

2              THE COURT:  Can you proffer what she's going to

3      say?

4              MR. PIERCE:  Yeah.  She's gonna say essentially

5      that her mother said that, you know, if the doors are opened

6      that she was going to go in and she felt that she --

7      essentially felt God had put her there at that moment for --

8      I don't remember the exact wording.  But that's essentially

9      the conversation.

10             THE COURT:  So, Mr. Parker, I mean, I think we are

11     now getting to potentially a subject area I'd like to hear

12     your thoughts, where it is the present sense impression and

13     not sort of the buildup to the trip and things like that,

14     but at the moment that they're saying they can lay a

15     foundation when this sort of event occurred, if she stated

16     something that goes to her state of mind, perhaps that this

17     minimal thing, you know, or very limited, I should say,

18     thing could potentially be permissible.  So what do you have

19     to say?

20             MR. PARKER:  Your Honor, I think the last point is

21     crucial.

22             If all that is elicited is what the literal

23     statement was that Ms. Lavrenz made, I think that -- it's a

24     close call in my mind -- I think it's probably -- it might

25     be a present sense impression or excited utterance.  So I'm

1      not going to fight that.

2              If the followup question is something that would

3      ask her to speculate about intent, I just don't want to --

4              MR. PIERCE:  I won't do that.

5              THE COURT:  Great.  So we have -- we have some

6      consensus here.  Thank you, Mr. Pierce and Mr. Parker.  I

7      appreciate, again, what you're trying to do here and your

8      professionalism.

9              So, Mr. Pierce, we're going to move on and you can

10     get to the question.  To be very clear, we just want her to

11     testify as to what she was told the statement was.  Okay?

12             MR. PIERCE:  Understood, your Honor.

13             THE COURT:  Thanks.

14             (Whereupon, the following proceedings were had in

15     open court:)

16     BY MR. PIERCE:

17     Q.  I'll move on now to the actual day of January 6th.

18             Did you talk to your mother over the phone at all

19     during the day of January 6th, 2021?

20     A.  Yes, I did.

21     Q.  And do you recall approximately what time that was?

22     A.  It was sometime midmorning, noon, because we're two

23     hours earlier and I like to sleep in.  So it wouldn't have

24     been early.  Midmorning.  10:00, 12:00, in that range,

25     maybe.

1    Q.  And that was your time, local time?

2    A.  I believe so.  Yes.

3    Q.  And what did -- what was said during the conversation?

4    A.  Basically, that she expressed that if the doors would

5    open, she would like to go in.  She felt that God put her in

6    that place and she just wanted to pray.

7         I said, Do what you feel God is leading you to do.

8    And I will be praying for you here.

9    Q.  Thank you.

10        Is there anything else that occurred on

11   January 6th with respect to your mom that you actually had

12   any involvement in?

13   A.  Later that evening, I had a conversation with her based

14   on -- she had misplaced a purse that she had with her.  And

15   someone had reached out via DM on her Facebook and said,

16   Hey, I have found this purse.  I don't have a phone number.

17        And so then I had reached out to my mom and said,

18   Hey, your purse is missing.

19        She's like, I know.  I am.  I'm trying to find

20   that purse.  I misplaced it outside somewhere.  So I had

21   that conversation much later in the evening.

22   Q.  And to the extent you know, what ultimately ended up

23   happening with that situation with the purse?

24   A.  Ultimately, she had -- went to the police station to try

25   to find it.  They didn't have anybody that turned it in.

1    And then I connected their phone numbers together so they

2    could meet up.  I think the next day or so that they met up

3    and she was able to return the purse to my mom.

4    Q.  Just one second.  Oh, let me ask, so to be clear, you

5    care very much what happens in terms of the outcome of this

6    case.  Is that fair?

7    A.  Absolutely.

8    Q.  So you're not pretending to be an unbiased witness here?

9    A.  No.

10              MR. PIERCE:  Just one moment.

11              No further questions.  Thank you.

12              THE COURT:  Anything from the United States?

13              MR. PARKER:  No, your Honor.

14              THE COURT:  Thanks.  Thanks so much.  You can step

15   down.

16              THE WITNESS:  Thank you, your Honor.

17              (Witness excused.)

18              THE COURT:  If we can have a bench conference real

19   quick.

20              (Whereupon, the following bench conference was

21   held:)

22              THE COURT:  I believe because this witness's

23   testimony is over, it's fine for her -- I just want to make

24   sure that you all are okay for her to stay in the gallery.

25              MR. PARKER:  Yes, your Honor.

```
 1                    THE COURT:  All right.

 2                    MR. PARKER:  Thank you.

 3                    MR. PIERCE:  I'm sorry.

 4                    THE COURT:  Are you ready to call your next

 5      witness?

 6                    MR. PIERCE:  Yeah.  Mr. Roots is going to put on

 7      Mr. Sumrall, who's going to be by Zoom.  So we may need a

 8      few minutes to coordinate the electronics of that testimony.

 9                    THE COURT:  Ms. Lavigne-Rhodes has sent the link?

10                    THE COURTROOM DEPUTY:  They have it, Judge.

11                    MR. PIERCE:  We have the link.

12                    THE COURT:  You're going to tell him to get on the

13      Zoom now.  Do you want to call him and tell him to do that?

14                    MR. PIERCE:  Yeah.  Sure.

15                    THE COURT:  Okay.  Great.  I think the jurors are

16      anxious, so let's just keep things going.  Let's see if we

17      can do this while we're in here.  And if we need a few more

18      minutes, we'll send them out.

19                    MR. PIERCE:  Do you want me to step outside?

20                    THE COURT:  No.  You can do it from here.

21                    (Whereupon, the following proceedings were had in

22      open court:)

23                    THE COURT:  We're going to call our next witness.

24      That witness is going to appear by the miracle of Zoom.  So

25      we're just going to get them on.  Hopefully, no cat filters
```

1    or anything like that.  So just bear with us.

2              Okay.  Mr. Sumrall -- is this Mr. Sumrall?

3              MR. PIERCE:  Yes.

4              (David Sumrall joins the proceedings via

5    videoconference.)

6              THE COURT:  Mr. Sumrall, this is Judge Faruqui.

7    Can you see me?

8              MR. SUMRALL:  I can.

9              THE COURT:  The jurors, are you able to see him on

10   your screen?  You can.  Great.

11             Mr. Sumrall, I've already twice probably in the

12   last hour gotten in trouble with the court reporter.  So

13   please do not -- three strikes and I'm out.  So I just

14   ask -- I know it's hard on Zoom.  You're going to have to

15   wait every time until Mr. Roots is done asking a question or

16   the Government.  And if we need to take a little pause, then

17   do that before you start speaking because it's very

18   difficult on these virtual platforms to sometimes not talk

19   over each other.  And that is extremely difficult for the

20   court reporter to manage.  Okay?

21             MR. SUMRALL:  Okay.  Thank you, sir.

22             MR. BALLOU:  Your Honor, to the phones.

23             (Whereupon, the following bench conference was

24   held:)

25             MR. BALLOU:  Your Honor, I wanted to raise an

1    issue in the hopes that we can address this and avoid a

2    whole bunch of objections here, which is as I understand it,

3    Mr. Sumrall was at the Capitol on January 6th, 2021, but

4    confined himself to the west side of the building.

5           At this point, unless they want to add further

6    evidence that there was in fact chaos throughout the Capitol

7    grounds, I'm not sure what the relevance of any testimony

8    about his presence on the west side is going to be.  So to

9    that extent, I think it might be helpful to hear from the

10   defense -- one, it would be helpful to hear from your Honor

11   if that testimony would be helpful; and if it isn't, what

12   the purpose of this witness is.

13          THE COURT:  Mr. Roots?

14          MR. ROOTS:  Well, this witness is -- he was on

15   January 6th on the west side.  He also is a -- he has vast

16   knowledge of all things January 6th.  He really is -- he's a

17   videographer.  He's a journalist.  He has a podcast like so

18   many of these other people.

19          And so he can testify about many things about the

20   event:  the brochures and fliers that were circulating about

21   permitted events for spectators to attend, that would be

22   both east side and west side, the atmosphere of the crowd

23   generally speaking and those sorts of things.

24          THE COURT:  So I guess he's trying to, in some

25   ways, respond to the raindrop theory.  But this sounds way

1    too broad in scope from what I've heard so far.

2              Mr. Ballou, what do you say to that?

3              MR. BALLOU:  I think that's exactly right.  I

4    mean, this man may know many things about January 6th.  But

5    I think we need to know specifically how his knowledge

6    relates to the actions of the Defendant.  And if he didn't

7    see the Defendant on January 6th, if he didn't talk to the

8    Defendant on January 6th, I don't understand what the

9    purpose of this witness is going to be.

10             THE COURT:  Well, I guess I'm a little broader

11   than this.  I think this is consistent with what I did in

12   *Barron*, which if you get to show videos of the west front

13   and just the whole sort of scene, I think that in a limited

14   fashion and you didn't take much time with it, but you did

15   some about what was going on in the whole sort of -- that is

16   what Day 1 was.  We didn't see any videos that circled

17   Ms. Lavrenz on Day 1.  Day 2, certainly that's what you

18   limited yourself to.

19             But to the extent that he is going to say from his

20   personal -- you know, his own view firsthand, not hearsay,

21   that he saw -- I mean, I guess there was no violence or

22   things like that on the west front, I think you can

23   cross-examine him and say, Well, did you go in with

24   Ms. Lavrenz or did you see what she was doing or things like

25   that.

1          But much like your witnesses spoke -- again, in

2    very limited fashion, but they did speak, limited in time,

3    but not in scope -- they did speak to that issue, I think

4    that --

5          MR. PIERCE:  Could I add one thing, your Honor?

6          Just as a matter of precedent also, you know, as

7    always there's a body of case law here, Mr. Sumrall did

8    testify -- Chief Judge Boasberg did let him testify very

9    sensibly, honestly, in the case of Ryan Zink.  So just so

10   the Court's aware, you know, this issue was kind of

11   addressed and Chief Judge Boasberg kind of basically said

12   the same thing I heard you just say.  But I wanted to let

13   you know that that occurred.

14         THE COURT:  Okay.  So I think we can get started.

15   I agree with Mr. Ballou that he may be an expert on all

16   things J6, but I'm concerned that is way more than I'm

17   willing to get into.  Right?

18         What I want to be focused on is the same thing the

19   Government talked about, which is what happened there in

20   terms of they were trying to establish that there was

21   violence, that there was part of the raindrop theory that

22   many people were acting in a disorderly way.

23         To the extent that he has firsthand knowledge --

24   him, being there, not him talking to someone else and that

25   person telling him they didn't do something, what he saw

1    that day when he was there, I think that he can get into it.

2    He needs to be clear when he's talking about the west or

3    east front.  So we don't want there to be any confusion for

4    the jurors.  But I think that that is sort of what we can be

5    limited on.

6             I mean, you know, to the extent that he has

7    personal knowledge that there was a permit, that he, I

8    guess, obtained or sought or if he went there as part of a

9    permitted process, I mean, not much more than that.  Again,

10   I don't want to get into hearsay.

11            But I think we're just going to have to tread

12   carefully, Mr. Ballou.  But I appreciate your concerns.  I

13   do think this is fair testimony.  Again, limit it to what

14   his knowledge is.  Okay?

15            MR. ROOTS:  Okay.

16            (Whereupon, the following proceedings were had in

17   open court:)

18            MR. ROOTS:  The defense next calls Mr. David

19   Sumrall.

20            THE COURTROOM DEPUTY:  Mr. Sumrall, please raise

21   your right hand.

22            DAVID SUMRALL, DEFENSE WITNESS, SWORN.

23            THE COURTROOM DEPUTY:  Thank you.

24                      DIRECT EXAMINATION

25

1   BY MR. ROOTS:

2   Q.  Okay, Mr. Sumrall.  Would you state and spell your full

3   name for the court reporter.

4   A.  My name is David Sumrall, D-A-V-I-D, S-U-M-R-A-L-L.

5   Q.  And, Mr. Sumrall, where are you from?

6   A.  I'm from just outside of Dallas, Texas.

7              THE COURT:  Just one moment.  I want to make

8   sure -- are you all able to hear okay?  Great.  Thank you.

9              Please proceed.

10  BY MR. ROOTS:

11  Q.  And how long have you lived there?

12  A.  Most of my life.

13  Q.  And what do you do there?

14  A.  I'm a carpenter.

15  Q.  A carpenter.  Now, does that mean a construction worker

16  or something?

17  A.  Yes.  I do woodwork.  Woodwork, decks, pergolas,

18  outdoor, remodeling, all kinds of carpentry.

19  Q.  And that's your full-time job?  You're in business --

20  self-employed?

21  A.  Yes, sir, I am.

22  Q.  Okay.  Let me ask, do you also have an avocation or any

23  hobbies?

24  A.  Yes, or a ministry, maybe.  Stophate.com I started in

25  1992 during the LA riots when I saw what the media did with

1    the little piece of footage.  And stophate is an acronym:

2    Start Turning Off Prejudice, Heal Attitudes Through

3    Education.

4    Q.  And what year was that again?

5    A.  1992.

6    Q.  And so that's been a continuous ministry?  Let me just

7    ask:  Does that have a website?

8    A.  Yes, it does.  Stophate.com is where we house all our

9    material.  And since January 6th, it's become a little

10   overloaded with evidence from January 6th.

11   Q.  Okay.  Do you also do broadcasts or any kind of

12   television or anything?

13   A.  I do have a small podcast that I have January 6th and

14   other guests on as well.

15   Q.  And have you -- are you an author?  Have you written

16   anything?

17   A.  I've written articles and produced several documentaries

18   about January 6th.  I'm currently working on a book.

19   Q.  Okay.  Well, let's talk about January 6th.  So why does

20   stophate.com focus on January 6th?

21   A.  Well, we see it as a great travesty of justice.  People

22   went to express their First Amendment rights to redress

23   their grievance and to assemble as a group; and without

24   clear direction from the police that day, they were led into

25   what a lot of people consider a setup.

1   Q.  Let me ask you, were you -- were you at January 6th?

2   A.  Yes, I was.

3   Q.  And could you briefly describe your experience beginning

4   in the morning of that day?

5   A.  Yes.  I was there with several friends at the Ellipse.

6   We met at the Washington Monument around 8:00.  We took the

7   train into town.  We tried to listen to Trump's speech.  We

8   couldn't get close enough.  Of course, electronics didn't

9   work very well.  And we couldn't get a good signal to listen

10   on YouTube.

11       So we decided to walk down to the Capitol a little

12   early to hopefully shoot footage of the massive crowd, you

13   know, moving towards the Capitol.  We thought that would be

14   an iconic image.  Things changed a little bit as we got down

15   there.

16   Q.  You said things changed a little bit?

17   A.  Yes.  We were gathered in the circle there on the west

18   side before the gates were pushed through or whatnot.  And

19   we watched everything unfold, you know, from very close.

20   And it was a very interesting time, let's just say.

21   Q.  Now, when you -- you've said "we."  Did you have a film

22   crew?  Did you have a group?

23   A.  Yes, I did.  I had several friends that eventually

24   spread out to film in different locations that day.  We were

25   there to document history more than anything and experience

1    what turned out to be the history event that we thought, but

2    for different reasons.

3    Q.  Let me just ask, just in general speaking here, just in

4    terms of politics, are you on the political spectrum

5    yourself?  Do you support Trump?  What -- where would you

6    place yourself?

7               MR. BALLOU:  Objection.

8               THE COURT:  Let's go to the bench conference.

9               (Whereupon, the following bench conference was

10   held:)

11              THE COURT:  Go ahead, Mr. Ballou.

12              MR. BALLOU:  It's unclear how this witness's

13   political beliefs is going to be relevant.

14              THE COURT:  I think it's plainly irrelevant.  I

15   mean, it doesn't -- I don't think it helps your client if

16   we're getting -- it's not a political issue.  I'm hoping, I

17   think, for her -- he stated, or you sort of adduced, this

18   isn't a political question.  It's just:  Was she there?  Was

19   she parading or demonstrating?  So I don't think we need to

20   get into people's -- this witness's political viewpoint.  So

21   let's just keep going.

22              MR. ROOTS:  Yeah.  Basically I'm just -- it goes

23   to bias.  We're not putting him on pretending he's unbiased.

24              THE COURT:  I don't think anyone's -- if they want

25   to cross-examine him as to bias, they can get to that.  But

1     I don't think there's any implication.  Obviously, he's your

2     witness, just like the Government's witnesses were theirs.

3     One of the things we instruct people is they've got to treat

4     everyone equally and to make their own conclusions.

5            So I appreciate you're trying to do that, but

6     let's move on.

7            (Whereupon, the following proceedings were had in

8     open court:)

9            THE COURT:  Mr. Sumrall, I'm going to strike that

10    last question.  We'll move on to a new one.

11    BY MR. ROOTS:

12    Q.  Okay.  So back to that question of "we."  So you had a

13    group of people that were also filming along with you?

14    A.  Yes, I did.

15    Q.  And were they both on the west side of the Capitol and

16    the east side or where were they located?  Where were you

17    located?

18    A.  Our team was on the west side.

19    Q.  And were you -- did you also know people on the east

20    side?

21    A.  Yes, I did.

22    Q.  Let me just ask, was there any communication?

23    A.  No.

24    Q.  Okay.

25            MR. ROOTS:  We'd like to bring up Defense Exhibit

```
 1    46.
 2            Ms. Lambert, our paralegal, said she may need to
 3    log into Zoom and share her screen.
 4            So I can ask some other questions.  Are we close
 5    to a break?  Maybe we could -- I could ask some more
 6    questions.
 7            THE COURT:  Well --
 8            MR. ROOTS:  There are a couple videos, maybe two
 9    I'd like to show and another document.
10            (Discussion off the record.)
11            THE COURT:  Ms. Lambert always has the answers.
12    Thank you.
13            THE COURTROOM DEPUTY:  What can you see right now?
14            THE JURY:  A symbol.
15            THE COURTROOM DEPUTY:  We're good.
16            MR. ROOTS:  What number did I say?  46.  Defense
17    46.  So we have to get this -- the witness to authenticate
18    it.  Right?
19    BY MR. ROOTS:
20    Q.  Are you familiar with a document called the MAGA map
21    guide?
22    A.  Yes, I am.
23    Q.  And what can you say about that?
24    A.  It was a flier, basically, that was circulated through
25    the crowds to tell people where the permitted events on
```

```
 1    January 5th and 6th were located in D.C.

 2              MR. BALLOU:  Objection, your Honor.

 3              (Whereupon, the following bench conference was

 4    held:)

 5              THE COURT:  Go ahead, Mr. Ballou.

 6              MR. BALLOU:  Your Honor, I think we're rapidly

 7    going to have a relevance problem here if this witness can't

 8    offer any evidence that the Defendant actually saw this

 9    guide.

10              THE COURT:  Go ahead, Mr. Roots.  What is he going

11    to talk about when he sees this?

12              MR. ROOTS:  Well, the guide talks about all the

13    scheduled permitted events.  And he will testify that it

14    circulated widely.

15              Obviously, he doesn't know Ms. Lavrenz.  He can't

16    testify if she read it.  But it was a commonly read thing.

17    And the crowd, such as it is -- remember, the Government is

18    accusing her of committing crimes because she was in this

19    crowd.  But the crowd was largely reading this map guide.

20              THE COURT:  Well, I don't want him speculating as

21    to what anyone has read other than himself.  You can ask him

22    if he read this prior to going there and then if he did --

23    prior, not after -- if he read it prior to going there, what

24    he understood it to say and things like that, although I

25    think he's already spoken a little bit about that.  But to
```

```
1    the extent you're asking further questions -- is this a

2    video or an exhibit?

3              MR. ROOTS:  This is a little pamphlet that was

4    circulating.  A lot of people had them in their hands.

5              THE COURT:  No, no.  Your exhibit.  Is your

6    exhibit a video showing it or is it just a pamphlet?

7              MR. ROOTS:  It's a picture.

8              THE COURT:  Mr. Ballou, go ahead.

9              MR. BALLOU:  Your Honor, that makes sense.  I'd

10   add one point.  It's fine for him to testify about his

11   knowledge of the pamphlet.  That seems appropriate.

12             General statements about this being widely

13   distributed without some sort of basis for saying that seems

14   highly speculative here.

15             THE COURT:  Yeah.  It's only if he personally

16   distributed it or I guess he could see if he saw, you know,

17   50 or 100 or some people.  He can say how many people he saw

18   on January 6th with it.  It's his impression.  But he can't

19   say that he thought everyone else had one if he doesn't

20   know.

21             Okay, Mr. Roots?

22             MR. ROOTS:  Okay.  I'll just ask him if he knows

23   Ms. Lavrenz, some questions about that.  And then I'll get

24   back into it.

25             THE COURT:  Okay.  Sure.
```

1              (Whereupon, the following proceedings were had in

2     open court:)

3     BY MR. ROOTS:

4     Q.   Okay.  We're going to have a couple other questions

5     before we get into that.  So we're here in the trial of a

6     Defendant named Rebecca Lavrenz.

7              Do you know Ms. Lavrenz?

8     A.   No, I don't.

9     Q.   To your knowledge, have you ever met her?

10    A.   Not to my knowledge.

11    Q.   You've met a lot of January 6ers?

12    A.   I have.

13    Q.   About how many?

14    A.   Hundreds.

15    Q.   Was that before January 6th or during January 6th -- or

16    after January 6th?

17    A.   I knew a lot of people that were there before, but I've

18    met so many more afterwards.

19    Q.   Okay.  So you just described this MAGA map guide.

20              Did you witness, talk to people who were looking

21    at that map guide on January 6th?

22    A.   Yes, I did.

23    Q.   Would you say that that guide or things like that were

24    common among those you yourself saw or talked to?

25              MR. BALLOU:  Objection.

1            THE COURT:  Why don't you rephrase the question.

2    BY MR. ROOTS:

3    Q.  That was a very badly worded question.

4            Would you say that people that you talked to on

5    January 6th were reading that guide?

6    A.  I wouldn't really know.  I know a few people that did.

7    But the majority of people, I couldn't tell you.

8    Q.  Did you see people consulting that map guide?

9    A.  I know I talked to several people who were.  Some of my

10   friends were speakers at some of those events, so we were in

11   communication with some of them.

12   Q.  Okay.

13           MR. ROOTS:  We offer to admit that, Defense 46.

14           MR. BALLOU:  Objection.

15           (Whereupon, the following bench conference was

16   held:)

17           THE COURT:  Go ahead, Mr. Ballou.

18           MR. BALLOU:  Your Honor, we've got no evidence at

19   this point that the Defendant actually saw this map.  We

20   also don't have any evidence that this witness was even on

21   the same side of the Capitol as the Defendant.  So it's a

22   really tenuous argument to think that she would have seen --

23   that this witness knows that she saw this map.

24           THE COURT:  I hear you.  I think that goes to its

25   weight but not to its admissibility.  He's saying it's a

1    fair and accurate copy of something that he saw that day

2    himself.  And I mean, there is testimony that's come in

3    through the Government about sort of what else happened that

4    day outside of -- I mean, clearly, what happened outside of

5    Ms. Lavrenz's view.  Right?  Like inside the building and

6    things.  Of course that's to establish the elements.

7              But I think I want to give them some leeway based

8    on that.  So over your objection, I'll going to allow it to

9    be admitted.

10             MR. BALLOU:  Understood.

11             (Whereupon, the following proceedings were had in

12   open court:)

13             THE COURT:  I'm going to overrule and allow it to

14   be admitted and published.

15             (Whereupon, Defendant's Exhibit No. 46 was entered

16   into evidence.)

17             THE COURT:  What do you see now, the jury?

18             THE JURY:  The witness.

19             THE COURT:  Do you want to spotlight that?  You

20   know what I mean?  Can you pin it?

21             Do you have a physical copy of this here?

22             MR. ROOTS:  Ms. Lambert could log in and share her

23   screen.  I can ask a couple questions while that is

24   happening.

25

1    BY MR. ROOTS:

2    Q.  Mr. Sumrall --

3                 THE COURT:  One second.  She'll keep it on mute.

4    Thank you.

5                 THE COURTROOM DEPUTY:  Can you see that?

6                 THE JURY:  (Nods head in the affirmative.)

7                 THE COURT:  Members of the jury, what do you --

8    hold on.  Do you see the document that says MAGA rally map

9    guide on the screen now?

10                THE JURY:  Yes.

11                THE COURT:  Thank you, Ms. Lambert, again.

12                All right, Mr. Roots.

13   BY MR. ROOTS:

14   Q.  Mr. Sumrall, do you see this document?

15   A.  Yes, I do.

16   Q.  I just want to go through.  The front says MAGA rally

17   map guide, the biggest protest rally in Washington, D.C.,

18   exclamation point.  Do you see that?

19   A.  Yes, sir.

20   Q.  Let's flip to the next page.

21                And very quickly, you just mentioned that you knew

22   some speakers that were scheduled to speak on January 6th?

23   A.  Yes, sir.

24   Q.  Well, we'll get to that list, the roster.

25                Who specifically are you referring to?

1    A.  Tamara Lee, General Flynn, Roger Stone, Alex Jones,

2    several people that we were aware that were speaking that I

3    am familiar with.

4    Q.  Okay.  Were you a speaker on January 6th?

5    A.  No, I was not.

6    Q.  Okay.  So we're on Page 2.  I don't know if you can read

7    that clearly.  "Hello, patriots."  Can you read that?

8    A.  I can now.

9    Q.  Okay.  Let's start with -- well, what would you describe

10   about what is being said here?

11   A.  It's just an invitation to help give direction to people

12   so they'll know exactly where to be for the different

13   speakers to see the people they're interested in.

14   Q.  Okay.  And I want to direct attention to these bullet

15   points here.  "There'll be food trucks available."  It says,

16   "The national parks have public restrooms.  Bring small

17   bills for vendors."

18           Do you see that, where it says, "Remember to be a

19   generous tipper.  Let's bless the city of D.C. and its

20   residents"?

21   A.  Yes, sir.

22   Q.  And I'll let you -- you're the witness, instead of me

23   reading it to you.  Do you see the bottom part there?  If

24   you could just read that.

25   A.  "Leave the city better than how you found it.  Please

Sumrall - DIRECT - By Mr. Roots

1    pick up any trash and garbage you come across."

2    Q.  Okay.  And in general, is this -- if you could describe,

3    what was the general atmosphere like on January 6th earlier

4    in the day that day?

5    A.  I would say it was patriotic and festive, kind of like a

6    big tailgate party.

7    Q.  Were the people that you saw appear -- did they appear

8    to be happy or angry?

9    A.  It was a mix.  I'd say they were happy to be there.  It

10   was a great experience to be in that big of a crowd in

11   support of the president.

12        But there was, you know, an underlying tone of

13   concern, of course, about the whole Stop the Steal movement,

14   I guess, for lack of a better word, and people were anxious

15   to see what the results would be that day.

16   Q.  Okay.  Let's go to the next page.

17        Now, if you look at the top, what does it say at

18   the top there, the day?

19   A.  January 5th, 2021.

20   Q.  Okay.  And so if you could just describe a little bit.

21   So this was a guide for events that were scheduled on the

22   5th of January?

23   A.  That's correct.  A small map for directions -- most

24   people I don't believe had been to D.C. before.  We didn't

25   know our way around.  And this just gave the times and the

Sumrall - DIRECT - By Mr. Roots

1    different groups that were sponsoring the different events

2    that they had permits for as far as locations and how to

3    direct traffic to those points.

4    Q.  Okay.  Does anything stand out in terms of what to

5    expect if you were a person reading this?

6    A.  Not particularly, other than whoever your favorite

7    people that you want to go see.  This is an easy way to find

8    out where they'd be.

9    Q.  And can you just read off some of the names of speakers

10   on either of these columns here?

11   A.  Absolutely.  Mike Lindell, Ali Alexander.  Further down

12   on the next, Roger Stone, like I said, Joe Flynn, Rob

13   Weaver, Suzanne Monk.  Just a great variety, I think, of

14   different kinds of speakers as well.

15              MR. ROOTS:  Okay.  Let's go to the next page.

16   BY MR. ROOTS:

17   Q.  So this was the schedule for January 6th, the next day.

18   This was the big day.

19              Do you see that it appears to people reading this

20   that there were events scheduled both at the Capitol and the

21   Ellipse area?

22   A.  That is correct.

23   Q.  Very importantly, in the lower right-hand corner, do you

24   see this, where it says -- I'm sorry -- let me just -- the

25   lower right-hand corner in the yellow.  Could you read that

1   in that yellow column there?

2   A.  Yes, sir.  "March for Trump.  Doors open at 7:00.

3   Democrats are scheming to disenfranchise and nullify

4   Republican votes.  It's up to the American people to stop

5   it."

6          Then "The Ellipse rally:  Doors open at 7:00 a.m.,

7   starts 9:00 a.m."

8          And then "U.S. Capitol:  1:00 p.m.,

9   MarchtoSaveAmerica.com."

10  Q.  So what did you understand from this statement, doors

11  open at 7:00 and then down below, U.S. Capitol, 1:00 p.m.?

12  What does that suggest to you?

13  A.  Well, it means get there early --

14          MR. BALLOU:  Objection.

15          THE COURT:  Hold on.  Hold on.  Hold on.

16          (Whereupon, the following bench conference was

17  held:)

18          THE COURT:  I think we're now getting far afield

19  of where we need to be.  We're beyond the scope of

20  relevance.  We're potentially getting into speculation and

21  hearsay.  So I'm not interested in him testifying as to what

22  he understood was meant by this.  I'm giving you some more

23  rein than most would in terms of going over what's in here.

24  But I only want what's in here, not him interpreting it.

25          Okay, Mr. Roots?

1          MR. ROOTS:  Okay.

2          THE COURT:  Thanks.

3          (Whereupon, the following proceedings were had in

4    open court:)

5          THE COURT:  Mr. Sumrall, we're striking that last

6    question.  I'm going to let Mr. Roots proceed.

7    BY MR. ROOTS:

8    Q.  Okay.  Do you see this center column?  A list of

9    speakers.  If you could just read a couple of those names at

10   the top and who they are.

11   A.  Okay.  Representative Paul Gosar.  You see several state

12   reps:  Vernon Jones, Representative Lance Goodman, State Rep

13   Mark Finchem, Dr. Simone Gold, Brandon Stracka, you know,

14   politicians, Congress, Senate and influencers.

15   Q.  And Representative Paul Gosar, he's a member of

16   Congress?

17   A.  Yes.

18   Q.  And if you look -- if you could read the top part there.

19   A.  It says, "We the people must take to the U.S. Capitol

20   lawn and steps to tell Congress do not certify on

21   January 6th.  Congress cannot certify this fraudulent

22   Electoral College."

23   Q.  Okay.  And this map guide was being circulated before

24   January 6th.  Right?

25   A.  Yes, sir.

1    Q.  And so it indicates for people to go to the Capitol

2    lawn.  And I believe it says the steps, U.S. Capitol lawn

3    and steps -- to tell Congress things.  Among the speakers is

4    an actual member of Congress.

5                   Do you see that?

6                   MR. BALLOU:  Objection, your Honor.

7                   THE WITNESS:  That --

8                   THE COURT:  Hold on, Mr. Sumrall.

9                   (Whereupon, the following bench conference was

10   held:)

11                  THE COURT:  Okay, Mr. Ballou.  Go ahead.

12                  MR. BALLOU:  Once again, we're getting into the

13   witness trying to interpret the meaning of this document

14   rather than just saying what it says.

15                  THE COURT:  I agree.

16                  Mr. Roots, I just don't want him getting into

17   interpreting what the things are here.  He was there.  What

18   he saw and did on his own as to January 6 is fine.  But

19   interpreting this map and what it meant, that's just not

20   what we're going to do.  Okay?

21                  MR. ROOTS:  All right.

22                  THE COURT:  Thank you.

23                  (Whereupon, the following proceedings were had in

24   open court:)

25                  THE COURT:  Mr. Sumrall, we're striking that

1    question.

2             Mr. Roots will ask you a new one.

3    BY MR. ROOTS:

4    Q.  Okay.  We're going to move on to some videos.

5             Did you yourself film videos, Mr. Sumrall?

6    A.  I did.

7    Q.  If you could say, whereabouts were you located when you

8    were filming those?

9    A.  I was on the west side.  I started filming in the Peace

10   Circle before the property entrance and then we went into

11   the property over to the left side on the west side, I guess

12   northwest, and stayed pretty far back in the grass and

13   filmed from there, myself.

14            MR. ROOTS:  Let's bring up Defense Exhibit 18.

15   BY MR. ROOTS:

16   Q.  Do you see this image?

17   A.  Yes.

18   Q.  Do you recognize this?

19   A.  Yes.

20   Q.  And was that from your perspective, from the perspective

21   you were?

22   A.  Unfortunately, no.  That's David Snow, one of my crew

23   members, that shot that particular video.

24   Q.  So now let me orient you to him.

25            Were you -- where were you in relation to that?

1    A.  So I was behind him -- I don't know -- 50 or 75 yards,

2    probably.  He went down to the front, whereas I stayed back

3    towards the back with another team member.

4    Q.  Well, very importantly, I want to ask a few questions

5    about the signs and the barricades.

6              When --

7              MR. BALLOU:  Objection.

8              THE COURT:  Hold on, Mr. Sumrall.

9              (Whereupon, the following bench conference was

10   held:)

11             THE COURT:  Go ahead, Mr. Ballou.

12             MR. BALLOU:  Your Honor, we object both to the

13   admission of the exhibit and this line of inquiry.  As to

14   the exhibit, once again, we understand that you want to give

15   the defense some leeway here.  But this wasn't even a video

16   that was taken by the Defendant, so his ability to speak to

17   it is limited.

18             As to the line of questioning, you know, we never

19   alleged that Ms. Lavrenz was on the west side.  And so

20   questions about signage, barriers, snow fencing, or their

21   absence, which is where I assume defense counsel is going,

22   on the west side just is not going to be relevant here to

23   the Defendant's actions or intent.

24             THE COURT:  Go ahead.

25             MR. ROOTS:  Well, the Government has put this

Sumrall - DIRECT - By Mr. Roots

1    right into their case.  So the Government has shown lots of

2    video and pictures of signs from the west side, very much

3    using them to convict Ms. Lavrenz of crimes.

4              THE COURT:  I want to watch the video first.  I'm

5    going to tell -- excuse the jury so we can all see the video

6    and be more informed as we look at the argument.  I think

7    we're fine to keep the witness on.  We don't need to excuse

8    him.  Okay?

9              (Whereupon, the following proceedings were had in

10   open court:)

11             THE COURT:  We're going to continue talking about

12   this, but I don't need to hold you all here.  So if you want

13   to go back and take a few minutes and stretch your legs.

14             (Whereupon, the jury exited the courtroom at 3:43

15   p.m. and the following proceedings were had:)

16             THE COURT:  You all can be seated.

17             Mr. Sumrall, we're going to play the video now

18   because I want to have -- I have some questions as to

19   admissibility, so I want to see the video first, and then we

20   may talk outside of your listening or with you there.  I

21   couldn't tell you.  But first I just want to see the video.

22             (Whereupon, Defendant's Exhibit No. 18 was

23   published in open court.)

24             THE COURT:  Are there additional videos you said

25   you wanted to show?

```
 1                    MR. ROOTS:  We do.

 2                    One point there:  I want to get in the fact that

 3          the crowd is remarking that they interpreted, or at least

 4          some in the crowd interpreted that bleacher area that it was

 5          being set up, the scaffold area, we all know that it was

 6          being set up for the inauguration on January 20.  But many

 7          people in that crowd thought it was set up for us.  That's

 8          what they said.  So they thought the bleachers were set up

 9          for their events.

10                    THE COURT:  So I'm not going to allow that.  I

11          think that goes to the truth of the matter asserted.  It's

12          also, I think, extremely confusing, even if I let this video

13          in, for you to comment on that.

14                    We can talk about the audio issues separately.

15          But there's no indication your client was there.  So the

16          fact that some people on the west side through hearsay may

17          have thought that this was set up for their invitation is

18          not something I'm going to permit.

19                    So what other videos do you have?  We'll come back

20          to whether or not we're going to allow this.

21                    MR. ROOTS:  We have a video -- I think one of the

22          earliest videos.  He actually filmed one that was of the

23          breach that was on the west side that was a little bit of

24          distance from him, but he was there fairly early but saw --

25          I guess the overarching point we want to make through this
```

1    witness is that the crowd, other than the first hundred,

2    didn't ever see any signs because the signs were just

3    crushed down and just --

4            THE COURT:  I just want to see the videos.  I hear

5    you.  So what other video are you showing?  And can you tell

6    us the number?

7            MR. ROOTS:  22.

8            (Whereupon, Defendant's Exhibit No. 22 was

9    published in open court.)

10           THE COURT:  Was that -- who shot that video?

11           MR. ROOTS:  I believe Mr. Sumrall himself did.

12   Let's ask Mr. Sumrall.

13   BY MR. ROOTS:

14   Q.  Can you hear me?

15   A.  I can.

16   Q.  Who shot that video?

17   A.  I'm actually in that video.  David was standing next to

18   me, David Snow, and he filmed that.  I filmed another one

19   just like it.  I was standing next to him.  But that's

20   actually his video.

21   Q.  Okay.

22           THE COURT:  What was the last thing you said,

23   Mr. Sumrall?

24           THE WITNESS:  I said I'm actually in the video.

25   That was me in the black hoodie.

```
1              THE COURT:  Now, Mr. Roots, are there other

2    videos?

3              MR. ROOTS:  We could show a couple other videos.

4    These are to rebut the Government's videos.  Remember, they

5    have put these videos before the jury showing these violent

6    breaches.

7              THE COURT:  I just want to know how many videos

8    you have.  How many more?

9              MR. ROOTS:  Three more we could show.

10             THE COURT:  And of those three, do you know --

11   were they from Mr. Sumrall or unclear?

12             MR. ROOTS:  I believe the three -- we're pretty

13   sure that these are Sumrall, that he shot them.

14             THE COURT:  So, Mr. Sumrall, as we watch these

15   videos, we'll ask you after each one if you are in it or

16   videotaped it.  Okay?

17             THE WITNESS:  Okay.

18             MR. ROOTS:  This one is Defense 9.

19             (Whereupon, Defendant's Exhibit No. 9 was

20   published in open court.)

21             MR. ROOTS:  That was No. 9.

22             19 is the next one.

23             (Whereupon, Defendant's Exhibit No. 19 was

24   published in open court.)

25             MR. ROOTS:  The next one is 21.
```

```
1              (Whereupon, Defendant's Exhibit No. 21 was
2      published in open court.)
3              THE COURT:  Mr. Sumrall, were you in any of those
4      three videos or did you record any of those three videos or
5      do you know who recorded any of those three videos?
6              THE WITNESS:  Yes.  I recorded the first two
7      videos.  The third one I'm in and was standing next to David
8      Snow still when he filmed that one as well.
9              THE COURT:  Okay.  Thank you.
10             MR. ROOTS:  These we'll just say are relevant.
11     They're relevant to show --
12             THE COURT:  Why don't we just -- we can go to the
13     bench conference.  I don't think we need to have the witness
14     hear this.
15             Ms. Lavigne-Rhodes, can you put him back in the
16     waiting room?  That way we don't have to keep switching back
17     and forth.
18             Mr. Sumrall, we're going to put you in the waiting
19     room.  Wait for us.
20             (Whereupon, the following bench conference was
21     held:)
22             THE COURT:  Okay.
23             MR. ROOTS:  Yeah.  So we would proffer these are
24     all relevant to show the general confusion, which, of
25     course, this is on the west side.  But the same state of
```

1    facts exists all around the Capitol on January 6th.

2          The Government has put on a case showing these

3    violent breaches and they put on witnesses talking about how

4    there were these signs; there were these warnings, police

5    lines.  These videos clearly show there were no police lines

6    at that -- from that standpoint where Mr. Sumrall was on the

7    west side for the vast majority of people.  He was there

8    fairly early, not immediately.

9          But he was there.  I believe he's testified before

10   he would have -- there would have been a few hundred --

11   three -- several hundred people were in front of him.  And

12   so he's filming from that perspective.  And all signs are

13   gone.  Yeah, you can see a barricade or bike rack here or

14   there.  They're all in disarray, moved to the side.  And

15   that is what the crowd saw.  And there were thousands of

16   people.  That's what they saw and experienced when they went

17   through at that time on the west side.

18         THE COURT:  Are you asking to show all five of

19   these videos or whatever, four?

20         MR. ROOTS:  We could limit it.  I'm willing to

21   limit it to one or two.

22         THE COURT:  Mr. Ballou, I'm happy to hear from

23   you.  Let me just tee up my issue, which is that I think

24   that he's got a right to respond to this raindrop theory.  I

25   think there is a difference between admissibility and

1    weight.  I think certainly you have arguments on

2    cross-examination, but more so as closing, to say:  Forget

3    about the videos of what happened on the west front about a

4    bunch of strangers when I've got videos of the east front

5    and showing what, you know, I think are my conceded

6    Defendant here.

7             So I'm just hesitant to exclude this because I

8    think exclusion is different than the weight of it.  I don't

9    think that it's highly probative, but I also don't think

10   it's highly -- its lack of probativeness also cuts into its

11   prejudice.

12            And so I want to first start with just, I guess,

13   one or two -- he's asking for one or two of these.  I think

14   that isn't unreasonable, but I'm happy to hear from you on

15   this.

16            And then to talk about whether it matters if

17   Mr. Sumrall was in it, or if he was -- as long as he can

18   authenticate it, if he, you know, can see it being made or

19   something.  Then if there's other issues, I'll hear from

20   you, too.

21            MR. BALLOU:  I think if Mr. Sumrall can properly

22   authenticate the videos, we agree it's irrelevant whether he

23   took the video or was in the video.

24            And I understand your point that the Government

25   has introduced videos on the west side and the defense

1   should be given an opportunity to rebut some of those

2   arguments.

3            I do want to make one distinction here --

4            THE COURT:  Please.

5            MR. BALLOU:  -- which is, the Government

6   introduced the west side exhibits, as you said, to go to

7   the -- to explain the civil disorder charges, or the

8   disorderly and disruptive conduct charges in that there was

9   disruptive conduct happening in the entirety of the Capitol.

10  So a single person on the east side could still be

11  contributing to the disorder.

12           As I understand it from defense counsel, they want

13  to introduce these exhibits not necessarily to rebut that

14  idea but for something different, namely the intent of the

15  people there, that they thought that this was a festive or

16  peaceful environment and thus were allowed in there.

17           If these videos are being brought in for intent

18  purposes, then I think it's pretty clear that they're not

19  relevant and shouldn't be admitted because Ms. Lavrenz

20  wasn't on the west side.  So the intent of any of these

21  other rioters on the west side just isn't going to matter to

22  this case.

23           So if this -- if these exhibits are going to be

24  admitted, I think it should be cabined to dealing with

25  whether or not there was disorderly conduct happening on the

1    west side, not what the intent or understanding of the

2    rioters was over there.

3            THE COURT:  I definitely am concerned about -- I

4    don't want videos that are confusing.  So that first one I

5    think I don't want there with audio because when people

6    start talking about, "See, we're going to be here," these

7    are folks -- it's hearsay that would be for the truth of the

8    matter asserted, as I stated.  And it's to an entirely

9    different side of the building.  So that I think that one is

10   too prejudicial.  So I'm not going to allow that first

11   video.

12           The distinction you're trying to draw about the

13   applicability of the evidence when it's in, I mean, that

14   argument, in closing arguments, if Mr. Roots or Mr. Pierce

15   is going to say that you saw videos, the Government's and

16   the defense's, and those videos show people and they're not

17   disorderly, I think that is one thing.

18           I guess, you know, your concern that -- you know,

19   I think they are permitted to make this argument that

20   they -- Ms. Lavrenz believed that she was allowed to be

21   there.  Now, where "there" is, is it inside the Capitol?  Is

22   it at the doors of the Capitol where the breach is

23   occurring?  Again, I think that you have arguments in

24   rebuttal that you will say why that's not the case.

25           But I think that to have some leeway to sort of

1    present evidence that's trying to show what the scene was

2    and then -- I mean, part of the disorderliness is whether or

3    not you're invited, I think.

4              So I hear you, and I understand the distinction

5    you're making.  It's interesting.  And I think -- I don't

6    think you're wrong, but I want to give the defense some

7    leeway here.

8              So sure.  Go ahead, Mr. Ballou.

9              MR. BALLOU:  Just for the record, I understand

10   you've made your decision here --

11             THE COURT:  Yeah.

12             MR. BALLOU:  -- but as we continue to get into

13   this line of questioning with Mr. Sumrall, he's really

14   presented himself as an expert on January 6th.  And it seems

15   increasingly not just in the colloquial sense of expert, but

16   expert testimony.

17             And he has not been qualified as an expert here.

18   And so I'm very reluctant to be having him offer sort of

19   generalized descriptions about what's going on at the

20   Capitol absent some sort of designation there.

21             THE COURT:  Well, it's too late for such

22   designation, I would say.

23             I think that the Government was very generous at

24   the beginning of his testimony.  I think they could have

25   made objections, that he started speaking about sort of

 1    general January 6th testimony, which I appreciate.  That's

 2    both their prerogative to do so and their sort of decision

 3    not only to do it strategically but also just to be polite.

 4    So I think they've given you plenty of leeway.

 5              I think he has already potentially gone a little

 6    far afield, if not too far afield.

 7              I want him to testify about what he saw then in

 8    those videos.  He's not to talk about what he believes

 9    people there think, whether or not they're permitted.  He's

10    not there to speak about anything other than himself.

11    That's the limit of what this video is going to be.

12              We want to authenticate it.  So he can say, Yes,

13    I'm in that video or I saw that video being shot.  It's a

14    fair and accurate depiction of what I remember from that

15    day.  Then you can play the video.  But I want to know what

16    your questions and followup are going to be to him

17    after whatever two videos you're picking here.

18              MR. PIERCE:  Well, I just want to juxtapose what

19    the Government has been allowed to put on.  So they put on

20    violent images of the lower garage area where the Defendant

21    never could have even been where people were throwing a

22    garbage can at officers.  That got to the jury.  The jury

23    was able to see that.

24              THE COURT:  But I'm letting you play your video.

25    So why are you telling me what they got to do when I'm

 1   saying you get to do something?  What are you --

 2           MR. ROOTS:  So you want us to limit it to two.

 3           THE COURT:  I thought you said two.  If you want

 4   three, then do three.  I'm fine with that.  But at some

 5   point, it's cumulative.  They didn't show five videos of the

 6   door; they showed one.

 7           MR. ROOTS:  We'll choose 21 and 22 to make our

 8   point.

 9           THE COURT:  Okay.  I want to be clear I said you

10   could choose three.

11           MR. ROOTS:  19, 21 and 22.

12           THE COURT:  That's not the one with the

13   scaffolding.  I don't want that one.

14           MR. ROOTS:  That was 18.  Right?

15           THE COURT:  Thank you.

16           So I want to know what questions you're going to

17   ask after you show the videos.

18           MR. ROOTS:  Okay.  Does it appear that there is a

19   huge police presence here?  You know, do you see -- did

20   you --

21           THE COURT:  No.  You can ask him, Did he see a

22   police presence?  I'll wait to hear from the Government.

23   But let's just start with that as a baseline.  Again, it's

24   what his perceptions were.

25           MR. ROOTS:  Yeah.  Did you recall seeing police --

1      a police line here at this time?

2              Did you recall seeing signs here at this time that

3      said don't come on -- you know, Stay Away, Closed, those

4      kinds of questions.

5              THE COURT:  Okay.  Mr. Ballou?

6              MR. BALLOU:  Again, I think that they're trying to

7      do something very different with this west side evidence

8      than what the Government is trying to do here, which is if

9      he wants to testify about whether there were -- he

10     personally observed violence on the west side, did he

11     observe people trespassing on the west side and he says no

12     to those, that would -- you know, they could argue in

13     closing it says something about whether or not there was

14     disorderly or disruptive conduct happening.

15             If it's general statements about police presence

16     or signs or barricades, that's going to rioters' intent and

17     belief that they can be there.  And that's just not relevant

18     to Ms. Lavrenz.

19             THE COURT:  I think it goes to trespass, though,

20     if there were signs or things there.  I don't want to get

21     into sort of -- it's a very fine line, though.  I hear you.

22     I just don't want him talking -- I'm going to direct him, I

23     guess, before we bring the jury back, I don't want him

24     opining as to what he thinks people's views were about --

25     well, I don't want him opining as to anyone else's views.

1   He can talk about what he saw and I'm going to allow you to

2   ask your question, Mr. Roots, as to what did he see.  Did he

3   see a police presence, a barricade there or something?

4   Because I think it goes to trespass.

5          But I don't want him getting into, you know, that

6   he felt welcomed in or things like that.  I think that --

7   whether he felt welcomed in is irrelevant to Ms. Lavrenz.

8   And so I'm comfortable with this scope as I have directed

9   you.

10          Do you understand?

11          MR. ROOTS:  Yeah.  I mean, I'm thinking of a

12   question like:  Could you tell if people were allowed to go

13   onto the Capitol grounds?

14          I think the obvious answer is yes.

15          THE COURT:  No.  I don't want to know if he

16   thinks -- you can ask him, Did he go onto the Capitol

17   grounds?  Right?  You can ask him, Was he -- did he see

18   barricades that stopped him from going?  But not people.

19   I'm not here to hear about people.

20          I'm here to hear about -- I mean, I can't.  I can

21   only hear about him and Ms. Lavrenz.  Because he has no

22   knowledge of Ms. Lavrenz, I can't hear about that.  So I can

23   hear about him.  So he can say, I did not see a barricade.

24   I went on to the Capitol.  I did not see a police presence

25   that stopped me, so I continued on.

1          But he cannot be talking about what other people

2     are doing.

3          I'm allowing you to bring in the video, which,

4     again, we can -- if and when we get to closing, then that is

5     things that we can front there before we get into it.  I

6     tend to think that you can use your exhibits rather broadly

7     then, but not as testimony.  Testimony is evidence.

8     Argument is different than evidence.

9          Okay, Mr. Roots?

10          MR. ROOTS:  Okay.

11          THE COURT:  You don't have to --

12          MR. ROOTS:  It's not clear what questions I can

13     ask.  Can I ask him, Did you see barriers?  The Government

14     objected.  Did you see barriers?

15          THE COURT:  Yeah.  I said that's fine.  You can

16     ask him, Did he see barricades?  Did he see a police line?

17     Where did he go?  You can ask him about him.  And that's it.

18     He can't speculate as to what other people are doing.  He

19     can't speculate about other people's minds.  And I don't

20     want him to be speculating about whether or not he felt

21     welcomed there, because now we're getting into a confusing

22     area.

23          You can ask him about, Where did he go?  What did

24     he see?

25          MR. ROOTS:  Okay.

```
 1                THE COURT:  Obviously, admit the videos, which I
 2    think that you believe to be valuable.
 3                MR. ROOTS:  Yeah.
 4                So 19, 20 -- what is it?  19, 21 and 22.
 5                THE COURT:  Okay.  So over the Government's
 6    objection, I'm going to allow this in for that limited
 7    purpose.
 8                (Whereupon, Defendant's Exhibit Nos. 19, 21 and 22
 9    were entered into evidence.)
10                THE COURT:  I'm going to draw him back in from the
11    waiting room, Ms. Lavigne-Rhodes, and instruct him as to
12    what's happening here.
13                Thanks for your patience, Mr. Sumrall.  Can you
14    hear me okay?
15                THE WITNESS:  Yes, I can.  Thank you.
16                THE COURT:  So we're going to have a couple of
17    those videos again that we showed you once the jury is
18    called back in.
19                I'm going to instruct you now, I don't want you
20    testifying as to what you believe other people were thinking
21    or doing.  There's going to be limited questions to ask you
22    about what you did and what you saw.  That's it.  Okay?
23                THE WITNESS:  Okay.
24                THE COURT:  So let's call the jury back in and
25    have him authenticate each of the three videos before you
```

1   show them.

2                  MR. BALLOU:  I think he's already -- we

3   pre-authenticated --

4                  THE COURT:  That's helpful, Mr. Ballou.  Outside

5   of other questions, in terms of authentication, I think he's

6   laid a foundation.  Do you have an objection as to

7   authentication?

8                  MR. BALLOU:  No.

9                  THE COURT:  So they've already been authenticated.

10  So when the jury comes in, Mr. Sumrall, we'll be playing the

11  videos.  They'll be published to them.  And then Mr. Roots

12  will be asking you questions like I described.  Okay?

13                 THE WITNESS:  Yes, sir.  Thank you.

14                 THE COURT:  Thanks.

15                 (Whereupon, the jury entered the courtroom at 4:05

16  p.m. and the following proceedings were had:)

17                 THE COURTROOM DEPUTY:  Please be seated.

18  BY MR. ROOTS:

19  Q.  Okay, Mr. Sumrall.  We are going to play some videos.

20  We will start with Defense 19.

21                 (Whereupon, Defendant's Exhibit No. 19 was

22  published in open court.)

23                 MR. ROOTS:  Stop right there.

24  BY MR. ROOTS:

25  Q.  Okay.  Now, that was your video?

```
 1    A.   Yes, sir.

 2    Q.   And so you filmed that from your perspective?

 3    A.   Yes.  With my phone.  Yes.

 4    Q.   Let me ask, did you see bike racks or barriers there at

 5    that time?

 6    A.   Not at that time.  They had already been removed.

 7    Q.   Did you see signs saying Area Closed?

 8    A.   Those were gone as well with the barricades.

 9    Q.   What about a police line, any police line?

10    A.   No police were left in the area.  They all evacuated

11    towards the Capitol and left no one to give us directions.

12              THE COURT:  Let's just -- Mr. Sumrall, I want you

13    to just answer the questions as asked, not what may or may

14    not have happened earlier.  But just answer what you saw at

15    that moment in time.  Okay?

16              THE WITNESS:  No police.

17    BY MR. ROOTS:

18    Q.   What about any announcements, any loudspeaker

19    announcements?

20    A.   No, sir.  There were none.

21    Q.   And this crowd that's coming through at this time, let

22    me just say, what time about was this in the day?

23    A.   It was right at 1:00.  A little after.

24    Q.   Okay.  Would you say this crowd was coming from the

25    Ellipse?
```

1    A.  Yes.

2    Q.  And if you could give us a number.  How many people were

3    coming through that area at that time?

4    A.  Thousands.  There's no way to count.

5              MR. ROOTS:  Let's play the rest.

6              (Whereupon, Defendant's Exhibit No. 19 was

7    published in open court.)

8              MR. ROOTS:  Let's go to Defense 21.

9              (Whereupon, Defendant's Exhibit No. 21 was

10   published in open court.)

11             THE COURT:  One second.

12             THE WITNESS:  To the jurors, did you see the prior

13   video or not?

14             THE JURY:  No.

15             THE COURT:  We need to go back and reshow the

16   prior video.

17             MR. ROOTS:  Let's show that prior video to the

18   jury.

19             (Whereupon, Defendant's Exhibit No. 19 was

20   published in open court.)

21             MR. ROOTS:  Okay.  I think the jury can remember

22   the questions I asked regarding that video.  I don't think I

23   need to repeat them.

24             Okay.  Let's -- did the jury see the second video?

25             THE COURTROOM DEPUTY:  Yes.

Sumrall - DIRECT - By Mr. Roots

1    BY MR. ROOTS:

2    Q.  Let's go -- a couple questions, Mr. Sumrall, about that

3    video, the second video which we played without questions.

4           Was that your video also?

5    A.  I believe so.

6           MR. ROOTS:  Let's go to the third one, which would

7    be Defense 22.

8           (Whereupon, Defendant's Exhibit No. 22 was

9    published in open court.)

10   BY MR. ROOTS:

11   Q.  Was that also your video, Mr. Sumrall?

12   A.  I'm in that video.  David Snow shot it standing next to

13   me.

14   Q.  Okay.  Let me just ask, was that a riot from that

15   perspective at that time?

16           MR. BALLOU:  Objection.

17           THE COURT:  We can go to the bench conference.

18           (Whereupon, the following bench conference was

19   held:)

20           THE COURT:  Mr. Roots, he can't testify to things

21   like that.  That's speculation.  It's prejudicial.  It's

22   also a legal conclusion that we have not had a single

23   Government witness that they started testifying about this

24   sort of question about whether they thought something was or

25   was not a riot.  They just described what they personally

1    saw.

2              Now, we've already seen the videos.  They speak

3    for themselves.  So I'm not going to allow you to ask that

4    question.

5              What other questions do you have for him?

6              MR. ROOTS:  I could reask the same questions about

7    signs, police presence and announcements with regard to

8    that -- the last video.

9              THE COURT:  Okay.  Great.

10             (Whereupon, the following proceedings were had in

11   open court:)

12             THE COURT:  Mr. Sumrall, we're going to ask you

13   some questions about the last video again.  I will direct

14   you to only answer the question as asked as to what you saw

15   or observed.

16             Go ahead, Mr. Roots.

17   BY MR. ROOTS:

18   Q.  Mr. Sumrall, just a few final questions.

19             That last video, at that time, did you see those

20   same things?  Any police presence at that time?

21   A.  No.  There were no police.

22   Q.  Announcements?  Any kind of loudspeaker announcements?

23   A.  No, sir.

24   Q.  And signs saying trespass -- No Trespassing or Closed

25   Area?

1    A.  No signs.

2    Q.  You did -- there were -- with regard to barricades

3    there, what can you say about those?

4    A.  The barricades had all been moved out of the way and

5    stacked --

6              THE COURT:  Mr. Sumrall, I just want you to just

7    answer the question.  Did you or did you not see barricades?

8              THE WITNESS:  Yes.  I did see barricades stacked

9    on the edges on the side.  They had been moved out of the

10   pathways.

11             MR. ROOTS:  Thank you so much, Mr. Sumrall.  No

12   further questions.

13             THE COURT:  Mr. Ballou from the United States is

14   going to be cross-examining you now.

15                        CROSS-EXAMINATION

16   BY MR. BALLOU:

17   Q.  Good afternoon, Mr. Sumrall.  Can you hear me?

18   A.  I can.

19   Q.  Thank you.

20             Your organization, stophate.org -- is that right?

21   A.  No.  Stophate.com.

22   Q.  Stophate.com.  You said that you work with people who

23   have been -- who were at the Capitol on January 6th, 2021.

24   Is that right?

25   A.  Yes.

```
 1      Q.  Can you describe that work?

 2                THE COURT:  One moment.  Sorry.  One moment.

 3                Ms. Lambert, I think we should stop the screen

 4      share, so we'll go back to him.  Perfect.

 5                Mr. Sumrall, can you just test your microphone

 6      again.

 7                THE WITNESS:  Testing one two.

 8                THE COURT:  Who do you see on the screen there, to

 9      the jurors?

10                THE COURTROOM DEPUTY:  They see the whole thing.

11                THE COURT:  The whole thing.  Do you want to

12      spotlight him?  Can you do that?

13                Mr. Ballou, let me ask this, are you going to be

14      playing any of the videos?

15                MR. BALLOU:  I think we can live without them.

16                THE COURT:  Are you sure?  It's fine.

17                MR. BALLOU:  It'll be fine.

18                THE COURT:  Okay.  Just for now, Ms. Lambert, why

19      don't you sign off or you can go back to the waiting room.

20                Can you all still see Mr. Sumrall?

21                THE JURY:  No.  The seal.

22                THE COURT:  You see the seal.

23                Mr. Sumrall, can you say something?

24                THE WITNESS:  Hello.

25                THE COURT:  Thank you.  Thanks for your patience,
```

1    everybody.

2              Go ahead, Mr. Ballou.

3    BY MR. BALLOU:

4    Q.  Mr. Sumrall, you said that your nonprofit works with

5    people who were at the Capitol on January 6th, 2021.  Is

6    that correct?

7    A.  No, sir, it is not.

8    Q.  Oh, okay.

9    A.  I am not a nonprofit.

10   Q.  Sorry.  I had trouble hearing you.

11   A.  I am not a nonprofit.

12   Q.  Oh, okay.  So stophate.com actually makes a profit?

13   A.  No, it does not.  We do all our work for free,

14   volunteer.  But it is an LLC.

15   Q.  And as an LLC, does it receive any money?

16   A.  No, not particularly -- I don't understand the question.

17   We don't charge for our services.  No.

18   Q.  Understood.

19              But have you received money for your services or

20   has the LLC received any money?

21   A.  Well, sure.  We sell products and other things like

22   T-shirts.

23   Q.  What sort of products or T-shirts do you sell?

24   A.  The kind you wear.

25   Q.  Do any of those products, do any of those T-shirts,

1    reference the United States Capitol?

2    A.  Yes.  I would say one J6 witness T-shirt.  I don't know

3    if we're actively selling that online right now.  I'd have

4    to look.

5    Q.  Okay.  But you have sold that T-shirt in the past?

6    A.  I believe so.  I would have to check.

7    Q.  And that money went to the LLC.  Correct?

8    A.  Yes.

9    Q.  You were at the Capitol on January 6th?

10   A.  Yes.

11   Q.  You were at -- did you say the Peace Circle?  Is that

12   right?

13   A.  Yes.  Peace Monument, Circle.

14   Q.  And is the Peace Circle on the west side of the

15   building?

16   A.  It is.

17   Q.  Okay.  And you went past the Peace Circle.  Correct?

18   A.  Yes.

19   Q.  Okay.  Where did you go after you passed the Peace

20   Circle?

21   A.  To the left and to the grass.

22   Q.  Approximately how far up into the grass did you go?

23   A.  Probably less than halfway.

24   Q.  Halfway to the Capitol?

25   A.  Yes.

```
 1                    MR. BALLOU:  Can I ask Ms. Marcelin to pull up

 2      Government's Exhibit 202 -- actually, 206 for now.

 3                    THE COURT:  Is she going to need to sign in to be

 4      able to see that?

 5                    MR. BALLOU:  I'm sorry to do this, but --

 6                    THE COURT:  No.  That's fine.

 7                    Ms. Marcelin, I think you're going to have to sign

 8      in and share your screen if you have the Zoom link.

 9                    MS. MARCELIN:  We can use the ELMO, actually.

10                    THE COURT:  Okay.  Great.  Good old paper to the

11      rescue.

12                    Members of the jury, do you see what's on the --

13      what do you see?

14                    So can you switch for everybody to see the ELMO so

15      they know?

16                    THE COURTROOM DEPUTY:  They can see it.

17                    THE COURT:  Mr. Sumrall, what do you see on the

18      screen?

19                    THE WITNESS:  I see you and me.

20                    THE COURTROOM DEPUTY:  I don't know how that works

21      for him.

22                    THE COURT:  Can you switch to Zoom camera so at

23      least it's pointing at the --

24                    MR. BALLOU:  This isn't going to require great

25      attention to this.  As long as we can get generalities,
```

Sumrall - CROSS - By Mr. Ballou

1 that's fine.

2     THE COURT:  It's pretty hard to see.  We can do

3 this:  Can you email him a copy -- he's on email clearly.

4 Can you email him an attachment and he can just have it on

5 the screen?  It's fine.  It'll take a second.

6     MR. BALLOU:  It's fine.  We can move on.

7     THE COURT:  It'll take a moment.

8     MR. ROOTS:  He's familiar with that.

9     THE COURT:  They're going to email it to you.  Can

10 you pull up your email, Mr. Sumrall?

11     THE WITNESS:  Sure.

12     MR. BALLOU:  I can wrap up with the other

13 questions before we turn to this.

14     THE COURT:  That's fine.

15     Ms. Marcelin, we can turn the screen back.  Thank

16 you for accommodating us.

17     Mr. Sumrall, I'm going to ask you a couple

18 questions while we wait for you to get that attachment

19 through the internet.

20     THE WITNESS:  Okay.

21 BY MR. BALLOU:

22 Q.  Mr. Sumrall, can you hear me?

23 A.  Yes.

24 Q.  You mentioned a MAGA rally map guide.

25     Do you remember that?

Sumrall - CROSS - By Mr. Ballou

```
1    A.  Yes.
2    Q.  Okay.  Was that map guide issued by the Capitol Police?
3    A.  Not to my knowledge.
4    Q.  Was it issued by a government agency?
5    A.  I don't know who issued it, but I would think not.
6    Q.  Now, you said that you did not see Ms. Lavrenz on
7    January 6th, 2021.  Correct?
8    A.  Correct.
9    Q.  And you didn't talk to her on January 6th.  Correct?
10   A.  Not to my knowledge.
11   Q.  Okay.  So at the risk of asking an obvious question
12   here, did you see Ms. Lavrenz with this map that we were
13   talking about?
14   A.  Not that I'm aware of.  No.
15   Q.  Did you talk to Ms. Lavrenz -- again, at the risk of
16   asking an obvious question here, did you talk to Ms. Lavrenz
17   on January 6th about this map?
18   A.  Not to my knowledge.
19   Q.  Okay.  At any point when you were on the Capitol
20   grounds -- you said you went to the Peace Circle and then
21   you went halfway up towards the Capitol.  At any point did
22   you go to the east side of the Capitol Building?
23   A.  No, sir.
24   Q.  Okay.  Did you see any of the restricted perimeter on
25   the east side of the Capitol Building?
```

1    A.   No.  We never went to that side of the building.

2              MR. BALLOU:  Nothing further, your Honor.

3              THE COURT:  Thanks, sir.

4              We can switch back to the Zoom screen.

5              THE COURT:  With my prior admonition, redirect.

6              Can you all see him?

7                        REDIRECT EXAMINATION

8    BY MR. ROOTS:

9    Q.   The prosecutor asked you about the money, the money made

10   by this stophate.com.

11             Would you describe stophate.com as a lucrative

12   thing?

13   A.   No, I would not.

14   Q.   Is it a -- has it ever made a profit?

15   A.   No, it has not.

16   Q.   Are you familiar with a diagram that has been released

17   by the Government of the Capitol with these big red art

18   lines, big red lines drawn around a certain perimeter around

19   the Capitol?

20   A.   Yes, I am.

21   Q.   Did that -- what do you know about that?  Did that --

22   did that map exist before January 6th?

23             MR. BALLOU:  Objection.

24             THE COURT:  Yeah.  We can have a bench conference.

25             (Whereupon, the following bench conference was

1    held:)

2                THE COURT:  Go ahead, Mr. Ballou.

3                MR. BALLOU:  Your Honor, given that the Defendant

4    wasn't actually able to see the exhibit and we asked no

5    questions about the exhibit, this is now outside the scope

6    of the cross-examination.

7                THE COURT:  They didn't actually show it, so I do

8    think it's outside the scope.

9                What are you trying to get at, Mr. Roots?

10               MR. ROOTS:  The fact that it was invented by the

11   Government after January 6th.

12               THE COURT:  I think we've already had testimony

13   about that.  Their own witness said there was no red paint

14   on the ground or anything like that.  I mean, I think it's

15   fairly ludicrous for anyone to think that there was

16   something painted.  But they never got into that, so I think

17   we're beyond the scope here.

18               Anything else as to that?

19               MR. ROOTS:  Well, I could ask a question:  Did you

20   see an unbroken red barricade line as the map suggests?

21               THE COURT:  I'm saying that we have already had

22   testimony initially about that in a previous witness and

23   they said that obviously there is not.

24               I mean, we have the video.  It speaks for itself.

25   And it wasn't asked in the direct.  So I think for those

1    reasons I'm not going to allow that.

2              Do you have any other questions?

3              MR. ROOTS:  Well, then, forget the word "red."

4    Can I just ask, Did you see an unbroken barricade line

5    around the perimeter?

6              THE COURT:  Well, that was never covered in the

7    cross-examination.  So I mean, you already established that

8    with your direct.  Why would we go over it again?  I think

9    it's cumulative.

10             MR. ROOTS:  Okay.

11             (Whereupon, the following proceedings were had in

12   open court:)

13             MR. ROOTS:  Okay, Mr. Sumrall.  Thank you so much.

14   No further questions.  Thank you.

15             THE COURT:  You're excused, Mr. Sumrall.  Thank

16   you.

17             THE WITNESS:  Thank you.

18             (Witness excused.)

19             THE COURT:  Let's have a bench conference real

20   quick.

21             (Whereupon, the following bench conference was

22   held:)

23             THE COURT:  I wanted to know who the defense's

24   next witness is.

25             MR. PIERCE:  Yes.  Well, at this point in time,

1    your Honor, the only other witness that we have ready to go

2    would be Ms. Rebecca Lavrenz.

3              THE COURT:  I get it.  Who else are you -- where

4    is Mr. Powell?  Is he still testifying?

5              MR. PIERCE:  Oh, that's right.  I forgot about

6    him.

7              MR. ROOTS:  We don't know where he is.  I could

8    out and try to find him.

9              MR. PIERCE:  I totally forgot about him.

10             THE COURT:  That's okay.

11             MR. ROOTS:  I'll go look for him.

12             THE COURT:  So we have Mr. Powell.  Let me just

13   get a sense of who your remaining witnesses are you intended

14   to offer.

15             Mr. Powell; potentially, the Defendant.  Who else?

16   Is there anything else?  There's one other person by Zoom,

17   right?

18             MR. PIERCE:  Yes.  There's Mr. Powell; there's --

19   then tomorrow morning there's going to be that police

20   officer that --

21             THE COURT:  Sure.  Anyone else?

22             MR. PIERCE:  Then there's going to be -- well,

23   probably we'll have Ms. Lavrenz go in terms of order.  And

24   then we have Mr. Cusick by video, assuming that she makes a

25   decision to testify.

1          The other thing I should flag for the Court is we

2     were successful actually in getting in touch with

3     Mr. Guandolo.

4          THE COURT:  Okay.

5          MR. PIERCE:  It looks like he's -- he would be

6     willing to testify.  We should be talking to him in some

7     detail tonight.  We've just been able to have text

8     communications with him.

9          But he would not be available until Monday

10    morning, it looks like.  And so --

11         THE COURT:  When you say until Monday morning, you

12    mean even by Zoom he's not available tomorrow?

13         MR. PIERCE:  Oh, actually, I don't know that we

14    asked that.

15         THE COURT:  I want to first find out what that

16    testimony is, a proffer.

17         As you may imagine, I have some grave concerns

18    about someone coming in to say something that we know to be

19    factually incorrect.  I mean, he may believe that he's the

20    queen of England.  That doesn't make him that.  So he may

21    believe that he was an FBI informant.  But I think we have

22    fairly objective --

23         MR. PIERCE:  Oh, no.  I'm sorry, your Honor.  I

24    don't mean to interrupt.  But nobody suggested that he's an

25    FBI informant.  Our understanding is he was -- he was an FBI

1    agent who was actually the liaison between the FBI and the

2    Capitol Police.

3              THE COURT:  But we've had a proffer from the

4    United States with an FBI -- current active FBI agent --

5    I'll ask them again to double check that tonight -- that

6    that is factually incorrect.  So I'm not going to have

7    someone --

8              MR. PIERCE:  I don't recall him saying that.

9              MR. PARKER:  Your Honor, to be specific, I believe

10   Mr. Guandolo might have been the liaison to the Capitol

11   Police somewhere around 2001.

12             My understanding is that he left the Bureau.  He

13   resigned from the Bureau somewhere around 2008 or 2009.  So

14   he had not been at the Capitol for about 20 years.

15             MR. PIERCE:  My only point is that particular fact

16   at one point he was the -- was not false, the particular

17   fact.

18             And then we're also looking -- I'm sorry.

19             THE COURT:  Before you go on, I'm going to want a

20   detailed proffer.  So don't talk to him for anything less

21   than as much time as you can squeeze out of him tonight

22   because I'm going to want a very, very detailed proffer.

23   I'm very hesitant to think that it's going to be relevant

24   or --

25             MR. PIERCE:  Your Honor, he --

```
1                THE COURT:  Just talk to him.

2                MR. PIERCE:  Yeah.

3                THE COURT:  I'm just telling you, make sure to get

4      as much detailed notes as you can out of him as to what you

5      anticipate he's going to speak to.

6                MR. PIERCE:  Yes, your Honor.  Of course.

7                We also have the other Capitol Police officer that

8      Ms. Lavrenz spoke to that we've asked about in terms of

9      availability.

10               THE COURT:  Did you hear back on that?

11               MR. PIERCE:  Not yet.  We'll have to follow up

12     with that, counsel.

13               THE COURT:  Let's go find Mr. Powell.  We've got

14     about 30 minutes.

15               MR. PIERCE:  We did send the subpoenas for those

16     to your email, I believe.

17               THE COURT:  Yes.  I believe they're being

18     processed.

19               MR. PIERCE:  And then the other one is we may have

20     Suzanne Monk who may testify.  She's local.

21               Why don't you go find Mr. Powell, one of you.

22               MR. PIERCE:  I'll do that, your Honor.

23               THE COURT:  Mr. Roots, can you tell us who --

24               MR. ROOTS:  Yeah.  Suzanne Monk is a local D.C.

25     patriot activist who was -- I don't believe -- well, she
```

1      was at January 6th.  By the way, she's a featured speaker on

2      that map guide for the 5th.  So she was a featured speaker

3      on events on the 5th.

4             On the 6th, she did not actually enter Capitol

5      grounds.  However, she is very familiar with the whole thing

6      and she -- she -- she did witness the Capitol from a

7      distance on January 6th.

8             THE COURT:  Again, I think it's extremely unlikely

9      I'm going to admit that testimony.  It seems Mr. Sumrall was

10     there and could authenticate he was right there and what he

11     saw.

12            What happened on January 5 I don't think is in any

13     way relevant to what the allegations are in this case.  I

14     think what we're talking about is what happened on

15     January 6th.  In addition, if she's far afield, I don't know

16     that there's much probative value to that.

17            So I think it's extremely unlikely I'm going to

18     let it in.  But I encourage you again to talk to her and

19     nail down sort of the scope of what her testimony would be.

20     Okay?

21            MR. ROOTS:  Okay.

22            MR. PARKER:  Your Honor, my understanding is there

23     won't be another Zoom witness today.  Is that correct?

24            THE COURT:  There will not.

25            MR. PARKER:  Thank you.  That's all I was trying

1      to clear up.  Thank you.

2             THE COURT:  Can you just remind me, Mr. Roots, of

3      the other Zoom witness tomorrow you're going to have

4      testify?  What's his name?

5             MR. ROOTS:  His name is Jim Cusick.  He is a

6      January 6th defendant who has been prosecuted and convicted

7      of misdemeanors.

8             He went inside the Capitol.  We don't believe he

9      ever interacted inside the Capitol with the Defendant.  But

10     similar times.  So he has that perspective.

11            He has been sentenced to ten days and he served

12     ten days.  He's on appeal.  But he's a great witness.  He's

13     a 70-some-odd-year-old pastor.

14            THE COURT:  What's he going to testify about?

15            MR. ROOTS:  His -- basically, we'll play some

16     videos.

17            THE COURT:  We'll get back to it.  I see

18     Mr. Powell is here.  I don't want to slow things down.

19            (Whereupon, the following proceedings were had in

20     open court:)

21            (Thereupon, Robert A. Powell entered the courtroom

22     and the following proceedings were had:)

23            THE COURTROOM DEPUTY:  Please raise your right

24     hand.

25            ROBERT A. POWELL, DEFENSE WITNESS, SWORN.

```
 1              THE COURTROOM DEPUTY:  Please be seated and speak
 2    into the mic.
 3                        DIRECT EXAMINATION
 4    BY MR. ROOTS:
 5    Q.  Okay, Mr. Powell.  Would you state and spell your full
 6    name for the court reporter.
 7    A.  Robert Alan Powell, R-O-B-E-R-T, A-L-A-N, P-O-W-E-L-L.
 8    Q.  And, Mr. Powell, where are you from?
 9    A.  Well, that's a complicated question.  But I'm currently
10    in Florida.  I'm traveling around the country.
11    Q.  What do you do?
12    A.  I'm a journalist.
13    Q.  A journalist.
14              Now, are you an active current journalist?
15    Retired?  Are you employed?
16    A.  I'm retired.
17    Q.  Okay.
18              THE COURT:  Mr. Powell, could you just, for the
19    court reporter's sake, just make sure you wait until after
20    the question --
21              THE WITNESS:  I'm sorry, sir?
22              THE COURT:  Just make sure for the court
23    reporter's sake that you wait until after the question is
24    fully stated before you answer just so that the court
25    reporter --
```

```
 1                    THE WITNESS:  Gotcha.

 2                    THE COURT:  Thank you, sir.

 3      BY MR. ROOTS:

 4      Q.  Do you have credentials in terms of a journalism degree

 5      or --

 6      A.  I do.

 7      Q.  -- education?

 8      A.  Sorry.  Yes.  I do have credentials as a journalist.  I

 9      graduated and received a degree in journalism in 1986.

10      Q.  Where was that from?

11      A.  Specs Howard School of Broadcast Arts.  Specs.  It's

12      spelled S-P-E-C-S.  That's the man's first name.

13      Q.  If you could just briefly describe your career in

14      journalism.

15      A.  Well, I worked in radio, television and newspapers since

16      1987.  There was a brief break in there when I was injured

17      and couldn't work.  When I came back, I started my own news

18      program and eventually it grew to eclipse local legacy media

19      outlets by a factor of ten, according to all of those, you

20      know, services, like -- that measure who watches what.

21      Q.  A couple words there.  Legacy, local legacy.  Now, local

22      means where or what?

23      A.  Northern Michigan.

24      Q.  What period are we talking about?

25      A.  From 2008 until 2021.
```

1    Q.  And you said you -- it grew.  First, what's the name of

2    this thing?

3    A.  It's called The Truth Is Viral.

4    Q.  The Truth Is Viral.

5              And is that a radio show?

6    A.  Internet and radio, because at some point there was -- I

7    was also working for WCHY 97.7 in Cheboygan, Michigan.  So

8    the two kind of melded together at times.

9    Q.  You said it outgrew legacy media.  What do you mean by

10   that?

11             MR. BALLOU:  Objection.

12             THE COURT:  Bench conference.

13             (Whereupon, the following bench conference was

14   held:)

15             THE COURT:  I fail to see the relevance of this.

16   We don't need to get into his -- further into his

17   credentialed journalism.  But is there something else

18   you're --

19             MR. BALLOU:  That's exactly right, your Honor.

20             THE COURT:  Mr. Roots, let's keep moving on.  We

21   don't need to be talking about this.  Okay?

22             MR. ROOTS:  Okay.

23             (Whereupon, the following proceedings were had in

24   open court:)

25             THE COURT:  We're going to strike that last

```
 1    question.

 2                  Please continue.

 3    BY MR. ROOTS:

 4    Q.  One additional question about your career.  Have you won

 5    any journalism awards?

 6    A.  I was nominated for the Associated Press --

 7                  MR. BALLOU:  Objection.

 8    A.  -- best investigative journalism.

 9                  THE COURT:  Hold on.

10                  (Whereupon, the following bench conference was

11    held:)

12                  THE COURT:  The Government has objected again.

13                  I don't want to hear further about his career as a

14    journalist.  I don't think that's relevant to what's

15    happened.  He's not testifying here as a journalist; he's

16    talking about what he saw on January 6th.  Okay?

17                  MR. ROOTS:  Okay.

18                  (Whereupon, the following proceedings were had in

19    open court:)

20                  THE COURT:  I'm going to strike that last question

21    and response.

22                  Please move on.

23    BY MR. ROOTS:

24    Q.  Okay.  Let's just cut to the chase.  January 6th, 2021,

25    where were you?
```

1    A.  I was in Washington, D.C., covering what was supposed to

2    be my last story ever.  On January 7, I was going to return

3    to Michigan and retire and turn in my work and go fishing

4    for the rest of my life.  But if you want to make God laugh,

5    make a plan for your life.  It didn't turn out that way.

6    Q.  Okay.  So let's dig into that.  How did you arrive there

7    in D.C. for that event?

8    A.  I drove.

9    Q.  And when did you get to D.C.?

10   A.  I was -- I think we arrived on the 4th.  Don't hold me

11   to that because -- I'm pretty sure we arrived on the 4th,

12   because I was the next day going around the Mall and

13   recording events, demonstrations -- this is on the 5th --

14   that were, you know, permitted demonstrations that were

15   taking place on the Capital Mall.

16   Q.  Okay.  Were you interviewing people?

17   A.  I was.

18   Q.  Were you filming?

19   A.  I was.

20   Q.  Okay.  So on the morning of January 6th, where were you?

21   A.  At what time of the morning?

22   Q.  Well, if you could just describe your day.

23   A.  Okay.  Well, I woke up at 0 dark 30.  It's just really

24   early, for nonmilitary-type people, because I wanted to be

25   as close to where President Trump was giving his speech as I

1    could.

2              I got to the National Mall about 5:30, maybe 6:00,

3    somewhere around in there.  It was just before dawn.  And I

4    spent the rest of the day doing exactly what you just said:

5    interviewing people, taking video.

6              At some point -- it was about -- let me think,

7    make sure I get my facts straight here -- it was about 1:00

8    when another journalist that I had traveled from Ohio with

9    and I decided to split up.  I said -- because we were

10   getting basically the same footage.  And we had agreed to

11   pool our footage.

12             So I said, You stay here.  I'm going to go down to

13   the Capitol and I'm going to get video of half a million

14   people walking straight towards me.

15             And I did that.

16             But when I eventually got to the Capitol around --

17   I'm going to say between 1:30 and 1:45, there was a ruckus

18   going on on the west side.

19             Now, I was not close enough to determine exactly

20   what was going on.  But I now know from news reports that

21   the explosions that I heard were not fireworks; they were

22   flash bang grenades.

23             So I had my fiancée with me.  She had just had

24   knee surgery.  She had a knee replacement.  And we had an

25   apartment on the northeast side of the Capitol across the

Powell - DIRECT - By Mr. Roots

1    street where I was going to take her and, you know, let her

2    lay down and rest her head and her knee.

3            Well, by the time we came around the northeast --

4    or the north side of the Capitol, I see a crowd of people

5    starting to come towards the east steps as well on my right

6    side as I'm looking.

7            And my journalistic curiosity, I guess, just got

8    the better of me and I found a Department of Homeland

9    Security pickup truck.  I set my wife in it, or my fiancée,

10   and said, Honey, sit here and you'll be safe.  Let me go do

11   my job.

12           And she says, You can go do what you got to do.

13           So I started walking towards the east steps where

14   a crowd had already gathered and started making my way into

15   the crowd filming what was happening around me.

16           And all of a sudden Capitol Hill police officers

17   [sic] started beating people with batons and then the crowd

18   started defending themselves and rushed the Capitol Hill

19   police officers.

20           I was knocked down.

21   Q.  Let me just stop at that.  Let me ask a couple other

22   things.

23           I forgot to ask, do you also have a military

24   background of any kind?

25   A.  Yes, I do.  I'm a United States marine.

1    Q.  Okay.  So let's try to find a video of the east side.

2              MR. ROOTS:  Let's bring up Government's 107, I

3    believe.

4              Now, my screen says source disconnected.

5    BY MR. ROOTS:

6    Q.  Before we start this video, let me just ask a couple

7    questions.

8              On your way to this location, the east steps, did

9    you cross any barricades?

10   A.  No, I did not.

11   Q.  Did you see any signs saying Closed Area?

12   A.  I did not.

13   Q.  What about any announcements?

14   A.  No.  There were no announcements saying anything at all.

15   Q.  Any police lines that you saw?

16             MR. BALLOU:  Objection.

17             THE COURT:  Let's go to the bench conference.

18             (Whereupon, the following bench conference was

19   held:)

20             THE COURT:  Go ahead, Mr. Ballou.

21             MR. BALLOU:  Your Honor, you admonished us earlier

22   to avoid leading questions.  Since then I've tried to avoid

23   that.

24             THE COURT:  These are extremely leading questions.

25   You can ask him what he saw, but you can't ask him about the

Powell - DIRECT - By Mr. Roots

 1    specific things as if this were a cross-examination.  I

 2    think the Government's been very generous, which I

 3    appreciate.  But we're way past what is a close call on

 4    leading questions.  So you can ask him specifically what did

 5    he see and, you know, where were you, things like that.  But

 6    let's not lead him.

 7            Okay, Mr. Roots?

 8            (Whereupon, the following proceedings were had in

 9    open court:)

10            THE COURT:  We'll strike that question.  You can

11    ask again.

12    BY MR. ROOTS:

13    Q.  Okay.  Can you just briefly describe the level of -- the

14    level of, I guess, restrictions that you experienced on that

15    east plaza from where you were.

16    A.  I encountered none.

17    Q.  Specifically where were you?  What was your approach?

18    A.  Well, can you bring up an overhead view of the Capitol

19    Building?

20    Q.  We'll try.

21    A.  Okeydokey.

22    Q.  We'll bring up Government's 202.

23    A.  Okay.  Now, same thing as last time.  I could just put

24    my finger on the screen and draw my route?

25    Q.  Yeah.  That's a touch screen there.

Powell - DIRECT - By Mr. Roots

```
 1    A.   Okay.  So I believe we came up this way and went right
 2    through here and down here to the steps.
 3    Q.   Okay.  And you encountered no -- no -- well, what --
 4    again, what -- if you could say all through here, what did
 5    you encounter with regard to security or restrictions?
 6    A.   Police officers standing around doing nothing.
 7    Q.   And where did you see that?
 8    A.   That would have been right here, because I asked the
 9    police officer what was going on.  And he says people are
10    just walking all over the place.
11              MR. BALLOU:  Objection.
12              THE COURT:  Yes.  So I'm going to limit your
13    testimony to only what you said, not what other people said.
14    Okay?
15              THE WITNESS:  I can't say what the response was to
16    me?
17              THE COURT:  That's correct.
18              THE WITNESS:  Okay.
19              THE COURT:  So we'll strike what you said before.
20    You can say what you said.
21    BY MR. ROOTS:
22    Q.   Okay.  So you came around -- first of all, do you see
23    this big red sort of line all the way around the Capitol
24    area here?
25    A.   Yes, I do.
```

1    Q.  Was that there on January 6th?

2    A.  No.  As a matter of fact, there were two permitted

3    demonstrations to be held within that red line.

4              MR. BALLOU:  Objection.

5              THE COURT:  A quick bench conference.

6              (Whereupon, the following bench conference was

7    held:)

8              THE COURT:  So, Mr. Roots, you can direct your

9    witness here -- if not, I will -- that he's only to answer

10   the questions that are asked, not opine about other

11   statements.

12             Now, you can certainly ask him certain things, and

13   that's fine; but again, from his personal recollections of

14   what happened that day.  But he's not up here to be an

15   advocate or speak about his general philosophies on

16   January 6th.  Okay?

17             MR. ROOTS:  Understood.

18             THE COURT:  I will excuse him if he continues to

19   do so.

20             (Whereupon, the following proceedings were had in

21   open court:)

22   BY MR. ROOTS:

23   Q.  Let's take this down and go back to that video that was

24   just up earlier.

25             (Whereupon, segments of Government's Exhibit No.

1    107 were published in open court.)

2             MR. ROOTS:  Actually, go back a second or two.

3    Let's stop right here.

4    BY MR. ROOTS:

5    Q.  Do you recognize this, Mr. Powell?

6    A.  Not from this angle, no.  I would have been coming in

7    from this side over here.

8    Q.  Okay.

9             MR. ROOTS:  Let's play that a little bit.

10            (Whereupon, segments of Government's Exhibit No.

11   107 were published in open court.)

12            MR. BALLOU:  Objection, your Honor.

13            THE COURT:  Hold on.  You can pause the video.

14   Thank you.

15            (Whereupon, the following bench conference was

16   held:)

17            THE COURT:  Go ahead, Mr. Ballou.

18            MR. BALLOU:  The witness just said that he didn't

19   recognize this area.  Now, I understand that he may have

20   some familiarity with the east side.  But if he's going to

21   testify about it, it's got to be with a video that he

22   actually recognizes.

23            THE COURT:  Mr. Roots?

24            MR. ROOTS:  I understood what he was saying.  In

25   other words, he recognizes it, but not from this angle way

Powell - DIRECT - By Mr. Roots

1    back where this camera is, which would have been quite a

2    ways from him.  That's what I believe he was saying.

3            THE COURT:  So does the angle change -- or what's

4    your point?  Do you think if he continues on he's going to

5    recognize it?  Because at some point he's got to.

6            MR. ROOTS:  Well, I think he did indicate -- I can

7    clarify exactly what he means.

8            THE COURT:  How long is this clip?  Do you know?

9            MR. ROOTS:  It looks like nine minutes.

10           THE COURT:  How much are you intending to play?

11           MR. ROOTS:  Well, I believe his story is -- his

12   story goes through up to the steps.  So all the way to --

13   up -- maybe to the end.

14           THE COURT:  Okay.  This is previously admitted; is

15   that right?

16           MR. BALLOU:  Yes, your Honor.

17           THE COURT:  So we can play it.  But you can again

18   direct him that he can only speak to things that he knows

19   and so if he's -- if he didn't see it himself, he cannot

20   speak to it.

21           So he can observe the video, I would think,

22   Mr. Ballou, and then see -- if he didn't see the first few

23   seconds and it pans out or something and then he knows, I

24   guess that's different.  Does that make sense?

25           MR. BALLOU:  It does.

```
 1                Your Honor, I'll say that we've been made aware

 2      that I believe the witness has made about a three-and-a-

 3      half-hour video of what he did see at the east side at that

 4      time.  So maybe it would be easier for defense counsel to

 5      simply rely on that view where it's something that the

 6      witness can definitively say he did see rather than relying

 7      on these.

 8                THE COURT:  Oh, are we going to be seeing some of

 9      those, Mr. Roots?

10                MR. ROOTS:  Some of those that he shot, yes.  But

11      what I really want to do is orient where he entered this

12      plaza area, which is on this video.

13                MR. BALLOU:  Again, your Honor, if he doesn't have

14      any familiarity from this angle, then he's not going to be

15      able to do that.

16                THE COURT:  Right.  We can show some more -- a

17      minute or so more of this.  And then we'll ask him again if

18      he recognizes it from this angle, you know, if he's familiar

19      with it from that day and time.  If the answer is no, then

20      you're going to have to do what you -- I mean, you already

21      did.  You showed a different map and he marked sort of his

22      egress and how he got there.

23                Okay, Mr. Roots?

24                MR. ROOTS:  Okay.

25                (Whereupon, the following proceedings were had in
```

Powell - DIRECT - By Mr. Roots

1    open court:)

2              MR. ROOTS:  This is Government's 107.

3              THE COURT:  Continue to play it, please.

4              MR. ROOTS:  So let's play this.

5              (Whereupon, segments of Government's Exhibit No.

6    107 were published in open court.)

7              THE WITNESS:  Am I supposed to be looking for me?

8    BY MR. ROOTS:

9    Q.  Well, let me just stop and ask some questions here.

10   A.  Okay.

11   Q.  So describe where this is.

12   A.  That is the center of the Capitol Building, the east

13   steps that lead into the Senate chamber.  The Columbus doors

14   are up at the top in the background.

15   Q.  Did you actually come to these steps?

16   A.  I did.

17   Q.  Do you know how -- do you happen to know about what

18   time?

19   A.  It was just a little bit before 2:00.  I can't say

20   exactly, because I wasn't really checking my watch.  And the

21   phone that I was using to record the action as I approached

22   the steps was stolen by a Capitol Hill police officer.  And

23   my FOIA requests to have it returned were denied.

24              MR. BALLOU:  Objection.

25              THE COURT:  Mr. Roots, I need you to --

1    BY MR. ROOTS:

2    Q.  Just please answer the questions I ask.  Please answer

3    the questions I ask.

4         Let me just circle this time up here.  Do you see

5    this?

6         THE COURT:  We're going to strike the testimony.

7    I'll direct the jurors not to consider anything that may

8    have happened afterwards regarding his phone or any

9    requests.

10        Continue.

11   BY MR. ROOTS:

12   Q.  Do you see what I've circled there?

13   A.  Yes.

14   Q.  And what time does that say?

15   A.  2:00 and 24 seconds p.m. on January 6th.

16   Q.  If you could orient yourself with regard to this image.

17   Where about would you be about now?

18   A.  I would not be in the screen yet.

19        MR. ROOTS:  Let's play a little bit more.

20        (Whereupon, segments of Government's Exhibit No.

21   107 were published in open court.)

22   BY MR. ROOTS:

23   Q.  And go ahead and -- if you see yourself, go ahead and

24   indicate.

25   A.  I was on the very right side.  I think I'm behind all

1    those flags.

2    Q.  Could you take your screen -- your finger and just sort

3    of point to where you think you were.

4    A.  (Witness indicates.)

5    Q.  Oh, okay.  So you may be in the shot here?

6    A.  I may be.

7              MR. ROOTS:  We are at 1:06 in the film and

8    2:01 p.m.

9    BY MR. ROOTS:

10   Q.  What were you experiencing here at this time?

11   A.  People were chanting, "USA, USA, USA."  They were just

12   chanting and vocalizing their disapproval of the election

13   results.

14   Q.  Okay.  Actually, let me ask a couple questions about

15   this case.

16              Do you know anyone named Rebecca Lavrenz?

17   A.  I do not.

18   Q.  Okay.

19   A.  However, she may know me.

20              MR. BALLOU:  Objection.

21              THE COURT:  No, no.  Just answer the question.

22   Thank you.

23              THE WITNESS:  Okay.  Thank you.

24   BY MR. ROOTS:

25   Q.  And -- so you don't recall meeting anyone with that

```
 1    name?

 2    A.  No.  I've never met her before last night.

 3    Q.  You met her last night?

 4    A.  Yes.

 5    Q.  Can you identify her in the courtroom?

 6    A.  She's sitting over there, right there.

 7    Q.  But do you have any recollection of seeing her on

 8    January 6th, 2021?

 9    A.  No, I do not.

10    Q.  Okay.  Let me clear this.

11              MR. ROOTS:  Let's keep playing.

12              (Whereupon, segments of Government's Exhibit No.

13    107 were published in open court.)

14              THE COURT:  Why don't we stop it here.  It's 5:00.

15              To the jurors, I'm going to stick by my word and

16    I'm going to let you go.  I know things moved a little

17    slowly today.  So hopefully we'll be efficient tomorrow.  We

18    teed up a lot of the legal issues today so that tomorrow

19    things should move more efficiently again.  I'll ask you to

20    be here at 9:15 so we can start promptly at 9:30.  Okay?

21    Thank you for your continued service.

22              (Whereupon, the jury exited the courtroom at 5:01

23    p.m. and the following proceedings were had:)

24              THE COURT:  Okay, Mr. Powell.  You can step down.

25    I'll just remind you your testimony will continue first
```

 1   thing tomorrow morning.  If you could please -- you can

 2   handle the logistics and speak to your -- speak to Mr. Roots

 3   about that.  But plan to be here by 9:00.  You shouldn't be

 4   speaking to him about the substance, about sort of your

 5   testimony, things like that.  But of course for logistics or

 6   things, you can talk to him.  Okay?

 7            THE WITNESS:  Okay.  I have just want to -- just a

 8   little funny thing.

 9            I did not --

10            THE COURT:  Mr. Powell, I appreciate it, but

11   you're still --

12            THE WITNESS:  We're still on the record?

13            THE COURT:  Yes.  So I don't want you talking

14   about those things.

15            THE WITNESS:  All right.  I just thought you'd

16   enjoy it.

17            Great beard, by the way.

18            (Witness excused.)

19            THE COURT:  You all can be seated.

20            So in terms of -- what we were talking about

21   before was we were going through the sort of proffer on the

22   witnesses.  I think we already touched on Mr. Guandolo.  We

23   touched on -- I'm sorry; I don't remember the woman's name,

24   but you mentioned her.

25            MR. ROOTS:  Suzanne Monk.

1          THE COURT:  Monk, yes.  We talked about her.  And

2     then finally Mr. -- who was the last person?  Cusick, yes?

3          MR. PIERCE:  Yes, your Honor.  Cusick by Zoom.

4     Yes, your Honor.

5          THE COURT:  And --

6          MR. PIERCE:  Then there're those two Capitol

7     Police officers eventually.

8          THE COURT:  Yes, of course.

9          So in terms of Mr. Cusick, did you already -- can

10    you start a proffer of what he was going to say?  Can you

11    tell me?

12         MR. PIERCE:  Well, I mean, we've -- what

13    Mr. Cusick -- I mean, he's testified in multiple trials,

14    including his own.  And so he was -- he was on the east

15    side.  Right?  Oh, he was on the west side.  Yeah.  So his

16    fact pattern is very similar to Ms. Lavrenz's in the sense

17    that although he was on the other side, it sounds like, you

18    know, he was -- he did not see signs.  He was not told by

19    police to not enter.  He went in through an open door.  He

20    walked around for ten to 15 minutes.  You know, that sort of

21    thing.

22         Apparently he's already in Defense -- he's also in

23    Defense Exhibit 53, which is -- oh, yes.  He's in that video

24    in which you see the police officer picking up the gate and

25    sort of moving it backwards a little bit.  He's the one

1      that's walking in that video.

2              THE COURT:  Okay.  Well, I'll urge the Government

3      and you both to look at any of the prior transcripts where

4      he testified.  I'm curious if they had another witness who

5      spoke of -- who spoke about sort of what happened on the

6      west side.

7              I think a second witness is, you know, perhaps not

8      so cumulative to not allow.  But it certainly is my

9      concern -- you know, you can review the testimony today as

10     your memory.  I will direct you.  But -- and his -- anything

11     that he says is going to be extremely limited to what we

12     ultimately were able to get that witness to do, which is

13     simply at best -- I'm not saying I'm not going to allow

14     him -- but at best, it is:  What did he see?  Where did he

15     go?  I mean, of course he's going to be cross-examined on

16     then, Were you -- I presume, Were you in fact convicted for

17     doing those things?  And that's, as I'm sure, a strategic

18     decision for you all to consider.

19             But --

20             MR. PIERCE:  He testified in the *Gunby* case.  And

21     so, you know, I mean, that transcript kind of lays out

22     exactly what we would have him testify to.

23             THE COURT:  I encourage you both to look at the

24     *Gunby* transcript and also to think about if there was

25     another witness who may have given similar testimony,

1    because some of what you're saying has already been covered

2    by Mr. Sumrall.  So I'm not going to answer that question

3    today.  I'll leave it for you all to argue tomorrow.

4           Are those all the potential sort of realm of

5    witnesses?

6           MR. PIERCE:  I believe we have them all on the

7    table right now.  Yes, your Honor.

8           THE COURT:  Go ahead, Mr. Parker.

9           MR. PARKER:  Your Honor, we can leave the

10   substance of Mr. Cusick to tomorrow.

11          I'll just note now, I'm highly skeptical that he

12   has relevant testimony.  While he did enter the Capitol, he

13   breached the Senate wing door, which is on the west side.

14   It was a different breach point at a different time.  If

15   there's no testimony that he interacted with the Defendant,

16   it -- we're just getting into the same mess we got in with

17   the other witnesses.  So --

18          MR. PIERCE:  And -- sorry.

19          MR. PARKER:  -- I think at this point the

20   Government's going to renew its objection to doing Zoom

21   witnesses.  I know we're all making our best efforts here,

22   but it is tremendously difficult to do logistically.  If the

23   relevant testimony is so *de minimis*, then I think we are

24   wasting the jury's time at some point.  It would be either

25   irrelevant or it would be prejudice -- the 403 prejudice

1    would substantially outweigh the relevance.  So we would

2    move to exclude further Zoom witnesses.

3              THE COURT:  I don't need you to respond yet,

4    Mr. Pierce.  We can talk about it tomorrow.  That's fine.

5              MR. PIERCE:  Well, I just want to make one point

6    of clarification.  He is our client.  Mr. Cusick breached

7    nothing.  Okay?  These people walked in through open doors

8    with police officers letting them in.  So I just -- you

9    know --

10             THE COURT:  Mr. Pierce.

11             MR. PIERCE:  I protest the -- you know, the

12   language.

13             THE COURT:  That's --

14             MR. PIERCE:  I get worked up because he's my

15   client.  But, you know.

16             THE COURT:  Yeah.  I hear you.  But again, we're

17   not here to litigate what happened --

18             MR. PIERCE:  Yes.

19             THE COURT:  -- writ large on January 6th.  We're

20   here to talk about just what's in front of us.

21             So those are the witnesses.  You've heard my

22   concerns.  And in particular about two, Ms. Monk and

23   Mr. Guandolo are the ones that it seems extremely difficult

24   for me to fathom how they will get their testimony admitted.

25   But I haven't heard a full proffer yet, so I'll wait until

1    tomorrow morning.

2              We'll start at 9:00.  We can table the jury

3    instruction.

4              I want to just ask, how many videos and things, I

5    guess, do you anticipate going through with Mr. Powell?

6              MR. PIERCE:  It sounds like four or five, your

7    Honor.  Four or five.

8              THE COURT:  So, Mr. Roots, do you have a sense as

9    to sort of how long that is?

10             MR. ROOTS:  With Mr. Powell, I can't imagine it

11   would be much more than half an hour for my -- for me, and

12   then I don't know what the cross would be.

13             THE COURT:  Sure.

14             And so then -- you'd start with him.  Then go to

15   the -- I'm sorry.  I don't remember the Capitol Police

16   officer.  Warner is who you would next call, I believe.  Is

17   that right?

18             MR. ROOTS:  Yeah.  We've never spoken to him, so

19   we'll have to sort of figure out what he would say and that

20   kind of thing.

21             THE COURT:  Well, I don't think he's under an

22   obligation to speak with you.  I mean, he's under an

23   obligation to testify.  But I'll leave that to him and his

24   lawyer to work that out with you all.  So you'd have

25   potentially Officer Warner in the morning.

```
 1                So I just ask again, please coordinate with
 2      Capitol Police.
 3                Ms. Lavigne-Rhodes will get that subpoena resolved
 4      so they'll have that.
 5                THE COURTROOM DEPUTY:  They've already been sent.
 6                THE COURT:  Okay.  The subpoenas have been sent.
 7                Can you send a copy to both sides to make sure
 8      they have a copy of it?
 9                MR. ROOTS:  I apologize.  One other thing:  I
10      forgot to finish my proposed jury instruction on the theory
11      of the defense.
12                THE COURT:  That's okay.
13                MR. ROOTS:  It's almost ready to email.  But I
14      ended up having to be --
15                THE COURT:  We have a lot going on.
16                MR. ROOTS:  -- at the podium.
17                THE COURT:  If you can just get that done later
18      this evening and get that over to the Government so that
19      tomorrow at a break, if we have one, we can conclude the
20      jury instructions.
21                I guess what I'd ask the United States is if you
22      could just send a clean copy, obviously without that
23      instruction you don't have, as well as we didn't get back to
24      the mere presence.  I don't need to talk about it right now.
25      We can leave it for the morning.  But I think that that's
```

1    really -- the jury instructions are close to being done.

2    Would you agree, Mr. Ballou?

3              MR. BALLOU:  I do, your Honor.

4              So just to clarify, you would like a clean version

5    of the complete jury instructions.  Right?

6              THE COURT:  Yes.

7              MR. BALLOU:  Absolutely.  With the two outstanding

8    issues?

9              THE COURT:  Right.  So just that.  If we need to

10   slip it in, then we can.

11             Have you contemplated, Mr. Parker, how long you're

12   going to need for closing?

13             MR. PARKER:  30 to 40 minutes.  I'm going to try

14   to keep it succinct.

15             THE COURT:  I don't know about 40.  Okay.  Let's

16   start with 30.

17             Mr. Roots or Mr. Pierce, who's doing the closing?

18             MR. PIERCE:  I think it'll probably be me.  We

19   haven't fully decided yet.  But it should be about the same

20   amount of time.

21             THE COURT:  I think 30 minutes sounds pretty

22   reasonable.  I'll hear from you all tomorrow if you think

23   you need additional time.

24             I'm going to hope we can get to it tomorrow.  But

25   I don't know.  We'll just see how things are moving.

1        All right.  Anything else from the United States?

2        MR. PARKER:  No, your Honor.

3        THE COURT:  Okay.  Thanks for your patience.

4        Same for you, Mr. Pierce, Mr. Roots.  Anything on

5    your end?

6        MR. ROOTS:  Nothing.

7        MR. PIERCE:  Nothing else, your Honor.

8        THE COURT:  Thanks for your patience, bearing with

9    us as we get through this.

10        Ms. Lavrenz, we're going to leave it here.  We'll

11    be back in the morning to hear from Mr. Powell.

12        Then I just want to just remind you again now --

13    I'll do it again tomorrow, but I want to remind you now so

14    that it doesn't feel rushed tomorrow, you have an absolute

15    right not to testify.  I know your lawyers have discussed

16    that you potentially might want to testify.  I'm going to

17    inquire upon you tomorrow if you decide to.  I'm not

18    suggesting anything one way or another.

19        You'll remember the instruction I gave the jury.

20    You can't take anything I say as sort of telling you what to

21    do.  I just have to remind you of your rights and that right

22    to remain silent.  So of course I want you to talk to your

23    lawyers.  One of the things I'm going to ask is if you've

24    had a chance to talk to them to make sure it's something you

25    want to do.  If you say yes, then you will be certainly able

1    to do that.  And if you say no, you haven't talked to them,

2    then I'll have to take a break and allow you to do that.  So

3    I'd rather that we keep things moving and you talk to them

4    again this evening about that, if that's something you want

5    to do.  Okay?

6              She nodded her head yes.  We'll just have the

7    record reflect.

8              That's it for today.  Thanks so much, everybody.

9    Take care.

10             MR. PIERCE:  Thank you, your Honor.

11             THE COURT:  We're in recess.

12             (Proceedings adjourned at 5:12 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>**CERTIFICATE**</u>

2

3                I, LISA EDWARDS, RDR, CRR, do hereby

4     certify that the foregoing constitutes a true and accurate

5     transcript of my stenographic notes, and is a full, true,

6     and complete transcript of the proceedings produced to the

7     best of my ability.

8

9

10               Dated this 15th day of May, 2024.

11

12          <u>/s/ Lisa Edwards, RDR, CRR</u>
            Official Court Reporter
13          United States District Court for the
              District of Columbia
14          333 Constitution Avenue, Northwest
            Washington, D.C. 20001
15          (202) 354-3269

16

17

18

19

20

21

22

23

24

25

**'**

**'"knowingly'** [1] - 18:9
**'demonstrating'** [1] - 29:7
**'parading** [2] - 27:1, 29:7
**'picketing'** [1] - 29:7

**/**

**/s** [1] - 279:12

**0**

**0** [1] - 255:23
**02903** [1] - 1:23
**0700** [1] - 37:13

**1**

**1** [14] - 9:9, 9:16, 118:9, 118:10, 120:12, 122:10, 122:16, 123:15, 127:13, 129:17, 129:18, 130:25, 191:16, 191:17
**10** [2] - 1:22, 137:1
**100** [3] - 40:2, 47:14, 201:17
**104** [3] - 46:15, 124:9, 124:13
**104-A** [2] - 46:15, 46:22
**105** [1] - 124:9
**107** [7] - 258:2, 262:1, 262:11, 265:2, 265:6, 266:21, 268:13
**10:00** [1] - 185:24
**10:08** [1] - 35:10
**10:32** [1] - 54:1
**114** [1] - 9:4
**11:13** [1] - 81:7
**11:20** [1] - 81:8
**11:46** [1] - 93:19
**12** [1] - 22:18
**12:00** [1] - 185:24
**12:12** [1] - 113:18
**12:13** [2] - 114:5, 114:11
**13** [1] - 23:13
**1300** [1] - 37:21
**139** [1] - 3:7
**14** [1] - 74:16
**144** [1] - 3:7

**145** [1] - 3:8
**14:50** [1] - 41:22
**15** [3] - 91:6, 99:9, 270:20
**1589** [1] - 7:9
**15:20** [1] - 41:23
**15:35** [2] - 43:1, 46:3
**15:37** [1] - 46:4
**15:39** [1] - 43:14
**15th** [1] - 279:10
**169** [1] - 3:9
**17** [2] - 31:9, 31:20
**1742(a)(1** [1] - 11:8
**1752** [1] - 123:18
**1752(a)(1** [1] - 5:11
**18** [3] - 212:14, 214:22, 225:14
**19** [11] - 3:19, 217:22, 217:23, 225:11, 229:4, 229:8, 230:20, 230:21, 232:6, 232:19
**193** [1] - 3:10
**1986** [1] - 252:9
**1987** [1] - 252:16
**1992** [2] - 194:25, 195:5
**1:00** [5] - 37:21, 209:8, 209:11, 231:23, 256:7
**1:05** [1] - 114:8
**1:06** [1] - 267:7
**1:10** [1] - 117:21
**1:15** [2] - 114:5, 114:6
**1:20** [1] - 99:5
**1:21** [1] - 82:9
**1:22** [2] - 68:23, 80:14
**1:30** [1] - 256:17
**1:39** [1] - 42:14
**1:45** [1] - 256:17
**1:51** [1] - 139:12
**1st** [1] - 47:6

**2**

**2** [20] - 5:16, 9:8, 9:12, 9:18, 10:17, 119:17, 120:12, 120:14, 121:3, 122:6, 125:8, 125:10, 126:6, 126:8, 129:14, 130:16, 191:17, 206:6
**20** [15] - 47:6, 49:8, 56:4, 66:17, 67:9, 68:19, 80:16, 82:1, 82:6, 82:11, 95:9, 100:10, 215:6, 229:4,

247:14
**20-A** [9] - 3:17, 95:5, 95:7, 95:12, 95:15, 95:24, 99:12, 100:4, 100:8
**20-A.1** [1] - 95:6
**20001** [2] - 2:4, 279:14
**2001** [1] - 247:11
**2003** [1] - 21:9
**2004** [3] - 36:15, 36:18, 47:6
**2007** [1] - 36:19
**2008** [2] - 247:13, 252:25
**2009** [1] - 247:13
**2012** [1] - 31:5
**202** [5] - 2:4, 124:9, 239:2, 259:22, 279:15
**2020** [1] - 150:15
**2021** [16] - 37:1, 37:4, 152:12, 152:14, 152:16, 174:13, 174:16, 185:19, 190:3, 207:19, 235:23, 237:5, 241:7, 252:25, 254:24, 268:8
**2023** [4] - 48:7, 136:25, 138:3, 138:11
**2024** [2] - 1:6, 279:10
**204** [1] - 3:18
**20530** [1] - 1:17
**206** [1] - 239:2
**21** [9] - 3:19, 217:25, 218:1, 225:7, 225:11, 229:4, 229:8, 232:8, 232:9
**21-CR-205** [1] - 14:1
**21550** [1] - 1:19
**22** [9] - 3:19, 216:7, 216:8, 225:7, 225:11, 229:4, 229:8, 233:7, 233:8
**229** [1] - 3:19
**23** [1] - 146:13
**23-00066** [1] - 1:3
**23-66** [1] - 4:1
**235** [1] - 3:10
**24** [1] - 266:15
**242** [1] - 3:10
**25** [1] - 28:8
**251** [1] - 3:11
**28** [1] - 1:6
**28,000** [1] - 147:13
**29** [3] - 116:20, 118:6, 122:25
**290** [1] - 127:10
**2:00** [2] - 265:19, 266:15
**2:01** [1] - 267:8

**2:06** [1] - 151:2
**2:20** [1] - 46:16
**2:22** [1] - 46:20
**2:23** [1] - 164:2
**2:37** [1] - 167:3
**2:38** [1] - 164:2

**3**

**3** [13] - 5:16, 9:12, 12:10, 119:17, 120:12, 120:13, 121:3, 122:6, 126:7, 132:5, 132:7, 132:10, 134:3
**30** [6] - 146:4, 248:14, 255:23, 276:13, 276:16, 276:21
**302** [1] - 109:15
**305** [1] - 124:13
**30th** [1] - 149:14
**313** [12] - 3:15, 38:21, 39:15, 41:16, 41:21, 41:25, 42:16, 42:22, 43:4, 43:16, 46:3, 46:6
**33** [1] - 137:1
**333** [3] - 2:3, 127:12, 279:14
**3477249** [1] - 21:9
**35** [1] - 3:5
**354-3269** [2] - 2:4, 279:15
**36** [3] - 31:1, 31:8, 31:20
**370** [1] - 127:10
**375** [1] - 127:10
**38** [2] - 82:5, 96:2
**3:43** [1] - 214:14

**4**

**4** [18] - 6:5, 6:6, 8:3, 8:25, 9:3, 9:6, 9:12, 20:24, 22:18, 26:22, 28:1, 121:2, 122:5, 122:6, 126:10, 133:13, 134:3
**40** [2] - 276:13, 276:15
**403** [2] - 40:4, 272:25
**41** [1] - 3:15
**437** [1] - 127:2
**46** [6] - 3:18, 199:1, 199:16, 199:17, 203:13, 204:15
**47** [1] - 3:5

**4:05** [1] - 230:15
**4th** [2] - 255:10, 255:11

**5**

**5** [3] - 18:7, 21:9, 249:12
**50** [4] - 40:2, 56:22, 201:17, 213:1
**503** [3] - 124:21, 160:11, 160:15
**504** [4] - 124:15, 160:11, 160:17, 168:20
**505** [3] - 126:2, 160:11, 160:23
**52** [14] - 44:19, 44:21, 45:10, 101:6, 101:7, 101:18, 102:4, 102:17, 104:11, 104:15, 104:19, 107:8, 107:13, 108:1
**53** [1] - 270:23
**562** [1] - 126:22
**5:00** [1] - 268:14
**5:01** [1] - 268:22
**5:12** [1] - 278:12
**5:30** [1] - 256:2
**5th** [6] - 200:1, 207:19, 207:22, 249:2, 249:3, 255:13

**6**

**6** [1] - 211:18
**60** [3] - 10:14, 30:23, 31:23
**601** [1] - 1:16
**6364648** [1] - 137:1
**6706** [1] - 2:3
**683** [1] - 126:22
**6:00** [1] - 256:2
**6ers** [1] - 202:11
**6th** [103] - 37:1, 37:3, 37:4, 39:12, 42:8, 47:10, 48:1, 48:9, 48:21, 55:6, 70:2, 73:8, 74:1, 78:23, 84:19, 93:2, 95:18, 109:12, 119:19, 120:25, 144:21, 145:3, 145:6, 148:11, 148:13, 148:18, 149:6, 149:12, 149:15, 150:7, 150:13, 152:12, 152:14, 152:16, 154:7, 155:16,

155:18, 155:20,
157:1, 157:18, 159:4,
159:9, 160:16, 165:9,
174:12, 174:16,
174:20, 175:4,
177:18, 183:16,
185:17, 185:19,
186:11, 190:3,
190:15, 190:16,
191:4, 191:7, 191:8,
195:9, 195:10,
195:13, 195:18,
195:19, 195:20,
196:1, 200:1, 201:18,
202:15, 202:16,
202:21, 203:5,
205:22, 206:4, 207:3,
208:17, 210:21,
210:24, 219:1,
223:14, 224:1,
235:23, 237:5, 238:9,
241:7, 241:9, 241:17,
242:22, 243:11,
249:1, 249:4, 249:7,
249:15, 250:6,
254:16, 254:24,
255:20, 261:1,
261:16, 266:15,
268:8, 273:19

**7**

**7** [2] - 20:4, 255:2
**70-some-odd-year-
old** [1] - 250:13
**700** [1] - 1:23
**718** [1] - 127:2
**75** [1] - 213:1
**760** [1] - 127:12
**7:00** [5] - 37:13, 71:8,
209:2, 209:6, 209:11

**8**

**8** [1] - 31:6
**8:00** [1] - 196:6

**9**

**9** [3] - 217:18,
217:19, 217:21
**9-year-old** [1] - 25:5
**90** [1] - 138:13
**91367** [1] - 1:20
**95** [1] - 3:17
**97.7** [1] - 253:7
**9:00** [3] - 209:7,
269:3, 274:2

**9:13** [1] - 1:7
**9:15** [1] - 268:20
**9:30** [1] - 268:20

**A**

**A-L-A-M** [1] - 30:3
**A-L-F-O-R-D** [1] -
131:6
**a.m** [8] - 1:7, 35:10,
37:13, 54:2, 71:8,
93:19, 209:6, 209:7
**aberration** [1] -
121:1
**abiding** [3] - 172:22,
173:12, 173:14
**abidingness** [8] -
115:23, 137:6,
141:18, 142:2,
172:19, 173:8,
182:23, 183:2
**ability** [4] - 82:16,
125:20, 213:16, 279:7
**able** [26] - 31:15,
55:13, 59:8, 61:1,
61:2, 68:2, 77:2,
80:22, 81:21, 85:16,
91:11, 91:12, 104:3,
110:1, 111:16,
174:21, 187:3, 189:9,
194:8, 224:23, 239:4,
243:4, 246:7, 264:15,
271:12, 277:25
**absence** [1] - 213:21
**absent** [1] - 223:20
**absolute** [2] - 62:13,
277:14
**absolutely** [13] -
37:12, 63:14, 74:9,
74:10, 74:24, 76:14,
120:3, 141:19,
154:13, 172:20,
187:7, 208:11, 276:7
**academic** [1] - 17:13
**academy** [1] - 36:18
**accept** [1] - 163:4
**acceptable** [2] -
5:24, 161:9
**access** [2] - 75:17,
77:3
**accident** [4] - 19:18,
19:25, 132:8, 134:4
**accidental** [2] -
100:25, 133:22
**accidentally** [2] -
38:6, 101:1
**accommodating** [1]
- 240:16
**accommodations**

[2] - 175:7, 175:25,
249:15
**accompanied** [1] -
4:7
**accompanying** [1] -
59:25
**according** [3] -
21:24, 75:4, 252:19
**accuracy** [2] - 59:24,
74:4, 74:11
**accurate** [7] - 25:18,
73:7, 73:10, 82:17,
204:1, 224:14, 279:4
**accusing** [1] -
200:18
**acknowledged** [2] -
124:20, 125:14
**acknowledging** [1] -
126:13
**acquittal** [4] - 118:7,
127:3, 127:8, 135:2
**acres** [1] - 171:9
**acronym** [1] - 195:1
**act** [7] - 19:17, 23:16,
24:9, 24:13, 25:24,
132:12, 132:13
**acted** [3] - 24:5,
24:7, 24:9
**acting** [2] - 24:13,
192:22
**Action** [1] - 1:3
**action** [2] - 119:25,
265:21
**actions** [9] - 15:7,
24:15, 108:25,
131:24, 148:19,
180:3, 180:10, 191:6,
213:23
**activated** [1] - 38:2
**active** [2] - 247:4,
251:14
**actively** [1] - 238:3
**activist** [1] - 248:25
**activities** [1] - 29:19
**activity** [2] - 6:9,
21:25
**acts** [4] - 19:16,
23:23, 23:24, 25:11
**actual** [6] - 17:5,
64:1, 74:23, 137:15,
185:17, 211:4
**ad** [1] - 140:22
**add** [12] - 12:3, 13:9,
13:11, 16:20, 63:6,
81:22, 87:12, 120:13,
138:4, 190:5, 192:5,
201:10
**added** [1] - 6:21
**addition** [11] - 11:13,
11:25, 23:13, 24:13,
24:16, 26:22, 26:25,

28:3, 31:2, 175:15,
249:15
**additional** [11] -
12:3, 12:11, 14:9,
18:8, 18:14, 33:23,
160:9, 166:23,
214:24, 254:4, 276:23
**additionally** [1] -
21:23
**address** [5] - 6:21,
8:6, 49:16, 135:12,
190:1
**addressed** [4] - 11:2,
20:7, 20:11, 192:11
**addresses** [2] - 8:4,
8:9
**adds** [1] - 18:14
**adduce** [1] - 166:20
**adduced** [4] -
130:15, 179:14,
179:15, 197:17
**adduces** [1] - 178:6
**adducing** [1] -
177:25
**adjourned** [1] -
278:12
**admin** [2] - 170:18,
171:11
**admiration** [1] -
117:19
**admissibility** [3] -
203:25, 214:19,
219:25
**admissible** [1] -
165:20
**admission** [1] -
213:13
**admit** [10] - 39:15,
41:13, 41:14, 56:17,
64:5, 69:21, 70:22,
203:13, 229:1, 249:9
**admitted** [9] - 38:21,
46:15, 148:24, 204:9,
204:14, 221:19,
221:24, 263:14,
273:24
**admitting** [1] - 57:22
**admonished** [1] -
258:21
**admonition** [2] -
5:22, 242:5
**adopted** [1] - 16:10
**advance** [3] - 41:22,
46:16, 71:16
**advancing** [1] - 16:7
**advise** [1] - 140:7
**advocate** [2] - 21:4,
261:15
**affinity** [1] - 136:25
**affirmatively** [1] -

130:9
**afield** [8] - 97:14,
139:4, 165:16,
209:18, 224:6, 249:15
**afternoon** [9] -
11:19, 139:20, 140:1,
140:2, 144:16,
145:23, 169:17,
169:23, 235:17
**afterwards** [3] -
65:14, 202:18, 266:8
**agency** [1] - 241:4
**Agent** [1] - 4:9
**agent** [7] - 60:20,
60:21, 62:18, 90:8,
134:15, 247:1, 247:4
**ages** [1] - 146:7
**aggressive** [1] -
38:1
**agitated** [2] - 37:22,
37:25
**agitation** [1] - 40:18
**ago** [4] - 28:8, 28:11,
144:18, 152:24
**agree** [20] - 11:23,
58:15, 63:11, 63:16,
69:25, 78:22, 83:4,
84:20, 99:24, 102:20,
104:22, 104:24,
108:8, 110:14,
127:17, 159:15,
192:15, 211:15,
220:22, 276:2
**agreed** [3] - 30:10,
30:13, 256:10
**agreement** [7] -
61:10, 74:8, 74:23,
77:20, 77:22, 97:9,
97:10
**ahead** [37] - 30:6,
39:19, 49:13, 52:1,
54:18, 64:10, 67:19,
71:14, 73:17, 79:13,
86:13, 93:16, 97:6,
98:12, 118:4, 135:23,
138:3, 147:10,
155:11, 182:18,
197:11, 200:5,
200:10, 201:8,
203:17, 211:11,
213:11, 213:24,
223:8, 234:16, 237:2,
243:2, 258:20,
262:17, 266:23, 272:8
**air** [2] - 64:24,
132:22
**Alam** [1] - 30:3
**Alan** [1] - 251:7
**ALAN** [1] - 251:7
**Alex** [1] - 206:1
**Alexander** [1] -

208:11
**Alford** [5] - 22:20, 125:15, 125:21, 131:6, 131:17
**ALFORD** [1] - 22:21
**Ali** [1] - 208:11
**alibi** [1] - 165:25
**allegation** [3] - 118:9, 118:11, 129:10
**allegations** [2] - 119:18, 249:13
**alleged** [3] - 56:8, 118:12, 213:19
**allow** [21] - 41:2, 41:10, 62:25, 80:6, 81:14, 82:10, 86:13, 180:16, 182:4, 204:8, 204:13, 215:10, 215:20, 222:10, 227:1, 229:6, 234:3, 244:1, 271:8, 271:13, 278:2
**allowed** [9] - 49:4, 64:22, 66:24, 94:12, 137:3, 221:16, 222:20, 224:19, 227:12
**allowing** [4] - 74:9, 75:15, 94:16, 228:3
**allows** [1] - 122:17
**almost** [7] - 18:19, 87:19, 109:4, 119:19, 135:19, 144:20, 275:13
**alone** [1] - 128:11
**Amendment** [6] - 6:9, 6:11, 20:12, 28:17, 28:25, 195:22
**AMERICA** [1] - 1:3
**America** [2] - 4:2, 18:22
**American** [1] - 209:4
**amount** [3] - 80:1, 119:23, 276:20
**analogy** [1] - 19:20
**angle** [5] - 262:6, 262:25, 263:3, 264:14, 264:18
**angry** [3] - 38:1, 43:24, 207:8
**announcement** [1] - 12:24
**announcements** [7] - 231:18, 231:19, 234:7, 234:22, 258:13, 258:14
**answer** [27] - 9:21, 10:9, 51:24, 58:6, 67:12, 86:17, 92:20, 104:3, 140:9, 143:22,

150:10, 157:3, 161:13, 161:23, 227:14, 231:13, 231:14, 234:14, 235:7, 251:24, 261:9, 264:19, 266:2, 267:21, 272:2
**answered** [3] - 79:1, 109:25, 128:1
**answering** [1] - 109:25
**answers** [2] - 104:2, 199:11
**anticipate** [6] - 14:23, 33:10, 153:17, 153:22, 248:5, 274:5
**anticipated** [1] - 116:22
**anxious** [2] - 188:16, 207:14
**anyways** [1] - 10:9
**apartment** [1] - 256:25
**apologize** [3] - 136:10, 167:7, 275:9
**apology** [2] - 136:4, 136:8
**apparent** [2] - 128:12, 128:18
**appeal** [2] - 22:15, 250:12
**appear** [8] - 83:25, 91:9, 102:23, 108:5, 188:24, 207:7, 225:18
**aPPEARANCES** [1] - 1:13
**appeared** [3] - 38:3, 97:1, 112:22
**applicability** [1] - 222:13
**applied** [2] - 6:7, 10:19
**applies** [3] - 28:23, 129:23, 138:21
**apply** [3] - 15:20, 18:17, 134:17
**appreciate** [18] - 35:14, 50:11, 50:22, 83:4, 88:14, 104:1, 113:5, 117:13, 126:19, 127:15, 157:6, 182:3, 185:7, 193:12, 198:5, 224:1, 259:3, 269:10
**approach** [2] - 70:25, 259:17
**approached** [1] - 265:21
**approaching** [1] - 43:22

**appropriate** [15] - 14:24, 18:3, 20:24, 22:11, 51:1, 61:25, 65:1, 76:11, 83:15, 131:1, 135:3, 137:12, 150:4, 150:8, 201:11
**AR-15** [1] - 177:8
**arbitrary** [1] - 18:24
**area** [79] - 9:10, 10:17, 10:21, 10:23, 11:3, 11:6, 11:10, 12:14, 12:18, 12:19, 13:15, 14:17, 17:10, 18:23, 19:2, 19:6, 19:23, 21:22, 37:17, 38:13, 40:3, 42:5, 44:1, 47:2, 50:2, 54:24, 55:8, 69:12, 70:3, 70:4, 70:6, 70:10, 73:4, 76:6, 79:3, 79:10, 79:12, 79:15, 79:24, 99:18, 100:17, 103:12, 103:21, 105:13, 110:21, 112:15, 118:10, 118:17, 119:7, 123:17, 124:8, 124:10, 124:11, 124:16, 125:1, 125:24, 129:11, 129:23, 147:17, 162:15, 184:11, 208:21, 215:4, 215:5, 224:20, 228:22, 231:10, 232:3, 260:24, 262:19, 264:12
**Area** [3] - 231:7, 234:25, 258:11
**areas** [1] - 166:4
**arguably** [1] - 9:10
**argue** [3] - 25:11, 27:21, 63:20, 74:21, 119:8, 122:6, 226:12, 272:3
**argued** [4] - 11:19, 16:23, 20:25, 126:9
**arguing** [1] - 17:24
**argument** [29] - 7:11, 14:11, 14:12, 14:24, 16:5, 17:11, 22:13, 22:24, 23:3, 23:4, 23:6, 23:9, 26:1, 26:2, 27:7, 57:13, 71:2, 72:16, 85:8, 85:24, 86:3, 117:19, 130:24, 133:1, 203:22, 214:6, 222:14, 222:19, 228:8
**arguments** [7] -

13:23, 14:19, 127:24, 220:1, 221:2, 222:14, 222:23
**arm's** [1] - 102:21
**armed** [1] - 17:8
**armor** [4] - 176:5, 176:15, 177:12, 182:6
**arms** [1] - 108:14
**arrested** [2] - 19:1, 19:6
**arrive** [1] - 255:6
**arrived** [2] - 255:10, 255:11
**art** [1] - 242:17
**article** [1] - 31:4
**articles** [1] - 195:17
**Arts** [1] - 252:11
**aside** [5] - 33:21, 40:20, 74:1, 165:19, 178:8
**aspects** [1] - 183:24
**assault** [1] - 161:11
**assaulted** [1] - 161:7
**assemble** [1] - 195:23
**assert** [1] - 61:2
**asserted** [5] - 61:13, 156:10, 179:16, 215:11, 222:8
**assigned** [1] - 48:19
**assignment** [1] - 37:17
**Associated** [1] - 254:6
**associated** [1] - 40:1
**association** [1] - 23:2
**assume** [2] - 121:17, 213:21
**assuming** [3] - 75:10, 76:16, 245:24
**assumption** [1] - 158:19
**atmosphere** [2] - 190:22, 207:3
**attach** [2] - 9:8, 9:14
**attached** [2] - 9:2, 9:6
**attachment** [2] - 240:4, 240:18
**attacking** [1] - 102:23
**attempt** [3] - 11:8, 103:10, 130:6
**attempted** [2] - 10:15, 103:10
**attend** [2] - 155:2, 190:21
**attention** [6] - 38:18, 112:13, 112:16,

158:9, 206:14, 239:25
**Attitudes** [1] - 195:2
**attorney** [6] - 53:16, 76:4, 76:8, 76:21, 89:8, 146:25
**ATTORNEY'S** [1] - 1:15
**Attorney's** [2] - 86:21, 88:1
**attorneys** [1] - 114:7
**audio** [13] - 40:11, 40:16, 41:5, 65:24, 82:11, 84:23, 85:13, 85:16, 92:16, 92:18, 95:10, 215:14, 222:5
**audiovisual** [1] - 64:9
**August** [1] - 48:7
**Austin** [1] - 146:2
**authentic** [1] - 62:21
**authenticate** [13] - 63:1, 63:9, 65:20, 82:15, 82:19, 82:21, 85:14, 199:17, 220:18, 220:22, 224:12, 229:25, 249:10
**authenticated** [5] - 57:16, 58:9, 69:22, 230:3, 230:9
**authenticating** [2] - 62:23, 72:16
**authentication** [6] - 59:14, 59:16, 60:7, 73:21, 230:5, 230:7
**authenticity** [4] - 60:5, 61:2, 63:14, 65:18
**author** [4] - 30:9, 30:13, 158:2, 195:15
**authority** [3] - 10:24, 76:6, 166:1
**authorization** [2] - 21:24, 22:2
**availability** [1] - 248:9
**available** [14] - 75:9, 75:19, 83:18, 83:25, 84:2, 86:23, 89:9, 89:21, 91:7, 91:9, 206:15, 246:9, 246:12
**Avenue** [2] - 2:3, 279:14
**avocation** [1] - 194:22
**avoid** [4] - 181:3, 190:1, 258:22
**awake** [1] - 151:21
**awards** [1] - 254:5
**aware** [10] - 19:17,

23:20, 25:20, 110:3, 132:16, 173:10, 192:10, 206:2, 241:14, 264:1

## B

**B-A-E-Z** [1] - 136:24
**bachelor's** [1] - 140:15
**back-dooring** [1] - 163:21
**background** [5] - 140:14, 149:22, 170:9, 257:24, 265:14
**backwards** [1] - 270:25
**bad** [4] - 23:16, 23:17, 24:2, 24:25
**badly** [1] - 203:3
**Baez** [2] - 136:24, 137:22
**baked** [1] - 111:19
**Ballou** [37] - 4:8, 4:19, 10:12, 22:9, 31:16, 38:22, 49:13, 50:10, 50:23, 54:16, 70:25, 97:6, 97:22, 98:12, 106:17, 108:22, 191:2, 192:15, 193:12, 197:11, 200:5, 201:8, 203:17, 211:11, 213:11, 219:22, 223:8, 226:5, 230:4, 235:13, 236:13, 237:2, 243:2, 258:20, 262:17, 263:22, 276:2
**BALLOU** [148] - 1:14, 4:21, 4:25, 5:3, 6:13, 6:16, 6:18, 6:20, 7:3, 7:8, 7:16, 8:7, 10:13, 12:9, 15:3, 18:7, 20:5, 23:12, 26:23, 27:3, 30:24, 31:21, 34:16, 34:18, 34:21, 34:24, 35:3, 35:17, 35:24, 38:20, 38:23, 39:4, 39:7, 39:15, 40:7, 40:13, 41:13, 41:18, 41:22, 42:1, 42:14, 42:17, 42:23, 43:1, 43:5, 43:14, 43:17, 44:13, 44:17, 44:23, 45:16, 45:18, 46:2, 46:7, 46:14, 46:17, 46:20, 46:23, 47:15, 49:9, 49:14, 50:17, 51:8, 52:23, 59:7, 60:10, 60:13, 60:16,

60:18, 60:25, 61:6, 61:22, 71:4, 71:6, 71:16, 71:18, 73:18, 75:3, 86:5, 89:4, 97:3, 97:7, 98:11, 98:13, 106:12, 106:18, 108:19, 108:23, 110:24, 111:3, 111:11, 111:14, 113:3, 153:1, 189:22, 189:25, 191:3, 197:7, 197:12, 200:2, 200:6, 201:9, 202:25, 203:14, 203:18, 204:10, 209:14, 211:6, 211:12, 213:7, 213:12, 220:21, 221:5, 223:9, 223:12, 226:6, 230:2, 230:8, 233:16, 235:16, 236:15, 236:17, 237:3, 239:1, 239:5, 239:24, 240:6, 240:12, 240:21, 242:2, 242:23, 243:3, 253:11, 253:19, 254:7, 258:16, 258:21, 260:11, 261:4, 262:12, 262:18, 263:16, 263:25, 264:13, 265:24, 267:20, 276:3, 276:7
**bang** [1] - 256:22
**banner** [1] - 122:1
**Barnett** [1] - 30:3
**BARNETT** [1] - 30:3
**barricade** [6] - 79:23, 219:13, 227:3, 227:23, 243:20, 244:4
**barricaded** [1] - 54:23
**barricades** [24] - 48:22, 48:25, 49:1, 64:21, 100:18, 119:2, 122:14, 127:22, 128:9, 128:14, 132:20, 160:5, 160:20, 183:18, 213:5, 226:16, 227:18, 228:16, 231:8, 235:2, 235:4, 235:7, 235:8, 258:9
**barriers** [8] - 124:3, 124:22, 124:23, 124:24, 213:20, 228:13, 228:14, 231:4
**Barron** [2] - 31:7, 191:12
**base** [2] - 32:15,

125:4
**based** [10] - 18:13, 48:8, 62:19, 75:3, 128:5, 129:7, 180:2, 181:16, 186:13, 204:7
**baseline** [1] - 225:23
**basis** [16] - 26:16, 27:23, 56:11, 74:24, 76:22, 129:18, 141:16, 141:25, 142:11, 142:19, 155:24, 167:11, 172:17, 173:5, 173:17, 201:13
**bathroom** [2] - 34:24, 81:6
**baton** [4] - 38:7, 100:21, 100:23, 101:13
**batons** [1] - 257:17
**bear** [1] - 189:17
**beard** [1] - 269:17
**bearing** [1] - 277:8
**beating** [1] - 257:17
**became** [1] - 16:14
**become** [3] - 19:2, 157:24, 195:9
**becomes** [3] - 19:3, 32:1, 119:1
**becoming** [2] - 138:12, 160:18
**bed** [2] - 171:6, 174:23
**BEFORE** [1] - 1:10
**beforehand** [1] - 129:11
**begin** [5] - 56:10, 71:2, 149:15, 154:19, 157:19
**beginning** [14] - 56:7, 68:17, 68:24, 72:3, 72:7, 72:11, 81:25, 82:18, 95:2, 101:17, 102:16, 107:24, 196:3, 223:24
**begins** [1] - 7:8
**behalf** [2] - 4:7, 4:11
**behaving** [1] - 119:25
**behavior** [1] - 42:7
**behaviors** [2] - 15:14, 38:1
**behind** [2] - 213:1, 266:25
**behooves** [1] - 83:21
**belabor** [1] - 12:7
**belief** [3] - 10:23, 181:20, 226:17
**beliefs** [1] - 197:13
**believes** [5] - 31:10,

130:24, 131:3, 157:18, 224:8
**below** [1] - 209:11
**bench** [43] - 39:17, 49:10, 49:11, 97:4, 106:15, 108:20, 111:12, 143:8, 143:9, 148:5, 151:6, 167:5, 168:2, 176:9, 176:10, 177:20, 177:21, 187:18, 187:20, 189:23, 197:8, 197:9, 200:3, 203:15, 209:16, 211:9, 213:9, 218:13, 218:20, 233:17, 233:18, 242:24, 242:25, 244:19, 244:21, 253:12, 253:13, 254:10, 258:17, 258:18, 261:5, 261:6, 262:15
**benchmark** [1] - 113:22
**beneficial** [1] - 53:10
**Benschoten** [3] - 60:18, 124:2, 124:4
**berth** [1] - 81:20
**best** [13] - 10:13, 37:15, 76:9, 82:16, 88:17, 117:9, 117:17, 172:13, 254:8, 271:13, 271:14, 272:21, 279:7
**better** [3] - 206:25, 207:14, 257:8
**between** [16] - 48:3, 51:13, 61:10, 70:1, 70:11, 74:8, 74:23, 78:23, 94:11, 97:10, 99:25, 137:12, 178:14, 219:25, 247:1, 256:17
**beyond** [8] - 24:17, 123:3, 123:9, 126:24, 135:7, 209:19, 243:17
**bias** [2] - 197:23, 197:25
**big** [12] - 52:7, 55:8, 70:6, 73:4, 78:19, 79:3, 207:6, 207:10, 208:18, 242:17, 242:18, 260:23
**bigger** [1] - 153:14
**biggest** [1] - 205:17
**bike** [16] - 12:20, 37:20, 42:4, 103:2, 105:9, 107:17, 107:18, 110:12, 124:3, 124:12, 125:3,

128:9, 160:16, 219:13, 231:4
**Bill** [1] - 87:14
**bill** [1] - 88:10
**bills** [1] - 206:17
**bishop** [2] - 15:24, 15:25
**bit** [29] - 9:16, 19:21, 21:2, 24:20, 24:23, 34:8, 38:6, 43:7, 58:18, 59:3, 68:2, 106:21, 107:6, 109:18, 117:16, 122:10, 146:17, 158:21, 174:12, 175:20, 196:14, 196:16, 200:25, 207:20, 215:23, 262:9, 265:19, 266:19, 270:25
**black** [4] - 69:3, 70:17, 80:25, 216:25
**blacked** [1] - 92:18
**blanks** [1] - 149:21, 153:25
**blatant** [1] - 88:8
**bleacher** [1] - 215:4
**bleachers** [1] - 215:8
**bless** [1] - 206:19
**block** [1] - 42:5
**blocking** [1] - 43:7
**blue** [2] - 39:2, 67:23
**bluffing** [1] - 77:21
**Boasberg** [5] - 17:18, 74:3, 134:25, 192:8, 192:11
**Boasberg's** [2] - 13:22, 137:3
**body** [5] - 176:5, 176:15, 177:12, 182:6, 192:7
**bomb** [2] - 7:20, 132:22
**book** [1] - 195:18
**booking** [1] - 171:6
**bookkeeping** [1] - 171:6
**bottom** [7] - 7:9, 39:3, 53:22, 80:22, 80:25, 81:23, 206:23
**boundaries** [2] - 12:13, 139:1
**bounds** [1] - 139:3
**box** [1] - 175:9
**boxed** [1] - 158:21
**branch** [2] - 76:3, 76:4
**Brandon** [1] - 210:13
**breach** [9] - 61:8, 69:14, 69:15, 69:19,

71:8, 124:12, 215:23, 222:22, 272:14
**breached** [2] - 272:13, 273:6
**breaches** [2] - 217:6, 219:3
**break** [13] - 34:25, 53:18, 81:6, 88:25, 106:5, 114:2, 116:24, 117:16, 135:20, 199:5, 252:16, 275:19, 278:2
**breakfast** [3] - 171:7, 171:8, 174:23
**breaking** [3] - 37:23, 107:17, 120:16
**BRENDAN** [1] - 1:14
**Brendan** [1] - 4:8
**Brian** [1] - 26:14
**brief** [4] - 81:5, 90:17, 90:25, 252:16
**briefed** [2] - 16:19, 37:15
**briefly** [12] - 18:11, 90:4, 118:6, 121:21, 140:13, 144:12, 148:4, 170:8, 171:3, 196:3, 252:13, 259:13
**bring** [17] - 49:7, 83:16, 84:2, 85:13, 86:2, 98:16, 167:1, 168:5, 168:20, 198:25, 206:16, 212:14, 226:23, 228:3, 258:2, 259:18, 259:22
**bringing** [1] - 49:23
**brings** [1] - 171:17
**broad** [3] - 16:22, 174:7, 191:1
**Broadcast** [1] - 252:11
**broadcast** [5] - 90:13, 118:25, 121:10, 164:18, 169:1
**broadcasts** [1] - 195:11
**broader** [2] - 15:14, 191:10
**broadly** [2] - 6:10, 228:6
**brochures** [1] - 190:20
**broke** [8] - 38:4, 38:9, 38:12, 40:21, 42:3, 43:24, 103:11, 110:11
**broken** [2] - 173:12, 173:14
**Bronze** [1] - 36:25

**Brooks** [4] - 59:17, 59:19, 60:10, 124:1
**brother** [1] - 174:20
**brought** [3] - 49:20, 63:12, 221:17
**brutally** [1] - 136:10
**building** [24] - 12:12, 14:16, 15:19, 15:20, 16:7, 16:14, 21:23, 22:2, 28:25, 71:10, 71:21, 126:8, 127:14, 130:20, 132:11, 133:10, 134:9, 134:14, 161:3, 190:4, 204:5, 222:9, 238:15, 242:1
**Building** [12] - 26:25, 121:20, 126:12, 128:16, 133:17, 134:6, 155:5, 165:23, 241:22, 241:25, 259:19, 265:12
**buildings** [2] - 21:14, 48:18
**buildup** [1] - 184:13
**bullet** [1] - 206:14
**bullhorn** [7] - 50:20, 51:13, 62:1, 74:5, 74:17, 74:19, 80:10
**bunch** [2] - 190:2, 220:4
**burden** [4] - 19:12, 31:6, 32:12, 122:8
**Bureau** [2] - 247:12, 247:13
**business** [15] - 22:6, 27:20, 28:21, 28:24, 29:8, 29:17, 29:25, 87:5, 129:16, 130:18, 130:21, 131:14, 138:16, 175:16, 194:19
**businesses** [1] - 171:5
**busy** [1] - 116:24
**but..** [1] - 152:5
**button** [1] - 39:4
**BY** [91] - 2:1, 35:24, 39:7, 42:1, 42:17, 42:23, 43:5, 43:17, 44:13, 44:23, 45:18, 46:7, 46:17, 46:23, 47:19, 54:19, 66:19, 67:20, 69:2, 69:24, 71:6, 71:18, 72:18, 94:3, 95:17, 96:3, 99:14, 100:5, 100:9, 101:10, 101:20, 102:6, 102:19, 103:15, 104:7,

104:21, 105:21, 107:10, 107:16, 108:3, 109:10, 111:1, 111:9, 112:8, 139:25, 143:25, 144:15, 145:22, 151:18, 168:18, 169:22, 177:3, 185:16, 194:1, 194:10, 198:11, 199:19, 202:3, 203:2, 205:1, 205:13, 208:16, 210:7, 212:3, 212:15, 216:13, 230:18, 230:24, 231:17, 233:1, 233:10, 234:17, 235:16, 237:3, 240:21, 242:8, 251:4, 252:3, 254:3, 254:23, 258:5, 259:12, 260:21, 261:22, 262:4, 265:8, 266:1, 266:11, 266:22, 267:9, 267:24
**Bynum** [5] - 28:8, 28:9, 28:22, 30:9, 30:20

**C**

**cabined** [1] - 221:24
**California** [1] - 1:20
**calm** [2] - 104:23, 172:1
**camera** [3] - 105:5, 239:22, 263:1
**cannot** [8] - 8:15, 9:19, 13:12, 76:11, 122:7, 210:21, 228:1, 263:19
**cap** [1] - 42:10
**capable** [1] - 62:23
**Capital** [1] - 255:15
**capital** [1] - 36:13
**Capitol** [137] - 7:18, 7:22, 8:16, 16:6, 16:12, 17:7, 21:5, 21:14, 21:23, 22:1, 22:2, 22:5, 22:6, 26:25, 28:10, 28:13, 28:17, 29:3, 34:17, 36:8, 36:10, 36:14, 37:1, 37:9, 39:10, 42:10, 47:5, 47:7, 47:24, 48:12, 48:14, 48:23, 50:2, 51:13, 52:8, 59:17, 59:22, 60:9, 60:22, 61:19, 63:7, 71:20, 75:19, 75:23, 76:5, 76:10,

76:21, 83:19, 86:22, 90:3, 90:8, 91:5, 91:21, 105:6, 106:6, 114:15, 118:12, 121:3, 121:5, 121:20, 125:6, 125:19, 125:23, 126:8, 126:11, 126:16, 126:8, 128:8, 128:16, 130:5, 131:13, 132:11, 133:9, 133:16, 134:6, 134:14, 145:2, 145:5, 155:4, 160:24, 165:23, 183:19, 190:3, 190:6, 196:11, 196:13, 198:15, 203:21, 208:20, 209:8, 209:11, 210:19, 211:1, 211:2, 219:1, 221:9, 222:21, 222:22, 223:20, 227:13, 227:16, 227:24, 231:11, 235:23, 237:5, 238:1, 238:9, 238:24, 241:2, 241:19, 241:21, 241:22, 241:25, 242:17, 242:19, 247:2, 247:10, 247:14, 248:7, 249:4, 249:6, 250:8, 250:9, 256:13, 256:16, 256:25, 257:4, 257:16, 257:18, 259:18, 260:23, 265:12, 265:22, 270:6, 272:12, 274:15, 275:2
**Capitol's** [1] - 131:14
**Captain** [3] - 59:17, 59:18, 124:1
**captain** [2] - 60:10, 60:15
**caption** [1] - 80:21
**captioned** [1] - 92:19
**care** [7] - 92:3, 140:23, 144:3, 171:7, 174:23, 187:5, 278:9
**career** [3] - 252:13, 254:4, 254:13
**careful** [1] - 138:23
**carefully** [1] - 193:12
**caring** [2] - 172:24, 173:24
**Carpenter** [9] - 13:21, 14:1, 17:17, 22:17, 26:20, 134:25, 137:1, 138:10
**carpenter** [2] -

194:14, 194:15
**CARPENTER** [1] - 14:1
**carpentry** [1] - 194:18
**carpet** [2] - 18:21, 19:5
**carrying** [1] - 7:20
**carving** [1] - 29:22
**case** [55] - 6:6, 6:14, 6:20, 9:5, 9:25, 12:20, 13:7, 15:1, 17:4, 26:1, 26:3, 27:5, 28:6, 28:7, 28:8, 28:9, 30:10, 34:1, 50:14, 51:4, 56:13, 60:20, 60:21, 61:12, 74:3, 85:12, 88:24, 90:8, 90:15, 116:10, 116:21, 119:19, 119:22, 120:10, 120:23, 128:23, 131:7, 134:15, 136:3, 137:24, 138:5, 140:24, 170:11, 183:24, 187:6, 192:7, 192:9, 214:1, 219:2, 221:22, 222:24, 249:13, 267:15, 271:20
**Case** [1] - 4:1
**cases** [21] - 5:15, 5:20, 10:5, 10:7, 11:22, 11:23, 14:7, 17:12, 18:12, 20:2, 22:14, 23:21, 23:22, 26:20, 76:17, 129:10, 137:18, 138:13, 138:18, 178:6
**cat** [1] - 188:25
**category** [2] - 156:11, 160:9
**caught** [1] - 133:20
**Center** [3] - 36:13, 48:12, 48:14
**center** [3] - 71:21, 210:8, 265:12
**central** [1] - 84:3
**certain** [7] - 50:24, 70:2, 78:24, 81:15, 137:3, 242:18, 261:12
**certainly** [22] - 20:17, 59:7, 65:2, 65:12, 76:5, 83:18, 83:21, 106:22, 128:18, 128:19, 130:25, 131:23, 134:8, 150:17, 158:12, 159:15, 180:4, 191:17, 220:1,

261:12, 271:8, 277:25
**CERTIFICATE** [1] - 279:1
**certification** [1] - 131:25
**certify** [5] - 124:18, 160:20, 210:20, 210:21, 279:4
**cetera** [1] - 8:5
**chair** [1] - 117:3
**chairs** [1] - 53:23
**chamber** [2] - 125:25, 265:13
**chambers** [1] - 30:7
**chance** [3] - 147:24, 155:8, 277:24
**change** [3] - 58:5, 85:6, 263:3
**changed** [3] - 175:13, 196:14, 196:16
**chanting** [2] - 267:11, 267:12
**chaos** [2] - 63:22, 190:6
**chaotic** [4] - 110:8, 110:13, 110:14, 110:17
**character** [26] - 33:25, 34:7, 34:9, 115:10, 115:13, 115:21, 115:25, 136:20, 136:23, 137:4, 137:18, 137:24, 138:22, 141:18, 142:2, 142:12, 142:20, 148:13, 148:15, 148:20, 148:25, 172:19, 173:8, 173:18, 182:22
**characterize** [1] - 141:23
**charge** [4] - 37:7, 127:13, 132:4, 237:17
**charged** [6] - 87:17, 87:20, 87:21, 88:10, 148:23
**charges** [3] - 26:17, 221:7, 221:8
**chase** [1] - 254:24
**chat** [4] - 152:22, 152:23, 164:1, 165:11
**chats** [2] - 156:22, 157:1
**Cheboygan** [1] - 253:7
**check** [4] - 72:24, 78:14, 238:6, 247:5
**checking** [2] -

100:14, 265:20
**chew** [1] - 81:3
**Chief** [3] - 75:14, 192:8, 192:11
**chief** [4] - 50:15, 51:4, 56:14, 85:12
**choose** [2] - 225:7, 225:10
**chunk** [1] - 103:18
**church** [1] - 152:4
**Chutkan** [2] - 12:1, 135:1
**Chwiesiuk** [1] - 14:4
**CHWIESIUK** [1] - 14:5
**Circle** [7] - 212:10, 238:11, 238:13, 238:14, 238:17, 238:20, 241:20
**circle** [3] - 43:8, 196:17, 266:4
**circled** [7] - 46:18, 47:13, 60:19, 60:20, 60:22, 191:16, 266:12
**circling** [1] - 46:8
**circuit** [1] - 11:16
**Circuit** [3] - 13:7, 15:1, 31:5
**circuits** [1] - 17:15
**circulated** [4] - 32:21, 199:24, 200:14, 210:23
**circulating** [2] - 190:20, 201:4
**circumstances** [3] - 22:4, 22:22, 120:1
**circumstantial** [2] - 178:15, 178:19
**circumvent** [1] - 183:3
**citation** [2] - 21:8, 138:11
**cite** [4] - 131:6, 131:7, 133:18, 138:2
**cited** [5] - 11:24, 22:20, 26:20, 28:7, 138:13
**cities** [1] - 170:25
**citing** [3] - 20:1, 23:20, 26:13
**citizen** [1] - 165:21
**citizens** [4] - 146:7, 146:9, 146:16, 154:8
**citizenship** [1] - 146:19
**City** [1] - 172:5
**city** [3] - 146:20, 206:19, 206:25
**civic** [7] - 149:23, 154:3, 157:4, 162:23,

164:24, 164:25, 165:22
**civics** [2] - 146:18, 157:6
**civil** [1] - 221:7
**civility** [1] - 182:22
**claim** [1] - 118:23
**clarification** [2] - 48:20, 273:6
**clarify** [3] - 51:11, 263:7, 276:4
**clarity** [1] - 138:4
**class** [3] - 147:23, 152:10, 163:19
**classes** [5] - 147:12, 149:4, 149:23, 154:1, 158:8
**clean** [4] - 32:1, 171:8, 275:22, 276:4
**cleanest** [1] - 65:2
**cleaning** [2] - 170:21
**clear** [35] - 11:3, 12:23, 12:25, 18:13, 22:21, 24:11, 27:17, 32:1, 40:16, 56:6, 61:23, 71:1, 93:9, 95:1, 97:7, 97:12, 98:13, 106:7, 116:9, 119:1, 129:25, 131:17, 132:25, 160:8, 165:18, 180:13, 185:10, 187:4, 193:2, 195:24, 221:18, 225:9, 228:12, 250:1, 268:10
**clearer** [1] - 23:23
**clearly** [14] - 11:21, 21:20, 64:11, 101:24, 105:8, 118:13, 122:7, 124:7, 125:15, 165:10, 204:4, 206:7, 219:5, 240:3
**clerk** [1] - 21:7
**clerks** [1] - 30:18
**client** [15] - 27:8, 90:19, 127:21, 131:5, 150:11, 156:16, 159:2, 159:17, 166:6, 166:10, 183:13, 197:15, 215:15, 273:6, 273:15
**client's** [1] - 162:5
**clients** [3] - 88:15, 171:1, 171:18
**clip** [9] - 67:15, 69:8, 90:5, 90:6, 129:12, 160:15, 160:17, 161:5, 263:8
**clips** [6] - 41:5, 159:22, 159:24,

159:25, 160:3, 161:6
**close** [20] - 55:13, 69:14, 71:21, 81:17, 113:20, 118:10, 118:14, 119:16, 138:5, 172:13, 182:25, 183:4, 184:24, 196:8, 196:19, 199:4, 255:25, 256:19, 259:3, 276:1
**closed** [4] - 80:21, 92:19, 128:15, 132:24
**Closed** [4] - 226:3, 231:7, 234:24, 258:11
**closed-captioned** [1] - 92:19
**closer** [1] - 122:11
**closest** [1] - 127:17
**closing** [8] - 57:14, 182:11, 220:2, 222:14, 226:13, 228:4, 276:12, 276:17
**clothes** [2] - 175:11, 176:2
**club** [1] - 154:5
**co** [1] - 4:8
**co-counsel** [1] - 4:8
**coach** [7] - 147:20, 147:24, 152:3, 154:15, 157:24, 162:24, 164:25
**coaches** [2] - 147:9, 147:13
**coerced** [1] - 157:10
**cold** [2] - 42:9
**colleague** [2] - 61:17, 75:11
**colleagues** [1] - 17:16
**College** [1] - 210:22
**colloquial** [1] - 223:15
**color** [3] - 154:22, 154:23, 165:25
**color-of-law** [1] - 154:22
**Colorado** [7] - 140:12, 147:17, 152:7, 152:8, 170:7, 172:6
**Columbia** [2] - 2:2, 279:13
**COLUMBIA** [2] - 1:1, 1:16
**Columbus** [1] - 265:13
**column** [2] - 209:1, 210:8
**columns** [1] - 208:10

159:25, 160:3, 161:6
**combat** [3] - 36:25, 106:2, 106:3
**comfortable** [3] - 93:23, 138:19, 227:8
**coming** [13] - 17:25, 42:6, 47:23, 80:1, 108:16, 115:14, 145:12, 183:18, 231:21, 231:24, 232:3, 246:18, 262:6
**commands** [1] - 12:24
**commendations** [1] - 36:22
**comment** [1] - 215:13
**commit** [2] - 75:18, 182:1
**committees** [1] - 146:20
**committing** [2] - 9:13, 200:18
**common** [2] - 182:13, 202:24
**commonalities** [1] - 172:14
**commonly** [1] - 200:16
**communication** [3] - 91:8, 198:22, 203:11
**communications** [1] - 246:8
**community** [8] - 115:16, 142:1, 142:20, 146:22, 152:5, 152:6, 173:6, 174:5
**compared** [1] - 119:22
**compelling** [1] - 15:1
**complete** [2] - 276:5, 279:6
**completely** [2] - 49:19, 125:16
**completeness** [2] - 149:18, 149:20
**complicated** [1] - 251:9
**component** [1] - 25:19
**conceded** [1] - 220:5
**concern** [16] - 6:22, 8:4, 8:6, 13:20, 74:6, 83:17, 103:19, 103:22, 105:14, 105:17, 105:25, 106:8, 106:9, 207:13, 222:18, 271:9
**concerned** [5] - 103:22, 156:20,

176:12, 192:16, 222:3
**concerns** [15] - 5:6, 6:8, 8:10, 15:4, 24:22, 57:15, 59:13, 73:19, 154:19, 155:13, 176:17, 176:19, 193:12, 246:17, 273:22
**concert** [1] - 13:13
**conclude** [4] - 123:2, 126:24, 133:24, 275:19
**concluded** [2] - 28:12, 113:9
**conclusion** [3] - 129:6, 181:11, 233:22
**conclusions** [1] - 198:4
**condition** [1] - 21:14
**condone** [1] - 94:16
**conduct** [41] - 5:16, 9:13, 9:18, 9:19, 19:17, 20:14, 20:20, 21:3, 24:6, 25:17, 25:21, 27:8, 28:21, 29:8, 29:16, 29:24, 119:18, 120:2, 120:16, 120:22, 120:25, 125:11, 125:17, 129:16, 130:18, 130:19, 130:20, 130:21, 131:4, 131:17, 132:8, 132:10, 132:17, 133:7, 133:12, 164:25, 165:3, 221:8, 221:9, 221:25, 226:14
**confer** [1] - 162:13
**conference** [46] - 4:16, 13:24, 39:17, 49:10, 49:11, 97:4, 106:15, 108:20, 111:12, 143:8, 143:9, 148:5, 151:6, 152:3, 167:5, 168:2, 176:9, 176:10, 177:20, 177:21, 187:18, 187:20, 189:23, 197:8, 197:9, 200:3, 203:15, 209:16, 211:9, 213:9, 218:13, 218:20, 233:17, 233:18, 242:24, 242:25, 244:19, 244:21, 253:12, 253:13, 254:10, 258:17, 258:18, 261:5, 261:6, 262:15
**conferences** [1] - 147:13

**confess** [1] - 51:9
**confined** [1] - 190:4
**confronted** [1] - 60:2
**confuse** [1] - 23:18
**confused** [6] - 56:21, 84:20, 94:6, 94:7, 106:10, 110:22
**confusing** [9] - 14:11, 24:16, 27:24, 39:23, 57:11, 157:15, 215:12, 222:4, 228:21
**confusion** [19] - 8:5, 24:24, 26:6, 49:25, 50:3, 57:2, 57:5, 57:12, 64:21, 77:15, 86:4, 98:10, 98:14, 110:15, 110:16, 110:17, 166:14, 193:3, 218:24
**congratulate** [1] - 93:21
**Congress** [18] - 8:15, 28:16, 28:21, 29:9, 29:17, 29:25, 121:12, 121:14, 122:3, 126:14, 161:2, 210:14, 210:16, 210:20, 210:21, 211:3, 211:4
**congressional** [1] - 21:25
**congressmen** [1] - 126:3
**connected** [1] - 187:1
**connection** [1] - 162:19
**conscious** [1] - 5:22
**consensus** [1] - 185:6
**consider** [11] - 22:7, 27:25, 66:25, 85:6, 120:12, 127:8, 130:11, 133:4, 195:25, 266:7, 271:18
**considered** [3] - 20:9, 62:6, 120:24
**considering** [2] - 26:18, 135:6
**consistent** [10] - 139:1, 141:9, 162:22, 162:24, 162:25, 163:12, 163:18, 165:2, 172:8, 191:11
**constitute** [1] - 20:14
**constitutes** [1] - 279:4
**constituting** [1] - 18:9
**Constitution** [8] -

2:3, 146:8, 147:8, 147:13, 147:24, 147:25, 152:2, 279:14
**constitutional** [4] - 6:21, 147:20, 154:1, 157:24
**construction** [2] - 16:24, 194:15
**construed** [1] - 120:1
**consulting** [1] - 203:8
**contact** [7] - 76:7, 76:9, 86:21, 87:8, 89:11, 156:21, 165:12
**contacted** [1] - 62:6
**contemplated** [1] - 276:11
**contend** [1] - 77:20
**content** [1] - 40:23
**contention** [1] - 24:14
**context** [6] - 17:1, 77:17, 122:11, 125:22, 164:24
**continually** [1] - 130:3
**continue** [11] - 6:19, 15:2, 27:25, 73:18, 93:25, 214:11, 223:12, 254:2, 265:3, 266:10, 268:25
**continued** [4] - 21:17, 21:20, 227:25, 268:21
**continues** [3] - 23:6, 261:18, 263:4
**continuing** [3] - 4:15, 79:8, 179:19
**continuous** [1] - 195:6
**contrary** [1] - 20:18
**contrast** [1] - 59:16
**contributing** [1] - 221:11
**control** [2] - 21:19, 21:21
**convene** [1] - 8:15
**conversation** [18] - 59:3, 70:7, 70:13, 72:4, 79:5, 90:18, 90:23, 90:25, 97:9, 150:20, 152:22, 174:22, 183:15, 183:20, 184:9, 186:3, 186:13, 186:21
**conversations** [9] - 50:20, 51:13, 70:11, 70:14, 70:15, 84:12, 92:12, 94:10, 94:13

**conversing** [1] - 94:14
**convict** [2] - 33:1, 214:3
**convicted** [4] - 88:11, 88:18, 250:6, 271:16
**conviction** [1] - 33:15
**cooler** [1] - 175:9
**coordinate** [3] - 114:22, 188:8, 275:1
**cop** [1] - 57:10
**copies** [2] - 6:25, 157:1
**cops** [2] - 64:14, 77:16
**copy** [8] - 32:1, 32:17, 204:1, 204:21, 240:3, 275:7, 275:8, 275:22
**cordoned** [2] - 13:17, 14:17
**cordoned-off** [2] - 13:17, 14:17
**corner** [2] - 208:23, 208:25
**correct** [23] - 8:6, 27:2, 33:6, 47:25, 48:2, 50:13, 88:8, 90:20, 98:15, 107:20, 112:21, 175:19, 207:23, 208:22, 237:6, 238:7, 238:17, 241:7, 241:8, 241:9, 249:23, 260:17
**corroborate** [1] - 61:15
**council** [1] - 146:20
**counsel** [18] - 4:8, 44:12, 49:18, 74:2, 74:18, 76:5, 76:7, 76:9, 76:16, 88:12, 109:1, 114:15, 115:13, 213:21, 221:12, 248:12, 264:4
**Count** [50] - 6:5, 6:6, 8:3, 8:25, 9:2, 9:6, 9:8, 9:9, 9:12, 9:16, 9:18, 20:24, 22:18, 26:22, 28:1, 118:9, 118:10, 119:17, 120:13, 120:14, 121:2, 122:5, 122:6, 122:10, 122:16, 123:15, 125:8, 125:10, 126:6, 126:7, 126:8, 126:10, 127:13, 129:14, 129:17, 129:18,

130:16, 130:25, 132:5, 132:7, 132:10, 133:13, 134:3
**count** [9] - 118:8, 119:16, 123:11, 123:14, 130:16, 232:4
**country** [3] - 147:12, 147:14, 251:10
**counts** [6] - 9:15, 10:15, 118:7, 123:4, 123:10, 133:8
**Counts** [4] - 5:16, 120:12, 121:3
**County** [1] - 140:19
**couple** [25] - 8:13, 32:20, 80:4, 99:9, 112:9, 117:22, 119:20, 142:8, 153:5, 160:3, 162:10, 163:22, 176:13, 199:8, 202:4, 204:23, 210:9, 217:3, 229:16, 233:2, 240:17, 252:21, 257:21, 258:6, 267:14
**course** [19] - 23:5, 56:24, 77:1, 86:17, 114:2, 116:17, 134:23, 137:2, 137:14, 162:23, 196:8, 204:6, 207:13, 218:25, 248:6, 269:5, 270:8, 271:15, 277:22
**courses** [4] - 157:24, 158:1, 158:2, 164:24
**Court** [15] - 2:1, 2:2, 7:3, 71:11, 71:12, 71:24, 122:25, 123:4, 123:5, 127:2, 127:8, 246:1, 279:12, 279:13
**COURT** [493] - 1:1, 4:14, 5:2, 6:12, 6:14, 6:19, 7:1, 7:7, 7:10, 7:24, 8:11, 9:20, 10:10, 11:14, 11:21, 13:4, 13:18, 16:18, 17:11, 19:8, 21:1, 21:6, 24:19, 26:13, 26:24, 27:4, 28:4, 29:10, 30:5, 30:14, 30:25, 31:15, 31:22, 32:9, 32:17, 32:20, 33:7, 33:14, 33:19, 34:4, 34:10, 34:13, 34:17, 34:19, 34:22, 35:1, 35:6, 35:12, 38:22, 38:25, 39:19, 40:5, 40:8, 40:24, 41:14, 44:11, 45:7, 45:9, 45:12, 45:17,

47:16, 49:10, 49:13,
49:21, 50:7, 50:10,
50:22, 51:17, 52:10,
52:24, 53:4, 53:14,
53:21, 54:3, 54:10,
55:12, 55:16, 55:18,
55:21, 55:24, 56:2,
56:6, 57:13, 58:1,
60:8, 60:11, 60:15,
60:17, 60:19, 61:3,
61:20, 62:2, 62:4,
62:16, 64:25, 65:11,
65:22, 66:1, 66:6,
66:12, 66:15, 66:23,
67:7, 67:12, 67:14,
67:19, 68:3, 68:10,
68:14, 68:16, 68:21,
68:24, 70:24, 72:15,
73:11, 73:16, 75:1,
75:5, 75:13, 75:20,
76:12, 76:18, 77:25,
79:7, 79:19, 79:25,
80:18, 81:2, 81:12,
81:24, 82:3, 82:8,
84:22, 85:20, 86:7,
86:10, 87:8, 87:10,
87:14, 88:4, 88:9,
88:14, 88:22, 89:5,
89:14, 90:1, 90:5,
90:19, 90:22, 91:2,
91:14, 91:16, 92:1,
92:6, 92:11, 92:24,
93:4, 93:6, 93:14,
93:16, 93:20, 95:1,
95:6, 95:8, 97:6,
97:16, 98:12, 98:15,
99:4, 101:3, 103:7,
103:25, 106:14,
106:17, 106:21,
108:22, 109:5, 111:5,
111:17, 112:5, 113:4,
113:7, 113:9, 113:18,
114:13, 114:16,
114:19, 114:22,
114:25, 115:5, 115:7,
116:1, 116:7, 116:14,
116:22, 117:25,
118:4, 122:21,
123:14, 125:8,
126:17, 135:10,
135:14, 135:21,
136:1, 136:6, 136:12,
136:15, 138:2, 138:8,
138:15, 139:5,
139:10, 139:14,
143:8, 143:11,
143:17, 143:21,
144:11, 144:13,
145:10, 145:12,
148:2, 148:17, 149:2,
149:9, 150:9, 150:14,

150:16, 150:24,
151:4, 151:8, 153:3,
153:7, 153:12,
154:18, 156:2,
156:14, 158:6,
159:15, 159:25,
160:12, 161:4,
161:14, 162:2,
162:21, 163:1,
163:25, 164:6,
164:11, 165:7, 167:1,
167:7, 167:15,
167:21, 167:24,
168:7, 168:13, 169:8,
169:10, 169:13,
176:9, 176:12,
176:21, 177:20,
177:23, 178:20,
179:23, 181:5,
181:12, 181:19,
182:3, 182:18, 183:5,
183:11, 184:2,
184:10, 185:5,
185:13, 187:12,
187:14, 187:18,
187:22, 188:1, 188:4,
188:9, 188:12,
188:15, 188:20,
188:23, 189:6, 189:9,
190:13, 190:24,
191:10, 192:14,
194:7, 197:8, 197:11,
197:14, 197:24,
198:9, 199:7, 199:11,
200:5, 200:10,
200:20, 201:5, 201:8,
201:15, 201:25,
203:1, 203:17,
203:24, 204:13,
204:17, 204:19,
205:3, 205:7, 205:11,
209:15, 209:18,
210:2, 210:5, 211:8,
211:11, 211:15,
211:22, 211:25,
213:8, 213:11,
213:24, 214:4,
214:11, 214:16,
214:24, 215:10,
216:4, 216:10,
216:22, 217:1, 217:7,
217:10, 217:14,
218:3, 218:9, 218:12,
218:22, 219:18,
219:22, 221:4, 222:3,
223:11, 223:21,
224:24, 225:3, 225:9,
225:12, 225:15,
225:21, 226:5,
226:19, 227:15,
228:11, 228:15,

229:1, 229:5, 229:10,
229:16, 229:24,
230:4, 230:9, 230:14,
231:12, 232:11,
232:15, 233:17,
233:20, 234:9,
234:12, 235:6,
235:13, 236:2, 236:8,
236:11, 236:16,
236:18, 236:22,
236:25, 239:3, 239:6,
239:10, 239:17,
239:22, 240:2, 240:7,
240:9, 240:14, 242:3,
242:5, 242:24, 243:2,
243:7, 243:12,
243:21, 244:6,
244:15, 244:19,
244:23, 245:3,
245:10, 245:12,
245:21, 246:4,
246:11, 246:15,
247:3, 247:19, 248:1,
248:3, 248:10,
248:13, 248:17,
248:23, 249:8,
249:24, 250:2,
250:14, 250:17,
251:18, 251:22,
252:2, 253:12,
253:15, 253:20,
253:25, 254:9,
254:12, 254:20,
258:17, 258:20,
258:24, 259:10,
260:12, 260:17,
260:19, 261:5, 261:8,
261:18, 262:13,
262:17, 262:23,
263:3, 263:8, 263:10,
263:14, 263:17,
264:8, 264:16, 265:3,
265:25, 266:6,
267:21, 268:14,
268:24, 269:10,
269:13, 269:19,
270:1, 270:5, 270:8,
271:2, 271:23, 272:8,
273:3, 273:10,
273:13, 273:16,
273:19, 274:8,
274:13, 274:21,
275:6, 275:12,
275:15, 275:17,
276:6, 276:9, 276:15,
276:21, 277:3, 277:8,
278:11
  court [93] - 13:20,
17:16, 19:13, 25:7,
41:12, 41:21, 41:25,
42:16, 42:22, 43:4,

43:16, 44:22, 45:11,
46:6, 46:22, 53:20,
56:5, 58:8, 66:18,
67:10, 68:20, 80:17,
82:2, 82:7, 95:15,
95:24, 99:7, 99:12,
100:4, 100:8, 101:8,
101:19, 102:5,
102:18, 104:12,
104:16, 104:20,
107:5, 107:9, 107:14,
108:2, 109:9, 112:7,
120:24, 127:3,
138:13, 140:7,
143:20, 145:24,
150:23, 151:17,
167:23, 168:17,
177:2, 185:15,
188:22, 189:12,
189:20, 193:17,
194:3, 198:8, 202:2,
204:12, 210:4,
211:24, 214:10,
214:23, 216:9,
217:20, 217:24,
218:2, 230:22, 232:7,
232:10, 232:20,
233:9, 234:11,
244:12, 250:20,
251:6, 251:19,
251:22, 251:24,
253:24, 254:19,
259:9, 261:21, 262:1,
262:11, 265:1, 265:6,
266:21, 268:13
  Court's [1] - 192:10
  courtroom [19] -
35:9, 54:1, 55:25,
66:4, 73:14, 92:10,
93:18, 114:11,
139:12, 147:7, 151:2,
153:11, 167:3,
167:25, 214:14,
230:15, 250:21,
268:5, 268:22
  COURTROOM [29] -
4:1, 4:24, 7:6, 35:11,
35:19, 35:21, 39:2,
39:6, 139:11, 139:20,
139:22, 145:16,
145:19, 169:17,
169:19, 188:10,
193:20, 193:23,
199:13, 199:15,
205:5, 230:17,
232:25, 236:10,
239:16, 239:20,
250:23, 251:1, 275:5
  courts [1] - 120:25
  cover [2] - 34:2,

118:3
  covered [4] - 13:25,
40:8, 244:6, 272:1
  covering [3] - 42:12,
149:25, 255:1
  COVID [1] - 42:11
  create [2] - 26:3,
74:7
  creates [1] - 18:18
  creating [2] - 19:12,
63:21
  credentialed [1] -
253:17
  credentials [2] -
252:4, 252:8
  credibility [4] - 64:7,
81:16, 98:23, 123:5
  crew [2] - 196:22,
212:22
  crime [1] - 16:14
  crimes [3] - 182:1,
200:18, 214:3
  Criminal [2] - 1:3,
4:1
  criminality [1] -
137:6
  criminalizes [2] -
129:15, 130:16
  cropped [1] - 81:23
  cross [20] - 47:16,
49:17, 57:7, 57:17,
57:18, 63:23, 94:1,
97:21, 102:10, 143:3,
191:23, 197:25,
220:2, 235:14, 243:6,
244:7, 258:9, 259:1,
271:15, 274:12
  Cross [1] - 3:3
  CROSS [3] - 47:18,
144:14, 235:15
  cross-examination
[9] - 47:16, 49:17,
57:17, 94:1, 97:21,
220:2, 243:6, 244:7,
259:1
  CROSS-
EXAMINATION [3] -
47:18, 144:14, 235:15
  cross-
examinations [1] -
63:23
  cross-examine [3] -
57:7, 191:23, 197:25
  cross-examined [1]
- 271:15
  cross-examining [1]
- 235:14
  crossed [1] - 98:2
  crowd [81] - 37:8,
37:19, 37:21, 38:2,

38:17, 40:18, 43:24,
48:23, 49:4, 49:25,
50:1, 50:4, 56:21,
56:25, 57:3, 57:6,
57:8, 64:13, 64:18,
64:21, 70:1, 70:12,
77:10, 77:15, 78:23,
84:17, 84:20, 94:4,
94:6, 94:7, 94:11,
94:12, 96:5, 96:6,
96:21, 96:23, 97:2,
98:10, 98:14, 99:21,
99:25, 100:24, 102:2,
104:25, 105:15,
105:16, 105:19,
106:10, 106:20,
106:23, 106:24,
107:12, 108:16,
110:5, 110:23, 111:2,
111:15, 124:7,
124:17, 133:11,
160:18, 160:21,
179:16, 190:22,
196:12, 200:17,
200:19, 207:10,
215:3, 215:4, 215:7,
216:1, 219:15,
231:21, 231:24,
257:4, 257:14,
257:15, 257:17
**crowds** [1] - 199:25
**CRR** [3] - 2:1, 279:3,
279:12
**crucial** [2] - 6:4,
184:21
**cruiser** [1] - 42:10
**crushed** [1] - 216:3
**cumulative** [4] -
109:7, 225:5, 244:9,
271:8
**curiosity** [1] - 257:7
**curious** [1] - 271:4
**current** [3] - 23:22,
247:4, 251:14
**Cusick** [8] - 245:24,
250:5, 270:2, 270:3,
270:9, 270:13,
272:10, 273:6
**cut** [3] - 87:6,
167:16, 254:24
**cuts** [1] - 220:10
**CVC** [6] - 36:11,
36:12, 48:12, 48:16,
48:19

## D

**D.C** [20] - 1:6, 1:17,
2:4, 154:12, 174:16,
175:18, 175:22,

175:24, 177:6,
177:18, 181:8, 200:1,
205:17, 206:19,
207:24, 248:24,
255:1, 255:7, 255:9,
279:14
**dad** [1] - 175:11
**Dallas** [1] - 194:6
**danger** [6] - 40:16,
43:25, 102:8, 102:10,
106:4
**dangerous** [4] -
18:18, 106:3, 108:5,
110:13
**dark** [1] - 255:23
**database** [1] -
152:17
**date** [3] - 93:1,
151:24, 165:19
**Dated** [1] - 279:10
**dates** [1] - 158:22
**daughter** [1] -
182:12
**DAVID** [2] - 193:22,
194:4
**David** [9] - 3:10,
189:4, 193:18, 194:4,
212:22, 216:17,
216:18, 218:7, 233:12
**Davis** [1] - 126:21
**DAVIS** [1] - 126:22
**dawn** [1] - 256:3
**days** [2] - 250:11,
250:12
**de** [1] - 272:23
**dealing** [2] - 175:16,
221:24
**debunks** [1] - 118:23
**deceived** [1] - 166:6
**decide** [5] - 54:7,
113:23, 128:14,
133:2, 277:17
**decided** [4] - 175:9,
196:11, 256:9, 276:19
**deciding** [2] - 65:18,
130:11
**decision** [10] - 13:22,
22:21, 28:22, 30:9,
30:13, 51:19, 223:10,
224:2, 245:25, 271:18
**decisions** [1] - 12:7
**decks** [1] - 194:17
**declare** [1] - 18:19
**deemed** [4] - 10:21,
11:6, 38:15, 43:23
**deep** [1] - 63:2
**deep-fake** [1] - 63:2
**deepfakes** [1] -
138:9
**deeply** [1] - 156:12

**defeat** [1] - 30:5
**Defendant** [76] - 1:7,
4:11, 10:20, 11:4,
19:1, 24:5, 24:7, 24:8,
24:9, 25:20, 27:13,
50:3, 91:20, 118:11,
118:21, 119:11,
119:24, 120:4, 121:5,
121:10, 121:20,
123:3, 123:8, 123:16,
123:24, 124:11,
124:14, 124:15,
124:20, 125:23,
125:24, 126:16,
132:11, 133:10,
133:13, 133:14,
134:6, 140:24,
144:18, 145:2, 145:5,
148:9, 148:11,
148:12, 149:5, 150:2,
151:10, 151:20,
155:15, 155:19,
156:9, 160:15,
160:17, 160:23,
161:24, 164:8,
164:17, 170:11,
176:16, 176:23,
179:3, 180:14, 191:6,
191:7, 191:8, 200:8,
202:6, 203:19,
203:21, 213:16,
220:6, 224:20, 243:3,
245:15, 250:9, 272:15
**defendant** [2] -
132:16, 250:6
**DEFENDANT** [2] -
1:18, 3:6
**Defendant's** [49] -
3:17, 3:18, 3:19, 15:7,
24:15, 44:21, 45:10,
56:4, 66:17, 67:9,
68:19, 80:16, 82:1,
82:6, 95:12, 95:23,
99:11, 100:3, 100:7,
101:7, 101:18, 102:4,
102:17, 104:11,
104:15, 104:19,
107:8, 107:13, 108:1,
122:12, 125:17,
127:5, 156:4, 178:1,
179:10, 179:20,
204:15, 213:23,
214:22, 216:8,
217:19, 217:23,
218:1, 229:8, 230:21,
232:6, 232:9, 232:19,
233:8
**defending** [1] -
257:18
**defense** [55] - 6:23,

9:11, 9:13, 9:17,
10:19, 12:10, 15:6,
18:8, 20:6, 23:20,
24:4, 26:24, 31:1,
32:4, 32:7, 47:17,
49:18, 66:9, 73:22,
74:12, 74:18, 75:6,
75:16, 76:9, 76:15,
76:25, 81:20, 83:22,
84:4, 88:11, 95:5,
109:1, 113:11,
113:23, 115:12,
130:25, 132:5,
139:18, 145:14,
154:22, 165:25,
166:9, 166:10,
169:15, 180:16,
190:10, 193:18,
199:16, 213:15,
213:21, 220:25,
221:12, 223:6, 264:4,
275:11
**DEFENSE** [4] -
145:18, 169:18,
193:22, 250:25
**Defense** [12] - 44:19,
49:7, 101:6, 198:25,
203:13, 212:14,
217:18, 230:20,
232:8, 233:7, 270:22,
270:23
**defense's** [6] - 16:5,
20:12, 118:2, 126:18,
222:16, 244:23
**defined** [2] - 25:23,
132:13
**defines** [1] - 27:19
**definitely** [3] - 88:5,
109:6, 222:3
**definition** [14] - 11:3,
12:11, 14:16, 15:4,
15:10, 15:16, 15:19,
15:20, 17:9, 18:2,
18:12, 23:14, 23:22,
25:10
**definitions** [3] -
15:15, 27:15, 28:19
**definitively** [1] -
264:6
**degree** [6] - 18:25,
140:15, 140:16,
170:10, 252:4, 252:9
**dehoarder** [4] -
171:14, 171:15,
171:19, 171:20
**delay** [1] - 138:6
**delaying** [1] - 115:8
**deliberately** [1] -
49:16
**deliberating** [1] -

128:22
**delta** [1] - 137:12
**Democrats** [2] -
146:14, 209:3
**demonstrate** [4] -
28:20, 131:19,
132:19, 166:5
**demonstrated** [6] -
27:14, 121:7, 128:2,
128:5, 133:6, 133:14
**demonstrating** [17] -
6:7, 27:1, 27:10,
29:13, 29:14, 29:22,
121:2, 121:24, 124:7,
126:5, 126:11,
126:15, 133:25,
134:22, 155:5, 197:19
**demonstration** [4] -
27:19, 134:8, 134:17,
165:23
**demonstrations** [3] -
255:13, 255:14, 261:3
**demonstrators** [1] -
94:17
**denied** [1] - 265:23
**deny** [4] - 123:4,
126:18, 131:1, 135:2
**Department** [1] -
257:8
**depiction** [1] -
224:14
**deployed** [1] - 36:17
**Deputy** [1] - 75:14
**DEPUTY** [29] - 4:1,
4:24, 7:6, 35:11,
35:19, 35:21, 39:2,
39:6, 139:11, 139:20,
139:22, 145:16,
145:19, 169:17,
169:19, 188:10,
193:20, 193:23,
199:13, 199:15,
205:5, 230:17,
232:25, 236:10,
239:16, 239:20,
250:23, 251:1, 275:5
**describe** [14] -
140:13, 141:12,
170:8, 172:11, 196:3,
206:9, 207:2, 207:20,
236:1, 242:11,
252:13, 255:22,
259:13, 265:11
**described** [6] -
128:10, 165:1,
202:19, 230:12,
233:25
**describes** [1] - 19:10
**describing** [1] -
162:25

**descriptions** [1] - 223:19
**designated** [1] - 48:11
**designation** [2] - 223:20, 223:22
**destroy** [1] - 181:8
**destroying** [1] - 182:2
**detail** [1] - 246:7
**detailed** [3] - 247:20, 247:22, 248:4
**detain** [1] - 22:1
**determination** [1] - 22:23
**determine** [1] - 256:19
**deterrence** [1] - 34:13
**diagram** [1] - 242:16
**dialogue** [1] - 59:1
**dictionary** [1] - 15:15
**difference** [2] - 178:14, 219:25
**different** [37] - 6:4, 27:9, 27:11, 29:23, 39:22, 49:19, 51:6, 56:16, 77:16, 79:17, 79:18, 85:3, 118:21, 142:9, 170:19, 170:23, 170:24, 170:25, 175:13, 179:22, 196:24, 197:2, 206:12, 208:1, 208:14, 220:8, 221:14, 222:9, 226:7, 228:8, 263:24, 264:21, 272:14
**differentiation** [1] - 63:19
**differently** [1] - 6:22
**difficult** [8] - 77:25, 84:1, 100:17, 161:22, 189:18, 189:19, 272:22, 273:23
**dig** [1] - 255:6
**diligent** [1] - 158:17
**DIRE** [1] - 71:5
**DIRECT** [6] - 35:23, 139:24, 145:21, 169:21, 193:24, 251:3
**direct** [20] - 49:15, 49:20, 57:18, 62:5, 132:11, 143:21, 158:4, 178:14, 178:15, 178:22, 206:14, 208:3, 226:22, 234:13, 243:25, 244:8, 261:8, 263:18, 266:7, 271:10

**Direct** [1] - 3:3
**directed** [4] - 118:7, 129:19, 165:21, 227:8
**directing** [1] - 158:3
**direction** [5] - 26:19, 49:19, 130:12, 195:24, 206:11
**directions** [4] - 41:15, 67:15, 207:23, 231:11
**directly** [5] - 16:25, 77:12, 164:13, 164:22, 165:5
**director** [1] - 158:1
**disagree** [1] - 127:18
**disagreement** [2] - 10:16, 10:17
**disapproval** [1] - 267:12
**disarray** [1] - 219:14
**disconnected** [1] - 258:4
**discuss** [3] - 32:22, 150:25, 180:4
**discussed** [7] - 20:15, 31:7, 56:9, 111:8, 129:13, 177:23, 277:15
**discusses** [1] - 124:15
**discussing** [2] - 50:1, 160:23
**discussion** [17] - 48:21, 49:3, 49:25, 52:7, 52:25, 57:1, 64:23, 65:10, 77:18, 84:17, 96:8, 99:24, 121:17, 121:21, 123:18, 164:7, 199:10
**discussions** [3] - 11:2, 94:20, 100:1
**disenfranchise** [1] - 209:3
**dismissed** [1] - 128:23
**disobey** [3] - 23:25, 25:12, 132:15
**disorder** [2] - 221:7, 221:11
**disorderliness** [1] - 223:2
**disorderly** [31] - 5:15, 5:21, 9:13, 9:18, 9:19, 20:9, 20:14, 20:17, 21:3, 21:11, 21:19, 22:22, 119:18, 119:25, 120:1, 120:16, 120:22, 120:24, 125:10, 125:13, 130:19,

131:4, 131:12, 131:16, 132:10, 133:7, 192:22, 221:8, 221:25, 222:17, 226:14
**displayed** [1] - 121:16
**dispute** [2] - 31:25, 134:2
**disregard** [3] - 23:25, 25:12, 132:15
**disrupt** [1] - 21:25, 28:16, 28:21, 29:4, 29:8, 29:17, 29:24, 129:16, 130:17, 131:25, 133:12
**disrupted** [1] - 125:19
**disrupting** [3] - 22:25, 27:20, 120:16
**disruptive** [24] - 5:16, 5:18, 5:21, 7:18, 7:23, 20:10, 20:17, 21:2, 21:13, 22:4, 23:7, 23:8, 120:2, 125:10, 125:13, 125:17, 130:19, 131:4, 131:17, 131:21, 133:12, 221:8, 221:9, 226:14
**distance** [4] - 47:12, 57:12, 215:24, 249:7
**distinct** [1] - 27:15
**distinction** [5] - 27:5, 56:6, 221:3, 222:12, 223:4
**distributed** [2] - 201:13, 201:16
**DISTRICT** [3] - 1:1, 1:1, 1:16
**District** [3] - 2:2, 2:2, 279:13
**district** [3] - 17:16, 127:3, 279:13
**disturbance** [1] - 21:12
**disturbs** [1] - 21:13
**divine** [1] - 24:2
**division** [3] - 36:10, 48:16, 48:17
**DM** [1] - 186:15
**docket** [1] - 89:1
**Document** [1] - 9:4
**document** [8] - 7:3, 87:11, 196:25, 199:9, 199:20, 205:8, 205:14, 211:13
**documentaries** [1] - 195:17
**dome** [1] - 63:8

**done** [14] - 62:8, 112:4, 114:23, 134:21, 137:18, 158:11, 170:20, 173:15, 174:7, 180:8, 189:15, 275:17, 276:1
**door** [6] - 56:9, 91:1, 128:15, 132:24, 132:25, 225:6, 270:19, 272:13
**dooring** [1] - 163:21
**doors** [8] - 184:5, 186:4, 209:2, 209:6, 209:10, 222:22, 265:13, 273:7
**Dorrance** [1] - 1:22
**double** [3] - 61:18, 86:12, 247:5
**doubt** [6] - 123:3, 123:9, 126:25, 127:5, 135:7, 135:12
**down** [37] - 8:18, 8:20, 55:18, 63:4, 64:21, 69:10, 72:24, 78:13, 79:23, 95:20, 100:13, 100:18, 107:7, 113:4, 119:4, 145:12, 160:21, 160:24, 162:15, 166:24, 167:16, 183:18, 187:15, 196:11, 196:14, 208:11, 209:11, 213:2, 216:3, 249:19, 250:18, 256:12, 257:2, 257:20, 260:2, 261:23, 268:24
**downside** [1] - 87:3
**dozen** [1] - 119:19
**dozens** [1] - 78:2
**Dr** [1] - 210:13
**drafted** [2] - 5:7, 6:22
**dramatic** [1] - 183:23
**draw** [3] - 222:12, 229:10, 259:24
**drawn** [1] - 242:18
**drive** [1] - 175:10
**drove** [1] - 255:8
**dual** [1] - 183:5
**Dunfee** [6] - 71:16, 73:22, 74:17, 87:13, 88:10, 136:3
**Dunfey** [1] - 62:11
**duplicative** [2] - 19:14, 20:1
**during** [15] - 85:12, 88:24, 90:8, 137:15, 141:9, 158:7, 161:18, 172:2, 172:9, 175:6, 185:19, 186:3,

194:25, 202:15
**duty** [2] - 31:11, 33:1
**DVDs** [1] - 147:15

## E

**earliest** [1] - 215:22
**early** [7] - 33:18, 185:24, 196:12, 209:13, 215:24, 219:8, 255:24
**easier** [3] - 51:19, 62:2, 264:4
**east** [46] - 14:21, 37:9, 37:18, 39:10, 39:13, 47:9, 48:14, 54:25, 55:7, 55:10, 56:7, 56:19, 59:9, 70:5, 71:7, 71:20, 73:3, 78:18, 79:3, 87:18, 87:19, 97:14, 99:16, 99:18, 99:22, 100:13, 123:24, 124:19, 160:22, 190:22, 193:3, 198:16, 198:19, 220:4, 221:10, 241:22, 241:25, 257:5, 257:13, 258:1, 258:8, 259:15, 262:20, 264:3, 265:12, 270:14
**easy** [3] - 27:17, 128:10, 208:7
**eat** [1] - 141:14
**ECF** [6] - 10:14, 30:23, 31:1, 31:8, 31:19, 31:23
**eclipse** [1] - 252:18
**edges** [1] - 235:9
**edit** [1] - 80:24
**edited** [1] - 60:3
**educate** [1] - 158:7
**educated** [2] - 157:9, 166:7
**Education** [1] - 195:3
**education** [3] - 140:16, 157:4, 252:7
**educational** [3] - 140:13, 146:6, 170:8
**Edward** [3] - 3:5, 36:3, 92:9
**EDWARD** [1] - 35:20
**Edwards** [1] - 279:12
**EDWARDS** [2] - 2:1, 279:3
**effect** [10] - 64:12, 64:17, 77:17, 77:23,

83:4, 83:6, 83:12, 159:11, 162:7, 168:12
**effect-on-the-listener** [1] - 159:11
**effective** [1] - 127:15
**efficient** [1] - 268:17
**efficiently** [1] - 268:19
**effort** [1] - 75:20
**efforts** [2] - 21:21, 272:21
**egress** [1] - 264:22
**Eicher** [1] - 14:3
**EICHER** [1] - 14:3
**eight** [1] - 10:7
**either** [13] - 14:19, 54:13, 61:25, 62:8, 73:24, 80:6, 134:3, 161:2, 171:21, 171:23, 179:16, 208:10, 272:24
**either/or** [1] - 65:15
**EI** [1] - 140:19
**election** [5] - 131:25, 160:20, 164:20, 164:21, 267:12
**Electoral** [1] - 210:22
**electronics** [2] - 188:8, 196:8
**element** [7] - 11:25, 12:5, 13:3, 27:13, 118:16, 119:9
**elements** [5] - 27:12, 132:3, 157:7, 157:14, 204:6
**elicited** [3] - 41:4, 182:21, 184:22
**Ellipse** [4] - 196:5, 208:21, 209:6, 231:25
**ELMO** [2] - 239:9, 239:14
**eloquently** [1] - 131:10
**email** [12] - 32:21, 89:10, 92:4, 115:3, 135:19, 240:3, 240:4, 240:9, 240:10, 248:16, 275:13
**emailed** [1] - 7:4
**emailing** [1] - 89:12
**Emily** [1] - 4:13
**emotionally** [1] - 171:22
**emphasis** [2] - 5:8
**emphatic** [1] - 5:8
**employed** [2] - 194:20, 251:15
**encompass** [3] - 6:11, 15:13, 16:1
**encounter** [4] -

111:10, 111:19, 111:23, 260:5
**encountered** [2] - 259:16, 260:3
**encourage** [3] - 86:23, 249:18, 271:23
**encouragement** [1] - 157:14
**encouraging** [1] - 158:13
**end** [7] - 32:10, 32:22, 33:8, 90:5, 109:6, 263:13, 277:5
**endangered** [1] - 109:20
**ended** [4] - 37:23, 180:25, 186:22, 275:14
**enforcement** [1] - 121:21
**enforcement's** [1] - 21:21
**engagement** [1] - 162:23
**engaging** [2] - 119:25, 130:19
**England** [1] - 246:20
**enjoy** [1] - 269:16
**ensure** [2] - 37:8, 115:14
**enter** [5] - 155:4, 166:4, 249:4, 270:19, 272:12
**entered** [21] - 35:9, 41:17, 66:4, 92:9, 93:18, 95:13, 118:11, 119:7, 123:16, 124:11, 125:1, 125:6, 134:6, 139:12, 167:3, 167:25, 204:15, 229:9, 230:15, 250:21, 264:11
**entering** [8] - 9:9, 10:24, 11:10, 21:23, 42:5, 118:9, 124:16, 127:14
**enters** [2] - 10:23, 22:2
**entire** [4] - 74:15, 125:21, 141:10, 172:9
**entirely** [4] - 23:18, 51:9, 156:23, 222:8
**entirety** [3] - 44:20, 72:2, 221:9
**entrance** [1] - 212:10
**entrapment** [2] - 154:22, 154:23
**environment** [1] - 221:16
**Epps** [2] - 87:19,

87:20
**equally** [2] - 129:23, 198:4
**equate** [1] - 106:3
**equivalent** [1] - 6:6
**especially** [4] - 21:4, 68:1, 77:16, 77:24
**ESQ** [4] - 1:14, 1:15, 1:18, 1:21
**essential** [1] - 83:22
**essentially** [13] - 11:8, 106:19, 118:7, 121:14, 122:4, 126:7, 131:5, 133:16, 156:21, 161:15, 184:4, 184:7, 184:8
**establish** [7] - 12:17, 61:9, 65:17, 68:7, 143:14, 192:20, 204:6
**established** [5] - 62:20, 63:13, 102:11, 155:3, 244:7
**et** [1] - 8:5
**eternity** [1] - 97:19
**evacuated** [2] - 161:3, 231:10
**evaluating** [1] - 127:7
**evening** [4] - 186:13, 186:21, 275:18, 278:4
**event** [7] - 141:4, 147:16, 152:1, 184:15, 190:20, 197:1, 255:7
**events** [10] - 190:21, 199:25, 200:13, 203:10, 207:21, 208:1, 208:20, 215:9, 249:3, 255:13
**eventually** [5] - 112:18, 196:23, 252:18, 256:16, 270:7
**EVIDENCE** [1] - 3:14
**Evidence** [3] - 81:13, 138:20, 162:6
**evidence** [69] - 40:19, 41:17, 77:9, 95:13, 113:10, 113:21, 115:13, 115:25, 118:14, 118:18, 118:22, 119:5, 119:13, 119:14, 120:3, 120:6, 120:11, 121:4, 121:6, 121:8, 122:4, 122:9, 122:17, 123:1, 123:7, 123:22, 126:23, 127:8, 127:18, 127:20, 128:15, 129:22, 130:1,

130:15, 131:4, 131:23, 132:1, 133:7, 133:10, 133:14, 134:5, 134:14, 137:4, 137:5, 137:15, 148:20, 158:20, 164:14, 164:22, 165:6, 165:8, 178:15, 178:19, 180:9, 182:22, 190:6, 195:10, 200:8, 203:18, 203:20, 204:16, 222:13, 223:1, 226:7, 228:7, 228:8, 229:9
**evidentiary** [1] - 74:24
**evil** [2] - 24:8, 24:12
**evil-meaning** [2] - 24:8, 24:12
**exact** [7] - 16:1, 62:14, 97:19, 100:11, 149:25, 151:24, 184:8
**exactly** [16] - 27:3, 59:18, 73:5, 84:2, 97:22, 110:19, 152:11, 165:2, 191:3, 206:12, 253:19, 256:4, 256:19, 263:7, 265:20, 271:22
**examination** [11] - 47:16, 49:17, 57:17, 94:1, 97:21, 116:12, 161:16, 220:2, 243:6, 244:7, 259:1
**EXAMINATION** [11] - 35:23, 47:18, 71:5, 139:24, 144:14, 145:21, 169:21, 193:24, 235:15, 242:7, 251:3
**examinations** [1] - 63:23
**examine** [3] - 57:7, 191:23, 197:25
**examined** [1] - 271:15
**examining** [1] - 235:14
**example** [8] - 7:19, 15:24, 17:5, 29:17, 102:25, 103:1, 104:22, 164:16
**exception** [7] - 178:11, 178:18, 179:4, 179:12, 180:22, 183:21
**exchange** [5] - 70:1, 70:7, 78:23, 79:5, 79:22

**exchanges** [1] - 70:8
**excited** [3] - 179:17, 183:22, 184:25
**exclamation** [1] - 205:18
**exclude** [3] - 158:24, 220:7, 273:2
**exclusion** [1] - 220:8
**exculpatory** [1] - 154:11
**excuse** [14] - 51:17, 52:20, 52:24, 53:2, 53:5, 53:17, 54:5, 75:12, 150:20, 150:24, 151:8, 214:5, 214:7, 261:18
**excused** [8] - 113:6, 145:13, 169:10, 169:12, 187:17, 244:15, 244:18, 269:18
**Exhibit** [67] - 3:15, 3:17, 3:18, 3:19, 38:20, 41:16, 41:20, 41:24, 42:15, 42:21, 43:3, 43:15, 44:19, 44:21, 45:10, 46:3, 46:5, 46:14, 46:21, 49:8, 56:4, 66:17, 67:9, 68:19, 80:16, 82:1, 82:6, 95:3, 95:12, 95:14, 95:23, 99:11, 100:3, 100:7, 101:7, 101:18, 102:4, 102:17, 104:11, 104:15, 104:19, 107:8, 107:13, 108:1, 124:20, 168:20, 198:25, 204:15, 212:14, 214:22, 216:8, 217:19, 217:23, 218:1, 229:8, 230:21, 232:6, 232:9, 232:19, 233:8, 239:2, 261:25, 262:10, 265:5, 266:20, 268:12, 270:23
**exhibit** [13] - 39:20, 94:24, 95:4, 95:8, 127:25, 168:5, 201:2, 201:5, 201:6, 213:13, 213:14, 243:4, 243:5
**Exhibits** [1] - 124:9
**EXHIBITS** [1] - 3:14
**exhibits** [6] - 124:12, 128:2, 221:6, 221:13, 221:23, 228:6
**exist** [1] - 242:22
**existed** [2] - 146:12, 165:12

**existing** [2] - 15:16, 179:4
**exists** [1] - 219:1
**exited** [7] - 54:1, 90:25, 91:21, 114:11, 151:2, 214:14, 268:22
**expect** [1] - 208:5
**expecting** [3] - 33:16, 37:16, 138:21
**experience** [4] - 74:14, 196:3, 196:25, 207:10
**experienced** [2] - 219:16, 259:14
**experiencing** [1] - 267:10
**expert** [6] - 73:9, 192:15, 223:14, 223:15, 223:16, 223:17
**explain** [4] - 25:4, 49:22, 146:17, 221:7
**explosions** [1] - 256:21
**express** [1] - 195:22
**expressed** [1] - 186:4
**expression** [1] - 20:8
**extensive** [1] - 74:14
**extent** [14] - 17:13, 29:21, 74:12, 86:18, 134:4, 136:12, 148:20, 173:10, 186:22, 190:9, 191:19, 192:23, 193:6, 201:1
**extra** [2] - 31:2, 117:22
**extremely** [9] - 108:23, 172:13, 189:19, 215:12, 249:8, 249:17, 258:24, 271:11, 273:23

**F**

**F-I-O-L-A** [1] - 12:2
**F.2d** [3] - 126:22, 127:2, 127:12
**F.3d** [1] - 127:10
**face** [1] - 174:8
**Facebook** [5] - 160:2, 160:8, 164:17, 186:15
**faces** [1] - 85:18
**facing** [1] - 71:24
**fact** [34] - 7:14, 9:3, 17:24, 22:4, 34:8,

40:20, 64:13, 74:14, 77:20, 78:4, 80:2, 84:25, 90:7, 92:2, 106:25, 119:23, 121:7, 122:9, 128:13, 130:20, 131:24, 148:21, 149:1, 164:24, 181:23, 190:6, 215:2, 215:16, 243:10, 247:15, 247:17, 261:2, 270:16, 271:16
**fact-finder** [1] - 122:9
**factor** [1] - 252:19
**facts** [10] - 18:9, 71:1, 85:6, 91:22, 128:18, 132:3, 132:19, 183:24, 219:1, 256:7
**factual** [4] - 22:22, 157:16, 157:19, 158:25
**factually** [2] - 246:19, 247:6
**fail** [1] - 253:15
**failed** [2] - 116:20, 122:16
**fair** [10] - 13:13, 54:16, 82:16, 85:5, 86:11, 117:12, 187:6, 193:13, 204:1, 224:14
**fairly** [10] - 11:3, 27:17, 76:24, 104:23, 126:24, 215:24, 219:8, 243:15, 246:22
**faith** [1] - 10:23
**fake** [2] - 63:2, 63:7
**Falcon** [1] - 170:7
**fall** [5] - 26:25, 38:12, 38:18, 179:11, 180:21
**fallen** [4] - 43:21, 110:6, 112:11, 112:23
**falling** [1] - 112:21
**falls** [1] - 17:20
**false** [2] - 88:8, 247:16
**familiar** [9] - 47:7, 116:16, 137:10, 199:20, 206:3, 240:8, 242:16, 249:5, 264:18
**familiarity** [4] - 59:9, 59:22, 262:20, 264:14
**far** [20] - 18:13, 47:14, 55:14, 61:7, 76:1, 94:14, 97:14, 106:4, 110:20, 120:24, 165:16, 176:3, 191:1, 208:2, 209:18, 212:12,

224:6, 238:22, 249:15
**Faruqui** [1] - 189:6
**FARUQUI** [1] - 1:10
**fashion** [3] - 76:10, 191:14, 192:2
**fasting** [1] - 175:8
**fathom** [1] - 273:24
**favor** [1] - 128:25
**favorable** [8] - 123:1, 127:9, 128:20, 129:3, 131:22, 133:5, 134:5, 135:5
**favorite** [2] - 141:24, 208:6
**favorites** [1] - 26:15
**FBI** [9] - 4:9, 109:15, 109:17, 246:21, 246:25, 247:1, 247:4
**fear** [1] - 105:23
**feared** [1] - 102:12
**featured** [2] - 249:1, 249:2
**Federal** [1] - 81:13
**feet** [5] - 40:2, 56:22, 78:1, 78:2, 125:5
**fellowship** [1] - 141:14
**felt** [6] - 184:6, 184:7, 186:5, 227:6, 227:7, 228:20
**fencing** [2] - 12:20, 213:20
**fertile** [2] - 25:10, 58:16
**festive** [2] - 207:5, 221:15
**few** [20] - 27:18, 36:24, 64:18, 74:2, 79:16, 79:18, 79:23, 81:4, 99:3, 99:8, 150:24, 153:4, 188:8, 188:17, 203:6, 213:4, 214:13, 219:10, 234:18, 263:22
**fiancée** [2] - 256:23, 257:9
**field** [1] - 55:8
**fifth** [1] - 109:2
**fight** [1] - 185:1
**fighting** [1] - 183:12
**figure** [2] - 83:20, 274:19
**figures** [1] - 19:4
**fill** [3] - 149:21, 153:25, 170:19
**filled** [1] - 175:13
**filling** [2] - 156:6, 156:13
**filling-in-the-gaps** [1] - 156:13

**film** [5] - 73:7, 196:21, 196:24, 212:5, 267:7
**filmed** [6] - 212:13, 215:22, 216:18, 218:8, 231:2
**filming** [6] - 198:13, 212:8, 212:9, 219:12, 255:18, 257:15
**filters** [1] - 188:25
**final** [4] - 30:23, 112:9, 144:1, 234:18
**finally** [4] - 25:23, 65:4, 133:13, 270:2
**Finchem** [1] - 210:13
**finder** [1] - 122:9
**fine** [25] - 27:7, 35:1, 45:17, 50:16, 76:18, 111:5, 137:16, 164:11, 168:14, 187:23, 201:10, 211:18, 214:7, 225:4, 226:21, 228:15, 236:16, 236:17, 239:6, 240:1, 240:5, 240:6, 240:14, 261:13, 273:4
**finger** [2] - 259:24, 267:2
**finish** [1] - 275:10
**finished** [1] - 135:19
**finishing** [1] - 162:17
**Fiola** [1] - 12:2
**fireworks** [1] - 256:21
**firing** [1] - 132:21
**First** [6] - 6:9, 6:11, 20:12, 28:16, 28:25, 195:22
**first** [70] - 5:7, 7:10, 10:17, 10:18, 11:1, 20:7, 23:15, 24:25, 27:13, 33:3, 49:22, 54:5, 56:18, 57:19, 58:7, 58:20, 58:21, 58:25, 59:4, 59:5, 60:4, 60:12, 60:13, 62:5, 65:6, 65:14, 65:17, 65:22, 66:24, 68:10, 68:11, 68:25, 73:17, 77:13, 82:14, 82:21, 84:13, 92:14, 96:15, 107:17, 116:6, 117:25, 122:24, 124:14, 127:13, 135:22, 139:16, 140:20, 151:25, 152:5, 156:11, 156:14, 160:1, 163:21, 176:17,

214:4, 214:19, 214:21, 216:1, 218:6, 220:12, 222:4, 222:10, 246:15, 252:12, 253:1, 260:22, 263:22, 268:25
**firsthand** [3] - 51:2, 191:20, 192:23
**fishing** [1] - 255:3
**fishy** [1] - 87:22
**five** [9] - 35:2, 144:20, 162:2, 164:1, 171:9, 219:18, 225:5, 274:6, 274:7
**flag** [6] - 31:16, 121:25, 137:14, 183:9, 246:1
**flag's** [1] - 43:7
**flag-type** [1] - 121:25
**flags** [1] - 267:1
**flash** [2] - 132:22, 256:22
**flee** [1] - 16:11
**flier** [1] - 199:24
**fliers** [1] - 190:20
**flip** [1] - 205:20
**Floor** [1] - 1:20
**Florida** [1] - 251:10
**flow** [1] - 115:11
**Flynn** [2] - 206:1, 208:12
**focus** [6] - 123:23, 125:13, 154:2, 154:3, 154:13, 195:20
**focused** [4] - 57:14, 154:16, 163:5, 192:18
**focuses** [2] - 132:5, 149:23
**focusing** [1] - 105:16
**FOIA** [1] - 265:23
**folding** [1] - 107:19
**folks** [3] - 85:22, 111:25, 222:7
**follow** [8] - 11:23, 12:1, 13:21, 17:17, 22:16, 26:19, 182:20, 248:11
**followed** [1] - 166:8
**following** [80] - 35:5, 35:10, 39:17, 41:11, 49:11, 53:19, 54:2, 56:1, 66:5, 73:15, 81:11, 92:10, 93:19, 97:4, 99:6, 106:15, 107:4, 108:20, 109:8, 111:12, 112:6, 114:12, 117:24, 139:13, 143:9, 143:19, 148:5,

150:22, 151:3, 151:6, 151:16, 153:11, 164:5, 167:4, 167:5, 167:22, 168:1, 168:2, 168:16, 176:10, 177:1, 177:21, 185:14, 187:20, 188:21, 189:23, 193:16, 197:9, 198:7, 200:3, 202:1, 203:15, 204:11, 209:16, 210:3, 211:9, 211:23, 213:9, 214:9, 214:15, 218:20, 230:16, 233:18, 234:10, 242:25, 244:11, 244:21, 250:19, 250:22, 253:13, 253:23, 254:10, 254:18, 258:18, 259:8, 261:6, 261:20, 262:15, 264:25, 268:23

**follows** [2] - 8:25, 180:22

**followup** [1] - 185:2, 224:16

**food** [3] - 175:7, 175:8, 206:15

**footage** [5] - 60:3, 195:1, 196:12, 256:10, 256:11

**football** [1] - 55:8

**Footnote** [5] - 10:17, 12:10, 18:7, 20:4, 23:13

**footnote** [2] - 15:2, 15:3

**footnotes** [1] - 10:16

**FOR** [6] - 1:1, 1:14, 1:16, 1:18, 3:4, 3:6

**forbids** [3] - 23:25, 25:12, 132:14

**forcefully** [1] - 173:23

**forces** [1] - 17:8

**forcing** [1] - 16:11

**foregoing** [1] - 279:4

**foreground** [1] - 104:23

**forget** [5] - 9:5, 10:5, 26:10, 220:2, 244:3

**forgetting** [2] - 110:10, 137:25

**forgive** [1] - 80:20

**forgot** [4] - 245:5, 245:9, 257:23, 275:10

**form** [1] - 75:17, 133:24, 154:10

**formed** [6] - 37:19,

141:17, 142:11, 149:5, 172:18, 173:18

**former** [4] - 10:20, 11:5, 15:8, 147:2

**forming** [1] - 124:6

**forth** [2] - 140:10, 218:17

**forward** [12] - 43:2, 84:14, 85:9, 92:6, 101:25, 105:6, 108:7, 108:9, 108:12, 108:15, 108:17, 114:1

**foster** [1] - 140:23

**foundation** [10] - 23:19, 50:21, 61:14, 62:20, 115:18, 156:20, 157:19, 163:19, 184:15, 230:6

**foundational** [1] - 166:15

**four** [11] - 10:15, 95:20, 104:17, 141:8, 144:18, 144:20, 159:22, 219:19, 274:6, 274:7

**Fourth** [2] - 13:7, 14:25

**fourth** [1] - 15:2, 15:3

**frame** [1] - 43:2

**frames** [1] - 68:6

**frankly** [2] - 57:23, 166:10

**fraud** [1] - 164:20

**fraudulent** [1] - 210:21

**free** [2] - 28:13, 237:13

**Friedman** [8] - 6:17, 6:18, 28:11, 29:2, 30:9, 30:12, 136:24, 137:24

**Friedman's** [1] - 28:8

**friend** [2] - 141:6, 172:16

**friendly** [1] - 172:25

**friends** [4] - 172:13, 196:5, 196:23, 203:10

**friendship** [1] - 172:23

**frightening** [1] - 102:8

**Front** [1] - 152:19

**front** [48] - 14:21, 14:22, 24:22, 37:9, 37:18, 39:10, 39:13, 47:9, 48:25, 52:4, 52:7, 53:13, 53:15, 54:23, 54:25, 55:10, 56:8, 56:19, 59:10,

65:9, 65:14, 70:5, 71:7, 71:20, 73:3, 78:18, 79:3, 97:14, 99:16, 99:18, 99:22, 100:13, 121:11, 123:24, 128:6, 154:20, 161:2, 191:12, 191:22, 193:3, 205:16, 213:2, 219:11, 220:3, 220:4, 228:5, 273:20

**front's** [1] - 55:7

**frustration** [1] - 19:19

**full** [7] - 44:11, 45:13, 194:2, 194:19, 251:5, 273:25, 279:5

**full-time** [1] - 194:19

**fully** [6] - 85:19, 139:3, 165:1, 251:24, 276:19

**function** [1] - 29:23

**functions** [3] - 129:17, 130:19, 130:22

**fundamental** [2] - 60:6, 74:6

**funny** [1] - 269:8

**furthers** [1] - 21:12

**future** [2] - 26:4, 166:18

## G

**G-I-E-T-Z-E-N** [1] - 14:6

**G-R-E-E-N** [1] - 145:25

**G-R-I-F-F-I-T-H** [2] - 21:9, 131:9

**G-U-N-B-Y** [1] - 6:3

**GAL** [2] - 140:18, 140:21

**gallery** [1] - 187:24

**games** [1] - 117:11

**gander** [1] - 63:12

**gap** [1] - 170:20

**gaps** [2] - 156:6, 156:13

**garage** [2] - 171:24, 224:20

**garbage** [2] - 207:1, 224:22

**gas** [1] - 175:12

**gate** [1] - 270:24

**gates** [1] - 196:18

**gathered** [2] - 196:17, 257:14

**gear** [2] - 176:6,

177:14

**gears** [1] - 10:14

**General** [1] - 206:1

**general** [13] - 8:5, 23:15, 33:20, 40:18, 160:13, 197:3, 201:12, 207:2, 207:3, 218:24, 224:1, 226:15, 261:15

**generalities** [1] - 239:25

**generalized** [1] - 223:19

**generally** [4] - 13:21, 141:12, 142:13, 190:23

**generous** [4] - 24:23, 206:19, 223:23, 259:2

**generousness** [1] - 115:24

**gentle** [2] - 141:22, 142:7

**gesture** [1] - 40:6

**gestured** [1] - 40:22

**gestures** [1] - 40:10

**gesturing** [1] - 40:14

**giant** [5] - 55:8, 104:25, 105:15, 105:16, 105:19

**Gietzen** [1] - 14:5

**given** [14] - 15:24, 33:2, 59:9, 73:25, 74:1, 77:16, 91:9, 128:6, 130:12, 157:17, 221:1, 224:4, 243:3, 271:25

**global** [2] - 5:6, 6:23

**God** [4] - 184:7, 186:5, 186:7, 255:4

**Gold** [1] - 210:13

**gonna** [2] - 64:15, 184:4

**good-faith** [1] - 10:23

**Goodman** [1] - 210:12

**goose** [1] - 63:12

**GOP** [1] - 140:19

**Gosar** [2] - 210:11, 210:15

**gotcha** [3] - 31:17, 58:1, 252:1

**GOVERNMENT** [3] - 1:14, 3:4, 35:20

**Government** [94] - 4:5, 5:6, 5:25, 8:8, 8:16, 8:24, 16:21, 18:2, 18:19, 20:21, 23:5, 30:21, 35:18, 39:15, 41:13, 50:6,

52:14, 58:11, 58:25, 61:2, 62:14, 75:8, 75:9, 113:21, 116:20, 118:12, 118:20, 118:22, 118:24, 119:5, 119:10, 119:12, 119:24, 120:2, 120:4, 120:11, 120:18, 121:4, 121:16, 121:23, 122:4, 122:7, 122:12, 122:16, 123:1, 123:15, 127:9, 128:1, 128:20, 129:4, 129:7, 130:15, 131:19, 131:22, 132:18, 133:5, 134:6, 134:19, 137:11, 137:20, 139:2, 149:7, 153:24, 159:13, 162:18, 164:14, 164:16, 165:1, 165:6, 168:8, 178:6, 179:14, 180:15, 189:16, 192:19, 200:17, 204:3, 213:25, 214:1, 219:2, 220:24, 221:5, 223:23, 224:19, 225:22, 226:8, 228:13, 233:23, 242:17, 243:11, 254:12, 271:2, 275:18

**government** [8] - 19:3, 76:3, 76:4, 129:16, 130:18, 130:21, 154:24, 241:4

**government's** [1] - 3:15

**Government's** [37] - 18:17, 24:14, 38:20, 41:16, 41:20, 41:24, 42:15, 42:21, 43:3, 43:15, 46:2, 46:5, 46:14, 46:21, 86:11, 95:14, 124:9, 124:15, 124:20, 129:22, 168:20, 180:1, 198:2, 217:4, 222:15, 229:5, 239:2, 258:2, 259:2, 259:22, 261:25, 262:10, 265:2, 265:5, 266:20, 268:12, 272:20

**graduated** [1] - 252:9

**grandmothers** [1] - 146:8

**grant** [1] - 127:3

**granted** [3] - 9:8, 9:16, 126:23

**grass** [3] - 212:12, 238:21, 238:22
**grave** [1] - 246:17
**grayish** [1] - 67:23
**Great** [1] - 91:14
**great** [29] - 7:1, 28:12, 29:11, 33:15, 52:24, 57:13, 66:1, 98:24, 114:22, 115:5, 117:19, 135:21, 136:25, 137:11, 139:6, 146:8, 174:10, 185:5, 188:15, 189:10, 194:8, 195:21, 207:10, 208:13, 234:9, 239:10, 239:24, 250:12, 269:17
**great-grandmothers** [1] - 146:8
**green** [9] - 46:8, 46:24, 47:2, 47:12, 71:23, 146:1, 151:19, 164:13, 168:19
**Green** [6] - 3:8, 145:15, 145:25, 146:14, 153:10, 167:25
**GREEN** [1] - 145:18
**greet** [1] - 171:10
**grenades** [1] - 256:22
**grew** [2] - 252:18, 253:1
**grievance** [1] - 195:23
**grievances** [1] - 20:9
**Griffith** [2] - 21:8, 131:8
**ground** [3] - 25:10, 57:5, 243:14
**grounds** [18] - 8:17, 12:12, 14:16, 21:14, 25:14, 47:7, 58:16, 123:17, 125:12, 127:14, 130:7, 132:11, 155:6, 190:7, 227:13, 227:17, 241:20, 249:5
**group** [10] - 28:10, 59:2, 72:22, 78:11, 105:9, 147:17, 174:7, 195:23, 196:22, 198:13
**groups** [2] - 131:24, 208:1
**Guandolo** [4] - 246:3, 247:10, 269:22, 273:23

**Guard** [1] - 36:17
**guardian** [1] - 140:22
**guess** [29] - 24:22, 34:5, 53:6, 86:5, 104:25, 112:9, 121:9, 149:22, 154:20, 156:25, 161:25, 171:11, 183:6, 190:24, 191:10, 191:21, 193:8, 201:16, 207:14, 212:11, 215:25, 220:12, 222:18, 226:23, 257:7, 259:14, 263:24, 274:5, 275:21
**guessing** [2] - 55:3, 93:21
**guest** [1] - 15:21
**guests** [5] - 94:16, 171:7, 171:10, 175:5, 195:14
**guidance** [1] - 116:8
**guide** [16] - 199:21, 200:9, 200:12, 200:19, 202:19, 202:21, 202:23, 203:5, 203:8, 205:9, 205:17, 207:21, 210:23, 240:24, 241:2, 249:2
**guilt** [2] - 126:24, 127:5
**guilty** [5] - 10:24, 23:2, 31:11, 123:3, 123:9
**Gunby** [12] - 6:2, 6:15, 6:16, 8:1, 9:5, 9:25, 30:10, 32:5, 32:6, 32:15, 271:20, 271:24
**guy** [7] - 18:21, 62:11, 68:2, 87:13, 87:19, 136:3, 162:20
**guys** [3] - 64:15, 95:20, 164:1

**H**

**hair** [1] - 67:23
**half** [6] - 95:21, 97:18, 144:22, 256:13, 264:3, 274:11
**half-hour** [1] - 264:3
**halfway** [3] - 238:23, 238:24, 241:21
**Hall** [1] - 31:4
**halls** [1] - 29:3
**hallway** [5] - 73:12,

153:4, 160:24, 160:25, 162:12
**halt** [2] - 103:17, 108:17
**hand** [14] - 40:6, 40:10, 57:4, 101:24, 103:1, 104:9, 108:12, 108:13, 108:17, 145:17, 193:21, 208:23, 208:25, 250:24
**handle** [3] - 51:10, 116:23, 269:2
**handled** [1] - 35:13
**handling** [1] - 117:13
**hands** [4] - 104:8, 110:12, 112:14, 201:4
**handy** [2] - 30:19, 31:8
**happy** [20] - 13:6, 13:9, 16:19, 20:24, 26:8, 72:16, 76:7, 76:20, 83:25, 89:16, 89:21, 113:11, 116:18, 122:22, 123:11, 176:17, 207:8, 207:9, 219:22, 220:14
**hard** [19] - 9:17, 25:2, 25:6, 26:7, 45:14, 55:19, 58:17, 78:1, 88:16, 112:14, 117:3, 117:4, 117:7, 151:22, 170:17, 171:21, 189:14, 240:2
**harder** [2] - 30:15, 117:15
**hardest** [1] - 138:16
**hardest-working** [1] - 138:16
**harm** [4] - 58:12, 106:5, 181:8, 182:11
**Hawa** [5] - 5:16, 51:2, 123:19, 124:2, 125:19, 131:24
**Hawa's** [1] - 7:13
**head** [5] - 10:4, 153:21, 205:6, 257:2, 278:6
**headed** [2] - 126:2, 126:3
**heading** [1] - 183:19
**heads** [2] - 55:4, 95:21
**Heal** [1] - 195:2
**hear** [90] - 7:15, 8:11, 13:6, 13:9, 16:19, 19:20, 19:21, 24:20, 26:8, 33:19, 38:2, 44:8, 44:14, 48:17,

50:10, 50:20, 51:23, 52:6, 52:12, 52:16, 52:18, 53:12, 57:13, 57:21, 58:11, 58:12, 58:14, 58:25, 59:12, 64:8, 65:4, 65:8, 70:24, 72:3, 72:16, 73:16, 76:19, 78:4, 80:9, 82:24, 83:2, 84:19, 86:19, 88:6, 92:19, 94:10, 97:16, 97:23, 98:4, 98:19, 98:21, 104:2, 113:11, 113:12, 116:18, 122:22, 136:7, 137:13, 154:18, 155:7, 158:6, 168:8, 176:17, 184:11, 190:9, 190:10, 194:8, 203:24, 216:4, 216:14, 218:14, 219:22, 220:14, 220:19, 223:4, 225:22, 226:21, 227:19, 227:20, 227:21, 227:22, 227:23, 229:14, 235:17, 240:22, 248:10, 254:13, 273:16, 276:22, 277:11
**heard** [41] - 14:20, 20:19, 38:4, 42:7, 51:12, 58:3, 58:7, 58:14, 61:14, 63:19, 64:23, 65:2, 75:15, 81:18, 82:24, 83:11, 83:13, 84:12, 85:21, 114:15, 115:3, 124:1, 125:19, 128:7, 128:11, 130:2, 131:23, 137:10, 141:21, 143:2, 143:23, 148:3, 154:9, 174:24, 178:23, 180:19, 191:1, 192:12, 256:21, 273:21, 273:25
**hearing** [10] - 56:24, 58:7, 65:5, 65:24, 84:17, 84:19, 98:4, 98:5, 98:21, 237:10
**hearings** [1] - 29:18
**hearsay** [31] - 39:21, 40:8, 41:6, 59:14, 61:6, 61:18, 63:18, 74:6, 74:10, 156:8, 159:18, 161:11, 161:13, 163:5, 163:7, 176:13, 178:11, 178:12, 178:18,

178:22, 179:1, 179:11, 180:18, 181:4, 183:21, 191:20, 193:10, 209:21, 215:16, 222:7
**heart** [1] - 182:10
**Heart** [1] - 36:25
**heavy** [1] - 128:10
**held** [32] - 39:18, 49:12, 97:5, 106:16, 108:17, 108:21, 111:13, 143:10, 148:6, 151:7, 167:6, 168:3, 176:11, 177:22, 187:21, 189:24, 197:10, 200:4, 203:16, 209:17, 211:10, 213:10, 218:21, 233:19, 243:1, 244:22, 253:14, 254:11, 258:19, 261:3, 261:7, 262:16
**hello** [2] - 169:24, 236:24
**Hello** [1] - 206:7
**helmet** [1] - 177:5
**help** [8] - 51:14, 68:7, 147:14, 153:16, 170:17, 170:19, 171:25, 206:11
**helped** [1] - 175:21
**helpful** [11] - 51:21, 51:24, 53:6, 53:9, 61:4, 123:12, 150:17, 190:9, 190:10, 190:11, 230:4
**helping** [2] - 175:17, 175:22
**helps** [5] - 40:16, 58:13, 72:14, 154:10, 197:15
**hereby** [1] - 279:3
**herself** [2] - 154:15, 163:18
**hesitant** [4] - 26:5, 181:1, 220:7, 247:23
**hesitate** [1] - 75:18
**hi** [1] - 144:17
**high** [3] - 28:6, 70:18, 170:10
**high-ranking** [1] - 70:18
**higher** [7] - 5:10, 11:9, 18:25, 19:12, 117:2, 120:14, 134:3
**highly** [6] - 60:3, 157:9, 201:14, 220:9, 220:10, 272:11
**Hill** [3] - 257:16,

257:18, 265:22
**Hills** [1] - 1:20
**himself** [10] - 30:9,
30:13, 161:18, 190:4,
200:21, 204:2,
216:11, 223:14,
224:10, 263:19
**history** [3] - 146:8,
196:25, 197:1
**hit** [3] - 38:6, 100:20,
147:15
**hoard** [1] - 171:20
**hoarding** [1] -
170:20
**hobbies** [1] - 194:23
**hold** [15] - 45:7,
54:15, 106:14, 130:4,
180:11, 182:18,
205:8, 209:15, 211:8,
214:12, 254:9,
255:10, 262:13
**Hold** [1] - 213:8
**holding** [5] - 85:17,
96:22, 97:1, 102:25,
141:3
**hole** [1] - 63:5
**home** [1] - 171:24
**Homeland** [1] -
257:8
**honestly** [2] - 50:8,
192:9
**Honey** [1] - 257:10
**Honor** [126] - 4:6,
4:10, 4:22, 5:4, 5:22,
6:18, 7:4, 7:8, 7:16,
8:7, 12:9, 15:3, 20:5,
23:12, 23:17, 24:11,
30:24, 31:21, 33:13,
33:24, 34:2, 34:16,
35:3, 35:8, 35:17,
40:7, 47:15, 49:9,
49:14, 51:8, 52:23,
59:18, 60:25, 70:23,
73:18, 75:12, 76:1,
76:14, 87:9, 88:3,
88:7, 89:24, 91:13,
91:17, 94:2, 97:3,
97:7, 98:11, 106:18,
108:19, 108:23,
111:14, 113:3,
113:17, 114:14,
115:6, 115:12, 116:5,
116:13, 116:19,
118:3, 122:23,
123:11, 123:12,
135:9, 135:12,
135:25, 137:18,
138:1, 138:24,
139:18, 143:16,
143:18, 144:12,

145:9, 148:1, 148:7,
149:24, 155:12,
155:13, 169:9,
169:15, 176:20,
178:5, 179:2, 179:18,
182:20, 184:20,
185:12, 187:13,
187:16, 187:25,
189:22, 189:25,
190:10, 192:5, 200:2,
200:6, 201:9, 203:18,
211:6, 213:12, 242:2,
243:3, 245:1, 246:23,
247:9, 247:25, 248:6,
248:22, 249:22,
253:19, 258:21,
262:12, 263:16,
264:1, 264:13, 270:3,
270:4, 272:7, 272:9,
274:7, 276:3, 277:2,
277:7, 278:10
**Honor's** [1] - 125:14
**HONORABLE** [1] -
1:10
**hoodie** [1] - 216:25
**hope** [1] - 276:24
**hopefully** [10] - 44:1,
72:14, 81:8, 93:9,
93:23, 98:17, 117:15,
188:25, 196:12,
268:17
**hopes** [1] - 190:1
**hoping** [3] - 136:12,
150:9, 197:16
**horrendous** [1] -
23:1
**host** [2] - 147:23,
147:24
**hotel** [1] - 175:25
**hour** [5] - 97:18,
189:12, 264:3, 274:11
**hours** [7] - 37:13,
37:21, 157:25, 158:3,
158:5, 165:15, 185:23
**house** [2] - 170:21,
195:8
**House** [4] - 16:25,
48:15, 48:17, 48:18
**Howard** [1] - 252:11
**huge** [3] - 73:4,
78:19, 225:19
**hundred** [3] - 216:1,
219:10, 219:11
**hundreds** [5] -
157:24, 158:3, 158:5,
165:15, 202:14
**hurt** [1] - 182:1
**husband** [1] - 141:3
**hypothetical** [1] -
165:11

**hypotheticals** [1] -
143:15

---

**I**

**i.e** [1] - 129:21
**iconic** [1] - 196:14
**idea** [10] - 6:9, 16:1,
16:13, 19:11, 32:25,
57:17, 119:8, 157:25,
158:11, 221:14
**ideas** [1] - 154:16
**identify** [5] - 10:16,
42:18, 55:1, 59:8,
268:5
**identity** [2] - 90:2,
90:15
**ignorance** [3] -
19:18, 19:25, 80:21
**illogical** [1] - 13:18
**image** [4] - 39:8,
196:14, 212:16,
266:16
**images** [1] - 224:20
**imagine** [5] - 12:21,
84:1, 117:3, 246:17,
274:10
**immediately** [3] -
8:25, 130:14, 219:8
**impact** [1] - 16:9
**impeach** [5] - 52:11,
78:1, 84:14, 85:19,
98:16
**impeached** [1] -
53:11
**impeaches** [5] -
52:6, 57:23, 64:6,
164:14, 165:5
**impeaching** [4] -
52:2, 52:5, 78:3,
98:22
**impeachment** [16] -
52:15, 52:19, 58:6,
58:16, 63:17, 64:5,
74:13, 74:21, 81:14,
81:15, 85:10, 85:17,
85:23, 89:2, 92:7,
97:13
**impede** [3] - 75:16,
129:15, 130:17
**impedes** [2] - 21:20,
130:21
**impeding** [1] - 29:18
**implication** [3] -
97:7, 166:5, 198:1
**implying** [1] - 97:22
**important** [5] -
40:12, 40:13, 75:6,
77:23, 113:22

**importantly** [5] -
131:18, 154:21,
166:15, 208:23, 213:4
**imposed** [1] - 19:13
**impression** [8] -
6:11, 41:9, 74:8,
179:17, 183:22,
184:12, 184:25,
201:18
**improper** [4] -
154:12, 180:15, 183:4
**IN** [1] - 3:14
**inadvertently** [1] -
31:23
**inauguration** [1] -
215:6
**incarcerated** [1] -
88:19
**incident** [2] - 109:12,
109:22
**incidents** [1] - 137:8
**include** [5] - 17:17,
20:3, 22:19, 29:19,
36:24
**included** [1] - 10:1
**includes** [1] - 15:21
**including** [2] -
134:25, 270:14
**incorporate** [6] -
12:6, 13:22, 14:2,
17:18, 126:9, 134:23
**incorrect** [2] -
246:19, 247:6
**increasingly** [1] -
223:15
**incredibly** [1] - 138:5
**indicate** [9] - 105:2,
105:5, 114:17,
127:22, 128:11,
132:8, 133:21, 263:6,
266:24
**indicated** [9] - 78:6,
100:20, 102:7,
102:12, 103:17,
119:1, 121:15,
131:11, 181:7
**indicates** [8] - 18:3,
43:10, 69:25, 78:22,
119:10, 121:23,
211:1, 267:4
**indicating** [2] -
119:6, 121:8
**indication** [4] -
17:23, 57:9, 78:7,
215:15
**indicator** [1] - 13:15
**indicia** [1] - 119:23
**indirect** [1] - 158:4
**individual** [4] -
150:4, 150:5, 156:4,

161:1
**infer** [1] - 182:13
**inference** [1] - 97:24
**infiltrated** [1] -
105:10
**influencers** [1] -
210:14
**informant** [3] -
136:9, 246:21, 246:25
**information** [5] -
76:8, 76:13, 76:16,
86:21, 87:8
**informed** [1] - 214:6
**initial** [3] - 33:3,
59:3, 113:24
**injured** [3] - 101:1,
110:1, 252:16
**injuries** [1] - 109:21
**injury** [2] - 101:13,
109:13
**innocence** [1] -
32:13
**innocent** [4] - 129:1,
129:2, 165:3, 165:4
**inquire** [2] - 82:13,
277:17
**inquiry** [17] - 17:7,
28:10, 28:13, 28:17,
28:25, 73:20, 90:3,
90:7, 121:3, 121:4,
133:9, 134:13,
160:23, 204:5,
222:21, 250:8, 250:9
**insofar** [3] - 21:13,
21:19, 21:25
**inspect** [1] - 15:23
**Inspector** [7] - 5:16,
7:13, 51:2, 123:19,
124:2, 125:19, 131:24
**instance** [3] -
100:15, 132:18,
180:24
**instances** [4] -
115:17, 115:20,
137:8, 183:1
**instead** [2] - 50:15,
206:22
**instruct** [5] - 86:15,
92:14, 198:3, 229:11,
229:19
**instructed** [1] -
30:10
**instruction** [61] -
4:16, 5:5, 5:7, 5:24,
6:1, 6:4, 6:5, 6:21,
6:23, 7:8, 8:1, 8:3,
8:8, 8:25, 9:7, 10:1,
11:4, 12:8, 12:9, 14:8,
14:12, 14:25, 16:10,

18:4, 18:15, 19:15, 19:24, 20:2, 20:22, 22:8, 23:3, 23:10, 23:13, 24:1, 24:21, 25:9, 25:19, 26:21, 27:23, 28:1, 30:2, 31:10, 32:4, 32:8, 32:12, 32:13, 32:16, 33:6, 33:8, 111:6, 134:10, 135:12, 135:16, 135:18, 166:8, 274:3, 275:10, 275:23, 277:19

**Instruction** [1] - 31:6
**instructions** [21] - 5:9, 9:3, 10:15, 12:2, 13:24, 14:11, 18:13, 20:12, 22:18, 30:15, 31:19, 31:24, 32:6, 32:24, 33:4, 97:12, 113:25, 132:9, 275:20, 276:1, 276:5

**instrumentalities** [1] - 182:7
**intend** [6] - 84:5, 84:9, 106:25, 112:2, 116:19, 138:25
**intended** [2] - 42:5, 245:13
**intending** [3] - 139:3, 181:14, 263:10
**intent** [18] - 23:24, 25:11, 108:16, 110:20, 117:10, 125:24, 129:15, 130:17, 132:14, 174:24, 181:18, 185:3, 213:23, 221:14, 221:17, 221:20, 222:1, 226:16
**intention** [1] - 16:17
**intentionally** [1] - 5:9
**intentions** [2] - 108:25, 111:15
**interact** [3] - 155:15, 155:22, 159:2
**interacted** [2] - 250:9, 272:15
**interacting** [1] - 91:20
**interaction** [1] - 91:23
**interactions** [3] - 141:9, 158:3, 172:8
**interested** [5] - 8:11, 85:9, 173:1, 206:13, 209:21
**interesting** [7] - 9:20, 17:12, 24:21, 31:4, 63:18, 196:20,

223:5
**interior** [1] - 118:12
**intermediate** [1] - 16:3
**internal** [1] - 59:1
**internet** [2] - 240:19, 253:6
**interpret** [2] - 180:6, 211:13
**interpreted** [5] - 6:10, 77:11, 77:16, 215:3, 215:4
**interpreting** [3] - 209:24, 211:17, 211:19
**interrupt** [2] - 6:12, 246:24
**interview** [8] - 109:23, 118:25, 121:10, 159:8, 160:15, 160:17, 161:18, 161:19
**interviewed** [3] - 109:17, 149:8, 160:4
**interviewing** [2] - 255:16, 256:5
**interviews** [2] - 91:23, 126:1
**intrepid** [1] - 21:7
**introduce** [6] - 4:4, 56:13, 61:25, 74:3, 74:12, 221:13
**introduced** [6] - 56:12, 59:21, 153:25, 159:13, 220:25, 221:6
**invaded** [2] - 125:22, 126:16
**invented** [1] - 243:10
**investigative** [1] - 254:8
**invitation** [2] - 206:11, 215:17
**invited** [1] - 223:3
**involved** [3] - 28:9, 30:17, 146:19
**involvement** [1] - 186:12
**Iraq** [2] - 36:18, 36:20
**ironically** [1] - 118:22
**irrelevant** [4] - 197:14, 220:22, 227:7, 272:25
**Island** [1] - 1:23
**issue** [28] - 5:14, 11:17, 16:19, 56:24, 61:6, 74:7, 75:6, 84:3, 85:15, 87:25, 115:21, 137:19, 149:19,

153:14, 157:2, 157:3, 159:18, 166:13, 166:14, 166:15, 177:23, 178:12, 181:4, 190:1, 192:3, 192:10, 197:16, 219:23
**issued** [3] - 241:2, 241:4, 241:5
**issues** [14] - 14:13, 35:13, 49:16, 53:21, 64:9, 73:21, 112:3, 114:8, 153:5, 178:20, 215:14, 220:19, 268:18, 276:8
**it'll** [6] - 48:7, 92:16, 236:17, 240:5, 240:7, 276:18
**itself** [5] - 8:9, 13:12, 15:11, 44:2, 243:24

## J

**J-E-N-K-I-N-S** [1] - 36:6
**J6** [2] - 192:16, 238:2
**jacket** [1] - 42:10
**jailed** [1] - 18:22
**January** [110] - 37:1, 37:3, 37:4, 39:12, 42:8, 47:10, 48:1, 48:9, 48:21, 55:6, 70:2, 73:8, 74:1, 78:23, 84:19, 93:2, 95:18, 109:12, 119:19, 120:25, 144:21, 145:3, 145:6, 148:11, 148:13, 148:18, 149:6, 149:12, 149:14, 149:15, 150:7, 150:13, 152:12, 152:14, 152:16, 154:7, 155:16, 155:18, 155:20, 157:1, 157:18, 159:4, 159:9, 160:16, 165:9, 174:12, 174:16, 174:20, 175:4, 177:18, 183:16, 185:17, 185:19, 186:11, 190:3, 190:15, 190:16, 191:4, 191:7, 191:8, 195:9, 195:10, 195:13, 195:18, 195:19, 195:20, 196:1, 200:1, 201:18, 202:11, 202:15, 202:16, 202:21,

203:5, 205:22, 206:4, 207:3, 207:19, 207:22, 208:17, 210:21, 210:24, 211:18, 215:6, 219:1, 223:14, 224:1, 235:23, 237:5, 238:9, 241:7, 241:9, 241:17, 242:22, 243:11, 249:1, 249:7, 249:12, 249:15, 250:6, 254:16, 254:24, 255:2, 255:20, 261:1, 261:16, 266:15, 268:8, 273:19
**jaws** [1] - 30:6
**JENKINS** [1] - 35:20
**Jenkins** [8] - 3:5, 35:18, 36:3, 36:5, 47:20, 92:9, 94:4, 124:5
**JENNIFER** [2] - 169:18, 170:4
**Jennifer** [5] - 3:9, 169:16, 170:4, 178:10, 181:22
**Jensen** [1] - 21:7
**jeopardize** [1] - 172:23
**Jim** [1] - 250:5
**job** [7] - 43:10, 93:9, 163:14, 183:12, 194:19, 257:11
**Joe** [1] - 208:12
**John** [6] - 3:5, 4:9, 4:10, 35:18, 36:3, 92:9
**JOHN** [3] - 1:18, 1:19, 35:20
**joined** [2] - 125:23, 126:16
**joins** [1] - 189:4
**joint** [2] - 123:21, 125:20
**Jones** [2] - 206:1, 210:12
**journalism** [6] - 252:4, 252:9, 252:14, 253:17, 254:5, 254:8
**journalist** [8] - 190:17, 251:12, 251:13, 251:14, 252:8, 254:14, 254:15, 256:8
**journalistic** [1] - 257:7
**journeyed** [1] - 152:8
**Jr** [3] - 3:5, 36:3, 92:9
**JR** [1] - 35:20

**Judge** [23] - 12:1, 13:22, 17:18, 21:10, 22:16, 28:7, 28:11, 29:2, 30:8, 30:12, 74:3, 131:10, 131:18, 133:18, 134:25, 136:24, 137:3, 137:24, 188:10, 189:6, 192:8, 192:11
**judge** [1] - 6:14
**JUDGE** [1] - 1:11
**judgements** [1] - 123:6
**judges** [3] - 13:8, 26:18, 134:24
**judges'** [1] - 12:6
**judgment** [3] - 127:3, 127:7, 135:2
**juggle** [2] - 30:16, 88:16
**July** [1] - 47:6
**jump** [1] - 46:3
**jumped** [1] - 120:6
**jumping** [1] - 120:8
**jurisdiction** [1] - 11:24
**juror** [5] - 127:4, 132:2, 133:1, 133:4, 134:12
**JUROR** [1] - 45:8
**jurors** [11] - 32:25, 52:20, 97:25, 130:11, 188:15, 189:9, 193:4, 232:12, 236:9, 266:7, 268:15
**JURY** [7] - 1:10, 199:14, 204:18, 205:6, 205:10, 232:14, 236:21
**jury** [101] - 4:3, 4:16, 5:5, 5:10, 6:1, 9:3, 9:7, 18:13, 22:18, 23:18, 23:23, 24:1, 24:7, 24:17, 24:24, 25:7, 32:6, 32:24, 33:2, 35:7, 35:9, 40:13, 41:19, 51:14, 51:17, 52:24, 53:11, 53:17, 53:23, 54:1, 58:4, 65:9, 65:10, 65:14, 65:18, 65:23, 66:7, 73:19, 74:25, 82:20, 82:22, 85:16, 86:15, 92:8, 92:16, 93:7, 93:17, 93:18, 114:10, 114:11, 118:18, 119:6, 119:14, 120:11, 122:7, 122:18, 123:2, 123:6, 123:8, 128:13,

128:24, 131:7, 132:9, 134:10, 135:4, 136:16, 139:7, 139:12, 139:15, 143:21, 150:19, 150:20, 151:2, 157:15, 162:19, 166:24, 167:1, 167:3, 204:17, 205:7, 214:5, 214:14, 217:5, 224:22, 226:23, 229:17, 229:24, 230:10, 230:15, 232:18, 232:21, 232:24, 239:12, 268:22, 274:2, 275:10, 275:20, 276:1, 276:5, 277:19
**jury's** [2] - 33:3, 272:24
**justice** [1] - 195:21
**juxtapose** [1] - 224:18

## K

**Kansas** [1] - 172:5
**Karen** [1] - 75:14
**Kate** [1] - 63:5
**keep** [24] - 4:20, 38:9, 56:2, 88:16, 95:22, 99:10, 100:2, 110:9, 114:4, 117:15, 124:6, 150:21, 171:9, 171:17, 183:12, 188:16, 197:21, 205:3, 214:7, 218:16, 253:20, 268:11, 276:14, 278:3
**keeping** [2] - 34:14, 176:22
**kept** [1] - 49:16
**Kevlar** [1] - 177:5
**key** [4] - 10:18, 10:22, 15:6, 42:19
**kids** [1] - 146:7
**kind** [29] - 20:19, 26:9, 30:1, 43:7, 71:14, 77:20, 77:23, 96:18, 137:10, 138:12, 138:21, 141:22, 143:2, 170:17, 171:3, 173:24, 175:12, 177:14, 192:10, 192:11, 195:11, 207:5, 234:22, 237:24, 253:8, 257:24, 271:21, 274:20

**kindergartener** [1] - 158:7
**kindest** [1] - 142:6
**kinds** [7] - 17:8, 70:16, 178:7, 182:2, 194:18, 208:14, 226:4
**knee** [3] - 256:24, 257:2
**knit** [1] - 42:10
**knives** [1] - 177:10
**knocked** [1] - 257:20
**knowing** [7] - 5:12, 7:21, 18:11, 25:17, 118:16, 122:15, 153:17
**knowingly** [15] - 11:10, 18:6, 19:10, 19:16, 27:15, 118:16, 119:7, 124:14, 125:1, 125:23, 127:20, 127:23, 129:15, 130:17, 132:12
**knowledge** [29] - 5:10, 9:25, 11:9, 18:9, 18:25, 24:6, 24:9, 24:13, 68:11, 111:15, 129:10, 142:4, 153:13, 157:4, 157:13, 165:9, 174:2, 190:16, 191:5, 192:23, 193:7, 193:14, 201:11, 202:9, 202:10, 227:22, 241:3, 241:10, 241:18
**known** [13] - 10:20, 11:5, 126:4, 126:12, 126:13, 128:3, 141:7, 144:21, 147:18, 148:8, 151:10, 151:19, 173:13
**knows** [8] - 18:21, 88:12, 130:23, 142:5, 201:22, 203:23, 263:18, 263:23
**Kollar** [5] - 21:10, 22:16, 131:10, 131:18, 133:18
**Kollar-Kotelly** [4] - 21:10, 22:16, 131:10, 133:18
**Kollar-Kotelly's** [1] - 131:18
**Kotelly** [4] - 21:10, 22:16, 131:10, 133:18
**Kotelly's** [1] - 131:18

## L

**L-A-V-R-E-N-Z** [1] - 170:5
**LA** [1] - 194:25
**lack** [3] - 157:19, 207:14, 220:10
**laid** [4] - 26:9, 61:13, 136:21, 230:6
**Lambert** [22] - 4:13, 56:3, 66:15, 67:8, 68:14, 68:18, 80:12, 80:19, 81:2, 81:21, 89:12, 89:18, 92:4, 95:2, 115:2, 137:22, 199:2, 199:11, 204:22, 205:11, 236:3, 236:18
**LAMBERT** [3] - 81:23, 82:5, 92:5
**Lance** [1] - 210:12
**landline** [1] - 53:1
**language** [11] - 11:20, 12:3, 14:9, 15:11, 17:17, 19:8, 19:9, 22:19, 26:10, 26:11, 273:12
**large** [2] - 83:17, 273:19
**largely** [3] - 13:25, 136:22, 200:19
**larger** [2] - 157:2, 157:3
**lashing** [1] - 120:8
**last** [19] - 39:20, 50:13, 143:22, 182:21, 184:20, 189:12, 198:10, 210:5, 216:22, 234:8, 234:13, 234:19, 253:25, 254:20, 255:2, 259:23, 268:2, 268:3, 270:2
**late** [1] - 223:21
**laudable** [1] - 157:5
**laugh** [1] - 255:4
**Lavigne** [5] - 139:10, 188:9, 218:15, 229:11, 275:3
**Lavigne-Rhodes** [5] - 139:10, 188:9, 218:15, 229:11, 275:3
**Lavrenz** [85] - 3:9, 4:2, 4:12, 14:19, 22:25, 40:1, 56:15, 56:22, 57:11, 60:20, 60:21, 60:22, 64:17, 77:14, 77:24, 83:8, 90:3, 91:22, 117:1,

128:14, 128:21, 135:6, 140:25, 141:2, 141:4, 141:5, 141:7, 141:13, 142:1, 142:6, 143:4, 144:4, 147:5, 147:18, 151:20, 154:3, 157:5, 158:10, 158:11, 158:17, 160:4, 165:13, 169:16, 170:4, 170:6, 170:12, 170:14, 176:16, 178:9, 178:10, 178:16, 178:17, 180:20, 180:21, 181:7, 181:14, 181:22, 183:17, 184:23, 191:17, 191:24, 200:15, 201:23, 202:6, 202:7, 213:19, 214:3, 221:19, 222:20, 226:18, 227:7, 227:21, 227:22, 241:6, 241:12, 241:15, 241:16, 245:2, 245:23, 248:8, 267:16, 277:10
**LAVRENZ** [2] - 1:6, 169:18
**Lavrenz's** [7] - 141:17, 142:12, 177:25, 180:2, 182:10, 204:5, 270:16
**law** [42] - 11:11, 14:14, 14:25, 21:7, 21:20, 23:25, 25:7, 25:12, 25:13, 25:18, 25:21, 26:1, 26:3, 26:16, 27:5, 27:23, 28:6, 30:17, 34:1, 115:23, 116:10, 120:16, 120:21, 121:21, 132:14, 132:15, 132:17, 137:6, 141:18, 142:2, 154:22, 154:23, 166:1, 172:19, 172:22, 173:8, 173:12, 173:14, 182:23, 183:2, 192:7
**LAW** [2] - 1:19, 1:22
**Law** [1] - 31:4
**law-abiding** [3] - 172:22, 173:12, 173:14
**law-abidingness** [8] - 115:23, 137:6, 141:18, 142:2, 172:19, 173:8,

182:23, 183:2
**lawful** [2] - 10:24, 21:15
**lawfulness** [1] - 143:14
**lawmaker** [1] - 147:2
**lawmakers** [1] - 154:8
**lawn** [3] - 210:20, 211:2
**laws** [1] - 173:12
**lawyer** [4] - 88:24, 88:25, 91:5, 274:24
**lawyers** [3] - 128:22, 277:15, 277:23
**lawyers'** [1] - 93:8
**lay** [3] - 115:18, 184:14, 257:2
**lays** [1] - 271:21
**lead** [4] - 5:9, 181:10, 259:6, 265:13
**leading** [5] - 87:5, 186:7, 258:22, 258:24, 259:4
**leads** [2] - 59:2, 181:19
**learn** [2] - 146:19, 174:18
**learned** [10] - 90:2, 90:15, 92:17, 92:25, 136:25, 149:12, 149:14, 158:8, 159:3, 174:15
**learning** [2] - 153:20, 158:8
**least** [18] - 40:2, 51:14, 54:17, 57:2, 68:1, 72:21, 77:4, 78:10, 87:20, 116:3, 119:22, 153:8, 158:4, 165:5, 168:5, 179:5, 215:3, 239:23
**leave** [14] - 23:9, 91:12, 119:12, 119:13, 129:21, 130:13, 150:19, 167:15, 206:25, 272:3, 272:9, 274:23, 275:25, 277:10
**leaving** [1] - 121:20
**lectern** [1] - 70:25
**led** [4] - 154:6, 154:7, 181:25, 195:24
**Lee** [1] - 206:1
**leeway** [7] - 109:5, 115:18, 204:7, 213:15, 222:25, 223:7, 224:4
**left** [14] - 4:22, 5:4, 16:6, 31:23, 43:23,

71:25, 125:7, 161:3, 168:12, 212:11, 231:10, 231:11, 238:21, 247:12
**leg** [3] - 38:7, 100:20, 101:13
**legacy** [4] - 252:18, 252:21, 253:9
**legal** [6] - 23:19, 35:13, 53:21, 153:5, 233:22, 268:18
**legislative** [2] - 21:5, 146:20
**legitimate** [1] - 6:11
**legs** [2] - 81:7, 214:13
**length** [1] - 102:21
**Lesperance** [1] - 14:3
**LESPERANCE** [1] - 14:4
**less** [8] - 11:18, 30:16, 33:12, 38:8, 40:23, 111:18, 238:23, 247:20
**letting** [10] - 48:23, 57:1, 57:9, 58:23, 64:20, 89:8, 171:21, 224:24, 273:8
**level** [6] - 28:6, 56:2, 70:20, 134:3, 259:13, 259:14
**liaison** [2] - 247:1, 247:10
**Libertarians** [1] - 146:14
**library** [1] - 147:16
**Lieutenant** [5] - 35:18, 47:20, 112:25, 124:2, 124:5
**lieutenant** [8] - 36:10, 42:2, 47:4, 47:24, 48:12, 54:20, 94:4, 124:3
**life** [8] - 141:15, 172:2, 172:9, 172:14, 173:1, 194:12, 255:4, 255:5
**light** [9] - 39:2, 46:13, 123:1, 127:8, 128:19, 129:3, 131:22, 133:5, 134:5
**limine** [1] - 11:2
**limit** [6] - 193:13, 219:20, 219:21, 224:11, 225:2, 260:12
**limited** [17] - 6:5, 6:7, 27:15, 49:16, 53:8, 84:11, 129:5, 184:17, 191:13, 191:18,

192:2, 193:5, 213:17, 229:6, 229:21, 271:11
**limiting** [2] - 33:6, 98:7
**Lindell** [1] - 208:11
**line** [47] - 22:13, 37:8, 37:23, 38:5, 40:21, 42:3, 43:24, 69:10, 69:20, 72:24, 74:15, 75:18, 78:13, 94:17, 97:13, 97:13, 98:2, 99:20, 100:14, 102:10, 103:11, 103:20, 103:21, 105:9, 111:6, 111:23, 112:11, 112:20, 124:5, 124:6, 126:1, 130:4, 132:24, 183:9, 183:15, 213:13, 213:18, 223:13, 226:1, 226:21, 228:16, 231:9, 243:20, 244:4, 260:23, 261:3
**lined** [4] - 37:19, 99:21, 99:22
**lines** [13] - 22:9, 106:5, 116:9, 124:17, 125:2, 125:3, 126:11, 162:5, 219:5, 242:18, 258:15
**link** [3] - 188:9, 188:11, 239:8
**LISA** [2] - 2:1, 279:3
**Lisa** [1] - 279:12
**list** [2] - 205:24, 210:8
**listen** [5] - 51:18, 52:11, 98:1, 196:7, 196:9
**listener** [8] - 77:17, 77:23, 83:5, 83:7, 83:12, 159:11, 162:7
**listeners** [4] - 64:12, 64:17, 83:13
**listening** [2] - 83:9, 214:20
**litany** [1] - 129:7
**litem** [1] - 140:22
**literal** [1] - 184:22
**literally** [7] - 52:3, 91:21, 119:18, 120:2, 120:10, 120:18, 147:14
**litigate** [1] - 273:17
**litigated** [1] - 13:5
**littering** [1] - 120:9
**live** [4] - 146:18, 152:19, 152:22, 236:15

**lived** [5] - 146:3, 172:2, 172:5, 175:24, 194:11
**lives** [1] - 171:9
**living** [1] - 147:15
**LLC** [47] - 237:14, 237:15, 237:20, 238:7
**local** [8] - 146:20, 147:16, 186:1, 248:20, 248:24, 252:18, 252:21
**located** [4] - 198:16, 198:17, 200:1, 212:7
**location** [5] - 69:9, 97:13, 99:15, 100:16, 258:8
**locations** [5] - 59:19, 73:3, 78:18, 196:24, 208:2
**log** [2] - 199:3, 204:22
**logic** [1] - 133:19
**logical** [3] - 29:15, 78:4, 133:24
**logistically** [1] - 272:22
**logistics** [2] - 269:2, 269:5
**Look** [1] - 182:12
**look** [35] - 9:3, 12:2, 13:21, 21:6, 26:12, 30:14, 30:18, 31:19, 47:1, 53:17, 57:7, 63:3, 73:7, 78:6, 78:8, 81:14, 89:1, 99:17, 107:11, 123:7, 124:9, 125:21, 127:13, 129:3, 129:6, 136:23, 156:25, 164:23, 207:17, 210:18, 214:6, 238:4, 245:11, 271:3, 271:23
**looked** [14] - 6:3, 15:15, 34:1, 38:14, 69:5, 96:4, 96:6, 96:20, 104:9, 107:21, 120:22, 136:2, 137:1
**looking** [17] - 14:15, 14:18, 17:16, 29:20, 39:8, 67:2, 73:2, 76:15, 78:17, 85:8, 88:16, 136:22, 137:7, 202:20, 247:18, 257:6, 265:7
**looks** [16] - 54:25, 58:18, 63:4, 63:7, 71:11, 71:20, 73:9, 73:10, 80:13, 81:21, 99:19, 100:1, 146:23, 246:5, 246:10, 263:9

**loss** [1] - 86:12
**loud** [4] - 52:8, 94:19, 110:8, 110:13
**loudspeaker** [6] - 57:25, 59:2, 59:3, 94:20, 231:18, 234:22
**loudspeakers** [2] - 56:23, 64:24
**love** [5] - 150:18, 174:4, 174:5, 174:6
**loving** [3] - 142:7, 143:1, 172:24
**low** [1] - 56:2
**lower** [3] - 208:23, 208:25, 224:20
**luck** [1] - 75:21
**lucrative** [1] - 242:11
**ludicrous** [1] - 243:15
**lunch** [12] - 32:10, 32:22, 33:9, 88:25, 113:16, 114:2, 115:9, 116:2, 116:21, 116:23, 117:16, 175:9
**lunch..** [1] - 113:15
**luncheon** [1] - 117:23
**lunchtime** [1] - 113:14
**lunge** [1] - 108:4
**lying** [2] - 64:14, 90:12

## M

**ma'am** [3] - 101:4, 140:1, 144:1
**MAGA** [5] - 199:20, 202:19, 205:8, 205:16, 240:24
**MAGISTRATE** [1] - 1:11
**main** [3] - 103:22, 105:17, 172:4
**maintain** [1] - 77:4
**maintenance** [2] - 170:19, 171:11
**majestic** [1] - 18:20
**major** [2] - 87:18, 87:23
**majority** [3] - 172:6, 203:7, 219:7
**Mall** [3] - 255:12, 255:15, 256:2
**man** [2] - 62:1, 191:4
**man's** [1] - 252:12
**manage** [1] - 189:20
**management** [2] - 37:8, 140:15

**manner** [2] - 84:15, 178:7
**map** [20] - 199:20, 200:19, 202:19, 202:21, 203:8, 203:19, 203:23, 205:8, 205:17, 207:23, 210:23, 211:19, 240:24, 241:2, 241:12, 241:17, 242:22, 243:20, 249:2, 264:21
**MARCELIN** [1] - 239:9
**Marcelin** [4] - 4:8, 239:1, 239:7, 240:15
**March** [1] - 1:6
**march** [1] - 209:2
**MarchtoSaveAmerica.com** [1] - 209:9
**marine** [1] - 257:25
**mark** [2] - 82:4, 95:3
**Mark** [1] - 210:13
**marked** [4] - 12:14, 12:19, 13:16, 264:21
**marker** [1] - 68:22
**markers** [1] - 12:22
**marking** [1] - 13:3
**mask** [3] - 42:12, 67:23, 68:1
**massive** [1] - 196:12
**master's** [1] - 140:16
**material** [1] - 195:9
**matter** [15] - 4:3, 14:14, 14:25, 23:15, 24:3, 61:13, 64:13, 142:17, 156:10, 179:16, 192:6, 215:11, 221:21, 222:8, 261:2
**mattered** [1] - 63:21
**matters** [2] - 16:4, 220:16
**mean** [83] - 14:12, 17:13, 17:21, 19:2, 19:11, 19:15, 24:25, 25:3, 25:7, 25:17, 25:18, 26:8, 29:12, 37:25, 40:10, 42:6, 50:12, 51:2, 55:3, 56:8, 56:10, 58:2, 63:2, 63:9, 64:8, 72:6, 75:20, 76:20, 79:11, 79:25, 108:15, 120:23, 142:16, 148:16, 148:18, 149:17, 153:18, 153:21, 154:21, 156:15, 157:8, 159:17, 161:5, 163:3,

163:9, 165:10, 165:18, 167:10, 178:9, 178:11, 178:13, 181:21, 181:23, 184:10, 191:4, 191:21, 193:6, 193:9, 194:15, 197:15, 204:2, 204:4, 204:20, 222:13, 223:2, 227:11, 227:20, 243:14, 243:24, 244:7, 246:12, 246:19, 246:24, 253:9, 264:20, 270:12, 270:13, 271:15, 271:21, 274:22

**mean..** [1] - 55:15

**meaning** [4] - 24:8, 24:12, 134:11, 211:13

**meaningfully** [1] - 155:15

**meanings** [2] - 27:16, 28:20

**means** [12] - 14:16, 15:16, 17:2, 24:5, 25:4, 25:15, 120:15, 156:6, 170:18, 209:13, 252:22, 263:7

**meant** [5] - 15:13, 24:12, 180:6, 209:22, 211:19

**measure** [2] - 21:19, 252:20

**media** [3] - 194:25, 252:18, 253:9

**meet** [8] - 27:12, 122:8, 132:3, 147:16, 150:11, 151:25, 152:16, 187:2

**meeting** [1] - 267:25

**meetings** [1] - 29:18

**megaphone** [7] - 49:3, 49:24, 62:12, 86:16, 96:5, 96:22, 97:1

**megaphones** [2] - 85:17, 85:25

**melded** [1] - 253:8

**member** [8] - 96:5, 96:21, 96:25, 110:5, 154:3, 210:15, 211:4, 213:3

**members** [12] - 50:1, 107:12, 114:9, 122:2, 124:7, 126:14, 139:15, 147:23, 161:2, 205:7, 212:23, 239:12

**memory** [3] - 156:16,

156:17, 271:10

**men** [1] - 138:16

**mens** [1] - 12:5

**mention** [3] - 109:19, 174:6, 175:21

**mentioned** [8] - 91:17, 109:23, 110:9, 140:20, 174:20, 205:21, 240:24, 269:24

**mentions** [1] - 16:25

**mere** [28] - 4:23, 5:4, 5:8, 5:15, 5:20, 5:23, 7:14, 8:2, 8:24, 9:10, 9:12, 9:14, 9:17, 9:18, 10:1, 20:8, 20:13, 20:22, 21:10, 22:3, 22:7, 28:1, 32:11, 120:19, 121:4, 275:24

**merely** [3] - 74:13, 120:4, 120:19

**mess** [1] - 272:16

**met** [17] - 118:17, 126:6, 144:18, 148:10, 148:22, 152:18, 152:19, 156:15, 157:17, 157:25, 187:2, 196:6, 202:9, 202:11, 202:18, 268:2, 268:3

**metal** [2] - 42:4, 105:9

**mic** [4] - 139:23, 145:20, 169:20, 251:2

**Michigan** [3] - 252:23, 253:7, 255:3

**microphone** [4] - 4:24, 35:22, 71:17, 236:5

**microphones** [1] - 85:25

**midafternoon** [1] - 33:18

**middle** [1] - 99:18

**midmorning** [2] - 185:22, 185:24

**might** [14] - 15:18, 65:2, 80:25, 93:21, 100:16, 138:6, 152:21, 170:1, 174:21, 178:25, 184:24, 190:9, 247:10, 277:16

**Mike** [4] - 96:16, 164:19, 208:11

**military** [2] - 36:22, 257:23

**million** [1] - 256:13

**mind** [35] - 24:8, 24:12, 106:20,

126:24, 128:19, 149:5, 149:13, 149:15, 149:22, 150:3, 150:6, 153:4, 153:18, 154:11, 163:2, 165:4, 165:10, 177:18, 178:1, 178:6, 178:11, 178:16, 178:17, 178:19, 179:4, 179:21, 180:2, 180:7, 180:9, 180:14, 180:19, 182:10, 184:16, 184:24

**minds** [1] - 228:19

**minimal** [1] - 184:17

**minimis** [1] - 272:23

**minimum** [1] - 134:16

**ministry** [2] - 194:24, 195:6

**Minneapolis** [1] - 172:5

**minute** [11] - 7:7, 34:19, 40:23, 79:21, 81:1, 82:4, 82:9, 82:11, 95:9, 100:10, 264:17

**minutes** [22] - 32:20, 35:2, 79:16, 79:23, 80:4, 81:4, 91:7, 117:22, 150:25, 153:4, 162:3, 162:10, 163:22, 164:1, 188:8, 188:18, 214:13, 248:14, 263:9, 270:20, 276:13, 276:21

**miracle** [1] - 188:24

**misdemeanors** [1] - 250:7

**misplaced** [2] - 186:14, 186:20

**missed** [2] - 31:1, 87:2

**missing** [1] - 186:18

**mistake** [3] - 19:18, 19:25, 134:4

**mistaken** [1] - 96:16

**mitigated** [1] - 58:6

**mix** [1] - 207:9

**mob** [7] - 21:11, 21:18, 125:22, 125:23, 126:16, 133:21, 143:5

**mob's** [1] - 21:12

**mobile** [1] - 38:8

**model** [1] - 18:13

**mold** [1] - 11:8

**mom** [6] - 170:22, 171:15, 176:4,

186:11, 186:17, 187:3

**moment** [32] - 15:19, 42:19, 45:5, 45:21, 45:23, 72:19, 73:2, 78:9, 78:16, 79:7, 85:22, 95:2, 96:9, 97:11, 106:20, 108:5, 110:20, 111:5, 121:19, 132:10, 136:20, 179:6, 180:23, 183:23, 184:7, 184:14, 187:10, 194:7, 231:15, 236:2, 240:7

**Monday** [2] - 246:9, 246:11

**money** [6] - 237:15, 237:19, 237:20, 238:7, 242:9

**Monk** [6] - 208:13, 248:20, 248:24, 269:25, 270:1, 273:22

**montage** [5] - 50:24, 59:17, 59:20, 60:11, 60:13

**Monument** [2] - 196:6, 238:13

**moored** [1] - 26:1

**morning** [25] - 4:6, 4:10, 4:14, 35:12, 35:19, 35:25, 36:1, 37:11, 114:18, 116:24, 117:18, 124:5, 128:8, 150:1, 196:4, 245:19, 246:10, 246:11, 255:20, 255:21, 269:1, 274:1, 274:25, 275:25, 277:11

**most** [17] - 20:24, 123:1, 123:12, 127:9, 128:7, 128:19, 129:3, 131:22, 133:5, 134:5, 135:5, 156:22, 174:6, 183:23, 194:12, 207:23, 209:23

**mostly** [1] - 123:24

**motel** [1] - 17:3

**mother** [15] - 170:15, 171:1, 171:4, 172:3, 172:9, 172:12, 172:16, 173:6, 174:9, 174:15, 179:8, 181:25, 183:16, 184:5, 185:18

**mother's** [2] - 172:18, 173:18

**motion** [12] - 11:2, 43:18, 84:6, 107:11, 107:25, 116:20,

122:25, 123:4, 126:18, 127:3, 127:7, 135:2

**motions** [3] - 57:4, 116:23, 118:2

**motorcade** [2] - 16:6, 16:9

**mouth** [1] - 170:25

**mouths** [1] - 8:21

**move** [16] - 4:25, 68:2, 69:21, 109:4, 118:6, 128:10, 183:8, 185:9, 185:17, 198:6, 198:10, 212:4, 240:6, 254:22, 268:19, 273:2

**moved** [5] - 120:7, 219:14, 235:4, 235:9, 268:16

**movement** [4] - 101:24, 154:5, 154:14, 207:13

**moves** [2] - 39:15, 41:13

**moving** [9] - 69:17, 113:19, 114:4, 120:8, 196:13, 253:20, 270:25, 276:25, 278:3

**mow** [2] - 170:21, 171:8

**MR** [560] - 4:6, 4:10, 4:21, 4:25, 5:3, 6:13, 6:16, 6:17, 6:18, 6:20, 7:3, 7:4, 7:8, 7:16, 8:7, 8:13, 10:3, 10:13, 11:18, 12:9, 13:11, 15:3, 16:21, 18:7, 18:16, 20:5, 20:25, 21:2, 23:12, 26:10, 26:23, 27:3, 28:3, 28:5, 30:4, 30:8, 30:24, 31:14, 31:21, 32:3, 32:15, 32:19, 32:25, 33:13, 33:17, 33:23, 34:6, 34:11, 34:12, 34:16, 34:18, 34:21, 34:23, 34:24, 35:3, 35:8, 35:17, 35:24, 38:20, 38:23, 39:4, 39:7, 39:15, 39:16, 39:20, 40:7, 40:13, 41:13, 41:18, 41:22, 42:1, 42:14, 42:17, 42:23, 43:1, 43:5, 43:14, 43:17, 44:13, 44:17, 44:23, 45:16, 45:18, 46:2, 46:7, 46:14, 46:17, 46:20, 46:23, 47:15, 47:19, 49:7, 49:9, 49:14, 49:24, 50:8,

50:17, 51:8, 52:2, 52:23, 53:2, 53:10, 54:19, 56:20, 57:23, 59:7, 60:10, 60:13, 60:16, 60:18, 60:25, 61:6, 61:22, 62:3, 62:8, 64:11, 65:8, 65:20, 65:25, 66:19, 67:18, 67:20, 68:9, 68:13, 68:15, 68:23, 69:2, 69:21, 69:24, 70:22, 71:4, 71:6, 71:16, 71:18, 72:18, 73:18, 75:3, 77:7, 79:6, 79:14, 79:21, 80:23, 84:16, 85:15, 86:5, 86:9, 87:7, 87:12, 87:15, 88:3, 88:7, 88:10, 88:13, 88:21, 89:4, 89:12, 89:23, 89:24, 90:2, 90:6, 90:21, 90:24, 91:12, 91:15, 91:17, 94:2, 94:3, 94:24, 95:5, 95:7, 95:11, 95:16, 95:17, 95:22, 96:2, 96:3, 97:3, 97:7, 98:9, 98:11, 98:13, 99:2, 99:8, 99:13, 99:14, 100:2, 100:5, 100:9, 101:5, 101:9, 101:10, 101:17, 101:20, 102:3, 102:6, 102:15, 102:19, 103:15, 104:7, 104:10, 104:13, 104:17, 104:21, 105:20, 105:21, 106:12, 106:18, 107:3, 107:6, 107:10, 107:15, 107:16, 107:24, 108:3, 108:19, 108:23, 109:3, 109:10, 110:24, 110:25, 111:1, 111:3, 111:4, 111:9, 111:11, 111:14, 112:4, 112:8, 112:25, 113:3, 113:8, 113:16, 114:14, 114:17, 114:20, 114:24, 115:2, 115:6, 115:8, 116:5, 116:13, 116:19, 118:3, 118:5, 122:23, 123:15, 125:9, 135:9, 135:11, 135:19, 135:25, 136:2, 136:8, 136:14, 137:17, 138:1, 138:4, 138:12, 138:24, 139:9, 139:18,

139:25, 143:7, 143:16, 143:18, 143:24, 143:25, 144:9, 144:12, 144:15, 145:8, 145:9, 145:14, 145:22, 148:1, 148:3, 148:7, 148:25, 149:4, 149:20, 149:24, 150:13, 150:15, 151:15, 151:18, 153:1, 153:23, 155:12, 156:3, 157:21, 159:7, 159:24, 160:7, 160:14, 161:10, 161:21, 162:16, 162:22, 163:24, 164:7, 164:12, 166:25, 167:13, 167:20, 168:4, 168:10, 168:15, 168:18, 169:3, 169:6, 169:9, 169:15, 169:22, 176:8, 176:19, 176:25, 177:3, 177:19, 178:4, 179:2, 181:2, 181:6, 181:15, 181:22, 182:17, 182:20, 183:8, 183:14, 184:4, 184:20, 185:4, 185:12, 185:16, 187:10, 187:13, 187:25, 188:2, 188:3, 188:6, 188:11, 188:14, 188:19, 189:3, 189:8, 189:21, 189:22, 189:25, 190:14, 191:3, 192:5, 193:15, 193:18, 194:1, 194:10, 197:7, 197:12, 197:22, 198:11, 198:25, 199:8, 199:16, 199:19, 200:2, 200:6, 200:12, 201:3, 201:7, 201:9, 201:22, 202:3, 202:25, 203:2, 203:13, 203:14, 203:18, 204:10, 204:22, 205:1, 205:13, 208:15, 208:16, 209:14, 210:1, 210:7, 211:6, 211:12, 211:21, 212:3, 212:14, 212:15, 213:7, 213:12, 213:25, 215:1, 215:21, 216:7, 216:11, 216:13,

217:3, 217:9, 217:12, 217:18, 217:21, 217:25, 218:10, 218:23, 219:20, 220:21, 221:5, 223:9, 223:12, 224:18, 225:2, 225:7, 225:11, 225:14, 225:18, 225:25, 226:6, 227:11, 228:10, 228:12, 228:25, 229:3, 230:2, 230:8, 230:18, 230:23, 230:24, 231:17, 232:5, 232:8, 232:17, 232:21, 233:1, 233:6, 233:10, 233:16, 234:6, 234:17, 235:11, 235:16, 236:15, 236:17, 237:3, 239:1, 239:5, 239:24, 240:6, 240:8, 240:12, 240:21, 242:2, 242:8, 242:23, 243:3, 243:10, 243:19, 244:3, 244:10, 244:13, 244:25, 245:5, 245:7, 245:9, 245:11, 245:18, 245:22, 246:5, 246:13, 246:23, 247:8, 247:9, 247:15, 247:25, 248:2, 248:6, 248:11, 248:15, 248:19, 248:22, 248:24, 249:21, 249:22, 249:25, 250:5, 250:15, 251:4, 252:3, 253:11, 253:19, 253:22, 254:3, 254:7, 254:17, 254:23, 258:2, 258:5, 258:16, 258:21, 259:12, 260:11, 260:21, 261:4, 261:17, 261:22, 262:2, 262:4, 262:9, 262:12, 262:18, 262:24, 263:6, 263:9, 263:11, 263:16, 263:25, 264:10, 264:13, 264:24, 265:2, 265:4, 265:8, 265:24, 266:1, 266:11, 266:19, 266:22, 267:7, 267:9, 267:20, 267:24, 268:11, 269:25, 270:3, 270:6, 270:12, 271:20, 272:6, 272:9, 272:18, 272:19,

273:5, 273:11, 273:14, 273:18, 274:6, 274:10, 274:18, 275:9, 275:13, 275:16, 276:3, 276:7, 276:13, 276:18, 277:2, 277:6, 277:7, 278:10
  **MS** [10] - 75:12, 75:14, 75:25, 76:14, 81:23, 82:5, 87:9, 87:11, 92:5, 239:9
  **multiple** [7] - 17:12, 108:10, 130:1, 137:2, 170:23, 170:24, 270:13
  **multitude** [1] - 131:20
  **music** [3] - 81:13, 126:20, 151:11
  **must** [11] - 10:20, 12:14, 15:7, 21:17, 24:5, 24:7, 25:24, 127:4, 127:8, 130:10, 210:19
  **mute** [5] - 68:6, 80:13, 80:14, 81:25, 205:3

# N

  **N-E-S-T-O-R** [1] - 135:1
  **nail** [2] - 183:13, 249:19
  **name** [18] - 36:2, 75:1, 96:15, 140:3, 145:23, 170:2, 170:4, 174:6, 174:8, 194:3, 194:4, 250:4, 250:5, 251:6, 252:12, 253:1, 268:1, 269:23
  **named** [4] - 136:3, 147:4, 202:6, 267:16
  **namely** [1] - 221:14
  **names** [2] - 208:9, 210:9
  **narrow** [1] - 16:23
  **nation** [1] - 146:23
  **National** [2] - 36:17, 256:2
  **national** [1] - 206:16
  **nature** [5] - 19:17, 20:19, 142:18, 160:13, 175:14
  **near** [16] - 48:25, 53:8, 55:6, 56:9, 57:20, 58:13, 58:14, 58:18, 64:7, 67:3,

69:13, 79:14, 84:24, 85:4, 91:1, 98:20
  **nebulous** [2] - 25:2, 25:8
  **necessarily** [5] - 21:24, 111:2, 127:4, 133:8, 221:13
  **necessary** [4] - 11:25, 18:15, 20:23, 23:10
  **need** [56] - 11:4, 12:7, 23:3, 34:19, 36:3, 40:11, 40:25, 51:9, 53:18, 58:9, 67:12, 68:5, 68:6, 77:14, 80:25, 82:19, 83:25, 86:18, 88:7, 88:22, 89:7, 91:7, 92:25, 93:11, 103:25, 104:4, 106:23, 129:23, 134:18, 134:19, 135:14, 150:25, 163:25, 170:20, 171:22, 188:7, 188:17, 189:16, 191:5, 197:19, 199:2, 209:19, 214:7, 214:12, 218:13, 232:15, 232:23, 239:3, 253:16, 253:21, 265:25, 273:3, 275:24, 276:9, 276:12, 276:23
  **needed** [7] - 35:13, 37:8, 93:22, 130:13, 174:22, 175:7, 176:3
  **needs** [6] - 15:18, 57:16, 63:3, 68:11, 122:19, 193:2
  **neighbors** [2] - 146:9, 147:25
  **nervous** [1] - 97:16
  **Nestor** [2] - 12:1, 135:1
  **NESTOR** [1] - 12:1
  **never** [21] - 56:15, 58:3, 87:16, 109:23, 136:6, 141:21, 143:2, 155:22, 172:22, 173:12, 173:14, 173:22, 173:23, 183:11, 213:18, 224:21, 242:1, 243:16, 244:6, 268:2, 274:18
  **new** [5] - 22:19, 95:3, 95:8, 198:10, 212:2
  **news** [2] - 252:17, 256:20

**newspapers** [1] - 252:15

**next** [37] - 9:22, 10:12, 12:8, 12:9, 18:5, 23:11, 23:12, 35:15, 52:18, 61:5, 70:6, 79:3, 113:7, 113:11, 129:14, 135:20, 145:14, 169:14, 183:9, 187:2, 188:4, 188:23, 193:18, 205:20, 207:16, 208:12, 208:15, 208:17, 216:17, 216:19, 217:22, 217:25, 218:7, 233:12, 244:24, 255:12, 274:16

**night** [4] - 39:21, 151:22, 268:2, 268:3

**nine** [2] - 10:7, 263:9

**noble** [1] - 157:5

**nobody** [2] - 57:24, 246:24

**noise** [3] - 132:23, 151:21, 153:9

**nominated** [1] - 254:6

**non** [1] - 63:24

**non-peaceful** [1] - 63:24

**nondisruptive** [1] - 29:1

**none** [4] - 122:1, 127:19, 231:20, 259:16

**nonmilitary** [1] - 255:24

**nonmilitary-type** [1] - 255:24

**nonpartisan** [2] - 146:6, 146:13

**nonparty** [1] - 146:15

**nonprofit** [6] - 146:6, 146:11, 146:13, 237:4, 237:9, 237:11

**noon** [1] - 185:22

**normal** [5] - 21:13, 38:8, 120:7, 122:2, 141:15

**north** [2] - 160:25, 257:4

**northeast** [2] - 256:25, 257:3

**northern** [1] - 252:23

**Northwest** [3] - 1:16, 2:3, 279:14

**northwest** [1] -

212:12

**Nos** [2] - 3:19, 229:8

**nosy** [1] - 170:1

**note** [6] - 15:11, 27:18, 31:3, 33:2, 135:11, 272:11

**noted** [1] - 125:14, 137:2

**notes** [4] - 125:21, 131:3, 248:4, 279:5

**nothing** [31] - 33:23, 47:15, 118:3, 119:5, 119:10, 119:14, 119:23, 119:24, 120:2, 120:3, 120:7, 120:10, 120:18, 121:14, 121:23, 122:14, 127:23, 129:19, 129:20, 131:5, 132:5, 132:7, 133:21, 242:2, 260:6, 273:7, 277:6, 277:7

**notice** [4] - 66:7, 66:9, 91:10, 91:18

**noticed** [1] - 43:22

**notion** [1] - 18:18

**nowhere** [1] - 8:17

**nuance** [1] - 52:13

**nullify** [1] - 209:3

**number** [10] - 8:14, 8:23, 33:25, 59:13, 66:25, 124:12, 186:16, 199:16, 216:6, 232:2

**numbers** [1] - 187:1

**numerous** [1] - 91:23

**nutshell** [1] - 171:19

## O

**obey** [1] - 124:24

**obeyed** [1] - 124:23

**obeying** [1] - 125:1

**object** [5] - 40:4, 167:11, 167:14, 168:10, 213:12

**objected** [2] - 228:14, 254:12

**objecting** [3] - 65:5, 65:17, 115:11

**objection** [46] - 11:16, 22:12, 33:21, 39:16, 41:2, 41:14, 49:9, 62:19, 62:20, 86:11, 97:3, 106:12, 106:19, 108:19, 110:24, 111:3, 111:11, 143:7, 156:8,

166:17, 166:18, 168:8, 176:8, 177:19, 197:7, 200:2, 202:25, 203:14, 204:8, 209:14, 211:6, 213:7, 229:6, 230:6, 233:16, 242:23, 253:11, 254:7, 258:16, 260:11, 261:4, 262:12, 265:24, 267:20, 272:20

**objections** [3] - 161:20, 190:2, 223:25

**objective** [1] - 246:22

**objectively** [1] - 123:7

**obligation** [3] - 113:24, 274:22, 274:23

**observations** [5] - 179:8, 181:3, 181:7, 181:10, 181:16

**observe** [3] - 51:2, 226:11, 263:21

**observed** [5] - 111:24, 181:17, 181:25, 226:10, 234:15

**observing** [1] - 98:24

**obstruct** [1] - 181:9

**obstructing** [1] - 29:18

**obtained** [1] - 193:8

**obvious** [4] - 38:16, 227:14, 241:11, 241:16

**obviously** [19] - 13:8, 13:12, 25:16, 53:13, 57:6, 77:9, 83:1, 84:7, 118:14, 123:18, 124:25, 125:12, 150:3, 162:12, 198:1, 200:15, 229:1, 243:23, 275:22

**occasion** [1] - 152:1

**occupants** [1] - 21:16

**occur** [1] - 100:16

**occurred** [6] - 15:7, 85:1, 134:13, 184:15, 186:10, 192:13

**occurring** [3] - 15:17, 84:12, 222:23

**occurs** [1] - 59:2

**odd** [2] - 137:22, 137:23

**OF** [5] - 1:1, 1:3, 1:10, 1:16, 1:22

**offense** [4] - 10:25,

18:10, 19:12, 31:11

**offer** [8] - 29:5, 70:22, 155:17, 155:21, 200:8, 203:13, 223:18, 245:14

**offered** [2] - 10:6, 85:10

**offering** [3] - 40:19, 64:11, 156:9

**office** [1] - 17:5, 17:7, 17:22, 140:19, 146:21

**Office** [2] - 86:21, 88:1

**OFFICE** [1] - 1:15

**Officer** [10] - 62:1, 62:7, 69:5, 70:17, 73:23, 75:3, 75:9, 96:14, 114:17, 274:25

**officer** [49] - 34:17, 40:6, 52:3, 56:9, 57:7, 57:8, 60:9, 61:19, 66:6, 69:3, 70:17, 70:18, 70:19, 74:14, 75:2, 75:19, 82:13, 83:2, 83:19, 85:12, 90:3, 90:7, 90:10, 90:13, 90:16, 90:20, 91:1, 91:5, 91:20, 91:22, 96:7, 96:11, 96:23, 97:2, 98:6, 100:23, 100:25, 101:1, 121:22, 128:8, 134:14, 245:20, 248:7, 260:9, 265:22, 270:24, 274:16

**officer's** [1] - 57:4

**officers** [65] - 38:7, 38:15, 40:14, 43:22, 44:5, 44:8, 44:15, 45:24, 49:25, 50:25, 55:2, 57:5, 61:11, 64:20, 67:21, 70:2, 72:22, 72:25, 74:8, 74:23, 77:10, 78:11, 78:14, 78:24, 80:9, 94:11, 94:21, 95:19, 97:10, 98:17, 99:20, 99:22, 99:25, 100:14, 101:22, 102:1, 102:13, 103:20, 105:13, 105:18, 106:1, 106:9, 106:23, 107:1, 108:9, 108:18, 109:20, 110:1, 110:21, 112:10, 112:12, 112:14, 112:17, 112:22, 129:25, 130:1,

132:20, 132:23, 224:22, 257:16, 257:19, 260:6, 270:7, 273:8

**officers'** [2] - 38:18, 105:14

**OFFICES** [1] - 1:22

**official** [7] - 21:15, 129:17, 130:18, 130:22, 154:24, 181:9, 279:12

**Official** [1] - 2:1

**officially** [1] - 15:23

**often** [1] - 12:19

**Ohio** [1] - 256:8

**oil** [1] - 175:13

**okeydokey** [1] - 259:21

**old** [1] - 239:10

**once** [12] - 24:11, 30:16, 32:1, 38:9, 38:12, 54:6, 63:11, 105:8, 172:1, 211:12, 213:14, 229:17

**oncoming** [1] - 38:17

**one** [154] - 6:8, 8:14, 9:23, 9:24, 10:3, 10:18, 12:11, 14:14, 17:12, 18:5, 18:21, 20:24, 21:11, 22:5, 23:7, 23:11, 23:16, 26:15, 28:3, 30:25, 31:1, 31:2, 31:5, 31:19, 31:22, 31:23, 33:17, 34:7, 34:8, 36:21, 38:2, 38:7, 45:7, 49:25, 51:11, 55:4, 55:11, 61:10, 62:5, 63:22, 65:1, 66:25, 68:14, 69:16, 73:21, 78:8, 79:7, 80:21, 82:11, 83:16, 84:25, 90:5, 91:15, 95:9, 96:22, 97:23, 98:17, 100:10, 104:9, 104:18, 108:12, 108:17, 112:9, 116:3, 117:5, 119:3, 121:9, 124:22, 124:23, 127:17, 128:24, 131:11, 131:12, 132:10, 133:20, 135:18, 136:2, 136:20, 137:21, 141:14, 141:24, 147:8, 147:21, 149:9, 150:10, 152:5, 157:9, 158:8, 159:8, 160:1, 160:9, 162:15, 163:5, 163:21, 164:9, 171:1,

171:13, 172:13, 176:17, 178:22, 179:9, 182:18, 187:4, 187:10, 190:10, 192:5, 194:7, 198:3, 198:10, 201:10, 201:19, 205:3, 212:2, 212:22, 215:2, 215:21, 215:22, 216:18, 217:15, 217:18, 217:22, 217:25, 218:7, 218:8, 219:21, 220:13, 221:3, 222:4, 222:9, 222:17, 225:6, 225:12, 225:13, 231:11, 232:11, 233:6, 236:2, 236:7, 238:2, 245:16, 247:16, 248:19, 248:21, 254:4, 270:25, 273:5, 275:9, 275:19, 277:18, 277:23

**one's** [1] - 17:24

**ones** [6] - 67:25, 110:11, 146:23, 158:9, 170:19, 273:23

**ongoing** [2] - 73:6, 78:20

**online** [2] - 158:9, 238:3

**open** [89] - 41:12, 41:21, 41:25, 42:16, 42:22, 43:4, 43:16, 44:22, 45:11, 46:6, 46:22, 53:20, 56:5, 62:13, 66:18, 67:10, 68:20, 80:17, 80:23, 82:2, 82:7, 95:15, 95:24, 99:7, 99:12, 100:4, 100:8, 101:8, 101:19, 102:5, 102:18, 104:12, 104:16, 104:20, 107:5, 107:9, 107:14, 107:19, 107:22, 108:2, 109:9, 112:7, 119:4, 127:16, 143:20, 150:23, 151:17, 167:23, 168:17, 177:2, 180:25, 185:15, 186:5, 188:22, 193:17, 198:8, 202:2, 204:12, 209:2, 209:6, 209:11, 210:4, 211:24, 214:10, 214:23, 216:9, 217:20, 217:24,

218:2, 230:22, 232:7, 232:10, 232:20, 233:9, 234:11, 244:12, 250:20, 253:24, 254:19, 259:9, 261:21, 262:1, 262:11, 265:1, 265:6, 266:21, 268:13, 270:19, 273:7

**open-ended** [1] - 180:25

**open-source** [1] - 62:13

**opened** [4] - 48:22, 49:1, 122:14, 184:5

**opening** [1] - 107:19

**opine** [2] - 165:15, 261:10

**opining** [2] - 226:24, 226:25

**opinion** [13] - 28:12, 115:16, 115:19, 131:18, 137:3, 141:17, 141:20, 142:11, 142:15, 172:18, 172:21, 173:18, 173:21

**opponent** [2] - 159:16, 159:17

**opportunity** [5] - 47:9, 81:6, 87:1, 112:1, 221:1

**opposite** [3] - 70:5, 79:2, 85:1

**order** [4] - 21:24, 137:6, 137:21, 245:23

**orderly** [7] - 28:21, 29:8, 29:17, 29:25, 129:16, 130:18, 130:21

**ordinary** [3] - 27:16, 28:20, 134:11

**organization** [7] - 146:6, 146:11, 147:22, 152:17, 154:2, 154:14, 235:20

**organizational** [1] - 140:15

**organized** [1] - 171:17

**organizing** [1] - 170:18

**orient** [5] - 41:19, 69:8, 212:24, 264:11, 266:16

**orienting** [1] - 40:21

**others'** [1] - 27:9

**otherwise** [2] - 14:17, 172:5

**outcome** [1] - 187:5

**outdoor** [1] - 194:18

**outgrew** [1] - 253:9

**outlets** [1] - 252:19

**outlines** [1] - 124:10

**outranked** [1] - 70:21

**outside** [19] - 49:15, 55:21, 65:22, 92:12, 122:2, 143:12, 151:11, 165:10, 165:11, 173:24, 186:20, 188:19, 194:6, 204:4, 214:20, 230:4, 243:5, 243:8

**outstanding** [1] - 276:7

**outweigh** [1] - 273:1

**overarching** [1] - 215:25

**overhead** [1] - 259:18

**overheard** [1] - 51:22

**overlap** [1] - 103:8

**overloaded** [1] - 195:10

**overprosecuted** [2] - 136:5, 136:10

**overrule** [2] - 41:2, 204:13

**overrun** [1] - 125:2, 125:4

**oversee** [2] - 15:23, 125:20

**owe** [2] - 136:3, 136:8

**own** [17] - 53:12, 105:22, 105:25, 106:8, 122:12, 156:9, 171:23, 172:18, 179:8, 180:4, 182:12, 191:20, 198:4, 211:18, 243:13, 252:17, 270:14

**Oxnard** [1] - 1:19

---

# P

**P-O-W-E-L-L** [1] - 251:7

**P.A** [1] - 12:24

**P.C** [1] - 1:19

**p.m** [13] - 37:21, 114:12, 139:13, 151:3, 167:4, 209:8, 209:11, 214:15, 230:16, 266:15, 267:8, 268:23, 278:12

**pace** [1] - 110:4

**pack** [8] - 175:8,

176:5, 176:14, 177:5, 177:8, 177:10, 177:12, 182:14

**packed** [1] - 176:3

**padding** [1] - 112:15

**Page** [7] - 7:9, 21:9, 22:18, 31:9, 31:20, 127:10, 206:6

**page** [4] - 160:2, 205:20, 207:16, 208:15

**PAGE** [1] - 3:14

**Pages** [1] - 137:1

**painfully** [1] - 158:7

**paint** [1] - 243:13

**painted** [1] - 243:16

**pamphlet** [3] - 201:3, 201:6, 201:11

**pans** [1] - 263:23

**paper** [1] - 239:10

**parade** [8] - 27:16, 28:19, 29:5, 29:23, 134:9, 134:10, 165:23, 166:4

**paraded** [3] - 27:13, 121:7, 133:15

**parading** [15] - 6:6, 6:10, 22:8, 27:10, 27:19, 28:23, 29:1, 30:11, 121:2, 121:24, 133:25, 134:16, 134:22, 155:5, 197:19

**paragraph** [1] - 32:5

**paralegal** [3] - 4:8, 4:13, 199:2

**pared** [1] - 162:15

**parishes** [2] - 15:25

**Parker** [24] - 4:7, 4:19, 34:13, 54:16, 88:15, 126:17, 127:6, 139:5, 139:8, 143:17, 153:12, 154:18, 154:19, 155:8, 155:11, 159:20, 167:8, 178:20, 179:1, 182:19, 184:10, 185:6, 272:8, 276:11

**parker** [1] - 167:12

**PARKER** [58] - 1:15, 4:6, 33:23, 34:12, 35:8, 88:3, 88:7, 88:10, 88:21, 91:15, 91:17, 113:8, 115:8, 118:3, 122:23, 123:15, 125:9, 135:9, 135:11, 135:25, 138:1, 138:4, 139:9, 143:7, 143:18, 144:12, 144:15, 145:8, 148:1, 148:3,

148:7, 149:24, 155:12, 156:3, 159:24, 160:7, 160:14, 161:10, 161:21, 167:13, 168:10, 169:9, 176:8, 176:19, 177:19, 179:2, 182:20, 184:20, 187:13, 187:25, 188:2, 247:9, 249:22, 249:25, 272:9, 272:19, 276:13, 277:2

**parks** [1] - 206:16

**part** [34] - 11:15, 14:23, 17:9, 25:16, 56:10, 56:18, 59:1, 59:3, 61:5, 65:6, 68:4, 69:1, 83:17, 86:2, 97:17, 99:4, 121:5, 129:18, 133:23, 133:24, 134:7, 143:4, 152:17, 156:14, 162:23, 170:22, 171:22, 180:12, 192:21, 193:8, 206:23, 210:18, 223:2

**part-time** [1] - 170:22

**partially** [1] - 164:14

**participate** [4] - 154:5, 154:6, 154:9

**participating** [1] - 154:16

**participation** [2] - 149:23, 154:4

**particular** [10] - 15:22, 21:21, 123:13, 124:4, 179:6, 180:24, 212:23, 247:15, 247:16, 273:22

**particularly** [2] - 208:6, 237:16

**parties** [1] - 4:4

**parts** [1] - 153:24

**Party** [1] - 146:14

**party** [5] - 60:3, 60:24, 63:13, 159:16, 207:6

**Paso** [1] - 140:19

**passageways** [1] - 29:18

**passed** [2] - 175:11, 238:19

**past** [1] - 57:8, 102:21, 104:22, 105:23, 107:12, 108:4, 143:14, 155:6, 238:5, 238:17, 259:3

**paste** [1] - 32:17

**Pastor** [1] - 87:14
**pastor** [1] - 250:13
**path** [1] - 64:4
**pathways** [1] -
235:10
**patience** [9] - 35:12,
50:11, 93:20, 114:9,
117:18, 229:13,
236:25, 277:3, 277:8
**patient** [2] - 35:14,
177:24
**patriot** [1] - 248:25
**patriotic** [1] - 207:5
**patriots** [1] - 206:7
**pattern** [1] - 270:16
**Paul** [2] - 210:11,
210:15
**pause** [8] - 68:21,
80:18, 95:1, 95:16,
104:13, 104:14,
189:16, 262:13
**pay** [1] - 158:9
**peace** [3] - 21:13,
137:6, 238:13
**Peace** [6] - 212:9,
238:11, 238:14,
238:17, 238:19,
241:20
**peaceability** [3] -
142:12, 142:21,
173:19
**peaceful** [13] - 21:14,
63:23, 63:24, 142:13,
142:16, 142:18,
143:1, 171:25,
173:19, 173:22,
173:25, 174:3, 221:16
**peacefulness** [2] -
115:23, 183:2
**pence** [1] - 17:7
**Pence** [4] - 124:18,
160:20, 164:19
**penetration** [1] -
130:6
**People** [1] - 146:22
**people** [132] - 19:23,
23:1, 23:8, 39:22,
40:25, 41:5, 41:7,
42:3, 42:5, 52:8,
56:24, 63:23, 65:1,
77:1, 83:13, 83:16,
85:17, 85:21, 86:3,
94:20, 98:18, 98:20,
101:25, 102:10,
102:21, 103:21,
104:22, 104:23,
104:25, 105:6,
105:15, 105:16,
105:23, 106:4,
106:13, 106:24,

108:4, 110:9, 110:10,
111:10, 111:20,
111:21, 111:23,
117:7, 128:16, 130:2,
130:4, 132:21, 134:9,
140:22, 141:24,
142:25, 146:22,
147:15, 158:9, 161:1,
165:21, 166:1, 166:4,
166:7, 170:23,
170:24, 172:25,
174:4, 174:6, 174:7,
178:8, 179:20, 180:6,
182:1, 190:18,
192:22, 195:21,
195:25, 198:3,
198:13, 198:19,
199:25, 201:4,
201:17, 202:17,
202:20, 203:4, 203:6,
203:7, 203:8, 203:9,
206:2, 206:11,
206:13, 207:7,
207:14, 207:24,
208:7, 208:19, 209:4,
210:19, 211:1, 215:7,
215:16, 219:7,
219:11, 219:16,
221:15, 222:5,
222:16, 224:9,
224:21, 226:11,
227:12, 227:18,
227:19, 228:1,
228:18, 229:20,
232:2, 235:22, 237:5,
255:16, 255:24,
256:5, 256:14, 257:4,
257:17, 260:9,
260:13, 267:11, 273:7
**people's** [3] -
197:20, 226:24,
228:19
**pepper** [2] - 21:18,
132:21
**perceive** [1] - 111:2
**percent** [1] - 138:13
**perceptions** [1] -
225:24
**perfect** [4] - 39:6,
61:3, 81:24, 236:4
**perfectly** [1] - 62:23
**pergolas** [1] - 194:17
**perhaps** [23] - 24:3,
26:2, 26:3, 30:19,
34:24, 51:11, 51:22,
52:15, 56:15, 68:5,
74:16, 80:11, 83:13,
97:24, 111:22,
120:25, 153:14,
155:3, 163:3, 163:8,

180:24, 184:16, 271:7
**perimeter** [9] -
12:23, 13:1, 15:10,
16:12, 37:20, 61:8,
241:24, 242:18, 244:5
**period** [2] - 175:6,
252:24
**periods** [2] - 16:2,
172:2
**permanently** [1] -
17:24
**permissible** [1] -
184:18
**permit** [2] - 193:7,
215:18
**permits** [2] - 155:3,
208:2
**permitted** [9] - 51:7,
190:21, 193:9,
199:25, 200:13,
222:19, 224:9,
255:14, 261:2
**person** [65] - 5:17,
5:19, 7:18, 7:19,
10:22, 11:9, 15:4,
15:18, 19:16, 20:16,
22:5, 23:7, 23:23,
25:11, 40:20, 46:18,
47:13, 53:7, 78:4,
81:17, 86:22, 86:24,
87:6, 89:9, 92:2,
97:23, 98:5, 115:1,
115:3, 115:4, 121:11,
128:3, 129:3, 130:12,
131:12, 131:13,
131:20, 133:20,
141:23, 142:6,
142:13, 142:18,
143:4, 148:18,
148:22, 149:2,
152:18, 152:20,
157:18, 158:14,
158:17, 159:8,
162:18, 165:22,
167:10, 173:19,
174:3, 174:10,
192:25, 208:5,
221:10, 245:16, 270:2
**person's** [2] - 7:21,
21:20
**personal** [12] -
141:17, 142:11,
172:14, 172:18,
173:18, 179:8, 181:3,
181:10, 181:16,
191:20, 193:7, 261:13
**personally** [4] -
177:17, 201:15,
226:10, 233:25
**perspective** [11] -

77:24, 105:5, 113:19,
117:2, 161:5, 212:20,
219:12, 231:2,
233:15, 250:10
**persuasion** [1] -
122:8
**petitioning** [1] - 20:8
**philosophies** [1] -
261:15
**phone** [13] - 89:11,
89:13, 89:15, 91:11,
94:20, 151:5, 183:16,
185:18, 186:16,
187:1, 231:3, 265:21,
266:8
**phones** [4] - 53:1,
93:22, 148:3, 189:22
**phrase** [3] - 16:22,
23:17, 23:19
**phrases** [1] - 40:17
**physical** [2] - 12:13,
204:21
**physically** [1] - 16:2
**pick** [2] - 151:5,
207:1
**picket** [5] - 27:16,
28:19, 29:5, 29:24,
134:10
**picketed** [2] - 27:14,
121:7
**picketing** [12] - 27:1,
27:10, 27:19, 28:24,
29:1, 29:14, 30:11,
121:2, 121:24,
133:25, 134:16,
134:22
**picking** [2] - 224:17,
270:24
**pickup** [1] - 257:9
**picture** [7] - 55:7,
55:10, 91:20, 168:6,
168:23, 168:25, 201:7
**pictured** [1] - 121:21
**pictures** [2] - 112:15,
214:2
**piece** [1] - 195:1
**PIERCE** [86] - 1:18,
1:19, 4:10, 33:13,
33:17, 34:6, 34:11,
34:23, 89:12, 89:23,
91:12, 113:16,
114:14, 114:17,
114:20, 114:24,
115:2, 115:6, 116:5,
116:13, 137:17,
138:12, 138:24,
139:18, 139:25,
143:16, 143:24,
143:25, 144:9, 145:9,
169:15, 169:22,

176:25, 177:3, 178:4,
181:2, 181:6, 181:15,
181:22, 182:17,
183:8, 183:14, 184:4,
185:4, 185:12,
185:16, 187:10,
188:3, 188:6, 188:11,
188:14, 188:19,
189:3, 192:5, 224:18,
244:25, 245:5, 245:9,
245:18, 245:22,
246:5, 246:13,
246:23, 247:8,
247:15, 247:25,
248:2, 248:6, 248:11,
248:15, 248:19,
248:22, 270:3, 270:6,
270:12, 271:20,
272:6, 272:18, 273:5,
273:11, 273:14,
273:18, 274:6,
276:18, 277:7, 278:10
**Pierce** [32] - 4:11,
7:11, 33:14, 34:22,
80:19, 86:20, 88:15,
89:17, 91:11, 116:4,
116:11, 116:14,
119:19, 136:19,
137:9, 138:16,
139:16, 169:13,
176:21, 177:24,
179:23, 182:3,
182:21, 182:25,
183:11, 185:6, 185:9,
222:14, 273:4,
273:10, 276:17, 277:4
**Pierce's** [1] - 179:13
**pin** [4] - 28:1, 30:21,
153:12, 204:20
**pinpoint** [1] - 79:24
**place** [11] - 15:22,
21:3, 21:4, 72:19,
123:23, 130:13,
172:1, 186:6, 197:6,
255:15, 260:10
**places** [6] - 13:13,
118:21, 120:5,
120:19, 120:20
**plainly** [8] - 57:21,
124:11, 125:17,
126:5, 126:11,
126:14, 179:11,
197:14
**Plaintiff** [1] - 1:4
**plan** [5] - 7:19,
175:17, 175:22,
255:5, 269:3
**planned** [1] - 174:16
**planning** [1] - 175:24
**platforms** [1] -

189:18
**play** [48] - 41:18, 41:22, 42:14, 43:14, 44:19, 45:9, 46:3, 46:20, 47:21, 66:16, 68:25, 74:16, 81:25, 84:18, 84:23, 85:16, 86:5, 94:24, 95:9, 95:11, 99:2, 99:4, 99:9, 101:5, 101:17, 102:3, 102:15, 104:10, 104:14, 105:20, 105:22, 107:6, 147:15, 153:8, 159:10, 161:5, 214:17, 224:15, 224:24, 230:19, 232:5, 250:15, 262:9, 263:10, 263:17, 265:3, 265:4, 266:19
**played** [6] - 82:22, 107:11, 129:12, 156:3, 159:22, 233:3
**player** [2] - 87:18, 87:23
**playing** [9] - 54:15, 56:3, 95:22, 99:10, 100:2, 117:11, 230:10, 236:14, 268:11
**Plaza** [1] - 105:7
**plaza** [8] - 73:8, 94:12, 99:18, 118:11, 124:19, 160:22, 259:15, 264:12
**pleasant** [1] - 141:23
**plenty** [1] - 224:4
**podcast** [15] - 118:25, 121:10, 149:8, 149:17, 153:24, 158:23, 159:5, 159:12, 160:10, 162:15, 162:19, 165:2, 168:25, 190:17, 195:13
**podcaster** [1] - 160:3
**podium** [1] - 275:16
**point** [60] - 8:23, 12:7, 15:14, 29:12, 33:25, 38:2, 40:9, 44:6, 45:25, 50:1, 67:22, 71:15, 73:20, 74:25, 77:14, 84:25, 89:25, 90:11, 91:15, 103:19, 104:9, 105:12, 109:3, 109:7, 115:9, 124:23, 125:16, 136:2, 137:21, 155:25,

161:1, 166:19, 179:13, 179:19, 182:21, 184:20, 190:5, 201:10, 203:19, 205:18, 215:2, 215:25, 220:24, 225:5, 225:8, 241:19, 241:21, 244:25, 247:15, 247:16, 253:6, 256:6, 263:4, 263:5, 267:3, 272:14, 272:19, 272:24, 273:5
**pointed** [3] - 6:2, 108:11, 108:14
**pointing** [2] - 61:17, 239:23
**points** [3] - 8:13, 206:15, 208:3
**Police** [30] - 22:1, 34:17, 36:8, 36:14, 42:11, 47:5, 47:24, 51:13, 59:22, 60:9, 60:23, 61:19, 75:19, 75:24, 76:5, 76:10, 76:21, 83:19, 86:22, 91:5, 114:15, 128:8, 134:14, 241:2, 247:2, 247:11, 248:7, 270:7, 274:15, 275:2
**police** [64] - 12:21, 12:24, 13:11, 13:13, 13:14, 13:17, 37:8, 42:3, 43:24, 48:22, 49:4, 57:1, 64:22, 75:2, 85:12, 90:3, 94:17, 98:5, 100:14, 102:10, 103:11, 103:21, 105:9, 106:5, 109:11, 112:11, 112:20, 124:4, 124:6, 125:2, 125:3, 126:1, 129:25, 132:20, 132:23, 186:24, 195:24, 219:4, 219:5, 225:19, 225:22, 225:25, 226:1, 226:15, 227:3, 227:24, 228:16, 231:9, 231:10, 231:16, 234:7, 234:20, 234:21, 245:19, 257:16, 257:19, 258:15, 260:6, 260:9, 265:22, 270:19, 270:24, 273:8
**polite** [1] - 224:3
**political** [10] - 20:8, 21:4, 121:25, 134:20, 154:16, 197:4,

197:13, 197:16, 197:18, 197:20
**politicians** [1] - 210:14
**politics** [1] - 197:4
**pool** [1] - 256:11
**Porch** [1] - 152:19
**portion** [4] - 24:25, 58:22, 66:8, 83:22
**posed** [1] - 92:21
**position** [9] - 21:4, 36:9, 59:11, 60:4, 61:15, 74:4, 74:10, 106:19, 166:1
**positioned** [1] - 48:25
**possible** [2] - 104:14, 107:7
**possibly** [1] - 174:24
**posted** [1] - 14:17
**potential** [4] - 26:6, 58:16, 87:4, 272:4
**potentially** [23] - 48:22, 52:19, 58:18, 64:6, 77:1, 77:2, 85:5, 129:11, 133:1, 133:20, 154:25, 161:19, 161:21, 162:1, 167:17, 174:21, 184:11, 184:18, 209:20, 224:5, 245:15, 274:25, 277:16
**POWELL** [1] - 250:25
**Powell** [22] - 3:11, 129:12, 160:1, 164:18, 245:4, 245:12, 245:15, 245:18, 248:13, 248:21, 250:18, 250:21, 251:5, 251:7, 251:8, 251:18, 262:5, 268:24, 269:10, 274:5, 274:10, 277:11
**power** [3] - 34:13, 39:4, 164:19
**powerful** [4] - 18:20, 19:3, 19:4, 19:5
**practical** [2] - 16:9, 175:13
**practically** [3] - 12:16, 16:4, 16:16
**pray** [2] - 141:14, 186:6
**prayed** [1] - 24:8
**prayer** [5] - 20:9, 24:15, 27:6, 28:9, 141:4
**prayerful** [1] - 143:2

**praying** [12] - 24:9, 24:12, 24:14, 25:24, 26:25, 27:18, 28:10, 28:15, 29:19, 126:15, 174:25, 186:8
**pre** [1] - 230:3
**pre-authenticated** [1] - 230:3
**precedent** [1] - 192:6
**predicate** [1] - 159:1
**prefer** [2] - 85:11, 113:16
**preference** [1] - 8:2
**prejudice** [5] - 63:10, 166:14, 220:11, 272:25
**Prejudice** [1] - 195:2
**prejudicial** [4] - 39:24, 163:16, 222:10, 233:21
**preparations** [1] - 175:2
**prepared** [4] - 73:1, 78:15, 135:11, 182:12
**preparing** [1] - 176:3
**prerogative** [1] - 224:2
**presence** [52] - 4:23, 5:5, 5:8, 5:9, 5:15, 5:20, 5:24, 7:14, 7:22, 8:2, 8:25, 9:10, 9:12, 9:14, 9:17, 9:18, 10:1, 13:12, 13:13, 13:14, 20:13, 20:22, 21:11, 21:18, 21:20, 22:3, 22:5, 22:7, 28:1, 32:11, 65:23, 92:13, 92:15, 120:19, 121:4, 123:19, 125:18, 126:4, 126:12, 126:13, 151:12, 166:24, 190:8, 225:19, 225:22, 226:15, 227:3, 227:24, 234:7, 234:20, 275:24
**present** [14] - 15:12, 15:16, 41:9, 119:3, 120:5, 122:17, 131:12, 133:16, 179:17, 180:9, 183:22, 184:12, 184:25, 223:1
**presentation** [2] - 113:10, 137:15
**presented** [4] - 123:7, 123:22, 131:23, 223:14
**preserve** [2] - 22:13, 166:17

**President** [3] - 124:17, 160:19, 255:25
**president** [10] - 10:20, 11:5, 15:8, 16:8, 16:11, 51:3, 123:19, 123:20, 129:13, 207:11
**president's** [2] - 16:6, 125:20
**Press** [1] - 254:6
**pressured** [1] - 166:6
**presumably** [1] - 88:23
**presume** [2] - 75:10, 271:16
**presumed** [2] - 129:1, 129:2
**presumed-innocent** [1] - 129:2
**presumption** [1] - 32:12
**pretending** [3] - 144:6, 187:8, 197:23
**pretrial** [3] - 13:24, 91:23, 138:7
**pretty** [15] - 11:21, 47:14, 55:8, 71:21, 100:17, 102:11, 106:6, 175:23, 176:1, 212:12, 217:12, 221:18, 240:2, 255:11, 276:21
**prevent** [1] - 130:4
**preview** [1] - 51:5
**previous** [2] - 72:4, 243:22
**previously** [5] - 33:3, 46:15, 61:1, 74:2, 263:14
**primarily** [1] - 59:8
**Princess** [1] - 63:5
**private** [1] - 165:21
**probative** [2] - 220:9, 249:16
**probativeness** [1] - 220:10
**problem** [12] - 5:2, 34:12, 47:22, 60:7, 92:3, 143:16, 149:25, 159:18, 165:7, 181:12, 181:20, 200:7
**problematic** [2] - 156:12, 156:13
**problems** [1] - 156:12
**procedure** [1] - 76:9
**proceed** [3] - 76:10, 194:9, 210:6

**proceeding** [1] - 181:9

**proceedings** [53] - 21:15, 35:5, 35:10, 41:11, 53:19, 54:2, 56:1, 66:5, 73:15, 81:11, 92:10, 93:19, 99:6, 107:4, 109:8, 112:6, 114:12, 117:24, 139:13, 143:19, 150:22, 151:3, 151:16, 153:11, 164:5, 167:4, 167:22, 168:1, 168:16, 177:1, 185:14, 188:21, 189:4, 193:16, 198:7, 202:1, 204:11, 210:3, 211:23, 214:9, 214:15, 230:16, 234:10, 244:11, 250:19, 250:22, 253:23, 254:18, 259:8, 261:20, 264:25, 268:23, 279:6

**Proceedings** [1] - 278:12

**process** [7] - 76:11, 84:8, 86:22, 87:6, 89:8, 117:14, 193:9

**processed** [1] - 248:18

**produced** [2] - 195:17, 279:6

**products** [3] - 237:21, 237:23, 237:25

**professionalism** [1] - 185:8

**professionally** [2] - 140:17, 170:16

**proffer** [12] - 49:21, 53:8, 56:20, 184:2, 218:23, 246:16, 247:3, 247:20, 247:22, 269:21, 270:10, 273:25

**proffered** [2] - 115:25, 166:16

**proffering** [1] - 153:16

**profit** [2] - 237:12, 242:14

**program** [1] - 252:18

**programming** [1] - 157:4

**prohibit** [1] - 20:20

**promotion** [3] - 48:3, 48:6, 48:8

**promptly** [1] -

**proof** [5] - 25:20, 31:6, 32:12, 132:16, 135:7

**proper** [5] - 115:14, 115:22, 154:13, 182:22, 183:3

**properly** [2] - 85:14, 220:21

**property** [9] - 170:18, 171:9, 171:11, 171:24, 174:24, 181:8, 182:2, 212:10, 212:11

**proposal** [1] - 24:4

**propose** [3] - 32:3, 76:2, 164:12

**proposed** [7] - 6:23, 11:19, 14:9, 19:15, 20:12, 23:13, 275:10

**proposes** [3] - 10:19, 18:8, 26:24

**proposing** [3] - 12:10, 20:6, 50:15

**proposition** [2] - 8:14, 18:18

**prosecuted** [2] - 136:11, 250:6

**prosecutor** [1] - 242:9

**prosecutors** [1] - 75:18

**protected** [5] - 6:9, 15:4, 17:8, 19:22, 28:16

**protection** [2] - 28:25, 29:4

**protective** [1] - 76:6

**protest** [2] - 205:17, 273:11

**protester** [3] - 8:15, 62:12, 96:21

**protesters** [5] - 44:3, 44:5, 44:14, 44:15, 45:25

**prove** [1] - 116:20

**proven** [1] - 123:16

**provide** [3] - 76:7, 76:13, 165:8

**provided** [2] - 8:24, 18:12

**Providence** [1] - 1:23

**provides** [1] - 25:10

**public** [4] - 97:1, 124:8, 159:8, 206:16

**publish** [1] - 41:15

**published** [51] - 9:4, 41:21, 41:25, 42:16, 42:22, 43:4, 43:16,

44:22, 45:11, 46:6, 46:22, 56:5, 66:18, 67:10, 68:20, 80:17, 82:2, 82:7, 95:15, 95:24, 99:12, 100:4, 100:8, 101:8, 101:19, 102:5, 102:18, 104:12, 104:16, 104:20, 107:9, 107:14, 108:2, 120:23, 204:14, 214:23, 216:9, 217:20, 217:24, 218:2, 230:11, 230:22, 232:7, 232:10, 232:20, 233:9, 262:1, 262:11, 265:6, 266:21, 268:13

**pull** [9] - 31:9, 31:16, 38:20, 38:23, 44:19, 46:14, 132:9, 239:1, 240:10

**pure** [1] - 34:8

**Purple** [1] - 36:24

**purported** [3] - 62:1, 74:23, 97:9

**purporting** [1] - 61:8

**purpose** [14] - 15:22, 23:16, 23:17, 24:2, 25:1, 25:6, 86:14, 98:13, 98:15, 151:12, 159:11, 190:12, 191:9, 229:7

**purposeful** [2] - 19:10, 132:8

**purposes** [2] - 74:13, 221:18

**purse** [6] - 186:14, 186:16, 186:18, 186:20, 186:23, 187:3

**pursue** [1] - 172:15

**purview** [1] - 161:9

**push** [2] - 93:7, 128:16

**pushed** [4] - 107:21, 107:22, 111:23, 196:18

**pushing** [3] - 103:2, 120:8, 132:24

**put** [47] - 17:14, 28:1, 30:20, 32:1, 62:14, 65:3, 80:25, 81:2, 113:25, 118:20, 118:22, 118:24, 119:5, 119:10, 119:12, 119:24, 120:3, 120:11, 120:18, 121:4, 121:6, 121:23, 122:4, 122:8, 122:12, 132:18,

139:2, 149:7, 153:12, 159:7, 160:21, 164:12, 164:15, 164:16, 165:6, 184:7, 186:5, 188:6, 213:25, 217:5, 218:15, 218:18, 219:2, 219:3, 224:19, 259:23

**puts** [1] - 160:18

**putting** [2] - 152:10, 197:23

## Q

**qualified** [1] - 223:17

**qualify** [1] - 134:22

**quality** [1] - 62:14

**quantify** [1] - 25:3

**queen** [1] - 246:20

**questionable** [1] - 173:15

**questioned** [2] - 65:9, 65:13

**questioning** [9] - 84:11, 97:8, 97:13, 97:18, 182:4, 183:9, 183:15, 213:18, 223:13

**questions** [76] - 14:14, 66:13, 68:25, 71:1, 72:15, 82:14, 82:23, 86:17, 87:17, 89:17, 90:9, 92:19, 92:20, 93:9, 104:4, 111:15, 112:9, 113:1, 116:17, 123:13, 134:24, 135:3, 142:8, 144:9, 145:8, 156:4, 157:23, 159:11, 159:12, 161:22, 161:23, 162:4, 162:14, 166:23, 169:3, 182:24, 187:11, 199:4, 199:6, 201:1, 201:23, 202:4, 204:23, 213:4, 213:20, 214:18, 224:16, 225:16, 226:4, 228:12, 229:21, 230:5, 230:12, 231:13, 232:22, 233:2, 233:3, 234:5, 234:6, 234:13, 234:18, 235:12, 240:13, 240:18, 243:5, 244:2, 244:14, 258:7, 258:22, 258:24, 259:4, 261:10, 265:9, 266:2, 266:3, 267:14

**quick** [4] - 17:25, 187:19, 244:20, 261:5

**quickly** [2] - 49:15, 205:21

**quiet** [1] - 29:19, 126:15

**quietly** [2] - 28:11, 28:15

**quite** [12] - 21:2, 36:24, 75:25, 88:4, 91:21, 128:2, 131:10, 157:15, 163:12, 166:3, 182:22, 263:1

**quote** [5] - 10:19, 10:22, 15:7, 15:24, 18:8

**quoted** [1] - 131:8

## R

**rabbit** [1] - 63:5

**Rachel** [1] - 4:8

**rack** [4] - 107:18, 110:12, 124:3, 219:13

**racks** [12] - 12:20, 37:20, 42:4, 103:2, 103:3, 105:9, 107:18, 124:12, 125:3, 128:9, 160:16, 231:4

**radio** [1] - 59:25, 252:15, 253:5, 253:6

**raindrop** [1] - 133:23, 134:1, 190:25, 192:21, 219:24

**raise** [9] - 33:22, 141:21, 145:16, 166:9, 166:11, 173:22, 189:25, 193:20, 250:23

**raised** [5] - 8:10, 49:16, 49:19, 91:24, 179:21

**raising** [1] - 12:4

**rally** [6] - 155:2, 205:8, 205:16, 205:17, 209:6, 240:24

**range** [2] - 15:14, 185:24

**Rani** [1] - 60:10

**ranking** [1] - 70:18

**rapidly** [1] - 200:6

**rarely** [1] - 58:8

**rather** [8] - 53:22, 53:23, 59:21, 61:9, 211:14, 228:6, 264:6, 278:3

**Ray** [2] - 87:19, 87:20

**RDR** [3] - 2:1, 279:3, 279:12
**re** [6] - 50:14, 92:7, 92:12, 93:16, 167:24
**re-call** [5] - 50:14, 92:7, 93:16, 167:24
**re-called** [1] - 92:12
**rea** [1] - 12:5
**reach** [4] - 62:11, 75:23, 87:16, 88:25
**reached** [5] - 73:22, 73:23, 113:21, 186:15, 186:17
**reaching** [1] - 120:8
**reaction** [1] - 50:4
**read** [15] - 7:7, 16:24, 17:1, 200:16, 200:21, 200:22, 200:23, 206:6, 206:7, 206:24, 208:9, 208:25, 210:9, 210:18
**readily** [1] - 128:18
**reading** [6] - 125:15, 200:19, 203:5, 206:23, 208:5, 208:19
**ready** [22] - 12:8, 32:14, 34:17, 34:20, 34:21, 34:23, 35:7, 55:22, 72:25, 78:15, 92:6, 100:15, 109:4, 114:6, 136:16, 136:18, 139:7, 176:2, 188:4, 245:1, 275:13
**real** [4] - 85:15, 155:24, 187:18, 244:19
**realize** [2] - 86:25, 110:6
**realized** [1] - 160:19
**realizes** [1] - 19:16
**really** [42] - 9:2, 9:8, 9:14, 12:10, 18:16, 18:18, 25:2, 26:7, 28:5, 28:23, 40:11, 42:9, 55:5, 67:25, 69:10, 70:8, 72:11, 79:8, 85:16, 85:18, 85:19, 122:6, 122:11, 122:19, 137:19, 153:23, 154:1, 154:10, 154:23, 158:1, 163:15, 172:16, 177:25, 190:16, 203:6, 203:22, 223:13, 255:23, 264:11, 265:20, 276:1
**realm** [2] - 122:2, 272:4
**reask** [1] - 234:6

**reason** [10] - 6:7, 22:5, 22:11, 40:11, 56:21, 77:4, 84:22, 131:13, 148:11, 183:6
**reasonable** [17] - 54:15, 123:2, 123:3, 123:8, 123:9, 126:24, 126:25, 127:4, 127:5, 128:19, 130:11, 132:2, 133:4, 134:12, 135:7, 135:12, 276:22
**reasoning** [1] - 17:18
**reasons** [8] - 20:15, 38:16, 41:3, 134:23, 135:1, 166:16, 197:2, 244:1
**Rebecca** [15] - 4:2, 4:11, 140:25, 147:4, 170:11, 170:14, 174:6, 174:7, 176:4, 178:9, 180:20, 183:17, 202:6, 245:2, 267:16
**REBECCA** [1] - 1:6
**rebut** [4] - 164:22, 217:4, 221:1, 221:13
**rebuts** [4] - 118:23, 164:13, 165:5
**rebuttal** [1] - 222:24
**receive** [2] - 36:22, 237:15
**received** [3] - 237:19, 237:20, 252:9
**RECEIVED** [1] - 3:14
**receiving** [1] - 22:8
**recently** [3] - 48:6, 128:7, 160:3
**recess** [8] - 35:4, 81:5, 81:9, 81:10, 117:23, 164:3, 164:4, 278:11
**recognize** [20] - 39:8, 39:11, 54:11, 54:14, 54:20, 54:22, 67:21, 67:25, 69:6, 71:10, 71:19, 95:18, 95:19, 96:11, 99:15, 147:7, 212:18, 262:5, 262:19, 263:5
**recognizes** [3] - 262:22, 262:25, 264:18
**recollection** [4] - 156:25, 159:21, 160:12, 268:7
**recollections** [1] - 261:13
**record** [19] - 4:5, 8:7, 31:3, 36:2, 44:12, 58:2, 91:19, 92:11,

115:13, 140:4, 160:7, 160:11, 170:3, 199:10, 218:4, 223:9, 265:21, 269:12, 278:7
**recorded** [3] - 59:20, 218:5, 218:6
**recording** [2] - 59:23, 255:13
**recordkeeping** [1] - 171:6
**Red** [1] - 3:3
**red** [8] - 10:16, 242:17, 242:18, 243:13, 243:20, 244:3, 260:23, 261:3
**Redcoats** [1] - 19:21
**REDIRECT** [1] - 242:7
**redirect** [4] - 86:18, 113:3, 145:9, 242:5
**redress** [2] - 20:8, 195:22
**Reese** [2] - 67:22, 67:24
**refer** [4] - 29:7, 29:16, 29:24, 37:3
**reference** [5] - 12:6, 13:22, 14:2, 179:15, 238:1
**references** [2] - 160:16, 160:18
**referencing** [2] - 70:16, 124:22
**referring** [1] - 205:25
**refers** [3] - 15:12, 18:9, 28:20
**reflect** [2] - 92:11, 278:7
**refresh** [3] - 156:25, 159:21, 160:12
**refute** [1] - 61:16
**refutes** [1] - 118:23
**regain** [1] - 21:21
**regard** [7] - 122:10, 149:21, 175:21, 234:7, 235:2, 260:5, 266:16
**regarding** [2] - 232:22, 266:8
**regardless** [1] - 138:10
**rein** [1] - 209:23
**reiterate** [1] - 105:17
**reject** [3] - 26:21, 76:22, 166:16
**rejected** [1] - 10:5
**related** [2] - 11:24, 142:8
**relates** [1] - 191:6
**relating** [1] - 175:15

**relation** [3] - 71:12, 175:3, 212:25
**relationship** [2] - 141:13, 172:12
**relative** [1] - 59:10
**released** [1] - 242:16
**relevance** [10] - 40:4, 59:14, 61:20, 61:22, 166:13, 190:7, 200:7, 209:20, 253:15, 273:1
**relevant** [26] - 57:21, 76:24, 83:13, 88:6, 115:22, 148:14, 150:8, 153:1, 155:4, 157:8, 159:4, 163:4, 163:16, 197:13, 213:22, 218:10, 218:11, 218:24, 221:19, 226:17, 247:23, 249:13, 254:14, 272:12, 272:23
**religiosity** [1] - 115:24
**relisting** [1] - 127:25
**reluctant** [2] - 223:18
**rely** [4] - 53:15, 63:25, 138:9, 264:5
**relying** [1] - 264:6
**remain** [2] - 154:20, 277:22
**remained** [4] - 119:7, 119:11, 123:16, 127:23
**remaining** [6] - 9:9, 118:9, 119:8, 127:14, 129:20, 245:13
**remains** [1] - 165:7
**remarking** [1] - 215:3
**remedy** [1] - 50:12
**remember** [23] - 42:8, 85:4, 94:13, 98:4, 98:5, 109:14, 109:22, 113:23, 117:7, 152:2, 152:5, 152:23, 152:24, 154:15, 184:8, 200:17, 217:4, 224:14, 232:21, 240:25, 269:23, 274:15, 277:19
**Remember** [1] - 206:18
**remembers** [1] - 156:21
**remind** [9] - 60:8, 75:1, 116:16, 116:25, 250:2, 268:25, 277:12, 277:13,

277:21
**reminded** [1] - 163:6
**remodeling** [1] - 194:18
**remote** [2] - 33:16, 158:8
**remotely** [2] - 40:1, 91:9
**remove** [1] - 80:22
**removed** [2] - 129:24, 231:6
**renew** [1] - 272:20
**Rep** [1] - 210:12
**repeat** [4] - 96:24, 131:11, 140:20, 232:23
**repetitive** [1] - 108:24
**rephrase** [2] - 177:4, 203:1
**replacement** [1] - 256:24
**replay** [4] - 80:12, 107:22, 107:24, 168:7
**replaying** [2] - 168:9, 168:10
**report** [3] - 109:11, 109:14, 109:15
**REPORTED** [1] - 2:1
**reporter** [7] - 140:8, 145:24, 189:12, 189:20, 194:3, 251:6, 251:25
**Reporter** [2] - 2:1, 279:12
**REPORTER** [4] - 44:11, 86:7, 101:3, 103:7
**reporter's** [2] - 251:19, 251:23
**reports** [1] - 256:20
**representative** [3] - 86:20, 147:3, 210:11
**Representative** [2] - 210:12, 210:15
**reps** [1] - 210:12
**Republican** [1] - 209:4
**Republicans** [1] - 146:14
**reputation** [11] - 115:15, 115:19, 142:1, 142:4, 142:20, 142:23, 143:15, 173:6, 173:10, 174:2
**request** [3] - 89:20, 129:18, 131:2
**requests** [3] - 113:13, 265:23, 266:9
**require** [3] - 25:20,

132:16, 239:24
**required** [2] - 12:15,
12:17
**requirement** [6] -
5:10, 5:12, 5:13, 11:9,
120:14, 130:8
**requires** [1] - 13:2
**rescue** [1] - 239:11
**reshow** [1] - 232:15
**reside** [1] - 15:21
**residence** [3] - 17:3,
172:4, 172:6
**residents** [1] -
206:20
**resigned** [1] - 247:13
**resolved** [3] - 35:13,
138:7, 275:3
**respect** [5] - 174:1,
175:17, 178:4, 178:7,
186:11
**respond** [12] - 7:11,
23:5, 62:3, 62:4,
100:15, 155:9,
157:21, 178:21,
190:25, 219:24, 273:3
**responded** [2] -
62:12, 87:16
**response** [6] - 11:15,
50:4, 131:1, 161:9,
254:21, 260:15
**responsible** [1] -
146:23
**rest** [5] - 89:3, 232:5,
255:4, 256:4, 257:2
**restate** [1] - 80:7
**restricted** [46] - 9:10,
10:21, 10:23, 11:3,
11:6, 11:10, 12:11,
12:17, 12:19, 12:23,
12:25, 13:15, 14:16,
14:17, 15:10, 15:20,
16:12, 17:10, 18:23,
19:2, 19:6, 61:8,
118:10, 118:13,
118:17, 118:19,
118:24, 119:7,
123:17, 124:8,
124:10, 124:11,
124:16, 125:1,
125:12, 127:14,
127:21, 127:22,
128:4, 129:11,
129:22, 130:6,
130:20, 155:6, 166:4,
241:24
**restriction** [4] -
124:6, 128:12,
128:15, 132:20
**restrictions** [7] -
86:6, 86:8, 86:9,

123:23, 165:19,
259:14, 260:5
**restrooms** [1] -
206:16
**rests** [1] - 113:8
**results** [2] - 207:15,
267:13
**retire** [1] - 255:3
**retired** [5] - 55:25,
73:14, 153:10,
251:15, 251:16
**retreated** [1] - 105:13
**return** [3] - 117:21,
187:3, 255:2
**returned** [1] - 265:23
**review** [2] - 61:1,
271:9
**Review** [2] - 31:4,
31:5
**reviewed** [3] - 6:24,
39:21, 62:18
**revisit** [2] - 32:10,
32:11
**rewatch** [1] - 58:22
**Rhode** [1] - 1:23
**Rhodes** [5] - 139:10,
188:9, 218:15,
229:11, 275:3
**Richard** [4] - 3:8,
145:25, 153:10,
167:25
**RICHARD** [2] -
145:18, 145:25
**Rick** [1] - 145:14
**rid** [1] - 171:25
**ridiculous** [2] - 19:2,
19:7
**right-hand** [2] -
208:23, 208:25
**rights** [2] - 195:22,
277:21
**riled** [2] - 124:17,
160:19
**riot** [3] - 21:11,
233:14, 233:25
**rioters** [12] - 16:6,
16:10, 16:13, 21:19,
51:13, 61:9, 61:10,
73:20, 74:9, 97:10,
221:21, 222:2
**rioters'** [1] - 226:16
**riots** [1] - 194:25
**rise** [1] - 139:11
**rises** [1] - 81:17
**risk** [3] - 115:8,
241:11, 241:15
**road** [1] - 135:23
**Rob** [1] - 208:12
**ROBERT** [2] -
250:25, 251:7

**Robert** [3] - 3:11,
250:21, 251:7
**ROCHLIN** [8] -
75:12, 75:14, 75:25,
76:14, 87:9, 87:11
**Rochlin** [1] - 75:14
**rock** [2] - 13:13,
34:23
**ROGER** [2] - 1:21,
1:22
**Roger** [5] - 4:11,
26:15, 31:5, 206:1,
208:12
**role** [2] - 37:6,
175:12
**roll** [2] - 34:23, 37:14
**rolling** [1] - 4:20
**Room** [1] - 2:3
**room** [6] - 53:23,
147:16, 218:16,
218:19, 229:11,
236:19
**rooms** [1] - 171:8
**ROOTS** [272] - 1:21,
1:22, 6:17, 7:4, 8:13,
10:3, 11:18, 13:11,
16:21, 18:16, 20:25,
21:2, 26:10, 28:3,
28:5, 30:4, 30:8,
31:14, 32:3, 32:15,
32:19, 32:25, 39:16,
39:20, 47:19, 49:7,
49:24, 50:8, 52:2,
53:2, 53:10, 54:19,
56:20, 57:23, 62:3,
62:8, 64:11, 65:8,
65:20, 65:25, 66:19,
67:18, 67:20, 68:9,
68:13, 68:15, 68:23,
69:2, 69:21, 69:24,
70:22, 72:18, 77:7,
79:6, 79:14, 79:21,
80:23, 84:16, 85:15,
86:9, 87:7, 87:12,
87:15, 88:13, 89:24,
90:2, 90:6, 90:21,
90:24, 94:2, 94:3,
94:24, 95:5, 95:7,
95:11, 95:16, 95:17,
95:22, 96:2, 96:3,
98:9, 99:2, 99:8,
99:13, 99:14, 100:2,
100:5, 100:9, 101:5,
101:9, 101:10,
101:17, 101:20,
102:3, 102:6, 102:15,
102:19, 103:15,
104:7, 104:10,
104:13, 104:17,
104:21, 105:20,

105:21, 107:3, 107:6,
107:10, 107:15,
107:16, 107:24,
108:3, 109:3, 109:10,
110:25, 111:1, 111:4,
111:9, 112:4, 112:8,
112:25, 116:19,
118:5, 135:19, 136:2,
136:8, 136:14,
145:14, 145:22,
148:25, 149:4,
149:20, 150:13,
150:15, 151:15,
151:18, 153:23,
157:21, 159:7,
162:16, 162:22,
163:24, 164:7,
164:12, 166:25,
167:20, 168:4,
168:15, 168:18,
169:3, 169:6, 190:14,
193:15, 193:18,
194:1, 194:10,
197:22, 198:11,
198:25, 199:8,
199:16, 199:19,
200:12, 201:3, 201:7,
201:22, 202:3, 203:2,
203:13, 204:22,
205:1, 205:13,
208:15, 208:16,
210:1, 210:7, 211:21,
212:3, 212:14,
212:15, 213:25,
215:1, 215:21, 216:7,
216:11, 216:13,
217:3, 217:9, 217:12,
217:18, 217:21,
217:25, 218:10,
218:23, 219:20,
225:2, 225:7, 225:11,
225:14, 225:18,
225:25, 227:11,
228:10, 228:12,
228:25, 229:3,
230:18, 230:23,
230:24, 231:17,
232:5, 232:8, 232:17,
232:21, 233:1, 233:6,
233:10, 234:6,
234:17, 235:11,
240:8, 242:8, 243:10,
243:19, 244:3,
244:10, 244:13,
245:7, 245:11,
248:24, 249:21,
250:5, 250:15, 251:4,
252:3, 253:22, 254:3,
254:17, 254:23,
258:2, 258:5, 259:12,
260:21, 261:17,

261:22, 262:2, 262:4,
262:9, 262:24, 263:6,
263:9, 263:11,
264:10, 264:24,
265:2, 265:4, 265:8,
266:1, 266:11,
266:19, 266:22,
267:7, 267:9, 267:24,
268:11, 269:25,
274:10, 274:18,
275:9, 275:13,
275:16, 277:6
**roots** [1] - 34:22
**Roots** [103] - 4:11,
6:2, 7:11, 8:11, 9:25,
11:14, 13:6, 13:18,
16:18, 24:19, 26:9,
26:15, 28:4, 29:16,
30:5, 31:2, 31:5, 31:7,
31:13, 31:24, 32:23,
33:8, 39:19, 40:9,
51:12, 52:1, 52:13,
54:13, 58:15, 65:11,
67:7, 68:3, 72:16,
76:19, 78:21, 80:19,
82:13, 86:19, 87:11,
88:15, 98:2, 98:8,
99:1, 103:25, 104:5,
104:6, 106:25, 109:6,
109:7, 111:17,
116:11, 116:15,
118:4, 122:21,
124:21, 127:15,
130:23, 131:3,
135:17, 136:1, 136:6,
138:17, 148:10,
148:23, 151:14,
153:16, 158:6, 162:2,
164:6, 167:15,
182:12, 188:6,
189:15, 190:13,
200:10, 201:21,
205:12, 209:25,
210:6, 211:16, 212:2,
217:1, 222:14, 227:2,
228:9, 230:11,
233:20, 234:16,
243:9, 248:23, 250:2,
253:20, 259:7, 261:8,
262:23, 264:9,
264:23, 265:25,
269:2, 274:8, 276:17,
277:4
**roster** [1] - 205:24
**Rotunda** [2] - 5:17,
38:13
**roughly** [2] - 144:22,
151:24
**route** [1] - 259:24
**royal** [1] - 19:22

**ruckus** [1] - 256:17
**rule** [14] - 8:17, 8:20, 21:25, 25:21, 30:7, 132:17, 133:2, 133:3, 133:4, 139:2, 178:11, 178:18, 180:22, 183:21
**Rule** [3] - 116:20, 118:6, 122:25
**ruled** [1] - 134:24
**Rules** [3] - 81:13, 138:20, 162:6
**rules** [2] - 81:14, 173:15
**ruling** [4] - 84:10, 85:7, 85:8, 158:24
**rulings** [1] - 20:11
**run** [3] - 146:6, 146:21, 147:22
**runs** [2] - 20:18, 59:25
**rush** [1] - 38:3
**rushed** [3] - 124:18, 257:18, 277:14
**rushes** [1] - 160:21
**Ryan** [1] - 192:9

**S**

**S-P-E-C-S** [1] - 252:12
**S-U-M-R-A-L-L** [1] - 194:4
**safe** [2] - 110:21, 257:10
**safer** [1] - 44:1, 105:13
**safety** [10] - 21:15, 40:15, 102:12, 105:14, 105:18, 105:22, 105:25, 106:8, 110:21
**sailed** [1] - 183:7
**sake** [3] - 37:3, 251:19, 251:23
**satisfied** [1] - 136:6
**saw** [42] - 31:1, 50:23, 69:18, 71:13, 72:2, 72:7, 72:11, 84:12, 124:12, 128:14, 130:3, 133:9, 134:13, 179:7, 182:13, 191:21, 192:25, 194:25, 200:8, 201:16, 201:17, 202:24, 203:19, 203:23, 204:1, 207:7, 211:18, 215:24, 219:15,

219:16, 222:15, 224:7, 224:13, 227:1, 229:22, 231:14, 234:1, 234:14, 249:11, 254:16, 258:15, 258:25
**scaffold** [1] - 215:5
**scaffolding** [1] - 225:13
**scared** [1] - 109:20
**scary** [1] - 102:8
**scenario** [1] - 56:16
**scene** [14] - 41:8, 50:25, 54:20, 55:2, 63:21, 68:7, 70:1, 73:25, 74:15, 78:23, 95:19, 125:5, 191:13, 223:1
**scenes** [1] - 66:21
**schedule** [1] - 208:17
**scheduled** [4] - 200:13, 205:22, 207:21, 208:20
**scheduling** [1] - 89:5
**scheming** [1] - 209:3
**school** [1] - 170:10
**School** [1] - 252:11
**schoolteachers** [1] - 153:19
**scienter** [2] - 120:14, 134:3
**scope** [17] - 5:23, 24:17, 49:15, 61:24, 138:22, 143:12, 161:15, 162:14, 171:3, 191:1, 192:3, 209:19, 227:8, 243:5, 243:8, 243:17, 249:19
**screaming** [1] - 42:7
**screen** [21] - 39:1, 43:8, 55:3, 168:12, 168:21, 189:10, 199:3, 204:23, 205:9, 236:3, 236:8, 239:8, 239:18, 240:5, 240:15, 242:4, 258:4, 259:24, 259:25, 266:18, 267:2
**screen's** [1] - 45:8
**seal** [2] - 236:21, 236:22
**seamless** [1] - 114:3
**seated** [15] - 4:17, 35:6, 35:11, 35:22, 54:4, 114:13, 139:14, 139:23, 145:20, 151:4, 169:20, 214:16, 230:17, 251:1, 269:19

**second** [29] - 5:14, 7:25, 10:22, 11:7, 11:15, 15:6, 20:13, 25:16, 29:6, 45:7, 58:21, 61:6, 67:1, 72:9, 91:5, 104:18, 155:25, 159:21, 159:25, 160:2, 182:18, 187:4, 205:3, 232:11, 232:24, 233:3, 240:5, 262:2, 271:7
**seconds** [15] - 41:18, 74:2, 74:16, 79:17, 79:18, 82:5, 82:11, 95:9, 96:2, 99:3, 99:8, 99:9, 104:17, 263:23, 266:15
**Secret** [1] - 15:4
**section** [4] - 36:11, 36:12, 58:20, 58:21
**sections** [1] - 58:23
**secure** [2] - 37:9, 44:1
**Security** [1] - 257:9
**security** [1] - 260:5
**see** [161] - 7:1, 15:22, 22:20, 26:2, 26:5, 26:17, 30:19, 38:14, 39:1, 39:4, 42:3, 42:6, 42:18, 42:24, 43:18, 43:22, 44:5, 44:24, 46:10, 46:18, 46:24, 47:1, 51:18, 51:19, 51:20, 53:11, 54:8, 54:20, 55:7, 59:5, 59:8, 65:18, 66:2, 66:20, 67:1, 67:11, 67:22, 69:12, 72:11, 72:23, 73:25, 74:18, 78:12, 80:13, 88:25, 92:1, 96:4, 96:9, 96:20, 96:25, 98:19, 100:6, 101:11, 112:15, 112:17, 113:20, 114:8, 127:22, 129:2, 148:16, 163:16, 168:21, 182:6, 182:7, 182:16, 188:16, 189:7, 189:9, 191:7, 191:16, 191:24, 195:21, 199:13, 201:16, 203:8, 204:17, 205:5, 205:8, 205:14, 205:18, 206:13, 206:18, 206:23, 207:15, 208:7, 208:19, 208:24, 210:8,

210:11, 211:5, 212:16, 214:5, 214:19, 214:21, 216:2, 216:4, 219:13, 220:18, 222:6, 224:23, 225:19, 225:21, 227:2, 227:3, 227:17, 227:23, 227:24, 228:13, 228:14, 228:16, 228:24, 231:4, 231:7, 232:12, 232:24, 234:19, 235:7, 235:8, 236:8, 236:10, 236:20, 236:22, 239:4, 239:12, 239:13, 239:14, 239:16, 239:17, 239:19, 240:2, 241:6, 241:12, 241:24, 242:6, 243:4, 243:20, 244:4, 250:17, 253:15, 257:4, 258:11, 259:5, 260:7, 260:22, 263:19, 263:22, 264:3, 264:6, 264:4, 266:12, 266:23, 270:18, 270:24, 271:14, 276:25
**seeing** [13] - 55:19, 60:4, 63:1, 69:8, 73:19, 74:25, 98:6, 160:16, 181:23, 225:25, 226:2, 264:8, 268:7
**seek** [2] - 22:1, 86:15
**seem** [6] - 54:14, 54:16, 76:24, 104:23, 105:2, 167:16
**seemingly** [1] - 150:6
**sees** [2] - 39:1, 200:11
**segment** [1] - 73:8
**segments** [34] - 41:20, 41:24, 42:15, 42:21, 43:3, 43:15, 46:5, 46:21, 67:9, 68:19, 80:16, 82:1, 82:6, 95:14, 95:23, 99:11, 100:3, 100:7, 101:7, 101:18, 102:4, 102:17, 104:11, 104:15, 104:19, 107:8, 107:13, 108:1, 162:18, 261:25, 262:10, 265:5, 266:20, 268:12
**self** [1] - 194:20

**self-employed** [1] - 194:20
**sell** [2] - 237:21, 237:23
**selling** [1] - 238:3
**seminar** [1] - 152:3
**Senate** [4] - 125:25, 210:14, 265:13, 272:13
**send** [7] - 32:14, 32:17, 93:22, 188:18, 248:15, 275:7, 275:22
**sense** [22] - 21:12, 41:9, 54:8, 68:12, 74:16, 86:25, 89:22, 93:4, 107:2, 150:7, 151:1, 179:17, 182:14, 183:22, 184:12, 184:25, 201:9, 223:15, 245:13, 263:24, 270:16, 274:8
**sensibly** [1] - 192:9
**sensitive** [2] - 40:9, 104:1
**sent** [7] - 21:7, 32:5, 92:4, 114:21, 188:9, 275:5, 275:6
**sentence** [11] - 10:22, 11:1, 11:7, 12:11, 12:13, 15:6, 18:8, 18:14, 20:7, 23:15, 29:6
**sentenced** [1] - 250:11
**sentences** [2] - 10:18, 20:6
**separate** [6] - 9:6, 76:3, 76:4, 119:9, 134:1
**separated** [1] - 9:5
**separately** [2] - 20:7, 215:14
**September** [2] - 138:3, 150:15
**sergeant** [2] - 37:7, 48:1
**Sergeant** [2] - 67:22, 67:24
**series** [1] - 160:3
**serious** [2] - 73:19, 131:16
**seriously** [1] - 51:15
**serve** [1] - 36:20
**served** [1] - 250:11
**Service** [1] - 15:5
**service** [2] - 36:23, 268:21
**services** [3] - 237:17, 237:19, 252:20

session [3] - 121:12, 123:21, 125:20
set [13] - 4:3, 11:21, 41:8, 42:4, 47:20, 127:11, 157:23, 215:5, 215:6, 215:7, 215:8, 215:17, 257:9
Seton [1] - 31:4
sets [1] - 126:21
setting [5] - 33:21, 37:20, 50:25, 126:19, 165:18
setup [1] - 195:25
several [10] - 90:9, 137:18, 171:5, 195:17, 196:5, 196:23, 203:9, 206:2, 210:11, 219:11
severe [1] - 102:8
shape [1] - 75:17
share [7] - 155:12, 164:17, 172:14, 199:3, 204:22, 236:4, 239:8
shared [1] - 164:17
sheds [1] - 171:24
sheet [3] - 81:13, 126:20, 151:11
shift [1] - 10:14
shifts [1] - 128:25
ship [1] - 183:7
shirt [2] - 238:2, 238:5
shirts [3] - 237:22, 237:23, 237:25
shoot [1] - 196:12
short [4] - 34:24, 67:23, 91:10, 91:17
shortly [1] - 121:19
shot [8] - 212:23, 216:10, 216:16, 217:13, 224:13, 233:12, 264:10, 267:5
show [37] - 40:22, 57:6, 61:8, 72:5, 72:9, 98:23, 127:20, 127:23, 128:3, 131:4, 131:5, 131:16, 132:6, 132:25, 134:18, 134:19, 138:16, 152:22, 169:1, 191:12, 199:9, 214:25, 217:3, 217:9, 218:11, 218:24, 219:5, 219:18, 222:16, 223:1, 225:5, 225:17, 230:1, 232:17, 243:7, 253:5, 264:16
showed [10] - 63:22,

71:23, 118:15, 133:7, 134:15, 180:3, 180:5, 225:6, 229:17, 264:21
showing [8] - 130:3, 131:15, 162:17, 201:6, 216:5, 217:5, 219:2, 220:5
shown [10] - 41:3, 50:5, 84:3, 120:4, 129:19, 129:20, 133:8, 162:18, 214:1
shows [12] - 49:22, 49:24, 56:21, 79:14, 85:17, 99:3, 118:21, 119:24, 120:4, 152:19, 164:24, 165:4
shut [1] - 127:16
sic [1] - 257:17
sic] [2] - 64:20, 106:1
side [59] - 4:25, 48:14, 63:20, 87:18, 87:19, 91:1, 168:12, 190:4, 190:8, 190:15, 190:22, 196:18, 198:15, 198:16, 198:18, 198:20, 203:21, 212:9, 212:11, 213:19, 213:22, 214:2, 215:16, 215:23, 218:25, 219:7, 219:14, 219:17, 220:25, 221:6, 221:10, 221:20, 221:21, 222:1, 222:9, 226:7, 226:10, 226:11, 235:9, 238:14, 241:22, 241:25, 242:1, 256:18, 256:25, 257:4, 257:6, 258:1, 262:7, 262:20, 264:3, 266:25, 270:15, 270:17, 271:6, 272:13
side's [1] - 117:5
sides [8] - 22:20, 41:4, 77:21, 88:17, 117:4, 117:5, 117:7, 275:7
Sidney [3] - 129:12, 160:1, 164:18
sign [4] - 89:21, 236:19, 239:3, 239:7
signage [2] - 128:6, 213:20
signal [2] - 103:1, 196:9
signs [18] - 12:20, 13:16, 14:21, 213:5, 214:2, 216:2, 219:4,

219:12, 226:2, 226:16, 226:20, 231:7, 234:7, 234:24, 235:1, 258:11, 270:18
silent [1] - 277:22
silently [1] - 134:21
similar [9] - 14:7, 14:8, 26:17, 32:5, 116:9, 119:17, 250:10, 270:16, 271:25
Simone [1] - 210:13
simple [2] - 75:25, 126:15
simplicity's [1] - 37:3
simply [24] - 12:16, 19:12, 22:25, 24:17, 26:14, 41:8, 50:13, 62:25, 77:5, 80:7, 82:22, 83:6, 85:11, 86:17, 128:5, 158:25, 159:4, 161:17, 179:22, 180:14, 180:20, 182:5, 264:5, 271:13
single [8] - 5:17, 7:17, 8:15, 63:20, 127:25, 131:20, 221:10, 233:22
sister [1] - 175:24
sit [2] - 53:18, 257:10
sitting [4] - 53:23, 93:23, 151:1, 268:6
situated [1] - 169:25
situation [7] - 12:21, 55:6, 60:1, 63:6, 128:24, 163:8, 186:23
situations [2] - 20:16, 106:3
skeptical [1] - 272:11
sleep [2] - 151:22, 185:23
sleeping [1] - 17:3
slightly [3] - 79:17, 87:21, 179:5
slip [1] - 276:10
slow [2] - 107:25, 250:18
slowed [1] - 107:7
slower [2] - 107:11, 113:19
slowly [1] - 268:17
small [4] - 171:5, 195:13, 206:16, 207:23
smart [1] - 61:17
Smith [1] - 4:9
snatch [1] - 30:5

snippet [1] - 72:2
snippets [1] - 121:9
snow [2] - 12:20, 213:20
Snow [4] - 212:22, 216:18, 218:8, 233:12
social [1] - 140:18
sold [1] - 238:5
solution [1] - 76:20
someone [21] - 9:13, 52:17, 57:17, 62:25, 78:3, 107:18, 108:7, 121:15, 130:9, 147:4, 148:22, 155:2, 158:6, 165:20, 171:20, 178:24, 186:15, 192:24, 246:18, 247:7
sometime [1] - 185:22
sometimes [3] - 31:25, 117:7, 189:18
somewhat [3] - 81:19, 159:18, 179:5
somewhere [7] - 17:3, 17:4, 99:16, 186:20, 247:11, 247:13, 256:3
son [1] - 25:5
soon [1] - 74:22
sorry [31] - 9:24, 10:12, 36:6, 43:11, 46:16, 67:7, 67:13, 81:2, 82:19, 96:24, 98:11, 101:4, 103:7, 117:1, 120:12, 129:17, 136:19, 145:4, 188:3, 208:24, 236:2, 237:10, 239:5, 246:23, 247:18, 251:21, 252:8, 269:23, 272:18, 274:15
sort [29] - 5:23, 12:4, 15:13, 19:20, 19:22, 22:9, 22:13, 25:3, 25:25, 29:23, 43:2, 46:8, 50:1, 51:12, 56:7, 58:22, 59:1, 61:10, 64:8, 80:23, 92:18, 97:8, 97:9, 99:18, 99:20, 99:21, 115:13, 128:25, 129:21, 136:21, 138:22, 143:14, 143:15, 149:5, 154:21, 159:6, 160:1, 160:4, 161:6, 161:8, 162:3, 162:13, 162:14, 163:1, 165:25, 166:5,

183:23, 184:13, 184:15, 191:13, 191:15, 193:4, 197:17, 201:13, 204:3, 222:25, 223:18, 223:20, 223:25, 224:2, 226:21, 233:24, 237:23, 249:19, 260:23, 264:21, 267:2, 269:4, 269:21, 270:20, 270:25, 271:5, 272:4, 274:9, 274:19, 277:20
sorts [3] - 12:22, 159:12, 190:23
sought [1] - 193:8
sound [14] - 4:16, 40:18, 68:15, 68:16, 73:23, 94:25, 137:11, 137:16, 144:22, 155:23
sounds [21] - 6:24, 23:6, 33:12, 49:18, 61:14, 83:23, 88:18, 103:9, 112:2, 126:4, 126:14, 136:16, 136:18, 138:19, 149:24, 155:14, 157:5, 190:25, 270:17, 274:6, 276:21
source [4] - 26:11, 62:13, 80:23, 258:4
sources [1] - 63:13
speaker [10] - 62:6, 77:3, 83:3, 83:10, 84:11, 85:11, 103:8, 206:4, 249:1, 249:2
speakers [7] - 203:10, 205:22, 206:13, 208:9, 208:14, 210:9, 211:3
speaking [18] - 29:2, 75:2, 77:2, 91:4, 92:17, 96:6, 98:20, 121:18, 141:12, 152:3, 163:17, 189:17, 190:23, 197:3, 206:2, 223:25, 269:4
speaks [4] - 8:8, 15:11, 180:5, 243:24
Special [1] - 4:9
specific [27] - 25:21, 33:21, 40:17, 40:20, 69:11, 70:4, 70:10, 73:1, 73:3, 78:16, 78:18, 79:2, 79:10, 94:13, 99:17, 100:16, 102:1, 109:14,

115:16, 115:20, 132:17, 137:8, 137:13, 179:5, 183:1, 247:9, 259:1

**specifically** [11] - 6:8, 7:21, 37:10, 70:9, 79:9, 84:16, 171:4, 191:5, 205:25, 259:4, 259:17

**Specs** [1] - 252:11

**specs** [1] - 252:11

**spectators** [1] - 190:21

**spectrum** [1] - 197:4

**speculate** [9] - 155:24, 163:2, 165:14, 178:24, 180:7, 180:13, 185:3, 228:18, 228:19

**speculating** [11] - 106:23, 143:12, 155:22, 156:23, 158:14, 178:2, 180:1, 181:13, 181:21, 200:20, 228:20

**speculation** [8] - 80:1, 154:20, 165:17, 180:12, 181:13, 181:19, 209:20, 233:21

**speculative** [1] - 201:14

**speech** [5] - 28:13, 38:1, 80:8, 196:7, 255:25

**speeches** [1] - 29:3

**speed** [1] - 120:7

**spell** [6] - 36:2, 140:3, 145:23, 170:2, 194:2, 251:5

**spelled** [1] - 252:12

**spelling** [1] - 36:3

**spend** [1] - 17:15

**spending** [1] - 105:10

**spent** [3] - 59:23, 142:25, 256:4

**spirits** [1] - 117:17

**spiritually** [1] - 25:4

**split** [1] - 256:9

**spoken** [2] - 200:25, 274:18

**sponsoring** [1] - 208:1

**sponte** [1] - 18:19

**spot** [2] - 43:6, 81:3

**spotlight** [2] - 204:19, 236:12

**spray** [1] - 132:22

**sprayed** [1] - 21:18

**spread** [2] - 18:21, 196:24

**Springs** [3] - 140:12, 147:17, 152:7

**squad** [1] - 112:14

**squarely** [3] - 11:1, 17:20, 20:11

**squeeze** [1] - 247:21

**stacked** [2] - 235:5, 235:8

**staff** [1] - 122:3

**stakes** [1] - 117:1

**stance** [1] - 129:5

**stand** [9] - 11:19, 26:12, 66:7, 77:8, 80:7, 145:16, 150:5, 178:8, 208:4

**standard** [12] - 12:5, 25:19, 120:21, 122:24, 122:25, 126:19, 126:22, 127:6, 127:11, 128:21, 128:25, 135:5

**standing** [20] - 5:18, 11:16, 20:14, 20:16, 22:12, 38:15, 52:18, 64:7, 69:17, 72:8, 72:12, 120:19, 120:23, 125:4, 153:4, 216:17, 216:19, 218:7, 233:12, 260:6

**standpoint** [1] - 219:6

**Star** [1] - 36:25

**start** [35] - 4:15, 24:24, 66:23, 68:17, 74:17, 75:5, 76:15, 77:6, 84:6, 84:8, 86:22, 87:5, 89:8, 113:12, 115:10, 118:1, 122:24, 156:14, 157:16, 164:2, 179:1, 182:24, 183:18, 189:17, 206:9, 220:12, 222:6, 225:23, 230:20, 258:6, 268:20, 270:10, 274:2, 274:14, 276:16

**Start** [1] - 195:2

**started** [15] - 21:6, 32:21, 116:7, 161:1, 175:1, 192:14, 194:24, 212:9, 223:25, 233:23, 252:17, 257:13, 257:14, 257:17, 257:18

**starting** [2] - 4:5, 257:5

**starts** [2] - 74:22, 209:7

**State** [1] - 210:12

**state** [39] - 13:13, 25:23, 36:2, 91:19, 106:20, 140:3, 145:23, 147:3, 149:5, 149:13, 149:15, 149:22, 150:2, 150:6, 153:18, 154:10, 154:11, 165:4, 165:9, 170:2, 172:11, 177:17, 178:1, 178:6, 178:10, 178:17, 178:19, 179:4, 179:20, 180:2, 180:7, 180:9, 180:19, 182:5, 184:16, 194:2, 210:11, 218:25, 251:5

**state-of-mind** [2] - 178:6, 179:4

**statement** [17] - 25:18, 53:11, 84:16, 88:2, 88:8, 91:21, 118:25, 159:9, 159:16, 162:25, 165:2, 178:23, 178:25, 184:23, 185:11, 209:10

**statements** [14] - 74:5, 122:12, 134:20, 156:5, 156:9, 179:3, 179:11, 180:4, 180:10, 180:18, 201:12, 226:15, 261:11

**states** [2] - 133:13, 170:25

**STATES** [4] - 1:1, 1:3, 1:11, 1:15

**States** [49] - 2:2, 4:2, 4:7, 6:2, 14:2, 14:3, 14:4, 14:5, 21:8, 26:14, 33:19, 34:15, 35:15, 52:22, 73:16, 75:16, 113:7, 113:8, 113:9, 115:7, 115:9, 118:1, 122:22, 125:6, 125:18, 125:23, 126:19, 126:21, 127:1, 127:9, 127:11, 131:8, 135:8, 135:24, 136:21, 136:23, 137:2, 159:20, 160:24, 169:8, 176:18, 187:12, 235:13, 238:1, 247:4, 257:25, 275:21, 277:1, 279:13

**States's** [1] - 161:5

**station** [1] - 186:24

**statute** [13] - 5:12, 6:10, 11:8, 11:12, 12:15, 12:16, 13:2, 15:12, 16:17, 19:19, 20:19, 24:17, 28:5

**stave** [1] - 130:6

**stay** [13] - 4:17, 15:22, 57:10, 57:14, 70:24, 130:9, 139:3, 151:21, 162:3, 171:7, 174:23, 187:24, 256:12

**Stay** [1] - 226:3

**stayed** [2] - 212:12, 213:2

**staying** [3] - 17:2, 162:11, 175:5

**Steal** [1] - 207:13

**stenographic** [1] - 279:5

**step** [12] - 53:24, 55:18, 55:21, 89:7, 89:12, 113:4, 140:9, 162:13, 166:24, 187:14, 188:19, 268:24

**steps** [27] - 38:13, 48:23, 49:5, 50:2, 52:9, 57:2, 64:15, 64:20, 94:12, 94:21, 110:11, 125:4, 125:6, 175:13, 175:15, 175:17, 210:20, 211:2, 211:3, 257:5, 257:13, 258:8, 260:2, 263:12, 265:13, 265:15, 265:22

**stick** [1] - 268:15

**still** [35] - 8:2, 8:5, 12:23, 14:19, 22:7, 42:11, 52:20, 58:2, 63:10, 64:4, 64:6, 69:18, 69:21, 70:21, 83:15, 84:14, 85:20, 85:23, 86:2, 88:23, 111:19, 131:1, 134:21, 135:23, 138:10, 149:11, 163:17, 163:20, 165:18, 218:8, 221:10, 236:20, 245:4, 269:11, 269:12

**stipulated** [1] - 119:20

**stolen** [1] - 265:22

**Stone** [2] - 206:1, 208:12

**stood** [1] - 120:5

**stop** [27] - 66:3, 66:9,

82:3, 82:8, 82:12, 96:2, 99:13, 100:6, 101:9, 103:1, 103:3, 103:10, 103:14, 103:17, 105:3, 107:15, 108:16, 122:19, 132:21, 209:4, 230:23, 236:3, 257:21, 262:3, 265:9, 268:14

**Stop** [1] - 207:13

**stophate** [1] - 195:1

**stophate.com** [8] - 194:24, 195:8, 195:20, 235:21, 235:22, 237:12, 242:10, 242:11

**stophate.org** [1] - 235:20

**stopped** [6] - 66:10, 100:10, 124:25, 125:25, 227:18, 227:25

**stopping** [3] - 80:7, 105:11, 160:5

**stories** [1] - 172:14

**storm** [1] - 106:6

**story** [3] - 255:2, 263:11, 263:12

**Stracka** [1] - 210:13

**straight** [4] - 71:14, 140:8, 256:7, 256:14

**straightforward** [1] - 76:20

**strange** [1] - 105:15

**strangers** [1] - 220:4

**strategic** [1] - 271:17

**strategically** [1] - 224:3

**stray** [1] - 139:4

**Street** [3] - 1:16, 1:19, 1:22

**street** [1] - 257:1

**stresses** [1] - 154:4

**stretch** [2] - 81:7, 214:13

**strike** [9] - 143:21, 144:1, 180:4, 198:9, 253:25, 254:20, 259:10, 260:19, 266:6

**strikes** [1] - 189:13

**striking** [2] - 210:5, 211:25

**stripe** [1] - 80:25

**striving** [1] - 155:19

**stronger** [2] - 130:24, 130:25

**struck** [1] - 137:21

**structure** [4] - 46:9, 46:24, 47:13, 71:23

**structures** [1] - 47:2
**struggling** [6] -
57:19, 75:7, 155:7,
155:10, 157:17,
163:15
**stuck** [1] - 156:17
**study** [1] - 147:25
**stuff** [8] - 31:17,
57:25, 68:1, 92:21,
110:12, 121:25,
138:7, 171:17
**sua** [1] - 18:19
**sub** [1] - 119:9
**sub-element** [1] -
119:9
**subject** [2] - 104:1,
184:11
**submit** [1] - 120:21
**submitted** [1] - 10:4
**subpart** [1] - 16:24
**subpoena** [8] -
75:24, 76:22, 87:6,
89:20, 91:2, 114:20,
114:23, 275:3
**subpoenaed** [1] -
73:24
**subpoenaing** [1] -
62:7
**subpoenas** [2] -
248:15, 275:6
**substance** [5] -
52:16, 63:20, 82:25,
269:4, 272:10
**substantially** [1] -
273:1
**substantively** [1] -
59:13
**successful** [3] -
16:11, 16:13, 246:2
**succinct** [1] - 276:14
**sudden** [1] - 257:16
**sufficient** [15] - 5:15,
19:9, 83:14, 98:21,
130:12, 132:1, 132:3,
133:6, 141:16,
141:25, 142:11,
142:19, 172:17,
173:5, 173:17
**suggest** [4] - 56:14,
68:3, 161:23, 209:12
**suggested** [6] - 18:2,
56:11, 133:15, 136:9,
182:25, 246:24
**suggesting** [5] -
90:14, 94:21, 157:12,
277:18
**suggestion** [3] -
15:6, 54:3, 54:5
**suggests** [3] -
124:24, 131:19,

243:20
**Suite** [1] - 1:23
**summarize** [1] -
171:3
**summarizing** [1] -
126:3
**SUMRALL** [3] -
189:8, 189:21, 193:22
**Sumrall** [59] - 3:10,
33:17, 188:7, 189:2,
189:4, 189:6, 189:11,
190:3, 192:7, 193:19,
193:20, 194:2, 194:4,
194:5, 198:9, 205:2,
205:14, 210:5, 211:8,
211:25, 212:5, 213:8,
214:17, 216:11,
216:12, 216:23,
217:11, 217:13,
217:14, 218:3,
218:18, 219:6,
220:17, 220:21,
223:13, 229:13,
230:10, 230:19,
231:12, 233:2,
233:11, 234:12,
234:18, 235:6,
235:11, 235:17,
236:5, 236:20,
236:23, 237:4,
239:17, 240:10,
240:17, 240:22,
244:13, 244:15,
249:9, 272:2
**super** [2] - 172:15,
172:25
**supervisor** [1] -
96:18
**support** [8] - 26:3,
27:5, 30:8, 30:12,
170:17, 171:22,
197:5, 207:11
**supportive** [1] -
172:15
**supports** [2] - 11:12,
13:7
**supposed** [5] - 12:5,
82:17, 103:12, 255:1,
265:7
**Supreme** [3] - 71:11,
71:12, 71:24
**surely** [1] - 112:20
**surgery** [1] - 256:24
**surprise** [3] - 58:1,
58:8, 91:24
**surreal** [1] - 138:12
**surrounded** [1] -
106:4
**suspect** [1] - 88:11
**suspend** [2] - 22:6,

131:13
**suspicious** [1] -
87:22
**Suzanne** [4] -
208:13, 248:20,
248:24, 269:25
**switch** [3] - 239:14,
239:22, 242:4
**switched** [1] - 8:3
**switching** [1] -
218:16
**SWORN** [6] - 35:20,
139:21, 145:18,
169:18, 193:22,
250:25
**symbol** [2] - 108:18,
199:14
**system** [4] - 12:24,
59:23, 59:24, 140:23

## T

**T-O-N-K-I-N-S** [1] -
140:5
**T-shirt** [2] - 238:2,
238:5
**T-shirts** [3] - 237:22,
237:23, 237:25
**table** [4] - 4:18, 5:1,
272:7, 274:2
**tactical** [2] - 176:6,
177:14
**tailgate** [1] - 207:6
**tailored** [1] - 86:14
**talks** [2] - 27:20,
200:12
**tall** [3] - 69:3, 70:17,
96:7
**Tamara** [1] - 206:1
**Taser** [1] - 38:2
**task** [1] - 123:6
**taught** [2] - 163:10,
165:22
**teach** [4] - 146:7,
146:14, 146:16,
147:23
**teacher** [1] - 154:25
**team** [2] - 198:18,
213:3
**teargas** [1] - 132:21
**technological** [1] -
80:20
**tee** [1] - 219:23
**teed** [1] - 268:18
**television** [2] -
195:12, 252:15
**temporarily** [4] -
15:8, 15:21, 16:22,
123:20

**temporary** [7] - 15:9,
17:2, 17:3, 17:6,
17:21, 17:23
**ten** [6] - 10:8, 41:18,
250:11, 250:12,
252:19, 270:20
**tend** [2] - 63:16,
228:6
**tenders** [1] - 7:3
**Tenders** [1] - 87:11
**tense** [1] - 70:11
**tenuous** [1] - 203:22
**TERENCE** [1] - 1:15
**Terence** [1] - 4:6
**term** [4] - 14:16,
24:5, 28:20, 29:20
**terminated** [1] - 15:9
**terms** [30] - 8:1,
13:24, 27:1, 28:19,
29:7, 30:11, 32:23,
69:9, 81:14, 113:12,
125:24, 132:7,
134:10, 138:21,
149:17, 161:6,
165:16, 165:17,
180:12, 187:5,
192:20, 197:4, 208:4,
209:23, 230:5,
245:23, 248:8, 252:4,
269:20, 270:9
**test** [1] - 236:5
**testified** [20] - 5:17,
40:15, 50:19, 52:3,
60:9, 62:18, 78:12,
79:11, 94:4, 94:7,
100:19, 101:21,
102:7, 108:9, 108:24,
123:20, 219:9,
270:13, 271:4, 271:20
**testify** [40] - 59:19,
74:4, 74:11, 77:2,
106:24, 111:16,
112:1, 114:18,
121:13, 146:19,
150:3, 150:6, 150:16,
156:7, 158:10,
158:13, 159:2, 179:7,
179:20, 180:17,
185:11, 190:19,
192:8, 200:13,
200:16, 201:10,
224:7, 226:9, 233:20,
245:25, 246:6,
248:20, 250:4,
250:14, 262:21,
271:22, 274:23,
277:15, 277:16
**testifying** [1] - 40:24,
115:10, 149:3,
209:21, 229:20,

233:23, 245:4, 254:15
**testimony** [74] -
7:13, 7:17, 8:19,
14:20, 16:8, 20:18,
33:10, 41:4, 49:15,
49:20, 51:15, 53:15,
58:9, 61:24, 77:12,
81:15, 84:2, 85:3,
85:13, 89:3, 90:8,
90:22, 98:1, 110:23,
115:12, 124:1, 128:7,
138:22, 143:13,
148:19, 149:19,
151:13, 153:2,
153:22, 155:14,
156:17, 157:19,
158:24, 159:4,
160:13, 161:6,
165:20, 166:16,
166:20, 177:25,
178:6, 183:3, 183:4,
187:23, 188:8, 190:7,
190:11, 193:13,
204:2, 223:16,
223:24, 224:1, 228:7,
243:12, 243:22,
246:16, 249:9,
249:19, 260:13,
266:6, 268:25, 269:5,
271:9, 271:25,
272:12, 272:15,
272:23, 273:24
**testing** [1] - 236:7
**Texas** [4] - 146:2,
147:3, 152:8, 194:6
**text** [2] - 92:19,
246:7
**THE** [590] - 1:1, 1:10,
1:14, 1:16, 1:18, 3:4,
3:6, 4:1, 4:14, 4:24,
5:2, 6:12, 6:14, 6:19,
7:1, 7:6, 7:7, 7:10,
7:24, 8:11, 9:20,
10:10, 11:14, 11:21,
13:4, 13:18, 16:18,
17:11, 19:8, 21:1,
21:6, 24:19, 26:13,
26:24, 27:4, 28:4,
29:10, 30:5, 30:14,
30:25, 31:15, 31:22,
32:9, 32:17, 32:20,
33:7, 33:14, 33:19,
34:4, 34:10, 34:13,
34:17, 34:19, 34:22,
35:1, 35:6, 35:11,
35:12, 35:19, 35:21,
38:22, 38:25, 39:2,
39:6, 39:19, 40:5,
40:8, 40:24, 41:14,
44:11, 45:7, 45:9,

45:12, 45:15, 45:17, 47:16, 49:10, 49:13, 49:21, 50:7, 50:10, 50:22, 51:17, 52:10, 52:24, 53:4, 53:14, 53:21, 54:3, 54:9, 54:10, 55:12, 55:15, 55:16, 55:17, 55:18, 55:19, 55:21, 55:23, 55:24, 56:2, 56:6, 57:13, 58:1, 60:8, 60:11, 60:15, 60:17, 60:19, 61:3, 61:20, 62:2, 62:4, 62:16, 64:25, 65:11, 65:22, 66:1, 66:6, 66:11, 66:12, 66:14, 66:15, 66:23, 67:6, 67:7, 67:11, 67:12, 67:13, 67:14, 67:17, 67:19, 68:3, 68:10, 68:14, 68:16, 68:21, 68:24, 70:24, 72:15, 73:11, 73:13, 73:16, 75:1, 75:5, 75:13, 75:20, 76:12, 76:18, 77:25, 79:7, 79:19, 79:25, 80:18, 81:2, 81:12, 81:24, 82:3, 82:8, 84:22, 85:20, 86:7, 86:10, 87:8, 87:10, 87:14, 88:4, 88:9, 88:14, 88:22, 89:5, 89:14, 90:1, 90:5, 90:19, 90:22, 91:2, 91:14, 91:16, 92:1, 92:6, 92:11, 92:23, 92:24, 93:3, 93:4, 93:5, 93:6, 93:13, 93:14, 93:15, 93:16, 93:20, 95:1, 95:6, 95:8, 96:1, 97:6, 97:16, 98:12, 98:15, 99:4, 101:3, 101:4, 103:7, 103:9, 103:25, 106:13, 106:14, 106:17, 106:21, 108:22, 109:5, 111:5, 111:17, 112:5, 113:2, 113:4, 113:5, 113:7, 113:9, 113:18, 114:13, 114:16, 114:19, 114:22, 114:25, 115:5, 115:7, 116:1, 116:7, 116:14, 116:22, 117:25, 118:4, 122:21, 123:14, 125:8, 126:17, 135:10, 135:14, 135:21, 136:1, 136:6, 136:12,

136:15, 138:2, 138:8, 138:15, 139:5, 139:10, 139:11, 139:14, 139:20, 139:22, 143:8, 143:11, 143:17, 143:21, 144:11, 144:13, 145:10, 145:11, 145:12, 145:16, 145:19, 148:2, 148:17, 149:2, 149:9, 150:9, 150:14, 150:16, 150:24, 151:4, 151:8, 153:3, 153:6, 153:7, 153:8, 153:12, 154:18, 156:2, 156:14, 158:6, 159:15, 159:25, 160:12, 161:4, 161:14, 162:2, 162:21, 163:1, 163:25, 164:6, 164:11, 165:7, 167:1, 167:7, 167:15, 167:21, 167:24, 168:7, 168:13, 169:5, 169:7, 169:8, 169:10, 169:11, 169:13, 169:17, 169:19, 176:9, 176:12, 176:21, 177:20, 177:23, 178:20, 179:23, 181:5, 181:12, 181:19, 182:3, 182:18, 183:5, 183:11, 184:2, 184:10, 185:5, 185:13, 187:12, 187:14, 187:16, 187:18, 187:22, 188:1, 188:4, 188:9, 188:10, 188:12, 188:15, 188:20, 188:23, 189:6, 189:9, 190:13, 190:24, 191:10, 192:14, 193:20, 193:23, 194:7, 197:8, 197:11, 197:14, 197:24, 198:9, 199:7, 199:11, 199:13, 199:14, 199:15, 200:5, 200:10, 200:20, 201:5, 201:8, 201:15, 201:25, 203:1, 203:17, 203:24, 204:13, 204:17, 204:18, 204:19, 205:3, 205:5, 205:6, 205:7, 205:10, 205:11, 209:15,

209:18, 210:2, 210:5, 211:7, 211:8, 211:11, 211:15, 211:22, 211:25, 213:8, 213:11, 213:24, 214:4, 214:11, 214:16, 214:24, 215:10, 216:4, 216:10, 216:22, 216:24, 217:1, 217:7, 217:10, 217:14, 217:17, 218:3, 218:6, 218:9, 218:12, 218:22, 219:18, 219:22, 221:4, 222:3, 223:11, 223:21, 224:24, 225:3, 225:9, 225:12, 225:15, 225:21, 226:5, 226:19, 227:15, 228:11, 228:15, 229:1, 229:5, 229:10, 229:15, 229:16, 229:23, 229:24, 230:4, 230:9, 230:13, 230:14, 230:17, 231:12, 231:16, 232:11, 232:12, 232:14, 232:15, 232:25, 233:17, 233:20, 234:9, 234:12, 235:6, 235:8, 235:13, 236:2, 236:7, 236:8, 236:10, 236:11, 236:16, 236:18, 236:21, 236:22, 236:24, 236:25, 239:3, 239:6, 239:10, 239:16, 239:17, 239:19, 239:20, 239:22, 240:2, 240:7, 240:9, 240:11, 240:14, 240:20, 242:3, 242:5, 242:24, 242:3, 243:7, 243:12, 243:21, 244:6, 244:15, 244:17, 244:19, 244:23, 245:3, 245:10, 245:12, 245:21, 246:4, 246:11, 246:15, 247:3, 247:19, 248:1, 248:3, 248:10, 248:13, 248:17, 248:23, 249:8, 249:24, 250:2, 250:14, 250:17, 250:23, 251:1, 251:18, 251:21, 251:22, 252:1, 252:2,

253:12, 253:15, 253:20, 253:25, 254:9, 254:12, 254:20, 258:17, 258:20, 258:24, 259:10, 260:12, 260:15, 260:17, 260:18, 260:19, 261:5, 261:8, 261:18, 262:13, 262:17, 262:23, 263:3, 263:8, 263:10, 263:14, 263:17, 264:8, 264:16, 265:3, 265:7, 265:25, 266:6, 267:21, 267:23, 268:14, 268:24, 269:7, 269:10, 269:12, 269:13, 269:15, 269:19, 270:1, 270:5, 270:8, 271:2, 271:23, 272:8, 273:3, 273:10, 273:13, 273:16, 273:19, 274:8, 274:13, 274:21, 275:5, 275:6, 275:12, 275:15, 275:17, 276:6, 276:9, 276:15, 276:21, 277:3, 277:8, 278:11
   **theirs** [1] - 198:2
   **themselves** [9] - 38:15, 43:23, 103:20, 105:18, 106:9, 112:24, 117:13, 234:3, 257:18
   **theologian** [3] - 24:3, 24:20, 26:15
   **theories** [1] - 10:16
   **theory** [8] - 32:4, 32:7, 133:23, 134:2, 190:25, 192:21, 219:24, 275:10
   **theory-of-the-defense** [2] - 32:4, 32:7
   **there'll** [2] - 13:14, 206:15
   **there're** [2] - 138:8, 270:6
   **therefore** [2] - 27:12, 182:10
   **Thereupon** [11] - 35:4, 55:25, 66:4, 73:14, 81:10, 92:9, 117:23, 153:10, 164:4, 167:25, 250:21
   **they've** [6] - 131:23, 133:8, 198:3, 224:4,

230:9, 275:5
   **thicket** [1] - 163:13
   **thinking** [11] - 17:15, 68:11, 88:17, 93:1, 106:23, 162:16, 163:11, 168:4, 178:25, 227:11, 229:20
   **thinks** [4] - 8:8, 123:12, 226:24, 227:16
   **third** [7] - 60:3, 60:24, 61:20, 61:22, 63:13, 218:7, 233:6
   **Third** [1] - 1:20
   **third-party** [3] - 60:3, 60:24, 63:13
   **thoroughly** [2] - 16:19, 128:1
   **thoughtful** [1] - 173:25
   **thoughts** [2] - 33:20, 184:12
   **thousands** [2] - 219:15, 232:4
   **three** [22] - 9:15, 147:19, 148:9, 151:23, 151:24, 159:24, 159:25, 160:9, 166:15, 189:13, 217:9, 217:10, 217:12, 218:4, 218:5, 219:11, 225:4, 225:10, 229:25, 264:2
   **three-and-a** [1] - 264:2
   **throughout** [7] - 37:22, 99:23, 117:14, 133:10, 134:9, 149:25, 190:6
   **throw** [1] - 87:24
   **throwing** [2] - 19:4, 224:21
   **thumbs** [1] - 54:18
   **thumbs-up** [1] - 54:18
   **Tiffany** [1] - 7:5
   **timeframe** [3] - 141:10, 144:24, 148:15
   **timestamp** [1] - 66:3
   **tipper** [1] - 206:19
   **title** [1] - 170:17
   **today** [15] - 32:10, 33:11, 33:16, 83:23, 106:21, 113:19, 116:4, 135:22, 136:25, 249:23, 268:17, 268:18,

271:9, 272:3, 278:8
**today's** [1] - 92:3
**together** [9] - 32:2,
54:6, 132:19, 141:14,
141:15, 146:21,
147:25, 187:1, 253:8
**tomorrow** [21] -
83:23, 86:25, 89:22,
114:18, 135:22,
245:19, 246:12,
250:3, 268:17,
268:18, 269:1, 272:3,
272:10, 273:4, 274:1,
275:19, 276:22,
276:24, 277:13,
277:14, 277:17
**tomorrow's** [1] -
92:3
**tone** [1] - 207:12
**tonight** [3] - 246:7,
247:5, 247:21
**Tonkins** [5] - 3:7,
139:19, 140:5, 140:6,
140:11
**TONKINS** [1] -
139:21
**took** [4] - 110:12,
175:16, 196:6, 220:23
**tooth** [1] - 183:13
**top** [7] - 10:4, 125:5,
207:17, 207:18,
210:10, 210:18,
265:14
**topic** [1] - 135:9
**tossing** [1] - 120:9
**total** [1] - 34:10
**totally** [4] - 27:11,
56:16, 80:3, 245:9
**touch** [3] - 155:25,
246:2, 259:25
**touched** [3] - 175:20,
269:22, 269:23
**touching** [1] - 120:9
**tough** [1] - 111:6
**toward** [3] - 54:23,
108:5
**towards** [13] - 6:2,
125:25, 126:2, 126:3,
173:25, 183:19,
196:13, 213:3,
231:11, 241:21,
256:14, 257:5, 257:13
**tower** [1] - 63:7
**town** [1] - 196:7
**track** [1] - 137:19
**tracking** [1] - 137:17
**traditional** [1] -
101:25
**traffic** [1] - 208:3
**train** [2] - 147:14,

196:7
**training** [1] - 162:23
**transcript** [10] - 8:24,
9:5, 22:17, 30:18,
78:8, 140:8, 271:21,
271:24, 279:5, 279:6
**TRANSCRIPT** [1] -
1:10
**transcripts** [1] -
271:3
**transforming** [1] -
5:11
**trash** [1] - 207:1
**travel** [2] - 170:21,
170:24
**traveled** [1] - 256:8
**traveling** [1] - 251:10
**travesty** [1] - 195:21
**tread** [1] - 193:11
**Treadwell** [1] -
127:12
**TREADWELL** [1] -
127:12
**treat** [2] - 146:9,
198:3
**treated** [1] - 146:10
**tremendous** [1] -
80:1
**tremendously** [1] -
125:5, 272:22
**trespass** [3] -
226:19, 227:4, 234:24
**Trespassing** [1] -
234:24
**trespassing** [3] - 9:9,
9:17, 226:11
**TRIAL** [1] - 1:10
**trial** [18] - 4:3, 4:12,
9:1, 10:7, 30:17, 31:7,
72:4, 76:22, 87:15,
88:11, 88:19, 122:19,
138:5, 144:4, 144:25,
155:19, 179:21, 202:5
**trials** [6] - 8:19,
116:16, 119:20,
119:21, 179:24,
270:13
**tried** [5] - 62:11,
74:2, 137:23, 196:7,
258:22
**trier** [1] - 148:21
**trip** [4] - 18:1,
174:25, 182:13,
184:13
**trouble** [2] - 189:12,
237:10
**troubling** [1] -
111:18
**truck** [1] - 257:9
**trucks** [1] - 206:15

**true** [6] - 29:14, 73:7,
102:25, 103:16,
279:4, 279:5
**truly** [1] - 127:19
**Trump** [4] - 121:25,
197:5, 209:2, 255:25
**Trump's** [1] - 196:7
**trust** [1] - 97:25
**truth** [11] - 41:6,
41:7, 61:13, 63:25,
64:13, 64:16, 83:5,
156:10, 179:16,
215:11, 222:7
**Truth** [1] - 253:3,
253:4
**truthful** [1] - 104:2
**truthfully** [1] - 51:8
**truthfulness** [1] -
81:16
**try** [16] - 25:4, 45:13,
54:8, 64:15, 68:7,
71:1, 81:3, 111:7,
163:14, 165:15,
171:17, 186:24,
245:8, 258:1, 259:20,
276:13
**trying** [43] - 20:20,
24:2, 49:18, 61:12,
63:25, 84:14, 89:5,
98:9, 98:23, 103:14,
111:4, 111:22,
112:13, 112:16,
117:5, 117:8, 124:6,
128:16, 130:2, 130:3,
130:4, 132:21,
143:13, 157:10,
161:16, 161:20,
163:1, 163:2, 163:13,
173:13, 177:24,
185:7, 186:19,
190:24, 192:20,
198:5, 211:13,
222:12, 223:1, 226:6,
226:8, 243:9, 249:25
**Tuesday** [1] - 5:17
**turn** [8] - 6:1, 7:10,
39:3, 161:1, 240:13,
240:15, 255:3, 255:5
**turned** [2] - 186:25,
197:1
**Turning** [1] - 195:2
**turning** [1] - 160:24
**twice** [1] - 189:11
**two** [53] - 5:6, 8:23,
10:18, 20:6, 21:13,
30:16, 34:7, 34:10,
34:11, 34:14, 34:19,
38:15, 43:22, 45:24,
62:4, 67:4, 69:17,
73:21, 77:10, 101:21,

102:1, 104:25,
105:16, 105:18,
106:1, 108:9, 108:18,
109:19, 110:9, 116:6,
119:20, 121:9,
127:24, 153:24,
159:25, 160:8,
178:20, 185:22,
199:8, 218:6, 219:21,
220:13, 224:17,
225:2, 225:3, 236:7,
253:8, 261:2, 262:2,
270:6, 273:22, 276:7
**type** [3] - 121:25,
143:4, 255:24
**typically** [1] - 31:10
**tyrannical** [1] - 19:3

## U

**U.S** [13] - 36:8,
59:22, 61:19, 76:5,
76:10, 86:20, 88:1,
114:15, 145:5, 209:8,
209:11, 210:19, 211:2
**ultimately** [6] -
50:12, 83:5, 146:23,
186:22, 186:24,
271:12
**unauthorized** [5] -
7:18, 7:22, 22:5,
125:18, 131:13
**unbiased** [3] - 144:6,
187:8, 197:23
**unbroken** [2] -
243:20, 244:4
**unclear** [4] - 23:18,
80:3, 197:12, 217:11
**under** [7] - 28:16,
56:25, 118:6, 120:1,
183:21, 274:21,
274:22
**undercharged** [1] -
87:20
**undercut** [1] -
138:17
**underlying** [1] -
207:12
**underpinning** [1] -
133:19
**underprosecuted** [1]
- 136:4
**understood** [8] -
72:13, 185:12,
200:24, 204:10,
209:22, 237:18,
261:17, 262:24
**undertaken** [1] -
23:16

**unfairly** [1] - 39:23
**unfold** [1] - 196:19
**unfortunately** [4] -
156:17, 158:19,
158:22, 212:22
**UNIDENTIFIED** [1] -
45:8
**unit** [1] - 37:8
**UNITED** [4] - 1:1,
1:3, 1:11, 1:15
**United** [49] - 4:2, 4:7,
6:2, 14:2, 14:3, 14:4,
14:5, 21:8, 26:13,
33:19, 34:15, 35:15,
52:22, 73:16, 75:16,
113:7, 113:8, 113:9,
115:7, 115:9, 118:1,
122:22, 125:6,
125:18, 125:22,
126:19, 126:21,
127:1, 127:9, 127:11,
131:8, 135:8, 135:24,
136:21, 136:23,
137:2, 159:20,
160:24, 161:4, 169:8,
176:18, 187:12,
235:13, 238:1, 247:4,
257:25, 275:21,
277:1, 279:13
**united** [1] - 2:2
**unlawful** [6] - 21:11,
24:6, 24:10, 24:14,
25:17, 25:24
**unless** [2] - 157:9,
190:5
**unlike** [1] - 129:9
**unlikely** [2] - 249:8,
249:17
**unnecessary** [1] -
24:18
**unreasonable** [1] -
220:14
**unrelated** [1] - 134:1
**unruly** [1] - 21:25
**unsafe** [1] - 38:16
**unsure** [1] - 93:8
**up** [116] - 11:16,
15:15, 26:12, 30:18,
31:9, 31:16, 33:11,
37:15, 37:19, 37:20,
37:23, 38:20, 38:22,
38:24, 42:4, 44:19,
46:14, 47:20, 48:22,
49:1, 49:5, 49:7,
49:20, 53:13, 53:14,
54:18, 63:6, 63:19,
64:2, 66:6, 69:10,
69:13, 72:24, 73:19,
74:16, 76:15, 78:13,
80:14, 82:11, 85:17,

89:1, 94:12, 95:9,
96:22, 97:1, 99:4,
99:8, 99:9, 99:21,
99:22, 100:13,
102:25, 110:10,
119:4, 120:22,
122:14, 124:17,
128:9, 132:9, 133:21,
136:3, 137:15, 139:2,
150:9, 151:5, 152:8,
157:23, 160:19,
162:3, 162:17,
165:21, 166:22,
167:9, 167:15, 168:5,
168:20, 171:10,
182:20, 186:22,
187:2, 198:25, 207:1,
209:4, 212:14, 215:5,
215:6, 215:7, 215:8,
215:17, 219:23,
238:22, 239:1,
240:10, 240:12,
241:21, 248:11,
250:1, 255:23, 256:9,
258:2, 259:18,
259:22, 260:1,
261:14, 261:24,
263:12, 263:13,
265:14, 266:4,
268:18, 270:24,
273:14, 275:14
  **upset** [2] - 183:10,
183:11
  **upside** [1] - 87:4
  **urge** [1] - 271:2
  **USA** [1] - 267:11
  **useful** [1] - 148:21
  **utterance** [2] -
183:22, 184:25
  **utterances** [1] -
179:17

---

## V

  **vague** [2] - 24:23,
27:24
  **vagueness** [1] - 26:6
  **valor** [1] - 36:25
  **valuable** [2] -
167:16, 229:2
  **value** [3] - 58:6,
63:17, 249:16
  **Van** [3] - 60:18,
124:2, 124:3
  **variation** [1] - 109:2
  **variety** [1] - 208:13
  **vast** [3] - 100:17,
190:15, 219:7
  **vehicle** [1] - 176:2

  **vendors** [1] - 206:17
  **venture** [2] - 115:20,
115:21
  **verbal** [2] - 12:24,
134:20
  **verdict** [3] - 118:7,
119:15, 129:19
  **verify** [1] - 174:22
  **Vernon** [1] - 210:12
  **version** [2] - 80:20,
276:4
  **versus** [17] - 4:2,
14:2, 14:3, 14:4, 14:5,
21:8, 26:14, 69:16,
105:18, 126:21,
127:1, 127:10,
127:12, 131:8,
136:23, 137:2, 137:6
  **via** [2] - 186:15,
189:4
  **vice** [11] - 10:20,
11:5, 15:8, 16:6, 16:8,
16:11, 51:3, 123:19,
123:20, 125:19,
129:13
  **Vice** [2] - 124:17,
160:19
  **Vickie** [3] - 3:7,
139:19, 140:5
  **VICKIE** [2] - 139:21,
140:5
  **victory** [1] - 30:6
  **video** [142] - 40:5,
40:6, 40:23, 44:24,
45:1, 45:3, 45:9,
45:19, 47:1, 49:22,
49:24, 50:7, 51:15,
52:4, 52:21, 52:22,
52:25, 54:6, 54:8,
55:12, 56:7, 56:10,
56:18, 57:16, 57:20,
58:21, 59:4, 59:9,
59:10, 59:14, 59:18,
59:20, 59:21, 59:23,
60:14, 60:23, 61:7,
61:19, 62:13, 62:14,
62:25, 65:6, 66:2,
66:3, 66:8, 66:16,
68:4, 68:22, 69:14,
69:18, 71:13, 72:1,
72:6, 72:10, 72:11,
72:23, 73:9, 73:19,
74:1, 74:7, 75:4,
78:13, 79:14, 80:8,
80:13, 80:18, 80:20,
81:25, 82:11, 87:13,
90:24, 92:15, 96:4,
96:20, 96:25, 98:14,
101:5, 101:11,
118:24, 124:21,

130:3, 149:7, 159:13,
159:21, 167:10,
168:9, 168:11, 201:2,
201:6, 212:23,
213:15, 214:2, 214:4,
214:5, 214:17,
214:19, 214:21,
215:12, 215:21,
216:5, 216:10,
216:16, 216:17,
216:24, 216:24,
220:23, 222:11,
224:11, 224:13,
224:15, 224:24,
228:3, 230:25,
232:13, 232:16,
232:17, 232:22,
232:24, 233:3, 233:4,
233:11, 233:12,
234:8, 234:13,
234:19, 243:24,
245:24, 256:5,
256:13, 258:1, 258:6,
261:23, 262:13,
262:21, 263:21,
264:3, 264:12,
270:23, 271:1
  **video-recorded** [1] -
59:20
  **videoconference** [1]
- 189:5
  **videographer** [1] -
190:17
  **videos** [62] - 47:21,
50:5, 50:24, 60:22,
60:24, 61:1, 62:18,
62:21, 63:3, 63:13,
118:20, 134:15,
156:3, 158:18, 160:1,
160:8, 160:10,
165:15, 180:3, 180:5,
191:12, 191:16,
199:8, 212:4, 212:5,
214:24, 215:19,
215:22, 216:4, 217:2,
217:3, 217:4, 217:5,
217:7, 217:15, 218:4,
218:5, 218:7, 219:5,
219:19, 220:3, 220:4,
220:22, 220:25,
221:17, 222:4,
222:15, 222:16,
224:8, 224:17, 225:5,
225:17, 229:1,
229:17, 229:25,
230:11, 230:19,
234:2, 236:14,
250:16, 274:4
  **videotaped** [1] -
217:16

  **view** [6] - 51:5,
65:13, 191:20, 204:5,
259:18, 264:5
  **viewpoint** [1] -
197:20
  **views** [2] - 226:24,
226:25
  **violating** [3] - 11:11,
15:22, 132:17
  **violence** [8] - 29:12,
131:6, 131:16, 182:8,
191:21, 192:21,
226:10
  **violent** [6] - 39:25,
125:5, 143:5, 217:5,
219:3, 224:20
  **Viral** [2] - 253:3,
253:4
  **Virginia** [1] - 36:17
  **virtual** [1] - 189:18
  **visible** [2] - 12:22,
13:2
  **visibly** [2] - 12:14,
12:19
  **visit** [5] - 15:9, 15:25,
16:1, 17:21, 17:24
  **visiting** [11] - 10:21,
11:5, 15:8, 15:12,
15:13, 15:21, 15:24,
16:22, 17:2, 17:6,
123:21
  **Visitor** [3] - 36:13,
48:12, 48:14
  **vocalizing** [1] -
267:12
  **voice** [2] - 141:21,
173:23
  **voicemail** [1] - 91:12
  **voices** [1] - 154:9
  **VOIR** [1] - 71:5
  **volume** [2] - 56:2,
128:2
  **volunteer** [1] -
237:14
  **votes** [1] - 209:4
  **voting** [1] - 146:19
  **vs** [1] - 1:5

---

## W

  **Wahl** [1] - 127:10
  **WAHL** [1] - 127:10
  **wait** [14] - 34:2,
45:13, 92:1, 98:11,
104:5, 113:15,
113:16, 189:15,
218:19, 225:22,
240:18, 251:19,
251:23, 273:25

  **waiting** [5] - 38:23,
218:16, 218:18,
229:11, 236:19
  **waive** [1] - 161:19
  **walk** [5] - 37:11,
110:2, 110:8, 111:6,
196:11
  **walked** [6] - 103:11,
108:4, 110:4, 120:5,
270:20, 273:7
  **walking** [17] - 20:13,
20:16, 57:8, 72:24,
78:13, 102:21,
104:22, 105:23,
107:12, 120:19,
120:23, 133:10,
134:9, 256:14,
257:13, 260:10, 271:1
  **wants** [9] - 35:15,
74:12, 75:11, 88:1,
126:13, 150:2, 179:7,
226:9
  **warm** [1] - 175:10
  **Warner** [15] - 55:3,
62:1, 62:7, 69:5,
70:18, 72:12, 73:23,
75:3, 75:9, 77:14,
83:20, 96:14, 114:18,
274:16, 274:25
  **warning** [1] - 129:21
  **warnings** [1] - 219:4
  **Washington** [10] -
1:6, 1:17, 2:4, 154:12,
174:16, 177:18,
196:6, 205:17, 255:1,
279:14
  **wasting** [1] - 272:24
  **watch** [18] - 52:25,
53:5, 54:6, 55:12,
57:20, 58:24, 66:8,
67:15, 68:3, 68:4,
68:5, 68:10, 73:2,
78:17, 82:14, 214:4,
217:14, 265:20
  **watched** [8] - 125:2,
125:3, 144:25, 158:5,
158:18, 165:14,
196:19
  **watches** [1] - 252:20
  **watching** [3] - 65:17,
67:4, 152:19
  **wave** [6] - 77:9,
77:11, 79:24, 101:25,
104:13, 104:14
  **waved** [3] - 108:12,
108:18, 112:18
  **waves** [1] - 77:15
  **waving** [25] - 43:18,
43:20, 44:3, 44:5,
45:1, 45:19, 45:23,

45:25, 57:4, 77:9,
77:10, 79:14, 94:5,
101:21, 102:1,
102:13, 102:20,
105:6, 108:7, 108:9,
108:14, 109:19,
112:12, 112:14
**ways** [7] - 12:25,
77:16, 87:23, 131:20,
158:2, 190:25, 263:2
**WCHY** [1] - 253:7
**we're..** [1] - 26:12
**weapons** [2] - 176:6,
182:7, 182:14
**wear** [1] - 237:24
**wearing** [2] - 42:8,
121:24
**Weaver** [1] - 208:13
**website** [1] - 195:7
**week** [1] - 117:14
**weigh** [1] - 60:5
**weight** [3] - 203:25,
220:1, 220:8
**Weise** [1] - 127:1
**WEISE** [1] - 127:1
**welcome** [1] - 91:2
**welcomed** [3] -
227:6, 227:7, 228:21
**welcoming** [1] -
44:15
**well-established** [1]
- 102:11
**west** [36] - 14:21,
128:6, 190:4, 190:8,
190:15, 190:22,
191:12, 191:22,
193:2, 196:17,
198:15, 198:18,
212:9, 212:11,
213:19, 213:22,
214:2, 215:16,
215:23, 218:25,
219:7, 219:17, 220:3,
220:25, 221:6,
221:20, 221:21,
222:1, 226:7, 226:10,
226:11, 238:14,
256:18, 270:15,
271:6, 272:13
**Westlaw** [5] - 21:9,
136:25, 138:2, 138:9,
138:11
**whatnot** [2] - 164:21,
196:18
**wheels** [1] - 84:6
**whereabouts** [1] -
212:7
**whereas** [3] - 15:20,
64:1, 213:2
**white** [3] - 87:13,

151:21, 153:8
**White** [1] - 16:25
**whole** [20] - 33:11,
33:13, 51:3, 51:18,
55:12, 64:18, 67:15,
68:4, 69:8, 72:10,
99:23, 109:22, 190:2,
191:13, 191:15,
207:13, 236:10,
236:11, 249:5
**wide** [1] - 81:20
**widely** [2] - 200:14,
201:12
**wife** [3] - 25:5, 163:6,
257:9
**willful** [2] - 5:12,
23:16
**willfully** [13] - 23:14,
23:24, 24:5, 24:7,
25:6, 25:11, 25:19,
27:14, 120:15,
132:12, 132:13,
132:15
**willfulness** [5] -
12:4, 25:23, 132:6,
132:19, 133:1
**willing** [4] - 89:1,
192:17, 219:20, 246:6
**wing** [1] - 272:13
**wintertime** [1] -
175:11
**wish** [1] - 75:16
**withdraw** [3] -
110:25, 143:24, 177:4
**witness** [125] - 34:8,
34:9, 35:16, 39:1,
40:21, 43:10, 50:7,
50:13, 50:19, 51:12,
52:3, 53:2, 53:5, 54:5,
54:11, 55:25, 56:14,
58:17, 59:5, 59:7,
60:2, 61:1, 61:14,
61:25, 62:23, 64:6,
65:1, 65:3, 65:5, 66:1,
66:4, 73:14, 73:25,
74:10, 76:23, 77:5,
77:8, 78:5, 80:2, 80:7,
81:16, 83:22, 86:2,
86:23, 92:7, 92:12,
94:1, 98:16, 106:18,
108:24, 111:16,
113:6, 136:13,
136:20, 138:22,
139:17, 143:13,
144:6, 145:13, 148:8,
149:1, 149:8, 151:8,
157:17, 161:23,
162:12, 165:16,
166:21, 167:24,
169:12, 169:14,

176:14, 176:22,
178:8, 178:24, 179:7,
180:13, 180:19,
180:21, 181:23,
183:6, 187:8, 187:17,
188:5, 188:23,
188:24, 190:12,
190:14, 191:9, 198:2,
199:17, 200:7,
202:20, 203:20,
203:23, 204:18,
206:22, 211:13,
214:7, 216:1, 218:13,
233:23, 238:2,
243:13, 243:22,
244:18, 244:24,
245:1, 249:6, 249:23,
250:3, 250:12, 261:9,
262:18, 264:2, 264:6,
267:4, 271:4, 271:7,
271:12, 271:25
**Witness** [1] - 269:18
**WITNESS** [61] -
35:20, 45:15, 54:9,
55:15, 55:17, 55:19,
55:23, 66:11, 66:14,
67:6, 67:11, 67:13,
67:17, 73:13, 92:23,
93:3, 93:5, 93:13,
93:15, 96:1, 101:4,
103:9, 106:13, 113:2,
113:5, 145:11,
145:18, 153:6, 153:8,
169:5, 169:7, 169:11,
169:18, 187:16,
193:22, 211:7,
216:24, 217:17,
218:6, 229:15,
229:23, 230:13,
231:16, 232:12,
235:8, 236:7, 236:24,
239:19, 240:11,
240:20, 244:17,
250:25, 251:21,
252:1, 260:15,
260:18, 265:7,
267:23, 269:7,
269:12, 269:15
**witness's** [4] - 51:15,
187:22, 197:12,
197:20
**WITNESSES** [2] -
3:4, 3:6
**witnesses** [27] -
8:19, 8:21, 33:10,
33:16, 33:25, 41:5,
80:8, 83:24, 112:2,
113:13, 113:25,
115:10, 116:3,
136:18, 136:23,

137:18, 137:24,
192:1, 198:2, 219:3,
245:13, 269:22,
272:5, 272:17,
272:21, 273:2, 273:21
**wizard** [1] - 18:20
**WL-636464** [1] -
138:11
**woke** [1] - 255:23
**woman's** [1] - 269:23
**won** [1] - 254:4
**wonderful** [3] - 53:1,
170:15, 174:10
**Woodland** [1] - 1:20
**woodwork** [2] -
194:17
**word** [6] - 143:3,
164:10, 170:25,
207:14, 244:3, 268:15
**worded** [1] - 203:3
**wording** [1] - 184:8
**words** [11] - 28:24,
40:17, 48:3, 53:13,
57:9, 64:1, 94:9,
121:12, 173:13,
252:21, 262:25
**worker** [2] - 140:18,
194:15
**works** [2] - 237:4,
239:20
**world** [3] - 63:2,
181:24, 181:25
**worried** [1] - 40:15
**wrap** [1] - 240:12
**writ** [1] - 273:19
**written** [7] - 8:17,
8:18, 8:20, 28:23,
31:4, 195:15, 195:17
**wrote** [3] - 28:12,
109:11, 109:13

**Y**

**yard** [1] - 170:21
**yards** [6] - 40:2,
47:14, 64:18, 78:2,
213:1
**year** [5] - 36:21,
144:22, 148:22, 195:4
**years** [13] - 28:8,
28:11, 47:6, 141:8,
144:18, 144:20,
146:4, 146:13,
147:19, 148:9,
151:23, 151:24,
247:14
**yelled** [1] - 112:18
**yelling** [1] - 112:13
**yellow** [4] - 46:18,

47:13, 208:25, 209:1
**yesterday** [13] - 4:22,
11:4, 11:19, 11:24,
16:23, 41:3, 60:8,
60:17, 87:2, 90:23,
106:22, 113:20,
155:18
**young** [1] - 140:22
**yourself** [19] - 42:18,
42:24, 43:6, 43:18,
44:24, 66:20, 67:1,
69:9, 72:19, 100:6,
101:11, 139:2,
191:18, 197:5, 197:6,
202:24, 212:5,
266:16, 266:23
**yourselves** [1] - 4:4
**YouTube** [1] -
196:10

**Z**

**ZIA** [1] - 1:10
**Zink** [2] - 74:3, 192:9
**zone** [1] - 28:13
**Zoom** [16] - 83:25,
188:7, 188:13,
188:24, 189:14,
199:3, 239:8, 239:22,
242:4, 245:16,
246:12, 249:23,
250:3, 270:3, 272:20,
273:2