```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
       * * * * * * * * * * * * * * *   )
 3     UNITED STATES OF AMERICA,       )      Criminal Action
                                       )       No. 23-00066
 4                    Plaintiff,       )
                                       )
 5        vs.                          )
                                       )
 6     REBECCA LAVRENZ,                )      Washington, D.C.
                                       )      March 29, 2024
 7                    Defendant.       )      9:13 a.m.
                                       )
 8     * * * * * * * * * * * * * * *   )

 9

10                    TRANSCRIPT OF JURY TRIAL
               BEFORE THE HONORABLE ZIA M. FARUQUI
11                UNITED STATES MAGISTRATE JUDGE

12


13

14     APPEARANCES:

15     FOR THE GOVERNMENT:     BRENDAN BALLOU, ESQ.
                               TERENCE A. PARKER, ESQ.
16                             UNITED STATES ATTORNEY'S OFFICE
                                FOR THE DISTRICT OF COLUMBIA
17                             601 D Street, Northwest
                               Washington, D.C. 20530
18
       FOR THE DEFENDANT:      JOHN M. PIERCE, ESQ.
19                             JOHN PIERCE LAW, P.C.
                               21550 Oxnard Street
20                             Third Floor
                               Woodland Hills, California 91367
21
                               ROGER ROOTS, ESQ.
22                             LAW OFFICES OF ROGER ROOTS
                               10 Dorrance Street
23                             Suite 700
                               Providence, Rhode Island 02903
24


25
```

```
 1    REPORTED BY:              LISA EDWARDS, RDR, CRR
                                Official Court Reporter
 2                              United States District Court for the
                                  District of Columbia
 3                              333 Constitution Avenue, Northwest
                                Room 6706
 4                              Washington, D.C. 20001
                                (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                             I N D E X

2

3                              Direct      Cross        Red.

4

   WITNESSES FOR THE DEFENDANT:
5
   Robert Powell                 28
6
   John David Guandolo          105        121          123
7
   James V. Cusick, Jr.         145        179
8
   Anthony Warner               195
9                               202        212          217

10

11

   EXHIBITS RECEIVED IN EVIDENCE                        PAGE
12

13 Government's Exhibit No. 48                           33

14
   Defendant's Exhibit No. 48.3                          42
15
   Defendant's Exhibit No. 63-A                         102
16
   Defendant's Exhibit No. 63-B                         103
17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  Good morning.  This is

2     Criminal Case 23-66, the United States of America versus

3     Rebecca Lavrenz.

4          And this matter is set for jury trial.

5          Parties, please introduce yourselves for the

6     record, starting with the Government.

7          MR. PARKER:  Good morning, your Honor.  Terence

8     Parker on behalf of the United States, accompanied by

9     co-counsel Brendan Ballou, paralegal Rachel Marcelin and FBI

10    Special Agent John Smith.

11         MR. PIERCE:  Good morning, your Honor.  John

12    Pierce and Roger Roots on behalf of Defendant Rebecca

13    Lavrenz, who is here and will be right back into the

14    courtroom in a moment.

15         And also with us, our paralegal, Emily Lambert.

16         THE COURT:  I'm happy to wait for Ms. Lavrenz.

17         MR. PIERCE:  She'll be in in a moment, your Honor.

18         THE COURT:  No problem.

19         (Thereupon, the Defendant entered the courtroom

20    and the following proceedings were had:)

21         THE COURT:  Good morning.

22         So a couple preliminary matters to start with.  I

23    think we have maybe still a couple of jury instructions

24    hanging out.  And I know we had some subpoenas we went over.

25    I talked to Ms. Lavigne-Rhodes.  It sounds like the Capitol

1    Police general counsel's office is working with us on that.

2            Why don't we start with the United States.  Where

3    should we begin, if you have any suggestions?

4            MR. PARKER:  Your Honor, we're happy to talk about

5    jury instructions.

6            We'd like to raise a motion regarding Mr. Cusick,

7    who's the proposed Zoom remote witness today.  Whichever

8    your Honor prefers to take first.

9            THE COURT:  Sure.  Why don't we start with at

10   least two of the jury instructions.

11           I've thought further on the mere presence jury

12   instruction.  As we continue to go through and have argument

13   about what sort of evidence has come in and what the

14   evidence is, I am concerned the more I think about it,

15   although I understand and I agree with Mr. Pierce, I think

16   it looks like Judge Friedman actually -- or Mr. Roots, as

17   you indicated, Judge Friedman had put it in as a sort of

18   general instruction, though it sort of got read in after

19   Count 4.  I'm not sure how that happened.

20           I'm going to reject the jury instruction.  I think

21   with respect to Count 4, the statute makes certain that

22   willful and knowing actions, parading, demonstrating or

23   picketing in certain places is, in fact, illegal.

24           I'm concerned that adding a new concept of just

25   being present in addition to the statutory requirements is

1    confusing.  I'm not really sure how mere presence interacts

2    with the verbs proscribed by the statute.  As it stands, I

3    will instruct the jury that they must determine whether Ms.

4    Lavrenz knowingly or willfully paraded, demonstrated or

5    picketed in a Capitol building, which is an accurate

6    statement of the law and is all they need to know to fairly

7    determine whether she violated the statute.

8           I think the mere presence instruction muddies the

9    waters.  And because I don't find an affirmative, compelling

10   reason to let it in, I will not permit it.

11          Again, after yesterday, I looked back to the

12   reasoning of other judges in the courthouse.  You know,

13   Judge Friedman didn't provide, I guess, really anything

14   affirmatively as to why it was necessary.  But on the flip

15   side, Judge Kollar-Kotelly's reasoning, where she found that

16   presence can result in a violation of Section 5104(e)(2)(G),

17   really drives my decision.  That was from the *Griffith* case,

18   G-R-I-F-F-I-T-H.  And that's 2023 WL 3477249.

19          I won't restate the quote that I read yesterday.

20   But, you know, she pretty emphatically rejects -- I mean,

21   legally, she says it's legally incorrect.  I have no

22   citation that states it's legally necessary.  The only legal

23   citation I found says it's legally incorrect.

24          Also, *United States versus MacAndrew*,

25   M-A-C-A-N-D-R-E-W, 21-730, which is at 2023 Westlaw 196132

1    at Page 9.  The Court came to the same decision.  So for

2    those reasons, I'll reject the mere presence.

3              I'm happy to hear from you on Jury Instruction 8

4    briefly if there's anything you want to add.

5              MR. BALLOU:  On the reasonable doubt instruction?

6    Yes, your Honor.

7              I believe we sent to chambers three citations that

8    make clear that when a jury finds that the Defendant is

9    guilty beyond a reasonable doubt, it's not a permissive

10   direction to find the Defendant guilty; it's mandatory.  The

11   finder of fact must find the Defendant guilty in that

12   situation, just as if the Government fails to meet their

13   burden, the Defendant must be found not guilty.

14             THE COURT:  Mr. Roots and I have had a discussion

15   about this in the past.  I know your position on it,

16   Mr. Roots.  I think you've indicated it before.  You believe

17   it's something that requires a very clear decision but one

18   that, you know, as I believe, it requires it from an

19   authority higher than me.

20             So I don't need to hear a lot more argument on it.

21   I intend to deny it.  But if there's anything you need to

22   add in terms of the record, I'm happy to allow you to do so.

23             MR. ROOTS:  Yeah.  The jury really in the

24   constitutional order can be viewed as above the Court in

25   these things.  And the Founding Fathers, the framers of the

1   Constitution, put the right to jury trial in the

2   Constitution, by the way, in several places.

3            And the point is that all things in the courts are

4   reviewed ultimately by the jury.  The jury is the voice of

5   the people and it actually sits above the courts and

6   ultimately it does have the power to, you know, nullify,

7   essentially.  It does have the power to act as the final

8   arbiter in a trial.

9            And the framers all understood this.  Of course,

10  this goes back in English common law history, back to the

11  trials of William Penn.  And the Supreme Court itself

12  recognized this all throughout American history, has never

13  denied this.

14           However, there are Circuit Court rulings that

15  have, you know -- that have imposed this idea that there's a

16  duty to convict by jury -- for jurors.  These are Circuit

17  Court opinions.

18           The Supreme Court has never pronounced that.  And

19  in fact, as I pointed out in that *Law Review* article, the

20  Supreme Court has issued a number of both suggestions and

21  rulings that in fact that's not the law.  And there was --

22  you know, it's a trivial little point of American history

23  that the Supreme Court at times had a few jury trials.  Most

24  lawyers don't even know about this.

25           Back in the 1790s, there was a few jury trials in

1    the U.S. Supreme Court.  And so -- and we know from the jury

2    instructions that were given in at least one case that we

3    know of that the Supreme Court jury instructions given to

4    the jury consider -- again, this is over 200 years ago --

5    plainly said the jury has the authority, the power and the

6    right to judge both the facts and the law when necessary to

7    prevent injustice.

8              So we think that that jury instruction has to be

9    changed to "may."

10             THE COURT:  I hear you.

11             I agree everyone is above me.  I'll agree with

12   that.

13             But at this time, I'm going to stick with the

14   instruction as it's in the Red Book that the Government's

15   proposed instructions copied from 2.108.  Supporting that

16   instruction, the Government cited the following cases, all

17   of which stand for the proposition that if a jury finds the

18   Defendant guilty beyond a reasonable doubt, they must, not

19   may, convict that person.

20             The cases are *United States versus Pierre*,

21   P-I-E-R-R-E.  That's 974 F.2d 1355.

22             We also have *Baptist versus U.S.*, 466 A.2d. 452,

23   and *Watts*, W-A-T-T-S, *versus U.S.*, 362 A.2d. 706, all of

24   which found essentially that it's the jury's duty or, as the

25   term they use, both of those last two cases, "to uphold" --

1    when upholding laws to find a defendant guilty if all

2    elements are proved.

3              So that's the main two.

4              I think there's also this theory-of-the-case

5    instruction.  That's the only one I have that's left on my

6    sheet.

7              MR. BALLOU:  Yes, your Honor.

8              The defense submitted that about 20 minutes before

9    court began.

10             THE COURT:  We could take that up at the end of

11   lunch today.

12             MR. BALLOU:  I think by lunch we should have an

13   answer for you.

14             THE COURT:  I'm happy to hear next about your

15   question regarding Mr. Cusick.

16             We'll note we reviewed the transcript from *Gunby*,

17   G-U-N-B-Y, where both Mr. Cusick and Mr. Sumrall did

18   testify.

19             So I'm happy to hear from the United States.

20             MR. PARKER:  Yes, your Honor.

21             So essentially two points to our motion.  They're

22   somewhat related.

23             The first is, Mr. Cusick is going to testify by

24   Zoom.  I suspect we're going to run into the same sort of

25   time/practical issues of presenting a lot of video evidence

1    by Zoom.

2              THE COURT:  Well, let me interrupt there.

3              What are the demonstratives that you intend to

4    use?  I'm not in any way trying to discourage you from using

5    any; I just want to know what those are.

6              MR. PIERCE:  Well, I think, your Honor, I think

7    they'd be whatever it was that we actually used in *Gunby*.

8    You know, the idea here would be to have him provide, you

9    know, very similar testimony.  It sounds like there's four

10   videos that we would -- maybe three.

11             THE COURT:  I might just start asking my questions

12   to Ms. Lambert.

13             Thank you, Ms. Lambert.

14             Three to four videos.  Okay.

15             Anything -- can you confirm, Ms. Lambert?  Any

16   photographs that you anticipate?  Or non-videos?

17             MS. LAMBERT:  (Shakes head in the negative.)

18             THE COURT:  So I hear you.  She's shaking her

19   head.

20             Thank you, Mr. Parker.  I want to get my facts

21   straight.

22             MR. PARKER:  Yes, your Honor.  So I won't belabor

23   the point, your Honor.  I think your Honor understands our

24   concerns about the Zoom videos.

25             I think we'll also most likely run into similar

1    issues that we did with Mr. Sumrall yesterday, where

2    inevitably we will have to break, excuse the jury, show

3    Mr. Cusick the video, see whether he actually has any

4    relevant testimony about that video, bring the jury back in

5    and just go through this unnecessary delay over and over

6    again.

7           And I think we -- what we experienced with

8    Mr. Sumrall yesterday under Rule 403 -- I mean, Rule 403

9    talks about a waste of time, you know, substantially

10   outweighing the probity of the evidence.  I think we

11   experienced that yesterday with Mr. Sumrall.  I anticipate

12   we are going to experience that today with Mr. Cusick if he

13   testifies by video.

14          Setting aside the practical logistics concerns

15   that we have, I think our second point -- maybe I should

16   have led with it, and maybe it's the more important -- is we

17   don't understand Mr. Cusick to have any relevant testimony

18   about this Defendant and the charges that she is facing.

19          Mr. Cusick, it is my understanding, went to trial.

20   He has been convicted.  And the general facts of his case

21   were that he was at the Ellipse watching President Trump's

22   speech.  Sometime around 1:00, he went with a large crowd

23   that traveled from the Ellipse to the Capitol.

24          He was on the west side of the Capitol, not the

25   east side.

1      He eventually entered the Capitol through the

2      Senate wing door, not where the Defendant entered, a

3      different floor of the building, different side of the

4      building.

5      He's -- he entered the Capitol at about 3:09 p.m.

6      That's after the Defendant already left.  She had been gone

7      for about 15 to 20 minutes at that point.

8      And so he's not inside the Capitol at the same

9      time as the Defendant, so he can't speak to what was going

10     on inside the Capitol when the Defendant was inside of the

11     Capitol.

12     And he exits the U.S. Capitol, my understanding is

13     through the west side again.  And he remains off the west

14     side in the upper west terrace.  We don't have allegations

15     that the Defendant was on the upper west terrace.  So he's

16     not in a place to see the Defendant, interact with the

17     Defendant.  He's not even in the same general vicinity as

18     the Defendant at the same time.

19     So he can't speak to -- even if we're going to

20     allow him to talk to atmosphere, he can't talk about the

21     atmosphere that the Defendant experienced, as he simply was

22     not there.

23     If he's going to testify about January 6th more

24     generally, the same way that Mr. Sumrall tried to, he's

25     going to get into expert testimony.  He was not noticed as

1    an expert.  We would move to exclude him.

2              Your Honor made clear yesterday with Mr. Sumrall

3    that the time for noticing experts has long since passed.

4              So the probity of this witness is so tremendously

5    low that it's substantially outweighed.

6              THE COURT:  Can you tell me the timeline again?

7              MR. PARKER:  My understanding is Mr. Cusick

8    entered the building at about 3:09 p.m.  He exits the

9    building at about 3:20.  He's inside for about ten, 11

10   minutes.

11             So he's not inside at the same time as the

12   Defendant, and he's certainly not in the same locations

13   inside the building as the Defendant when she's there.

14             THE COURT:  Mr. Pierce?

15             MR. PIERCE:  I just think this is so unfair.

16             You know --

17             THE COURT:  Mr. Pierce, I think that's a standing

18   objection you have to everything.  So I know that.  But I --

19   tell me about -- why is this particularly unfair?

20             MR. PIERCE:  Well, it's particularly unfair

21   because, you know -- I mean, we've had multiple cases before

22   you.  And not only cases before you, but in every other case

23   we've had.  You know, we don't object to any witness,

24   really, that the Government wants to put on.  We're ready to

25   have the jury see all the facts.

1          Even when we object to all these videos and all

2     these pictures and all this testimony about stuff that

3     happened nowhere near any of these defendants repeatedly,

4     time after time after time after time, that evidence is let

5     in.

6          He has a very similar fact pattern to Ms. Lavrenz.

7     He's -- well, I mean, to begin with, he's a 75-year-old

8     grandfather who's a pastor who, you know, came to D.C. to

9     have his voice be heard.

10          He got to the Capitol grounds.  He doesn't see any

11     signs.  He doesn't knock over any barricades, doesn't have

12     any police officers tell him, you know, to not go in.  He

13     walks in through an open door.  He walks around for, you

14     know, ten to 15 minutes.  He walks out.  And that's pretty

15     much it.

16          And, you know, this could -- it goes to this

17     whole -- he's also in a video that shows the fence being

18     moved.

19          It goes to -- it goes to the heart of this idea

20     that Ms. Lavrenz was part of some -- by definition, because

21     she was at the Capitol, she was part of some violent mob

22     where, you know, everybody's breaking things and hurting

23     people and trying to stop Congress and all that kind of

24     stuff.

25          I mean, she's up against the full force of the

1    United States government.  We don't object whenever the

2    Government brings in specialists from down the street to

3    argue jury instructions or people, you know, come up to the

4    mic who haven't appeared in the case.  We don't object to

5    that.

6              And, you know, just let the woman have her

7    defense.  I mean, you know, it's not like this trial's going

8    to go on for two weeks.  It's obviously relevant, because

9    it's such a similar fact pattern and it relates to the

10   Capitol on January 6th.

11             And I just think it's unfair that time after time

12   the relevance baloney gets sliced so thin for us but just

13   not for the Government.

14             I just think it's unfair.  I think he should

15   testify.

16             THE COURT:  I just want to hear from the United

17   States, not -- I don't need a response as to that.  I just

18   want to -- I presume you're also moving to exclude these

19   other witnesses, Ms. Monk and Mr. Guandolo?

20             MR. PARKER:  My understanding is Ms. Monk wasn't

21   even at the Capitol on January 6th.

22             THE COURT:  That's not my question.  Are you

23   moving to exclude?

24             MR. PARKER:  Yes.  Yes.

25             THE COURT:  Hold on.

1          MR. PIERCE:  So here's what I can say on that,

2     your Honor:  So we've already -- we'll withdraw Ms. Monk.

3     We'll withdraw Ms. Monk.

4          THE COURT:  Okay.

5          MR. PIERCE:  And maybe Mr. Roots might want to

6     talk for a moment about Mr. Guandolo.  But he is absolutely

7     imperative and directly relevant.  I mean, he was at the

8     exact same vantage point, the exact same stage, exact same

9     rally, saw the exact same viewpoint of the crowd, went up

10    the stairs and knows what was -- exactly what was happening

11    in the same location.

12         So -- in addition to the fact that he was -- think

13    about this for a second, your Honor.  He was the liaison

14    from the FBI to the Capitol Police and so -- and he, he --

15    I'm not suggesting that in the sense of -- although

16    Mr. Roots likes to do it, and maybe he'll try, going down

17    the direction of the fact that it was a setup.  But we'll

18    set that aside for a second.

19         But he -- he's -- he's been involved in these same

20    kind of events from the standpoint of being a law

21    enforcement officer who is liaising with the Capitol Police.

22    So he knows the way that things occur, the procedures that

23    are in place.  I mean, he just has vast knowledge of the way

24    things go on a day like that.

25         So it's -- I mean, it's hard to imagine somebody

1    who's more relevant.

2          I will say this:  While we think Mr. Cusick should

3    be allowed to testify for sure, I mean, from our standpoint

4    Mr. Guandolo is, you know, a much more important witness to

5    us.  And so, you know, I'll put that out there.

6          But Mr. Guandolo is -- he is right on target.

7          THE COURT:  Well, I'm not going to have

8    Mr. Guandolo testify about anything that in his knowledge or

9    training -- and he's not been noticed as an expert.  I don't

10   think he would pass testing as an expert because presumably

11   in the decade or more when he retired, presumably things

12   could have changed.  I would imagine quite a bit changed.

13         And so him testifying about what happened ten

14   years ago between the FBI and the Capitol Police is in no

15   way relevant.  It's extremely prejudicial and it's highly

16   confusing to the jurors.

17         Now, if you want to scope his testimony to what he

18   saw, like Mr. Powell, I don't know.  I'll have to think

19   about that.

20         But I want to be very clear now:  He is not -- I

21   will instruct him that he's not going to.  If he is allowed

22   to testify, that he's not to speak about any of that sort of

23   knowledge that he might have.  It would be absolutely purely

24   speculation because he would have no foundation to know what

25   they were doing ten years ago or whatever.

1          How many years is it, Mr. Parker?

2          MR. PARKER:  My understanding is that Mr. Guandolo

3     resigned from the FBI on or about December 1st, 2008.

4          THE COURT:  So certainly more than a decade.  He

5     just has no basis to speak about that.

6          The limits of his testimony at most would be what

7     he saw, not what he believed the FBI agents were doing or

8     what he believed the Capitol Police were doing.  It would be

9     similar to what the testimony of Mr. Cusick is.  "What did

10    you see?"  Where did you go?"  And that's it.  The end.

11         And that's again a question of whether or not it's

12    cumulative.

13         But yes.  Go ahead, Mr. Parker.

14         MR. PARKER:  Yes, your Honor.

15         I think I should maybe add more nuance to our

16    objection.

17         I agree that it is a closer call if all that

18    Mr. Guandolo is going to testify about is "I was a civilian

19    standing on a grassy area at the Capitol.  Here's what I

20    saw."  Leave it at that.  He's on the east side.  Okay.

21         If he's going to even mention that he's an FBI

22    agent, we're going to have a problem.

23         THE COURT:  No.  He's not going to.

24         MR. PARKER:  Or even mention that he was -- had

25    prior FBI service.  We're going to object.

1          THE COURT:  That's totally irrelevant in any way

2     to anything he is going to be stating from stating his

3     background.  He is there to testify as a person who was at

4     January 6th.  It doesn't matter what he was.

5          But to start suggesting, you know, that his role

6     in law enforcement -- it's extremely confusing to the jury.

7     The very issue that we've said that we're not -- an

8     entrapment defense requires someone being currently having

9     the color of law on January 6th, not someone who had it

10    decades before and then coming in and saying, like, "Yeah,

11    this all seems like a setup to me," because that's not what

12    this case is about.  That's a larger question that's not for

13    this Court of law.

14         I don't have that authority, Ms. Lavrenz.  I'm

15    sorry.  It's simply beyond what I'm allowed to do.  I am

16    bound by the law just like everybody else.  I cannot sit

17    here and have the Court start entering into these questions

18    which are not before me.

19         Go ahead, Mr. Roots.

20         MR. ROOTS:  Yeah.  It goes to the credibility.

21    And by the way, yesterday the Government --

22         THE COURT:  Mr. Roots, his credibility as to what?

23    His credibility as to see whether there were barricades,

24    whether or not there were police officers?  It does not go

25    to that.  Whether he was a police officer or he was, you

1   know, a volunteer in the Peace Corps or if he was a priest,

2   it doesn't matter.  You know, the other folks I've allowed,

3   the Government hasn't objected.  But it's not really

4   relevant what their life story is.  There simply is:  What

5   did you see that day?

6           Now, I appreciate their allowing you to ask those

7   questions because we want your witness to be able to present

8   themselves as the human being that they are.  That's

9   important for the finding of credibility.

10          But what their actual employment was, how does

11  that matter as to whether or not they saw barricades or

12  whether or not they saw that there were police officers or

13  whether or not they had to struggle to get in?

14          That has nothing to do with it.

15          MR. ROOTS:  So the Government gets to put on these

16  witnesses wearing medals and talking about Iraq and they

17  have this -- all this experience.  And they get to basically

18  tell the jury that these are the most credible witnesses at

19  all.  I mean, medals all over their chest, uniforms.

20          But we have to put on witnesses as if they're

21  homeless bums.  We can't even talk about their great

22  credentials.  It's just fundamentally unfair.

23          THE COURT:  Well, Mr. Roots, you've had every

24  witness so far talk about their credentials.  So I disagree

25  factually with everything you just said.

1          Those people that came, first of all, there was no

2     objection to them being presented as such.  But more

3     importantly, they are still working in that job right now.

4     So presumably that's their literal work uniform and they're

5     testifying as part of their work, what they observed as they

6     were working.

7          If they were not police officers on January 6th

8     and just went to the police academy afterwards, it would

9     seem ludicrous to have them come in and wearing their

10    uniform now, because all I care about is what was happening

11    on the date of January 6th, not what happened decades

12    before, not what happened years after.  So that date and

13    time.  And those witnesses were all police officers at that

14    time.

15         So I appreciate your frustration.  You are -- I

16    understand, Ms. Lavrenz, it may seem at every moment that

17    your life hangs in the balance, and that you have every

18    right to be frustrated and disagree with my decisions.  I am

19    just trying to make the decisions I think the law directs me

20    to do.

21         And all I can tell you is that Mr. Roots and

22    Mr. Pierce of course always have the ability to appeal any

23    decisions that I make.  But I make them all not only with

24    the understanding of your presumption of innocence, but

25    there are rules.  Rule 403 is clear I have to be careful in

1   terms of prejudice.

2          And so I think Mr. Guandolo talking about his

3   prior experience in the FBI as a Capitol Police officer

4   liaison, that that relevance of that narrow testimony is

5   more than substantially outweighed by the danger that it

6   would cause to unfair prejudice and especially confusing the

7   issue.

8          This is not an issue in this case, whether there

9   was a legal permission given by law enforcement or, you

10  know, the government for people to enter.

11         Now, Ms. Lavrenz, as I've said before, can testify

12  as to what she perceived.  That is totally different than

13  someone else coming and being a pseudo-government

14  representative trying to suggest that what they saw

15  happened.

16         That is something to litigate in a court of public

17  opinion or in other venues, but not a four-count misdemeanor

18  case in this court.

19         So I don't need to hear anything else.

20         Mr. Roots, you can make your record, but I don't

21  need to hear anything else.  But go ahead if you need to add

22  anything else for the record.

23         MR. ROOTS:  Mr. Guandolo can testify about his

24  knowledge of other FBI people that he witnessed there.  And

25  this goes to the heart of the Government's case.  The heart

1    of the Government's case is that this was a criminal mob,

2    essentially, whereas in fact Mr. Guandolo can testify that

3    the government actually had a lot more control than they are

4    letting on, that in fact there were undercovers and there

5    were FBIs that were not undercover.  They were just there as

6    participants who would have, if they had seen crimes

7    committed, would have engaged in enforcing laws and this

8    kind of thing.

9            So Mr. Guandolo can identify people that he knew

10   to be FBI agents.

11           THE COURT:  Mr. Roots, Mr. Roots, you've got to

12   stop.

13           He cannot do that.  How on earth could he do that

14   when he is not part of the FBI?  My ex-girlfriend from ten

15   years ago cannot tell what I am like right now.  Only my

16   wife knows that.  Right?

17           He was more than a decade out of the game.  I

18   appreciate your stance.  It is -- factually, there's no

19   predicate for it, nor do I think -- it's in fact an

20   impossibility.

21           What you're asking for is expert testimony.  You

22   did not notice him as an expert, and I find it very

23   difficult to believe that he would be able to be admitted as

24   an expert because he was more than a decade out from

25   talking.  Even if he knew someone was an FBI officer still,

1    just from his friendship or communication, we know and we

2    can hear it -- right? -- from the Government if it's not the

3    case that they're not supposed to be talking to civilians

4    about what is sensitive law enforcement techniques.

5             That, I'm concerned, would be implicating both him

6    if he's trying to get sensitive information, his Fifth

7    Amendment rights, as well as anyone who was then leaking it

8    to them.

9             But there's no such information that that exists.

10   And we're well past the time for him to be noticed as an

11   expert.

12            So I'm not allowing it.  We're not going to hear

13   further argument on this.

14            I will consider again the narrow scope of him --

15   just what he saw that day and not as an FBI agent but just

16   as a person who was there who has -- can testify as to what

17   he saw, much like I'm allowing Mr. Powell.

18            So that's the end of that.

19            In terms of the theory of the case, we'll come

20   back to it at lunch.

21            Ready for Mr. Powell?  Go ahead.

22            MR. ROOTS:  I want to make another record.

23            We spoke to Mr. Guandolo yesterday.  He indicated

24   that almost as soon as we placed him on the witness list for

25   the defense, he received a phone call from the FBI wanting

1    to, you know, talk to him or I'll say potentially intimidate

2    him.

3            And this is while they were telling us and the

4    Court that they didn't know his number.  I want to put that

5    on the record.

6            THE COURT:  So --

7            MR. PARKER:  The --

8            THE COURT:  That's not what they indicated.  They

9    said they had a phone number.  They said they shared that

10   phone number with you.  So that's a gross misstatement of

11   the facts.

12           Now, Mr. Roots, let's be clear.  There's two

13   different things.  There's being an advocate -- and I want

14   there to be professionalism between the parties here.  You

15   do recall they gave you a phone number, did they not?

16           MR. ROOTS:  As I recall, there was a delay.  And I

17   believe they were making a call to him during that delay.

18           THE COURT:  Well, there was no admonition for them

19   not to call.  As you stated yesterday, you were hoping to

20   speak to the Capitol Police officer before he testifies.

21   That's everyone's right to speak to a witness.  Just like

22   you have that right, they have that right.  That doesn't

23   mean that it's intimidation.

24           I would think someone, especially a retired FBI

25   agent, is more than capable -- he's not a wilting flower

1   here -- that he could tell someone, "Buzz off.  I'm not

2   talking to you."  And so it's no different than a Capitol

3   Police officer who may not want to talk to you.

4          So I don't think there's any indication that's

5   witness intimidation.

6          Moreover, they never said that they weren't going

7   to call him, that they were told not to call him, much like

8   I have not told you not to call.  You can call any of their

9   witnesses and Capitol Police officers and ask to talk to

10  them.  That's normal trial practice.

11         Mr. Parker, I really don't need to hear about

12  this.  So I don't think it's valuable.

13         MR. PARKER:  Okay.

14         THE COURT:  I'll give you the opportunity to

15  speak.  I don't need anything else.  But if you feel that

16  you need to say something, I'm not going to stop you.

17         MR. PARKER:  We'll leave it at that, your Honor.

18         THE COURT:  Thank you.

19         All right.  Ready for Mr. Powell, Mr. Roots?

20         MR. ROOTS:  Yes.

21         THE COURT:  Why don't we call him up here first so

22  we have him before the jury comes out.

23         (Thereupon, Robert Powell entered the courtroom

24  and the following proceedings were had:)

25         THE COURT:  You can come up to the stand.  Thanks,

1    Mr. Powell.

2              Okay, Ms. Lavigne-Rhodes.  Once he gets up there,

3    can you get the jury, please?

4              (Whereupon, the jury entered the courtroom at 9:46

5    a.m. and the following proceedings were had:)

6              THE COURT:  You can be seated.  Thank you.

7              Good morning, everybody.

8              THE JURY:  Good morning.

9              THE COURT:  Great to see all.  Thanks for your

10   patience.  We're ready to continue with the testimony of

11   Mr. Powell.

12             Mr. Roots, your witness.

13             MR. ROOTS:  Thank you, your Honor.

14      (ROBERT POWELL, DEFENSE WITNESS, PREVIOUSLY SWORN.)

15                  CONTINUED DIRECT EXAMINATION

16   BY MR. ROOTS:

17   Q.  Good morning, Mr. Powell.

18   A.  Good morning.

19   Q.  I believe last night we were watching Government's 107.

20             MR. ROOTS:  And let's bring up Government's 107

21   again.

22             THE COURTROOM DEPUTY:  Who's playing this?

23             MR. ROOTS:  She would be playing.

24   BY MR. ROOTS:

25   Q.  Before we start, let's just reorient where we were.

Powell - DIRECT - By Mr. Roots

1          So you testified that you had come on to the east

2    area of the Capitol.  Is that correct?

3    A.  From around the north side.  Yes.

4    Q.  And you believed in this particular frame -- where would

5    you believe you might be on this frame?

6    A.  Well, this looks like it's not quite as advanced as

7    where we were yesterday.  But I would be right here behind

8    these flags.

9    Q.  Okay.

10          MR. ROOTS:  Let's roll that film.

11          (Whereupon, segments of Government's Exhibit No.

12   107 were published in open court.)

13          THE WITNESS:  As a matter of fact, I think I see

14   myself right there.

15   BY MR. ROOTS:

16   Q.  Could you circle yourself?

17   A.  (Witness complies.) Right there.  Right in about two

18   people back from the line of Capitol Hill [sic] police

19   officers.

20          MR. ROOTS:  Okay.  And so we're at 58 seconds into

21   this video.  It's at -- the top left corner of the video

22   shows 2:00 p.m. and 58 seconds p.m.

23          And Mr. Powell has circled a place a little bit

24   confusing, but way over toward the right where the crowd is

25   and some flags are obscuring also.

1    BY MR ROOTS:

2    Q.   If you could describe the police line and what was going

3    on with the crowd at the police line there.

4    A.   They were chanting "USA, USA, USA" and expressing their

5    general displeasure at the results of the election.

6    Q.   And were you also filming yourself?

7    A.   I was.

8    Q.   We'll get to that later.

9             MR. ROOTS:   Let's play this film a little bit

10   further.

11            (Whereupon, segments of Government's Exhibit No.

12   107 were published in open court.)

13            MR. ROOTS:   We can stop anytime.

14   BY MR. ROOTS:

15   Q.   Now, you mentioned yesterday that you had never met the

16   Defendant in this case, Ms. Lavrenz?

17   A.   That's correct.

18   Q.   Do you know where she was, if she was, in this -- in

19   this setting?

20   A.   I have no clue.

21   Q.   Okay.

22            MR. ROOTS:   I want to bring up Government's 305-A.

23   Let's play this up to the steps.

24            (Whereupon, segments of Government's Exhibit No.

25   305-A were published in open court.)

1    BY MR. ROOTS:

2    Q.  Do you see the yellow circle there labeled --

3    A.  Yes, I do.

4    Q.  -- Lavrenz?

5                (Whereupon, segments of Government's Exhibit No.

6    305-A were published in open court.)

7    BY MR. ROOTS:

8    Q.  As Ms. Lavrenz gets close to the steps -- we're about 35

9    seconds into this clip -- where would you be in relation to

10   her?

11   A.  Take it back two frames.  A little bit more.  A little

12   bit more.  Stop.  Stop.  Stop.

13               I can't say for certain, but this is the same

14   colored jacket that I was wearing.  And I was wearing a knit

15   cap that I think that's me.

16               MR. ROOTS:  Okay.  And -- and so we're at 40

17   seconds in this clip.

18               Mr. Powell has circled an individual with a green

19   jacket, which he believes is him, about in the middle of

20   this scene.

21   BY MR. ROOTS:

22   Q.  Let me just ask, so you have an idea from this clip

23   where Ms. Lavrenz was in relation to you?

24   A.  Yes.

25   Q.  About how far away would you say?  If you know.

1    A.  It's been a long time since I took trigonometry.  Let's

2    see.  I want to say 50 feet.

3    Q.  Okay.  And is she in front of you or behind you?

4    A.  She's behind me.

5                MR. ROOTS:  Let's play this to the end.

6                (Whereupon, segments of Government's Exhibit No.

7    305-A were published in open court.)

8                MR. ROOTS:  Let's bring up Defense 48, which I

9    believe is your video.  Well, this is too early.  No.  This

10   is too late.  We may not have the video up the steps.

11               But let's go to 48.  We'll play that.  I don't

12   believe this is in evidence.

13               THE COURTROOM DEPUTY:  No.

14               (Whereupon, segments of Defendant's Exhibit No. 48

15   were published to the witness.)

16   BY MR. ROOTS:

17   Q.  Do you recognize this video?

18   A.  I do.  This is my video.

19   Q.  You filmed this video on January 6th?

20   A.  I did.

21               MR. ROOTS:  We move to admit Defense 48.

22               THE COURT:  Any objection?

23               MR. BALLOU:  No objection.

24               THE COURT:  It'll be admitted and published to the

25   jury.

 1            (Whereupon, Government's Exhibit No. 48 was

 2     entered into evidence.)

 3            MR. ROOTS:  Let's go ahead and play that.

 4            (Whereupon, segments of Defendant's Exhibit No. 48

 5     were published in open court.)

 6            MR. ROOTS:  Stop right there.

 7     BY MR. ROOTS:

 8     Q.  We've stopped at ten seconds.

 9            So just to orient the time, is this after you had

10     come up those steps?

11     A.  Oh, yes.

12     Q.  And where were you right now?

13     A.  I'm at the top of the steps going back down to look for

14     my phone.

15     Q.  And you were -- what were you doing there?

16     A.  I was doing my job as a journalist:  covering an event

17     that I never expected.

18     Q.  And you were filming?

19     A.  I was.

20     Q.  And this is your film?

21     A.  Yes.

22            MR. ROOTS:  Let's keep playing.

23            THE WITNESS:  As a matter of fact, if you go

24     back --

25            THE COURT:  There's no question pending,

Powell - DIRECT - By Mr. Roots

```
 1    Mr. Powell.  You've got to listen to me.  There's no
 2    question.  He said to go back.
 3                Please continue.
 4    BY MR. ROOTS:
 5    Q.  Let's go back and point out if you can where any
 6    landmarks or points of interest are.
 7                (Whereupon, segments of Defendant's Exhibit No. 48
 8    were published in open court.)
 9                THE WITNESS:  Okay.  It was at the second landing
10    down here that my phone was lost.
11    BY MR. ROOTS:
12    Q.  If I could ask, how was it lost?  Out of a pocket?
13                MR. BALLOU:  Objection.
14                (Whereupon, the following bench conference was
15    held:)
16                THE COURT:  Go ahead.
17                MR. BALLOU:  Your Honor, I don't see how this
18    witness's missing phone is going to have any relevance to
19    the actions or intentions of the Defendant.
20                MR. ROOTS:  It doesn't have a lot.  I'm just
21    setting the background.
22                THE COURT:  I mean, it's completely irrelevant.
23    So you can ask this one question, but then we need to move
24    on.  It has nothing to do with -- stay focused on what he
25    saw in terms of police presence and where he went that day,
```

1    where he stopped, his perceptions.  But, you know, we don't

2    need to orient this.  We clearly understand where we are.

3    Thank you.

4              MR. ROOTS:  Understood.

5              (Whereupon, the following proceedings were had in

6    open court:)

7    BY MR. ROOTS:

8    Q.  So you were focused on momentarily looking in which

9    direction?

10   A.  Down the stairs.

11             MR. ROOTS:  Let's keep playing.

12             (Whereupon, segments of Defendant's Exhibit No. 48

13   were published in open court.)

14             MR. ROOTS:  Pause right there.

15   BY MR. ROOTS:

16   Q.  Did you hear something at that time?

17   A.  I did.  I heard the sound of breaking glass, which drew

18   my attention to this window that's being broken by Hunter

19   Ehmke, E-H-M-K-E.

20             MR. BALLOU:  Objection.

21             (Whereupon, the following bench conference was

22   held:)

23             THE COURT:  Go ahead, Mr. Ballou.

24             MR. BALLOU:  Once again, we're -- it's not clear

25   to me at all how this gets to the Defendant's actions here,

1    where the relevance is.

2            I'm extremely concerned that we are headed down a

3    line of inquiry that's going to be conspiratorial and

4    suggest that this was some sort of false flag operation or

5    that the FBI or Antifa was responsible for agitating the

6    crowd.  I think we need to stop that line of inquiry very

7    quickly.

8            THE COURT:  I'm sure, Mr. Roots, you're not going

9    to do that.  Right?

10           MR. ROOTS:  Well, okay.  I do want to point out

11   that -- well, Hunter Ehmke was Antifa.  And I want to point

12   out that the crowd had different opinions.  Not everyone on

13   the crowd's on the same page.  The Government has suggested

14   Ms. Lavrenz was on the same page with a violent mob,

15   et cetera, and through this witness I want to point out that

16   there are a lot of things going on:  different voices,

17   different interests.

18           THE COURT:  So I don't want any questions about

19   Hunter Ehmke.  There's -- there's no relevance to anything

20   that's going on here.

21           And, you know, what he thinks of Hunter Ehmke is

22   completely speculative.  Even if Hunter Ehmke said

23   something, that would be hearsay.

24           So I don't need to hear about anything further

25   about that person.  Not what -- again, he can't speculate as

1    to what people's motivations were.  What he can testify is

2    what he saw.  And we've already discussed that to the

3    extent -- if you are -- I've allowed you to play clips.  The

4    clips have audio.  I don't think those clips are -- there's

5    a problem playing them because of both present sense

6    impression and it's not being offered for the truth.

7          But when you start having him testify what it is

8    because he's trying to demonstrate the truthfulness of each

9    thing, how people feel, then he's crossed the line.

10         Mr. Roots, this is now -- we're beyond the seventh

11   or eighth time I've instructed on this.  So after this, I'm

12   just going to start -- they're going to object; I'm going to

13   say "granted"; and it's going to make your testimony very

14   choppy.

15         It's really up to you how you want to handle this.

16   But I think it's not to your client's benefit if we have to

17   keep doing this.  You're just going to have to stay away.

18   You have a standing objection.  I appreciate that.  You've

19   preserved this for appeal.  But this is my ruling, and I

20   cannot keep repeating it over and over again.  Okay?

21         MR. ROOTS:  One -- okay.  Another -- just another

22   point I want to make, touch on.

23         THE COURT:  Please.

24         MR. ROOTS:  The law enforcement briefly arrests

25   this guy.  And then Mr. Powell observes basically the law

1      enforcement abandons him, the area, and Mr. Powell has to

2      protect that window.  Basically, the whole point is the

3      confusion.  The law enforcement is doing different things,

4      acting very strangely.  Ms. Lavrenz, you know, obviously is

5      in a state of confusion about all this.

6              THE COURT:  So, Mr. Ballou, what -- I'm happy to

7      happy to hear from you.  If he wants to ask Mr. Powell, Did

8      you see, you know, anyone get arrested and did you see them

9      continue to be arrested, I think that's fine.  But he can't

10     then speculate as to what that means.  And I will -- I can

11     again direct him as to that.

12              But I think that, you know, this is in the area

13     where Ms. Lavrenz was and I think where, you know, you have

14     set the scene one way and they want to have someone else

15     also describe sort of what they saw.  But that is to be

16     without any of this editorial or speculation.

17              MR. BALLOU:  Understood, your Honor.

18              I think what would be helpful here is perhaps

19     another admonition to the witness to just answer the

20     question as it's been asked.  Because I understand, your

21     Honor, I think those are legitimate questions to ask in

22     terms of establishing whether or not there was disorderly or

23     disruptive conduct happening.

24              But if he even steps a foot towards "This is a

25     conspiracy," I think that's going to be just highly, highly

1    prejudicial to the jury here.

2              THE COURT:  Okay.  Mr. Roots, do you understand

3    that?

4              MR. ROOTS:  Yes.  The Government is alleging a

5    conspiracy and it's not in existence.

6              THE COURT:  No.  In fact, they're not.  They've

7    not charged a conspiracy.  So that is incorrect.

8              They've been clear that what they are alleging is

9    that there was a disturbance and that many people were part

10   of it, but there's no sort of allegation that people --

11   there was an agreement between people.  So I mean, that's

12   simply not a charge here.  Perhaps if they did, then this

13   would become potentially relevant.  But they made a charging

14   decision to limit themselves, which was a more serious

15   charge.  Instead of a one-year maximum penalty, it would

16   have been a five-year at a minimum if it was a 371

17   conspiracy.

18             So, you know, they made a choice to not include

19   that higher charge.  And they now have the benefit of that,

20   which is that the things that you want to discuss cannot be

21   brought in.

22             So I will admonish your witness.  But you can ask

23   the questions I've directed you to.

24             Let's keep moving.

25             (Whereupon, the following proceedings were had in

```
 1    open court:)
 2              THE COURT:  All right, Mr. Powell.  I just want to
 3    remind you:  You're going to get a series of questions now.
 4    I want you to answer those questions without speculating as
 5    to anyone's intention or motives or what you think people
 6    may have been doing.  You can simply testify as to what you
 7    perceived in action that occurred, not kind of what was
 8    underlying that.  Okay?
 9              THE WITNESS:  I understand, your Honor.
10              THE COURT:  Thank you, Mr. Powell.
11              THE WITNESS:  I'll do it to the best of my
12    ability.
13              THE COURT:  Perfect.
14              Go ahead, Mr. Roots.
15              MR. ROOTS:  Let's keep playing.
16              (Whereupon, segments of Defendant's Exhibit No. 48
17    were published in open court.)
18              MR. ROOTS:  Let's stop right there.  We're stopped
19    at 1:19.
20    BY MR. ROOTS:
21    Q.  What did you just witness there?
22    A.  I witnessed the arrest of Hunter Allen Ehmke --
23              MR. BALLOU:  Objection.
24              THE COURT:  Mr. Powell, hold on.
25              MR. ROOTS:  We don't have to identify anyone.
```

1          THE COURT:  We're going to strike the name.  You

2   can just say what you saw at that moment.

3          THE WITNESS:  I witnessed the arrest of this

4   individual.

5   BY MR. ROOTS:

6   Q.  And was it a quick -- did -- it was -- about how -- how

7   long did it take for law enforcement to get there after this

8   individual was breaking that window?

9   A.  Oh, they were there within seconds.  They left the

10  Columbus doors and bum-rushed him, took him right off that

11  ledge.

12          MR. ROOTS:  Let's keep playing.

13          (Whereupon, segments of Defendant's Exhibit No. 48

14  were published in open court.)

15  BY MR. ROOTS:

16  Q.  Okay.  In your observations, was the crowd generally

17  supporting law enforcement or were they supporting that?

18          THE COURT:  You're not to speculate.

19          Mr. Roots, we can have another bench conference.

20          (Whereupon, the following bench conference was

21  held:)

22          THE COURT:  He's not to testify what the

23  motivations of the crowd were or what the crowd was

24  thinking.  He can testify as to what he saw was occurring,

25  the physical actions.  But this is both speculative; and

1    again, if he's repeating what other people said, it is

2    hearsay.  That's the truth of the matter asserted.  So we're

3    moving on from that.

4                I'm going to strike the question.

5                (Whereupon, the following proceedings were had in

6    open court:)

7                THE COURT:  I'm going to strike the question.

8                Please move on, Mr. Roots.

9                MR. ROOTS:  Let's bring up another exhibit.  This

10   would be Defense 48.3.  This is not in evidence.

11               (Whereupon, segments of Defendant's Exhibit No.

12   48.3 were published to the witness.)

13   BY MR. ROOTS:

14   Q.  Do you recognize this video?

15   A.  I do.  I recorded this video.

16               MR. ROOTS:  We move to admit Defense 48.3.

17               MR. BALLOU:  No objection.

18               THE COURT:  I'll be admitted and published to the

19   jury, please.

20               (Whereupon, Defendant's Exhibit No. 48.3 was

21   entered into evidence.)

22               MR. ROOTS:  Let's play this.

23               (Whereupon, segments of Defendant's Exhibit No.

24   48.3 were published in open court.)

25               MR. ROOTS:  Let's stop right here.  20 seconds

1    into this video.

2    BY MR. ROOTS:

3    Q.  What happened right there?

4    A.  The squad of eight Capitol Hill police officers that had

5    effected the arrest of the individual and had been guarding

6    the window walked away.

7    Q.  Did they leave any officers at the window?

8    A.  They did not.

9    Q.  And what did you do?

10   A.  I started picking up broken glass and pieces of detritus

11   that was on the ground.  You know, I didn't know what

12   exactly was happening, but I knew it was a momentous event.

13   And I wanted to take home a couple of souvenirs.  So I

14   started picking up a couple of pieces of broken glass.

15   Q.  Did you protect the window?

16   A.  I did.

17            MR. ROOTS:  Let's play.  Keep playing.

18            (Whereupon, segments of Defendant's Exhibit No.

19   48.3 were published in open court.)

20            MR. ROOTS:  You can stop right here.

21   BY MR. ROOTS:

22   Q.  What did you observe there?

23   A.  I observed a man in black tearing the window from its

24   frame.  And --

25   Q.  And the --

Powell - DIRECT - By Mr. Roots

1     A.  Excuse me?

2     Q.  Let me ask another.  We heard a voice saying, "Do not go

3     in there."

4     A.  That is the man in black's voice talking to me.  He's

5     asking:  Why don't you guys open up the rest of it and go

6     inside?  And I replied because that would probably be --

7     probably be illegal.

8     Q.  Was that your voice that --

9     A.  Yes.  That was my voice that said it would probably be

10    illegal to further damage that window and go inside the

11    Capitol.

12    Q.  And what happened then?

13    A.  Well, he tore the window from its frame.  And the man --

14    the man with the red hair wearing the mirrored sunglasses

15    rushed in like he was going to enter that window.

16            And I, being a sworn United States Marine, who

17    took an oath to defend this nation from all enemies, foreign

18    and domestic, got in his way to prevent that.

19    Q.  And ultimately, did anyone go through that window?

20    A.  No, they did not --

21    Q.  And --

22    A.  -- to my knowledge.  Not while I was there, anyway.

23    Q.  And so you're saying you protected that window to some

24    extent?

25    A.  Yes.

Powell - DIRECT - By Mr. Roots

1    Q.  Okay.  Now, from this perspective of Ms. Lavrenz, do you

2    know at all where she might have been at this time?

3    A.  I have no idea.

4    Q.  So -- and what ultimately -- where did you go

5    ultimately?

6    A.  Well, after these two guys scuffled a little bit, he --

7    the man in black blames the broken window on the man in the

8    mirrored sunglasses, who came on my show and told me what --

9              THE COURT:  Okay.  Okay.

10             THE WITNESS:  -- the man in black said.

11             THE COURT:  Let's stick to what happened that day.

12             THE WITNESS:  Okay.

13   BY MR. ROOTS:

14   Q.  So you observed an exchange between these individuals?

15   A.  I did.

16             MR. BALLOU:  Objection, your Honor.

17   BY MR. ROOTS:

18   Q.  I'm sorry.  That was sort of a leading question.  Let me

19   just ask --

20             THE COURT:  Hold on, Mr. Roots.  He wants to be

21   heard.

22             (Whereupon, the following bench conference was

23   held:)

24             THE COURT:  Go ahead, Mr. Ballou.

25             MR. BALLOU:  Your Honor, given that there's no

 1    testimony that Ms. Lavrenz was near this conversation, I
 2    don't see how it's relevant here.
 3                MR. ROOTS:  I'm going to go directly from here to
 4    the fact that Mr. Powell went back over towards the Rotunda
 5    door, where Ms. Lavrenz probably was.
 6                THE COURT:  Why do we need to hear about this
 7    conversation, though?
 8                MR. ROOTS:  It's -- I don't -- it's not that
 9    important.
10                THE COURT:  Let's keep moving.  I'm concerned it's
11    still hearsay beyond the relevancy.  So let's just keep
12    moving to the next question.
13                (Whereupon, the following proceedings were had in
14    open court:)
15                THE COURT:  We'll strike that question and move
16    on.
17    BY MR. ROOTS:
18    Q.  And what happened after this?
19    A.  I'm sorry.  I don't understand -- I don't comprehend --
20    Q.  Let me ask specifically.  What did you do after this,
21    this moment?
22    A.  Well, after they got done with their little shoving
23    match, I turned my camera off because I would -- the
24    original camera that I had was fully charged.  I was using a
25    backup camera that had a low battery power on it.  So I was

1    only recording things that I thought might be of particular

2    import.

3              I stood around defending that window from others

4    who were trying to enter it.  Nobody's going into the United

5    States Capitol during a riot on my watch.

6              And they eventually realized this, and the crowd

7    started moving over towards the Columbus doors.  So I'm

8    standing there in front of the window by myself pretty much.

9    Q.  Let me stop you.

10             Now, the Columbus doors, just -- so your

11   understanding -- would you describe what those doors are?

12   Would those be the main doors or do they have other names?

13   A.  Well, from our Capitol Hill architect's description of

14   them, they're 20-foot-tall, 20,000-pound bronze doors.

15   Q.  Let me just ask, are they the doors into --

16   A.  Leading into the Senate Rotunda.

17   Q.  Okay.  So we can take this down.

18             And so after the members of the crowd started

19   moving back that direction, what did you do?

20   A.  I followed them --

21   Q.  Okay.

22   A.  -- and continued recording.

23   Q.  Okay.  And ultimately, near those doors, what did you

24   observe?

25   A.  People coming in and out.  It was -- it was a fracas.

Powell - DIRECT - By Mr. Roots

1    People were coming inside.  People were going outside.

2    Q.  Okay.  Did you go inside the Capitol at all?

3    A.  No, I did not, even though somebody tried to push me

4    inside.

5    Q.  And ultimately -- so you did not go inside.  What did

6    you do there near the door, if anything?

7    A.  Well, I was recording -- I was holding my camera high up

8    above my head so that I could get footage from the interior

9    of the Capitol while still remaining outside on the portico.

10            And there was a man on my left yelling, "Hold the

11   line, hold the line, hold the line."  And he was pushing me

12   towards the door.

13            And at that moment, a squad of Capitol Hill police

14   officers opened the inner Senate Rotunda doors and sprayed

15   the entire crowd with chemical irritants.  And it pretty

16   much put me out of action because I was effectively blind at

17   that point.

18   Q.  And so what did you do?

19   A.  Well, I dusted off my camera and got back to work and,

20   you know, just kept my camera pointed in the general

21   direction of what was going on.  I really couldn't see a

22   thing.

23   Q.  And ultimately, did you leave the Capitol steps?

24   A.  Yes.

25   Q.  Let me ask, in the time afterwards, did you try to bring

```
 1    attention to things by contacting officials?

 2               MR. BALLOU:  Objection.

 3               THE COURT:  We can have a bench conference.

 4               (Whereupon, the following bench conference was

 5    held:)

 6               THE COURT:  Mr. Roots, the Government has

 7    proffered no testimony during their case in chief of what

 8    happened after January 6th.  Even if they had, it wouldn't

 9    make this necessarily relevant.  But they certainly have

10    not.

11               So I think on several grounds it's irrelevant.

12    Why does it matter what he did afterwards?

13               MR. ROOTS:  He became something of an

14    investigative journalist.  And he tried to contact everyone

15    from senators, congressmen, even Trump.  And, you know, it's

16    an interesting story about his being basically stonewalled

17    in every direction.

18               THE COURT:  Right.  But interesting is not

19    relevant.

20               So I'm not going to allow it.  I'll strike the

21    question and move on.

22               (Whereupon, the following proceedings were had in

23    open court:)

24               THE COURT:  We're going to strike the question and

25    move on.
```

Powell - DIRECT - By Mr. Roots

1    BY MR. ROOTS:

2    Q.  So you've briefly -- you recently met the Defendant

3    here, Ms. Lavrenz?

4    A.  Yes.

5    Q.  And do you recall interacting with her at all on

6    January 6th?

7    A.  I do not.

8    Q.  Do you now know about where she would have been at that

9    time that you spoke about the door --

10              MR. BALLOU:  Objection.

11              THE COURT:  Let's go to bench conference.

12              (Whereupon, the following bench conference was

13    held:)

14              THE COURT:  Mr. Ballou, go ahead.

15              MR. BALLOU:  Your Honor, if he just testified that

16    he doesn't know where she was that day --

17              THE COURT:  Yes.

18              MR. BALLOU:  -- the fact -- it makes a lot of

19    inquiry unnecessary.

20              THE COURT:  This is speculation.  He didn't know

21    then.  He wasn't there.  And, you know, what he's again

22    reviewed afterwards, he's not an expert witness.  He's there

23    to testify about what he saw on that day.

24              So I simply don't see what the basis is to have

25    him testify to anything Ms. Lavrenz was doing when he said

1     repeatedly he didn't know where she was.

2            MR. ROOTS:  I believe he was very close to her at

3     those doors, pretty close.

4            THE COURT:  Great.  That may be actually true.

5     But the problem is that he does not know that.  So

6     unfortunately, we're stuck here, because he's already

7     testified on not one, but several occasions that he did not

8     know where she was or who she was.  So he simply cannot be

9     testifying as to the things about her.  He can testify to

10    what he saw about the doors and then on argument you'll have

11    to put up the maps and try to show the Venn diagram

12    crossover, if that's what you want to do.

13           But what you can't do is have him speculate and

14    make argument for you.

15           So I'll leave it to you to go down with those

16    parameters.

17           (Whereupon, the following proceedings were had in

18    open court:)

19           MR. ROOTS:  Thank you.

20           THE WITNESS:  One moment, please.  Your Honor, I

21    need to correct a statement I just made for the record,

22    because I just remembered that in the charging documents and

23    statement of fact --

24           THE COURT:  No, no, no.  That's totally out of the

25    bounds of what we're talking about.  I'm going to strike

1    that.  It's not to be considered.

2              Jurors, you're not to consider that.  Okay?

3              We can go --

4              MR. ROOTS:  Well, let me --

5    BY MR. ROOTS:

6    Q.  So do you understand that at one point or another were

7    you close to Ms. Lavrenz in any way?

8    A.  Yes, I was.

9              MR. BALLOU:  Objection, your Honor.

10             THE COURT:  I'm going to excuse the jury.

11             You can leave.

12             (Whereupon, the jury exited the courtroom at 10:22

13   a.m. and the following proceedings were had:)

14             THE COURT:  You can be seated.  Thank you.

15             Mr. Roots, if you want to get a proffer out from

16   what he's going to say, we can do that.

17             But as I've explained to you, Mr. Powell, you

18   cannot use knowledge that you gained after January 6th.

19   You're not an expert witness.  Your testimony is limited to

20   what you saw that day.  And so you're putting together the

21   pieces of the puzzle.

22             That's not what you're here to do.  You're simply

23   here to state what you saw on that day for limited purposes.

24             If there's a question that you think you want to

25   proffer something for him, you can do that.  He's not here

1    to give speeches, though.  He can only answer questions.

2              What is your question, Mr. Roots?

3              MR. ROOTS:  Well, the question -- there's nothing

4    more relevant than this.

5    BY MR. ROOTS:

6    Q.  Were you close to Ms. Lavrenz?

7    A.  In the statement of facts, there is a photograph from an

8    interior camera showing Ms. Lavrenz walking into the Capitol

9    or being pushed, possibly.  I don't know.  I don't have

10   access to the original video or pictures.  I'm not allowed

11   to talk to anybody.  I can't get ahold of it.

12             But it appears that my press helmet is about two

13   feet -- about two people behind her.

14             THE COURT:  We're about six levels deep here on

15   speculation.  I'm not going to allow this testimony.  You've

16   presented it.  It's on the record.  So your objection is

17   preserved.

18             Is there any other questions that you have for

19   this witness?

20             MR. ROOTS:  I think he has mostly told his story.

21   Obviously, he's done some investigative journalism after.

22   He's identified some of the players.  I would like to get

23   those on the record.  But I understand that that -- I

24   understand your Honor's orders.

25             THE COURT:  Thank you.

1        Yes.  Any other questions within the parameters of

2   what I have, which is a fact witness for what he observed on

3   January 6th, not as an expert or something of an

4   investigative journalist or anything for after that?  Any

5   other questions within my scope?

6        MR. ROOTS:  I think we're more or less finished

7   with Mr. Powell.

8        THE COURT:  I need -- it's a yes or no.

9        THE WITNESS:  Yeah.

10        MR. ROOTS:  He's told his story.  And there's a

11   few things that are -- that would shed light on it.  But I

12   understand the Court's direction.

13        THE COURT:  Thank you.

14        So we're going to call the jury back in for

15   cross-examination and then redirect.

16        THE WITNESS:  Your Honor, before you do that, may

17   I get something on the record?  That has nothing -- well,

18   it --

19        THE COURT:  You can't, because you're -- that's

20   not your role in this.  Your role is simply to answer the

21   questions of the attorney.

22        I understand that you may have strong feelings.  I

23   appreciate that.  Mr. Powell, you have many rights, First

24   Amendment rights.  But unfortunately, what you're cabined

25   off right now is to only answer the questions of the

1      attorneys that are before you.  If you want to participate

2      in the Defendant's argument or in support of what they want

3      to do, I'm sure Mr. Roots and Mr. Pierce, Ms. Lambert, they

4      can use all the help them get.

5                  THE WITNESS:  No, your Honor.  It has nothing to

6      do with them.  My life was threatened --

7                  THE COURT:  Mr. Powell --

8                  THE WITNESS:  -- by a United States congressman.

9                  THE COURT:  Mr. Powell, that's something that has

10     nothing to do.  I can't -- I am focused right here on

11     Ms. Lavrenz, the presumption of innocence and her trial.

12     Things that happened to you you need to address with law

13     enforcement, not with me.  Okay?  Or outside of the time.

14     I'd be happy to talk to you when the trial is not going on.

15     But it's disrespectful to the jury if I take the time that

16     they have sworn to give Ms. Lavrenz.  And Ms. Lavrenz, it's

17     disrespectful to her if I start getting involved in what's

18     going on in your life.

19                  So afterwards, you're more than welcome.  I tell

20     prospective jurors -- I have students here all the time.

21     I'm happy to talk to you about your concerns.  I want to

22     make sure that you feel treated just like everyone else as

23     my fellow Americans.

24                  But this is not the opportunity for that.  We can

25     do it at a later time.

1          Let's call the jury back in and keep the trial

2     moving.

3          MR. ROOTS:  One point I would make.

4          THE COURT:  Mr. Roots.

5          Hold on, Ms. Lavigne-Rhodes.

6          MR. ROOTS:  So because of the Government's

7     objections, they basically made us put on really prejudicial

8     video, which was -- which hurts Ms. Lavrenz.  And we weren't

9     able to really through this witness develop the fact that

10    it's exculpatory in reality for Ms. Lavrenz.

11         So this is what happens:  So the jury sees a

12    broken window scene, and we're not able to explain it.  And

13    so this -- ultimately, they'll impute this to Ms. Lavrenz.

14    This is just a huge problem.  It's very, very improper and

15    unfair to her.

16         THE COURT:  I directed you before you admitted it

17    what the scope of the testimony would be both yesterday and

18    I told you again this morning.  And in addition, as it

19    relates to Mr. Guandolo, I told you he would have the same

20    testimony that we heard here today.

21         So the choice that you made still allows you to

22    make that argument.  I think you're more than welcome to

23    make that argument.  You simply cannot have someone who does

24    not have a factual predicate to make that argument.  You

25    have to do it yourself using pieces of puzzle that you've

57

 1   put together and that you've done as you did in the *Barron*
 2   case and other cases with witnesses like this or this exact
 3   witness.
 4          So, you know, I don't know what other remedy you
 5   want because I don't think there is prejudice.  You brought
 6   in these videos that are no different than what the
 7   Government has admitted.  And again, you showed someone
 8   being arrested but then police officers moving away.  I
 9   think that's consistent with your theory of the case, is
10   that there was confusion and that your client was confused
11   and that she was not someone who engaged in any violence.
12          So ultimately how you want to use that is a
13   strategic decision that is up to you.  But I don't see
14   anything that's prejudicial from what happened here.
15          So we're going to call the jury back in and have
16   cross-examination.
17          MR. ROOTS:  Should I just sit down and have --
18          THE COURT:  No.  You can say --
19          MR. ROOTS:  I'll say thanks.
20          THE COURT:  Yes.
21          MR. ROOTS:  Okay.
22          THE COURT:  Let's take this as a five-minute
23   restroom break.  We'll start back at 10:35.  Thank you.
24          (Thereupon a recess was taken, after which the
25   following proceedings were had:)

```
 1                    THE COURT:  You may be seated.

 2                    THE COURTROOM DEPUTY:  All rise.

 3                    (Whereupon, the jury entered the courtroom at

 4         10:35 a.m. and the following proceedings were had:)

 5                    THE COURTROOM DEPUTY:  Please be seated.

 6                    THE COURT:  Okay, Mr. Roots.  You may proceed.

 7                    MR. ROOTS:  Thank you, Mr. Powell.  No further

 8         questions.

 9                    THE COURT:  We'll have cross-examination.

10                    MR. BALLOU:  No questions, your Honor.

11                    THE COURT:  All right, Mr. Powell.  That's it for

12         today.  You may step down.  Thank you.

13                    THE WITNESS:  Thank you, sir.  Can I fly back to

14         Florida?

15                    THE COURT:  Speak to your lawyers about where you

16         need to be, please.

17                    (Witness excused.)

18                    THE COURT:  Ready to call your next witness?

19                    MR. PIERCE:  Yes, your Honor.  We're going to be

20         calling Officer Warner now.  We just need to locate him.

21                    THE COURT:  Do you have to coordinate with your

22         folks here to see if he's in the hallway?

23                    MR. PIERCE:  I'll go look right now.  He's under a

24         subpoena.  It was indicated that he was advised.  So he

25         should be here.
```

1          MR. BALLOU:  Your Honor, is this published to the

2     jury right now?

3          THE COURTROOM DEPUTY:  No.

4          MR. BALLOU:  Okay.  Thank you.

5          THE COURT:  Why don't we have a quick bench

6     conference.

7          (Whereupon, the following bench conference was

8     held:)

9          MR. PIERCE:  Yes, your Honor.  So I'm not sure

10    where he's at.  We emailed Ms. Walters, the counsel over

11    there, this morning.  And she indicated that she had to let

12    him know.

13          I just tried to call her, both her numbers, and

14    she didn't pick up.

15          THE COURT:  Who's your next witness?  We can

16    make -- follow up with Ms. Walters here.  She got this late

17    in the day yesterday.  But she has indicated to the Court, I

18    believe, to our courtroom deputy, Ms. Lavigne-Rhodes, that

19    he was made aware and he's going to be here.  So perhaps

20    it's a matter of a few minutes, getting things organized.

21          But do you have --

22          MR. PIERCE:  I think we might need to put our

23    heads together for a couple minutes, then, because that's

24    what we had been planning to do, was put him on.

25          THE COURT:  Okay.  Did you also speak to her about

1      the other Capitol Police officer?

2              MR. PIERCE:  We let her know -- and we copied the

3      Government -- that we don't need the other officer.

4              THE COURT:  Great.  I appreciate it.

5              So Ms. Lavigne-Rhodes, why don't we have her try

6      to reach out to Ms. Walters.  Let's take a minute and try to

7      see if we can get her quickly on the phone.  And if not,

8      then we'll have to take a break and figure out where he is.

9              MR. PIERCE:  Thank you.

10             THE COURT:  Thanks.

11             (Whereupon, the following proceedings were had in

12     open court:)

13             THE COURT:  Just bear with us for a minute.  We're

14     trying to get our next witness lined up here.  But

15     fortunately, I don't need to hold you out here while we're

16     sorting out the logistics, so I'm going to send you back.

17             (Whereupon, the jury exited the courtroom at 10:42

18     a.m. and the following proceedings were had:)

19             THE COURT:  You can be seated.  Thank you.

20             So I will continue to work with Ms. Lavigne-Rhodes

21     to track down the witness.  We didn't hear back from the

22     general counsel's office, so we will follow up with them.

23             We were told that the officer had received the

24     subpoena and would be available this morning.  So he may be

25     in the building somewhere, maybe on a bathroom break or just

 1    waiting outside.

 2           But my direction to you is to be nearby within a

 3    few steps of here.  At least have one person available so

 4    that if you all -- once we do locate him, we'll be ready to

 5    get going.

 6           I want to get the logistics.  Who will be the

 7    witness after that?

 8           MR. PIERCE:  So it looks like Mr. Guandolo will be

 9    available by Zoom at 1:00.  He will be available, Eastern

10    time.

11           THE COURT:  Who else -- what about Mr. Cusick?

12    What's your -- what's his availability?

13           MR. PIERCE:  Yeah.  I have to -- I just have to

14    double-check with him to see, you know.  I didn't give a

15    time for this morning.  So I assumed we were having the

16    officer.  But I can coordinate with him directly.

17           THE COURT:  And then those are the only two

18    witnesses, I believe, that you've proffered outside of then

19    potentially the Defendant.  Is that right?

20           MR. PIERCE:  I believe that's it as of right now.

21    Yes, your Honor.  Yes.

22           THE COURT:  Well, we'll take this time to try to

23    locate Officer Warner.

24           MR. PIERCE:  Thank you.

25           THE COURT:  We're in recess.

```
 1            (Thereupon a recess was taken, after which the
 2     following proceedings were had:)
 3            THE COURT:  So I understand we're still trying to
 4     locate the witness who received the subpoena last night.
 5     I'm quite confident we will get him located.
 6            By in the interim, to keep things moving, it
 7     sounds like you're ready to call your next witness,
 8     Mr. Pierce?
 9            MR. PIERCE:  Yes, your Honor.  Mr. Roots is going
10     to put on Mr. Guandolo.
11            THE COURT:  I want to speak to Mr. Guandolo first
12     to admonish him to, you know, understanding what the sort of
13     limits of his anticipated testimony are.  I've already told
14     you all over your objection.
15            But anything else before I speak to him,
16     Mr. Pierce?  You've already made your objection, so you
17     couldn't need to restate it.  I know what it is.
18            MR. ROOTS:  Honestly, we'd even make a motion for
19     mistrial.
20            The Government is able to shape a narrative.
21     We're not able to have witnesses answer questions about
22     information that would disrupt that narrative.
23            Obviously, there's a lot -- the Government has
24     weaponized the -- all the forces of criminal justice.
25     They're out to get Trump and they're out to paint a picture
```

 1    of January 6th as just a Trumper event.  There were 100

 2    Antifa.  That window was kicked in by an Antifa operative.

 3    We're not allowed to let the jury know that.  We're not

 4    allowed to let the jury know there were FBI agents on the

 5    east side, that the Government actually was in control or

 6    had more control of the crowd than they are pretending.

 7            So this is -- the Government is creating fake

 8    trials.  These are fake trials.

 9            We move for mistrial.

10            THE COURT:  Well, Mr. Roots, I'm going to overrule

11    that request, the motion.

12            I could not disagree more with your statement

13    about this being a fake trial.  I appreciate you're an

14    officer of the Court here, so your frustration needs to be

15    measured with the fact that while you have to advocate for

16    your client, I think that it is a gross mischaracterization

17    to state it's a fake trial.

18            You can describe it as prejudicial.  But even

19    suggesting that anything happening here is fake or

20    inaccurate I think is a problematic statement.  It does not

21    inure to your client's benefit or yours, as you have to

22    appear not only before me, but many other people.

23            I think you would agree, Mr. Roots, when looking

24    at the leeway I have given you in this trial versus other

25    judges that I give you far more leeway than the others.  I

 1    don't think those judges are so inept as to not understand

 2    what is and is not appropriate.

 3             I am allowing as much as in the *Gunby* trial, if

 4    not more.  As I see it, I have allowed in more witnesses

 5    than any judge in this district to come in and testify.

 6             Moreover, I think that the problems that you have

 7    identified are not problems with this trial.  Issues that

 8    you have with the direction the Department of Justice is

 9    moving are things that have to be addressed in a different

10    forum.

11             You cannot have witnesses come in here and

12    speculate about who is Antifa or who is anything.  You

13    cannot have witnesses come in here and testify about

14    hearsay.

15             I did not write the Rules of Evidence.  That is

16    written by other people.  My job is just to enforce it.

17    Perhaps you ought to seek through legislative fixes or

18    others to have the Rules of Evidence changed.  But I am

19    bound by what is here in the Rules of Evidence.

20             You provided no authority to support the request

21    for what you seek to admit.  And instead, the authority is

22    quite clear, I believe, as I look at case law and precedent

23    from other courts, other judges in this courthouse, that

24    what is permissible is what -- at a maximum what I have

25    allowed.

1          In fact, there's a good argument the Government's

2     made that what I have allowed is beyond what is permissible

3     and I have let you go further because I am so concerned not

4     about you or Mr. Pierce or Ms. Lambert but about your

5     client, Ms. Lavrenz.  She is a person who, again, every

6     decision I make is framed by one thought; and that is her

7     presumption of innocence, because again that is what I see

8     when I see her.

9          So I give you more leeway than you ought to be

10    able to have by the Rules of Evidence because I want her to

11    feel like she's got a fair shot.

12         She ultimately -- Ms. Lavrenz, you may not feel

13    that.  I can't decide how you feel.  I can't speculate how

14    you feel, much like witnesses can't speculate or decide

15    things about other people.

16         So you've made your motion.  You've preserved your

17    objections.  But I do take great umbrage with the suggestion

18    that this is a fake trial.  It's far from that.

19         The jurors, I think it's very evident, are giving

20    their 100 percent to listen to the evidence.  You have made

21    last-minute requests to get witnesses subpoenaed, people

22    that you have known well in advance of the trial.  And I

23    have made sure that the Capitol Police have done all they

24    can to get people here.

25         You have not asked for one but now three witnesses

1    to appear by Zoom.  I'm accommodating those requests.

2          So for anything other than to suggest that the

3    Court has bent over backwards to give Ms. Lavrenz a fair

4    trial is factually incorrect and makes me frustrated,

5    because I don't think that you actually believe that.

6          So there's a difference between advocacy and just

7    *ad hominem* attacks on the Court.

8          And so we're going to continue with your next

9    witness.

10         Call in the jury, please.

11         MR. ROOTS:  One --

12         THE COURT:  Go ahead, Mr. Roots.

13         MR. ROOTS:  It involves the exhibit we intend to

14   show with Mr. Guandolo.  So the exhibit shows Mr. Guandolo

15   at the stage, the same stage where Ms. Lavrenz was at just a

16   few minutes earlier.

17         And we -- the exhibit comes from open-source

18   internet.  And it has writing on it.  And the writing points

19   to Guandolo saying "former FBI agent."  He was standing next

20   to another FBI agent who was -- so there's some writing on

21   the exhibit.  So we're trying to figure out how to get that

22   on, given I guess we can't even see the word "FBI."

23         THE COURT:  You cannot talk about his prior --

24   I've already said, while I've allowed other witnesses to

25   bring in their testimony because there's confusion -- I

1    think this causes confusion from the jury.  So you've got to

2    redact it.  Like Ms. Lambert was able to do before, you need

3    to redact that.

4           I'm happy to hear from the United States.  But I

5    assume that you are objecting to the video stating he's a

6    former FBI agent?

7           MR. PARKER:  Yes, your Honor.  I don't know if

8    your Honor has seen this video.  I've seen it.  It was the

9    video -- and there's a link in the motion to compel about

10   this.

11          Maybe Ms. Lambert is much better at redactions

12   than I am on videos.  I think it's going to be hard.  It

13   might actually be useful for us to pull this up and show

14   your Honor.

15          THE COURT:  Well, I mean, we have to figure out a

16   way to get this done.  If you want to put him on after lunch

17   or something like that and just do Mr. Cusick first -- or

18   you'll have to figure out a way to do it.

19          You can presumably -- maybe you can

20   screen-capture, Ms. Lambert, and just make your own video of

21   the video or something like that at the end of the day,

22   cropping it out.  I don't know.  But, you know, what you

23   need to do to get that done, I'll leave to you.

24          Do you want to call Mr. Cusick now?

25          MR. ROOTS:  So we would have to have over lunch to

1    redact those.

2          THE COURT:  Right.  So I'm hoping you're going to

3    do that over lunch and we can get --

4          MR. ROOTS:  I understand that your Honor wanted to

5    speak to Mr. Guandolo.  We could call him right now and

6    maybe have that discussion.

7          THE COURT:  Well, I'm just going to admonish him

8    before his testimony.  So there's no reason to have him come

9    in and send them back to wait.  Why wouldn't we just begin

10   with Mr. Cusick?

11         MR. PIERCE:  Can we show you the video, your

12   Honor, so you can see?  Can we show it?

13         THE COURT:  Sure.

14         MR. PIERCE:  Can we show you the video, so we can

15   sort of show you the issues that Mr. Parker is referring to?

16   Because I believe, without being the expert that Ms. Lambert

17   is, I believe Mr. Parker is probably right in the sense

18   of -- because of the location throughout the screen of these

19   words, I don't think you can redact it out because it would

20   essentially erase most of the screen.

21         Anyway, can we just show it to you so you can see

22   what we're referring to?

23         THE COURT:  Sure.  It's really a technical

24   question.  Yeah.  Absolutely.

25         MR. PIERCE:  We can reach an agreement of some

1    sort.

2            THE COURT REPORTER:  Counsel, for the record,

3    could I have an exhibit number of what is going to be

4    published?

5            MR. PIERCE:  This is going to be Defense Exhibit

6    63.

7            MR. PARKER:  I'll need for the record, your

8    Honor -- I don't think it was on any defense exhibit list

9    we've received.

10           MR. ROOTS:  May I respond to that?

11           With the 302 we got in discovery from the

12   Government, it was on the eve of this trial, really maybe

13   the first day.  So we only had Guandolo -- that 302 in order

14   to start looking into Guandolo.

15           MR. PARKER:  I'm sorry, your Honor.

16           THE COURT:  Go ahead.

17           MR. PARKER:  The reason we turned over the 302 in

18   the first place is because we saw a video file that had been

19   uploaded to USAfx but was not given an exhibit number and

20   was not included on the exhibit list.  This is that video.

21   That's what started all of this.  They obviously knew about

22   Mr. Guandolo well ahead of the 302.

23           THE COURT:  I've heard enough about that.

24           MR. PARKER:  Sorry.

25           THE COURT:  No.  You're both fine.

1          Can I see the video, please, Ms. Lambert?  Are you

2     able to get it up?  Thank you.

3          (Whereupon, Defendant's Exhibit No. 63 was

4     published in open court.)

5          THE COURT:  I see the status bar is moving,

6     Ms. Lambert, but the screen is not.

7          (Whereupon, Defendant's Exhibit No. 63 was

8     published in open court.)

9          THE COURT:  Where is Mr. Guandolo in this?  Oh,

10    that's him right there, where the mouse is pointing?  Thank

11    you.  So the mouse is pointing to the person in the center

12    of the screen in the black sort of trench coat with a black

13    cap.

14          Please continue, Ms. Lambert.

15          (Whereupon, Defendant's Exhibit No. 63 was

16    published in open court.)

17          THE COURT:  I see a fairly simple solution to this

18    problem.  Don't play the middle part of the clip.  Either

19    you can snip it or stop it and make two clips, but just

20    don't include the part in the middle where all it does is it

21    has arrows that are demonstratives that have been put.  And

22    so you can play the before and the after or just the before

23    or just the after.  But that seems like a very easy

24    solution.

25          MR. PARKER:  Your Honor, if we can -- I think the

1  Government's preference would be for it to actually be

2  distinct clips where the video, whatever video --

3          THE COURT:  I mean, they can't fast-forward and

4  show the arrows for sure.  I'm saying whatever way they want

5  to do it, I want that excised, the middle part.

6          Ms. Lambert, I leave it to your expert judgment

7  how to do that.  Do you want to take a couple minutes to

8  figure out how you want to do that?

9          MR. ROOTS:  Okay.  We'll call one 63 and the next

10  one 63-A.

11          THE COURT:  So 63 --

12          MR. ROOTS:  She's saying we can play it and stop

13  it and later on she can clip it for -- to get everything

14  finalized as an exhibit.

15          THE COURT:  How are you going to -- Ms. Lambert,

16  can you go back to the part before the arrows come up,

17  please?  Thank you.

18          (Whereupon, Defendant's Exhibit No. 63 was

19  published in open court.)

20          THE COURT:  It's doing the same thing where it's

21  not moving again.

22          MR. PARKER:  Your Honor, if we're going to have

23  technical difficulties with it --

24          THE COURT:  I hear you.

25          (Whereupon, Defendant's Exhibit No. 63 was

1      published in open court.)

2            MR. ROOTS:  We'll start back again at 29 seconds.

3      That'll be the second clip.

4            THE COURT:  Just so I understand, you're going to

5      start with the first clip?

6            MS. LAMBERT:  Thirteen seconds.

7            THE COURT:  Thirteen seconds.  Can you start from

8      the beginning and show me what it looks like up to 13

9      seconds, please?  Thank you.

10            (Whereupon, Defendant's Exhibit No. 63 was

11      published in open court.)

12            MR. ROOTS:  We'll stop at 13 seconds.

13            THE COURT:  How close is it to the -- keep going.

14      Let's just stop at 12 to be safe.  There's no difference

15      between 12 and 13.  We'll stop at 12 seconds.  We'll

16      unpublish it to the jury, then, so the jury screens will be

17      off, just to make sure there's no issues.  And then we'll

18      jump to that second portion, to 29 seconds.

19            MR. PARKER:  Can we play to the end one last time,

20      please?

21            THE COURT:  Sure.

22            Ms. Lambert, if you could take it from the

23      beginning, please.

24            MR. PARKER:  No.  Just from here to the end.

25            THE COURT:  Oh.  Just from here to the end.

1           (Whereupon, Defendant's Exhibit No. 63 was

2     published in open court.)

3           MR. PARKER:  Thank you.

4           THE COURT:  What we'll do is play the first 12

5     seconds, hit stop, and that part will be published to the

6     jury.  I want to authenticate this before the jury comes in

7     so we can just deal with that once I'm admonishing

8     Mr. Guandolo.

9           Then we will -- Ms. Lavigne-Rhodes will take it

10    off so the jury no longer sees it after 12 seconds.  It'll

11    be stopped.  Then we will have Ms. Lambert jump it however

12    she wants to while it's not being -- it's not visible to the

13    jury to the 29 seconds and then they'll finish playing it.

14    Okay?

15          MR. PARKER:  Yes, your Honor.

16          THE COURT:  Ms. Lambert, you have to do this all,

17    I believe, while on Zoom and share screen.  And that's not

18    going to cause any problems?

19          MS. LAMBERT:  Probably not.

20          THE COURT:  Let's try it once with you logged in

21    via Zoom.

22          MS. LAMBERT:  (Complies.)

23          THE COURT:  Ms. Lambert, I'd like to stop it at

24    12, not 13, seconds.  So once the clock strikes 12, let's

25    stop.

```
 1              I think what we can do is admit Mr. Guandolo.  I'm

 2      going to give him his direction that he's not to talk about

 3      his prior employment and that his testimony is limited to

 4      not speculating on what other people were saying or doing,

 5      but simply what he observed that day.  And that's the scope

 6      of his testimony.

 7              MR. PARKER:  Your Honor, if we could also clarify

 8      to have the witness not say that he's there with other FBI

 9      agents.

10              THE COURT:  Sure.

11              So why don't we let Mr. Guandolo into the Zoom

12      room.

13              (Mr. Guandolo joins the proceedings via Zoom

14      videoconference.)

15              THE COURT:  Hi, Mr. Guandolo.  Can you hear me

16      okay?

17              MR. GUANDOLO:  Yes, sir, I can.

18              THE COURT:  Wonderful.

19              Judge Faruqui here.

20              What do you see right now on your screen?

21              MR. GUANDOLO:  I see you, your Honor.

22              THE COURT:  Great.  Thanks so much.

23              So right now you're visible to the parties.  The

24      jury is not in the room.  I wanted to give you a little bit

25      of direction as to your testimony.
```

1          There's been a motion to limit some of that

2     testimony, and I have ruled as to that motion.  So you're

3     not going to be asked nor are you at any time to mention

4     your prior employment.  Your testimony is limited to what

5     you perceived on January 6th in terms of what you saw in

6     terms of police barricades or what you saw in terms of did

7     anyone -- did you see people engaging in violence, your

8     perceptions that day.

9          You're not to speculate as to sort of the

10     motivation of people, what they were -- their sort of spirit

11     that was animating their decisions or anything like that.

12     You simply can say -- answer the questions that are posed to

13     you without speculating or stating hearsay, what other

14     people had said.

15          You're not to mention at any time what -- whether

16     you believe someone was an FBI officer or knew someone else

17     was an FBI officer.  You're just to talk about what you saw

18     that day on January 6th as any person who was there, not in

19     any role that you may have had, former, with the FBI or

20     Capitol Police liaison.

21          It's simply to state if you saw people moving

22     forward and it's people that you knew that day.  If you

23     discovered later that somebody was John Smith, if you didn't

24     know that on January 6th, then you can't tell us that.  So

25     the testimony is limited to just what you knew that day.

 1    Okay?

 2              MR. GUANDOLO:  Yes, sir.

 3              THE COURT:  I want to play a video for you, which

 4    we're going to have you authenticate it.  Before we do that,

 5    I want to make sure you're sworn in.

 6              MR. PIERCE:  Sorry.  Could we go to the -- put him

 7    in the waiting room for one second?

 8              THE COURT:  Yes.

 9              Sorry, Mr. Guandolo.  You're going to be put back

10    in the waiting room.  Hold tight.  That way, we can have a

11    bench conference here.

12              MR. GUANDOLO:  Yes, sir.

13              (Mr. Guandolo exits the proceedings via Zoom

14    videoconference.)

15              THE COURT:  Go ahead.

16              MR. PIERCE:  Throughout the course of the

17    proceedings with Ms. Lavrenz, your Honor, including the

18    pretrial hearings and whatnot, your Honor very, I think,

19    appropriately has consistently indicated to Ms. Lavrenz that

20    if she had any questions or concerns about the

21    proceedings --

22              THE COURT:  Yeah.

23              MR. PIERCE:  -- the fairness of the proceedings,

24    et cetera, that you would welcome her raising those

25    directly.

1          THE COURT:  Well, knowing her right to remain

2     silent.  I mean, I'd rather you asked the question for her

3     so she's preserving her right to remain silent.  But if

4     there's an issue you feel your client has, I'm happy to hear

5     it.

6          Yes.  Go ahead.

7          MR. PIERCE:  She would -- I want to approach this

8     respectfully.  I want Ms. Lavrenz to have -- she would like

9     to, you know, ask the Court a question and perhaps comment

10    on what she's seeing with respect to this witness.

11         THE COURT:  So, Ms. Lavrenz, again, anything you

12    say can be used against you.  And when Mr. Pierce or

13    Mr. Roots simply say exactly what you say, it can't be used

14    against you, because lawyers write the rules.  Lawyers

15    always make the rules, so it helps the lawyers.

16         And so I would just urge you.  But it's up to you,

17    because it's your life and it's your trial.  Everyone's

18    going to go their own way at the end of the day.  Right?

19    Maybe not your kids.  They seem like they're with you.

20         But I'm hesitant just without -- and again, I'll

21    remind you:  Just tell Mr. Pierce.  I want you to say, I

22    don't like what Judge Faruqui is doing on X, Y and Z, and

23    then I'll answer it.  I'll answer to you.

24         But there's not a real benefit to you saying it.

25    In fact, it could be a harm because then the Government,

1    especially if -- I don't know what -- if they would get to

2    cross-examine that.  So I'll leave it to you to decide.

3             Do you want to have Mr. Pierce ask that question

4    or do you want to ask the question?

5             THE DEFENDANT:  I would like to ask the question,

6    your Honor.

7             THE COURT:  Go ahead, Ms. Lavrenz.

8             THE DEFENDANT:  Okay.  I need some clarity,

9    because I understand that he has a profession that you don't

10   want mentioned.  But my daughter was asked extensively what

11   she did as a de-hoarder.  Every single witness that the

12   prosecution as well as my defense team put on the witness

13   stand had the right to say what they did for a profession.

14   I'm going to be saying that as well.

15            So I don't understand why Mr. Guandolo can't even

16   say what he did.  What does he have?  A gap in his life?

17   When you fill out an application, you do have to say what

18   you did during a certain gap.  And that's what I'm

19   questioning.

20            Thank you, your Honor.

21            THE COURT:  Thank you, Ms. Lavrenz.

22            I appreciate you -- I don't need to tell you what

23   you already know, which is everything that happens here, the

24   most important thing is it impacts you because it's your

25   life.  So I appreciate you're very invested in this and you

1      want to get your questions answered.

2               The situation is that when witnesses come in --

3      and so the Government didn't object to your daughter or

4      anyone else who's testified.  I think you had a character

5      witness that talked a little bit about their life, kind of

6      setting the scene.

7               They didn't object to that coming in.  Right?

8      They didn't object to that, saying that this is beyond the

9      scope or not relevant to the testimony that this person's

10     going to give.

11              The second thing is that they didn't object that

12     not only was it not relevant, was it prejudicial.

13              So here, they have objected.  And let me rewind

14     for a second.

15              The reason that they were allowed to cross-examine

16     and ask about de-hoarding or things like that, to understand

17     what it was, is we call that in the sort of legal-speak

18     you've opened the door.  So once someone opens the door to

19     something here and they ask about a profession, the other

20     side can then ask followup questions.

21              But had your lawyers not asked your daughter what

22     she had done, they would not likely get to cross-examine her

23     on that because it would have been outside the boundaries.

24     Right?  It's like a playing field.  It would be outside the

25     boundaries of what was asked.

1           And only the person on direct -- we're now on your

2    case -- they get to decide what the boundaries are.  And if

3    someone asks on cross-examination something which is

4    something outside of that boundary, it's not permitted.  But

5    here, it is within the boundaries of the direct examination

6    of what the professions were that people did.

7           So now let's turn to Mr. Guandolo.

8           I believe the Government's objection is primarily

9    one of prejudice, but I think it is fair that -- to also be

10   concerned about relevance.

11          It's not really relevant to -- whether he saw

12   police barricade lines or he saw the way that police were

13   acting on that day what his profession over a decade was

14   before that.

15          And although it was not relevant as to the other

16   witnesses that you had, so for instance Mr. Powell talked

17   about his life as a journalist and eventually there were

18   objections that were sustained that we had gone -- within

19   this irrelevant testimony, we had gone so far afield that it

20   now had become a problem for the Government.

21          So coming back to Mr. Guandolo, it is -- they are,

22   I think, fairly stating that this is not only irrelevant but

23   prejudicial because it is my -- the standard is it has to

24   under Rule 403 -- and I read it earlier, and I'll read it

25   again -- is that the relevance is substantially outweighed

1    if the probative value -- so, you know, like the educational

2    value of it -- is substantially outweighed by a danger of

3    one or more of the following:  unfair prejudice, confusing

4    the issues, misleading the jury, undue delay, wasting time

5    or needlessly presenting cumulative evidence.

6              So I think that my focus, as I said this morning,

7    was on confusing the issues and misleading the jury.

8              I've already ruled as a matter of law that there

9    is not a defense that can be presented that this was

10   sanctioned by a government official when there's no sort of

11   predicate for that.  He cannot as a retired FBI agent -- if

12   he was an FBI agent at the time of January 6th, I absolutely

13   would let him testify about what he was doing.

14             Just hold on.  I'll let you speak.

15             But he wasn't an FBI agent.

16             Now, there's things called expert testimony.

17   Experts can come in and they can speak about based on --

18   even though they weren't at the place or even if they were

19   at a place, based on their expert testimony, learning -- and

20   you have to be established and qualified as an expert --

21   that they could speak to sort of the tactics used by the

22   FBI, the tactics used by the Capitol Police, how you would

23   handle a riot.

24             That's absolutely something that if your attorneys

25   think it would be valuable testimony, long ago they had to

1    notice an expert and they could have potentially used it.

2          Now, I will tell you, experts are people who are

3    up to date as to what's happening at the relevant time.  I

4    think in 2008, when he retired, if -- in 2008 or '09

5    perhaps, if he wanted to testify as an expert about FBI

6    training, techniques or how they handle things, he

7    absolutely -- he would have, I think, a real chance to be

8    qualified under the *Daubert* standard as an expert.

9          But when you're more than a decade later, you

10   know, there's no reason to think that someone with that

11   great gap of time could still be an expert to testify about

12   things.  It's not speculation for experts.  Experts get up

13   there and they look at, like, a handwriting sample and put

14   the two handwriting things together.  They didn't write that

15   handwriting.  They would look at my handwriting; they would

16   look at one found on, you know, a banknote and say, Look,

17   this looks just like Zia Faruqui's handwriting.  You see the

18   Z and the F.

19          And how would you know that?

20          Well, I've gone to school, blah, blah, blah, all

21   these things.

22          So that's what expert testimony is.  They can

23   speculate, sort of.  They can make conclusions.

24          But Mr. Guandolo has not been noticed as that nor

25   do I think even now at this late minute or hour could we

1    qualify him as one because he's too far removed.

2            Now, the sort of fact that I have given your

3    lawyers a lot of leeway with other people to do things

4    doesn't mean that it applies to everybody.  It just means

5    that I was trying to be generous in those cases.

6            Now, I will tell you there are other judges in

7    this courthouse whose view is that that generosity can cause

8    confusion and that there's no purpose of it.

9            I am not saying they're right or I'm wrong and I'm

10    not saying I'm more magnanimous or better than them.  I'm

11    just saying generosity in terms of allowing additional

12    testimony in that otherwise may be objectionable under

13    relevance standards.

14            Relevance is less concerning to me than prejudice.

15    Prejudice is what I'm greatly concerned about, and

16    confusion.

17            His role in his prior career decades before this

18    as an FBI agent I believe can confuse the jury when we have

19    at issue a question about whether or not Mr. Roots believes

20    that there was permission by law enforcement -- it's already

21    been brought into issue with the Capitol Police officer who

22    testified yesterday with the waving of the hand.  We're

23    going to hear from Mr. Warner.

24            So if we weren't having perhaps that testimony,

25    then maybe it would have been okay to have it in.  But

1    because the defense has brought in testimony that implies

2    that there was a permission for law enforcement -- from law

3    enforcement to engage in these actions, to then have a

4    former law enforcement official come in will cause, I

5    believe, ultimately -- just my discretion, right? -- what I

6    think is prejudice.

7           And so for those reasons, that's why I will not

8    allow this one witness.  I'm still allowing Mr. Cusick, just

9    like I allowed Mr. Powell, just like I allowed some of the

10   Government's witnesses, to talk about their profession to

11   sort of set the scene.

12          But here, I don't think it's necessary and I think

13   it's unduly confusing.

14          So before you say anything, I want you to talk to

15   your lawyer real quick if you want to say something just so

16   we make sure and say, "Ms. Lavrenz, I think we've got to be

17   real careful.  We shouldn't say that."  And I'm sure

18   whatever you say hopefully will not be like that.

19          But I want you just to talk to him real quick.

20   Okay?  I'm not in a rush.  I want you to take as much time

21   as needed to protect your rights.

22          THE DEFENDANT:  (Confers with counsel privately.)

23          Your Honor, I just wanted to make myself a little

24   more clear about my question.

25          I understand what you're saying about you don't

1    want to go into what he did as an FBI agent.  That -- I

2    understand that completely.

3         But my question is, for example, I used to manage

4    a mobile home park, and I would take applications for

5    rentals.  And they were like, if somebody wanted to work for

6    me as -- you know, manage, you know, they had to be employed

7    by -- underneath me, as I was the manager.  I would ask

8    them, What did you do this year and that year, between this

9    year and that?  I did that.  If they left out a gap of what

10   they did, that would give me a big red flag.

11        All I'm saying -- I'm not saying that there was a

12   liaison with Capitol Police.  I'm just saying, why is he not

13   allowed to say that from 2000 -- I don't know when he was,

14   whenever he was, from 2000 to 2008 -- like, say he was in

15   the military.  I don't know his background at all.

16        But if he's in the military, you know, from 1980

17   to 1990 and then went in as an FBI agent from

18   such-and-such-and-such, why can't he say that?  Because that

19   to me would be questionable to the -- if I was sitting in

20   the juror [sic], knowing my background as who I was and what

21   I did -- even as a registered nurse, I worked from this --

22   every time I had to fill out an application, I have always

23   had to say, what did you do?

24        My daughters, who are sitting in the audience

25   here, they've had to fill out applications that say, What

1    did you do between here and here?

2            I told them, Tell them this.  Tell them that.

3    I've helped my husband fill out résumés over and over.  I

4    think if I was sitting in that juror box and I -- they said,

5    Well, I got out of the military and then I escaped the

6    country for ten years -- I don't know what they -- you know,

7    but I just think you're leaving out a bit of information.

8    Just employment.  You could tell him he doesn't -- he can't

9    say what he did.  That's perfectly fine with me.  I just

10   want him to say, This is what I did from 2020 to 2008 [sic].

11   Then I went and did this.

12           What is -- I don't see anything.  To me, that's

13   very unfair, that every prosecution witness, every defense

14   witness that I've seen so far, they've got to say what they

15   did.  And even all the jury selection, to my knowledge, they

16   had to say what kind of occupation they were.  And they were

17   an attorney.

18           I don't understand why this information must be

19   withheld from the jury.  That to me is an unfair jury --

20           THE COURT:  I understand.

21           THE DEFENDANT:  -- presentation.

22           Thank you.

23           THE COURT:  I understand what you're saying.

24           And I agree that when you're applying for housing

25   or a job, you have to list all of your prior work history,

1    because that's relevant to that decision.  If you want to

2    hire somebody, you want to know where they worked before.

3    If you're applying for a loan, you need to know what the

4    person's income is.

5            But ultimately, I don't think that it's relevant

6    here.  And I'm happy to instruct again, as I've told the

7    witness [sic] at the beginning, that -- to treat each

8    witness equally.  And I can instruct them here that they --

9    as I've told before, the witnesses can only answer the

10   questions asked of them.

11           If no one asks them of what their background is,

12   their job is not to speculate, just like our witnesses

13   aren't supposed to speculate as to why these questions

14   aren't being asked.  They're supposed to be a blank slate.

15   So whatever information comes, that's what comes.

16           I'm not sure why it could make someone more or

17   less credible because, similarly, someone could have had a

18   bad experience with law enforcement.  And so when someone

19   says they work with the FBI, then they could say, Well, now,

20   I don't like this person because he's at the FBI.

21           So we don't sort of go down that rabbit hole of,

22   what could they think as jurors when something is or is not

23   said?  All we can do is what is said.  Right?  And that's

24   all we can think of, not what is not said.  I should be

25   clear.  That's the rabbit hole we can't go down.  When

1    something's not said, then what would the sort of

2    assumptions be?

3            I will instruct them at the end that they can only

4    evaluate the testimony that comes forward and that they

5    can't think about things that weren't said and what does it

6    not mean.

7            I mean, frankly, they may just think we have to

8    get to the next witness.  I don't know.  But I don't want

9    them thinking about that, nor can I think about that.

10           I understand your objection.  Your lawyers have

11    made that objection.  I am concerned that him stating he

12    worked at the FBI would unfairly prejudice.

13           I will ask Mr. Parker, do you have -- would you

14    object to him stating that he worked for however many, 20

15    years and that he is now retired?  How about that?  Without

16    stating the nature of his work.

17           I'm sure that's not going to satisfy Mr. Pierce

18    and Mr. Roots.  But, you know...

19           MR. PARKER:  I suppose if it's phrased exactly

20    like that.

21           THE COURT:  Yeah.  We can ask him a leading

22    question.

23           MR. PARKER:  Yes.

24           THE COURT:  And he can be directed to only answer

25    "yes" or "no."

1          MR. PARKER:  My only concern is, I think that

2     invites more speculation from the jury than if we had just

3     never brought up his profession at all and he was just a

4     person who was there.

5          THE COURT:  Well, that's not our purview to decide

6     what they will or not speculate.

7          I'm giving you an option, Mr. Pierce and

8     Mr. Roots.  You can ask him a leading question.  I'll

9     instruct him it's a yes-or-no answer.  It's that:  Did you

10    work for however -- you know, 22 years prior to retiring in

11    2008?

12         MR. PARKER:  Your Honor, could I actually check

13    something very quickly?

14         THE COURT:  Yes.  Sure.

15         MR. PARKER:  I'm not sure "retiring" is actually

16    the correct term.  He resigned from the FBI in 2008.

17         THE COURT:  So you could say:  Did you work for --

18    you know, whenever he started?  And he may have had other

19    jobs before.  Did you work until 2008, at which time you

20    stopped working?

21         If you want to ask him that, then you could.  But

22    we cannot get into what the nature of his work was.  And

23    so --

24         THE DEFENDANT:  Your Honor, I --

25         THE COURT:  I want to make sure -- first, talk to

1    Mr. Pierce.  Why don't you just take a moment.  We're not in

2    a rush.

3          THE DEFENDANT:  In regard to the fact that no

4    other witness was questioned to a great extent about

5    their -- I'm getting somewhat -- it's hard for me to talk

6    with my headphones in.  But no other witness that was on the

7    stand was able -- was denied the right to say what they did

8    for an occupation.

9          And I'm just questioning as a citizen of the

10   United States why the prosecution is so afraid for

11   Mr. Guandolo to be -- have his voice heard that he worked

12   for the FBI.  I don't understand.  They have an FBI agent on

13   there, sitting at their table, that had no problem looking

14   into everything that I had.  Why is it -- it's prejudicial

15   or whatever, speculative or whatever, to object to the fact

16   that I have a witness that was at the same platform, a

17   praying platform that was permitted.  He cannot say that he

18   was an FBI agent.

19         My question:  Why are you afraid for that

20   gentleman that is on my defense to ask -- or to tell that "I

21   worked for the FBI"?  What's wrong?

22         I mean, if this person -- I had a woman out there

23   that had been a prostitute and that was her living, what's

24   wrong -- I mean, would you object to that?  I mean, this is

25   supposed to be the FBI.  That's supposed to be protecting

1    me, not -- I'm very unclear about this.  And it does not

2    compute with my brain.

3             I do have a college education.  I was a registered

4    nurse.  I'm not a 2-year-old.  I'm not dumb.  And this makes

5    no sense to me.  I'm just being quite honest.

6             THE COURT:  Sure.  I appreciate that, Ms. Lavrenz.

7    That's -- again, you have to.  You've got to fight for

8    yourself.  So I appreciate that you're being honest.

9             I'm going to answer your question and then we --

10   you don't have to agree, but -- with my decision.  As I

11   always say in court, Ms. Lavrenz, I'm just one person.  I

12   make mistakes just like anyone else.  That's why we have the

13   court upstairs, you know, and then the court down the

14   street.  And so we have a couple courts.  There are courts

15   that your lawyers go to.

16            But I have to make the best decision that I think

17   is right.  And so I hope again what you will think about

18   when you talk to your lawyers is that -- what have I said?

19   Is it right or is it wrong?  If it's wrong, then having

20   another court consider it -- the difference -- is

21   severalfold.

22            One is the FBI case agent who's sitting at that

23   table who was noticed and we were told would be there prior

24   to trial and is a current FBI agent.  He works for the FBI.

25            Mr. Guandolo does not work for the FBI.  It is --

1    we cannot get testimony to come forward of two kinds:  one

2    that we know is to be incorrect and one that we know is to

3    be so prejudicial that it substantially outweighs its value.

4         So I know it's incorrect that he's not an FBI

5    agent.  I don't think that's what he would testify to, I

6    hope.  I think what he would say is that he resigned in

7    2008; and after resigning, he still has knowledge about the

8    FBI.

9         While that is true that he resigned in 2008,

10   again, the fact that I have allowed in other witnesses to

11   testify about that doesn't create a precedent that he gets

12   it.  That's not how precedent works.  Each time, there was

13   no objection.  The first time someone objects, you don't get

14   to say, Well, they didn't object to the three other

15   witnesses.  There's no legal significance to that.

16        On this witness, they did object.  And I think

17   that reflects that they've tried to be limited in how they

18   object to things, tried to give you additional leeway, as

19   have I, more importantly.  Forget them.

20        And so the point is, here I have stated why I

21   believe a retired FBI agent is uniquely situated as to be so

22   prejudicial and so confuse the jury, because there's

23   testimony that your lawyers have presented that law

24   enforcement was permitting rioters, while other people

25   there, people quietly in prayer, anyone -- bystanders.  The

1   whole panoply of people who were there, they have said that

2   they were inviting them in, made with hand gestures.  We're

3   going to hear testimony from an officer that they were

4   engaged in conversations to invite them in.

5          So once your lawyers have presented that

6   testimony, because it's central to your defense, which is

7   their right to do so, we then can't bring someone in to

8   state that they're part of the FBI, because doing so -- or

9   were part of the FBI -- will cause confusion to the jury.

10  And the two things stacked on top of each other are the

11  problem.

12         Mr. Pierce, I've made my decision.  So I don't

13  need -- these are things that you need to save for your

14  appellate briefs, presuming again that there even is a

15  conviction, which I am not -- I have any reason to believe

16  that there will be.  I continue to believe that Ms. Lavrenz

17  is presumed innocent and the jury will do whatever they're

18  supposed to do.

19         MR. PIERCE:  It was just a clarification question,

20  your Honor.

21         I'm just getting a little confused now.  I

22  understood that you just said a moment ago -- a minute

23  ago -- that he could be asked.

24         THE COURT:  I said you can ask him:  Did you work

25  until 2008, at which time you stopped working?  And he can

1    say yes.

2              MR. PIERCE:  In the FBI.

3              THE COURT:  No, not in the FBI.  Just that he

4    worked.  Just that he was not a -- you know, he had -- if he

5    was not working, if that's something you want to know.  But

6    not in the FBI.  No.  The words "FBI" should not be uttered

7    by him for the reasons I've stated.

8              MR. PIERCE:  Your Honor, first -- what -- how -- I

9    have not heard from the Government, and I'm listening very

10   intently.  I have not heard from the Court how -- in what

11   way -- in what specific way is it -- can it -- could it be

12   prejudicial for them to learn that he worked for the FBI if

13   they understand that he was -- that he resigned or was done

14   with the FBI in 2008?  And of course the Government will

15   have the opportunity to cross-examine him on the idea

16   that -- to make it, you know, incredibly clear that he had

17   nothing to do with the FBI for the last 15 years and

18   certainly not on January 6th.

19             So I guess I -- I mean, I'm just looking for, you

20   know, the record's sake the exact specific way in which that

21   fact alone could possibly be prejudicial in a material way

22   under Rule 403.

23             THE COURT:  Yes.  The reason I believe -- I'm

24   happy to hear any additional thoughts from --

25             Let me be clear.  Mr. Parker, as I understand,

 1    you're objecting to him stating that he worked and he

 2    retired from the FBI or resigned from the FBI?

 3                MR. PARKER:  Yes, your Honor.

 4                And to tack on, this is the only additional thing

 5    I'm going to say:  If he references "I resigned from the

 6    FBI," I think a line of legitimate cross could be why he

 7    resigned.  And trust me, your Honor.  It is a sideshow that

 8    we do not want to go down.

 9                MR. PIERCE:  I would love to hear why he resigned

10    from the FBI.

11                THE COURT:  I wouldn't, because what happened in

12    2008 has nothing to do with this trial.  I will tell you now

13    one final time and then we're moving on.  That is the end.

14    I have made my decision.  Again, I am not some judge who

15    says I am omniscient or infallible.  I have to make a

16    decision.  We've got to keep the trial moving.  We cannot

17    keep litigating this until the end of time.

18                And my decision is this, is that his employment in

19    the FBI is in no way relevant to his testimony of what he

20    saw on January 6th.

21                That is the reason why, because there's actually

22    no value that is added by him stating that he's an FBI

23    agent.  It only causes confusion as to a defense that has

24    been brought in.

25                Now, if the defense had not in any way presented

1    this notion that there was permission by law enforcement for

2    people to come in and join -- go further, advance beyond

3    certain places or marked designated areas or undesignated

4    areas, yes, perhaps then it wouldn't matter.

5              But we've already introduced that testimony.

6    We're going to get more testimony later today.

7              The fact that he worked at the FBI is totally

8    irrelevant.  He could have been the president of a realty

9    association.  He could have been a prostitute or any other

10   things.

11             But the problem with this job, this one job of law

12   enforcement, is that it goes to an issue that's already been

13   put in here for which there can be great confusion.  Were he

14   any other job, as I think is evidenced by the testimony I've

15   let in with every other witness, I'd have no problem letting

16   it in.  Although it's irrelevant, it causes no potential

17   serious harm.

18             However, this could.  It is -- in no way adds

19   value to what he is here to testify.  He's not here to

20   testify as a former FBI agent.  He's not here to testify as

21   a law enforcement expert.  He's here to testify as

22   Mr. Guandolo, the person that was at January 6th and saw

23   things happening on January 6th from his then-knowledge that

24   day of what he saw without speculation, because he's not an

25   expert witness.

```
1          That is my ruling.  I will now -- we can -- well,
2   it doesn't even make any sense to have him start now because
3   we're going to have to stop in five minutes.  We're going to
4   call the jury in, take our lunch break, start at 1:20 on the
5   dot with him.
6          There's no further argument to be made.  You've
7   both made your arguments on this point.
8          So let's call the jury in, please.
9          (Whereupon, the jury entered the courtroom at
10  12:23 p.m. and the following proceedings were had:)
11         THE COURT:  I'm just calling you all to tell you
12  you're going to take a lunch break.  You're going to take a
13  lunch break.  That's all I wanted to tell you.  And so we're
14  going to start at -- we will start, I promise you, at 1:25.
15  We're going to start.  So you have an hour.  We'll be
16  starting with testimony at 1:25.  Okay?
17         Thank you.
18         (Whereupon, the jury exited the courtroom at 12:23
19  a.m. and the following proceedings were had:)
20         THE COURT:  We're in recess.  Let's be back here
21  at 1:20, ready to start at 1:25.
22         Thank you.
23         (Thereupon, a luncheon recess was taken, after
24  which the following proceedings were had:)
25         THE COURT:  We'll start here momentarily.  I'll
```

1    wait for your colleagues to return.

2              To begin with, I want -- do we have Mr. Guandolo

3    in the waiting room today?

4              THE COURTROOM DEPUTY:  He is.

5              THE COURT:  I'm going to plan to bring him in from

6    the waiting room and instruct him as -- he's already been

7    instructed.  So I guess the thing would be just now to have

8    him view the video.  It'll give us a chance to test out the

9    tech to make sure we're able to share a screen and do the

10   clipped video as discussed, have it admitted.

11             I'll remind him of the sort of instructions just

12   generally that I gave him very quickly.  And then we'll call

13   the jury.

14             Does that sound right to you, Mr. Pierce?

15             MR. PIERCE:  Yes, your Honor.

16             Could we just skip back to Officer Warner for one

17   second, logistically?

18             THE COURT:  Sure.

19             MR. PIERCE:  So I've been trying to contact the

20   general counsel's office at the Capitol Police.  They seem

21   to have gone dark on me.

22             And the last communication indicated that she had

23   tried to call him several times.  And it was previously

24   indicated yesterday by email that he was only available this

25   morning.  Now he's disappeared.

```
 1              So I guess I'd just ask the Court what the
 2    Court can --
 3              THE COURT:  So I guess Ms. Lavigne-Rhodes has
 4    spoken to their general counsel and said that we need him
 5    here.  Maybe if you want to just send an email and make your
 6    record, let him know.  He needs to show up today.  It's
 7    not -- this is not a voluntary process.  So if he's not
 8    here, then, yes, I will consider what remedies I need to get
 9    in place.
10              They can't simply just ignore us.  If they have an
11    objection, they need to tell us.
12              MR. PIERCE:  Okay, your Honor.
13              THE COURT:  Ms. Lavigne-Rhodes, if you want to
14    send him a message to their general counsel's office.
15              THE COURTROOM DEPUTY:  He did.  He sent several.
16              THE COURT:  Oh, Mr. Pierce.  Yes.
17              If they are not able to produce him, then I want
18    to hear from their office.  I mean, you can tell them that
19    if he's not here by 4:00 today, I'd like a representative
20    from Capitol Police to come and explain what's going on.
21              MR. PIERCE:  I'll email them that right now, your
22    Honor.
23              THE COURT:  Thank you.
24              THE COURTROOM DEPUTY:  Do you want me to let him
25    in?
```

```
1              THE COURT:  Yes.  Great.
2              Ms. Lambert, you'll use your share screen.
3              (John David Guandolo joined the proceedings via
4     videoconference.)
5              THE COURTROOM DEPUTY:  Mr. Guandolo, please raise
6     your right hand.
7          JOHN DAVID GUANDOLO, DEFENSE WITNESS, SWORN.
8              THE COURTROOM DEPUTY:  Thank you.
9              THE WITNESS:  Yes.
10             THE COURT:  Mr. Guandolo, this is Judge Faruqui
11    again.  I'm just going to remind you, I'm sure you recall,
12    but -- thank you for your patience.
13             You're -- to remind you, your testimony is not
14    going to describe your former employment, nor will you be
15    describing what you believe to be the law enforcement
16    employment of any other FBI agents that are there.  You're
17    going to be talking about what you saw and observed that
18    date.  I don't want you testifying as to what you believe
19    people might be doing.
20             We're going to go through and have the videos
21    authenticated that have you in it without the jury here just
22    so it can be kind of seamless when they come in.
23             So we're going to show you a video here
24    momentarily.  Ms. Lambert is going to work her magic.
25             (Whereupon, Defendant's Exhibit No. 63-A was
```

1    published in open court.)

2              THE COURT:  Is that the whole clip?

3              MS. LAMBERT:  Yes.

4              THE COURT:  Thank you, Ms. Lambert.

5              Mr. Guandolo, were you able to see that clip?

6              THE WITNESS:  Yes, your Honor.

7              THE COURT:  Mr. Roots or Mr. Pierce, do you want

8    to have him authenticate the video?

9              MR. ROOTS:  Yeah.  Thank you, Mr. Guandolo.

10             Was this -- do you recognize this video?

11             THE WITNESS:  I do.

12             MR. ROOTS:  Do you recognize the setting, date?

13             THE WITNESS:  I do.

14             MR. ROOTS:  What was the date?

15             THE WITNESS:  That was January 6th, 2021.

16             MR. ROOTS:  If you could just generally state

17   about the area where -- what's the location?

18             THE WITNESS:  So that's the grassy area I was in

19   with a group that had a permit for that area.  And the grass

20   leads right up to the sidewalk in front of the U.S. Capitol

21   facing the opposite direction of the way the camera is

22   currently pointed.

23             MR. ROOTS:  On that basis, I think we'd move for

24   that admission.

25             MR. PARKER:  With our previous objections noted,

1    no objection further.

2              THE COURT:  Your previous objections are noted.

3    I'll allow the exhibit in.

4              This is Defense Exhibit 63; is that right,

5    Mr. Roots?

6              MR. ROOTS:  I think it's 63.1.

7              THE COURTROOM DEPUTY:  What happened to 63-A?

8              MR. ROOTS:  She's created two new videos.

9              THE COURTROOM DEPUTY:  I'm definitely going to

10   need the updated list.

11             THE COURT:  Can we have this as 63-A?  Let's just

12   call it 63-A.

13             (Whereupon, Defendant's Exhibit No. 63-A was

14   entered into evidence.)

15             MR. ROOTS:  We can bring up the next one, which is

16   that continuation of that same.

17             THE COURT:  So 63-B, we'll call it.  So we're next

18   going to show you, Mr. Guandolo, 63-B.

19             THE WITNESS:  Okay, your Honor.

20             (Whereupon, Defendant's Exhibit No. 63-B was

21   published in open court.)

22             MR. ROOTS:  Did you see that video, Mr. Guandolo?

23             THE WITNESS:  It was in the upper right part of my

24   screen, but I could see that.  Yes.

25             MR. ROOTS:  And do you recognize that setting and

1    the date?

2                  THE WITNESS:  I do.

3                  MR. ROOTS:  And were you in that video as far as

4    you know?

5                  THE WITNESS:  I was not.

6                  THE COURT:  Can we play it again for him, please,

7    Mr. Lambert?  There should be a bigger video and then the

8    two boxes.

9                  (Whereupon, Defendant's Exhibit No. 63-B was

10   published in open court.)

11                 THE WITNESS:  Yes.  So I'm not -- I'm -- so the

12   video, the way it's playing to me -- and maybe that's the

13   way you intend it -- was there's a video in the center that

14   shows me making video with my phone and taking pictures.

15   And then there were two videos on the left and right of what

16   I was looking at.

17                 MR. ROOTS:  On the basis of that, we'd move for

18   admission of 63-B.

19                 THE COURT:  Over the Government's previously noted

20   objection, I will admit it and we'll publish it when the

21   jury comes back out.

22                 (Whereupon, Defendant's Exhibit No. 63-B was

23   entered into evidence.)

24                 MR. ROOTS:  Just to front this, we're also

25   planning on showing 107, which is already in, and 305-A,

1      which is already in.

2                THE COURTROOM DEPUTY:  Thank you.

3                THE COURT:  If they're already in, again, I'll

4      just remind you I don't want you speculating.  You have to

5      remember from that day, what you know of that day.  But you

6      certainly can testify to that, Mr. Guandolo.  Okay?

7                THE WITNESS:  Yes, sir.

8                THE COURT:  So I'd like the jurors to be able to

9      see him, Ms. Lambert.  Can we unshare screen and share it

10     again?  Yes.  Great.  Perfect.

11               THE COURTROOM DEPUTY:  There's a slight delay.

12               THE COURT:  Let's call in the jury, please.

13               MR. ROOTS:  Is he going to be re-sworn in front of

14     the jury?

15               THE COURT:  Yes.

16               (Whereupon, the jury entered the courtroom at 1:32

17     p.m. and the following proceedings were had:)

18               THE COURT:  You can be seated.

19               Ms. Lavigne-Rhodes, can you please swear in the

20     witness again.

21               MR. ROOTS:  Yeah.  The defense next calls John

22     David Guandolo.

23               THE COURTROOM DEPUTY:  Mr. Guandolo, please raise

24     your right hand.

25               JOHN DAVID GUANDOLO, DEFENSE WITNESS, SWORN.

```
 1              THE COURTROOM DEPUTY:  Thank you.

 2              THE COURT:  One moment.

 3                       DIRECT EXAMINATION

 4    BY MR. ROOTS:

 5    Q.  Would you say and spell your last name for the court

 6    reporter.

 7    A.  Guandolo, G-U-A-N-D-O-L-O.  Guandolo.

 8    Q.  Okay.  And, Mr. Guandolo, where do you live?

 9    A.  I live in Dallas, Texas.

10    Q.  Okay.

11              THE COURT:  Mr. Guandolo, this is Judge Faruqui.

12              We can hear you pretty well.  But if -- your

13    laptop or whatever device, if you can try talking a little

14    more loudly into the microphone.  Okay?

15              THE WITNESS:  Yes, sir.

16              THE COURT:  Hold on one second.

17              UNIDENTIFIED JUROR:  Judge, we can't see him.

18              THE COURT:  It's back.  All right.

19              Why don't we ask that question on the screen.  So

20    can you ask him again where he lives, please.

21    BY MR. ROOTS:

22    Q.  Where do you live?

23    A.  Dallas, Texas.

24              THE COURT:  That sounds great.  Continue.

25
```

1    BY MR. ROOTS:

2    Q.  And back on January 6th, 2021, did you happen to be in

3    Washington, D.C.?

4    A.  I did.

5    Q.  And can you just say -- so why did you come to

6    January 6th?

7    A.  So I was in Washington, D.C., on -- I arrived on the

8    4th.  And I was there in the capital area for those couple

9    days leading up to and including January 6th, 2021.  I was

10   invited by a pastor in Dallas who's a friend of mine.  We

11   knew each personally and professionally.

12          And I was actually a part of a group that had a

13   permit to be on the grassy area right up where the grass

14   meets the sidewalk right there in front of the Capitol.  As

15   you're looking at the Capitol on the Supreme Court side,

16   it's just left.  They had a permit for that spot.  This was

17   a Christian group, and the people that had organized this

18   were people that I knew for many years when I lived in the

19   D.C. area.

20          And one of the main speakers was a friend of mine

21   I had known for 14 years, professionally, personally,

22   Congresswoman Michele Bachmann.  And so I was invited to go.

23   And I decided that their purpose for being there was to pray

24   for the country, and so I thought that was a good reason to

25   be there.  So that's why I was there that day.

1    Q.  Okay.  So you were attending as an attendee or were you

2    a speaker or any kind of organizer?

3    A.  No.  I was not an organizer or main speaker.  No.

4    Q.  Okay.

5              MR. ROOTS:  We'd like to bring up Defense Exhibit

6    63-A.

7              THE COURT:  This has already been admitted and

8    will be published to the jury.

9              Jurors, can you see the video?

10             All right.  Thank you.  Thank you, Ms. Lambert.

11   BY MR. ROOTS:

12   Q.  Before we play this, Mr. Guandolo, can you tell the jury

13   a little bit about what they're seeing here?

14   A.  Yeah.  So this is the stage that was built for the group

15   I was a part of.  And you can see that at this time there's

16   still many folks from that group there.  And again, we were

17   there praying.  There were people speaking.  There was music

18   that was played and singing and that kind of thing.

19   Q.  Do you recognize that building in the background?

20   A.  Based on this angle, it looks like the Supreme Court.

21   Q.  What about the Library of Congress?

22             MR. PARKER:  Objection.

23             THE COURT:  Mr. Roots, we can't ask leading

24   questions.

25             I'll strike that last question.

1             Just continue, please, to your next question.

2     BY MR. ROOTS:

3     Q.  Let me ask, so about what time of day was this?

4     A.  Right about -- if the concurrent clip in the right-hand

5     corner is equal, meaning the same time as the CCTV, this

6     would be midafternoon after 2:00 or thereabouts.  It might

7     be a little earlier than that.  But it certainly is after

8     noon.

9     Q.  And what was the crowd -- what was the stage generally

10    doing?  What was happening on the stage there?

11    A.  So like I said, people were speaking.  There was worship

12    music being played, people leading prayers, that kind of

13    thing.

14    Q.  Okay.  And again, is this the east side of the Capitol

15    or the west side of the Capitol?

16    A.  This is as I'm looking straight on to the Capitol behind

17    me, so this is obviously -- this particular camera angle is

18    kind of at an angle.  So behind us as you're looking

19    straight at the Capitol, I'm looking at the front steps.  So

20    in other words, I'm looking at the video in the upper right

21    of my screen as I'm looking at it.  And I'm looking at that

22    side of the Capitol, the [indiscernible] side of the

23    Capitol.

24             THE COURT REPORTER:  I'm sorry.  Which side of the

25    Capitol?

```
 1                THE COURT:  Can you repeat which side of the
 2      Capitol?
 3                THE WITNESS:  The side opposite -- the same side
 4      the U.S. Supreme Court is on.
 5                MR. ROOTS:  Let's go ahead and play that exhibit.
 6      That's Defense 63-A.
 7                (Whereupon, Defendant's Exhibit No. 63-A was
 8      published in open court.)
 9      BY MR. ROOTS:
10      Q.  Did you see yourself in that video?
11      A.  Yes, I did.  I was in the center there in the black knit
12      cap and the black jacket taking pictures and videos.
13      Q.  Let's play that again.  I'll stop it and maybe circle
14      you, and you can answer if that was you or not.
15                (Whereupon, Defendant's Exhibit No. 63-A was
16      published in open court.)
17      BY MR. ROOTS:
18      Q.  I'll just circle someone.  We've stopped at -- I don't
19      know what the minute mark is.  But I'll just circle someone.
20                Can you say or not if that's you -- if that is you
21      or not?
22      A.  Yes.  So I'm -- just as you're looking at that speaker,
23      I'm just to the left of the speaker, right in the center of
24      the screen.  Yes.
25      Q.  Okay.
```

```
1              THE COURT:  I don't think he can see when you

2       circle.

3              MR. ROOTS:  Okay.

4       BY MR. ROOTS:

5       Q.  And everyone seems to be paying attention to what?

6       A.  Some of the people -- I was paying attention at the time

7       to a part of the crowd that was over to my right as you're

8       looking at me, which was in the steps area of the U.S.

9       Capitol.

10      Q.  So you were looking at -- what was happening on the

11      steps of the U.S. Capitol at that time?

12      A.  So the group had moved up from the plaza right in front

13      of the steps to the upper few of the steps and then sometime

14      afterwards, a number of minutes afterwards, started walking

15      up the steps of the Capitol.

16      Q.  Okay.

17             MR. ROOTS:  Let me bring up the next clip.  If

18      that was 63-A, I want to bring up 63-B.

19             (Whereupon, Defendant's Exhibit No. 63-B was

20      published in open court.)

21             MR. ROOTS:  Let's pause right here.

22      BY MR. ROOTS:

23      Q.  So again, just -- this is, I believe, a continuance of

24      the same clip.  Would you again orient yourself?  Where are

25      you on this?
```

1    A.  As you look on the left, that's exactly the angle I had,

2    so that the Capitol steps were to my right as I was looking

3    at the Capitol.  That's where the area we had permitted, the

4    permit, looking sort of a slight angle to the Capitol from

5    the left side.  So as I'm looking at that crowd, they're

6    just to my front right.

7            And I watched people walk up the steps.  And

8    again, the crowd, my experience, what I witnessed the

9    evening of the 4th, all day on the 5th, because I walked

10   around the whole area and I met a lot of people, talked to a

11   lot of people, it was very much a positive atmosphere.

12   People had come from all over the country, families.

13   Literally, there must have been people from three-plus dozen

14   states that were there.  And basically, I liken it to -- it

15   was like, you know, the atmosphere and the mood was very

16   positive and, like I said, people were singing patriotic

17   songs.

18           And at this point, when people walked up the

19   steps, what I witnessed, the police that were on the steps

20   had moved to the left or the right.  People moved up the

21   steps.  I witnessed Capitol Police opening doors for people,

22   waving people up the steps.  And nobody was -- at least this

23   is what I witnessed.  Everyone was walking, waving flags,

24   right up to the point I could see them entering the Capitol

25   Building.

1    Q.  Okay.  Was it a restricted area in that area?

2              MR. PARKER:  Objection.

3              THE COURT:  I'll remind you, I don't want the

4    witness making legal conclusions.

5              You can rephrase.  That's fine.  Mr. Roots, just

6    rephrase the question.

7    BY MR. ROOTS:

8    Q.  What can you say about any visible instructions?

9    A.  Based on my experience --

10             THE COURT:  I'm sorry.  This is Judge Faruqui.

11   I'm interrupting.

12             Mr. Guandolo, I just want you again, at my

13   direction, I want you to answer what you saw that day, not

14   based on your experience or anything like that.  What

15   restrictions, the question is, did you see that day.

16             MR. PIERCE:  Your Honor, could we have a bench

17   conference, please?

18             (Whereupon, the following bench conference was

19   held:)

20             MR. PIERCE:  Your Honor, it is totally

21   inappropriate for -- I don't know her name, but the chief or

22   the supervisor who is sitting in the audience to be yelling

23   out "objection" before her prosecutors.

24             THE COURT:  I did not hear her do that.

25             MR. PIERCE:  She did that.  She did that.  She

1    absolutely did that.  And that is totally inappropriate.

2    She's not appeared in this case.  We didn't object when

3    she's --

4            THE COURT:  Yes.  Mr. Ballou, did your -- I don't

5    know if your colleague did say something.  If you could just

6    first go ahead.

7            MR. BALLOU:  Of course.  We will remind her that

8    she shouldn't be sending instructions.  Thank you.

9            MR. PIERCE:  Thank you.

10           (Whereupon, the following proceedings were had in

11   open court:)

12           MR. ROOTS:  Let's take the exhibit down for a few

13   minutes, a few seconds.

14   BY MR. ROOTS:

15   Q.  Mr. Guandolo, so did you see that there were visible

16   restrictions or boundaries in those areas?

17   A.  Well, originally down on the plaza, there were some,

18   like, temporary bike racks that were being used to guide the

19   crowd, like a delineation.  And the reason --

20           THE WITNESS:  I want to be clear, your Honor.

21   What I said earlier was more -- I grew up in the Washington,

22   D.C., area.

23           MR. PARKER:  Objection.

24           THE WITNESS:  So that was --

25           THE COURT:  Mr. Guandolo, thank you.  I appreciate

1    it.  I'm not -- it's not a question of sort of right or

2    wrong.  It's just, I need you to follow those directions.  I

3    get it.  So it wasn't that you were doing something anyway

4    that was a problem; it's just not what my directions are.

5              So I understand what you're saying with your

6    words.

7              THE WITNESS:  Got it.

8              THE COURT:  Stick with me on this.  Thanks.

9              Please continue, Mr. Roots.

10             THE WITNESS:  Okay.

11   BY MR. ROOTS:

12   Q.  Let me ask a slightly different question.

13             Did you see any Restricted Area signs?

14   A.  I did not.

15   Q.  Did you hear any loudspeakers saying, "This is a

16   restricted area"?  Or did you hear that?

17   A.  I did not.  I did not.

18   Q.  What can you say about the police presence there?  Well,

19   let me ask a more limited question.

20             Did you see clear lines where police were marking

21   it off as a restricted area?

22             MR. PARKER:  Objection.

23             THE COURT:  We can have a bench conference.

24             THE WITNESS:  No, I did not.

25             THE COURT:  Hold on, Mr. Guandolo.

1          (Whereupon, the following bench conference was

2     held:)

3               THE COURT:  Go ahead, Mr. Parker.

4               MR. PARKER:  The objection is still leading, your

5     Honor.

6               THE COURT:  Yes.  I mean, I think they are leading

7     questions.  My only hesitation is that I'm concerned if we

8     give him free rein, the witness may veer unintentionally

9     into territory that I don't want him to go into.

10              I think you can ask him -- instead of, "Did he see

11     clear police lines" -- that's true leading.  I think you can

12     ask him:  What kind of police lines did you see there?

13              Okay, Mr. Roots?

14              MR. ROOTS:  Okay.

15              THE COURT:  Thank you.

16              (Whereupon, the following proceedings were had in

17     open court:)

18     BY MR. ROOTS:

19     Q.  If I could just ask, what kind of police lines did you

20     see there?

21     A.  I saw on the steps, a few steps up, a line of police.

22     Initially they were down a little lower.  Then they backed

23     up to the -- several steps, up the steps of the Capitol.

24     And then as people moved forward, those police, several of

25     the police on both the left and right, pushed a little --

1    what I'll call alcove, a little area not in the direct line

2    of the steps.  And then a few of them stayed in the middle.

3              And I did observe people walk up to those

4    uniformed police officers on the steps, like, holding flags,

5    groups of three or four, talk to the police and then them

6    point up the stairs.  Those people walked up the stairs.

7    And I witnessed police officers allowing people to enter in

8    the doorway and in cases Capitol police opening the door for

9    people as they walked in.

10   Q.  Now, let me ask you this.  This is obviously a criminal

11   trial of someone named Rebecca Lavrenz.

12             Do you know Rebecca Lavrenz at all?

13   A.  I do not.

14   Q.  Have you ever met her?

15   A.  I have not.  Not --

16   Q.  And you don't -- so do you have any recollection of her

17   on January 6th?

18   A.  Only from videos.

19             MR. ROOTS:  I want to bring up a video.  This will

20   be Government's 305-A.

21             MR. PARKER:  Your Honor, can we go on the phones?

22             (Whereupon, the following bench conference was

23   held:)

24             THE COURT:  Go ahead, Mr. Parker.

25             MR. PARKER:  So the witness there -- maybe this is

1    my confusion -- I believe the witness there said only from

2    videos in reference to his recollection of Ms. Lavrenz on

3    January 6th.

4          I just want to make sure we're not heading down a

5    speculative path.  I'm a little confused about what we're --

6    where we're headed.

7          THE COURT:  I think again, as with Mr. Powell, as

8    with him, you can share a video and you can ask him where he

9    was and what did he say.

10          But he can't start talking about what Ms. Lavrenz

11    is doing, because he's already told us.  He didn't know her

12    that day and he had nothing to -- about her.  He can't

13    describe what she's doing.  That's not his -- appropriate

14    for him to do.

15          So you can share the video with her on the screen.

16    That's fine.  You can ask him where he is and what he saw at

17    that time generally as of that day, whether or not he saw

18    her that day or other people and things like that.

19          Okay, Mr. Roots?

20          MR. ROOTS:  Okay.

21          THE COURT:  Thank you.

22          (Whereupon, the following proceedings were had in

23    open court:)

24          MR. ROOTS:  We'd like to bring up Government's

25    305-A.  We'll play this a few minutes and then we'll ask a

1    couple questions.

2              Go ahead and play.

3              (Whereupon, segments of Government's Exhibit No.

4    305-A were published in open court.)

5              MR. ROOTS:  We can stop here.

6    BY MR. ROOTS:

7    Q.  Let me ask you, Mr. Guandolo, did you witness this scene

8    on January 6th?

9    A.  I did.

10   Q.  Obviously, you see where there's that circle.  You

11   indicated you didn't know that person.  Correct?

12   A.  That's right.  I did not know her.

13   Q.  And what can you say about her entry into that area?

14             MR. PARKER:  Okay.

15             THE COURT:  I think --

16             THE WITNESS:  I am just --

17             THE COURT:  Hold on, Mr. Guandolo.

18             Let's have a quick bench conference.

19             (Whereupon, the following bench conference was

20   held:)

21             THE COURT:  My admonition was that you're not to

22   have him testify about what he sees her doing.  That's not

23   appropriate for him to do.

24             What he can describe is what he saw that day, not

25   now.  Sitting on March 29th, 2024, at 1:54 p.m., he can't

1     tell me what he's seeing now.  That's not testimony that is

2     under his purview.

3            His purview is:  What did he see on January 6th?

4     And you've generally set the scene.  You've talked about,

5     quite broadly, the people he saw going in, that there is no

6     police lines, things like this.  So you've already gotten

7     some very valuable testimony out of him for your theory of

8     the case.

9            He cannot say what he thinks Ms. Lavrenz is doing.

10    That's entirely speculative.  And I've covered this.  So I'm

11    going to remind you again, one last time, you cannot do

12    this.

13           MR. PIERCE:  Your Honor, he just testified that he

14    saw this scene right here.  So I mean, she's part of that

15    scene.  She's part of the crowd that he just testified he

16    saw on January 6th.  So maybe Mr. Roots didn't phrase it as

17    artfully as he could.

18           THE COURT:  He can say what he saw on January 6th.

19    You can say:  Going back, what did you see on January 6th

20    people doing?

21           But he did not see this person that day, I think

22    is what he said.  So he can say what he saw generally people

23    doing, but he simply cannot now create new testimony.  He

24    can talk about on that day what he saw people doing.

25           MR. PIERCE:  It's analogous to -- I think very

1   much -- you know, kind of the converse of the raindrop

2   theory, in the sense that, like he might not be able to say

3   on January 6th that he was looking at this particular

4   person.  But he did just say that he saw this scene, which

5   this person was in.

6           So he can certainly testify about what he

7   witnessed with regard to --

8           THE COURT:  Yes.  Generally.

9           MR. PIERCE:  -- people.

10          THE COURT:  He's testified already.  Absolutely.

11  He's testified before, and I think he had some very powerful

12  testimony he brought in about what he saw and the

13  peacefulness.  And I think this is certainly very valuable,

14  as I said, testimony that you all were hoping to get.

15  You've now gotten it in.

16          What he can't do is speak directly to Ms. Lavrenz,

17  because he does not -- he did not until the last 48 hours

18  know who she was.  So for him to sit up here and start

19  talking about what she was doing that day, that does not

20  comport with his role in this.  He can talk about what he

21  saw people generally doing, you know, which I think he's

22  already said.  But he can't start speculating as to what she

23  was doing because he has no firsthand knowledge, as he said,

24  of her.

25          So that's my ruling.  We'll continue on.

1          Mr. Roots, you can ask questions about as of that

2    day what did he see people doing.  I think you've already

3    adduced that testimony.  If you want to show it with some

4    more of these demonstratives, certainly you're welcome to do

5    so.

6          (Whereupon, the following proceedings were had in

7    open court:)

8          MR. ROOTS:  Thank you so much, Mr. Guandolo.

9          No further questions.

10          MR. PARKER:  Very briefly.

11          THE COURT:  Mr. Guandolo, you're going to now --

12    the prosecutor is going to come up with some questions for

13    cross-examination.

14          I just want to confirm with the jurors that

15    Mr. Guandolo is on your screen still.  Perfect.  So thank

16    you.

17          Thanks, Ms. Lavigne-Rhodes.

18                        CROSS-EXAMINATION

19    BY MR. PARKER:

20    Q.  Good afternoon, Mr. Guandolo.

21    A.  Good afternoon, sir.

22    Q.  My name's Terence Parker.  I'm an attorney with the

23    Department of Justice.

24          We've never met before, right?

25    A.  No, sir.

1  Q.  On January 6th in that video that we saw of you on that

2  grassy area, fair to say at that time you were about maybe

3  200 feet away from the Rotunda steps?

4  A.  No more than that.

5  Q.  More than that?

6  A.  Closer.  But no more than that.  Correct.

7  Q.  And you yourself, when that crowd went across the east

8  plaza, you didn't walk up to the police line at the Rotunda

9  steps.  Right?

10  A.  No, sir, I did not.

11  Q.  And you didn't walk up the steps to the doors.  Correct?

12  A.  Correct.

13  Q.  You mentioned some permits for that grassy area.

14      You didn't have a permit to go inside the Capitol

15  Rotunda; isn't that right?

16  A.  I did?  No, I didn't.

17  Q.  And you didn't have a permit to go to the Rotunda --

18  A.  No.

19  Q.  -- doors.  Right?

20  A.  No, sir.  And I'm not --

21      THE COURT:  Sorry.  You're cutting out.  Let's go

22  back and just answer the question again.

23      If you could ask it again, please, just to make

24  sure we're clear.

25      Just limit yourself to answering the question.

Guandolo - CROSS - By Mr. Parker

1    BY MR. PARKER:

2    Q.  I believe the question was:  You didn't have a permit to

3    go to the Rotunda doors.  Correct?

4    A.  Correct.

5    Q.  And you didn't have a permit to go to the Rotunda steps;

6    isn't that right?

7    A.  Correct.

8    Q.  Your permit was just for that grassy area where you

9    were?

10   A.  Correct.

11          MR. PARKER:  No further questions, your Honor.

12          THE COURT:  Thanks so much.

13          Any redirect?

14                    REDIRECT EXAMINATION

15   BY MR. ROOTS:

16   Q.  Okay.  So would there have been restrictions that you

17   saw that would have stopped you from going up the Rotunda

18   steps?

19          MR. PARKER:  Objection.

20          THE WITNESS:  Well --

21          THE COURT:  Hold on.  Bench conference.

22          (Whereupon, the following bench conference was

23   held:)

24          THE COURT:  So I think that he can testify as to

25   what he saw.  Let's just ask the question in a way that's --

1     what restrictions -- you can ask him something generally.

2     You asked him this before.

3            I mean, Mr. Parker, what is the specific objection

4     to asking him, What were the restrictions you saw going up

5     there?

6            MR. PARKER:  Your Honor, it's an

7     asked-and-answered objection.  It's cumulative.  And it's

8     outside the scope of cross.

9            THE COURT:  I'm going to let you, Mr. Roots, ask

10    the question.  I'm overruling the objection.  What

11    restrictions did he see?  I think he's already testified to

12    this.  So we are at asked and answered.  But I'm giving you

13    a little additional leeway here.  So let's -- but that's it.

14    Not further questions after that.

15           What other questions do you have for him?

16           MR. ROOTS:  This is more -- they asked questions

17    that pertained to him personally.  "Did you have a permit?"

18    "Did you go up?"

19           So I want to ask him:  Did you see restrictions

20    that would have prevented you?  Did you --

21           THE COURT:  I think you've asked that before on

22    your direct.  So you can ask him:  Did he see restrictions?

23    What else are you going to ask him?  About the permit, I

24    can't imagine you're asking him questions about that, are

25    you?

1           MR. ROOTS:  Well, your Honor --

2           MR. PIERCE:  I mean, your Honor, they're

3    implying -- and this is very clear.  They're implying that

4    he, you know, in not getting a permit or not choosing to go

5    up to the door, they're implying and leaving the impression

6    with the jury that he was under the impression that he was

7    not permitted to do that.

8           And I think that Mr. Roots should be permitted to

9    inquire as to whether or not -- you know, whether he had

10   that impression in fact, because they left the impression

11   that --

12          THE COURT:  What's the question?  I think --

13          MR. PIERCE:  I think the question would be:  Were

14   you under the impression that there was some restriction

15   that would prevent you from going up the steps or up to the

16   door?

17          THE COURT:  I'll allow it.  Let's just ask the

18   questions very pointed like that.  So what restrictions did

19   he see?  And did you think you were permitted to go up?

20   That's fine.  You can ask him that.

21          MR. PARKER:  Your Honor, if we could just not use

22   the word "permitted," maybe, in this context.

23          THE COURT:  Were you allowed?  How about

24   "allowed"?

25          MR. PARKER:  Thank you, your Honor.

```
 1                    THE COURT:  So that's -- "permit" is confusing.

 2       Let's stick with "allowed."

 3                    All right, Mr. Roots?  You got that?

 4                    MR. ROOTS:  Yes.

 5                    THE COURT:  Thank you.

 6                    (Whereupon, the following proceedings were had in

 7       open court:)

 8       BY MR. ROOTS:

 9       Q.  Okay.  What restrictions did you see that prevented you

10       from going up the Rotunda estops?

11       A.  I did not see any.

12       Q.  Did you think you were allowed to go up the Rotunda

13       steps?

14       A.  Yes.  I saw nothing that indicated I could not.

15                    MR. ROOTS:  Nothing further.  Thank you.

16                    THE COURT:  Thanks so much.

17                    All right, Mr. Guandolo.  That's going to be it

18       for now.  Thanks so much for being by Zoom.  I appreciate

19       it.  Thanks for your patience, for waiting with us this

20       morning.  I'm going to excuse you.  I don't think you'll be

21       needed, but keep your phone handy in case anything comes up.

22       Okay?

23                    THE WITNESS:  Thank you, your Honor.

24                    (Witness excused.)

25                    THE COURT:  Quick bench conference.
```

 1          (Whereupon, the following bench conference was

 2     held:)

 3          THE COURT:  So, Ms. Lavigne-Rhodes, I don't know

 4     if you're on the email or not about the officer.  It sounds

 5     like he is on his way, heading to court now, which was sent

 6     at about five minutes ago.  So I'm hoping that we can start

 7     with Mr. Cusick and then go to him once he gets here.

 8          MR. PIERCE:  Well, I mean, from a logistical

 9     standpoint, I think we could arrange that.

10          From a sort of tactical trial presentation

11     standpoint, we'd rather have this officer go first.  And I

12     don't think he's very far away.  We've certainly been

13     diligent in trying to get him here as fast as we can.  So we

14     would ask that we be permitted to do that.

15          THE COURT:  I don't have any reason to think --

16     this is a pretty big state.  There's no sort of indication

17     that he's here or close to here.  He could be 45 minutes

18     away or five minutes away.  I have no, unfortunately, way of

19     knowing that.

20          But I mean, I wouldn't agree with your statement

21     that you've been diligent in getting him.  You knew about

22     this person.  You tell me, Mr. Pierce.  The video that you

23     saw that he's in, you certainly knew about that more than 48

24     hours ago.  Correct?

25          MR. PIERCE:  Yeah.  We played that video in a

1      prior trial.  Yes, your Honor.

2              THE COURT:  So I would disagree with your

3      statement about the diligence in getting him here.  I think

4      you have been very busy as -- preparing for trial, which I

5      appreciate.  So that's why I'm not holding it against you

6      that he wasn't on the witness list.  And the marshals came

7      and dressed me down this morning, which I just told them,

8      Too bad.  They're like, We don't have that kind of service.

9      You can't get a subpoena with a six- to 15-hour turnaround

10     time.

11             I said:  No.  It's okay.  We've reached out to

12     Mr. Ballou and they're waiving personal service.  They are

13     going to agree to accept this by email.

14             So we've been trying to be very accommodating.

15     And I appreciate -- as have you, Mr. Pierce.  You've been

16     very accommodating, given your difficult schedule, to juggle

17     these balls.  You're doing an excellent job doing that.

18             But I don't think that I want to hold the jury up

19     here because, I mean, what if he gets in a car wreck or

20     something like that on the way here?  I certainly hope

21     that's not the case.  But if that was the case, then his

22     testimony would have to wait until Monday.

23             I mean, what is Mr. Cusick going to say that has

24     anything to do with what he's going to say?

25             MR. PIERCE:  I'm sorry, your Honor?  I'm sorry.

1    Ms. Lambert was talking to me.

2          THE COURT:  I appreciate that, and I want you to

3    have your strategic decisions.  But is it simply -- he's not

4    even your last witness.  You've indicated you anticipate

5    that the Defendant's going to testify.  Again, not that she

6    has to.  But why does -- why can't Mr. Cusick come first?

7          MR. PIERCE:  Well, I mean, I'll just tell you:  As

8    a matter of trial strategy, we very, very much want to and

9    have decided to choose if we can to have Mr. Cusick testify

10   after Ms. Lavrenz testifies.

11         And so the only reason, I think -- another point

12   here is the only reason that we are having to -- maybe

13   Mr. Roots will have to remind me how it played out -- but

14   the only reason we're having to call Mr. Warner is because

15   the Government objected to having the video played.  I

16   mean --

17         THE COURT:  Right.  The only reason he's not here

18   is because of the hearsay rules.  Again, some of the

19   complaints -- and I'm not saying that in any critical way.

20   But the criticisms that you have of things that are

21   happening are because of the Rules of Evidence, not

22   something that I can control or that the Government can

23   control.

24         So here's what I'm willing to do:  I'm willing to

25   give you -- we can take five minutes to try to see if we can

1      get some additional information on where in Virginia he is,

2      an estimated time of arrival.  We'll excuse the jury and see

3      what we can get.

4              You can take that five minutes also to get

5      Mr. Cusick ready, should we need to get him here.  I'm not

6      going to sit here -- if he shows up at 4:00, we're not

7      waiting two hours.  That's just not acceptable to me.

8              Had he been noticed properly in advance of the

9      trial and the subpoena delivered in a timely fashion, then

10     yeah.  I mean, I have the Capitol Police down here with a

11     contempt order because it would totally be inappropriate for

12     them not to be here.

13             But when they get a subpoena that they did not

14     require personal service, where they could have said, You

15     have to give personal service -- which means they wouldn't

16     have gotten it until sometime today; but they waived that.

17     So they have gone and bent over backwards to try to

18     accommodate.

19             So in doing that, I'm not going to expect them to

20     have a person just immediately on the ready.  As you heard

21     me say, had they not had him today by 4:00 and their general

22     counsel still is coming here today to answer any questions

23     if there's a problem, you can most assuredly expect there

24     would have been a contempt and/or bench warrant issued

25     because they made the choice to accept email service and had

1   not objected.

2          Had they objected and said, This is too late --

3   let's say he had a surgical appointment set up yesterday for

4   today.  He would have been out a lot, frankly.

5          So they have been very generous.  I'm happy to

6   continue to rely on their generosity.  So we'll take some

7   time to investigate.

8          So five minutes.  So let's -- let's just say 2:15.

9   We'll tell the jury we're going to hopefully restart around

10  then.  Let's see what we're going to find.

11         MR. PIERCE:  Yes, your Honor.

12         (Whereupon, the following proceedings were had in

13  open court:)

14         THE COURT:  All right, ladies and gentlemen.  One

15  additional witness we're just trying to sequence and get

16  some technical issues on.  So I don't need you to stay out

17  here.  I'm hoping about 2:15 we're going to restart.  I'm

18  going to stay out here, as are the parties.  We're just

19  trying to see who makes sense next to come up.

20         (Whereupon, the jury exited the courtroom at 2:08

21  p.m. and the following proceedings were had:)

22         THE COURT:  You can be seated.

23         MR. PIERCE:  Your Honor, are we still on the

24  record such that we could have a bench conference?

25         THE COURT:  You want to have a bench conference?

1    We're on the record.

2              MR. PIERCE:  It involves a serious imminent

3    medical situation with one of our witnesses.

4              THE COURT:  Sure.  We'll make this a sealed

5    portion of the record.

6              (Whereupon, the following bench conference was

7    held:)

8    

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25









25          THE COURT:  I'm going to bring Mr. Cusick in from

1    the waiting room prior to the jury coming in to give him the

2    direction I gave the prior witnesses, that he's just to

3    testify as to what he saw.

4         Mr. Roots, does that make sense?  I'm going to

5    call Mr. Cusick in and just give him the direction that I

6    gave the prior witnesses, that he's just to say what he saw,

7    not testify as to sort of his speculation, not talk over

8    witnesses or attorneys and the witness talking over each

9    other because of the Zoom situation.  And I'll just tell him

10   again that he's only to talk about what he knew as of

11   January 6th, not what he's learned afterwards.  I understand

12   that you object to this guidance.  But I'm going to go ahead

13   and do that now unless you've got anything else for me,

14   Mr. Roots.

15        MR. ROOTS:  Yeah.  That should do it.

16        THE COURT:  Are you intending to introduce videos

17   through him?  Because we can always do it again where we go

18   over them now.  New videos, I mean.

19        MR. ROOTS:  Three new videos.  Okay.  Yeah.  We do

20   have Defense Exhibit 65, Defense Exhibit 66 and I believe

21   Exhibit 53, which is already in.  Yeah.

22        THE COURT:  Do we want to go ahead and show those

23   videos?

24        Can we do that, please, Ms. Lambert, just so I can

25   get a sense of what they are?

```
1                    MR. ROOTS:  I think Exhibit 65 is the Trump

2       speech.

3                    MR. PARKER:  Your Honor, we'd --

4                    THE COURT:  I want to see the video first.

5                    I understand you're going to have objections.

6                    (Whereupon, Defendant's Exhibit No. 65 was

7       published in open court.)

8                    (Whereupon, Defendant's Exhibit No. 66 was

9       published in open court.)

10                   THE COURT:  Mr. Roots, is that a video --

11                   MR. ROOTS:  That was 66.

12                   THE COURT:  Is that a video that Mr. Cusick is in

13      or he made?  Can you give us a background?

14                   MR. ROOTS:  He was partially in it.  His friend,

15      David Lesperance, filmed it.  They were co-defendants

16      together and they walked together and pretty much traced

17      each other's steps together the final way.

18                   THE COURT:  Can you tell us the final exhibit

19      number and show us the exhibit?

20                   MR. ROOTS:  The final one is already in, Exhibit

21      53.

22                   THE COURT:  That's Defense 53?

23                   MR. ROOTS:  Yes, which shows that officers were

24      moving barricades.

25                   THE COURT:  Do you believe this is something he's
```

 1     going to say that he saw?

 2                 MR. ROOTS:  That is Mr. Cusick in that video right

 3     there in the white cap.

 4                 THE COURT:  So the final two videos, setting aside

 5     the first one that was President Trump's speech, the final

 6     two, I want to know, does the Government have any questions

 7     as to authenticity or any issues as to admission or

 8     publication of it?

 9                 MR. PARKER:  I don't believe we have a problem

10     with authenticity.

11                 As to admissibility, I understand your Honor's

12     ruling that the montage video opens the door to some west

13     side testimony.  I think we are far beyond a proportional

14     response to that limited door-opening.

15                 This is going to be the second witness to come

16     talk about the west side, where Ms. Lavrenz never went on

17     January 6th, to talk about scenes and sights that

18     Ms. Lavrenz never saw, to talk about entering a side of the

19     building that Ms. Lavrenz was never on, entering the

20     building at a time when Ms. Lavrenz was not there.  We're

21     trying to keep this case focused on Ms. Lavrenz, and this

22     simply is not focused on her.

23                 THE COURT:  Okay.  Well, I'm just -- I hear you.

24                 Let's stick with authenticity right now.  So I'll

25     note your objection.

1              As to the first video, what is the purpose of

2       that, of President Trump's speech?

3              MR. ROOTS:  Well, that's a very short snippet of

4       Trump's speech where he said, I know that some of you will

5       be going over to the Capitol to peacefully and patriotically

6       protest.

7              The record here in this case already shows that

8       Ms. Lavrenz was listening to that speech from loudspeakers

9       and things that were on the east side.

10             She did not attend the Trump speech, but she heard

11      that.  And there's the president of the United States

12      saying, Hey, let's go over and peacefully and patriotically

13      protest.  It goes to her state of mind, innocent state of

14      mind.

15             THE COURT:  I'm happy to hear briefly from the

16      United States.

17             MR. PARKER:  I understand Mr. Roots's argument

18      that Ms. Lavrenz listened to this speech.  She obviously did

19      not see the speech.  So this is a video of a speech which

20      she never witnessed.

21             I think the -- we had a motion *in limine* that

22      dealt with this, I believe, about President Trump inviting

23      the rioters in, essentially.

24             THE COURT:  I don't think this is relevant.  I

25      think as -- from Mr. Cusick's perspective, I think again

1    you've stated -- and as I've said every time, your client

2    does not have to testify.  But if she wants to, perhaps

3    that's something that we can discuss then.  But right now,

4    for a speech that she did not see, for Mr. Cusick to talk

5    about that, that -- he's not here to talk about

6    Ms. Lavrenz's state of mind.  He can only testify about his

7    own knowledge of what he saw and heard that day.

8          So I will deny the request to play that.

9          As to the other two, I appreciate the Government's

10    concern.  But I don't think it's cumulative.  You know,

11    there's some several thousand people, and somewhere between

12    two and several thousand is the line.  I don't know where it

13    is.  I'm sure that in subsequent trials we will find out.

14          But today we have not gotten there with Mr. Pierce

15    and Mr. Roots.  I think two witnesses is what they've capped

16    it at.  They did have additional ones, for the record, that

17    they were going to bring in.  But they have withdrawn them.

18          And so given that this is their last, essentially,

19    fact witness about the sort of -- in response to the

20    raindrop theory, I think it's sufficient.

21          It'll be pretty limited, Mr. Roots, again, as to

22    the things that I've discussed.  He can state what he saw on

23    January 6th.  He can state where he was on January 6th.  But

24    he can't speculate about other rioters.  He can't speculate

25    about his co-defendant.  He can simply talk about what he

1    saw that day.  He is a fact witness to talk about what he

2    saw that day.

3            So I'm going to admit over the Government's

4    objection the two exhibits that I am permitting, the latter

5    two that they showed, that showed video with him in it.  And

6    he can testify as to what he saw.

7            He cannot testify that -- again, as to the state

8    of mind of police officers when they were moving barricades.

9    He cannot testify as to what other people are thinking.  He

10   can testify as to what he thought about it.

11           And I understand the Government's frustration,

12   because it's his thinking.  That really seems quite barely

13   at the edges of relevance as to what Ms. Lavrenz was.  But I

14   want to give Ms. Lavrenz some leeway here.

15           So I'll go ahead and permit it.

16           (Whereupon, Government's Exhibit Nos. 53 and 66

17   were entered into evidence.)

18           THE COURT:  Let's admit him from the Zoom room in

19   and I'll give him that instruction.  Then we'll -- based on

20   your proffer, I'm fine with just admitting the video.  I

21   don't think we need to play it for him again, do we,

22   Mr. Parker?

23           MR. PARKER:  No.  I don't believe so.

24           THE COURT:  Thank you.

25           (Whereupon, James V. Cusick, Jr., joined the

```
1    proceedings via Zoom videoconference.)

2              THE COURT:  Mr. Cusick, can you hear me?

3              MR. CUSICK:  Yes, sir.  I can hear you.

4              THE COURT:  Great.  This is Judge Faruqi.  I'm

5    not sure.  Can you see me or no?

6              MR. CUSICK:  I actually can.

7              THE COURT:  Wonderful.

8              My courtroom deputy is going to swear you in.  I'm

9    going to give you a couple directions and then we'll get

10   started very soon.  Okay?

11             MR. CUSICK:  Wonderful.

12             THE COURT:  Thanks for your patience.

13             Go ahead, Mr. Lavigne-Rhodes.

14             THE COURTROOM DEPUTY:  Good afternoon, sir.

15   Please raise your right hand.

16        JAMES V. CUSICK, JR., DEFENSE WITNESS, SWORN.

17             THE COURTROOM DEPUTY:  Thank you.

18             THE COURT:  Mr. Cusick, this is Judge Faruqi.

19             I'm going to give you some guidance here as to

20   what is the acceptable scope of testimony.  I want you to

21   only limit what you testify about to be about what you saw

22   on January 6th, that day, not things that you may have

23   learned afterwards or learned afterward from friends.  I

24   don't want you to talk about what you believe other people

25   in the crowd were thinking or other police officers were
```

1    thinking; only the things that you knew that day from your

2    own personal knowledge.  Mostly, it's going to be about what

3    you saw or what you -- where you went.  Those are the things

4    that you'll be able to testify to.  Okay?

5              THE WITNESS:  Okay.

6              THE COURT:  If you have a question about that, you

7    can just say, "I have a question" before you answer a

8    question.  If you hear a question and you're not sure, you

9    can say, "I'm not really sure."  And if we need to, we'll

10   excuse the jury or we'll find other ways to ask the

11   questions.  Okay?

12             THE WITNESS:  Very good.  Yes, sir.

13             THE COURT:  Anything else from the United States

14   before we get started?

15             MR. PARKER:  No, your Honor.

16             THE COURT:  Mr. Roots, anything before we get

17   started?

18             MR. ROOTS:  No, your Honor.

19             THE COURT:  So we'll bring in the jury and then

20   swear you in, Mr. Cusick.

21             (Whereupon, the jury entered the courtroom at 2:57

22   p.m. and the following proceedings were had:)

23             THE COURT:  You can be seated.

24             Can you please swear in -- well, call the witness,

25   please, Mr. Roots.

1          MR. ROOTS:  Yes.  The defense next calls Mr. Jim

2     Cusick.

3          THE COURTROOM DEPUTY:  Mr. Cusick, can you please

4     raise your right hand.

5          JAMES V. CUSICK, JR., DEFENSE WITNESS, SWORN.

6          THE COURTROOM DEPUTY:  Thank you.

7                    DIRECT EXAMINATION

8     BY MR. ROOTS:

9     Q.  Okay, Mr. Cusick.  Would you please state and spell your

10    name for the record?

11    A.  My legal names is James, J-A-M-E-S, V., Varnell,

12    V-A-R-N-E-L-L, Cusick, C-U-S-I-C-K.  I'm a Junior, J-R.

13    Q.  Okay.  How old are you, Mr. Cusick?

14    A.  75.

15         THE COURT:  Hold on.  They can't see him on the

16    screen.

17         THE COURTROOM DEPUTY:  Apologies.

18         THE COURT:  Thanks for letting us know.  Can you

19    see him now?

20         THE JURY:  Yes.

21         THE COURT:  Ask the question again.

22    BY MR. ROOTS:

23    Q.  How old are you, Mr. Cusick?

24    A.  75.

25    Q.  Okay.  And where are you from?

```
1    A.  Melbourne, Florida.

2    Q.  Okay.  And where do you live right now?

3    A.  I live in Melbourne, Florida.

4    Q.  Let me ask you, did you serve in the military?

5    A.  I did.

6    Q.  Were you drafted or did you volunteer?

7    A.  I volunteered for the draft.

8    Q.  And what year was that?

9    A.  1968.  I think it was July of 1968.  I went in in August

10   of '68.

11   Q.  Okay.  About how old were you when you joined?

12   A.  19.

13   Q.  If you could, just briefly describe your military

14   experience.

15              MR. PARKER:  Objection.

16              THE COURT:  We can have a bench conference.

17              (Whereupon, the following bench conference was

18   held:)

19              THE COURT:  Go ahead, Mr. Parker.

20              MR. PARKER:  It's a relevance objection.  If he's

21   going to testify about January 6th, I'd ask, given how much

22   dead time we've had today, can we just get to January 6th?

23              THE COURT:  Mr. Roots, this is the issue we

24   covered previously.  No one objected before.  I'm not sure

25   how it's relevant what his military service is.  You've
```

Cusick - DIRECT - By Mr. Roots

1    already got in that he's a veteran, that he served, it

2    sounds like, honorably.  And I'm not sure why we need to get

3    further into this to establish who he is.

4         MR. ROOTS:  Again, it goes to credibility.  He's

5    not just a veteran; he's a Silver Star recipient, Vietnam

6    veteran.  So again, we -- the Government gets to put on

7    these wonderful witnesses wearing medals.  We put on

8    witnesses and the jury is made to believe that they're just

9    homeless people off the street.

10        THE COURT:  There's no indication of that.  He's

11   already indicated he volunteered to serve his country.  And

12   all of the other witnesses again have testified as to what

13   their employment was.  So -- moreover, I've instructed the

14   jury before and again at the end I've told them they treat

15   law enforcement officer witnesses like any other.

16        You can ask him if he received any awards for his

17   military service.  What else do you need to ask him?

18        MR. ROOTS:  I'd also -- he was a pastor.  I'd like

19   to go into his profession.

20        THE COURT:  You can ask him what his profession

21   is.  That's fine.  But we don't need to hear about his

22   testimony or things that he has done.  It's:  What is his

23   profession?  That's fine.

24        What else?

25        MR. ROOTS:  Well, I mean, a couple -- these

 1    questions were written by Mr. Pierce.

 2                THE COURT:  That's fine.

 3                MR. ROOTS:  You know, was he married?  Have any

 4    kids?  Just background information.

 5                THE COURT:  Mr. Parker, any objection to him

 6    answering whether he's married or has kids?

 7                MR. PARKER:  Yes, your Honor.  This is completely

 8    irrelevant.

 9                THE COURT:  I agree.  It is irrelevant.  You can

10    get his -- I don't think that's bolstering his credibility

11    or in any way undercutting him.  You can get that he is an

12    award-winning veteran.  You can get that he is a pastor.

13    And then let's move on to the question at issue here about

14    what he saw that day.  Okay?

15                MR. ROOTS:  Okay.

16                (Whereupon, the following proceedings were had in

17    open court:)

18    BY MR. ROOTS:

19    Q.  Okay, Mr. Cusick.  Very quickly, did you get any awards

20    from your military experience?

21    A.  Well, yes.  I was a Purple Heart, Bronze Star and the

22    various medals for different weapons, qualifications for

23    different weapons.

24    Q.  And were you honorably discharged or dishonorably

25    discharged?

1       A.  I was honorably discharged.

2       Q.  And what have you done for a living after leaving the

3       military?

4       A.  I went in the ministry.  I have worked a little bit in

5       advertising.  Then I went into the ministry.  I went to

6       school in 1978, Tulsa, Oklahoma, came out and was an

7       associate pastor for a while in Lakeland, Florida.  And

8       then --

9                   MR. PARKER:  Objection.

10                  THE COURT:  If you can wrap up the answer, please,

11      Mr. Cusick.

12                  THE WITNESS:  Okay.  We started a church and had a

13      school.

14                  MR. PARKER:  Objection.

15                  THE COURT:  I'll overrule the objection.

16                  You can just answer the question.  Finish your

17      answer, Mr. Cusick.

18                  THE WITNESS:  Well, we started a church.  We

19      pastored a church -- my wife passed away ten years ago.

20      Before she passed away, we pastored it 30-some years.  We

21      also did a lot of work overseas in Eastern Europe, Israel

22      and Central America.  My wife went to Nigeria every year for

23      three years --

24                  THE COURT:  Thank you, Mr. Cusick.  We're not

25      asking about your wife.  Thank you.

1           Next question, Mr. Roots.

2    BY MR. ROOTS:

3    Q.   Okay.  Are you retired now or are you still working?

4    A.   I'm retired.  I do a Bible study, pretty much.

5    Q.   Let me ask about January 6th and Washington, D.C.

6           First of all, prior to January 6th, had you ever

7    visited Washington, D.C.?

8    A.   Yes.

9    Q.   Did you ever visit the U.S. Capitol?

10          MR. PARKER:  Objection.

11          THE WITNESS:  Yes.

12          THE COURT:  We can have a quick bench conference.

13          (Whereupon, the following bench conference was

14   held:)

15          THE COURT:  Mr. Roots, he's not testifying as an

16   expert about the Capitol.  Why would it be relevant about

17   his prior travels to Washington, D.C.?

18          MR. ROOTS:  Well, it goes to his entire experience

19   at the Capitol.  He'd been there before many times.  In

20   fact, he'd been there during a larger rally on the green of

21   the Capitol and it sort of -- it informed his experience on

22   January 6th.

23          THE COURT:  How so?

24          MR. ROOTS:  The previous time, there were more --

25   it was the Glenn Beck -- I think they called it the Ten

1    Twelve.  More people were on the green on the Capitol.  That

2    was probably 20 years ago.  And he had, you know, a

3    completely different experience.

4           Then he expected to be treated similarly on

5    January 6th, and it was a totally different situation.

6           THE COURT:  That's not relevant.  I'm not going to

7    allow it.  Please move on to talking about January 6th.

8    He's not here -- he's already been on trial.  He's had his

9    trial.  He's not here to talk about what he thought was

10   going to happen.  That's completely irrelevant to what

11   Ms. Lavrenz was expecting to happen to her or what happened

12   to her that day.

13          So move on to January 6th.

14          (Whereupon, the following proceedings were had in

15   open court:)

16          THE COURT:  We're going to strike that prior

17   question.  Let's move on.

18   BY MR. ROOTS:

19   Q.  Mr. Cusick, have you ever met anyone named Rebecca

20   Lavrenz?

21   A.  No, I have not.

22   Q.  Do you follow politics, Mr. Cusick?

23          MR. PARKER:  Objection.

24          THE COURT:  That's not relevant.  I'm going to

25   strike that question.  Please focus in on the questions I

Cusick - DIRECT - By Mr. Roots

```
1    directed you to ask him.
2    BY MR. ROOTS:
3    Q.  Okay.  At some point, did you learn about events that
4    were going to be happening in Washington, D.C., on
5    January 6th, 2021?
6    A.  I did.
7    Q.  And at some point did you decide to go to Washington,
8    D.C., on January 6th, 2021?
9    A.  Yes.
10   Q.  And can you describe how you decided to do that?
11              MR. PARKER:  Objection.
12              THE COURT:  We can have a bench conference.
13              (Whereupon, the following bench conference was
14   held:)
15              THE COURT:  Go ahead, Mr. Parker.
16              MR. PARKER:  Your Honor, this witness's
17   preplanning to go to January 6th is not relevant.
18              If he wants to talk about what he saw and
19   experiences at the Capitol on January 6th, I think that's
20   what your Honor has -- I think that's what your Honor has
21   cabined his testimony to.  I think that's what it should be
22   limited to.
23              THE COURT:  I'm not sure if -- his motivation for
24   going there or what he did to plan for it isn't really
25   relevant to me, Mr. Roots.  Go ahead.
```

1          MR. ROOTS:  It's more about the common

2    understanding of everyone that went there.  It's like, Why

3    did you go to the state fair?

4          Because of advertisements.

5          People understood that this would be a big

6    patriotic thing.  It would be a civic duty to go there.

7    These are common with Ms. Lavrenz.  These kind of things.

8          THE COURT:  What's happened, though, unlike in the

9    *Gunby* trial, where Mr. Sumrall had very limited testimony, I

10   let him have broader testimony here.  He's already submitted

11   that information.

12         So this is cumulative, and that's why I could have

13   struck this entire witness, who's talking about events that

14   were never in the purview, never in the vision, had nothing

15   to do with your client.  But I'm trying to give you as much

16   leeway as I can, but you're making it difficult here and

17   you're getting into things that you were not supposed to be

18   talking about.

19         So I'm going to tell you one final time:  He

20   should just be talking about what happened when he got to

21   January 6th.  Let's start back off with, Did you attend the

22   rally on January 6th?  And then what happened after he got

23   there that day.  Not what motivated him to go there, not how

24   he got there.  That's not relevant.

25         Okay, Mr. Roots?

1          MR. ROOTS:  Okay.

2          (Whereupon, the following proceedings were had in

3     open court:)

4     BY MR. ROOTS:

5     Q.  Okay, Mr. Cusick.  Let's just talk about the actual day

6     of January 6th.

7          Can you describe that day?  Where did you go that

8     day?

9     A.  Well, we went there purposely to hear a rally speech by

10    the president.  And so we went out on the Mall where the

11    speech was taking place, and we joined tens of thousands of

12    other people.  And that's why I went:  to hear the speech.

13    Q.  Where did you first go that day?

14    A.  Around the Washington Monument.  We moved over to the --

15    to where the venue was that the president was speaking from,

16    the Ellipse, and we stood there for hours.

17    Q.  And can you tell the jury, what was the crowd atmosphere

18    like?

19          MR. PARKER:  Objection.

20          THE WITNESS:  It --

21          THE COURT:  I'm going to strike that question.

22    I've already stated why it's outside the scope.

23          So you can ask a new question, please.

24    BY MR. ROOTS:

25    Q.  What did you see in terms of the crowd you were with?

```
 1                    MR. PARKER:  Objection.

 2                    THE COURT:  We can have a quick bench conference.

 3                    (Whereupon, the following bench conference was

 4       held:)

 5                    THE COURT:  Before you go, Mr. Parker, I think he

 6       can testify as to what he saw that day.

 7                    Now, I guess my concern is that I don't know what

 8       is meant by their reaction.  If he's saying literally I saw

 9       people moving around or going into the building, that's

10       fine.  If he starts trying to speculate as to people's state

11       of mind, that's, I think, outside the bounds.

12                    Go ahead, Mr. Parker.

13                    MR. PARKER:  Your Honor, we have that objection.

14                    I also have an objection to an extensive amount of

15       testimony about what's going on at the Ellipse.  That's not

16       even at the Capitol grounds.  I don't think his Capitol

17       grounds testimony is relevant.  I absolutely don't think

18       it's -- the Ellipse testimony is relevant.

19                    THE COURT:  Let's move to the Capitol grounds.  I

20       definitely don't want to be talking about what's happening

21       at the Ellipse.  Okay?

22                    MR. ROOTS:  Okay.

23                    (Whereupon, the following proceedings were had in

24       open court:)

25                    THE COURT:  We're going to ask a new question
```

Cusick - DIRECT - By Mr. Roots

1    here, Mr. Cusick.  Thanks for bearing with us.

2    BY MR. ROOTS:

3    Q.  At some point, did you decide to go to the U.S. Capitol

4    on January 6th?

5    A.  Yes.

6    Q.  And were you by yourself or with others?

7    A.  I was with several others.

8    Q.  And about what time was that?

9    A.  That we went to the Capitol?  Whenever the president

10   finished his speech.  I'm not exactly sure what time it was.

11   But we didn't leave immediately because one of the guys with

12   us --

13            MR. PARKER:  Objection.

14            THE WITNESS:  -- went on the Ellipse --

15            THE COURT:  Hold on.  Stop your answer.  We don't

16   need to go into the reasons why.

17   BY MR. ROOTS:

18   Q.  So you walked -- let me just -- so you walked to the

19   Capitol from the Ellipse area?

20   A.  Correct.

21   Q.  Let me ask you, did you ever intend to go into the --

22   inside the U.S. Capitol?

23            MR. PARKER:  Objection.

24            THE COURT:  Hold on.  We can take a bench

25   conference.

1           (Whereupon, the following bench conference was

2      held:)

3           THE COURT:  So I'll say it again:  He's already

4      had his trial.  His trial was about what he wanted to do.

5      That has nothing to do with what Ms. Lavrenz wanted to do.

6           He can talk about what he saw and where he went.

7      That is simply it.  But what his intentions were or what

8      other people he thought were trying to do, that is simply

9      outside the scope of what he has been limited to for the

10     purposes of this trial.

11          So please focus your questions on:  Where did he

12     go?  What did he see?  And -- without speculating on what

13     people's reactions are.  Simply, if you saw people engaged

14     in violence, you can ask him.  Was there violence that you

15     observed?  And things like that.  That's fine.

16          But we can't ask him why -- what his intentions or

17     his hopes were for the day because that was the purview of

18     his trial, not this trial.  Let's move to those questions.

19     Thank you.

20          MR. PARKER:  I'm sorry, your Honor.

21          On the screen there for a moment it looked like

22     Mr. Cusick was talking to somebody.  If we could just have

23     clarification if anybody else is in the room, just for the

24     record.

25          THE COURT:  It did appear when the camera came on

 1   he's got a family member or friend who's helping him.  So

 2   yes.  Someone is there.  It did not appear he's being

 3   coached in any way.  But he may need technical assistance.

 4           MR. PARKER:  That's fine.  I'm just noting it for

 5   the record.

 6           THE COURT:  Thank you.

 7           (Whereupon, the following proceedings were had in

 8   open court:)

 9           THE COURT:  Okay, Mr. Cusick.  We're going to

10   start again.

11   BY MR. ROOTS:

12   Q.  Very importantly, did you expect to see President Trump

13   at the Capitol at some point that day?

14           MR. PARKER:  Objection.

15           THE COURT:  I want to be clear here.  I want your

16   questions to focus on what he did see, not what he was

17   expecting to.

18           So, Mr. Cusick, your testimony is limited.  I'm

19   going to instruct you now as to what you did see.

20           So you can ask him that question.

21           MR. ROOTS:  Can I have a phone conference?

22           (Whereupon, the following bench conference was

23   held:)

24           THE COURT:  In the pretrial conference, I already

25   had a motion *in limine*.  We discussed this.

1          President Trump's directing Mr. Cusick to go there

2     is not permissible testimony with regards to Ms. Lavrenz.

3     Perhaps it was as to his trial, but I don't know why we're

4     talking about President Trump.  We should be talking about

5     what he did see on January 6th.  You can ask what he did see

6     in terms of violence or things like that, sure.  But we're

7     not here to talk about President Trump.  That is not what

8     this trial is about.

9          MR. ROOTS:  Let me just say, his thinking is

10    almost identical to Ms. Lavrenz's thinking.

11          THE COURT:  That doesn't matter, Mr. Roots.  It

12    does not matter.  We're not in a position to have -- that's

13    not how trials work here.  His -- the facts -- that they may

14    have the same intent or interest simply does not work.

15          Ms. Lavrenz, you've already indicated on multiple

16    occasions, is going to testify.  If she wants to, she can

17    talk about what was in her heart and mind.  He cannot talk

18    about what's in his and you apply it to her.

19          So I'm giving you a very short leash.  If you

20    cannot address the questions I directed you, I'm going to

21    just dismiss this witness.

22          MR. ROOTS:  I want to say, can I just say, this

23    goes to the confusion of the crowd; and that is our defense.

24    The Government is wanting to convict her based on the crowd,

25    this raindrop theory that she -- that the crowd is imputed

1        to her.

2                And our defense is the confusion that was reigning

3        amongst the crowd, including her, including Mr. Cusick.

4                THE COURT:  That's what I've allowed this person

5        to testify about.  What did he see happening with the crowd?

6        You've not asked him a single question about that or what

7        was the restrictions of where people could move.

8                So let's move to that to ask him:  What did he see

9        about the crowd?  Where did he go?  That's fine.  You can

10       ask him that, because that's how we've seen the crowd.  You

11       have videos to show him of the crowd.

12               So those are things you should be talking about.

13       Let's move to that.

14               (Whereupon, the following proceedings were had in

15       open court:)

16       BY MR. ROOTS:

17       Q.  Okay, Mr. Cusick.  Very specifically, when you got down

18       near the Capitol grounds, what did you see?

19       A.  Lots of people milling around.

20               MR. ROOTS:  Let's bring up an exhibit.  Let's

21       bring up Defense 66.

22               THE COURT:  This exhibit has been admitted and

23       will be published to the jury.

24               Mr. Roots, just make sure you can talk kind of

25       loudly so we make sure that we can hear you.

1          But you can show the video, please.

2          (Whereupon, segments of Defendant's Exhibit No. 66

3     was published in open court.)

4          MR. ROOTS:  Pause here.

5     BY MR. ROOTS:

6     Q.  We've paused at 18 seconds in this video.  Mr. Cusick,

7     do you recall this on January 6th?

8     A.  Yes.

9     Q.  If you could tell the jury, what were the level of

10    restrictions in this area?

11    A.  None.

12    Q.  How about signs?  Did you see any signs?

13    A.  I did not.

14    Q.  What about police line?  Is there a police presence that

15    you recall in this area?

16    A.  I did not see any.

17    Q.  What about any kind of announcements or loudspeaker

18    statements?

19    A.  None.

20    Q.  Now, to be specific, what side of the Capitol is this?

21    A.  It's on the west side.  And I guess it would be

22    northwest.  I see the Senate up there.  Yeah.  West side.

23    Northwest side, I guess.

24          MR. ROOTS:  Let's play some more of that.

25          (Whereupon, segments of Government's Exhibit No.

1    66 were published in open court.)

2              MR. ROOTS:  We can stop here a little bit.

3    BY MR. ROOTS:

4    Q.  Okay.  Whereabouts are you on the Capitol grounds about

5    right now?

6    A.  We're nearing the Capitol.  I'm on the west side,

7    probably moving to the north, just a bunch of people milling

8    around.

9    Q.  Okay.  Did you encounter anyone who was telling you to

10   leave?

11             MR. PARKER:  Objection.

12             THE WITNESS:  No.

13             THE COURT:  I'm going to allow the question.  Go

14   ahead.

15             THE WITNESS:  No.  No one asked.

16   BY MR. ROOTS:

17   Q.  Did you encounter anyone telling you to leave?

18   A.  No one.

19   Q.  What about police officers?  How about any police

20   officers --

21             THE COURT:  You've already asked the question.

22   You got an answer.  Let's move on.

23             MR. ROOTS:  Let's keep playing.

24             (Whereupon, segments of Government's Exhibit No.

25   66 were published in open court.)

1              MR. ROOTS:  We can stop right here.

2      BY MR. ROOTS:

3      Q.  Are you continuing to walk, Mr. Cusick?

4      A.  Yes.

5      Q.  Are you walking in -- what direction?

6      A.  I guess we're walking east along the west side.

7      Q.  Okay.  Did you see any barricades preventing you from

8      walking in that area?

9              MR. PARKER:  Objection.

10             THE WITNESS:  No.

11             THE COURT:  Hold on.  We can have a bench

12     conference.

13             (Whereupon, the following bench conference was

14     held:)

15             THE COURT:  Okay, Mr. Parker.  Go ahead.

16             MR. PARKER:  This is asked and answered.  The

17     witness has moved, like, 10 feet in this video.  We just

18     went over it.  He didn't see barricades.  He's essentially

19     in the same spot.

20             THE COURT:  I understand.

21             I'm going to allow them to ask this, within

22     reason.

23             You can't just move it forward every few seconds

24     in a clip and ask the same question.  It's already been

25     asked and answered.  I'm going to allow him to answer it

1    here, but understand we can't keep going and asking the same

2    thing, Mr. Roots.  Do you see -- I don't see a way that we

3    could under the rules.  Do you?

4         MR. ROOTS:  Well, the Government has presented its

5    case about all these lines.  So was there a line at the

6    beginning?  A line in the middle?  A line -- so I think we

7    do get to ask:  Okay.  Did you see a line here?  What about,

8    you know, here?

9         THE COURT:  But the thing is, we're moving a few

10   seconds.  We would be here literally till potentially, you

11   know, the end of next week if every second you stopped and

12   asked the question.

13        So the point is, if, yes, he moves some

14   substantial amount and ultimately that it adds value, you

15   can do that.  But we're not at that.  We're asking him --

16   this is a three-minute clip.  It appears he went about ten

17   or 15 seconds.

18        Let's not keep doing this.  You can ask him, you

19   know, more efficiently if he saw one at any time.  That

20   seems to be pretty relevant.  But we cannot just keep asking

21   over and over again as to this.

22        I'll let him answer it here.  But I expect that

23   you're not going to ask him again at the next stop three

24   seconds later.  Do you understand?

25        MR. ROOTS:  Understood.

1                    THE COURT:  Thank you.

2                    (Whereupon, the following proceedings were had in

3      open court:)

4      BY MR. ROOTS:

5      Q.  Okay, Mr. Cusick.  Let me just ask, did you see anything

6      at all indicating that you were in a restricted area?

7                    MR. PARKER:  Objection.

8                    THE COURT:  We can ask it in a different way so

9      that's not calling for a legal conclusion.  But you can ask

10     as we have earlier.  "Did you see anything preventing his

11     entry" or whatever way you want to describe it.  Let's not

12     use "restricted area."

13     BY MR. ROOTS:

14     Q.  Okay.  Did you see anything at all indicating that you

15     were not permitted to be in that area?

16                    MR. PARKER:  Objection.

17                    THE COURT:  I'll allow the question.

18                    Go ahead.

19                    THE WITNESS:  Absolutely nothing.

20     BY MR. ROOTS:

21     Q.  Did this seem like a riot to you?

22                    MR. PARKER:  Objection.

23                    THE COURT:  That's calling for speculation.  We're

24     not going to do that.

25                    Please strike that question.

 1                Jurors, I'm instructing you to ignore the

 2     question.

 3                Let's move on, Mr. Roots.

 4     BY MR. ROOTS:

 5     Q.   Okay.   Mr. Cusick, did you go inside the Capitol at some

 6     point?

 7     A.   Yes.

 8     Q.   And can you describe for the jury, was that -- did you

 9     break -- did you break into the Capitol?

10                MR. PARKER:   Objection.

11                THE COURT:   Mr. Roots, that's a leading question.

12     It's prejudicial.   We're going to strike the question.   You

13     can ask him if he entered the building.

14     BY MR. ROOTS:

15     Q.   Can you describe for the jury the entry that you made?

16     A.   Well, the entry we went in, the door was open.   It was

17     cold.   We hadn't been in the bathroom.   I don't know what I

18     can say, anyway.   The door was open.   People coming in and

19     out.   There's police officers standing there.

20                We walked inside.   My son asked about a bathroom.

21     And one of the officers showed him where to go.   We stood

22     there for a short time.   I think we walked around -- about

23     eight minutes we were there.   The line was too long to get

24     in.   As a matter of fact, men were using the women's

25     bathroom because --

```
 1                    MR. PARKER:  Objection.

 2                    THE COURT:  We can --

 3                    THE WITNESS:  -- then --

 4                    THE COURT:  We can end the answer there.

 5                    Go ahead.  Do you have another question,

 6       Mr. Roots?

 7       BY MR. ROOTS:

 8       Q.  Okay, Mr. Cusick.  I would like to bring up a video.

 9                    MR. ROOTS:  And that is Defense 53.

10                    (Whereupon, segments of Defendant's Exhibit No. 53

11       were published in open court.)

12                    THE COURT:  Can you all see that on the screens?

13                    THE JURY:  Yes.

14                    THE COURT:  Go ahead.

15                    Thank you, Ms. Lambert.

16                    (Whereupon, segments of Defendant's Exhibit No. 53

17       were published in open court.)

18                    MR. ROOTS:  We can stop there.

19       BY MR. ROOTS:

20       Q.  Do you recognize this, Mr. Cusick?

21       A.  Yes.  That's me standing right there.

22       Q.  That's you?  I'll just circle this.

23                    THE COURT:  He can't see the circle.

24       BY MR. ROOTS:

25       Q.  You're the largest figure in the screen there?
```

Cusick - DIRECT - By Mr. Roots

1     A.  In the white hat.  Yes.

2     Q.  Okay.  And if I could just ask to clarify, who is

3     filming this?

4     A.  I don't know, unless it's Dave Lesperance, the guy who

5     was with us.

6     Q.  He was -- who was he?

7              MR. PARKER:  Objection.

8              THE COURT:  He's already answered the question.

9     He's not sure who.  We've already admitted this.  It's

10    published.  Let's keep moving.

11    BY MR. ROOTS:

12    Q.  I want to play it some more, but I want to focus on the

13    officer in this video near that bike rack thing over there,

14    Mr. Cusick.

15             MR. ROOTS:  Let's play that.

16             (Whereupon, segments of Defendant's Exhibit No. 53

17    were published in open court.)

18    BY MR. ROOTS:

19    Q.  Did you see officers moving barricades on January 6th?

20             MR. PARKER:  Objection.

21             THE COURT:  You can ask him what he saw there,

22    what he saw in that video.

23             Go ahead.

24    BY MR. ROOTS:

25    Q.  Did you see there an officer move --

 1                    MR. PARKER:  Objection.

 2                    THE COURT:  In a nonleading fashion.  You can ask

 3          him what he saw, Mr. Roots.

 4          BY MR. ROOTS:

 5          Q.  What did you just see, Mr. Cusick?

 6          A.  If you're asking about the officer, I saw an officer

 7          pick up a rail and move it there.

 8          Q.  Okay.  And did you see that sort of thing all over --

 9                    MR. PARKER:  Objection.

10                    THE COURT:  You can't lead him, Mr. Roots.  You

11          can take a moment and think about how you want to ask him.

12          BY MR. ROOTS:

13          Q.  Let me ask if you could give an impression of these bike

14          racks.  Were they in fixed locations and not moved?

15                    MR. PARKER:  Objection.

16                    THE COURT:  Let's have a bench conference.

17                    (Whereupon, the following bench conference was

18          held:)

19                    THE COURT:  Go ahead, Mr. Parker.

20                    MR. PARKER:  That's an exceptionally vague

21          statement.  "Were these bike racks in fixed locations?"

22                    What bike racks?  He's not testifying as a

23          January 6th expert about the restricted area writ large.  If

24          he wants to talk about specific things that he saw, we

25          already don't think that's relevant.

1          I simply do not understand why defense counsel

2     cannot string together two unobjectionable questions.  Your

3     Honor has given defense counsel so much leeway here.  We are

4     wasting the jury's time.  The United States objects.

5          THE COURT:  Mr. Roots, you've got to ask about

6     what he's seeing there.  I don't want impressions of the

7     entire January 6th day or what he thinks of, you know, bike

8     racks in general.  You can ask him about this specific --

9     you know, questions that are nonleading about this bike rack

10    that he saw moved.

11         To the extent that you have any -- you got the

12    testimony in.  You showed him this.  He said a police

13    officer moved it.  I don't know what else you're trying to

14    get out of him.  That's up to you.  But we've already

15    covered the ground, it seems like, that you're going to get

16    out of this.  You can ask him certainly.

17         I mean, I appreciate to some extent he's trying to

18    ask leading questions to cabin the answers to what I have

19    said to.

20         So I appreciate that, Mr. Roots.

21         I think -- why don't you tell me what else you

22    want to ask him.

23         MR. ROOTS:  "Did you see officers allowing people

24    in?"  Those kinds of things.  Very relevant.

25         THE COURT:  Mr. Parker, he wants to ask if he saw.

Cusick - DIRECT - By Mr. Roots

1    What is your objection to that?

2              MR. PARKER:  As phrased, it's beyond just a

3    helpful leading question to orient the witness to not go

4    beyond the scope of what your Honor has said is admissible

5    testimony.  But that's simply defense counsel testifying at

6    that point, more than just, you know, helpful leading.

7              THE COURT:  It is a leading question, clearly.

8    And he's on direct.  Maybe ask him:  What did he see in

9    terms of the police presence as it relates to the persons

10   attending the rally here at this moment?  So let's -- you

11   can just ask him that.  Okay?

12             MR. ROOTS:  Okay.

13             (Whereupon, the following proceedings were had in

14   open court:)

15             THE COURT:  Go ahead.

16   BY MR. ROOTS:

17   Q.  Okay, Mr. Cusick.  Did you see any police on

18   January 6th?

19   A.  Yes.

20   Q.  And what were the police doing?

21   A.  The police were all over Washington, everywhere.  Those

22   guys were just standing there, just watching.

23   Q.  Did you see --

24   A.  That video.

25   Q.  Did you see police interacting with the crowd in front

1    of you?

2    A.   In that video, I don't remember.  But when I was there,

3    yes.  They interacted with people.

4    Q.   Did you see hostile interactions?

5           MR. PARKER:  Objection.

6           THE COURT:  You can ask:  What were the

7    interactions that he saw?  But you cannot lead him.

8    BY MR. ROOTS:

9    Q.   And what were the interactions that you saw between

10   people and the police?

11   A.   Cordial, thanking them for their service.  Appreciate

12   them being there.

13          THE COURT:  Can you repeat what you said?  It's

14   hard with the microphone.  Something for the safety?  We

15   missed a word.

16          THE WITNESS:  I'm sorry.  We were encouraging

17   them, thanking them for being there, thanking them for the

18   service and letting them know we pray for them in their

19   work.

20   BY MR. ROOTS:

21   Q.   Did you see fist bumps?

22          MR. PARKER:  Objection.

23          THE COURT:  We already covered this.  I'm going to

24   strike that question.  You cannot ask leading questions.

25   You can ask what he saw.  That's it.

1    BY MR. ROOTS:

2    Q.  Do you recall any announcements to disperse?

3              MR. PARKER:  Objection.

4              THE COURT:  You can ask him what announcements he

5    heard.  You cannot lead him, Mr. Roots.

6    BY MR. ROOTS:

7    Q.  What announcements to disperse did you hear?

8              MR. PARKER:  Objection.

9              THE COURT:  We can have a bench conference.

10             (Whereupon, the following bench conference was

11   held:)

12             MR. PIERCE:  Your Honor, he's got to calm down.

13             THE COURT:  No, Mr. Pierce.  The frustration is

14   that I've already said about ten different times what is a

15   leading or not leading question.  You cannot seriously tell

16   me you don't think it's a leading question.  Half of his

17   answers have been yes or no.

18             MR. PIERCE:  I understand the Court's rulings.

19   But the Court has admonished Mr. Roots for the way he has

20   said some things.  Mr. Parker, who I like very much, is just

21   yelling now.

22             THE COURT:  No.  I understand.

23             Mr. Parker, I agree.  I share your frustration.

24   But I don't need to see it, nor does the jury.  So I agree

25   with that.

1          However, I'm extremely frustrated right now,

2   Mr. Roots.  You know, you are a very talented lawyer.  I

3   know that.  I've seen you many times.  You know what a

4   leading question is.

5          So when I say you can ask, "What did you hear?"

6   and then you say -- you asked, "Do you recall any

7   announcements to disperse?"  I said you cannot ask him that.

8   You can ask him what he heard.

9          And then you asked, "What announcements to

10  disperse?"  That's literally what I just told you not to

11  say.  You cannot ask what announcements to disperse.  I said

12  what announcements, period.  That's it.

13         So I need everyone here to start following my

14  directions and do what I'm saying.  I told you, I will just

15  excuse this witness if we can't ask questions that are not

16  leading.

17         Okay, Mr. Roots?

18         MR. ROOTS:  Yeah.  I'm very frustrated.  I don't

19  know what kind of question I can now ask that won't draw an

20  objection by the United States Government.  It almost seems

21  like any question I ask.  Can I just list some questions in

22  advance and clear them with your Honor?

23         THE COURT:  Please.

24         MR. ROOTS:  Okay.  Let me ask this question:  Did

25  you hear any announcements on any loudspeaker?  Would that

```
 1    be okay?
 2             THE COURT:  No.  That's leading.  That's a
 3    yes-or-no question.  That's literally -- think about this.
 4    If the answer is yes or no, it's usually a leading question.
 5    What did he hear?  How did he hear it?  Where did he hear
 6    it?  The who, what, when, where sort of initial to the
 7    question is what you should be asking or direct.
 8             MR. ROOTS:  I ask -- I'm actually afraid right
 9    now.  I feel like I'm going to be held in contempt if I ask
10    the question the wrong way.
11             THE COURT:  I never said that.  Don't put words in
12    my mouth.  I never suggested in any way you'd be held in
13    contempt.
14             MR. ROOTS:  Okay.  Can I ask a question such as, I
15    can say, What did you hear?
16             THE COURT:  Yes.
17             MR. ROOTS:  Can I follow up with -- I mean, it
18    would become too blatant.  "What did you see?"  I guess
19    that's all I can ask?
20             THE COURT:  Right.  Nonleading questions.  You can
21    orient him:  Now I'm turning you to 9:35 or when you are
22    walking the steps.  What did you see?  Now I'm turning to
23    when you were in the building.  What did you see?  What did
24    you hear?  But these are the things that -- you can orient
25    him, of course.
```

1          But you can't then ask:  Didn't you hear the siren

2     not go off?  Didn't you not see the police fighting?  These

3     are leading questions.

4          Again, I didn't write the Rules of Evidence.  I'm

5     stuck with them just like you are.  So you can orient him,

6     but then ask him the general questions that's permitted for

7     direct examination.

8          So let's focus on that, Mr. Roots.  Please.

9          MR. ROOTS:  Okay.

10          (Whereupon, the following proceedings were had in

11     open court:)

12          THE COURT:  Your witness, Mr. Roots.

13     BY MR. ROOTS:

14     Q.  Okay, Mr. Cusick.  What did you hear?

15     A.  What did I hear?  Hear about what?

16     Q.  What did you hear at the Capitol on January 6th?

17     A.  People singing patriotic songs, saying -- I don't

18     know -- mostly patriotic songs, things like that, cheering

19     "USA," just things like that.

20     Q.  With regard to any official announcements?

21     A.  I did not hear any official announcements.

22     Q.  About how long were you inside the Capitol?

23     A.  According to the Government I was in there nine minutes,

24     I believe.

25     Q.  And that entire time when you were inside the Capitol,

1    were there restrictions that you saw?

2              MR. PARKER:  Objection.

3              THE COURT:  We can have a bench conference.

4              (Whereupon, the following bench conference was

5    held:)

6              THE COURT:  Go ahead, Mr. Parker.

7              MR. PARKER:  It's the same leading question

8    problem.

9              THE COURT:  You can just ask him, What did he see

10   when he went in there?  Again, you can orient him, say:

11   You're inside the Capitol now.  What did you see?  "What did

12   you see?" is an acceptable question.

13             When you ask him about "What did you see in terms

14   of restrictions," you're directing him how to answer the

15   question.  And it's a leading question of yes or no.  We

16   already know based on everything he's said before that he's

17   likely going to say he didn't see anything, that everything

18   was fine in there.

19             So you don't need to give him these leading

20   questions.  Every statement he's given has been favorable,

21   you know, to your client's defense.  But we don't need you

22   testifying.  I need him testifying to say that.  He is very

23   credible.  So let's let him do what you have brought him

24   here to do, and testify.

25             MR. PARKER:  Your Honor, I have an additional

1      objection on that point.  I'm sorry.

2              My additional objection is he's already testified

3      about what he saw inside.  This is asked and answered.  This

4      is cumulative.  So I understand your Honor's --

5              THE COURT:  I just want to keep going.  You can

6      ask him what he saw when he got inside the Capitol Building.

7      Okay, Mr. Roots?

8              MR. ROOTS:  Okay.

9              (Whereupon, the following proceedings were had in

10     open court:)

11             THE COURT:  You're going to rephrase the question,

12     please.

13     BY MR. ROOTS:

14     Q.  Okay.  What did you see regarding your ability to walk

15     around?

16             THE COURT:  No.  You're asking, what did you see?

17             Strike that question.

18             Mr. Cusick, what did you see once you got inside

19     the Capitol Building?  Please answer that question.

20             THE WITNESS:  You walk in the building.  There

21     were people milling around.  Just looking, talking.  And

22     that was pretty much it.  There was no restrictions.  There

23     was no one to tell you you shouldn't be in here, you need to

24     leave or anything like that.

25             We just stood there for a few minutes.  Like I

Cusick - DIRECT - By Mr. Roots

1   said, my son went to go to the bathroom.  The line was too

2   long.  We left.  I got separated from him for a short time.

3   I don't know how long.  But we walked out the same way we

4   came in.

5   BY MR. ROOTS:

6   Q.  Just a few final questions.

7            Were you arrested and charged with respect to

8   January 6th?

9   A.  Yes.

10  Q.  Did you go to trial?

11  A.  I did.

12  Q.  And what was the result of that trial?

13  A.  We were found guilty of four misdemeanor charges.

14  Q.  Do you believe you did anything illegal on January 6th?

15  A.  That's --

16           MR. PARKER:  Objection.

17           THE COURT:  I'm not going to allow that.  It's

18  calling for a legal conclusion.  No, thank you.  It's

19  outside the scope.

20           MR. ROOTS:  Thank you so much, Mr. Cusick.  No

21  further questions.

22           THE WITNESS:  Thank you.

23           THE COURT:  Thanks for your patience, Mr. Cusick.

24  You're now going to be cross-examined by the prosecutor.

25                          CROSS-EXAMINATION

1    BY MR. PARKER:

2    Q.  Good afternoon, Mr. Cusick.

3    A.  Good afternoon.

4    Q.  Let's start where you ended with Mr. Roots.  You were --

5    you went to trial and were convicted of four counts, you

6    said?

7    A.  Correct.  Four misdemeanors.

8    Q.  One of those counts was entering and remaining in a

9    restricted building or grounds.  Isn't that right?

10   A.  That's correct.

11   Q.  The second count was disorderly or disruptive conduct in

12   a restricted building or grounds.  Isn't that correct?

13   A.  That's correct.

14   Q.  The third count was disorderly or disruptive conduct in

15   a Capitol building or grounds.  Isn't that right?

16   A.  That's correct.

17   Q.  The last count was parading, demonstrating or picketing

18   within a Capitol building.  Isn't that right?

19   A.  Correct.

20   Q.  You're currently appealing those?

21   A.  Yes.

22   Q.  If you admit that you did something wrong in this

23   testimony, do you think that would affect your appeal?

24           MR. ROOTS:  Objection.

25           THE COURT:  That's outside the scope.  It's not

1    relevant.  Let's keep moving.

2    BY MR. PARKER:

3    Q.  You entered the Capitol grounds from the west side.  Do

4    I have that right?

5    A.  That's correct.

6    Q.  You went into the Capitol through the west side?

7    A.  Yes.

8    Q.  You went into the Capitol Building around 3:09 p.m.

9    Isn't that right?

10   A.  Based on the Government's time, yes.

11   Q.  You left the Capitol about 3:19.  Isn't that correct?

12   A.  I think that's the time they gave.  Yes.

13   Q.  So if someone was inside of the United States Capitol

14   from 2:43 to 2:52 p.m., fair to say you did not see them

15   inside the United States Capitol because you were not there?

16   Isn't that right?

17   A.  Yes.

18   Q.  You were not on the east side of the Capitol when there

19   was the bike rack breach there.  Isn't that right?

20   A.  I was only on the east side of the Capitol when we left

21   the property.

22   Q.  That was later in the day.  Correct?

23   A.  I'm sorry?

24   Q.  That was later in the day.  Correct?

25          THE COURT:  Who just said "objection"?  Who said

1    "objection"?  Did someone in the audience say this again?

2    I'm going to direct the audience now -- we had this

3    earlier -- no one is to speak.  If I hear someone speaking

4    in the audience, they will be excused and lose their ability

5    to be here during the trial.

6            You can ask your question again.

7    BY MR. PARKER:

8    Q.  You were not on the east side of the Capitol when there

9    was the breach of the bike racks.  Correct?

10   A.  Correct.

11   Q.  You were not at the -- on the east side of the Capitol

12   when a police line was overrun at the Rotunda steps.  Isn't

13   that correct?

14           MR. ROOTS:  Objection.

15           THE COURT:  Let's go to the bench conference.

16           (Whereupon, the following bench conference was

17   held:)

18           THE COURT:  Go ahead, Mr. Roots.

19           MR. ROOTS:  Your Honor --

20           MR. PARKER:  Your Honor, I'm happy to rephrase,

21   too.

22           MR. ROOTS:  -- there's been several questions.

23   It's a compound question, form of the question.  It assumes

24   facts not in evidence, facts not through this witness.  So

25   it's beyond the scope, et cetera.

```
1              MR. PARKER:  I'll rephrase.

2              THE COURT:  Yes.  I think we getting cumulative.

3    Let's keep moving.

4              (Whereupon, the following proceedings were had in

5    open court:)

6              THE COURT:  Let's strike that question.  You can

7    re-ask it.

8    BY MR. PARKER:

9    Q.  You didn't go to the Rotunda steps anytime before 3:00

10   p.m. in the afternoon.  Isn't that right?

11   A.  Correct.

12   Q.  You didn't go up to the Rotunda doors anytime before

13   3:00 p.m.  Isn't that right?

14   A.  Correct.

15   Q.  So you have no personal knowledge of what happened on

16   the east side of the Capitol before, say, 3:20 p.m.  Isn't

17   that right?

18   A.  That's correct.

19             MR. PARKER:  No further questions.

20             THE COURT:  Any redirect, Mr. Roots?

21             MR. ROOTS:  No redirect.

22             THE COURT:  Okay, Mr. Cusick.  Thank you for your

23   patience today as we've had you waiting.  I really do

24   appreciate it.  You're excused now.  Just -- if we need you

25   again, I'm sure Mr. Pierce, Mr. Roots or Ms. Lambert will
```

1    reach out to you.  But you can sign off for now.  And thank

2    you.

3                    THE WITNESS:  Thank you very much.

4                    (Videoconference connection closed.)

5                    THE COURT:  Do you want to call your next witness?

6    I believe we have -- you can ask -- do you want to

7    communicate with Ms. Walters?  I believe we have the

8    gentleman here.  It sounds like we need to have a

9    conversation.  Is that right?

10                   MR. PIERCE:  I believe Ms. Walters, the general

11   counsel of the Capitol Police, would like to address the

12   Court, please.

13                   THE COURT:  I'm going to excuse the jury, please.

14                   (Whereupon, the jury exited the courtroom at 3:45

15   p.m. and the following proceedings were had:)

16                   THE COURT:  You can be seated.  Thanks.  Please

17   approach.

18                   Thank you, Ms. Walters, for coming on short

19   notice.  As I mentioned earlier before you were here today,

20   I'm extremely appreciative of the Capitol Police being so

21   flexible given the last-minute notice that you received, not

22   which in any way was service that you would have had to

23   accept.  As I noted for the record, you could have demanded

24   personal service.

25                   I know the marshals indicated there was no world

1      in which they could serve on this short notice.

2              And so as I stated earlier, the Capitol Police has

3      more than -- I think my words were "bent over backwards."

4      And so I do appreciate not only Capitol Police.  I apologize

5      to you for drawing you out here on a Friday --

6              MS. WALTERS:  Happy to see you, your Honor.

7              THE COURT:  -- in DMV rush-hour traffic.  So I'm

8      hoping that you're going to tell me that the police officer

9      is available.

10             THE COURT REPORTER:  I'm sorry, ma'am.  May I have

11     your name for the record?

12             MS. WALTERS:  Yes.  For the record -- and a

13     correction:  My name is Lisa Walters, senior counsel,

14     Officer of the General Counsel for the United States Capitol

15     Police.

16             THE COURT:  I can wish you're the general counsel.

17     That's fair.

18             MS. WALTERS:  Your Honor, I had the opportunity to

19     speak to Mr. Warner -- excuse me -- Sergeant Warner several

20     times.

21             THE COURT:  This is him right here?

22             SERGEANT WARNER:  Yes, sir.

23             THE COURT:  Sorry.  He's in here now.

24             MS. WALTERS:  I don't know if you want me to

25     continue.  But he is here now.

1          My information right before you called me was that

2     he was in the vicinity, just in traffic.

3          THE COURT:  Thank you.

4          MS. WALTERS:  May I be excused?

5          THE COURT:  Yes.  Thank you.  Sorry to drag you

6     down here today.  Thank you so much.  I appreciate it.

7          MS. WALTERS:  Thank you, your Honor.

8          THE COURT:  So, Sergeant Warner, you're going to

9     be --

10         Ms. Walters, do you need a moment to talk to him?

11    Or you guys are good?

12         MS. WALTERS:  If you would indulge me, your Honor,

13    two minutes.

14         THE COURT:  That's plenty.  Thank you.  We're

15    going to let them have their -- they're talking briefly

16    together.  Then we're going to call him up here.

17         I want to go over the exhibits.  The exhibit is

18    the one that we had before.  Now it will be with audio.  I

19    want the United States to make sure that we're all on the

20    same sheet of music here, because they have the witness who

21    is here.  I assume they want to play the audio for it.

22         Actually, Ms. Walters -- you don't have to stay.

23         But, Sergeant, if you could stand outside.  We're

24    going to handle one quick hearsay legal issue, an admission.

25         (Thereupon, Sergeant Warner retired from the

1    courtroom and the following proceedings were had:)

2           THE COURT:  So as I understand it, you want to

3    play the video with full audio now.  Is that correct,

4    Mr. Roots?

5           MR. ROOTS:  Yes.

6           THE COURT:  And so let's hear from the United

7    States.

8           MR. BALLOU:  Your Honor, I think we would continue

9    to oppose the introduction of the audio.  It could be

10   presented to refresh his recollection, as I understand it.

11   But then it would have to be done outside the presence of

12   the jury.  They can ask him about what he said, but that's

13   got to be testimony that he offered, not from the video.

14          THE COURT:  So my concern is, I guess, what is

15   stated by Pastor -- I don't remember his name; I think

16   Pastor Bill or something like that -- there's his

17   out-of-court statements here.  And there's the pastor's.

18          So let's start with his statements.  You're saying

19   that he can't -- so what's your objection as to his

20   statements?

21          MR. BALLOU:  Your Honor, I think both the

22   statements by the officer and by the pastor would continue

23   to be hearsay here.  Again, I can understand how they would

24   ask him a line of inquiry about if there was a conversation

25   between somebody with a bullhorn or a pastor or something

1     like that.

2              And he can testify and say yes or no.

3              But I would be confused as to how the underlying

4     video would become admissible.  Again, I can see it being

5     used to refresh his recollection outside the presence of the

6     jury, but I can't envision it being permissible otherwise.

7              THE COURT:  Okay.  Mr. Roots or Mr. Pierce?

8              MR. ROOTS:  Again, this is absolutely -- all of it

9     falls within the hearsay exception, effect on the listeners.

10    The listeners include the crowd.  Ms. Lavrenz was in that

11    general area, and so this is -- absolutely falls -- falls

12    square into that exception.

13             THE COURT:  But why --

14             MR. BALLOU:  Your Honor --

15             THE COURT:  Go ahead.

16             MR. BALLOU:  Very briefly, as I'm sure you recall,

17    there's no testimony or evidence thus far that Ms. Lavrenz

18    was actually in that area.  Now, obviously, defense counsel

19    has asserted that.  But we haven't gotten any testimony to

20    that effect yet.

21             THE COURT:  Yeah.  The only testimony we have is

22    that we don't know where she was at this time.  And so it's

23    hard for me to understand, how can this be effect on --

24    which listener?  The listeners in the crowd?  No.  I don't

25    think that that is relevant.  I've allowed you to get in

1    plenty regarding the raindrop theory from your end.  But

2    what every listener in the crowd thought that day at

3    different times and different locations, that's beyond what

4    I think is acceptable.

5          So what we can do is certainly -- I would presume

6    it would refresh his recollection to hear this.  And so we

7    can do that.  He may already remember it.  He can state what

8    he said.  I think for completeness's sake he can state

9    that -- what -- and, well, I'll let you to the extent you

10   have an objection.

11         But I think that if he wants to say what prompted

12   the conversation, I think for the completeness, that's

13   permissible.  I don't think he's saying that -- asserting it

14   was truthful, that, you know, whatever Pastor Bill or

15   whoever this person is, that what he said was correct.  But

16   he didn't *sua sponte* just go and ask if people could get in

17   as -- you know, whatever sort of generally he said at that

18   time.

19         MR. BALLOU:  Yes, your Honor.

20         I don't think the Government would object to

21   showing the witness the video outside the presence of the

22   jury for the purpose of refreshing the recollection even if

23   potentially Pastor Bill's testimony would also be hearsay

24   here.

25         THE COURT:  I've already said it's not effect on

1      the listener.

2              What other hearsay exception do you see here?

3              MR. ROOTS:   Okay.   Let me just say that the

4      Government's argument here is very disingenuous.   They have

5      put on evidence that places Ms. Lavrenz very, very close to

6      that.   More than one video that the Government has put on.

7      301 is one, for example, where they have actually circled

8      Ms. Lavrenz, shown where she was.   They know she was very

9      close to that area.   She was at those barricade/bike rack

10     areas.   So this is a disingenuous argument by the

11     Government.

12              And so of course she does have some hearing

13     issues.   But again, effect on the listener also applies to

14     the confusion.   And it is not at all offered for the truth.

15     In fact, we believe it was untrue, that there are statements

16     by this officer and others about being allowed by the police

17     to go to the steps.   And it's very clear.   And some of this

18     was said on loudspeakers and mega horns.   So it is a defense

19     to these charges that there was confusion in the crowd and

20     there was confusion that was picked up and imputed with

21     regard to Ms. Lavrenz.

22              And that is a defense.   And the Government is

23     openly trying to convict her of crimes in the United States

24     of America based on the actions of other people.

25              So we have a defense based on the confusion of

1    other people, and that confusion bled off to her.

2              THE COURT:  I've heard what you're saying.

3         My ruling is simply this:  It is being offered for

4    the substance of what it means.  Whether or not -- I

5    understand you're saying that you believe he was lying.

6    It's still for the truth of the fact that it caused

7    confusion.  So it's very clear to me it is being offered for

8    the truth of what was being said.

9         I've allowed you to play other clips, where audio

10   was there, when it was not being offered for the truth of

11   what is said.

12             The Government additionally has had one witness

13   who they called who was a Capitol Police officer who said he

14   didn't even recall where he was in location to this.  So I

15   don't think it's disingenuous of them to say they don't know

16   where Ms. Lavrenz was.  That person said he thought he was

17   on the opposite side maybe and stated that he was far away.

18             No one has stated where Ms. Lavrenz was relating

19   to this speaker.  If she wants to present video evidence or

20   if you have that to show that she is near in this video, it

21   can be circled.  But we haven't seen that.  The only people

22   we've seen in this video are other people.

23             And if she so chooses to testify -- which again, I

24   am not encouraging her to do, but it is her right to do --

25   she can certainly say the thing that she heard.  But she

1    cannot -- we cannot do effect on the listener just by the

2    assumption of that she may have been near here.

3          Go ahead, Mr. Pierce.

4          MR. PIERCE:  I think that that is -- with all

5    respect in the world, I think that is a misinterpretation of

6    the hearsay rule.

7          It is not offered for the truth of the matter

8    asserted as to whether or not that particular officer was

9    actually intending to get some kind of agreement.  It is not

10   offered for the truth of whether or not the higher-ups were

11   actually going to provide some kind of agreement.  It's

12   offered for the fact that it was said itself, just the very

13   fact that the words were stated.

14         THE COURT:  Right.  We're going to get this

15   officer to testify to that.  We're going to ask him if he

16   remembered saying that.  If he didn't remember saying that,

17   we're going to refresh his recollection and then you're

18   going to get to have that testimony in.  We're just not

19   going to have it through the video.  You're literally going

20   to have the live human being here, not the out-of-court

21   statement.

22         MR. PIERCE:  The only other thing I would

23   indicate, your Honor -- and again, I should put on the

24   record, this exact particular issue was --

25         THE COURT:  Please.

1          MR. PIERCE:  -- was raised.  And I'm almost

2     certain -- I know the video was played in front of Chief

3     Judge Boasberg.  I'm almost certain the same objection was

4     made and that it was litigated and ruled on.

5          So I want to -- and I'm almost certain that the

6     basis on which he let it be played was that -- I think that

7     it was, you know, effect on the listener in terms of the

8     crowd hearing it.  So I want to put that on the record.

9          THE COURT:  Sure.  Well, I don't know who was

10    there listening or not.

11         Mr. Roots, last thing.

12         MR. ROOTS:  Yeah.  One additional point.

13         This rebuts testimony that the Government has put

14    on.  They put on the officer who waved.  We asked him, you

15    know:  Was there any confusion on the crowd?

16         He indicated pretty strongly:  Oh, no.  The crowd

17    was absolutely -- understood it was a restricted area.

18         Your Honor invited us to track down Mr. Warner.

19    It was in response to your Honor.  You said literally -- as

20    I recall you said, Well, you can play this video through

21    this witness, Mr. Warner.

22         THE COURT:  You can play the video again.  You

23    can -- the video has already been admitted.  It can go back

24    to the jury.  He will now narrate what was actually said

25    then.

1    So the jury is not going to lack for knowledge.

2    They're going to have the exact knowledge of what happens

3    there.  If he doesn't remember, well, then, we will refresh

4    his recollection and he will say, This is what I said and

5    heard that day.  So they'll have the video.  And the audio

6    they will know based on what his testimony is.

7    This is my ruling.

8    You can bring in the witness.

9    MR. PIERCE:  I'd like to just make one more point,

10   just a technical sort of hearsay.  I believe -- and I'm sure

11   if I'm wrong, I'll be pointed out right away.  But I believe

12   that the hearsay rule or the spirit of the hearsay rule is

13   that you're not allowed to bring in out-of-court statements

14   for the truth of the matter asserted for a declarant that is

15   not available to be cross-examined.

16   So he's here.  You know, he can be cross-examined.

17   THE COURT:  So that's exactly what you're going to

18   do.  You're going to ask him about his out-of-court

19   statements.  You're going to cross-examine him about those

20   statements.  I don't think it needs to come in through the

21   video.  You're going to have it come in through him.  And if

22   he doesn't remember, we'll have him refresh his

23   recollection.  If he's still struggling, then perhaps we can

24   cross that bridge about whether it then would be admissible.

25   That's my ruling.

```
1                  Let's bring him in.
2                  (Thereupon, Sergeant Warner entered the courtroom
3        and the following proceedings were had:)
4                  THE COURT:  All right.  Can you come up to the
5        witness stand, please?
6                  Ms. Lavigne-Rhodes, can you swear him in, please.
7                  ANTHONY WARNER, DEFENSE WITNESS, SWORN.
8                  THE COURTROOM DEPUTY:  Thank you.
9                  THE COURT:  I'll note for the record we're outside
10       the presence of the jury.
11                 Go ahead, Mr. Roots.  You can ask if he remembers
12       the video and then go from there.
13                         DIRECT EXAMINATION
14       BY MR. ROOTS:
15       Q.  Thank you, Sergeant Warner.  My name is Roger Roots.  We
16       represent Rebecca Lavrenz.  She's a January 6th Defendant.
17                 So I want to ask you some questions about
18       January 6th, 2021, on the east side of the Capitol.
19       A.  Yes, sir.
20       Q.  Do you recall being up front near the barricades
21       communicating with members of the public on January 6th?
22       A.  I do.
23       Q.  I'd like to play a video and see if you can place
24       yourself in this.
25       A.  Yes, sir.
```

1          MR. ROOTS:  This is Defense Exhibit 20.

2          (Whereupon, segments of Defendant's Exhibit No. 20

3     were published in open court.)

4          THE WITNESS:  Do you want me to circle myself when

5     I see myself?

6          MR. ROOTS:  Sure.

7          Let's play that.

8          (Whereupon, segments of Defendant's Exhibit No. 20

9     were published in open court.)

10    BY MR. ROOTS:

11    Q.  Do you recall this exchange with this man with the black

12    jacket and the white megaphone?

13    A.  I do.  It was immediately after the protesters attempted

14    to breach the police line.  So he was the one that I saw

15    with the bullhorn.  I thought I would get to him so he can

16    get some kind of order so we could figure out what was going

17    on.

18    Q.  Okay.  And do you recall an exchange about this man

19    wanting you to help him go to the steps of the building?

20    A.  I do.

21    Q.  And do you recall speaking to him about -- that you

22    would look into it or something like that?

23    A.  I do.  Again, to be transparent, it was a stall tactic.

24    We were getting overrun.  We were getting pushed by the mob,

25    which I'm going to call a mob because, again, when you start

1   to breach a police line, you're no longer peaceful.

2           So again, trying to breach the police line, I use

3   the stall tactic, see if we can get reinforcements, because

4   I had no idea what was going on on the west front.  And in

5   the past, whenever we had someone try to overrun or breach a

6   police line, we would always call for CDU support.  So

7   that's what that was for that day.

8   Q.  And did you actually say to people or this guy in

9   particular that you would see what -- if you -- you would

10  try to see if you could get them to the steps?

11  A.  I definitely said I would -- let me talk to my

12  leadership and see what I can do.

13  Q.  And do you recall that that gentleman with the megaphone

14  was announcing or repeating that idea to the crowd?

15  A.  I do.  I also --

16          THE COURT:  Hold on, sir.

17          Do we need to go to bench conference?

18          MR. BALLOU:  Very briefly, can we focus on the

19  phrasing of the questions so they're not quite so leading

20  here?  This is not a hostile witness here.

21          THE COURT:  Sure.  I think we're just trying to

22  get here what he remembered.  Right?  So let's just get what

23  he remembered or not.

24          MR. ROOTS:  Okay.

25

Warner - DIRECT - By Mr. Roots

1   BY MR. ROOTS:

2   Q.  So you said a stall tactic?

3   A.  Correct.

4   Q.  So then you more or less admit that you were --

5           THE COURT:  No.  Let's just -- the jury's not

6   here.  So the points and things that you want to make, you

7   can make that when the jury's here.

8           I just want to know what he remembers or not,

9   whether we need to play this further to refresh his

10  recollection.

11          It seems like he remembered it all.  So I think

12  we're ready for the jury to come in, unless there's some

13  other thing you're not sure if he remembers.

14  BY MR. ROOTS:

15  Q.  So let me just ask a couple of questions about this.

16          After this, obviously, there was a breach of this

17  area?

18  A.  Correct.

19          THE COURT:  No.  No.  This video is just to

20  refresh his recollection.  His recollection is refreshed.

21  You don't get to have the sneak preview of his testimony.

22  So his testimony is going to be in front of the jury, for

23  better or for worse.  That's unfortunately the way that it

24  goes.  Again, I don't write the Rules of Evidence.

25          So do you have a question about this video to

1    refresh his recollection?

2              MR. ROOTS:  Yeah.

3    BY MR. ROOTS:

4    Q.  Do you recall yourself fist-bumping with members of the

5    public?

6    A.  Only at the top of the stairs when I was surrounded 360

7    degrees with everyone -- again, me in the middle --

8              THE COURT:  Thank you, Officer -- or Sergeant.

9              Does he remember that?  He said he did remember

10   it.

11             MR. ROOTS:  He does remember?

12             THE COURT:  That's what he said.

13             THE WITNESS:  Yes.

14   BY MR. ROOTS:

15   Q.  If you could just say what you specifically said,

16   specifically the conversation.

17             THE COURT:  Which conversation?

18   BY MR. ROOTS:

19   Q.  The conversation here depicted in this scene here.

20   A.  The only thing is initially I saw him in the pushing and

21   shoving with the police officers, asking them to get his

22   folks under control and tell me what it is that he wanted.

23             He said from there he wanted to get to the stairs.

24             I knew he couldn't.  I knew we weren't going to

25   allow it.  But like I said, we were about to be breached.

1      So for me it was a stall tactic.

2              Be mindful, I wasn't a sergeant that day.  I was

3      an officer trying to ensure that we could get some kind of

4      order.

5              THE COURT:  If you could just tell us right now,

6      you're not testifying.  The jury's not here.  I want to know

7      what you do or don't remember, the conversation.

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Explanation?

10             THE WITNESS:  I do remember the conversation.

11             THE COURT:  So just as you're recounting, anything

12     else about that conversation?

13             I mean, I think he's stated -- is there something

14     that you think he's not remembering that you know that's in

15     the conversation?  You're welcome to ask him that.

16     Otherwise, I'm ready to bring the jury in.

17             MR. ROOTS:  I think he's testified fairly

18     consistent with what we've seen on this video.

19             So I guess we're -- we would move to introduce the

20     video, maybe for background also.

21             THE COURT:  Well, no.  This version is -- I need

22     the kind that has the redaction on the bottom.  But you

23     absolutely can use it.  When we're doing it, I will remind

24     you to ask nonleading questions.

25             So:  What did you say now?  What did they say?

```
1    Why did you say that?  That's fine.  The when, where, what,

2    why, all those are fine.  But not:  What was -- wasn't the

3    purpose of this stall tactic to deceive?  That's what we're

4    going to ask.  So --

5              MR. ROOTS:  So we can play the video without the

6    sound?

7              THE COURT:  Of course.

8              MR. ROOTS:  Okay.

9              THE COURT:  It's been admitted.

10             MR. ROOTS:  Okay.

11             Does Ms. Lambert still have that video?

12             MR. PIERCE:  She's looking for it, your Honor.

13             THE COURT:  Mr. Lambert, is it Defense 20?  Is

14   that what you're looking for?

15             MR. ROOTS:  It might be 20 point something.

16             THE COURTROOM DEPUTY:  It's 20-A, probably.  20

17   was not admitted.  It's a minute-and-20-second video.

18             THE COURT:  Yes.

19             MR. ROOTS:  That's it.

20             THE COURTROOM DEPUTY:  It's 20-A.

21             THE COURT:  So we're ready to call in the jury?

22             MR. ROOTS:  (Nods head in the affirmative.)

23             THE COURT:  Okay.  I have high hopes for no

24   objections.  We can do this, guys.  We've run the gamut.

25             (Whereupon, the jury entered the courtroom at 4:07
```

```
1    p.m. and the following proceedings were had:)

2              THE COURTROOM DEPUTY:  Please be seated.

3              THE COURT:  Why don't you call your witness,

4    please, Mr. Roots.

5              MR. ROOTS:  Thank you, your Honor.

6              The defense next calls Sergeant Warner.  I forget

7    his first name.

8              THE WITNESS:  Anthony.

9              THE COURT:  Do you want to swear him in?

10             THE COURTROOM DEPUTY:  Please raise your right

11   hand.

12             ANTHONY WARNER, DEFENSE WITNESS, SWORN.

13             THE COURTROOM DEPUTY:  Thank you.  You may be

14   seated.

15                        DIRECT EXAMINATION

16   BY MR. ROOTS:

17   Q.  Thank you, Sergeant Warner.  Would you spell your name

18   for the court reporter?

19   A.  Yes.  W-A-R-N-E-R.

20             THE COURT:  Could you spell your first name as

21   well?

22             THE WITNESS:  A-N-T-H-O-N-Y.

23   BY MR. ROOTS:

24   Q.  Okay.  And what do you do?

25   A.  I'm a Capitol Police officer.  On this day, I was
```

1    assigned to the Library of Congress as a private first

2    class.  I wasn't a sergeant at that time.

3    Q.  So you've since been promoted to sergeant?

4    A.  Yes, sir.

5    Q.  Was that because of anything on January 6th?

6    A.  No, sir.  It's the test process that we have to go

7    through.  I tested for it and I passed.

8    Q.  Do you recall being at the Capitol on January 6th, 2021?

9    A.  Yes, sir.

10   Q.  And at a time about midday, do you recall being on the

11   east plaza in a barrier area communicating with members of

12   the public?

13   A.  Yes, sir.  That was our -- the Library of Congress area

14   responsibility or assignment for that day.  Yes, sir.

15              MR. ROOTS:  I'd like to play a video.  And this is

16   Defense 20-A.

17              THE COURT:  It's already been previously admitted

18   and published.  So the jury can see it.

19              Can you all see the video?

20              THE JURY:  Yes.

21              THE COURT:  Great.  Thank you.

22              (Whereupon, segments of Defendant's Exhibit 20-A

23   were published in open court.)

24   BY MR. ROOTS:

25   Q.  I'll have you circle.  It's stopped.  Let's back up a

1    little bit.  If you could circle yourself if you are in this

2    video.

3    A.  (Witness indicates.)

4    Q.  Okay.  Thank you.

5         MR. ROOTS:  So we'll let the record reflect he's

6    circled an officer in the middle, the tallest officer.

7    BY MR. ROOTS:

8    Q.  Let me ask, how tall are you, Sergeant Warner?

9    A.  Six-five, sir.

10   Q.  Six-five?

11        MR. ROOTS:  Let's play that video.

12        (Whereupon, segments of Defendant's Exhibit No.

13   20-A were published in open court.)

14        MR. ROOTS:  We can just pause right here.

15   BY MR. ROOTS:

16   Q.  Do you recall having communications with a man -- this

17   man here in a black parka with the white megaphone?

18   A.  Yes.  This conversation took place after the protesters

19   attempted to breach the line.  I saw that he had a

20   megaphone, reached out to him to try to get some kind of

21   order, to see if we can -- again, to get some kind of order.

22   Q.  And what did you tell him?

23   A.  I initially asked him what was he trying -- what were

24   they trying to accomplish?  What is it that you want?

25        His response was:  This is our House.  We'd like

1    to get to the stairs.

2              Again, me being 25 years' military, I could see we

3    were outnumbered.  So I just -- basically, a

4    rabbit-out-of-the-hat stall tactic.  Hey, sir, let me see

5    what I can do.

6    Q.  Okay.  So you told him, this man with the megaphone,

7    that you would see what you could do to get the crowd up to

8    the steps?

9              MR. BALLOU:  Objection.

10             THE WITNESS:  I would --

11             THE COURT:  I'll allow it.  He's just restating

12   it.  I want to make sure it's clear.

13             Go ahead.

14             THE WITNESS:  I told him I would see what I can

15   do, not that I'm going to get you to the stairs, because I

16   already knew I couldn't get you to the stairs because,

17   again, I wasn't the sergeant that day.  I had no authority.

18   But again, I saw a moment to try to seize to get some kind

19   of order.  That's when I -- if you play the video further,

20   you'll see where I went to my leadership for additional

21   guidance.

22             MR. ROOTS:  Okay.  Let's play a little bit

23   further.

24             (Whereupon, segments of Defendant's Exhibit No.

25   20-A were published in open court.)

1           MR. ROOTS:  We can stop right here.

2     BY MR. ROOTS:

3     Q.  And what happened after you told that -- the guy there

4     with the megaphone that you would see if the leadership

5     would let the crowd go up to the steps?

6     A.  We were able to reestablish the police line until

7     additional protesters started chanting, "He's not in charge.

8     Why are we talking to him?"  And then they again proceeded

9     to breach the police line.

10    Q.  Okay.  Very importantly, was this man sort of repeating

11    that by loudspeaker, by this megaphone?

12    A.  He --

13          MR. BALLOU:  Objection.

14          THE COURT:  You can ask -- rephrase.  What was the

15    man doing?

16    BY MR. ROOTS:

17    Q.  What was the man doing there with the megaphone?

18    A.  He was conveying to them that I was going to talk to

19    leadership to see what I could do.

20    Q.  And you -- you're now saying this was just a stall

21    tactic?

22    A.  That's all it was for me as an officer, being on the

23    line that's being overrun, trying to get more

24    reinforcements.  He was able to do what I needed him to do,

25    get everybody in control to get us reestablished.  And

1    again, not knowing what took place on the west front, my

2    whole goal was to get more reinforcements to help us control

3    that line.

4    Q.  But did you see that members of the crowd believed that

5    the police were working --

6              MR. BALLOU:  Objection.

7              THE COURT:  That's a leading question.  Please

8    rephrase.

9    BY MR. ROOTS:

10   Q.  Did you see members of the crowd who were believing --

11             MR. BALLOU:  Objection.

12             THE COURT:  No.  We can't speculate on the crowd.

13   You can ask him what he saw.  Just simply that.

14   BY MR. ROOTS:

15   Q.  What did you see after this bullhorn communication?

16   A.  Everyone stopped pushing the police line.  We

17   reestablished the police line.  He initially -- excuse me --

18   after the police line was established, he went over with the

19   bullhorn:  Sergeant -- I mean, Officer Warner, are you all

20   working with your leadership?

21             And I did this:  Yes.  We're on the phone.

22             But not one time did I ever say, "You're going to

23   the stairs; I'll give you permission to go to the stairs."

24   Not one time was it ever said.

25             MR. ROOTS:  Let's play some more of that.

1            (Whereupon, segments of Defendant's Exhibit No.

2      20-A were published in open court.)

3      BY MR. ROOTS:

4      Q.  Let's stop right there.

5      A.  That's me retelling them that we're working on it.

6      Q.  So yeah.  Okay.  So you were telling him that you were

7      working on it.  Were you also giving him a hand gesture of

8      some kind?

9      A.  No.  Just telling him to calm -- you know, I'm working

10     on it.  That's basically just:  Give me a moment.  I'm

11     working on it.

12     Q.  And what was he doing with that information?

13     A.  Again, just he called me a gentleman, if I recall.  "The

14     gentleman, the officer, is working on it."

15            MR. ROOTS:  Okay.  Let's play some more of that

16     video.

17            (Whereupon, segments of Defendant's Exhibit No.

18     20-A were published in open court.)

19            MR. ROOTS:  Let's stop right here.

20            MR. BALLOU:  Your Honor, the video.

21            MR. ROOTS:  We can take down that.

22     BY MR. ROOTS:

23     Q.  Did there come times when you were fist-bumping members

24     of the crowd?

25     A.  Yes.  At the top of the east stairs where I was

1   completely surrounded, trying to create some kind of

2   composure to where I can get myself out of the middle of it.

3   So again, everything is preserving my well-being as well as

4   trying to get with my -- get back online with my officers.

5   So yes, I did.  Not a fist bump of "You're good to go" or

6   "What you're doing is great."  None of that.  Again, to try

7   to get myself to safety to get back online with my

8   officers -- with my fellow officers.  Excuse me.

9   Q.  Did you also fist bump with members of the crowd inside

10  the Capitol?

11  A.  Yes.  That was after an impromptu me getting crushed at

12  the door where they again rebreached the inside of the

13  Capitol.  Impromptu just somebody's hand there and just did

14  it.  But again, it was nothing of "What you're doing is

15  okay.  This is a great day."  None of that.  It was --

16  again, I'm in this position where I'm at the disadvantage.

17  And without even thinking, just like basically, "Go ahead.

18  Get out of here."  That type of thing.

19  Q.  Do you recall members of the demonstrators wishing you

20  well, wishing you good --

21            MR. BALLOU:  Objection.

22  BY MR. ROOTS:

23  Q.  -- being friendly?

24            THE COURT:  That's hearsay.

25

Warner - DIRECT - By Mr. Roots

1   BY MR. ROOTS:

2   Q.  Do you recall people being friendly to you?

3          MR. BALLOU:  Objection.

4          THE COURT:  You can ask how they -- what were the

5   interactions with the crowd.

6   BY MR. ROOTS:

7   Q.  Yeah.  What were your interactions?

8   A.  As far as being friendly, I can't say that.  I do recall

9   one saying, "I'm surprised at how calm he is in the

10  situation where he's currently standing."  I didn't think

11  that was a positive gesture, because it looks -- to me, I

12  took that as if I decided to go full police, tell you to get

13  back, it wouldn't have been -- I wouldn't have probably

14  gotten that gesture.  Because I'm again trying to ensure my

15  safety and get back online with my officers, is why that

16  demeanor was there.

17  Q.  Did you -- was there a time where you were telling

18  protesters that they could still push --

19          MR. BALLOU:  Objection.

20  BY MR. ROOTS:

21  Q.  -- to keep pushing?

22          THE COURT:  You can ask what he said.  You can't

23  lead him.

24  BY MR. ROOTS:

25  Q.  Did you ever say any -- what did you say to --

1    A.  If you -- if we had the video, you would see that I'm in

2    the middle of the -- I don't want to call them protesters,

3    but I was in the middle of the protesters as they were

4    pushing me into the door.

5              So again:  Stop pushing.  Let me get past.  Go

6    back, you know.  But again, not giving you the permission

7    to -- let me be frank.  I'll be honest.  I was a little

8    arrogant at the top of the stairs because that door pushes

9    out, not in.

10             So I'm like, Let me get out of the way because no

11   matter how long you push, you're not getting in the door.

12   The only way they got into the door is because someone from

13   the inside pushed the door out.

14             So again, that's my arrogance on that day, but

15   again also trying to get out of harm's way to where if you

16   see the video I'm completely surrounded by this mob that I

17   don't know if I'm going to get stabbed; I don't know if I'm

18   going to get shot.  Let me get out of the pushing and

19   shoving of this mob here and get over to where my back is

20   against the wall or against one of my fellow officers.

21   Q.  So when you said something like, "Keep pushing," you

22   were --

23   A.  So I could get myself out of the middle of the crowd

24   because I was being pushed in the middle of that crowd.

25   Q.  Okay.

1          MR. ROOTS:  Thank you so much, Sergeant.  No

2    further questions.

3                      CROSS-EXAMINATION

4    BY MR. BALLOU:

5    Q.  Sergeant, thank you for your time.

6    A.  Thank you, sir.

7    Q.  On January 6th, very approximately, when were you on the

8    east front of the Capitol?

9    A.  That day we had roll call at 11:00 at the Library of

10   Congress.  And from there, we were told to get online by

11   noon.  So roughly around noon.  Yes, sir.

12   Q.  When you saw the video just now, do you know

13   approximately how long into your time on the east front you

14   were?

15   A.  Maybe ten or 15 minutes, give or take.  Once we got

16   online, I noticed protesters climbing trees, officers

17   telling them to get down from there.  I remember a call

18   going out.  "We need help on the west front."

19              Then a lady on a mega horn telling them, We need

20   to do what they're doing on the west front.

21              Then we get the push, the first push.

22   Q.  The first push?  What do you mean by that?

23   A.  The first surge of the protesters trying to breach the

24   police line.

25   Q.  On the east front?

1    A.  On the east front.

2    Q.  When you see that, what are you thinking?

3    A.  Let me take it a step back.

4         Before the breach, I'm noticing men in tactical

5    uniform moving to the front line of the police line.  And I

6    tell the fellow officers to be mindful of these guys because

7    I'm big and tall.  I can see over everything.  Tactical

8    helmets, tactical gear.  Be mindful of these guys to the

9    left and right.

10        So from that point I'm thinking, This is not a

11   normal day.  And then roughly after that notification to the

12   guys to the left and right of me, that's when the surge --

13   when they tried to push through the police line.

14   Q.  Was that initial surge successful?

15   A.  It was not.  That's when I intervened.  And you see me

16   talking to the gentleman in the megaphone:  Hey, what is it

17   that you guys want?  Get your guys under control.  Let's

18   talk, because we can't deal in chaos.

19        He talked.  They listened.  We established the

20   police line.

21        From there, we -- I did my dialogue:  I'll see

22   what I can do.

23        Again, police protocol.  Members of Congress,

24   active Congress session.  You know, you're not going to the

25   east front.  That's our rule.

1         But again, when you're outnumbered, you're trying

2    to hopefully get reinforcements.  So that was the whole

3    tactic for me for that day.

4    Q.  I think I heard you say on direct you called this a

5    stalling tactic.  What are you stalling to do?

6    A.  I'm stalling to get more officers to support us, because

7    if you look at the entire video, you see that whole police

8    line is covered with protesters.  We're getting pushed

9    around.  I'm in the middle of it.  We're getting pushed

10   around.  We need help because they're about to breach this

11   line.  Again, that's me saying to myself.

12   Q.  And in fact, did they breach the line?

13   A.  They did.  The second time around, yes, sir.

14   Q.  Okay.  What happens then?

15   A.  After that, we fall back to the bottom of the stairs,

16   reestablish another police line, telling them to get back.

17   "You're not getting up the stairs," all to no prevail [sic].

18        From that, they breached that line.  We ended up

19   holding another line at the top of the east stairs.  Again,

20   that's where I'm in the middle of the crowd, trying to get

21   over again to my fellow officers against the wall.  We were

22   all against the wall, trying to hold the door.

23        Again, we were -- we all knew that the door

24   couldn't be breached by pushing in.  It could only be

25   breached by pushing out.  So, again we still held our line,

1    hoping -- I'll say in my mind that they would just give up

2    and leave, not knowing it was going to end up the way it

3    did.

4              But from there, they breached the door from the

5    inside.  I was able to grab two of the protesters by the

6    backpacks to make my way on the inside.  That's then where I

7    reestablished resecuring the door.  And that's how my day

8    went.

9    Q.  When you said that you fist-bumped some of the

10   protesters, some of the rioters, can you just say why you

11   are doing that?

12   A.  Yes.  Again, for me, it's to preserve my well-being.

13   I'm surrounded 360 degrees, all aspects of the -- where I'm

14   standing.  I'm hearing, "He's calm to be in this position

15   he's in."  So again, for me, it's like:  Okay.  Let me just

16   stay cool so I can figure out how to get out of this.

17   Q.  You're a tall man?

18   A.  Yes, sir.

19   Q.  And you said you had military experience.  We don't need

20   to get into the details.  But you have military experience?

21   A.  Yes, sir.

22   Q.  Were you still worried for your safety at that moment?

23   A.  The initial breach.  That entire time, I'm worried about

24   my safety.

25   Q.  Okay.  Now, on the line -- let me just clarify one

1   thing.  When you're doing the fist bump, maybe this is sort

2   of an obvious question to you because you remember this

3   vividly.  Had they already breached the line at that point?

4   A.  Yes, sir.  This is the final stance at the top of the

5   east stairs.  Again, this is three breaches:  first on the

6   east front, the bottom of the stairs, the top of the stairs.

7   We're surrounded.  They're trying to get into the door.

8   That's what I'm engulfed with the mob -- or protesters at

9   that time.  Excuse me.  Engulfed with the protesters at that

10  time.

11  Q.  And you said when you were on the line before they

12  had -- as you testified, sort of the initial attempt at the

13  breach, before the second successful attempt, you're talking

14  to this man with the bullhorn.  You said you're going to

15  look into letting them come up?

16  A.  Correct.  Because like I said, that day I'm not of upper

17  leadership.  So everything that I do has to get approved.

18  Again, I speak frankly.  I knew it wasn't going to happen,

19  because that's not our protocol.  But again, I was trying to

20  get some kind of order so we could reestablish and get the

21  upper hand.

22  Q.  And at least temporarily was that successful?

23  A.  Temporarily.  Yes, it was, sir.

24  Q.  At any point, then, did you actually give any protester,

25  any rioter, permission to go past that perimeter?

Warner - CROSS - By Mr. Ballou

1    A.  I did not.

2    Q.  Did you see any other police officer give permission to

3    let the rioters get past that perimeter?

4    A.  Sir, our job is to protect the members of Congress.  And

5    when they're in session, we are not going to give anybody

6    permission to come into the building or pass the police

7    line.

8              MR. BALLOU:  Thank you.  Nothing further.

9              THE COURT:  Any redirect, Mr. Roots?

10                        REDIRECT EXAMINATION

11   BY MR. ROOTS:

12   Q.  Telling people you're going to work with leadership and

13   fist-bumping people --

14              THE COURT:  Let's make sure we're asking this in a

15   nonleading question.  Go ahead.  You can set the scene.  Go

16   ahead, Mr. Roots.

17   BY MR. ROOTS:

18   Q.  -- are indications of intending to give them permission?

19              MR. BALLOU:  Objection.

20              THE COURT:  You can ask what the indications were

21   by doing that, but you cannot lead him as to it.

22   BY MR. ROOTS:

23   Q.  What were the -- what were you communicating by that?

24   A.  The only thing I ask you to do is put it in context.

25   Again, the initial breach, there was no fist-bumping.

1    Again, I'm in the top of the stairs after the third surge,

2    again, trying to ensure my safety and my fellow officers'

3    safety are intact.

4              So I'm in the middle of something.  I don't know

5    what you would do if you were surrounded.  Would you fight

6    or would you try to figure a way out of it?  So that was my

7    way.  Let me get out of this.

8    Q.  I would cower.

9              THE COURT:  Thank you, Mr. Roots.  You don't have

10   to answer the question.

11             MR. ROOTS:  Thank you so much, Officer.  No

12   further -- or Sergeant.  No further questions.

13             THE WITNESS:  Thank you, sir.

14             THE COURT:  Thank you, Sergeant.  You can step

15   down.

16             THE WITNESS:  Thank you, sir.

17             (Witness excused.)

18             THE COURT:  We can have a quick bench conference.

19             (Whereupon, the following bench conference was

20   held:)

21             THE COURT:  I believe it would make sense now to

22   excuse the jury.  And I would like to let them know, because

23   we had told them that we expected to have closing arguments

24   to happen today, that we anticipate one, maximum two

25   witnesses just in case to give them Monday.  We'll have

1  closings Monday morning.  Is that correct?

2      MR. PIERCE:  Yes.  That's correct, your Honor.

3  I'm not -- you know, it depends.  Obviously --

4      THE COURT:  Let me say Monday.  We'll have it

5  Monday.  I meant starting Monday we'll have one to two

6  witnesses and then closings.

7      MR. PIERCE:  Yes, your Honor.

8      THE COURT:  Is that also good with the United

9  States?

10      MR. PARKER:  Yes, your Honor.

11      (Whereupon, the following proceedings were had in

12  open court:)

13      THE COURT:  Okay, members of the jury.  I'm going

14  to excuse you now.  It's 4:30.  We are going to continue

15  working.  I anticipate Monday morning there will be one,

16  maximum two witnesses and closings.  This will be the end of

17  the trial.  I will then give you the instructions and you'll

18  begin your deliberations at that time.  So to give you a

19  sense of scheduling.

20      I apologize.  We thought we would be there today.

21  But it's important again that we take as much time as

22  necessary to make sure we're getting things right.

23      So thank you for your patience.  If you have any

24  concerns about the schedule, please let Ms. Lavigne-Rhodes

25  know.  But I anticipate Monday the case will -- you all will

1    begin your deliberations.

2              My instructions to you remain over the weekend not

3    to talk to people about the case and not to talk to each

4    other about the case, not to do any other research.  All of

5    those instructions remain.

6              So thank you for your patience and your continued

7    public service.  Have a great weekend.

8              (Whereupon, the jury exited the courtroom at 4:30

9    p.m. and the following proceedings were had:)

10             THE COURT:  You can be seated.  Thank you.  I want

11   to go over the one final jury instruction that was at issue.

12   That was the theory-of-defense instruction.

13             I have reviewed the instruction.  I will review

14   the standard.  It is -- as stated in *United States versus*

15   *Hurt*, 527 F.3d 1347, H-U-R-T, it stated that a

16   theory-of-defense instruction is in order if there is

17   sufficient evidence from which a reasonable jury could find

18   for the Defendant on his theory.

19             However, what is required before the

20   theory-of-the-case rule comes into play is a more involved

21   theory involving law or fact or both that is not so obvious

22   to any jury.

23             And that was explained in *United States versus*

24   *Venkata*, V-E-N-K-A-T-A, 2024 Westlaw 86287.  That's at Page

25   26.  It's quoting a D.C. Circuit case, *Laughlin versus the*

1     *United States*.

2          So my reading of those cases is that an

3     instruction is appropriate when a defendant's theory is

4     sufficiently complicated that its explanation would help a

5     jury.  It is not simply, I believe, to restate the

6     Defendant's arguments.  Essentially, it's where the failure

7     to include it would deny him a fair trial, as noted in

8     *United States versus Hoffecker*, H-O-F-F-E-C-K-E-R.  That's a

9     Third Circuit case from 2008, 530 F.3d 137.

10         I believe such instruction is unnecessary here.

11    Ms. Lavrenz is charged with four misdemeanors that are

12    fairly self-evident, perhaps even without the instructions

13    that have been made to go over the elements, but certainly

14    with it.  These are not complicated charges, not serious

15    felonies that sometimes have multiple prongs or things like

16    that.

17         I do not believe there's any basis for a theory of

18    the defense.  I will note that the instructions are quite

19    clear and that the Defendant can make those arguments in her

20    closing; but its inclusion would not assist the jury as to

21    any questions about *mens rea* and is unnecessary because her

22    defense is not so complicated.

23         So you've made your request.  I have denied it.

24         Is there anything else in terms of jury

25    instructions from the Government?

1          MR. BALLOU:  Nothing, your Honor.

2          THE COURT:  Mr. Roots, anything else?

3    Understanding you have noted your objections; but having

4    ruled on them, are there any outstanding jury instructions

5    for which there are questions?

6          MR. ROOTS:  Nothing I can think of.

7          THE COURT:  In terms of the theory of the defense

8    that was submitted, it was submitted as a proposed jury

9    instruction.  If you want to, you can just file a notice or

10   something so that it's docketed what you did in fact email

11   us, because right now it's not in the record.  I'm not going

12   to torture the court reporter further by having me read it.

13         So in terms of what remains for legal issues, what

14   do you anticipate of anything other than the Defendant will

15   make her decision about her testimony and then I believe we

16   can go straight to jury instructions?

17         Is there anything from the United States?

18         MR. BALLOU:  That's right, your Honor.

19         THE COURT:  No.  He already said that's right.

20         MR. PARKER:  It's a mixed question of my

21   responsibilities and Mr. Ballou's responsibilities.

22         I should maybe know this.  Does your Honor intend

23   to instruct before or after closings?

24         THE COURT:  I prefer to instruct after.  But if

25   you all have a strong preference otherwise, I'll at least

1    listen to it.

2              MR. PARKER:  No, your Honor.  I just wanted to

3    make sure I had a heads-up.

4              THE COURT:  Okay.  If you intend to, however, you

5    can use some of the instructions in your closing because

6    we'll already have agreed upon what they are.

7              So there's nothing, then, from you all.

8              Mr. Pierce or Mr. Roots, any issues on Monday?  I

9    understand you're got giving up any rights.  But I just want

10   to know right now so I can preview if I've got to do some

11   homework on the weekend.

12             MR. ROOTS:  It's been a long day.  I can't think

13   of anything.

14             THE COURT:  That's fine.

15             It has been a long day.  And so we will reconvene

16   at 9:00 on Monday.  I hope that we will then decide what is

17   going to happen.

18             Ms. Lavrenz, as I've told you before, I'm going to

19   warn you again on Monday, explain why.  But I want to make

20   sure you've talked to your lawyers.  Make sure you know what

21   you want to do in terms of testimony.  You have the right to

22   not testify, but you also have the right to testify.  And so

23   you'll make whatever decision you want to then on Monday.

24   And then if you elect to testify, we'll hear your testimony

25   then.  If not, then we'll go -- assuming there's not

1    something unexpected, we'll go straight to closing argument

2    and then jury instructions.

3          I will just remind the parties here, it is

4    difficult during trial to keep sometimes our frustrations,

5    the parties, and sometimes to manage when we think the other

6    side is doing something wrong, to mitigate it.  But that's

7    your obligations, all of you.  It's the attorneys.  That's

8    your job to your clients, both the United States and to

9    Ms. Lavrenz.  It does not do anyone a benefit.  And it's

10   fine in the moment if we can lose our cool for a second.

11   But I want you all to continue to be an example.

12         We've had not one, but dozens of students come

13   through here.  What happens here is important.  People need

14   to see how we act and that we uphold ourselves in the way

15   that I know each and every one of you -- I've seen you

16   uphold yourselves.  Because what happens here again?  This

17   is our fundamental question, not just this case, but

18   everything.  Can we just get along?  And I believe that we

19   can.  I've seen you all do that.

20         And I respect you all tremendously.  Not because

21   you all are good lawyers, paralegals, whoever you are, FBI

22   agents.  Because you treat each other with decency and

23   courtesy.

24         Although I'll remind you in the last trial, when

25   Ms. Lambert could not pull up a piece of evidence, the

1  Government pulled it up for her.  And the jurors afterwards

2  commented on how important they thought it was to see that

3  everyone worked together.  People are watching.  So I want

4  you all to be the best people I know you are.

5          Mr. Pierce, I applaud you for caring so much about

6  your witnesses, for Mr. Powell, caring deeply about them and

7  taking care of them.  I think again it reflects who you are

8  as a person.

9          I am concerned about Mr. Powell.  I'd like to hear

10  about how he's doing as he continues to get medical care.

11  All of these things people are seeing.  Please be the people

12  that you are.  Don't let trial make you someone worse than

13  you are.  Okay?

14          I'll see you Monday morning 9:00 a.m.  Thank you

15  so much, everybody.

16              THE COURTROOM DEPUTY:  Court is adjourned.

17              (Proceedings concluded.)

18

19

20

21

22

23

24

25

1

<u>**CERTIFICATE**</u>

2

3              I, LISA EDWARDS, RDR, CRR, do hereby

4      certify that the foregoing constitutes a true and accurate

5      transcript of my stenographic notes, and is a full, true,

6      and complete transcript of the proceedings produced to the

7      best of my ability.

8

9

10             Dated this 13th day of May, 2024.

11

12             <u>/s/ Lisa Edwards, RDR, CRR</u>
               Official Court Reporter
13             United States District Court for the
                 District of Columbia
14             333 Constitution Avenue, Northwest
               Washington, D.C. 20001
15             (202) 354-3269

16

17

18

19

20

21

22

23

24

25

**'**

**'09** [1] - 82:4
**'68** [1] - 146:10

**/**

**/s** [1] - 226:12

**0**

**02903** [1] - 1:23

**1**

**10** [2] - 1:22, 163:17
**100** [2] - 63:1, 65:20
**102** [1] - 3:15
**103** [1] - 3:16
**105** [1] - 3:6
**107** [5] - 28:19, 28:20, 29:12, 30:12, 103:25
**10:22** [1] - 52:12
**10:35** [2] - 57:23, 58:4
**10:42** [1] - 60:17
**11** [1] - 14:9
**11:00** [1] - 212:9
**12** [7] - 72:14, 72:15, 73:4, 73:10, 73:24
**121** [1] - 3:6
**123** [1] - 3:6
**12:23** [2] - 97:10, 97:18
**13** [4] - 72:8, 72:12, 72:15, 73:24
**1347** [1] - 220:15
**1355** [1] - 9:21
**137** [1] - 221:9
**13th** [1] - 226:10
**14** [1] - 106:21
**145** [1] - 3:7
**15** [5] - 13:7, 15:14, 94:17, 164:17, 212:15
**15-hour** [1] - 128:9
**179** [1] - 3:7
**1790s** [1] - 8:25
**18** [1] - 161:6
**19** [1] - 146:12
**195** [1] - 3:8
**196132** [1] - 6:25
**1968** [2] - 146:9
**1978** [1] - 149:6
**1980** [1] - 85:16
**1990** [1] - 85:17
**1:00** [2] - 12:22, 61:9

**1:19** [1] - 40:19
**1:20** [2] - 97:4, 97:21
**1:25** [3] - 97:14, 97:16, 97:21
**1:32** [1] - 104:16
**1:54** [1] - 118:25
**1st** [1] - 19:3

**2**

**2-year-old** [1] - 91:4
**2.108** [1] - 9:15
**20** [11] - 10:8, 13:7, 42:25, 88:14, 151:2, 196:1, 196:2, 196:8, 201:13, 201:15, 201:16
**20,000-pound** [1] - 47:14
**20-A** [8] - 201:16, 201:20, 203:16, 203:22, 204:13, 205:25, 208:2, 208:18
**20-foot-tall** [1] - 47:14
**200** [2] - 9:4, 122:3
**2000** [2] - 85:13, 85:14
**20001** [2] - 2:4, 226:14
**2008** [14] - 19:3, 82:4, 85:14, 86:10, 89:11, 89:16, 89:19, 92:7, 92:9, 93:25, 94:14, 95:12, 221:9
**202** [3] - 2:4, 3:9, 226:15
**2020** [1] - 86:10
**2021** [7] - 101:15, 106:2, 106:9, 152:5, 152:8, 195:18, 203:8
**2023** [2] - 6:18, 6:25
**2024** [4] - 1:6, 118:25, 220:24, 226:10
**20530** [1] - 1:17
**21-730** [1] - 6:25
**212** [1] - 3:9
**21550** [1] - 1:19
**217** [1] - 3:9
**22** [1] - 89:10
**23-00066** [1] - 1:3
**23-66** [1] - 4:2
**25** [1] - 205:2
**26** [1] - 220:25
**28** [1] - 3:5
**29** [4] - 1:6, 72:2, 72:18, 73:13
**29th** [1] - 118:25

**2:00** [2] - 29:22, 108:6
**2:08** [1] - 131:20
**2:15** [2] - 131:8, 131:17
**2:43** [1] - 181:14
**2:52** [1] - 181:14
**2:57** [1] - 144:21

**3**

**30-some** [1] - 149:20
**301** [1] - 190:7
**302** [4] - 69:11, 69:13, 69:17, 69:22
**305-A** [8] - 30:22, 30:25, 31:6, 32:7, 103:25, 116:20, 117:25, 118:4
**33** [1] - 3:13
**333** [2] - 2:3, 226:14
**3477249** [1] - 6:18
**35** [1] - 31:8
**354-3269** [2] - 2:4, 226:15
**360** [2] - 199:6, 215:13
**362** [1] - 9:23
**371** [1] - 39:16
**3:00** [2] - 183:9, 183:13
**3:09** [3] - 13:5, 14:8, 181:8
**3:19** [1] - 181:11
**3:20** [1] - 14:9, 183:16
**3:45** [1] - 184:14

**4**

**4** [2] - 5:19, 5:21
**40** [1] - 31:16
**403** [5] - 12:8, 22:25, 80:24, 94:22
**42** [1] - 3:14
**45** [1] - 127:17
**452** [1] - 9:22
**466** [1] - 9:22
**48** [13] - 3:13, 32:8, 32:11, 32:14, 32:21, 33:1, 33:4, 34:7, 35:12, 40:16, 41:13, 120:17, 127:23
**48.3** [7] - 3:14, 42:10, 42:12, 42:16, 42:20, 42:24, 43:19
**4:00** [3] - 99:19, 130:6, 130:21

**4:07** [1] - 201:25
**4:30** [2] - 219:14, 220:8
**4th** [2] - 106:8, 111:9

**5**

**50** [1] - 32:2
**5104(e)(2)(G** [1] - 6:16
**527** [1] - 220:15
**53** [8] - 137:21, 138:21, 138:22, 142:16, 167:9, 167:10, 167:16, 168:16
**530** [1] - 221:9
**58** [2] - 29:20, 29:22
**5th** [1] - 111:9

**6**

**601** [1] - 1:16
**63** [11] - 69:6, 70:3, 70:7, 70:15, 71:9, 71:11, 71:18, 71:25, 72:10, 73:1, 102:4
**63-A** [12] - 3:15, 71:10, 100:25, 102:7, 102:11, 102:12, 102:13, 107:6, 109:6, 109:7, 109:15, 110:18
**63-B** [3] - 3:16, 102:17, 102:18, 102:20, 103:9, 103:18, 103:22, 110:18, 110:19
**63.1** [1] - 102:6
**65** [3] - 137:20, 138:1, 138:6
**66** [8] - 137:20, 138:8, 138:11, 142:16, 160:21, 161:2, 162:1, 162:25
**6706** [1] - 2:3
**6th** [70] - 13:23, 16:10, 16:21, 20:4, 20:9, 22:7, 22:11, 32:19, 49:8, 50:6, 52:18, 54:3, 63:1, 75:5, 75:18, 75:24, 81:12, 94:18, 95:20, 96:22, 96:23, 101:15, 106:2, 106:6, 106:9, 116:17, 117:3, 118:8, 119:3, 119:16, 119:18, 119:19, 120:3, 122:1, 137:11, 139:17, 141:23,

143:22, 146:21, 146:22, 150:5, 150:6, 150:22, 151:5, 151:7, 151:13, 152:5, 152:8, 152:17, 152:19, 153:21, 153:22, 154:6, 154:4, 159:5, 161:7, 168:19, 169:23, 170:7, 171:18, 176:16, 179:8, 179:14, 195:16, 195:18, 195:21, 203:5, 203:8, 212:7

**7**

**700** [1] - 1:23
**706** [1] - 9:23
**75** [2] - 145:14, 145:24
**75-year-old** [1] - 15:7

**8**

**8** [1] - 7:3
**86287** [1] - 220:24

**9**

**9** [1] - 7:1
**91367** [1] - 1:20
**974** [1] - 9:21
**9:00** [2] - 223:16, 225:14
**9:13** [1] - 1:7
**9:35** [1] - 175:21
**9:46** [1] - 28:4

**A**

**A-N-T-H-O-N-Y** [1] - 202:22
**A.2d** [2] - 9:22, 9:23
**a.m** [7] - 1:7, 28:5, 52:13, 58:4, 60:18, 97:19, 225:14
**abandons** [1] - 38:1
**ability** [5] - 22:22, 40:12, 178:14, 182:4, 226:7
**able** [19] - 21:7, 24:23, 56:9, 56:12, 62:20, 62:21, 65:10, 67:2, 70:2, 90:7, 98:9, 99:17, 101:5, 104:8, 120:2, 144:4, 206:6,

206:24, 215:5
**absolutely** [14] -
17:6, 18:23, 68:24,
81:12, 81:24, 82:7,
113:1, 120:10,
155:17, 165:19,
188:8, 188:11,
193:17, 200:23
**academy** [1] - 22:8
**accept** [3] - 128:13,
130:25, 184:23
**acceptable** [4] -
130:7, 143:20,
177:12, 189:4
**access** [1] - 53:10
**accommodate** [1] -
130:18
**accommodating** [3]
- 66:1, 128:14, 128:16
**accompanied** [1] -
4:8
**accomplish** [1] -
204:24
**according** [1] -
176:23
**accurate** [2] - 6:5,
226:4
**act** [2] - 8:7, 224:14
**acting** [2] - 38:4,
80:13
**action** [2] - 40:7,
48:16
**Action** [1] - 1:3
**actions** [6] - 5:22,
34:19, 35:25, 41:25,
84:3, 190:24
**active** [1] - 213:24
**actual** [2] - 21:10,
154:5
**ad** [1] - 66:7
**add** [4] - 7:4, 7:22,
19:15, 23:21
**added** [1] - 95:22
**adding** [1] - 5:24
**addition** [3] - 5:25,
17:12, 56:18
**additional** [13] -
83:11, 92:18, 94:24,
95:4, 124:13, 130:1,
131:15, 141:16,
177:25, 178:2,
193:12, 205:20, 206:7
**additionally** [1] -
191:12
**address** [3] - 55:12,
159:20, 184:11
**addressed** [1] - 64:9
**adds** [2] - 96:18,
164:14
**adduced** [1] - 121:3

**adjourned** [1] -
225:16
**admissibility** [1] -
139:11
**admissible** [3] -
171:4, 188:4, 194:24
**admission** [4] -
101:24, 103:18,
139:7, 186:24
**admit** [9] - 32:21,
42:16, 64:21, 74:1,
103:20, 142:3,
142:18, 180:22, 198:4
**admitted** [13] -
24:23, 32:24, 42:18,
56:16, 57:7, 98:10,
107:7, 160:22, 168:9,
193:23, 201:9,
201:17, 203:17
**admitting** [1] -
142:20
**admonish** [3] -
39:22, 62:12, 68:7
**admonished** [1] -
173:19
**admonishing** [1] -
73:7
**admonition** [3] -
26:18, 38:19, 118:21
**advance** [4] - 65:22,
96:2, 130:8, 174:22
**advanced** [1] - 29:6
**advertisements** [1] -
153:4
**advertising** [1] -
149:5
**advised** [1] - 58:24
**advocacy** [1] - 66:6
**advocate** [2] - 26:13,
63:15
**affect** [1] - 180:23
**affirmatively** [1] -
6:14
**afield** [1] - 80:19
**afraid** [3] - 90:10,
90:19, 175:8
**afternoon** [6] -
121:20, 121:21,
143:14, 180:2, 180:3,
183:10
**afterwards** [10] -
22:8, 48:25, 49:12,
50:22, 55:19, 110:14,
137:11, 143:23, 225:1
**Agent** [1] - 4:10
**agent** [20] - 19:22,
25:15, 26:25, 66:19,
66:20, 67:6, 81:11,
81:12, 81:15, 83:18,
85:1, 85:17, 90:12,

90:18, 91:22, 91:24,
92:5, 92:21, 95:23,
96:20
**agents** [6] - 19:7,
24:10, 63:4, 74:9,
100:16, 224:22
**agitating** [1] - 36:5
**ago** [11] - 9:4, 18:14,
18:25, 24:15, 81:25,
93:22, 93:23, 127:6,
127:24, 149:19, 151:2
**agree** [12] - 5:15,
9:11, 19:17, 63:23,
86:24, 91:10, 127:20,
128:13, 148:9,
173:23, 173:24
**agreed** [1] - 223:6
**agreement** [4] -
39:11, 68:25, 192:9,
192:11
**ahead** [46] - 19:13,
20:19, 23:21, 25:21,
33:3, 34:16, 35:23,
40:14, 45:24, 50:14,
66:12, 69:16, 69:22,
76:15, 77:6, 78:7,
109:5, 113:6, 115:3,
116:24, 118:2,
137:12, 137:22,
142:15, 143:13,
146:19, 152:15,
152:25, 155:12,
162:14, 163:15,
165:18, 167:5,
167:14, 168:23,
169:19, 171:15,
177:6, 182:18,
188:15, 192:3,
195:11, 205:13,
209:17, 217:15,
217:16
**ahold** [1] - 53:11
**alcove** [1] - 116:1
**allegation** [1] - 39:10
**allegations** [1] -
13:14
**alleging** [2] - 39:4,
39:8
**Allen** [1] - 40:22
**allow** [15] - 7:22,
13:20, 49:20, 53:15,
84:8, 102:3, 125:17,
151:7, 162:13,
163:21, 163:25,
165:17, 179:17,
199:25, 205:11
**allowed** [26] - 18:3,
18:21, 20:15, 21:2,
37:3, 53:10, 63:3,
63:4, 64:4, 64:25,

65:2, 66:24, 79:15,
84:9, 85:13, 92:10,
125:23, 125:24,
126:2, 126:12, 160:4,
188:25, 190:16,
191:9, 194:13
**allowing** [8] - 21:6,
25:12, 25:17, 64:3,
83:11, 84:8, 116:7,
170:23
**allows** [1] - 56:21
**almost** [6] - 25:24,
159:10, 174:20,
193:1, 193:3, 193:5
**alone** [1] - 94:21
**Amendment** [2] -
25:7, 54:24
**America** [3] - 4:2,
149:22, 190:24
**AMERICA** [1] - 1:3
**American** [2] - 8:12,
8:22
**Americans** [1] -
55:23
**amount** [2] - 155:14,
164:14
**analogous** [1] -
119:25
**angle** [5] - 107:20,
108:17, 108:18,
111:1, 111:4
**animating** [1] - 75:11
**announcements** [11]
- 161:17, 173:2,
173:4, 173:7, 174:7,
174:9, 174:11,
174:12, 174:25,
176:20, 176:21
**announcing** [1] -
197:14
**answer** [31] - 10:13,
38:19, 40:4, 53:1,
54:20, 54:25, 62:21,
75:12, 77:23, 87:9,
88:24, 89:9, 91:9,
109:14, 112:13,
122:22, 130:22,
144:7, 149:10,
149:16, 149:17,
156:15, 162:22,
163:25, 164:22,
167:4, 175:4, 177:14,
178:19, 218:10
**answered** [7] - 79:1,
124:7, 124:12,
163:16, 163:25,
168:8, 178:3
**answering** [2] -
122:25, 148:6
**answers** [2] -

65:2, 66:24, 79:15,
84:9, 85:13, 92:10,
125:23, 125:24,
126:2, 126:12, 160:4,
188:25, 190:16,
191:9, 194:13
**allowing** [8] - 21:6,
25:12, 25:17, 64:3,
83:11, 84:8, 116:7,
170:23

170:18, 173:17
**Anthony** [2] - 3:8,
202:8
**ANTHONY** [2] -
195:7, 202:12
**anticipate** [7] -
11:16, 12:11, 129:4,
218:24, 219:15,
219:25, 222:14
**anticipated** [1] -
62:13
**Antifa** [5] - 36:5,
36:11, 63:2, 64:12
**anytime** [1] - 30:13,
183:9, 183:12
**anyway** [4] - 44:22,
68:21, 114:3, 166:18
**apologies** [1] -
145:17
**apologize** [2] -
185:4, 219:20
**appeal** [3] - 22:22,
37:19, 180:23
**appealing** [1] -
180:20
**appear** [4] - 63:22,
66:1, 157:25, 158:2
**aPPEARANCES** [1] -
1:13
**appeared** [2] - 16:4,
113:2
**appellate** [1] - 93:14
**applaud** [1] - 225:5
**application** [2] -
78:17, 85:22
**applications** [2] -
85:4, 85:25
**applies** [2] - 83:4,
190:13
**apply** [1] - 159:18
**applying** [2] - 86:24,
87:3
**appointment** [1] -
131:3
**appreciate** [23] -
21:6, 22:15, 24:18,
37:18, 54:23, 60:4,
63:13, 78:22, 78:25,
91:6, 91:8, 113:25,
126:18, 128:5,
128:15, 129:2, 141:9,
170:17, 170:20,
172:11, 183:24,
185:4, 186:6
**appreciative** [1] -
184:20
**approach** [2] - 77:7,
184:17
**appropriate** [4] -
64:2, 117:13, 118:23,

221:3
**appropriately** [1] - 76:19
**approved** [1] - 216:17
**arbiter** [1] - 8:8
**architect's** [1] - 47:13
**Area** [1] - 114:13
**area** [38] - 19:19, 29:2, 38:1, 38:12, 101:17, 101:18, 101:19, 106:8, 106:13, 106:19, 110:8, 111:3, 111:10, 112:1, 113:22, 114:16, 114:21, 116:1, 118:13, 122:2, 122:13, 123:8, 156:19, 161:10, 161:15, 163:8, 165:6, 165:12, 165:15, 169:23, 188:11, 188:18, 190:9, 193:17, 198:17, 203:11, 203:13
**areas** [4] - 96:3, 96:4, 113:16, 190:10
**argue** [1] - 16:3
**argument** [15] - 5:12, 7:20, 25:13, 51:10, 51:14, 55:2, 56:22, 56:23, 56:24, 65:1, 97:6, 140:17, 190:4, 190:10, 224:1
**arguments** [4] - 97:7, 218:23, 221:6, 221:19
**arrange** [1] - 127:9
**arrest** [3] - 40:22, 41:3, 43:5
**arrested** [4] - 38:8, 38:9, 57:8, 179:7
**arrests** [1] - 37:24
**arrival** [1] - 130:2
**arrived** [1] - 106:7
**arrogance** [1] - 211:14
**arrogant** [1] - 211:8
**arrows** [3] - 70:21, 71:4, 71:16
**artfully** [1] - 119:17
**article** [1] - 8:19
**aside** [3] - 12:14, 17:18, 139:4
**asked-and-answered** [1] - 124:7
**aspects** [1] - 215:13
**asserted** [4] - 42:2, 188:19, 192:8, 194:14

**asserting** [1] - 189:13
**assigned** [1] - 203:1
**assignment** [1] - 203:14
**assist** [1] - 221:20
**assistance** [1] - 158:3
**associate** [1] - 149:7
**association** [1] - 96:9
**assume** [2] - 67:5, 186:21
**assumed** [1] - 61:15
**assumes** [1] - 182:23
**assuming** [1] - 223:25
**assumption** [1] - 192:2
**assumptions** [1] - 88:2
**assuredly** [1] - 130:23
**atmosphere** [5] - 13:20, 13:21, 111:11, 111:15, 154:17
**attacks** [1] - 66:7
**attempt** [2] - 216:12, 216:13
**attempted** [2] - 196:13, 204:19
**attend** [2] - 140:10, 153:21
**attendee** [1] - 107:1
**attending** [2] - 107:1, 171:10
**attention** [4] - 35:18, 49:1, 110:5, 110:6
**attorney** [3] - 54:21, 86:17, 121:22
**ATTORNEY'S** [1] - 1:15
**attorneys** [4] - 55:1, 81:24, 137:8, 224:7
**audience** [5] - 85:24, 112:22, 182:1, 182:2, 182:4
**audio** [7] - 37:4, 186:18, 186:21, 187:3, 187:9, 191:9, 194:5
**August** [1] - 146:9
**authenticate** [3] - 73:6, 76:4, 101:8
**authenticated** [1] - 100:21
**authenticity** [3] - 139:7, 139:10, 139:24
**authority** [6] - 7:19,

9:5, 20:14, 64:20, 64:21, 205:17
**availability** [1] - 61:12
**available** [7] - 60:24, 61:3, 61:9, 98:24, 185:9, 194:15
**Avenue** [2] - 2:3, 226:14
**award** [1] - 148:12
**award-winning** [1] - 148:12
**awards** [2] - 147:16, 148:19
**aware** [1] - 59:19

# B

**Bachmann** [1] - 106:22
**backed** [1] - 115:22
**background** [9] - 20:3, 34:21, 85:15, 85:20, 87:11, 107:19, 138:13, 148:4, 200:20
**backpacks** [1] - 215:6
**backup** [1] - 46:25
**backwards** [3] - 66:3, 130:17, 185:3
**bad** [2] - 87:18, 128:8
**balance** [1] - 22:17
**BALLOU** [42] - 1:14, 7:5, 10:7, 10:12, 32:23, 34:13, 34:17, 35:20, 35:24, 38:17, 40:23, 42:17, 45:16, 45:25, 49:2, 50:10, 50:15, 50:18, 52:9, 58:10, 59:1, 59:4, 113:7, 187:8, 187:21, 188:14, 188:16, 189:19, 197:18, 205:9, 206:13, 207:6, 207:11, 208:20, 209:21, 210:3, 210:19, 212:4, 217:8, 217:19, 222:1, 222:18
**Ballou** [7] - 4:9, 35:23, 38:6, 45:24, 50:14, 113:4, 128:12
**Ballou's** [1] - 222:21
**balls** [1] - 128:17
**baloney** [1] - 16:12
**banknote** [1] - 82:16
**Baptist** [1] - 9:22
**bar** [1] - 70:5
**barely** [1] - 142:12

**barricade** [1] - 80:12
**barricade/bike** [1] - 190:9
**barricades** [10] - 15:11, 20:23, 21:11, 75:6, 138:24, 142:8, 163:7, 163:18, 168:19, 195:20
**barrier** [1] - 203:11
**Barron** [1] - 57:1
**based** [12] - 81:17, 81:19, 107:20, 112:9, 112:14, 142:19, 159:24, 177:16, 181:10, 190:24, 190:25, 194:6
**basis** [6] - 19:5, 50:24, 101:23, 103:17, 193:6, 221:17
**bathroom** [5] - 60:25, 166:17, 166:20, 166:25, 179:1
**battery** [1] - 46:25
**bear** [1] - 60:13
**bearing** [1] - 156:1
**became** [1] - 49:13
**Beck** [1] - 150:25
**become** [4] - 39:13, 80:20, 175:18, 188:4
**BEFORE** [1] - 1:10
**began** [1] - 10:9
**begin** [6] - 5:3, 15:7, 68:9, 98:2, 219:18, 220:1
**beginning** [4] - 72:8, 72:23, 87:7, 164:6
**behalf** [2] - 4:8, 4:12
**behind** [6] - 29:7, 32:3, 32:4, 53:13, 108:16, 108:18
**belabor** [1] - 11:22
**believes** [2] - 31:19, 83:19
**bench** [51] - 34:14, 35:21, 41:19, 41:20, 45:22, 49:3, 49:4, 50:11, 50:12, 59:5, 59:7, 76:11, 112:16, 112:18, 114:23, 115:1, 116:22, 118:18, 118:19, 123:21, 123:22, 126:25, 127:1, 130:24, 131:24, 131:25, 132:6, 146:16, 146:17, 150:12, 150:13, 152:12, 152:13, 155:2, 155:3, 156:24, 157:1, 158:22,

163:11, 163:13, 169:16, 169:17, 173:9, 173:10, 177:3, 177:4, 182:15, 182:16, 197:17, 218:18, 218:19
**benefit** [5] - 37:16, 39:19, 63:21, 77:24, 224:9
**bent** [3] - 66:3, 130:17, 185:3
**best** [4] - 40:11, 91:16, 225:4, 226:7
**better** [3] - 67:11, 83:10, 198:23
**between** [11] - 18:14, 26:14, 39:11, 45:14, 66:6, 72:15, 85:8, 86:1, 141:11, 172:9, 187:25
**beyond** [13] - 7:9, 9:18, 20:15, 37:10, 46:11, 65:2, 79:8, 96:2, 139:13, 171:2, 171:4, 182:25, 189:3
**Bible** [1] - 150:4
**big** [4] - 85:10, 127:16, 153:5, 213:7
**bigger** [1] - 103:7
**bike** [9] - 113:18, 168:13, 169:13, 169:21, 169:22, 170:7, 170:9, 181:19, 182:9
**Bill** [2] - 187:16, 189:14
**Bill's** [1] - 189:23
**bit** [14] - 18:12, 29:23, 30:9, 31:11, 31:12, 45:6, 74:24, 79:5, 86:7, 107:13, 149:4, 162:2, 204:1, 205:22
**black** [9] - 43:23, 45:7, 45:10, 70:12, 109:11, 109:12, 196:11, 204:17
**black's** [1] - 44:4
**blah** [3] - 82:20
**blames** [1] - 45:7
**blank** [1] - 87:14
**blatant** [1] - 175:18
**bled** [1] - 191:1
**blind** [1] - 48:16
**Boasberg** [1] - 193:3
**bolstering** [1] - 148:10
**Book** [1] - 9:14
**bottom** [3] - 200:22, 214:15, 216:6

**bound** [2] - 20:16, 64:19
**boundaries** [5] - 79:23, 79:25, 80:2, 80:5, 113:16
**boundary** [1] - 80:4
**bounds** [2] - 51:25, 155:11
**box** [1] - 86:4
**boxes** [1] - 103:8
**brain** [1] - 91:2
**breach** [16] - 181:19, 182:9, 196:14, 197:1, 197:2, 197:5, 198:14, 204:19, 206:9, 212:23, 213:4, 214:10, 214:12, 215:23, 216:13, 217:25
**breached** [6] - 199:25, 214:18, 214:24, 214:25, 215:4, 216:3
**breaches** [1] - 216:5
**break** [9] - 12:2, 57:23, 60:8, 60:25, 97:4, 97:12, 97:13, 166:9
**breaking** [3] - 15:22, 35:17, 41:8
**Brendan** [1] - 4:9
**BRENDAN** [1] - 1:14
**bridge** [1] - 194:24
**briefly** [9] - 7:4, 37:24, 50:2, 121:10, 140:15, 146:13, 186:15, 188:16, 197:18
**briefs** [1] - 93:14
**bring** [25] - 12:4, 28:20, 30:22, 32:8, 42:9, 48:25, 66:25, 93:7, 98:5, 102:15, 107:5, 110:17, 110:18, 116:19, 117:24, 136:25, 141:17, 144:19, 160:20, 160:21, 167:8, 194:8, 194:13, 195:1, 200:16
**brings** [1] - 16:2
**broader** [1] - 153:10
**broadly** [1] - 119:5
**broken** [5] - 35:18, 43:10, 43:14, 45:7, 56:12
**bronze** [1] - 47:14
**Bronze** [1] - 148:21
**brought** [8] - 39:21, 57:5, 83:21, 84:1,

89:3, 95:24, 120:12, 177:23
**building** [20] - 6:5, 13:3, 13:4, 14:8, 14:9, 14:13, 60:25, 107:19, 139:19, 139:20, 155:9, 166:13, 175:23, 178:20, 180:9, 180:12, 180:15, 180:18, 199:19, 217:6
**Building** [4] - 111:25, 178:6, 178:19, 181:8
**built** [1] - 107:14
**bullhorn** [5] - 187:25, 196:15, 207:15, 207:19, 216:14
**bum** [1] - 41:10
**bum-rushed** [1] - 41:10
**bump** [3] - 209:5, 209:9, 216:1
**bumped** [1] - 215:9
**bumping** [4] - 199:4, 208:23, 217:13, 217:25
**bumps** [1] - 172:21
**bums** [1] - 21:21
**bunch** [1] - 162:7
**burden** [1] - 7:13
**busy** [1] - 128:4
**buzz** [1] - 27:1
**BY** [113] - 2:1, 28:16, 28:24, 29:15, 30:1, 30:14, 31:1, 31:7, 31:21, 32:16, 33:7, 34:4, 34:11, 35:7, 35:15, 40:20, 41:5, 41:15, 42:13, 43:2, 43:21, 45:13, 45:17, 46:17, 50:1, 52:5, 53:5, 105:4, 105:21, 106:1, 107:11, 108:2, 109:9, 109:17, 110:4, 110:22, 112:7, 114:3, 114:11, 115:18, 118:6, 121:19, 123:1, 123:15, 126:8, 145:8, 145:22, 148:18, 150:2, 151:18, 152:2, 154:4, 154:24, 156:2, 156:17, 158:11, 160:16, 161:5, 162:3, 162:16, 163:2, 165:4, 165:13, 165:20, 166:4, 166:14, 167:7, 167:19, 167:24,

168:11, 168:18, 168:24, 169:4, 169:12, 171:16, 172:8, 172:20, 173:1, 173:6, 176:13, 178:13, 179:5, 180:1, 181:2, 182:7, 183:8, 195:14, 196:10, 198:1, 198:14, 199:3, 199:14, 199:18, 202:16, 202:23, 203:24, 204:7, 204:15, 206:2, 206:16, 207:9, 207:14, 208:3, 208:22, 209:22, 210:1, 210:6, 210:20, 210:24, 212:4, 217:11, 217:17, 217:22
**bystanders** [1] - 92:25

# C

**C-U-S-I-C-K** [1] - 145:12
**cabin** [1] - 170:18
**cabined** [2] - 54:24, 152:21
**California** [1] - 1:20
**calm** [4] - 173:12, 208:9, 210:9, 215:14
**camera** [10] - 46:23, 46:24, 46:25, 48:7, 48:19, 48:20, 53:8, 101:21, 108:17, 157:25
**cannot** [34] - 20:16, 24:13, 24:15, 37:20, 39:20, 51:8, 52:18, 56:23, 64:11, 64:13, 66:23, 81:11, 89:22, 90:17, 92:1, 95:16, 119:9, 119:11, 119:23, 142:7, 142:9, 159:17, 159:20, 164:20, 170:2, 172:7, 172:24, 173:5, 173:15, 174:7, 174:11, 192:1, 217:21
**cap** [4] - 31:15, 70:13, 109:12, 139:3
**capable** [1] - 26:25
**capital** [1] - 106:8
**Capitol** [117] - 4:25, 6:5, 12:23, 12:24, 13:1, 13:5, 13:8, 13:10, 13:11, 13:12, 15:10, 15:21, 16:10,

16:21, 17:14, 17:21, 18:14, 19:8, 19:19, 23:3, 26:20, 27:2, 27:9, 29:2, 29:18, 43:4, 44:11, 47:5, 47:13, 48:2, 48:9, 48:13, 48:23, 53:8, 60:1, 65:23, 75:20, 81:22, 83:21, 85:12, 98:20, 99:20, 101:20, 106:14, 106:15, 108:14, 108:15, 108:16, 108:19, 108:22, 108:23, 108:25, 109:2, 110:9, 110:11, 110:15, 111:2, 111:3, 111:4, 111:21, 111:24, 115:23, 116:8, 122:14, 130:10, 140:5, 150:9, 150:16, 150:19, 150:21, 151:1, 152:19, 155:16, 155:19, 156:3, 156:9, 156:19, 156:22, 158:13, 160:18, 161:20, 162:4, 162:6, 166:5, 166:9, 176:16, 176:22, 176:25, 177:11, 178:6, 178:19, 180:15, 180:18, 181:3, 181:6, 181:8, 181:11, 181:13, 181:15, 181:18, 181:20, 182:8, 182:11, 183:16, 184:11, 184:20, 185:2, 185:4, 185:14, 191:13, 195:18, 202:25, 203:8, 209:10, 209:13, 212:8
**capped** [1] - 141:15
**capture** [1] - 67:20
**car** [1] - 128:19
**care** [3] - 22:10, 225:7, 225:10
**career** [1] - 83:17
**careful** [2] - 22:25, 84:17
**caring** [2] - 225:5, 225:6
**case** [36] - 6:17, 9:2, 10:4, 12:20, 14:22, 16:4, 20:12, 23:8, 23:18, 23:25, 24:1, 25:3, 25:19, 30:16, 49:7, 57:2, 57:9, 64:22, 80:2, 91:22,

113:2, 119:8, 126:21, 128:21, 139:21, 140:7, 164:5, 218:25, 219:25, 220:3, 220:4, 220:20, 220:25, 221:9, 224:17
**Case** [1] - 4:2
**cases** [9] - 9:16, 9:20, 9:25, 14:21, 14:22, 57:2, 83:5, 116:8, 221:2
**caused** [1] - 191:6
**causes** [3] - 67:1, 95:23, 96:16
**CCTV** [1] - 108:5
**CDU** [1] - 197:6
**center** [4] - 70:11, 103:13, 109:11, 109:23
**Central** [1] - 149:22
**central** [1] - 93:6
**certain** [8] - 5:21, 5:23, 31:13, 78:18, 96:3, 193:2, 193:3, 193:5
**certainly** [16] - 14:12, 19:4, 49:9, 94:18, 104:6, 108:7, 120:6, 120:13, 121:4, 127:12, 127:23, 128:20, 170:16, 189:5, 191:25, 221:13
**CERTIFICATE** [1] - 226:1
**certify** [1] - 226:4
**cetera** [3] - 36:15, 76:24, 182:25
**chambers** [1] - 7:7
**chance** [2] - 82:7, 98:8
**changed** [4] - 9:9, 18:12, 64:18
**chanting** [2] - 30:4, 206:7
**chaos** [1] - 213:18
**character** [1] - 79:4
**charge** [4] - 39:12, 39:15, 39:19, 206:7
**charged** [4] - 39:7, 46:24, 179:7, 221:11
**charges** [4] - 12:18, 179:13, 190:19, 221:14
**charging** [2] - 39:13, 51:22
**check** [2] - 61:14, 89:12
**cheering** [1] - 176:18
**chemical** [1] - 48:15
**chest** [1] - 21:19

**Chief** [1] - 193:2
**chief** [2] - 49:7, 112:21
**choice** [3] - 39:18, 56:21, 130:25
**choose** [1] - 129:9
**chooses** [1] - 191:23
**choosing** [1] - 125:4
**choppy** [1] - 37:14
**Christian** [1] - 106:17
**church** [3] - 149:12, 149:18, 149:19
**circle** [12] - 29:16, 31:2, 109:13, 109:18, 109:19, 110:2, 118:10, 167:22, 167:23, 196:4, 203:25, 204:1
**circled** [5] - 29:23, 31:18, 190:7, 191:21, 204:6
**Circuit** [4] - 8:14, 8:16, 220:25, 221:9
**citation** [2] - 6:22, 6:23
**citations** [1] - 7:7
**cited** [1] - 9:16
**citizen** [1] - 90:9
**civic** [1] - 153:6
**civilian** [1] - 19:18
**civilians** [1] - 25:3
**clarification** [2] - 93:19, 157:23
**clarify** [3] - 74:7, 168:2, 215:25
**clarity** [1] - 78:8
**class** [1] - 203:2
**clear** [24] - 7:8, 7:17, 14:2, 18:20, 22:25, 26:12, 35:24, 39:8, 64:22, 84:24, 87:25, 94:16, 94:25, 113:20, 114:20, 115:11, 122:24, 125:3, 158:15, 174:22, 190:17, 191:7, 205:12, 221:19
**clearly** [2] - 35:2, 171:7
**client** [6] - 57:10, 63:16, 65:5, 77:4, 141:1, 153:15
**client's** [3] - 37:16, 63:21, 177:21
**clients** [1] - 224:8
**climbing** [1] - 212:16
**clip** [14] - 31:9, 31:17, 31:22, 70:18, 71:13, 72:3, 72:5,

101:2, 101:5, 108:4, 110:17, 110:24, 163:24, 164:16
**clipped** [1] - 98:10
**clips** [6] - 37:3, 37:4, 70:19, 71:2, 101:9
**clock** [1] - 73:24
**close** [9] - 31:8, 51:2, 51:3, 52:7, 53:6, 72:13, 127:17, 190:5, 190:9
**closed** [1] - 184:4
**closer** [2] - 19:17, 122:6
**closing** [4] - 218:23, 221:20, 223:5, 224:1
**closings** [4] - 219:1, 219:6, 219:16, 222:23
**clue** [1] - 30:20
**co** [3] - 4:9, 138:15, 141:25
**co-counsel** [1] - 4:9
**co-defendant** [1] - 141:25
**co-defendants** [1] - 138:15
**coached** [1] - 158:3
**coat** [1] - 70:12
**cold** [1] - 166:17
**colleague** [1] - 113:5
**colleagues** [1] - 98:1
**college** [1] - 91:3
**color** [1] - 20:9
**colored** [1] - 31:14
**Columbia** [2] - 2:2, 226:13
**COLUMBIA** [2] - 1:1, 1:16
**Columbus** [3] - 41:10, 47:7, 47:10
**coming** [10] - 20:10, 23:13, 47:25, 48:1, 79:7, 80:21, 130:22, 137:1, 166:18, 184:18
**comment** [1] - 77:9
**commented** [1] - 225:2
**committed** [1] - 24:7
**common** [3] - 8:10, 153:1, 153:7
**communicate** [1] - 184:7
**communicating** [3] - 195:21, 203:11, 217:23
**communication** [3] - 25:1, 98:22, 207:15
**communications** [1] - 204:16
**compel** [1] - 67:9

**compelling** [1] - 6:9
**complaints** [1] - 129:19
**complete** [1] - 226:6
**completely** [8] - 34:22, 36:22, 85:2, 148:7, 151:3, 151:10, 209:1, 211:16
**completeness** [1] - 189:12
**completeness's** [1] - 189:8
**complicated** [3] - 221:4, 221:14, 221:22
**complies** [2] - 29:17, 73:22
**comport** [1] - 120:20
**composure** [1] - 209:2
**compound** [1] - 182:23
**comprehend** [1] - 46:19
**compute** [1] - 91:2
**concept** [1] - 5:24
**concern** [4] - 89:1, 141:10, 155:7, 187:14
**concerned** [11] - 5:14, 5:24, 25:5, 36:2, 46:10, 65:3, 80:10, 83:15, 88:11, 115:7, 225:9
**concerning** [1] - 83:14
**concerns** [5] - 11:24, 12:14, 55:21, 76:20, 219:24
**concluded** [1] - 225:17
**conclusion** [2] - 165:9, 179:18
**conclusions** [2] - 82:23, 112:4
**concurrent** [1] - 108:4
**conduct** [3] - 38:23, 180:11, 180:14
**conference** [52] - 34:14, 35:21, 41:19, 41:20, 45:22, 49:3, 49:4, 50:11, 50:12, 59:6, 59:7, 76:11, 112:17, 112:18, 114:23, 115:1, 116:22, 118:18, 118:19, 123:21, 123:22, 126:25, 127:1, 131:24, 131:25, 132:6, 146:16, 146:17,

150:12, 150:13, 152:12, 152:13, 155:2, 155:3, 156:25, 157:1, 158:21, 158:22, 158:24, 163:12, 163:13, 169:16, 169:17, 173:9, 173:10, 177:3, 177:4, 182:15, 182:16, 197:17, 218:18, 218:19
**confers** [1] - 84:22
**confident** [1] - 62:5
**confirm** [2] - 11:15, 121:14
**confuse** [2] - 83:18, 92:22
**confused** [4] - 57:10, 93:21, 117:5, 188:3
**confusing** [9] - 6:1, 18:16, 20:6, 23:6, 29:24, 81:3, 81:7, 84:13, 126:1
**confusion** [20] - 38:3, 38:5, 57:10, 66:25, 67:1, 83:8, 83:16, 93:9, 95:23, 96:13, 117:1, 159:23, 160:2, 190:14, 190:19, 190:20, 190:25, 191:1, 191:7, 193:15
**Congress** [8] - 15:23, 107:21, 203:1, 203:13, 212:10, 213:23, 213:24, 217:4
**congressman** [1] - 55:8
**congressmen** [1] - 49:15
**Congresswoman** [1] - 106:22
**connection** [1] - 184:4
**consider** [5] - 9:4, 25:14, 52:2, 91:20, 99:8
**considered** [1] - 52:1
**consistent** [2] - 57:9, 200:18
**consistently** [1] - 76:19
**conspiracy** [4] - 38:25, 39:5, 39:7, 39:17
**conspiratorial** [1] - 36:3
**constitutes** [1] - 226:4
**Constitution** [4] -

2:3, 8:1, 8:2, 226:14
**constitutional** [1] - 7:24
**contact** [2] - 49:14, 98:19
**contacting** [1] - 49:1
**contempt** [4] - 130:11, 130:24, 175:9, 175:13
**context** [2] - 125:22, 217:24
**continuance** [1] - 110:23
**continuation** [1] - 102:16
**continue** [18] - 5:12, 28:10, 34:3, 38:9, 60:20, 66:8, 70:14, 93:16, 105:24, 108:1, 114:9, 120:25, 131:6, 185:25, 187:8, 187:22, 219:14, 224:11
**continued** [2] - 47:22, 220:6
**CONTINUED** [1] - 28:15
**continues** [1] - 225:10
**continuing** [1] - 163:3
**control** [9] - 24:3, 63:5, 63:6, 129:22, 129:23, 199:22, 206:25, 207:2, 213:17
**conversation** [13] - 46:1, 46:7, 184:9, 187:24, 189:12, 199:16, 199:17, 199:19, 200:7, 200:10, 200:12, 200:15, 204:18
**conversations** [1] - 93:4
**converse** [1] - 120:1
**conveying** [1] - 206:18
**convict** [4] - 8:16, 9:19, 159:24, 190:23
**convicted** [2] - 12:20, 180:5
**conviction** [1] - 93:15
**cool** [2] - 215:16, 224:10
**coordinate** [2] - 58:21, 61:16
**copied** [2] - 9:15, 60:2
**cordial** [1] - 172:11

**corner** [2] - 29:21, 108:5

**Corps** [1] - 21:1

**correct** [37] - 29:2, 30:17, 51:21, 89:16, 118:11, 122:6, 122:11, 122:12, 123:3, 123:4, 123:7, 123:10, 127:24, 156:20, 180:7, 180:10, 180:12, 180:13, 180:16, 180:19, 181:5, 181:11, 181:22, 181:24, 182:9, 182:10, 182:13, 183:11, 183:14, 183:18, 187:3, 189:15, 198:3, 198:18, 216:16, 219:1, 219:2

**correction** [1] - 185:13

**counsel** [13] - 4:9, 59:10, 69:2, 84:22, 99:4, 130:22, 170:1, 170:3, 171:5, 184:11, 185:13, 185:16, 188:18

**Counsel** [1] - 185:14

**counsel's** [4] - 5:1, 60:22, 98:20, 99:14

**count** [4] - 23:17, 180:11, 180:14, 180:17

**Count** [2] - 5:19, 5:21

**country** [4] - 86:6, 106:24, 111:12, 147:11

**counts** [2] - 180:5, 180:8

**couple** [12] - 4:22, 4:23, 43:13, 43:14, 59:23, 71:7, 91:14, 106:8, 118:1, 143:9, 147:25, 198:15

**course** [8] - 8:9, 22:22, 76:16, 94:14, 113:7, 175:25, 190:12, 201:7

**Court** [30] - 2:1, 2:2, 7:1, 7:24, 8:11, 8:14, 8:17, 8:18, 8:20, 8:23, 9:1, 9:3, 20:13, 20:17, 26:4, 59:17, 63:14, 66:3, 66:7, 77:9, 94:10, 99:1, 99:2, 106:15, 107:20, 109:4, 173:19,

184:12, 226:12, 226:13

**COURT** [432] - 1:1, 4:16, 4:18, 4:21, 5:9, 7:14, 9:10, 10:10, 10:14, 11:2, 11:11, 11:18, 14:6, 14:14, 14:17, 16:16, 16:22, 16:25, 17:4, 18:7, 19:4, 19:23, 20:1, 20:22, 21:23, 24:11, 26:6, 26:8, 26:18, 27:14, 27:18, 27:21, 27:25, 28:6, 28:9, 32:22, 32:24, 33:25, 34:16, 34:22, 35:23, 36:8, 36:18, 37:23, 38:6, 39:2, 39:6, 40:2, 40:10, 40:13, 40:24, 41:1, 41:18, 41:22, 42:7, 42:18, 45:9, 45:11, 45:20, 45:24, 46:6, 46:10, 46:15, 49:3, 49:6, 49:18, 49:24, 50:11, 50:14, 50:17, 50:20, 51:4, 51:24, 52:10, 52:14, 53:14, 53:25, 54:8, 54:13, 54:19, 55:7, 55:9, 56:4, 56:16, 57:18, 57:20, 57:22, 58:1, 58:6, 58:9, 58:11, 58:15, 58:18, 58:21, 59:5, 59:15, 59:25, 60:4, 60:10, 60:13, 60:19, 61:11, 61:17, 61:22, 61:25, 62:3, 62:11, 63:10, 66:12, 66:23, 67:15, 68:2, 68:7, 68:13, 68:23, 69:2, 69:16, 69:23, 69:25, 70:5, 70:9, 70:17, 71:3, 71:11, 71:15, 71:20, 71:24, 72:4, 72:7, 72:13, 72:21, 72:25, 73:4, 73:16, 73:20, 73:23, 74:10, 74:15, 74:18, 74:22, 76:3, 76:8, 76:15, 76:22, 77:1, 77:11, 78:7, 78:21, 86:20, 86:23, 88:21, 88:24, 89:5, 89:14, 89:17, 89:25, 91:6, 93:24, 94:3, 94:23, 95:11, 97:11, 97:20, 97:25, 98:5, 98:18, 99:3, 99:13, 99:16, 99:23, 100:1, 100:10, 101:2, 101:4, 101:7, 102:2, 102:11,

102:17, 103:6, 103:19, 104:3, 104:8, 104:12, 104:15, 104:18, 105:2, 105:11, 105:16, 105:18, 105:24, 107:7, 107:23, 108:24, 109:1, 110:1, 112:3, 112:10, 112:24, 113:4, 113:25, 114:8, 114:23, 114:25, 115:3, 115:6, 115:15, 116:24, 117:7, 117:21, 118:15, 118:17, 118:21, 119:18, 120:8, 120:10, 121:11, 122:21, 123:12, 123:21, 123:24, 124:9, 124:21, 125:12, 125:17, 125:23, 126:1, 126:5, 126:16, 126:25, 127:3, 127:15, 128:2, 129:2, 129:17, 131:14, 131:22, 131:25, 132:4, 136:25, 137:16, 137:22, 138:4, 138:10, 138:12, 138:18, 138:22, 138:25, 139:4, 139:23, 140:15, 140:24, 142:18, 142:24, 143:2, 143:4, 143:7, 143:12, 143:18, 144:6, 144:13, 144:16, 144:19, 144:23, 145:15, 145:18, 145:21, 146:16, 146:19, 146:23, 147:10, 147:20, 148:2, 148:5, 148:9, 149:10, 149:15, 149:24, 150:12, 150:15, 150:23, 151:6, 151:16, 151:24, 152:12, 152:15, 152:23, 153:8, 154:21, 155:2, 155:5, 155:19, 155:25, 156:15, 156:24, 157:3, 157:25, 158:6, 158:9, 158:15, 158:24, 159:11, 160:4, 160:22, 162:13, 162:21, 163:11, 163:15, 163:20,

164:9, 165:1, 165:8, 165:17, 165:23, 166:11, 167:2, 167:4, 167:12, 167:14, 167:23, 168:8, 168:21, 169:2, 169:10, 169:16, 169:19, 170:5, 170:25, 171:7, 171:15, 172:6, 172:13, 172:23, 173:4, 173:9, 173:13, 173:22, 174:23, 175:2, 175:11, 175:16, 175:20, 176:12, 177:3, 177:6, 177:9, 178:5, 178:11, 178:16, 179:17, 179:23, 180:25, 181:25, 182:15, 182:18, 183:2, 183:6, 183:20, 183:22, 184:5, 184:13, 184:16, 185:7, 185:10, 185:16, 185:21, 185:23, 186:3, 186:5, 186:8, 186:14, 187:2, 187:6, 187:14, 188:7, 188:13, 188:15, 188:21, 189:25, 191:2, 192:14, 192:25, 193:9, 193:22, 194:17, 195:4, 195:9, 197:16, 197:21, 198:5, 198:19, 199:8, 199:12, 199:17, 200:5, 200:9, 200:11, 200:21, 201:7, 201:9, 201:13, 201:18, 201:21, 201:23, 202:3, 202:9, 202:20, 203:17, 203:21, 205:11, 206:14, 207:7, 207:12, 209:24, 210:4, 210:22, 217:9, 217:14, 217:20, 218:9, 218:14, 218:18, 218:21, 219:4, 219:8, 219:13, 220:10, 222:2, 222:7, 222:19, 222:24, 223:4, 223:14

**court** [82] - 10:9, 23:16, 23:18, 29:12, 30:12, 30:25, 31:6, 32:7, 33:5, 34:8, 35:6, 35:13, 40:1, 40:17, 41:14, 42:6, 42:24,

43:19, 46:14, 49:23, 51:18, 60:12, 70:4, 70:8, 70:16, 71:19, 72:1, 72:11, 73:2, 91:11, 91:13, 91:20, 101:1, 102:21, 103:10, 105:5, 109:8, 109:16, 110:20, 113:11, 115:17, 117:23, 118:4, 121:7, 126:7, 127:5, 131:13, 138:7, 138:9, 148:17, 151:15, 154:3, 155:24, 158:8, 160:15, 161:3, 162:1, 162:25, 165:3, 167:11, 167:17, 168:17, 171:14, 176:11, 178:10, 183:5, 187:17, 192:20, 194:13, 194:18, 196:3, 196:9, 202:18, 203:23, 204:13, 205:25, 208:2, 208:18, 219:12, 222:12, 225:16

**Court's** [2] - 54:12, 173:18

**courtesy** [1] - 224:23

**courthouse** [3] - 6:12, 64:23, 83:7

**COURTROOM** [29] - 4:1, 28:22, 32:13, 58:2, 58:5, 59:3, 98:4, 99:15, 99:24, 100:5, 100:8, 102:7, 102:9, 104:2, 104:11, 104:23, 105:1, 143:14, 143:17, 145:3, 145:6, 145:17, 195:8, 201:16, 201:20, 202:2, 202:10, 202:13, 225:16

**courtroom** [19] - 4:14, 4:19, 27:23, 28:4, 52:12, 58:3, 59:18, 60:17, 97:9, 97:18, 104:16, 131:20, 143:8, 144:21, 184:14, 187:1, 195:2, 201:25, 220:8

**courts** [5] - 8:3, 8:5, 64:23, 91:14

**covered** [5] - 119:10, 146:24, 170:15, 172:23, 214:8

**covering** [1] - 33:16

**cower** [1] - 218:8
**create** [3] - 92:11, 119:23, 209:1
**created** [1] - 102:8
**creating** [1] - 63:7
**credentials** [2] - 21:22, 21:24
**credibility** [6] - 20:20, 20:22, 20:23, 21:9, 147:4, 148:10
**credible** [3] - 21:18, 87:17, 177:23
**crimes** [2] - 24:6, 190:23
**Criminal** [2] - 1:3, 4:2
**criminal** [3] - 24:1, 62:24, 116:10
**critical** [1] - 129:19
**criticisms** [1] - 129:20
**cropping** [1] - 67:22
**cross** [16] - 54:15, 57:16, 58:9, 78:2, 79:15, 79:22, 80:3, 94:15, 95:6, 121:13, 124:8, 179:24, 194:15, 194:16, 194:19, 194:24
**CROSS** [3] - 121:18, 179:25, 212:3
**Cross** [1] - 3:3
**cross-examination** [5] - 54:15, 57:16, 58:9, 80:3, 121:13
**CROSS-EXAMINATION** [3] - 121:18, 179:25, 212:3
**cross-examine** [5] - 78:2, 79:15, 79:22, 94:15, 194:19
**cross-examined** [3] - 179:24, 194:15, 194:16
**crossed** [1] - 37:9
**crossover** [1] - 51:12
**crowd** [51] - 12:22, 17:9, 29:24, 30:3, 36:6, 36:12, 41:16, 41:23, 47:6, 47:18, 48:15, 63:6, 108:9, 110:7, 111:5, 111:8, 113:19, 119:15, 122:7, 143:25, 154:17, 154:25, 159:23, 159:24, 159:25, 160:3, 160:5, 160:9, 160:10, 160:11, 171:25, 188:10, 188:24,

189:2, 190:19, 193:8, 193:15, 193:16, 197:14, 205:7, 206:5, 207:4, 207:10, 207:12, 208:24, 209:9, 210:5, 211:23, 211:24, 214:20
**crowd's** [1] - 36:13
**CRR** [3] - 2:1, 226:3, 226:12
**crushed** [1] - 209:11
**cumulative** [7] - 19:12, 81:5, 124:7, 141:10, 153:12, 178:4, 183:2
**current** [1] - 91:24
**CUSICK** [5] - 143:3, 143:6, 143:11, 143:16, 145:5
**Cusick** [66] - 3:7, 5:6, 10:15, 10:17, 10:23, 12:3, 12:12, 12:17, 12:19, 14:7, 18:2, 19:9, 61:11, 67:17, 67:24, 68:10, 84:8, 127:7, 128:23, 129:6, 129:9, 130:5, 136:25, 137:5, 138:12, 139:2, 141:4, 142:25, 143:2, 143:18, 144:20, 145:2, 145:3, 145:9, 145:12, 145:13, 145:23, 148:19, 149:11, 149:17, 149:24, 151:19, 151:22, 154:5, 156:1, 157:22, 158:9, 158:18, 159:1, 160:3, 160:17, 161:6, 163:3, 165:5, 166:5, 167:8, 167:20, 168:14, 169:5, 171:17, 176:14, 178:18, 179:20, 179:23, 180:2, 183:22
**Cusick's** [1] - 140:25
**cutting** [1] - 122:21

**D**

**D.C** [15] - 1:6, 1:17, 2:4, 15:8, 106:3, 106:7, 106:19, 113:22, 150:5, 150:7, 150:17, 152:4, 152:8, 220:25, 226:14
**Dallas** [3] - 105:9, 105:23, 106:10
**damage** [1] - 44:10

**danger** [2] - 23:5, 81:2
**dark** [1] - 98:21
**date** [7] - 22:11, 22:12, 82:3, 100:18, 101:12, 101:14, 103:1
**Dated** [1] - 226:10
**Daubert** [1] - 82:8
**daughter** [2] - 78:10, 79:3, 79:21
**daughters** [1] - 85:24
**Dave** [1] - 168:4
**DAVID** [2] - 100:7, 104:25
**David** [4] - 3:6, 100:3, 104:22, 138:15
**days** [1] - 106:9
**de** [2] - 78:11, 79:16
**de-hoarder** [1] - 78:11
**de-hoarding** [1] - 79:16
**dead** [1] - 146:22
**deal** [2] - 73:7, 213:18
**dealt** [1] - 140:22
**decade** [6] - 18:11, 19:4, 24:17, 24:24, 80:13, 82:9
**decades** [2] - 20:10, 22:11, 83:17
**deceive** [1] - 201:3
**December** [1] - 19:3
**decency** [1] - 224:22
**decide** [8] - 65:13, 65:14, 78:2, 80:2, 89:5, 152:7, 156:3, 223:16
**decided** [4] - 106:23, 129:9, 152:10, 210:12
**decision** [15] - 6:17, 7:1, 7:17, 39:14, 57:13, 65:6, 87:1, 91:10, 91:16, 93:12, 95:14, 95:16, 95:18, 222:15, 223:23
**decisions** [5] - 22:18, 22:19, 22:23, 75:11, 129:3
**declarant** [1] - 194:14
**deep** [1] - 53:14
**deeply** [1] - 225:6
**defend** [1] - 44:17
**Defendant** [28] - 1:7, 4:12, 4:19, 7:8, 7:10, 7:11, 7:13, 9:18, 12:18, 13:2, 13:6, 13:9, 13:10, 13:15,

13:16, 13:17, 13:18, 13:21, 14:12, 14:13, 30:16, 34:19, 50:2, 61:19, 195:16, 220:18, 221:19, 222:14
**defendant** [2] - 10:1, 141:25
**DEFENDANT** [8] - 1:18, 3:4, 78:5, 78:8, 84:22, 86:21, 89:24, 90:3
**Defendant's** [45] - 3:14, 3:15, 3:16, 32:14, 33:4, 34:7, 35:12, 35:25, 40:16, 41:13, 42:11, 42:20, 42:23, 43:18, 55:2, 70:3, 70:7, 70:15, 71:18, 71:25, 72:10, 73:1, 100:25, 102:13, 102:20, 103:9, 103:22, 109:7, 109:15, 110:19, 129:5, 138:6, 138:8, 161:2, 167:10, 167:16, 168:16, 196:2, 196:8, 203:22, 204:12, 205:24, 208:1, 208:17, 221:6
**defendant's** [1] - 221:3
**defendants** [2] - 15:3, 138:15
**defending** [1] - 47:3
**DEFENSE** [7] - 28:14, 100:7, 104:25, 143:16, 145:5, 195:7, 202:12
**Defense** [16] - 32:8, 32:21, 42:10, 42:16, 69:5, 102:4, 107:5, 109:6, 137:20, 138:22, 160:21, 167:9, 196:1, 201:13, 203:16
**defense** [31] - 10:8, 16:7, 20:8, 25:25, 69:8, 78:12, 81:9, 84:1, 86:13, 90:20, 93:6, 95:23, 95:25, 104:21, 145:1, 159:23, 160:2, 170:1, 170:3, 171:5, 177:21, 188:18, 190:18, 190:22, 190:25, 202:6, 220:12, 220:16, 221:18, 221:22, 222:7
**definitely** [3] - 102:9,

155:20, 197:11
**definition** [1] - 15:20
**degrees** [2] - 199:7, 215:13
**delay** [5] - 12:5, 26:16, 26:17, 81:4, 104:11
**deliberations** [2] - 219:18, 220:1
**delineation** [1] - 113:19
**delivered** [1] - 130:9
**demanded** [1] - 184:23
**demeanor** [1] - 210:16
**demonstrate** [1] - 37:8
**demonstrated** [1] - 6:4
**demonstrating** [2] - 5:22, 180:17
**demonstratives** [3] - 11:3, 70:21, 121:4
**demonstrators** [1] - 209:19
**denied** [3] - 8:13, 90:7, 221:23
**deny** [3] - 7:21, 141:8, 221:7
**Department** [2] - 64:8, 121:23
**depicted** [1] - 199:19
**DEPUTY** [29] - 4:1, 28:22, 32:13, 58:2, 58:5, 59:3, 98:4, 99:15, 99:24, 100:5, 100:8, 102:7, 102:9, 104:2, 104:11, 104:23, 105:1, 143:14, 143:17, 145:3, 145:6, 145:17, 195:8, 201:16, 201:20, 202:2, 202:10, 202:13, 225:16
**deputy** [2] - 59:18, 143:8
**describe** [13] - 30:2, 38:15, 47:11, 63:18, 100:14, 117:13, 118:24, 146:13, 152:10, 154:7, 165:11, 166:8, 166:15
**describing** [1] - 100:15
**description** [1] - 47:13
**designated** [1] - 96:3
**details** [1] - 215:20

**determine** [2] - 6:3, 6:7
**detritus** [1] - 43:10
**develop** [1] - 56:9
**device** [1] - 105:13
**diagram** [1] - 51:11
**dialogue** [1] - 213:21
**difference** [3] - 66:6, 72:14, 91:20
**different** [20] - 13:3, 23:12, 26:13, 27:2, 36:12, 36:16, 36:17, 38:3, 57:6, 64:9, 114:12, 148:22, 148:23, 151:3, 151:5, 165:8, 173:14, 189:3
**difficult** [4] - 24:23, 128:16, 153:16, 224:4
**difficulties** [1] - 71:23
**diligence** [1] - 128:3
**diligent** [2] - 127:13, 127:21
**Direct** [1] - 3:3
**direct** [10] - 38:11, 80:1, 80:5, 116:1, 124:22, 171:8, 175:7, 176:7, 182:2, 214:4
**DIRECT** [5] - 28:15, 105:3, 145:7, 195:13, 202:15
**directed** [5] - 39:23, 56:16, 88:24, 152:1, 159:20
**directing** [2] - 159:1, 177:14
**direction** [16] - 7:10, 17:17, 35:9, 47:19, 48:21, 49:17, 54:12, 61:2, 64:8, 74:2, 74:25, 101:21, 112:13, 137:2, 137:5, 163:5
**directions** [4] - 114:2, 114:4, 143:9, 174:14
**directly** [5] - 17:7, 46:3, 61:16, 76:25, 120:16
**directs** [1] - 22:19
**disadvantage** [1] - 209:16
**disagree** [4] - 21:24, 22:18, 63:12, 128:2
**disappeared** [1] - 98:25
**discharged** [3] - 148:24, 148:25, 149:1
**discourage** [1] - 11:4
**discovered** [1] -

75:23
**discovery** [1] - 69:11
**discretion** [1] - 84:5
**discuss** [2] - 39:20, 141:3
**discussed** [4] - 37:2, 98:10, 141:22, 158:25
**discussion** [2] - 7:14, 68:6
**dishonorably** [1] - 148:24
**disingenuous** [3] - 190:4, 190:10, 191:15
**dismiss** [1] - 159:21
**disorderly** [3] - 38:22, 180:11, 180:14
**disperse** [5] - 173:2, 173:7, 174:7, 174:10, 174:11
**displeasure** [1] - 30:5
**disrespectful** [2] - 55:15, 55:17
**disrupt** [1] - 62:22
**disruptive** [3] - 38:23, 180:11, 180:14
**distinct** [1] - 71:2
**District** [3] - 2:2, 2:2, 226:13
**district** [2] - 64:5, 226:13
**DISTRICT** [3] - 1:1, 1:1, 1:16
**disturbance** [1] - 39:9
**DMV** [1] - 185:7
**docketed** [1] - 222:10
**documents** [1] - 51:22
**domestic** [1] - 44:18
**done** [11] - 46:22, 53:21, 57:1, 65:23, 67:16, 67:23, 79:22, 94:13, 147:22, 149:2, 187:11
**door** [26] - 13:2, 15:13, 46:5, 48:6, 48:12, 50:9, 79:18, 116:8, 125:5, 125:16, 139:12, 139:14, 166:16, 166:18, 209:12, 211:4, 211:8, 211:11, 211:12, 211:13, 214:22, 214:23, 215:4, 215:7, 216:7
**door-opening** [1] - 139:14
**doors** [16] - 41:10,

47:7, 47:10, 47:11, 47:12, 47:14, 47:15, 47:23, 48:14, 51:3, 51:10, 111:21, 122:11, 122:19, 123:3, 183:12
**doorway** [1] - 116:8
**Dorrance** [1] - 1:22
**dot** [1] - 97:5
**double** [1] - 61:14
**double-check** [1] - 61:14
**doubt** [3] - 7:5, 7:9, 9:18
**down** [28] - 16:2, 17:16, 33:13, 34:10, 35:10, 36:2, 47:17, 51:15, 57:17, 58:12, 60:21, 87:21, 87:25, 91:13, 95:8, 113:12, 113:17, 115:22, 117:4, 128:7, 130:10, 160:17, 173:12, 186:6, 193:18, 208:21, 212:17, 218:15
**dozen** [1] - 111:13
**dozens** [1] - 224:12
**draft** [1] - 146:7
**drafted** [1] - 146:6
**drag** [1] - 186:5
**draw** [1] - 174:19
**drawing** [1] - 185:5
**dressed** [1] - 128:7
**drew** [1] - 35:17
**drives** [1] - 6:17
**dumb** [1] - 91:4
**during** [7] - 26:17, 47:5, 49:7, 78:18, 150:20, 182:5, 224:4
**dusted** [1] - 48:19
**duty** [3] - 8:16, 9:24, 153:6

## E

**E-H-M-K-E** [1] - 35:19
**early** [1] - 32:9
**earth** [1] - 24:13
**east** [24] - 12:25, 19:20, 29:1, 63:5, 108:14, 122:7, 140:9, 163:6, 181:18, 181:20, 182:8, 182:11, 183:16, 195:18, 203:11, 208:25, 212:8, 212:13, 212:25,

213:1, 213:25, 214:19, 216:5, 216:6
**Eastern** [2] - 61:9, 149:21
**easy** [1] - 70:23
**edges** [1] - 142:13
**editorial** [1] - 38:16
**education** [1] - 91:3
**educational** [1] - 81:1
**EDWARDS** [2] - 2:1, 226:3
**Edwards** [1] - 226:12
**effect** [7] - 188:9, 188:20, 188:23, 189:25, 190:13, 192:1, 193:7
**effected** [1] - 43:5
**effectively** [1] - 48:16
**efficiently** [1] - 164:19
**Ehmke** [6] - 35:19, 36:11, 36:19, 36:21, 36:22, 40:22
**eight** [2] - 43:4, 166:23
**eighth** [1] - 37:11
**either** [1] - 70:18
**elect** [1] - 223:24
**election** [1] - 30:5
**elements** [2] - 10:2, 221:13
**Ellipse** [8] - 12:21, 12:23, 154:16, 155:15, 155:18, 155:21, 156:14, 156:19
**email** [7] - 98:24, 99:5, 99:21, 127:4, 128:13, 130:25, 222:10
**emailed** [1] - 59:10
**Emily** [1] - 4:15
**emphatically** [1] - 6:20
**employed** [1] - 85:6
**employment** [8] - 21:10, 74:3, 75:4, 86:8, 95:18, 100:14, 100:16, 147:13
**encounter** [2] - 162:9, 162:17
**encouraging** [2] - 172:16, 191:24
**end** [18] - 10:10, 19:10, 25:18, 32:5, 67:21, 72:19, 72:24, 72:25, 77:18, 88:3, 95:13, 95:17, 147:14,

164:11, 167:4, 189:1, 215:2, 219:16
**ended** [2] - 180:4, 214:18
**enemies** [1] - 44:17
**enforce** [1] - 64:16
**enforcement** [21] - 17:21, 20:6, 23:9, 25:4, 37:24, 38:1, 38:3, 41:7, 41:17, 55:13, 83:20, 84:2, 84:3, 84:4, 87:18, 92:24, 96:1, 96:12, 96:21, 100:15, 147:15
**enforcing** [1] - 24:7
**engage** [1] - 84:3
**engaged** [2] - 24:7, 57:11, 93:4, 157:4
**engaging** [1] - 75:7
**English** [1] - 8:10
**engulfed** [2] - 216:8, 216:9
**ensure** [3] - 200:3, 210:14, 218:2
**enter** [4] - 23:10, 44:15, 47:4, 116:7
**entered** [20] - 4:19, 13:1, 13:2, 13:5, 14:8, 27:23, 28:4, 33:2, 42:21, 58:3, 97:9, 102:14, 103:23, 104:16, 142:17, 144:21, 166:13, 181:3, 195:2, 201:25
**entering** [5] - 20:17, 111:24, 139:18, 139:19, 180:8
**entire** [7] - 48:15, 150:18, 153:13, 170:7, 176:25, 214:7, 215:23
**entirely** [1] - 119:10
**entrapment** [1] - 20:8
**entry** [4] - 118:13, 165:11, 166:15, 166:16
**envision** [1] - 188:6
**equal** [1] - 108:5
**equally** [1] - 87:8
**erase** [1] - 68:20
**escaped** [1] - 86:5
**especially** [2] - 23:6, 26:24, 78:1
**ESQ** [4] - 1:14, 1:15, 1:18, 1:21
**essentially** [9] - 8:7, 9:24, 10:21, 24:2, 68:20, 140:23, 141:18, 163:18, 221:6

**establish** [1] - 147:3
**established** [3] -
81:20, 207:18, 213:19
**establishing** [1] -
38:22
**estimated** [1] - 130:2
**estops** [1] - 126:10
**et** [3] - 36:15, 76:24,
182:25
**Europe** [1] - 149:21
**evaluate** [1] - 88:4
**eve** [1] - 69:12
**evening** [1] - 111:9
**event** [3] - 33:16,
43:12, 63:1
**events** [3] - 17:20,
152:3, 153:13
**eventually** [3] - 13:1,
47:6, 80:17
**everywhere** [1] -
171:21
**Evidence** [7] - 64:15,
64:18, 64:19, 65:10,
129:21, 176:4, 198:24
**evidence** [20] - 5:13,
5:14, 10:25, 12:10,
15:4, 32:12, 33:2,
42:10, 42:21, 65:20,
81:5, 102:14, 103:23,
142:17, 182:24,
188:17, 190:5,
191:19, 220:17,
224:25
**EVIDENCE** [1] - 3:11
**evidenced** [1] -
96:14
**evident** [2] - 65:19,
221:12
**ex** [1] - 24:14
**ex-girlfriend** [1] -
24:14
**exact** [8] - 17:8, 17:9,
57:2, 94:20, 192:24,
194:2
**exactly** [7] - 17:10,
43:12, 77:13, 88:19,
111:1, 156:10, 194:17
**examination** [7] -
54:15, 57:16, 58:9,
80:3, 80:5, 121:13,
176:7
**EXAMINATION** [10] -
28:15, 105:3, 121:18,
123:14, 145:7,
179:25, 195:13,
202:15, 212:3, 217:10
**examine** [5] - 78:2,
79:15, 79:22, 94:15,
194:19
**examined** [3] -

179:24, 194:15,
194:16
**example** [3] - 85:3,
190:7, 224:11
**excellent** [1] -
128:17
**exception** [3] -
188:9, 188:12, 190:2
**exceptionally** [1] -
169:20
**exchange** [3] -
45:14, 196:11, 196:18
**excised** [1] - 71:5
**exclude** [3] - 14:1,
16:18, 16:23
**exculpatory** [1] -
56:10
**excuse** [14] - 12:2,
44:1, 52:10, 126:20,
130:2, 144:10,
174:15, 184:13,
185:19, 207:17,
209:8, 216:9, 218:22,
219:14
**excused** [6] - 58:17,
126:24, 182:4,
183:24, 186:4, 218:17
**Exhibit** [61] - 3:13,
3:14, 3:15, 3:16,
29:11, 30:11, 30:24,
31:5, 32:6, 32:14,
33:1, 33:4, 34:7,
35:12, 40:16, 41:13,
42:11, 42:20, 42:23,
43:18, 69:5, 70:3,
70:7, 70:15, 71:18,
71:25, 72:10, 73:1,
100:25, 102:4,
102:13, 102:20,
103:9, 103:22, 107:5,
109:7, 109:15,
110:19, 118:3,
137:20, 137:21,
138:1, 138:6, 138:8,
138:20, 142:16,
161:2, 161:25,
162:24, 167:10,
167:16, 168:16,
196:1, 196:2, 196:8,
203:22, 204:12,
205:24, 208:1, 208:17
**exhibit** [18] - 42:9,
66:13, 66:14, 66:17,
66:21, 69:3, 69:8,
69:19, 69:20, 71:14,
102:3, 109:5, 113:12,
138:18, 138:19,
160:20, 160:22,
186:17
**exhibits** [2] - 142:4,

186:17
**EXHIBITS** [1] - 3:11
**existence** [1] - 39:5
**exists** [1] - 25:9
**exited** [6] - 52:12,
60:17, 97:18, 131:20,
184:14, 220:8
**exits** [3] - 13:12,
14:8, 76:13
**expect** [4] - 130:19,
130:23, 158:12,
164:22
**expected** [3] - 33:17,
151:4, 218:23
**expecting** [2] -
151:11, 158:17
**experience** [14] -
12:12, 21:17, 23:3,
87:18, 111:8, 112:9,
112:14, 146:14,
148:20, 150:18,
150:21, 151:3,
215:19, 215:20
**experienced** [3] -
12:7, 12:11, 13:21
**experiences** [1] -
152:19
**expert** [25] - 13:25,
14:1, 18:9, 18:10,
24:21, 24:22, 24:24,
25:11, 50:22, 52:19,
54:3, 68:16, 71:6,
81:16, 81:19, 81:20,
82:1, 82:5, 82:8,
82:11, 82:22, 96:21,
96:25, 150:16, 169:23
**experts** [5] - 14:3,
81:17, 82:2, 82:12
**explain** [3] - 56:12,
99:20, 223:19
**explained** [2] -
52:17, 220:23
**explanation** [2] -
200:9, 221:4
**expressing** [1] - 30:4
**extensive** [1] -
155:14
**extensively** [1] -
78:10
**extent** [6] - 37:3,
44:24, 90:4, 170:11,
170:17, 189:9
**extremely** [5] -
18:15, 20:6, 36:2,
174:1, 184:20

---

**F**

**F.2d** [1] - 9:21

**F.3d** [2] - 220:15,
221:9
**facing** [2] - 12:18,
101:21
**fact** [40] - 5:23, 7:11,
8:19, 8:21, 15:6, 16:9,
17:12, 17:17, 24:2,
24:4, 24:19, 29:13,
33:23, 39:6, 46:4,
50:18, 51:23, 54:2,
56:9, 63:15, 65:1,
77:25, 83:2, 90:3,
90:15, 92:10, 94:21,
96:7, 125:10, 141:19,
142:1, 150:20,
166:24, 190:15,
191:6, 192:12,
192:13, 214:12,
220:21, 222:10
**facts** [9] - 9:6, 11:20,
12:20, 14:25, 26:11,
53:7, 159:13, 182:24
**factual** [1] - 56:24
**factually** [3] - 21:25,
24:18, 66:4
**fails** [1] - 7:12
**failure** [1] - 221:6
**fair** [8] - 65:11, 66:3,
80:9, 122:2, 153:3,
181:14, 185:17, 221:7
**fairly** [5] - 6:6, 70:17,
80:22, 200:17, 221:12
**fairness** [1] - 76:23
**fake** [6] - 63:7, 63:8,
63:13, 63:17, 63:19,
65:18
**fall** [1] - 214:15
**falls** [3] - 188:9,
188:11
**false** [1] - 36:4
**families** [1] - 111:12
**family** [1] - 158:1
**far** [13] - 21:24,
31:25, 63:25, 65:18,
80:19, 83:1, 86:14,
103:3, 127:12,
139:13, 188:17,
191:17, 210:8
**Faruqui** [7] - 74:19,
77:22, 100:10,
105:11, 112:10,
143:4, 143:18
**FARUQUI** [1] - 1:10
**Faruqui's** [1] - 82:17
**fashion** [2] - 130:9,
169:2
**fast** [2] - 71:3,
127:13
**fast-forward** [1] -
71:3

**Fathers** [1] - 7:25
**favorable** [1] -
177:20
**FBI** [68] - 4:9, 17:14,
18:14, 19:3, 19:7,
19:21, 19:25, 23:3,
23:24, 24:10, 24:14,
24:25, 25:15, 25:25,
26:24, 36:5, 63:4,
66:19, 66:20, 66:22,
67:6, 74:8, 75:16,
75:17, 75:19, 81:11,
81:12, 81:15, 81:22,
82:5, 83:18, 85:1,
85:17, 87:19, 87:20,
88:12, 89:16, 90:12,
90:18, 90:21, 90:25,
91:22, 91:24, 91:25,
92:4, 92:8, 92:21,
93:8, 93:9, 94:2, 94:3,
94:6, 94:12, 94:14,
94:17, 95:2, 95:6,
95:10, 95:19, 95:22,
96:7, 96:20, 100:16,
224:21
**FBIs** [1] - 24:5
**feelings** [1] - 54:22
**feet** [4] - 32:2, 53:13,
122:3, 163:17
**fellow** [6] - 55:23,
209:8, 211:20, 213:6,
214:21, 218:2
**felonies** [1] - 221:15
**fence** [1] - 15:17
**few** [16] - 8:23, 8:25,
54:11, 59:20, 61:3,
66:16, 110:13,
113:12, 113:13,
115:21, 116:2,
117:25, 163:23,
164:9, 178:25, 179:6
**field** [1] - 79:24
**Fifth** [1] - 25:6
**fight** [2] - 91:7, 218:5
**fighting** [1] - 176:2
**figure** [9] - 60:8,
66:21, 67:15, 67:18,
71:8, 167:25, 196:16,
215:16, 218:6
**file** [2] - 69:18, 222:9
**fill** [4] - 78:17, 85:22,
85:25, 86:3
**film** [3] - 29:10, 30:9,
33:20
**filmed** [2] - 32:19,
138:15
**filming** [3] - 30:6,
33:18, 168:3
**final** [11] - 8:7, 95:13,
138:17, 138:18,

138:20, 139:4, 139:5, 153:19, 179:6, 216:4, 220:11
**finalized** [1] - 71:14
**finder** [1] - 7:11
**fine** [19] - 38:9, 69:25, 86:9, 112:5, 117:16, 125:20, 142:20, 147:21, 147:23, 148:2, 155:10, 157:15, 158:4, 160:9, 177:18, 201:1, 201:2, 223:14, 224:10
**finish** [2] - 73:13, 149:16
**finished** [2] - 54:6, 156:10
**first** [28] - 5:8, 10:23, 22:1, 27:21, 62:11, 67:17, 69:13, 69:18, 72:5, 73:4, 89:25, 92:13, 94:8, 113:6, 127:11, 129:6, 138:4, 139:5, 140:1, 150:6, 154:13, 202:7, 202:20, 203:1, 212:21, 212:22, 212:23, 216:5
**First** [1] - 54:23
**firsthand** [1] - 120:23
**fist** [9] - 172:21, 199:4, 208:23, 209:5, 209:9, 215:9, 216:1, 217:13, 217:25
**fist-bumped** [1] - 215:9
**fist-bumping** [4] - 199:4, 208:23, 217:13, 217:25
**five** [10] - 39:16, 57:22, 97:3, 127:6, 127:18, 129:25, 130:4, 131:8, 204:9, 204:10
**five-minute** [1] - 57:22
**five-year** [1] - 39:16
**fixed** [2] - 169:14, 169:21
**fixes** [1] - 64:17
**flag** [2] - 36:4, 85:10
**flags** [4] - 29:8, 29:25, 111:23, 116:4
**flexible** [1] - 184:21
**flip** [1] - 6:14
**Floor** [1] - 1:20
**floor** [1] - 13:3
**Florida** [4] - 58:14,

146:1, 146:3, 149:7
**flower** [1] - 26:25
**fly** [1] - 58:13
**focus** [7] - 81:6, 151:25, 157:11, 158:16, 168:12, 176:8, 197:18
**focused** [5] - 34:24, 35:8, 55:10, 139:21, 139:22
**folks** [4] - 21:2, 58:22, 107:16, 199:22
**follow** [5] - 59:16, 60:22, 114:2, 151:22, 175:17
**followed** [1] - 47:20
**following** [73] - 4:20, 9:16, 27:24, 28:5, 34:14, 35:5, 35:21, 39:25, 41:20, 42:5, 45:22, 46:13, 49:4, 49:22, 50:12, 51:17, 52:13, 57:25, 58:4, 59:7, 60:11, 60:18, 62:2, 81:3, 97:10, 97:19, 97:24, 104:17, 112:18, 113:10, 115:1, 115:16, 116:22, 117:22, 118:19, 121:6, 123:22, 126:6, 127:1, 131:12, 131:21, 132:6, 144:22, 146:17, 148:16, 150:13, 151:14, 152:13, 154:2, 155:3, 155:23, 157:1, 158:7, 158:22, 160:14, 163:13, 165:2, 169:17, 171:13, 173:10, 174:13, 176:10, 177:4, 178:9, 182:16, 183:4, 184:15, 187:1, 195:3, 202:1, 218:19, 219:11, 220:9
**followup** [1] - 79:20
**foot** [1] - 38:24
**footage** [1] - 48:8
**FOR** [5] - 1:1, 1:14, 1:16, 1:18, 3:4
**force** [1] - 15:25
**forces** [1] - 62:24
**foregoing** [1] - 226:4
**foreign** [1] - 44:17
**forget** [2] - 92:19, 202:6
**form** [1] - 182:23
**former** [6] - 66:19, 67:6, 75:19, 84:4,

96:20, 100:14
**fortunately** [1] - 60:15
**forum** [1] - 64:10
**forward** [6] - 71:3, 75:22, 88:4, 92:1, 115:24, 163:23
**foundation** [1] - 18:24
**Founding** [1] - 7:25
**four** [8] - 11:9, 11:14, 23:17, 116:5, 179:13, 180:5, 180:7, 221:11
**four-count** [1] - 23:17
**fracas** [1] - 47:25
**frame** [4] - 29:4, 29:5, 43:24, 44:13
**framed** [1] - 65:6
**framers** [2] - 7:25, 8:9
**frames** [1] - 31:11
**frank** [1] - 211:7
**frankly** [3] - 88:7, 131:4, 216:18
**free** [1] - 115:8
**Friday** [1] - 185:5
**Friedman** [3] - 5:16, 5:17, 6:13
**friend** [4] - 106:10, 106:20, 138:14, 158:1
**friendly** [3] - 209:23, 210:2, 210:8
**friends** [1] - 143:23
**friendship** [1] - 25:1
**front** [24] - 32:3, 47:8, 101:20, 103:24, 104:13, 106:14, 108:19, 110:12, 111:6, 171:25, 193:2, 195:20, 197:4, 198:22, 207:1, 212:8, 212:13, 212:18, 212:20, 212:25, 213:1, 213:5, 213:25, 216:6
**frustrated** [4] - 22:18, 66:4, 174:1, 174:18
**frustration** [5] - 22:15, 63:14, 142:11, 173:13, 173:23
**frustrations** [1] - 224:4
**full** [4] - 15:25, 187:3, 210:12, 226:5
**fully** [1] - 46:24
**fundamental** [1] - 224:17
**fundamentally** [1] -

21:22

# G

**G-R-I-F-F-I-T-H** [1] - 6:18
**G-U-A-N-D-O-L-O** [1] - 105:7
**gained** [1] - 52:18
**game** [1] - 24:17
**gamut** [1] - 201:24
**gap** [4] - 78:16, 78:18, 82:11, 85:9
**gear** [1] - 213:8
**General** [1] - 185:14
**general** [16] - 5:1, 5:18, 12:20, 13:17, 30:5, 48:20, 60:22, 98:20, 99:4, 99:14, 130:21, 170:8, 176:6, 184:10, 185:16, 188:11
**generally** [12] - 13:24, 41:16, 98:12, 101:16, 108:9, 117:17, 119:4, 119:22, 120:8, 120:21, 124:1, 189:17
**generosity** [3] - 83:7, 83:11, 131:6
**generous** [2] - 83:5, 131:5
**gentleman** [6] - 90:20, 184:8, 197:13, 208:13, 208:14, 213:16
**gentlemen** [1] - 131:14
**gesture** [3] - 208:7, 210:11, 210:14
**gestures** [1] - 93:2
**girlfriend** [1] - 24:14
**given** [14] - 9:2, 9:3, 23:9, 45:25, 63:24, 66:22, 69:19, 83:2, 128:16, 141:18, 146:21, 170:3, 177:20, 184:21
**glass** [3] - 35:17, 43:10, 43:14
**Glenn** [1] - 150:25
**goal** [1] - 207:2
**government** [5] - 16:1, 23:10, 23:13, 24:3, 81:10
**Government** [41] - 4:6, 7:12, 9:16, 14:24, 16:2, 16:13, 20:21, 21:3, 21:15, 25:2,

36:13, 39:4, 49:6, 57:7, 60:3, 62:20, 62:23, 63:5, 63:7, 69:12, 77:25, 79:3, 80:20, 94:9, 94:14, 129:15, 129:22, 139:6, 147:6, 159:24, 164:4, 174:20, 176:23, 189:20, 190:6, 190:11, 190:22, 191:12, 193:13, 221:25, 225:1
**GOVERNMENT** [1] - 1:14
**Government's** [29] - 9:14, 23:25, 24:1, 28:19, 28:20, 29:11, 30:11, 30:22, 30:24, 31:5, 32:6, 33:1, 56:6, 65:1, 71:1, 80:8, 84:10, 103:19, 116:20, 117:24, 118:3, 141:9, 142:3, 142:11, 142:16, 161:25, 162:24, 181:10, 190:4
**government's** [1] - 3:13
**grab** [1] - 215:5
**grandfather** [1] - 15:8
**granted** [1] - 37:13
**grass** [2] - 101:19, 106:13
**grassy** [6] - 19:19, 101:18, 106:13, 122:2, 122:13, 123:8
**great** [17] - 21:21, 28:9, 51:4, 60:4, 65:17, 74:22, 82:11, 90:4, 96:13, 100:1, 104:10, 105:24, 143:4, 203:21, 209:6, 209:15, 220:7
**greatly** [1] - 83:15
**green** [3] - 31:18, 150:20, 151:1
**grew** [1] - 113:21
**Griffith** [1] - 6:17
**gross** [2] - 26:10, 63:16
**ground** [2] - 43:11, 170:15
**grounds** [11] - 15:10, 49:11, 155:16, 155:17, 155:19, 160:18, 162:4, 180:9, 180:12, 180:15, 181:3
**group** [6] - 101:19, 106:12, 106:17,

107:14, 107:16,
110:12
 **groups** [1] - 116:5
 **Guandolo** [66] - 3:6,
16:19, 17:6, 18:4,
18:6, 18:8, 19:2,
19:18, 23:2, 23:23,
24:2, 24:9, 25:23,
56:19, 61:8, 62:10,
62:11, 66:14, 66:19,
68:5, 69:13, 69:14,
69:22, 70:9, 73:8,
74:1, 74:11, 74:13,
74:15, 76:9, 76:13,
78:15, 80:7, 80:21,
82:24, 90:11, 91:25,
96:22, 98:2, 100:3,
100:5, 100:10, 101:5,
101:9, 102:18,
102:22, 104:6,
104:22, 104:23,
105:7, 105:8, 105:11,
107:12, 112:12,
113:15, 113:25,
114:25, 118:7,
118:17, 121:8,
121:11, 121:15,
121:20, 126:17
 **GUANDOLO** [6] -
74:17, 74:21, 76:2,
76:12, 100:7, 104:25
 **guarding** [1] - 43:5
 **guess** [13] - 6:13,
66:22, 94:19, 98:7,
99:1, 99:3, 155:7,
161:21, 161:23,
163:6, 175:18,
187:14, 200:19
 **guidance** [3] -
137:12, 143:19,
205:21
 **guide** [1] - 113:18
 **guilty** [7] - 7:9, 7:10,
7:11, 7:13, 9:18, 10:1,
179:13
 **Gunby** [4] - 10:16,
11:7, 64:3, 153:9
 **GUNBY** [1] - 10:17
 **guy** [4] - 37:25,
168:4, 197:8, 206:3
 **guys** [11] - 44:5,
45:6, 156:11, 171:22,
186:11, 201:24,
213:6, 213:8, 213:12,
213:17

# H

 **H-O-F-F-E-C-K-E-R**
[1] - 221:8

 **hair** [1] - 44:14
 **half** [1] - 173:16
 **hallway** [1] - 58:22
 **hand** [11] - 83:22,
93:2, 100:6, 104:24,
108:4, 143:15, 145:4,
202:11, 208:7,
209:13, 216:21
 **handle** [4] - 37:15,
81:23, 82:6, 186:24
 **handwriting** [5] -
82:13, 82:14, 82:15,
82:17
 **handy** [1] - 126:21
 **hanging** [1] - 4:24
 **hangs** [1] - 22:17
 **happy** [18] - 4:16,
5:4, 7:3, 7:22, 10:14,
10:19, 38:6, 38:7,
55:14, 55:21, 67:4,
77:4, 87:6, 94:24,
131:5, 140:15,
182:20, 185:6
 **hard** [17] - 17:25,
67:12, 90:5, 172:14,
188:23
 **harm** [2] - 77:25,
96:17
 **harm's** [1] - 211:15
 **hat** [2] - 168:1, 205:4
 **head** [4] - 11:17,
11:19, 48:8, 201:22
 **headed** [2] - 36:2,
117:6
 **heading** [2] - 117:4,
127:5
 **headphones** [1] -
90:6
 **heads** [2] - 59:23,
223:3
 **heads-up** [1] - 223:3
 **hear** [58] - 7:3, 7:20,
9:10, 10:14, 10:19,
11:18, 16:16, 23:19,
23:21, 25:2, 25:12,
27:11, 35:16, 36:24,
38:7, 46:6, 60:21,
67:4, 71:24, 74:15,
77:4, 83:23, 93:3,
94:24, 95:9, 99:18,
105:12, 112:24,
114:15, 114:16,
139:23, 140:15,
143:2, 143:3, 144:8,
147:21, 154:9,
154:12, 160:25,
173:7, 174:5, 174:25,
175:5, 175:15,
175:24, 176:1,
176:14, 176:15,

176:16, 176:21,
182:3, 187:6, 189:6,
223:24, 225:9
 **heard** [18] - 15:9,
35:17, 44:2, 45:21,
56:20, 69:23, 90:11,
94:9, 94:10, 130:20,
140:10, 141:7, 173:5,
174:8, 191:2, 191:25,
194:5, 214:4
 **hearing** [3] - 190:12,
193:8, 215:14
 **hearings** [1] - 76:18
 **hearsay** [16] - 36:23,
42:2, 46:11, 64:14,
75:13, 129:18,
186:24, 187:23,
188:9, 189:23, 190:2,
192:6, 194:10,
194:12, 209:24
 **heart** [4] - 15:19,
23:25, 159:17
 **Heart** [1] - 148:21
 **held** [29] - 34:15,
35:22, 41:21, 45:23,
49:5, 50:13, 59:8,
112:19, 115:2,
116:23, 118:20,
123:23, 127:2, 132:7,
146:18, 150:14,
152:14, 155:4, 157:2,
158:23, 163:14,
169:18, 173:11,
175:9, 175:12, 177:5,
182:17, 214:25,
218:20
 **helmet** [1] - 53:12
 **helmets** [1] - 213:8
 **help** [6] - 55:4,
196:19, 207:2,
212:18, 214:10, 221:4
 **helped** [1] - 86:3
 **helpful** [3] - 38:18,
171:3, 171:6
 **helping** [1] - 158:1
 **helps** [1] - 77:15
 **hereby** [1] - 226:3
 **hesitant** [1] - 77:20
 **hesitation** [1] - 115:7
 **hi** [1] - 74:15
 **high** [2] - 48:7,
201:23
 **higher** [3] - 7:19,
39:19, 192:10
 **higher-ups** [1] -
192:10
 **highly** [3] - 18:15,
38:25
 **Hill** [4] - 29:18, 43:4,
47:13, 48:13

 **Hills** [1] - 1:20
 **hire** [1] - 87:2
 **history** [4] - 8:10,
8:12, 8:22, 86:25
 **hit** [1] - 73:5
 **hoarder** [1] - 78:11
 **hoarding** [1] - 79:16
 **Hoffecker** [1] - 221:8
 **hold** [21] - 16:25,
40:24, 45:20, 48:10,
48:11, 56:5, 60:15,
76:10, 81:14, 105:16,
114:25, 118:17,
123:21, 128:18,
145:15, 156:15,
156:24, 163:11,
197:16, 214:22
 **holding** [4] - 48:7,
116:4, 128:5, 214:19
 **hole** [2] - 87:21,
87:25
 **home** [2] - 43:13,
85:4
 **homeless** [2] -
21:21, 147:9
 **homework** [1] -
223:11
 **hominem** [1] - 66:7
 **honest** [3] - 91:5,
91:8, 211:7
 **honestly** [1] - 62:18
 **Honor** [117] - 4:7,
4:11, 4:17, 5:4, 5:8,
7:6, 10:7, 10:20, 11:6,
11:22, 11:23, 14:2,
17:2, 17:13, 19:14,
27:17, 28:13, 34:17,
38:17, 38:21, 40:9,
45:16, 45:25, 50:15,
51:20, 52:9, 54:16,
55:5, 58:10, 58:19,
59:1, 59:9, 61:21,
62:9, 67:7, 67:8,
67:14, 68:4, 68:12,
69:8, 69:15, 70:25,
71:22, 73:15, 74:7,
74:21, 76:17, 76:18,
78:6, 78:20, 84:23,
89:12, 89:24, 93:20,
94:8, 95:3, 95:7,
98:15, 99:12, 99:22,
101:6, 102:19,
112:16, 112:20,
113:20, 115:5,
116:21, 119:13,
123:11, 124:6, 125:1,
125:2, 125:21,
125:25, 126:23,
128:1, 128:25,
131:11, 131:23,

138:3, 144:15,
144:18, 148:7,
152:16, 152:20,
155:13, 157:20,
170:3, 171:4, 173:12,
174:22, 177:25,
182:19, 182:20,
185:6, 185:18, 186:7,
186:12, 187:8,
187:21, 188:14,
189:19, 192:23,
193:18, 193:19,
201:12, 202:5,
208:20, 219:2, 219:7,
219:10, 222:1,
222:18, 222:22, 223:2
 **Honor's** [3] - 53:24,
139:11, 178:4
 **HONORABLE** [1] -
1:10
 **honorably** [3] -
147:2, 148:24, 149:1
 **hope** [4] - 91:17,
92:6, 128:20, 223:16
 **hopefully** [3] - 84:18,
131:9, 214:2
 **hopes** [1] - 157:17,
201:23
 **hoping** [7] - 26:19,
68:2, 120:14, 127:6,
131:17, 185:8, 215:1
 **horn** [1] - 212:19
 **horns** [1] - 190:18
 **hostile** [2] - 172:4,
197:20
 **hour** [3] - 82:25,
97:15, 185:7
 **hours** [4] - 120:17,
127:24, 130:7, 154:16
 **House** [1] - 204:25
 **housing** [1] - 86:24
 **huge** [1] - 56:14
 **human** [2] - 21:8,
192:20
 **Hunter** [6] - 35:18,
36:11, 36:19, 36:21,
36:22, 40:22
 **Hurt** [1] - 220:15
 **HURT** [1] - 220:15
 **hurting** [1] - 15:22
 **hurts** [1] - 56:8
 **husband** [1] - 86:3

# I

 **idea** [8] - 8:15, 11:8,
15:19, 31:22, 45:3,
94:15, 197:4, 197:14
 **identical** [1] - 159:10

**identified** [2] - 53:22, 64:7
**identify** [2] - 24:9, 40:25
**ignore** [2] - 99:10, 166:1
**illegal** [4] - 5:23, 44:7, 44:10, 179:14
**imagine** [3] - 17:25, 18:12, 124:24
**immediately** [3] - 130:20, 156:11, 196:13
**imminent** [1] - 132:2
**impacts** [1] - 78:24
**imperative** [1] - 17:7
**implicating** [1] - 25:5
**implies** [1] - 84:1
**implying** [3] - 125:3, 125:5
**import** [1] - 47:2
**important** [8] - 12:16, 18:4, 21:9, 46:9, 78:24, 219:21, 224:13, 225:2
**importantly** [4] - 22:3, 92:19, 158:12, 206:10
**imposed** [1] - 8:15
**impossibility** [1] - 44:20
**impression** [7] - 37:6, 125:5, 125:6, 125:10, 125:14, 169:13
**impressions** [1] - 170:6
**impromptu** [2] - 209:11, 209:13
**improper** [1] - 56:14
**impute** [1] - 56:13
**imputed** [2] - 159:25, 190:20
**IN** [1] - 3:11
**inaccurate** [1] - 63:20
**inappropriate** [3] - 112:21, 113:1, 130:11
**include** [4] - 39:18, 70:20, 188:10, 221:7
**included** [1] - 69:20
**including** [4] - 76:17, 106:9, 160:3
**inclusion** [1] - 221:20
**income** [1] - 87:4
**incorrect** [6] - 6:21, 6:23, 39:7, 66:4, 92:2, 92:4
**incredibly** [1] - 94:16

**indicate** [1] - 192:23
**indicated** [17] - 5:17, 7:16, 25:23, 26:8, 58:24, 59:11, 59:17, 76:19, 98:22, 98:24, 118:11, 126:14, 129:4, 147:11, 159:15, 184:25, 193:16
**indicates** [1] - 204:3
**indicating** [2] - 165:6, 165:14
**indication** [3] - 27:4, 127:16, 147:10
**indications** [2] - 217:18, 217:20
**indiscernible** [1] - 108:22
**individual** [4] - 31:18, 41:4, 41:8, 43:5
**individuals** [1] - 45:14
**indulge** [1] - 186:12
**inept** [1] - 64:1
**inevitably** [1] - 12:2
**infallible** [1] - 95:15
**information** [1] - 25:6, 25:9, 62:22, 86:7, 86:18, 87:15, 130:1, 148:4, 153:11, 186:1, 208:12
**informed** [1] - 150:21
**initial** [5] - 175:6, 213:14, 215:23, 216:12, 217:25
**injustice** [1] - 9:7
**inner** [1] - 48:14
**innocence** [3] - 22:24, 55:11, 65:7
**innocent** [2] - 93:17, 140:13
**inquire** [1] - 125:9
**inquiry** [4] - 36:3, 36:6, 50:19, 187:24
**inside** [29] - 13:8, 13:10, 14:9, 14:11, 14:13, 44:6, 44:10, 48:1, 48:2, 48:4, 48:5, 122:14, 156:22, 166:5, 166:20, 176:22, 176:25, 177:11, 178:3, 178:6, 178:18, 181:13, 181:15, 209:9, 209:12, 211:13, 215:5, 215:6
**instance** [1] - 80:16
**instead** [3] - 39:15,

64:21, 115:10
**instruct** [10] - 6:3, 18:21, 87:6, 87:8, 88:3, 89:9, 98:6, 158:19, 222:23, 222:24
**instructed** [3] - 37:11, 98:7, 147:13
**instructing** [1] - 166:1
**Instruction** [1] - 7:3
**instruction** [17] - 5:12, 5:18, 5:20, 6:8, 7:5, 9:8, 9:14, 9:16, 10:5, 142:19, 220:11, 220:12, 220:13, 220:16, 221:3, 221:10, 222:9
**instructions** [20] - 4:23, 5:5, 5:10, 9:2, 9:3, 9:15, 16:3, 98:11, 112:8, 113:8, 219:17, 220:2, 220:5, 221:12, 221:18, 221:25, 222:4, 222:16, 223:5, 224:2
**intact** [1] - 218:3
**intend** [7] - 7:21, 11:3, 66:13, 103:13, 156:21, 222:22, 223:4
**intending** [3] - 137:16, 192:9, 217:18
**intent** [1] - 159:14
**intention** [1] - 40:5
**intentions** [3] - 34:19, 157:7, 157:16
**intently** [1] - 94:10
**interact** [1] - 13:16
**interacted** [1] - 172:3
**interacting** [2] - 50:5, 171:25
**interactions** [5] - 172:4, 172:7, 172:9, 210:5, 210:7
**interacts** [1] - 6:1
**interest** [2] - 34:6, 159:14
**interesting** [2] - 49:16, 49:18
**interests** [1] - 36:17
**interim** [1] - 62:6
**interior** [2] - 48:8, 53:8
**internet** [1] - 66:18
**interrupt** [1] - 11:2
**interrupting** [1] - 112:11
**intervened** [1] - 213:15
**intimidate** [1] - 26:1

**intimidation** [2] - 26:23, 27:5
**introduce** [3] - 4:5, 137:16, 200:19
**introduced** [1] - 96:5
**introduction** [1] - 187:9
**inure** [1] - 63:21
**invested** [1] - 78:25
**investigate** [1] - 131:7
**investigative** [3] - 49:14, 53:21, 54:4
**invite** [1] - 93:4
**invited** [3] - 106:10, 106:22, 193:18
**invites** [1] - 89:2
**inviting** [1] - 93:2, 140:22
**involved** [3] - 17:19, 55:17, 220:20
**involves** [1] - 66:13, 132:2
**involving** [1] - 220:21
**Iraq** [1] - 21:16
**irrelevant** [10] - 20:1, 34:22, 49:11, 80:19, 80:22, 96:8, 96:16, 148:8, 148:9, 151:10
**irritants** [1] - 48:15
**Island** [1] - 1:23
**Israel** [1] - 149:21
**issue** [12] - 20:7, 23:7, 23:8, 77:4, 83:19, 83:21, 96:12, 146:23, 148:13, 186:24, 192:24, 220:11
**issued** [2] - 8:20, 130:24
**issues** [10] - 10:25, 12:1, 64:7, 68:15, 72:17, 81:4, 81:7, 131:16, 139:7, 190:13, 222:13, 223:8
**it'll** [4] - 32:24, 73:10, 98:8, 141:21
**itself** [2] - 8:11, 192:12

**J**

**J-R** [1] - 145:12
**jacket** [4] - 31:14, 31:19, 109:12, 196:12
**James** [3] - 3:7, 142:25, 145:11
**JAMES** [3] - 143:16,

145:5, 145:11
**January** [70] - 13:23, 16:10, 16:21, 20:4, 20:9, 22:7, 22:11, 32:19, 49:8, 50:6, 52:18, 54:3, 63:1, 75:5, 75:18, 75:24, 81:12, 94:18, 95:20, 96:22, 96:23, 101:15, 106:2, 106:6, 106:9, 116:17, 117:3, 118:8, 119:3, 119:16, 119:18, 119:19, 120:3, 122:1, 137:11, 139:17, 141:23, 143:22, 146:21, 146:22, 150:5, 150:6, 150:22, 151:5, 151:7, 151:13, 152:5, 152:8, 152:17, 152:19, 153:21, 153:22, 154:6, 156:4, 159:5, 161:7, 168:19, 169:23, 170:7, 171:18, 176:16, 179:8, 179:14, 195:16, 195:18, 195:21, 203:5, 203:8, 212:7
**Jim** [1] - 145:1
**job** [11] - 22:3, 33:16, 64:16, 86:25, 87:12, 96:11, 96:14, 128:17, 217:4, 224:8
**jobs** [1] - 89:19
**John** [5] - 3:6, 4:10, 4:11, 75:23, 104:21
**JOHN** [4] - 1:18, 1:19, 100:7, 104:25
**john** [1] - 100:3
**join** [1] - 96:2
**joined** [4] - 100:3, 142:25, 146:11, 154:11
**joins** [1] - 74:13
**journalism** [1] - 53:21
**journalist** [4] - 33:16, 49:14, 54:4, 80:17
**JR** [2] - 143:16, 145:5
**Jr** [2] - 3:7, 142:25
**judge** [4] - 9:6, 64:5, 95:14, 105:17
**JUDGE** [1] - 1:11
**Judge** [12] - 5:16, 5:17, 6:13, 6:15, 74:19, 77:22, 100:10, 105:11, 112:10, 143:4, 143:18, 193:3

**judges** [5] - 6:12,
63:25, 64:1, 64:23,
83:6
**judgment** [1] - 71:6
**juggle** [1] - 128:16
**July** [1] - 146:9
**jump** [2] - 72:18,
73:11
**Junior** [1] - 145:12
**JUROR** [1] - 105:17
**juror** [2] - 85:20, 86:4
**jurors** [11] - 8:16,
18:16, 52:2, 55:20,
65:19, 87:22, 104:8,
107:9, 121:14, 166:1,
225:1
**jury** [120] - 4:4, 4:23,
5:5, 5:10, 5:11, 5:20,
6:3, 7:8, 7:23, 8:1,
8:4, 8:16, 8:23, 8:25,
9:1, 9:3, 9:4, 9:5, 9:8,
9:17, 12:2, 12:4,
14:25, 16:3, 20:6,
21:18, 27:22, 28:3,
28:4, 32:25, 39:1,
42:19, 52:10, 52:12,
54:14, 55:15, 56:1,
56:11, 57:15, 58:3,
59:2, 60:17, 63:3,
63:4, 66:10, 67:1,
72:16, 73:6, 73:10,
73:13, 74:24, 81:4,
81:7, 83:18, 86:15,
86:19, 89:2, 92:22,
93:9, 93:17, 97:4,
97:8, 97:9, 97:18,
98:13, 100:21,
103:21, 104:12,
104:14, 104:16,
107:8, 107:12, 125:6,
128:18, 130:2, 131:9,
131:20, 137:1,
144:10, 144:19,
144:21, 147:8,
147:14, 154:17,
160:23, 161:9, 166:8,
166:15, 173:24,
184:13, 184:14,
187:12, 188:6,
189:22, 193:24,
194:1, 195:10,
198:12, 198:22,
200:16, 201:21,
201:25, 203:18,
218:22, 219:13,
220:8, 220:11,
220:17, 220:22,
221:5, 221:20,
221:24, 222:4, 222:8,
222:16, 224:2

**Jury** [1] - 7:3
**JURY** [5] - 1:10,
28:8, 145:20, 167:13,
203:20
**jury's** [5] - 9:24,
170:4, 198:5, 198:7,
200:6
**Justice** [2] - 64:8,
121:23
**justice** [1] - 62:24

## K

**keep** [27] - 33:22,
35:11, 37:17, 37:20,
39:24, 40:15, 41:12,
43:17, 46:10, 46:11,
56:1, 62:6, 72:13,
95:16, 95:17, 126:21,
139:21, 162:23,
164:1, 164:18,
164:20, 168:10,
178:5, 181:1, 183:3,
210:21, 224:4
**Keep** [1] - 211:21
**kept** [1] - 48:20
**kicked** [1] - 63:2
**kids** [3] - 77:19,
148:4, 148:6
**kind** [30] - 15:23,
17:20, 24:8, 40:7,
79:5, 86:16, 100:22,
107:2, 107:18,
108:12, 108:18,
115:12, 115:19,
120:1, 128:8, 153:7,
160:24, 161:17,
174:19, 192:9,
192:11, 196:16,
200:3, 200:22,
204:20, 204:21,
205:18, 208:8, 209:1,
216:20
**kinds** [2] - 92:1,
170:24
**knit** [2] - 31:14,
109:11
**knock** [1] - 15:11
**know..** [1] - 88:18
**knowing** [6] - 5:22,
77:1, 85:20, 127:19,
207:1, 215:2
**knowingly** [1] - 6:4
**knowledge** [15] -
17:23, 18:8, 18:23,
23:24, 44:22, 52:18,
86:15, 92:7, 96:23,
120:23, 141:7, 144:2,
183:15, 194:1, 194:2

**known** [2] - 65:22,
106:21
**knows** [3] - 17:10,
17:22, 24:16
**Kollar** [1] - 6:15
**Kollar-Kotelly's** [1] -
6:15
**Kotelly's** [1] - 6:15

## L

**labeled** [1] - 31:2
**lack** [1] - 194:1
**ladies** [1] - 131:14
**lady** [1] - 212:19
**Lakeland** [1] - 149:7
**LAMBERT** [5] -
11:17, 72:6, 73:19,
73:22, 101:3
**Lambert** [32] - 4:15,
11:12, 11:13, 11:15,
55:3, 65:4, 67:2,
67:11, 67:20, 68:16,
70:1, 70:6, 70:14,
71:6, 71:15, 72:22,
73:11, 73:16, 73:23,
100:2, 100:24, 101:4,
103:7, 104:9, 107:10,
129:1, 137:24,
167:15, 183:25,
201:11, 201:13,
224:25
**landing** [1] - 34:9
**landmarks** [1] - 34:6
**laptop** [1] - 105:13
**large** [2] - 12:22,
169:23
**larger** [2] - 20:12,
150:20
**largest** [1] - 167:25
**last** [17] - 9:25,
28:19, 62:4, 65:21,
72:19, 94:17, 98:22,
105:5, 107:25,
119:11, 120:17,
129:4, 141:18,
180:17, 184:21,
193:11, 224:24
**last-minute** [2] -
65:21, 184:21
**late** [4] - 32:10,
59:16, 82:25, 131:2
**latter** [1] - 142:4
**Laughlin** [1] - 220:25
**Lavigne** [15] - 4:25,
28:2, 56:5, 59:18,
60:5, 60:20, 73:9,
99:3, 99:13, 104:19,
121:17, 127:3,

143:13, 195:6, 219:24
**Lavigne-Rhodes** [15]
- 4:25, 28:2, 56:5,
59:18, 60:5, 60:20,
73:9, 99:3, 99:13,
104:19, 121:17,
127:3, 143:13, 195:6,
219:24
**LAVRENZ** [1] - 1:6
**Lavrenz** [77] - 4:3,
4:13, 4:16, 6:4, 15:6,
15:20, 20:14, 22:16,
23:11, 30:16, 31:4,
31:8, 31:23, 36:14,
38:4, 38:13, 45:1,
46:1, 46:5, 50:3,
50:25, 52:7, 53:6,
53:8, 55:11, 55:16,
56:8, 56:10, 56:13,
65:5, 65:12, 66:3,
66:15, 76:17, 76:19,
77:8, 77:11, 78:7,
78:21, 84:16, 91:6,
91:11, 93:16, 116:11,
116:12, 117:2,
117:10, 119:9,
120:16, 129:10,
139:16, 139:18,
139:19, 139:20,
139:21, 140:8,
140:18, 142:13,
142:14, 151:11,
151:20, 153:7, 157:5,
159:2, 159:15,
188:10, 188:17,
190:5, 190:8, 190:21,
191:16, 191:18,
195:16, 221:11,
223:18, 224:9
**Lavrenz's** [2] -
141:6, 159:10
**law** [32] - 6:6, 8:10,
8:21, 9:6, 17:20, 20:6,
20:9, 20:13, 20:16,
22:19, 23:9, 25:4,
37:24, 37:25, 38:3,
41:7, 41:17, 55:12,
64:22, 81:8, 83:20,
84:2, 84:4, 87:18,
92:23, 96:1, 96:11,
96:21, 100:15,
147:15, 220:21
**LAW** [2] - 1:19, 1:22
**Law** [1] - 8:19
**laws** [2] - 10:1, 24:7
**lawyer** [2] - 84:15,
174:2
**lawyers** [14] - 8:24,
58:15, 77:14, 77:15,
79:21, 83:3, 88:10,

91:15, 91:18, 92:23,
93:5, 223:20, 224:21
**lead** [5] - 169:10,
172:7, 173:5, 210:23,
217:21
**leadership** [7] -
197:12, 205:20,
206:4, 206:19,
207:20, 216:17,
217:12
**leading** [29] - 45:18,
47:16, 88:21, 89:8,
106:9, 107:23,
108:12, 115:4, 115:6,
115:11, 166:11,
170:18, 171:3, 171:6,
171:7, 172:24,
173:15, 173:16,
174:4, 174:16, 175:2,
175:4, 176:3, 177:7,
177:15, 177:19,
197:19, 207:7
**leads** [1] - 101:20
**leaking** [1] - 25:7
**learn** [2] - 94:12,
152:3
**learned** [3] - 137:11,
143:23
**learning** [1] - 81:19
**leash** [1] - 159:19
**least** [6] - 5:10, 9:2,
61:3, 111:22, 216:22,
222:25
**leave** [14] - 19:20,
27:17, 43:7, 48:23,
51:15, 52:11, 67:23,
71:6, 78:2, 156:11,
162:10, 162:17,
178:24, 215:2
**leaving** [3] - 86:7,
125:5, 149:2
**led** [1] - 12:16
**ledge** [1] - 41:11
**leeway** [9] - 63:24,
63:25, 65:9, 83:3,
92:18, 124:13,
142:14, 153:16, 170:3
**left** [19] - 10:5, 13:6,
29:21, 41:9, 48:10,
85:9, 103:15, 106:16,
109:23, 111:1, 111:5,
111:20, 115:25,
125:10, 179:2,
181:11, 181:20,
213:9, 213:12
**legal** [10] - 6:22,
23:9, 79:17, 92:15,
112:4, 145:11, 165:9,
179:18, 186:24,
222:13

240

**legal-speak** [1] - 79:17

**legally** [4] - 6:21, 6:22, 6:23

**legislative** [1] - 64:17

**legitimate** [2] - 38:21, 95:6

**Lesperance** [2] - 138:15, 168:4

**less** [4] - 54:6, 83:14, 87:17, 198:4

**letting** [5] - 24:4, 96:15, 145:18, 172:18, 216:15

**level** [1] - 161:9

**levels** [1] - 53:14

**liaising** [1] - 17:21

**liaison** [4] - 17:13, 23:4, 75:20, 85:12

**Library** [4] - 107:21, 203:1, 203:13, 212:9

**life** [9] - 21:4, 22:17, 55:6, 55:18, 77:17, 78:16, 78:25, 79:5, 80:17

**light** [1] - 54:11

**likely** [3] - 11:25, 79:22, 177:17

**liken** [1] - 111:14

**limine** [2] - 140:21, 158:25

**limit** [4] - 39:14, 75:1, 122:25, 143:21

**limited** [13] - 52:19, 52:23, 74:3, 75:4, 75:25, 92:17, 114:19, 139:14, 141:21, 152:22, 153:9, 157:9, 158:18

**limits** [2] - 19:6, 62:13

**line** [51] - 29:18, 30:2, 30:3, 36:3, 36:6, 37:9, 48:11, 95:6, 115:21, 116:1, 122:8, 141:12, 161:14, 164:5, 164:6, 164:7, 166:23, 179:1, 182:12, 187:24, 196:14, 197:1, 197:2, 197:6, 204:19, 206:6, 206:9, 206:23, 207:3, 207:16, 207:17, 207:18, 212:24, 213:5, 213:13, 213:20, 214:8, 214:11, 214:12, 214:16, 214:18, 214:19, 214:25,

215:25, 216:3, 216:11, 217:7

**lined** [1] - 60:14

**lines** [7] - 80:12, 114:20, 115:11, 115:12, 115:19, 119:6, 164:5

**link** [1] - 67:9

**Lisa** [2] - 185:13, 226:12

**LISA** [2] - 2:1, 226:3

**list** [7] - 25:24, 69:8, 69:20, 86:25, 102:10, 128:6, 174:21

**listen** [3] - 34:1, 65:20, 223:1

**listened** [2] - 140:18, 213:19

**listener** [6] - 188:24, 189:2, 190:1, 190:13, 192:1, 193:7

**listeners** [3] - 188:9, 188:10, 188:24

**listening** [3] - 94:9, 140:8, 193:10

**literal** [1] - 22:4

**literally** [7] - 111:13, 155:8, 164:10, 174:10, 175:3, 192:19, 193:19

**litigate** [1] - 23:16

**litigated** [1] - 193:4

**litigating** [1] - 95:17

**live** [6] - 105:8, 105:9, 105:22, 146:2, 146:3, 192:20

**lived** [1] - 106:18

**lives** [1] - 105:20

**living** [2] - 90:23, 149:2

**loan** [1] - 87:3

**locate** [4] - 58:20, 61:4, 61:23, 62:4

**located** [1] - 62:5

**location** [4] - 17:11, 68:18, 101:17, 191:14

**locations** [3] - 14:12, 169:14, 169:21, 189:3

**logged** [1] - 73:20

**logistical** [1] - 127:8

**logistically** [1] - 98:17

**logistics** [3] - 12:14, 60:16, 61:6

**Look** [1] - 82:16

**look** [10] - 33:13, 58:23, 64:22, 82:13, 82:15, 82:16, 111:1, 196:22, 214:7, 216:15

**looked** [2] - 6:11,

157:21

**looking** [23] - 35:8, 63:23, 69:14, 90:13, 94:19, 103:16, 106:15, 108:16, 108:18, 108:19, 108:20, 108:21, 109:22, 110:8, 110:10, 111:2, 111:4, 111:5, 120:3, 178:21, 201:12, 201:14

**looks** [7] - 5:16, 29:6, 61:8, 72:8, 82:17, 107:20, 210:11

**lose** [2] - 182:4, 224:10

**lost** [2] - 34:10, 34:12

**loudly** [2] - 105:14, 160:25

**loudspeaker** [3] - 161:17, 174:25, 206:11

**loudspeakers** [3] - 114:15, 140:8, 190:18

**love** [1] - 95:9

**low** [2] - 14:5, 46:25

**lower** [1] - 115:22

**ludicrous** [1] - 22:9

**lunch** [9] - 10:11, 10:12, 25:20, 67:16, 67:25, 68:3, 97:4, 97:12, 97:13

**luncheon** [1] - 97:23

**lying** [1] - 191:5

## M

**ma'am** [1] - 185:10

**MacAndrew** [1] - 6:24

**MACANDREW** [1] - 6:25

**magic** [1] - 100:24

**MAGISTRATE** [1] - 1:11

**magnanimous** [1] - 83:10

**main** [4] - 10:3, 47:12, 106:20, 107:3

**Mall** [1] - 154:10

**man** [18] - 43:23, 44:4, 44:13, 44:14, 45:7, 45:10, 48:10, 196:11, 196:18, 204:16, 204:17, 205:6, 206:10, 206:15, 206:17, 215:17, 216:14

**manage** [3] - 85:3, 85:6, 224:5

**manager** [1] - 85:7

**mandatory** [1] - 7:10

**maps** [1] - 51:11

**Marcelin** [1] - 4:9

**March** [2] - 1:6, 118:25

**Marine** [1] - 44:16

**mark** [1] - 109:19

**marked** [1] - 96:3

**marking** [1] - 114:20

**married** [2] - 148:3, 148:6

**marshals** [2] - 128:6, 184:25

**match** [1] - 46:23

**material** [1] - 94:21

**matter** [18] - 4:4, 20:4, 21:2, 21:11, 29:13, 33:23, 42:2, 49:12, 59:20, 81:8, 96:4, 129:8, 159:11, 159:12, 166:24, 192:7, 194:14, 211:11

**matters** [1] - 4:22

**maximum** [4] - 39:15, 64:24, 218:24, 219:16

**mean** [43] - 6:20, 12:8, 14:21, 15:7, 15:25, 16:7, 17:7, 17:23, 17:25, 18:3, 21:19, 26:23, 34:22, 39:11, 67:15, 71:3, 77:2, 83:4, 88:6, 88:7, 90:22, 90:24, 94:19, 99:18, 115:6, 119:14, 124:3, 125:2, 127:8, 127:20, 128:19, 128:23, 129:7, 129:16, 130:10, 137:18, 147:25, 170:17, 175:17, 200:13, 207:19, 212:22

**meaning** [1] - 108:5

**means** [4] - 38:10, 83:4, 130:15, 191:4

**meant** [2] - 155:8, 219:5

**measured** [1] - 63:15

**medals** [4] - 21:16, 21:19, 147:7, 148:22

**medical** [2] - 132:3, 225:10

**meet** [1] - 7:12

**meets** [1] - 106:14

**mega** [2] - 190:18, 212:19

**megaphone** [9] - 196:12, 197:13, 204:17, 204:20, 205:6, 206:4, 206:11, 206:17, 213:16

**Melbourne** [2] - 146:1, 146:3

**member** [1] - 158:1

**members** [12] - 47:18, 195:21, 199:4, 203:11, 207:4, 207:10, 208:23, 209:9, 209:19, 213:23, 217:4, 219:13

**men** [2] - 166:24, 213:4

**mens** [1] - 221:21

**mention** [4] - 19:21, 19:24, 75:3, 75:15

**mentioned** [4] - 30:15, 78:10, 122:13, 184:19

**mere** [4] - 5:11, 6:1, 6:8, 7:2

**message** [1] - 99:14

**met** [6] - 30:15, 50:2, 111:10, 116:14, 121:24, 151:19

**mic** [1] - 16:4

**Michele** [1] - 106:22

**microphone** [2] - 105:14, 172:14

**midafternoon** [1] - 108:6

**midday** [1] - 203:10

**middle** [16] - 31:19, 70:18, 70:20, 71:5, 116:2, 164:6, 199:7, 204:6, 209:2, 211:2, 211:3, 211:23, 211:24, 214:9, 214:20, 218:4

**might** [12] - 11:11, 17:5, 18:23, 29:5, 45:2, 47:1, 59:22, 67:13, 100:19, 108:6, 120:2, 201:15

**military** [12] - 85:15, 85:16, 86:5, 146:4, 146:13, 146:25, 147:17, 148:20, 149:3, 205:2, 215:19, 215:20

**milling** [3] - 160:19, 162:7, 178:21

**mind** [7] - 140:13, 140:14, 141:6, 142:8, 155:11, 159:17, 215:1

**mindful** [2] - 200:2, 213:6, 213:8

**mine** [2] - 106:10, 106:20

**minimum** [1] - 39:16

**ministry** [2] - 149:4, 149:5

**minute** [9] - 57:22, 60:6, 60:13, 65:21, 82:25, 93:22, 109:19, 164:16, 184:21

**minute-and-20-second** [1] - 201:17

**minutes** [23] - 10:8, 13:7, 14:10, 15:14, 59:20, 59:23, 66:16, 71:7, 97:3, 110:14, 113:13, 117:25, 127:6, 127:17, 127:18, 129:25, 130:4, 131:8, 166:23, 176:23, 178:25, 186:13, 212:15

**mirrored** [2] - 44:14, 45:8

**mischaracterizatio n** [1] - 63:16

**misdemeanor** [2] - 23:17, 179:13

**misdemeanors** [2] - 180:7, 221:11

**misinterpretation** [1] - 192:5

**misleading** [2] - 81:4, 81:7

**missed** [1] - 172:15

**missing** [1] - 34:18

**misstatement** [1] - 26:10

**mistakes** [1] - 91:12

**mistrial** [2] - 62:19, 63:9

**mitigate** [1] - 224:6

**mixed** [1] - 222:20

**mob** [8] - 15:21, 24:1, 36:14, 196:24, 196:25, 211:16, 211:19, 216:8

**mobile** [1] - 85:4

**moment** [19] - 4:14, 4:17, 17:6, 22:16, 41:2, 46:21, 48:13, 51:20, 90:1, 93:22, 105:2, 157:21, 169:11, 171:10, 186:10, 205:18, 208:10, 215:22, 224:10

**momentarily** [3] - 35:8, 97:25, 100:24

**momentous** [1] - 43:12

**Monday** [13] - 128:22, 218:25, 219:1, 219:4, 219:5, 219:15, 219:25, 223:8, 223:16, 223:19, 223:23, 225:14

**Monk** [4] - 16:19, 16:20, 17:2, 17:3

**montage** [1] - 139:12

**Monument** [1] - 154:14

**mood** [1] - 111:15

**moreover** [3] - 27:6, 64:6, 147:13

**morning** [19] - 4:1, 4:7, 4:11, 4:21, 28:7, 28:8, 28:17, 28:18, 56:18, 59:11, 60:24, 61:15, 81:6, 98:25, 126:20, 128:7, 219:1, 219:15, 225:14

**most** [7] - 8:23, 11:25, 19:6, 21:18, 68:20, 78:24, 130:23

**mostly** [3] - 53:20, 144:2, 176:18

**motion** [10] - 5:6, 10:21, 62:18, 63:11, 65:16, 67:9, 75:1, 75:2, 140:21, 158:25

**motivated** [1] - 153:23

**motivation** [2] - 75:10, 152:23

**motivations** [2] - 37:1, 41:23

**motives** [1] - 40:5

**mouse** [2] - 70:10, 70:11

**mouth** [1] - 175:12

**move** [26] - 14:1, 32:21, 34:23, 42:8, 42:16, 46:15, 49:21, 49:25, 63:9, 101:23, 103:17, 148:13, 151:7, 151:13, 151:17, 155:19, 157:18, 160:7, 160:8, 160:13, 162:22, 163:23, 166:3, 168:25, 169:7, 200:19

**moved** [10] - 15:18, 110:12, 111:20, 115:24, 154:14, 163:17, 169:14, 170:10, 170:13

**moves** [1] - 164:13

**moving** [27] - 16:18, 16:23, 39:24, 42:3,

46:10, 46:12, 47:7, 47:19, 56:2, 57:8, 62:6, 64:9, 70:5, 71:21, 75:21, 95:13, 95:16, 138:24, 142:8, 155:9, 162:7, 164:9, 168:10, 168:19, 181:1, 183:3, 213:5

**MR** [494] - 4:7, 4:11, 4:17, 5:4, 7:5, 7:23, 10:7, 10:12, 10:20, 11:6, 11:22, 14:7, 14:15, 14:20, 16:20, 16:24, 17:1, 17:5, 19:2, 19:14, 19:24, 20:20, 21:15, 23:23, 25:22, 26:7, 26:16, 27:13, 27:17, 27:20, 28:13, 28:16, 28:20, 28:23, 28:24, 29:10, 29:15, 29:20, 30:1, 30:9, 30:13, 30:14, 30:22, 31:1, 31:7, 31:16, 31:21, 32:5, 32:8, 32:16, 32:21, 32:23, 33:3, 33:6, 33:7, 33:22, 34:4, 34:11, 34:13, 34:17, 34:20, 35:4, 35:7, 35:11, 35:14, 35:15, 35:20, 35:24, 36:10, 37:21, 37:24, 38:17, 39:4, 40:15, 40:18, 40:20, 40:23, 40:25, 41:5, 41:12, 41:15, 42:9, 42:13, 42:16, 42:17, 42:22, 42:25, 43:2, 43:17, 43:20, 43:21, 45:13, 45:16, 45:17, 45:25, 46:3, 46:8, 46:17, 49:2, 49:13, 50:1, 50:10, 50:15, 50:18, 51:2, 51:19, 52:4, 52:5, 52:9, 53:3, 53:5, 53:20, 54:6, 54:10, 56:3, 56:6, 57:17, 57:19, 57:21, 58:7, 58:10, 58:19, 58:23, 59:1, 59:4, 59:9, 59:22, 60:2, 60:9, 61:8, 61:13, 61:20, 61:24, 62:9, 62:18, 66:11, 66:13, 67:7, 67:25, 68:4, 68:11, 68:14, 68:25, 69:5, 69:7, 69:10, 69:15, 69:17, 69:24, 70:25, 71:9, 71:12, 71:22, 72:2, 72:12, 72:19, 72:24, 73:3, 73:15,

74:7, 74:17, 74:21, 76:2, 76:6, 76:12, 76:16, 76:23, 77:7, 88:19, 88:23, 89:1, 89:12, 89:15, 93:19, 94:2, 94:8, 95:3, 95:9, 98:15, 98:19, 99:12, 99:21, 101:9, 101:12, 101:14, 101:16, 101:23, 101:25, 102:6, 102:8, 102:15, 102:22, 102:25, 103:3, 103:17, 103:24, 104:13, 104:21, 105:4, 105:21, 106:1, 107:5, 107:11, 107:22, 108:2, 109:5, 109:9, 109:17, 110:3, 110:4, 110:17, 110:21, 110:22, 112:2, 112:7, 112:16, 112:20, 112:25, 113:7, 113:9, 113:12, 113:14, 113:23, 114:11, 114:22, 115:4, 115:14, 115:18, 116:19, 116:21, 116:25, 117:20, 117:24, 118:5, 118:6, 118:14, 119:13, 119:25, 120:9, 121:8, 121:10, 121:19, 123:1, 123:11, 123:15, 123:19, 124:6, 124:16, 125:1, 125:2, 125:13, 125:21, 125:25, 126:4, 126:8, 126:15, 127:8, 127:25, 128:25, 129:7, 131:11, 131:23, 132:2, 137:15, 137:19, 138:1, 138:3, 138:11, 138:14, 138:20, 138:23, 139:2, 139:9, 140:3, 140:17, 142:23, 143:3, 143:6, 143:11, 144:15, 144:18, 145:1, 145:8, 145:22, 146:15, 146:20, 147:4, 147:18, 147:25, 148:3, 148:7, 148:15, 148:18, 149:9, 149:14, 150:2, 150:10, 150:18, 150:24, 151:18, 151:23, 152:2, 152:11, 152:16, 153:1, 154:1, 154:4,

154:19, 154:24, 155:1, 155:13, 155:22, 156:2, 156:13, 156:17, 156:23, 157:20, 158:4, 158:11, 158:14, 158:21, 159:9, 159:22, 160:16, 160:20, 161:4, 161:5, 161:24, 162:2, 162:3, 162:11, 162:16, 162:23, 163:1, 163:2, 163:9, 163:16, 164:4, 164:25, 165:4, 165:7, 165:13, 165:16, 165:20, 165:22, 166:4, 166:10, 166:14, 167:1, 167:7, 167:9, 167:18, 167:19, 167:24, 168:7, 168:11, 168:15, 168:18, 168:20, 168:24, 169:1, 169:4, 169:9, 169:12, 169:15, 169:20, 170:23, 171:2, 171:12, 171:16, 172:5, 172:8, 172:20, 172:22, 173:1, 173:3, 173:6, 173:8, 173:12, 173:18, 174:18, 174:24, 175:8, 175:14, 175:17, 176:9, 176:13, 177:2, 177:7, 177:25, 178:8, 178:13, 179:5, 179:16, 179:20, 180:1, 180:24, 181:2, 182:7, 182:14, 182:19, 182:20, 182:22, 183:1, 183:8, 183:19, 183:21, 184:10, 187:5, 187:8, 187:21, 188:8, 188:14, 188:16, 189:19, 190:3, 192:4, 192:22, 193:1, 193:12, 194:9, 195:14, 196:1, 196:6, 196:10, 197:18, 197:24, 198:1, 198:14, 199:2, 199:3, 199:11, 199:14, 199:18, 200:17, 201:5, 201:8, 201:10, 201:12, 201:15, 201:19, 201:22, 202:5, 202:16, 202:23, 203:15,

203:24, 204:5, 204:7, 204:11, 204:14, 204:15, 205:9, 205:22, 206:1, 206:2, 206:13, 206:16, 207:6, 207:9, 207:11, 207:14, 207:25, 208:3, 208:15, 208:19, 208:20, 208:21, 208:22, 209:21, 209:22, 210:1, 210:3, 210:6, 210:19, 210:20, 210:24, 212:1, 212:4, 217:8, 217:11, 217:17, 217:19, 217:22, 218:11, 219:2, 219:7, 219:10, 222:1, 222:6, 222:18, 222:20, 223:2, 223:12

**MS** [12] - 11:17, 72:6, 73:19, 73:22, 101:3, 185:6, 185:12, 185:18, 185:24, 186:4, 186:7, 186:12

**muddies** [1] - 6:8
**multiple** [3] - 14:21, 159:15, 221:15
**music** [3] - 107:17, 108:12, 186:20
**must** [6] - 6:3, 7:11, 7:13, 9:18, 86:18, 111:13

# N

**name** [11] - 41:1, 105:5, 112:21, 145:10, 185:11, 185:13, 187:15, 195:15, 202:7, 202:17, 202:20
**name's** [1] - 121:22
**named** [2] - 116:11, 151:19
**names** [2] - 47:12, 145:11
**narrate** [1] - 193:24
**narrative** [2] - 62:20, 62:22
**narrow** [2] - 23:4, 25:14
**nation** [1] - 44:17
**nature** [2] - 88:16, 89:22
**near** [9] - 15:3, 46:1, 47:23, 48:6, 160:18, 168:13, 191:20, 192:2, 195:20
**nearby** [1] - 61:2

**nearing** [1] - 162:6
**necessarily** [1] - 49:9
**necessary** [5] - 6:14, 6:22, 9:6, 84:12, 219:22
**need** [63] - 6:6, 7:20, 7:21, 16:17, 23:19, 23:21, 27:11, 27:15, 27:16, 34:23, 35:2, 36:6, 36:24, 46:6, 51:21, 54:8, 55:12, 58:16, 58:20, 59:22, 60:3, 60:15, 62:17, 67:2, 67:23, 69:7, 78:8, 78:22, 87:3, 93:13, 99:4, 99:8, 99:11, 102:10, 114:2, 130:5, 131:16, 142:21, 144:9, 147:2, 147:17, 147:21, 156:16, 158:3, 173:24, 174:13, 177:19, 177:21, 177:22, 178:23, 183:24, 184:8, 186:10, 197:17, 198:9, 200:21, 212:18, 212:19, 214:10, 215:19, 224:13
**needed** [3] - 84:21, 126:21, 206:24
**needlessly** [1] - 81:5
**needs** [3] - 63:14, 99:6, 194:20
**negative** [1] - 11:17
**never** [15] - 8:12, 8:18, 27:6, 30:15, 33:17, 89:3, 121:24, 139:16, 139:18, 139:19, 140:20, 153:14, 175:11, 175:12
**new** [7] - 5:24, 102:8, 119:23, 137:18, 137:19, 154:23, 155:25
**next** [22] - 10:14, 46:12, 58:18, 59:15, 60:14, 62:7, 66:8, 66:19, 71:9, 88:8, 102:15, 102:17, 104:21, 108:1, 110:17, 131:19, 145:1, 150:1, 164:11, 164:23, 184:5, 202:6
**Nigeria** [1] - 149:22
**night** [2] - 28:19, 62:4

**nine** [1] - 176:23
**nobody** [1] - 111:22
**nobody's** [1] - 47:4
**non** [1] - 11:16
**non-videos** [1] - 11:16
**none** [4] - 161:11, 161:19, 209:6, 209:15
**nonleading** [5] - 169:2, 170:9, 175:20, 200:24, 217:15
**noon** [3] - 108:8, 212:11
**normal** [2] - 27:10, 213:11
**north** [2] - 29:3, 162:7
**Northwest** [3] - 1:16, 2:3, 226:14
**northwest** [2] - 161:22, 161:23
**Nos** [1] - 142:16
**note** [4] - 10:16, 139:25, 195:9, 221:18
**noted** [6] - 101:25, 102:2, 103:19, 184:23, 221:7, 222:3
**notes** [1] - 226:5
**nothing** [19] - 21:14, 34:24, 53:3, 54:17, 55:5, 55:10, 94:17, 95:12, 117:12, 126:14, 126:15, 153:14, 157:5, 165:19, 209:14, 217:8, 222:1, 222:6, 223:7
**notice** [6] - 24:22, 82:1, 184:19, 184:21, 185:1, 222:9
**noticed** [7] - 13:25, 18:9, 25:10, 82:24, 91:23, 130:8, 212:16
**noticing** [1] - 14:3, 213:4
**notification** [1] - 213:11
**noting** [1] - 158:4
**notion** [1] - 96:1
**nowhere** [1] - 15:3
**nuance** [1] - 19:15
**nullify** [1] - 8:6
**number** [9] - 8:20, 26:4, 26:9, 26:10, 26:15, 69:3, 69:19, 110:14, 138:19
**numbers** [1] - 59:13
**nurse** [2] - 85:21, 91:4

# O

**oath** [1] - 44:17
**object** [19] - 14:23, 15:1, 16:1, 16:4, 19:25, 37:12, 79:3, 79:7, 79:8, 79:11, 88:14, 90:15, 90:24, 92:14, 92:16, 92:18, 113:2, 137:12, 189:20
**objected** [6] - 21:3, 79:13, 129:15, 131:1, 131:2, 146:24
**objecting** [2] - 67:5, 95:1
**Objection** [1] - 49:2
**objection** [88] - 14:18, 19:16, 22:2, 32:22, 32:23, 34:13, 35:20, 37:18, 40:23, 42:17, 45:16, 50:10, 52:9, 53:16, 62:14, 62:16, 80:8, 88:10, 88:11, 92:13, 99:11, 102:1, 103:20, 107:22, 112:2, 112:23, 113:23, 114:22, 115:4, 123:19, 124:3, 124:7, 124:10, 139:25, 142:4, 146:15, 146:20, 148:5, 149:9, 149:14, 149:15, 150:10, 151:23, 152:11, 154:19, 155:1, 155:13, 155:14, 156:13, 156:23, 158:14, 162:11, 163:9, 165:7, 165:16, 165:22, 166:10, 167:1, 168:7, 168:20, 169:1, 169:9, 169:15, 171:1, 172:5, 172:22, 173:3, 173:8, 174:20, 177:2, 178:1, 178:2, 179:16, 180:24, 181:25, 182:1, 182:14, 187:19, 189:10, 193:3, 205:9, 206:13, 207:6, 207:11, 209:21, 210:3, 210:19, 217:19
**objectionable** [1] - 83:12
**objections** [8] - 56:7, 65:17, 80:18, 101:25, 102:2, 138:5, 201:24, 222:3
**objects** [2] - 92:13,

170:4
**obligations** [1] - 224:7
**obscuring** [1] - 29:25
**observations** [1] - 41:16
**observe** [3] - 43:22, 47:24, 116:3
**observed** [7] - 22:5, 43:23, 45:14, 54:2, 74:5, 100:17, 157:15
**observes** [1] - 37:25
**obvious** [2] - 216:2, 220:21
**obviously** [12] - 16:8, 38:4, 53:21, 62:23, 69:21, 108:17, 116:10, 118:10, 140:18, 188:18, 198:16, 219:3
**occasions** [2] - 51:7, 159:16
**occupation** [2] - 86:16, 90:8
**occur** [1] - 17:22
**occurred** [1] - 40:7
**occurring** [1] - 41:24
**OF** [5] - 1:1, 1:3, 1:10, 1:16, 1:22
**offered** [9] - 37:6, 187:13, 190:14, 191:3, 191:7, 191:10, 192:7, 192:10, 192:12
**OFFICE** [1] - 1:15
**office** [5] - 5:1, 60:22, 98:20, 99:14, 99:18
**Officer** [7] - 58:20, 61:23, 98:16, 185:14, 199:8, 207:19, 218:11
**officer** [37] - 17:21, 20:25, 23:3, 24:25, 26:20, 27:3, 60:1, 60:3, 60:23, 61:16, 63:14, 75:16, 75:17, 83:21, 93:3, 127:4, 127:11, 147:15, 168:13, 168:25, 169:6, 170:13, 185:8, 187:22, 190:16, 191:13, 192:8, 192:15, 193:14, 200:3, 202:25, 204:6, 206:22, 208:14, 217:2
**officers** [32] - 15:12, 20:24, 21:12, 22:7, 22:13, 27:9, 29:19, 43:4, 43:7, 48:14, 57:8, 116:4, 116:7,

138:23, 142:8,
143:25, 162:19,
162:20, 166:19,
166:21, 168:19,
170:23, 199:21,
209:4, 209:8, 210:15,
211:20, 212:16,
213:6, 214:6, 214:21
**officers'** [1] - 218:2
**OFFICES** [1] - 1:22
**official** [5] - 81:10,
84:4, 176:20, 176:21,
226:12
**Official** [1] - 2:1
**officials** [1] - 49:1
**Oklahoma** [1] -
149:6
**old** [3] - 145:13,
145:23, 146:11
**omniscient** [1] -
95:15
**once** [11] - 28:2,
35:24, 61:4, 73:7,
73:20, 73:24, 79:18,
93:5, 127:7, 178:18,
212:15
**one** [71] - 7:17, 9:2,
10:5, 34:23, 37:21,
38:14, 39:15, 51:7,
51:20, 52:6, 56:3,
61:3, 65:6, 65:25,
66:11, 71:9, 71:10,
72:19, 76:7, 80:9,
81:3, 82:16, 83:1,
84:8, 87:11, 91:11,
91:22, 92:1, 92:2,
95:13, 96:11, 98:16,
102:15, 105:2,
105:16, 106:20,
119:11, 131:14,
132:3, 138:20, 139:5,
146:24, 153:19,
156:11, 162:15,
162:18, 164:19,
166:21, 178:23,
180:8, 182:3, 186:18,
186:24, 190:6, 190:7,
191:12, 191:18,
193:12, 194:9,
196:14, 207:22,
207:24, 210:9,
211:20, 215:25,
218:24, 219:5,
219:15, 220:11,
224:12, 224:15
**one-year** [1] - 39:15
**ones** [1] - 141:16
**online** [5] - 209:4,
209:7, 210:15,
212:10, 212:16

**open** [71] - 15:13,
29:12, 30:12, 30:25,
31:6, 32:7, 33:5, 34:8,
35:6, 35:13, 40:1,
40:17, 41:14, 42:6,
42:24, 43:19, 44:5,
46:14, 49:23, 51:18,
60:12, 66:17, 70:4,
70:8, 70:16, 71:19,
72:1, 72:11, 73:2,
101:1, 102:21,
103:10, 109:8,
109:16, 110:20,
113:11, 115:17,
117:23, 118:4, 121:7,
126:7, 131:13, 138:7,
138:9, 148:17,
151:15, 154:3,
155:24, 158:8,
160:15, 161:3, 162:1,
162:25, 165:3,
166:16, 166:18,
167:11, 167:17,
168:17, 171:14,
176:11, 178:10,
183:5, 196:3, 196:9,
203:23, 204:13,
205:25, 208:2,
208:18, 219:12
**open-source** [1] -
66:17
**opened** [2] - 48:14,
79:18
**opening** [3] - 111:21,
116:8, 139:14
**openly** [1] - 190:23
**opens** [2] - 79:18,
139:12
**operation** [1] - 36:4
**operative** [1] - 63:2
**opinion** [1] - 23:17
**opinions** [2] - 8:17,
36:12
**opportunity** [4] -
27:14, 55:24, 94:15,
185:18
**oppose** [1] - 187:9
**opposite** [3] -
101:21, 109:3, 191:17
**option** [1] - 89:7
**order** [10] - 7:24,
69:13, 130:11,
196:16, 200:4,
204:21, 205:19,
216:20, 220:16
**orders** [1] - 53:24
**organized** [2] -
59:20, 106:17
**organizer** [2] - 107:2,
107:3

**orient** [8] - 33:9,
35:2, 110:24, 171:3,
175:21, 175:24,
176:5, 177:10
**original** [2] - 46:24,
53:10
**originally** [1] -
113:17
**otherwise** [4] -
83:12, 188:6, 200:16,
222:25
**ought** [2] - 64:17,
65:9
**ourselves** [1] -
224:14
**out-of-court** [4] -
187:17, 192:20,
194:13, 194:18
**outnumbered** [2] -
205:3, 214:1
**outside** [19] - 48:1,
48:9, 55:13, 61:1,
61:18, 79:23, 79:24,
80:4, 124:8, 154:22,
155:11, 157:9,
179:19, 180:25,
186:23, 187:11,
188:5, 189:21, 195:9
**outstanding** [1] -
222:4
**outweighed** [4] -
14:5, 23:5, 80:25,
81:2
**outweighing** [1] -
12:10
**outweighs** [1] - 92:3
**overrule** [2] - 63:10,
149:15
**overruling** [1] -
124:10
**overrun** [4] - 182:12,
196:24, 197:5, 206:23
**overseas** [1] -
149:21
**own** [4] - 67:20,
77:18, 141:7, 144:2
**Oxnard** [1] - 1:19

**P**

**P-I-E-R-R-E** [1] -
9:21
**P.C** [1] - 1:19
**p.m** [17] - 13:5, 14:8,
29:22, 97:10, 104:17,
118:25, 131:21,
144:22, 181:8,
181:14, 183:10,
183:13, 183:16,

184:15, 202:1, 220:9
**PAGE** [1] - 3:11
**Page** [2] - 7:1,
220:24
**page** [2] - 36:13,
36:14
**paint** [1] - 62:25
**panoply** [1] - 93:1
**paraded** [1] - 6:4
**parading** [2] - 5:22,
180:17
**paralegal** [2] - 4:9,
4:15
**paralegals** [1] -
224:21
**parameters** [2] -
51:16, 54:1
**park** [1] - 85:4
**parka** [1] - 204:17
**PARKER** [104] - 1:15,
4:7, 5:4, 10:20, 11:22,
14:7, 16:20, 16:24,
19:2, 19:14, 19:24,
26:7, 27:13, 27:17,
67:7, 69:7, 69:15,
69:17, 69:24, 70:25,
71:22, 72:19, 72:24,
73:3, 73:15, 74:7,
88:19, 88:23, 89:1,
89:12, 89:15, 95:3,
101:25, 107:22,
112:2, 113:23,
114:22, 115:4,
116:21, 116:25,
118:14, 121:10,
121:19, 123:1,
123:11, 123:19,
124:6, 125:21,
125:25, 138:3, 139:9,
140:17, 142:23,
144:15, 146:15,
146:20, 148:7, 149:9,
149:14, 150:10,
151:23, 152:11,
152:16, 154:19,
155:1, 155:13,
156:13, 156:23,
157:20, 158:4,
158:14, 162:11,
163:9, 163:16, 165:7,
165:16, 165:22,
166:10, 167:1, 168:7,
168:20, 169:1, 169:9,
169:15, 169:20,
171:2, 172:5, 172:22,
173:3, 173:8, 177:2,
177:7, 177:25,
179:16, 180:1, 181:2,
182:7, 182:20, 183:1,
183:8, 183:19,

219:10, 222:20, 223:2
**Parker** [25] - 4:8,
11:20, 19:1, 19:13,
27:11, 68:15, 68:17,
88:13, 94:25, 115:3,
116:24, 121:22,
124:3, 142:22,
146:19, 148:5,
152:15, 155:5,
155:12, 163:15,
169:19, 170:25,
173:20, 173:23, 177:6
**part** [18] - 15:20,
15:21, 22:5, 24:14,
39:9, 70:18, 70:20,
71:5, 71:16, 73:5,
93:8, 93:9, 102:23,
106:12, 107:15,
110:7, 119:14, 119:15
**partially** [1] - 138:14
**participants** [1] -
24:6
**participate** [1] - 55:1
**particular** [7] - 29:4,
47:1, 108:17, 120:3,
192:8, 192:24, 197:9
**particularly** [2] -
14:19, 14:20
**parties** [6] - 4:5,
26:14, 74:23, 131:18,
224:3, 224:5
**pass** [2] - 18:10,
217:6
**passed** [4] - 14:3,
149:19, 149:20, 203:7
**past** [6] - 7:15,
25:10, 197:5, 211:5,
216:25, 217:3
**Pastor** [4] - 187:15,
187:16, 189:14,
189:23
**pastor** [7] - 15:8,
106:10, 147:18,
148:12, 149:7,
187:22, 187:25
**pastor's** [1] - 187:17
**pastored** [2] -
149:19, 149:20
**path** [1] - 117:5
**patience** [8] - 28:10,
100:12, 126:19,
143:12, 179:23,
183:23, 219:23, 220:6
**patriotic** [4] - 111:16,
153:6, 176:17, 176:18
**patriotically** [2] -
140:5, 140:12
**pattern** [2] - 15:6,
16:9
**pause** [4] - 35:14,

110:21, 161:4, 204:14
**paused** [1] - 161:6
**paying** [2] - 110:5, 110:6
**Peace** [1] - 21:1
**peaceful** [1] - 197:1
**peacefully** [2] - 140:5, 140:12
**peacefulness** [1] - 120:13
**penalty** [1] - 39:15
**pending** [1] - 33:25
**Penn** [1] - 8:11
**people** [100] - 8:5, 15:23, 16:3, 22:1, 23:10, 23:24, 24:9, 29:18, 37:9, 39:9, 39:10, 39:11, 40:5, 42:1, 47:25, 48:1, 53:13, 63:22, 64:16, 65:15, 65:21, 65:24, 74:4, 75:7, 75:10, 75:14, 75:21, 75:22, 80:6, 82:2, 83:3, 92:24, 92:25, 93:1, 96:2, 100:19, 106:17, 106:18, 107:17, 108:11, 108:12, 110:6, 111:7, 111:10, 111:11, 111:12, 111:13, 111:16, 111:18, 111:20, 111:21, 111:22, 115:24, 116:3, 116:6, 116:7, 116:9, 117:18, 119:5, 119:20, 119:22, 119:24, 120:9, 120:21, 121:2, 141:11, 142:9, 143:24, 147:9, 151:1, 153:5, 154:12, 155:9, 157:8, 157:13, 160:7, 160:19, 162:7, 166:18, 170:23, 172:3, 172:10, 176:17, 178:21, 189:16, 190:24, 191:1, 191:21, 191:22, 197:8, 210:2, 217:12, 217:13, 220:3, 224:13, 225:3, 225:4, 225:11
**people's** [3] - 37:1, 155:10, 157:13
**perceived** [3] - 23:12, 40:7, 75:5
**percent** [1] - 65:20
**perceptions** [2] - 35:1, 75:8
**perfect** [3] - 40:13,

**perfectly** [1] - 86:9
**perhaps** [12] - 38:18, 39:12, 59:19, 64:17, 77:9, 82:5, 83:24, 96:4, 141:2, 159:3, 194:23, 221:12
**perimeter** [2] - 216:25, 217:3
**period** [1] - 174:12
**permissible** [5] - 64:24, 65:2, 159:2, 188:6, 189:13
**permission** [10] - 23:9, 83:20, 84:2, 96:1, 207:23, 211:6, 216:25, 217:2, 217:6, 217:18
**permissive** [1] - 7:9
**permit** [15] - 6:10, 101:19, 106:13, 106:16, 111:4, 122:14, 122:17, 123:2, 123:5, 123:8, 124:17, 124:23, 125:4, 126:1, 142:15
**permits** [1] - 122:13
**permitted** [10] - 80:4, 90:17, 111:3, 125:7, 125:8, 125:19, 125:22, 127:14, 165:15, 176:6
**permitting** [2] - 92:24, 142:4
**person** [24] - 9:19, 20:3, 25:16, 36:25, 61:3, 65:5, 70:11, 75:18, 80:1, 87:20, 89:4, 90:22, 91:11, 96:22, 118:11, 119:21, 120:4, 120:5, 127:22, 130:20, 160:4, 189:15, 191:16, 225:8
**person's** [2] - 79:9, 87:4
**personal** [6] - 128:12, 130:14, 130:15, 144:2, 183:15, 184:24
**personally** [3] - 106:11, 106:21, 124:17
**persons** [1] - 171:9
**perspective** [2] - 45:1, 140:25
**pertained** [1] - 124:17
**phone** [12] - 25:25, 26:9, 26:10, 26:15,

33:14, 34:10, 34:18, 60:7, 103:14, 126:21, 158:21, 207:21
**phones** [1] - 116:21
**photograph** [1] - 53:7
**photographs** [1] - 11:16
**phrase** [1] - 119:16
**phrased** [2] - 88:19, 171:2
**phrasing** [1] - 197:19
**physical** [1] - 41:25
**pick** [2] - 59:14, 169:7
**picked** [1] - 190:20
**picketed** [1] - 6:5
**picketing** [2] - 5:23, 180:17
**picking** [2] - 43:10, 43:14
**picture** [1] - 62:25
**pictures** [4] - 15:2, 53:10, 103:14, 109:12
**piece** [1] - 224:25
**pieces** [4] - 43:10, 43:14, 52:21, 56:25
**PIERCE** [62] - 1:18, 1:19, 4:11, 4:17, 11:6, 14:15, 14:20, 17:1, 17:5, 58:19, 58:23, 59:9, 59:22, 60:2, 60:9, 61:8, 61:13, 61:20, 61:24, 62:9, 68:11, 68:14, 68:25, 69:5, 76:6, 76:16, 76:23, 77:7, 93:19, 94:2, 94:8, 95:9, 98:15, 98:19, 99:12, 99:21, 112:16, 112:20, 112:25, 113:9, 119:13, 119:25, 120:9, 125:2, 125:13, 127:8, 127:25, 128:25, 129:7, 131:11, 131:23, 132:2, 173:12, 173:18, 184:10, 192:4, 192:22, 193:1, 194:9, 201:12, 219:2, 219:7
**pierce** [1] - 183:25
**Pierce** [28] - 4:12, 5:15, 14:14, 14:17, 22:22, 55:3, 62:8, 62:16, 65:4, 77:12, 77:21, 78:3, 88:17, 89:7, 90:1, 93:12, 98:14, 99:16, 101:7, 127:22, 128:15,

141:14, 148:1, 173:13, 188:7, 192:3, 223:8, 225:5
**Pierre** [1] - 9:20
**place** [11] - 13:16, 17:23, 29:23, 69:18, 81:18, 81:19, 99:9, 154:11, 195:23, 204:18, 207:1
**placed** [1] - 25:24
**places** [4] - 5:23, 8:2, 96:3, 190:5
**plainly** [1] - 9:5
**Plaintiff** [1] - 1:4
**plan** [2] - 98:5, 152:24
**planning** [2] - 59:24, 103:25
**platform** [2] - 90:16, 90:17
**play** [41] - 30:9, 30:23, 32:5, 32:11, 33:3, 37:3, 42:22, 43:17, 70:18, 70:22, 71:12, 72:19, 73:4, 76:3, 103:6, 107:12, 109:5, 109:13, 117:25, 118:2, 141:8, 142:21, 161:24, 168:12, 168:15, 186:21, 187:3, 191:9, 193:20, 193:22, 195:23, 196:7, 198:9, 201:5, 203:15, 204:11, 205:19, 205:22, 207:25, 208:15, 220:20
**played** [7] - 107:18, 108:12, 127:25, 129:13, 129:15, 193:2, 193:6
**players** [1] - 53:22
**playing** [12] - 28:22, 28:23, 33:22, 35:11, 37:5, 40:15, 41:12, 43:17, 73:13, 79:24, 103:12, 162:23
**plaza** [4] - 110:12, 113:17, 122:8, 203:11
**plenty** [2] - 186:14, 189:1
**plus** [1] - 111:13
**pocket** [1] - 34:12
**point** [35] - 8:3, 8:22, 11:23, 12:15, 13:7, 17:8, 34:5, 36:10, 36:11, 36:15, 37:22, 38:2, 48:17, 52:6, 56:3, 92:20, 97:7, 111:18, 111:24,

116:6, 129:11, 152:3, 152:7, 156:3, 158:13, 164:13, 166:6, 171:6, 178:1, 193:12, 194:9, 201:15, 213:10, 216:3, 216:24
**pointed** [5] - 8:19, 48:20, 101:22, 125:18, 194:11
**pointing** [2] - 70:10, 70:11
**points** [4] - 10:21, 34:6, 66:18, 198:6
**police** [71] - 15:12, 20:24, 20:25, 21:12, 22:7, 22:8, 22:13, 29:18, 30:2, 30:3, 34:25, 43:4, 48:13, 57:8, 75:6, 80:12, 111:19, 114:18, 114:20, 115:11, 115:12, 115:19, 115:21, 115:24, 115:25, 116:4, 116:5, 116:7, 116:8, 119:6, 122:8, 142:8, 143:25, 161:14, 162:19, 166:19, 170:12, 171:9, 171:17, 171:20, 171:21, 171:25, 172:10, 176:2, 182:12, 185:8, 190:16, 196:14, 197:1, 197:2, 197:6, 199:21, 206:6, 206:9, 207:5, 207:16, 207:17, 207:18, 210:12, 212:24, 213:5, 213:13, 213:20, 213:23, 214:7, 214:16, 217:2, 217:6
**Police** [26] - 5:1, 17:14, 17:21, 18:14, 19:8, 23:3, 26:20, 27:3, 27:9, 60:1, 65:23, 75:20, 81:22, 83:21, 85:12, 98:20, 99:20, 111:21, 130:10, 184:11, 184:20, 185:2, 185:4, 185:15, 191:13, 202:25
**politics** [1] - 151:22
**portico** [1] - 48:9
**portion** [2] - 72:18, 132:5
**posed** [1] - 75:12
**position** [4] - 7:15, 159:12, 209:16,

215:14
**positive** [3] - 111:11, 111:16, 210:11
**possibly** [2] - 53:9, 94:21
**potential** [1] - 96:16
**potentially** [6] - 26:1, 39:13, 61:19, 82:1, 164:10, 189:23
**Powell** [31] - 3:5, 18:18, 25:17, 25:21, 27:19, 27:23, 28:1, 28:11, 28:17, 29:23, 31:18, 34:1, 37:25, 38:1, 38:7, 40:2, 40:10, 40:24, 46:4, 52:17, 54:7, 54:23, 55:7, 55:9, 58:7, 58:11, 80:16, 84:9, 117:7, 225:6, 225:9
**POWELL** [1] - 28:14
**power** [4] - 8:6, 8:7, 9:5, 46:25
**powerful** [1] - 120:11
**practical** [1] - 12:14
**practice** [1] - 27:10
**pray** [2] - 106:23, 172:18
**prayer** [1] - 92:25
**prayers** [1] - 108:12
**praying** [2] - 90:17, 107:17
**precedent** [3] - 64:22, 92:11, 92:12
**predicate** [3] - 24:19, 56:24, 81:11
**prefer** [1] - 222:24
**preference** [2] - 71:1, 222:25
**prefers** [1] - 5:8
**prejudice** [9] - 23:1, 23:6, 57:5, 80:9, 81:3, 83:14, 83:15, 84:6, 88:12
**prejudicial** [13] - 18:15, 39:1, 56:7, 57:14, 63:18, 79:12, 80:23, 90:14, 92:3, 92:22, 94:12, 94:21, 166:12
**preliminary** [1] - 4:22
**preparing** [1] - 128:4
**preplanning** [1] - 152:17
**presence** [13] - 5:11, 6:1, 6:8, 6:16, 7:2, 34:25, 114:18, 161:14, 171:9, 187:11, 188:5,

189:21, 195:10
**present** [4] - 5:25, 21:7, 37:5, 191:19
**presentation** [2] - 86:21, 127:10
**presented** [8] - 22:2, 53:16, 81:9, 92:23, 93:5, 95:25, 164:4, 187:10
**presenting** [2] - 10:25, 81:5
**preserve** [1] - 215:12
**preserved** [3] - 37:19, 53:17, 65:16
**preserving** [2] - 77:3, 209:3
**president** [5] - 96:8, 140:11, 154:10, 154:15, 156:9
**President** [8] - 12:21, 139:5, 140:2, 140:22, 158:12, 159:1, 159:4, 159:7
**press** [1] - 53:12
**presumably** [4] - 18:10, 18:11, 22:4, 67:19
**presume** [2] - 16:18, 189:5
**presumed** [1] - 93:17
**presuming** [1] - 93:14
**presumption** [3] - 22:24, 55:11, 65:7
**pretending** [1] - 63:6
**pretrial** [2] - 76:18, 158:24
**pretty** [13] - 6:20, 15:14, 47:8, 48:15, 51:3, 105:12, 127:16, 138:16, 141:21, 150:4, 164:20, 178:22, 193:16
**prevail** [1] - 214:17
**prevent** [3] - 9:7, 44:18, 125:15
**prevented** [2] - 124:20, 126:9
**preventing** [2] - 163:7, 165:10
**preview** [2] - 198:21, 223:10
**previous** [3] - 101:25, 102:2, 150:24
**PREVIOUSLY** [1] - 28:14
**previously** [4] - 98:23, 103:19, 146:24, 203:17
**priest** [1] - 21:1

**primarily** [1] - 80:8
**private** [1] - 203:1
**privately** [1] - 84:22
**probative** [1] - 81:1
**probity** [2] - 12:10, 14:4
**problem** [15] - 4:18, 19:22, 37:5, 51:5, 56:14, 70:18, 80:20, 90:13, 93:11, 96:11, 96:15, 114:4, 130:23, 139:9, 177:8
**problematic** [1] - 63:20
**problems** [3] - 64:6, 64:7, 73:18
**procedures** [1] - 17:22
**proceed** [1] - 58:6
**proceeded** [1] - 206:8
**Proceedings** [1] - 225:17
**proceedings** [52] - 4:20, 27:24, 28:5, 35:5, 39:25, 42:5, 46:13, 49:22, 51:17, 52:13, 57:25, 58:4, 60:11, 60:18, 62:2, 74:13, 76:13, 76:17, 76:21, 76:23, 97:10, 97:19, 97:24, 100:3, 104:17, 113:10, 115:16, 117:22, 121:6, 126:6, 131:12, 131:21, 143:1, 144:22, 148:16, 151:14, 154:2, 155:23, 158:7, 160:14, 165:2, 171:13, 176:10, 178:9, 183:4, 184:15, 187:1, 195:3, 202:1, 219:11, 220:9, 226:6
**process** [2] - 99:7, 203:6
**produce** [1] - 99:17
**produced** [1] - 226:6
**profession** [9] - 78:9, 78:13, 79:19, 80:13, 84:10, 89:3, 147:19, 147:20, 147:23
**professionalism** [1] - 26:14
**professionally** [2] - 106:11, 106:21
**professions** [1] - 80:6
**proffer** [3] - 52:15,

52:25, 142:20
**proffered** [2] - 49:7, 61:18
**promise** [1] - 97:14
**promoted** [1] - 203:3
**prompted** [1] - 189:11
**prongs** [1] - 221:15
**pronounced** [1] - 8:18
**properly** [1] - 130:8
**property** [1] - 181:21
**proportional** [1] - 139:13
**proposed** [3] - 5:7, 9:15, 222:8
**proposition** [1] - 9:17
**proscribed** [1] - 6:2
**prosecution** [3] - 78:12, 86:13, 90:10
**prosecutor** [2] - 121:12, 179:24
**prosecutors** [1] - 112:23
**prospective** [1] - 55:20
**prostitute** [2] - 90:23, 96:9
**protect** [4] - 38:2, 43:15, 84:21, 217:4
**protected** [1] - 44:23
**protecting** [1] - 90:25
**protest** [2] - 140:6, 140:13
**protester** [1] - 216:24
**protesters** [13] - 196:13, 204:18, 206:7, 210:18, 211:2, 211:3, 212:16, 212:23, 214:8, 215:5, 215:10, 216:8, 216:9
**protocol** [2] - 213:23, 216:19
**proved** [1] - 10:2
**provide** [3] - 6:13, 11:8, 192:11
**provided** [1] - 64:20
**Providence** [1] - 1:23
**pseudo** [1] - 23:13
**pseudo-government** [1] - 23:13
**public** [5] - 23:16, 195:21, 199:5, 203:12, 220:7
**publication** [1] -

139:8
**publish** [1] - 103:20
**published** [52] - 29:12, 30:12, 30:25, 31:6, 32:7, 32:15, 32:24, 33:5, 34:8, 35:13, 40:17, 41:14, 42:12, 42:18, 42:24, 43:19, 59:1, 69:4, 70:4, 70:8, 70:16, 71:19, 72:1, 72:11, 73:2, 73:5, 101:1, 102:21, 103:10, 107:8, 109:8, 109:16, 110:20, 118:4, 138:7, 138:9, 160:23, 161:3, 162:1, 162:25, 167:11, 167:17, 168:10, 168:17, 196:3, 196:9, 203:18, 203:23, 204:13, 205:25, 208:2, 208:18
**pull** [2] - 67:13, 224:25
**pulled** [1] - 225:1
**purely** [1] - 18:23
**Purple** [1] - 148:21
**purpose** [5] - 83:8, 106:23, 140:1, 189:22, 201:3
**purposely** [1] - 154:9
**purposes** [2] - 52:23, 157:10
**purview** [5] - 89:5, 119:2, 119:3, 153:14, 157:17
**push** [7] - 48:3, 210:18, 211:11, 212:21, 212:22, 213:13
**pushed** [7] - 53:9, 115:25, 196:24, 211:13, 211:24, 214:8, 214:9
**pushes** [1] - 211:8
**pushing** [10] - 48:11, 199:20, 207:16, 210:21, 211:4, 211:5, 211:18, 211:21, 214:24, 214:25
**put** [31] - 5:17, 8:1, 14:24, 18:5, 21:15, 21:20, 26:4, 48:16, 51:11, 56:7, 57:1, 59:22, 59:24, 62:10, 67:16, 70:21, 76:6, 76:9, 78:12, 82:13, 96:13, 147:6, 147:7, 175:11, 190:5, 190:6, 192:23, 193:8,

193:13, 193:14, 217:24
**putting** [1] - 52:20
**puzzle** [2] - 52:21, 56:25

# Q

**qualifications** [1] - 148:22
**qualified** [2] - 81:20, 82:8
**qualify** [1] - 83:1
**questionable** [1] - 85:19
**questioned** [1] - 90:4
**questioning** [2] - 78:19, 90:9
**questions** [66] - 11:11, 20:17, 21:7, 36:18, 38:21, 39:23, 40:3, 40:4, 53:1, 53:18, 54:1, 54:5, 54:21, 54:25, 58:8, 58:10, 62:21, 75:12, 76:20, 79:1, 79:20, 87:10, 87:13, 107:24, 115:7, 118:1, 121:1, 121:9, 121:12, 123:11, 124:14, 124:15, 124:16, 124:24, 125:18, 130:22, 139:6, 144:11, 148:1, 151:25, 157:11, 157:18, 158:16, 159:20, 170:2, 170:9, 170:18, 172:24, 174:15, 174:21, 175:20, 176:3, 176:6, 177:20, 179:6, 179:21, 182:22, 183:19, 195:17, 197:19, 198:15, 200:24, 212:2, 218:12, 221:21, 222:5
**quick** [10] - 41:6, 59:5, 84:15, 84:19, 118:18, 126:25, 150:12, 155:2, 186:24, 218:18
**quickly** [5] - 36:7, 60:7, 89:13, 98:12, 148:19
**quietly** [1] - 92:25
**quite** [9] - 18:12, 29:6, 62:5, 64:22, 91:5, 119:5, 142:12, 197:19, 221:18
**quote** [1] - 6:19

**quoting** [1] - 220:25

# R

**rabbit** [3] - 87:21, 87:25, 205:4
**rabbit-out-of-the-hat** [1] - 205:4
**Rachel** [1] - 4:9
**rack** [4] - 168:13, 170:9, 181:19, 190:9
**racks** [6] - 113:18, 169:14, 169:21, 169:22, 170:8, 182:9
**rail** [1] - 169:7
**raindrop** [4] - 120:1, 141:20, 159:25, 189:1
**raise** [5] - 5:6, 100:5, 104:23, 143:15, 145:4, 202:10
**raised** [1] - 193:1
**raising** [1] - 76:24
**rally** [5] - 17:9, 150:20, 153:22, 154:9, 171:10
**rather** [2] - 77:2, 127:11
**RDR** [3] - 2:1, 226:3, 226:12
**re** [2] - 104:13, 183:7
**re-ask** [1] - 183:7
**re-sworn** [1] - 104:13
**rea** [1] - 221:21
**reach** [3] - 60:6, 68:25, 184:1
**reached** [2] - 128:11, 204:20
**reaction** [1] - 155:8
**reactions** [1] - 157:13
**read** [5] - 5:18, 6:19, 80:24, 222:12
**reading** [1] - 221:2
**ready** [13] - 14:24, 25:21, 27:19, 28:10, 58:18, 61:4, 62:7, 97:21, 130:5, 130:20, 198:12, 200:16, 201:21
**real** [5] - 77:24, 82:7, 84:15, 84:17, 84:19
**reality** [1] - 56:10
**realized** [1] - 47:6
**really** [18] - 6:1, 6:13, 6:17, 7:23, 14:24, 21:3, 27:11, 37:15, 48:21, 56:7, 56:9, 68:23, 69:12, 80:11, 142:12, 144:9,

152:24, 183:23
**realty** [1] - 96:8
**reason** [16] - 6:10, 68:8, 69:17, 79:15, 82:10, 93:15, 94:23, 95:21, 106:24, 113:19, 127:15, 129:11, 129:12, 129:14, 129:17, 163:22
**reasonable** [4] - 7:5, 7:9, 9:18, 220:17
**reasoning** [2] - 6:12, 6:15
**reasons** [4] - 7:2, 84:7, 94:7, 156:16
**Rebecca** [6] - 4:3, 4:12, 116:11, 116:12, 151:19, 195:16
**REBECCA** [1] - 1:6
**rebreached** [1] - 209:12
**rebuts** [1] - 193:13
**RECEIVED** [1] - 3:11
**received** [6] - 25:25, 60:23, 62:4, 69:9, 147:16, 184:21
**recently** [1] - 50:2
**recess** [5] - 57:24, 61:25, 62:1, 97:20, 97:23
**recipient** [1] - 147:5
**recognize** [7] - 32:17, 42:14, 101:10, 101:12, 102:25, 107:19, 167:20
**recognized** [1] - 8:12
**recollection** [13] - 116:16, 117:2, 187:10, 188:5, 189:6, 189:22, 192:17, 194:4, 194:23, 198:10, 198:20, 199:1
**reconvene** [1] - 223:15
**record** [29] - 4:6, 7:22, 23:20, 23:22, 25:22, 26:5, 51:21, 53:16, 53:23, 54:17, 69:2, 69:7, 99:6, 131:24, 132:1, 132:5, 140:7, 141:16, 145:10, 157:24, 158:5, 184:23, 185:11, 185:12, 192:24, 193:8, 195:9, 204:5, 222:11
**record's** [1] - 94:20
**recorded** [1] - 42:15
**recording** [3] - 47:1,

47:22, 48:7
**recounting** [1] - 200:11
**Red** [2] - 3:3, 9:14
**red** [2] - 44:14, 85:10
**redact** [4] - 67:2, 67:3, 68:1, 68:19
**redaction** [1] - 200:22
**redactions** [1] - 67:11
**redirect** [5] - 54:15, 123:13, 183:20, 183:21, 217:9
**REDIRECT** [2] - 123:14, 217:10
**reestablish** [3] - 206:6, 214:16, 216:20
**reestablished** [3] - 206:25, 207:17, 215:7
**reference** [1] - 117:2
**references** [1] - 95:5
**referring** [2] - 68:15, 68:22
**reflect** [1] - 204:5
**reflects** [2] - 92:17, 225:7
**refresh** [9] - 187:10, 188:5, 189:6, 192:17, 194:3, 194:22, 198:9, 198:20, 199:1
**refreshed** [1] - 198:20
**refreshing** [1] - 189:22
**regard** [4] - 90:3, 120:7, 176:20, 190:21
**regarding** [4] - 5:6, 10:15, 178:14, 189:1
**regards** [1] - 159:2
**registered** [2] - 85:21, 91:3
**reigning** [1] - 160:2
**rein** [1] - 115:8
**reinforcements** [4] - 197:3, 206:24, 207:2, 214:2
**reject** [2] - 5:20, 7:2
**rejects** [1] - 6:20
**related** [1] - 10:22
**relates** [3] - 16:9, 56:19, 171:9
**relating** [1] - 191:18
**relation** [2] - 31:9, 31:23
**relevance** [11] - 16:12, 23:4, 34:18, 36:1, 36:19, 80:10, 80:25, 83:13, 83:14, 142:13, 146:20

**relevancy** [1] - 46:11
**relevant** [35] - 12:4, 12:17, 16:8, 17:7, 18:1, 18:15, 21:4, 39:13, 46:2, 49:9, 49:19, 53:4, 79:9, 79:12, 80:11, 80:15, 82:3, 87:1, 87:5, 95:19, 140:24, 146:25, 150:16, 151:6, 151:24, 152:17, 152:25, 153:24, 155:17, 155:18, 164:20, 169:25, 170:24, 181:1, 188:25
**rely** [1] - 131:6
**remain** [4] - 77:1, 77:3, 220:2, 220:5
**remaining** [2] - 48:9, 180:8
**remains** [2] - 13:13, 222:13
**remedies** [1] - 99:8
**remedy** [1] - 57:4
**remember** [14] - 104:5, 172:2, 187:15, 189:7, 192:16, 194:3, 194:22, 199:9, 199:11, 200:7, 200:10, 212:17, 216:2
**remembered** [5] - 51:22, 192:16, 197:22, 197:23, 198:11
**remembering** [1] - 200:14
**remembers** [3] - 195:11, 198:8, 198:13
**remind** [13] - 40:3, 77:21, 98:11, 100:11, 100:13, 104:4, 112:3, 113:7, 119:11, 129:13, 200:23, 224:3, 224:24
**remote** [1] - 5:7
**removed** [1] - 83:1
**rentals** [1] - 85:5
**reorient** [1] - 28:25
**repeat** [2] - 109:1, 172:13
**repeatedly** [2] - 15:3, 51:1
**repeating** [4] - 37:20, 42:1, 197:14, 206:10
**rephrase** [7] - 112:5, 112:6, 178:11, 182:20, 183:1, 206:14, 207:8
**replied** [1] - 44:6

**REPORTED** [1] - 2:1
**reporter** [3] - 105:6, 202:18, 222:12
**REPORTER** [3] - 69:2, 108:24, 185:10
**Reporter** [2] - 2:1, 226:12
**represent** [1] - 195:16
**representative** [2] - 23:14, 99:19
**request** [4] - 63:11, 64:20, 141:8, 221:23
**requests** [2] - 65:21, 66:1
**require** [1] - 130:14
**required** [1] - 220:19
**requirements** [1] - 5:25
**requires** [3] - 7:17, 7:18, 20:8
**research** [1] - 220:4
**resecuring** [1] - 215:7
**resigned** [9] - 19:3, 89:16, 92:6, 92:9, 94:13, 95:2, 95:5, 95:7, 95:9
**resigning** [1] - 92:7
**respect** [5] - 5:21, 77:10, 179:7, 192:5, 224:20
**respectfully** [1] - 77:8
**respond** [1] - 69:10
**response** [5] - 16:17, 139:14, 141:19, 193:19, 204:25
**responsibilities** [2] - 222:21
**responsibility** [1] - 203:14
**responsible** [1] - 36:5
**rest** [1] - 44:5
**restart** [2] - 131:9, 131:17
**restate** [3] - 6:19, 62:17, 221:5
**restating** [1] - 205:11
**restricted** [9] - 112:1, 114:16, 114:21, 165:6, 165:12, 169:23, 180:9, 180:12, 193:17
**Restricted** [1] - 114:13
**restriction** [1] - 125:14
**restrictions** [15] -

112:15, 113:16, 123:16, 124:1, 124:4, 124:11, 124:19, 124:22, 125:18, 126:9, 160:7, 161:10, 177:1, 177:14, 178:22
**restroom** [1] - 57:23
**result** [2] - 6:16, 179:12
**results** [1] - 30:5
**retelling** [1] - 208:5
**retired** [10] - 18:11, 26:24, 81:11, 82:4, 88:15, 92:21, 95:2, 150:3, 150:4, 186:25
**retiring** [2] - 89:10, 89:15
**return** [1] - 98:1
**review** [1] - 220:13
**Review** [1] - 8:19
**reviewed** [4] - 8:4, 10:16, 50:22, 220:13
**rewind** [1] - 79:13
**Rhode** [1] - 1:23
**Rhodes** [15] - 4:25, 28:2, 56:5, 59:18, 60:5, 60:20, 73:9, 99:3, 99:13, 104:19, 121:17, 127:3, 143:13, 195:6, 219:24
**right-hand** [1] - 108:4
**rights** [5] - 25:7, 54:23, 54:24, 84:21, 223:9
**riot** [3] - 47:5, 81:23, 165:21
**rioter** [1] - 216:25
**rioters** [5] - 92:24, 140:23, 141:24, 215:10, 217:3
**rise** [1] - 58:2
**ROBERT** [1] - 28:14
**Robert** [2] - 3:5, 27:23
**Roger** [2] - 4:12, 195:15
**ROGER** [2] - 1:21, 1:22
**role** [6] - 20:5, 54:20, 75:19, 83:17, 120:20
**roll** [2] - 29:10, 212:9
**Room** [1] - 2:3
**room** [9] - 74:12, 74:24, 76:7, 76:10, 98:3, 98:6, 137:1, 142:18, 157:23
**ROOTS** [285] - 1:21, 1:22, 7:23, 20:20, 21:15, 23:23, 25:22,

26:16, 27:20, 28:13, 28:16, 28:20, 28:23, 28:24, 29:10, 29:15, 29:20, 30:1, 30:9, 30:13, 30:14, 30:22, 31:1, 31:7, 31:16, 31:21, 32:5, 32:8, 32:16, 32:21, 33:3, 33:6, 33:7, 33:22, 34:4, 34:11, 34:20, 35:4, 35:7, 35:11, 35:14, 35:15, 36:10, 37:21, 37:24, 39:4, 40:15, 40:18, 40:20, 40:25, 41:5, 41:12, 41:15, 42:9, 42:13, 42:16, 42:22, 42:25, 43:2, 43:17, 43:20, 43:21, 45:13, 45:17, 46:3, 46:8, 46:17, 49:13, 50:1, 51:2, 51:19, 52:4, 52:5, 53:3, 53:5, 53:20, 54:6, 54:10, 56:3, 56:6, 57:17, 57:19, 57:21, 58:7, 62:18, 66:11, 66:13, 67:25, 68:4, 69:10, 71:9, 71:12, 72:2, 72:12, 101:9, 101:12, 101:14, 101:16, 101:23, 102:6, 102:8, 102:15, 102:22, 102:25, 103:3, 103:17, 103:24, 104:13, 104:21, 105:4, 105:21, 106:1, 107:5, 107:11, 108:2, 109:5, 109:9, 109:17, 110:3, 110:4, 110:17, 110:21, 110:22, 112:7, 113:12, 113:14, 114:11, 115:14, 115:18, 116:19, 117:20, 117:24, 118:5, 118:6, 121:8, 123:15, 124:16, 125:1, 126:4, 126:8, 126:15, 137:15, 137:19, 138:1, 138:11, 138:14, 138:20, 138:23, 139:2, 140:3, 144:18, 145:1, 145:8, 145:22, 147:4, 147:18, 147:25, 148:3, 148:15, 148:18, 150:2, 150:18, 150:24, 151:18, 152:2, 153:1, 154:1, 154:4, 154:24,

155:22, 156:2, 156:17, 158:11, 158:21, 159:9, 159:22, 160:16, 160:20, 161:4, 161:5, 161:24, 162:2, 162:3, 162:16, 162:23, 163:1, 163:2, 164:4, 164:25, 165:4, 165:13, 165:20, 166:4, 166:14, 167:7, 167:9, 167:18, 167:19, 167:24, 168:11, 168:15, 168:18, 168:24, 169:4, 169:12, 170:23, 171:12, 171:16, 172:8, 172:20, 173:1, 173:6, 174:18, 174:24, 175:8, 175:14, 175:17, 176:9, 176:13, 178:8, 178:13, 179:5, 179:20, 180:24, 182:14, 182:19, 182:22, 183:21, 187:5, 188:8, 190:3, 193:12, 195:14, 196:1, 196:6, 196:10, 197:24, 198:1, 198:14, 199:2, 199:3, 199:11, 199:14, 199:18, 200:17, 201:5, 201:8, 201:10, 201:15, 201:19, 201:22, 202:5, 202:16, 202:23, 203:15, 203:24, 204:5, 204:7, 204:11, 204:14, 204:15, 205:22, 206:1, 206:2, 206:16, 207:9, 207:14, 207:25, 208:3, 208:15, 208:19, 208:21, 208:22, 209:22, 210:1, 210:6, 210:20, 210:24, 212:1, 217:11, 217:17, 217:22, 218:11, 222:6, 223:12
**Roots** [94] - 4:12, 5:16, 7:14, 7:16, 17:5, 17:16, 20:19, 20:22, 21:23, 22:21, 23:20, 24:11, 26:12, 27:19, 28:12, 36:8, 37:10, 39:2, 40:14, 41:19, 42:8, 45:20, 49:6, 52:15, 53:2, 55:3,

56:4, 58:6, 62:9, 63:10, 63:23, 66:12, 77:13, 83:19, 88:18, 89:8, 101:7, 102:5, 107:23, 112:5, 114:9, 115:13, 117:19, 119:16, 121:1, 124:9, 125:8, 126:3, 129:13, 137:4, 137:14, 138:10, 141:15, 141:21, 144:16, 144:25, 146:23, 150:1, 150:15, 152:25, 153:25, 159:11, 160:24, 164:2, 166:3, 166:11, 167:6, 169:3, 169:10, 170:5, 170:20, 173:5, 173:19, 174:2, 174:17, 176:8, 176:12, 178:7, 180:4, 182:18, 183:20, 183:25, 187:4, 188:7, 193:11, 195:11, 195:15, 202:4, 217:9, 217:16, 218:9, 222:2, 223:8
**Roots's** [1] - 140:17
**Rotunda** [15] - 46:4, 47:16, 48:14, 122:3, 122:8, 122:15, 122:17, 123:3, 123:5, 123:17, 126:10, 126:12, 182:12, 183:9, 183:12
**roughly** [2] - 212:11, 213:11
**Rule** [5] - 12:8, 22:25, 80:24, 94:22
**rule** [5] - 192:6, 194:12, 213:25, 220:20
**ruled** [4] - 75:2, 81:8, 193:4, 222:4
**Rules** [7] - 64:15, 64:18, 64:19, 65:10, 129:21, 176:4, 198:24
**rules** [5] - 22:25, 77:14, 77:15, 129:18, 164:3
**ruling** [7] - 37:19, 97:1, 120:25, 139:12, 191:3, 194:7, 194:25
**rulings** [3] - 8:14, 8:21, 173:18
**run** [3] - 10:24, 11:25, 201:24
**rush** [3] - 84:20, 90:2, 185:7
**rush-hour** [1] - 185:7

**rushed** [2] - 41:10, 44:15
**résumés** [1] - 86:3

## S

**safe** [1] - 72:14
**safety** [7] - 172:14, 209:7, 210:15, 215:22, 215:24, 218:2, 218:3
**sake** [2] - 94:20, 189:8
**sample** [1] - 82:13
**sanctioned** [1] - 81:10
**satisfy** [1] - 88:17
**save** [1] - 93:13
**saw** [86] - 17:9, 18:18, 19:7, 19:20, 21:11, 21:12, 23:14, 25:15, 25:17, 34:25, 37:2, 38:15, 41:2, 41:24, 50:23, 51:10, 52:20, 52:23, 69:18, 75:5, 75:6, 75:17, 75:21, 80:11, 80:12, 95:20, 96:22, 96:24, 100:17, 112:13, 115:21, 117:16, 117:17, 118:24, 119:5, 119:14, 119:16, 119:18, 119:22, 119:24, 120:4, 120:12, 120:21, 122:1, 123:17, 123:25, 124:4, 126:14, 127:23, 137:3, 137:6, 139:1, 139:18, 141:7, 141:22, 142:1, 142:2, 142:6, 143:21, 144:3, 148:14, 152:18, 155:6, 155:8, 157:6, 157:13, 164:19, 168:21, 168:22, 169:3, 169:6, 169:24, 170:10, 170:25, 172:7, 172:9, 172:25, 177:1, 178:3, 178:6, 196:14, 199:20, 204:19, 205:18, 207:13, 212:12
**scene** [12] - 31:20, 38:14, 56:12, 79:6, 84:11, 118:7, 119:4, 119:14, 119:15, 120:4, 199:19, 217:15
**scenes** [1] - 139:17
**schedule** [2] -

128:16, 219:24
**scheduling** [1] - 219:19
**school** [3] - 82:20, 149:6, 149:13
**scope** [14] - 18:17, 25:14, 54:5, 56:17, 74:5, 79:9, 124:8, 143:20, 154:22, 157:9, 171:4, 179:19, 180:25, 182:25
**screen** [19] - 67:20, 68:18, 68:20, 70:6, 70:12, 73:17, 74:20, 98:9, 100:2, 102:24, 104:9, 105:19, 108:21, 109:24, 117:15, 121:15, 145:16, 157:21, 167:25
**screen-capture** [1] - 67:20
**screens** [2] - 72:16, 167:12
**scuffled** [1] - 45:6
**sealed** [1] - 132:4
**seamless** [1] - 100:22
**seated** [12] - 28:6, 52:14, 58:1, 58:5, 60:19, 104:18, 131:22, 144:23, 184:16, 202:2, 202:14, 220:10
**second** [17] - 12:15, 17:13, 17:18, 34:9, 72:3, 72:18, 76:7, 79:11, 79:14, 98:17, 105:16, 139:15, 164:11, 180:11, 214:13, 216:13, 224:10
**seconds** [24] - 29:20, 29:22, 31:9, 31:17, 33:8, 41:9, 42:25, 72:2, 72:6, 72:7, 72:9, 72:12, 72:15, 72:18, 73:5, 73:10, 73:13, 73:24, 113:13, 161:6, 163:23, 164:10, 164:17, 164:24
**Section** [1] - 6:16
**see** [154] - 12:3, 13:16, 14:25, 15:10, 19:10, 20:23, 21:5, 28:9, 29:13, 31:2, 32:2, 34:17, 38:8, 46:2, 48:21, 50:24, 57:13, 58:22, 60:7, 61:14, 64:4, 65:7,

65:8, 66:22, 68:12, 68:21, 70:1, 70:5, 70:17, 74:20, 74:21, 75:7, 82:17, 86:12, 101:5, 102:22, 102:24, 104:9, 105:17, 107:9, 107:15, 109:10, 110:1, 111:24, 112:15, 113:15, 114:13, 114:20, 115:10, 115:12, 115:20, 118:10, 119:3, 119:19, 119:21, 121:2, 124:11, 124:19, 124:22, 125:19, 126:9, 126:11, 129:25, 130:2, 131:10, 131:19, 138:4, 140:19, 141:4, 143:5, 145:15, 145:19, 154:25, 157:12, 158:12, 158:16, 158:19, 159:5, 160:5, 160:8, 160:18, 161:12, 162:6, 162:12, 163:7, 163:18, 164:2, 164:7, 165:5, 165:10, 165:14, 167:12, 167:23, 168:19, 168:25, 169:5, 169:8, 170:23, 171:8, 171:17, 171:23, 171:25, 172:4, 172:21, 173:24, 175:18, 175:22, 175:23, 176:2, 177:9, 177:11, 177:12, 177:13, 177:17, 178:14, 178:16, 178:18, 181:14, 185:6, 188:4, 190:2, 195:23, 196:5, 197:3, 197:9, 197:10, 197:12, 203:18, 203:19, 204:21, 205:2, 205:4, 205:7, 205:14, 205:20, 206:4, 206:19, 207:4, 207:10, 207:15, 211:1, 211:16, 213:2, 213:7, 213:15, 213:21, 214:7, 217:2, 224:14, 225:2, 225:14
**seeing** [5] - 77:10, 107:13, 119:1, 170:6, 225:11
**seek** [2] - 64:17, 64:21

**seem** [5] - 22:9, 22:16, 77:19, 98:20, 165:21
**sees** [3] - 56:11, 73:10, 118:22
**segments** [28] - 29:11, 30:11, 30:24, 31:5, 32:6, 32:14, 33:4, 34:7, 35:12, 40:16, 41:13, 42:11, 42:23, 43:18, 118:3, 161:2, 161:25, 162:24, 167:10, 167:16, 168:16, 196:2, 196:8, 203:22, 204:12, 205:24, 208:1, 208:17
**seize** [1] - 205:18
**selection** [1] - 86:15
**self** [1] - 221:12
**self-evident** [1] - 221:12
**Senate** [4] - 13:2, 47:16, 48:14, 161:22
**senators** [1] - 49:15
**send** [4] - 60:16, 68:9, 99:5, 99:14
**sending** [1] - 113:8
**senior** [1] - 185:13
**sense** [11] - 17:15, 37:5, 68:17, 91:5, 97:2, 120:2, 131:19, 137:4, 137:25, 218:21, 219:19
**sensitive** [2] - 25:4, 25:6
**sent** [3] - 7:7, 99:15, 127:5
**separated** [1] - 179:2
**sequence** [1] - 131:15
**sergeant** [6] - 200:2, 203:2, 203:3, 205:17, 207:19, 212:5
**Sergeant** [13] - 185:19, 186:8, 186:23, 186:25, 195:2, 195:15, 199:8, 202:6, 202:17, 204:8, 212:1, 218:12, 218:14
**SERGEANT** [1] - 185:22
**series** [1] - 40:3
**serious** [4] - 39:14, 96:17, 132:2, 221:14
**seriously** [1] - 173:15
**serve** [3] - 146:4, 147:11, 185:1
**served** [1] - 147:1

**service** [13] - 19:25, 128:8, 128:12, 130:14, 130:15, 130:25, 146:25, 147:17, 172:11, 172:18, 184:22, 184:24, 220:7
**session** [2] - 213:24, 217:5
**set** [7] - 4:4, 17:18, 38:14, 84:11, 119:4, 131:3, 217:15
**setting** [7] - 12:14, 30:19, 34:21, 79:6, 101:12, 102:25, 139:4
**setup** [2] - 17:17, 20:11
**seventh** [1] - 37:10
**several** [12] - 8:2, 49:11, 51:7, 98:23, 99:15, 115:23, 115:24, 141:11, 141:12, 156:7, 182:22, 185:19
**severalfold** [1] - 91:21
**Shakes** [1] - 11:17
**shaking** [1] - 11:18
**shape** [1] - 62:20
**share** [7] - 73:17, 98:9, 100:2, 104:9, 117:8, 117:15, 173:23
**shared** [1] - 26:9
**shed** [1] - 54:11
**sheet** [2] - 10:6, 186:20
**short** [6] - 140:3, 159:19, 166:22, 179:2, 184:18, 185:1
**shot** [2] - 65:11, 211:18
**shoving** [3] - 46:22, 199:21, 211:19
**show** [21] - 12:2, 45:8, 51:11, 66:14, 67:13, 68:11, 68:12, 68:14, 68:15, 68:21, 71:4, 72:8, 99:6, 100:23, 102:18, 121:3, 137:22, 138:19, 160:11, 161:1, 191:20
**showed** [5] - 57:7, 142:5, 166:21, 170:12
**showing** [3] - 53:8, 103:25, 189:21
**shown** [1] - 190:8
**shows** [7] - 15:17, 29:22, 66:14, 103:14, 130:6, 138:23, 140:7

**sic** [3] - 29:18, 85:20, 87:7
**sic]** [2] - 86:10, 214:17
**side** [40] - 6:15, 12:24, 12:25, 13:3, 13:13, 13:14, 19:20, 29:3, 63:5, 79:20, 106:15, 108:14, 108:15, 108:22, 108:24, 109:1, 109:3, 111:5, 139:13, 139:16, 139:18, 140:9, 161:20, 161:21, 161:22, 161:23, 162:6, 163:6, 181:3, 181:6, 181:18, 181:20, 182:8, 182:11, 183:16, 191:17, 195:18, 224:6
**sideshow** [1] - 95:7
**sidewalk** [2] - 101:20, 106:14
**sights** [1] - 139:17
**sign** [1] - 184:1
**significance** [1] - 92:15
**signs** [4] - 15:11, 114:13, 161:12
**silent** [2] - 77:2, 77:3
**Silver** [1] - 147:5
**similar** [5] - 11:9, 11:25, 15:6, 16:9, 19:9
**similarly** [2] - 87:17, 151:4
**simple** [1] - 70:17
**simply** [28] - 13:21, 20:15, 21:4, 39:12, 40:6, 50:24, 51:8, 52:22, 54:20, 56:23, 74:5, 75:12, 75:21, 77:13, 99:10, 119:23, 129:3, 139:22, 141:25, 157:7, 157:8, 157:13, 159:14, 170:1, 171:5, 191:3, 207:13, 221:5
**singing** [3] - 107:18, 111:16, 176:17
**single** [2] - 78:11, 160:6
**siren** [1] - 176:1
**sit** [4] - 20:16, 57:17, 120:18, 130:6
**sits** [1] - 8:5
**sitting** [7] - 85:19, 85:24, 86:4, 90:13, 91:22, 112:22, 118:25
**situated** [1] - 92:21

**situation** [6] - 7:12, 79:2, 132:3, 137:9, 151:5, 210:10
**six** [4] - 53:14, 128:9, 204:9, 204:10
**six-five** [2] - 204:9, 204:10
**skip** [1] - 98:16
**slate** [1] - 87:14
**sliced** [1] - 16:12
**slight** [2] - 104:11, 111:4
**slightly** [1] - 114:12
**Smith** [2] - 4:10, 75:23
**sneak** [1] - 198:21
**snip** [1] - 70:19
**snippet** [1] - 140:3
**solution** [2] - 70:17, 70:24
**someone** [30] - 20:8, 20:9, 23:13, 24:25, 26:24, 27:1, 38:14, 56:23, 57:7, 57:11, 75:16, 79:18, 80:3, 82:10, 87:16, 87:17, 87:18, 92:13, 93:7, 109:18, 109:19, 116:11, 158:2, 181:13, 182:1, 182:3, 197:5, 211:12, 225:12
**something's** [1] - 88:1
**sometime** [3] - 12:22, 110:13, 130:16
**sometimes** [3] - 221:15, 224:4, 224:5
**somewhat** [2] - 10:22, 90:5
**somewhere** [2] - 60:25, 141:11
**son** [2] - 166:20, 179:1
**songs** [3] - 111:17, 176:17, 176:18
**soon** [2] - 25:24, 143:10
**sorry** [19] - 20:15, 45:18, 46:19, 69:15, 69:24, 76:6, 76:9, 108:24, 112:10, 122:21, 128:25, 157:20, 172:16, 178:1, 181:23, 185:10, 185:23, 186:5
**sort** [38] - 5:13, 5:17, 5:18, 10:24, 18:22, 36:4, 38:15, 39:10, 45:18, 62:12, 68:15, 69:1, 70:12, 75:9,

75:10, 79:17, 81:10, 81:21, 82:23, 83:2, 84:11, 87:21, 88:1, 98:11, 111:4, 114:1, 127:10, 127:16, 137:7, 141:19, 150:21, 169:8, 175:6, 189:17, 194:10, 206:10, 216:1, 216:12
**sorting** [1] - 60:16
**sound** [3] - 35:17, 98:14, 201:6
**sounds** [7] - 4:25, 11:9, 62:7, 105:24, 127:4, 147:2, 184:8
**source** [1] - 66:17
**souvenirs** [1] - 43:13
**speaker** [5] - 107:2, 107:3, 109:22, 109:23, 191:19
**speakers** [1] - 106:20
**speaking** [5] - 107:17, 108:11, 154:15, 182:3, 196:21
**Special** [1] - 4:10
**specialists** [1] - 16:2
**specific** [6] - 94:11, 94:20, 124:3, 161:20, 169:24, 170:8
**specifically** [4] - 46:20, 160:17, 199:15, 199:16
**speculate** [16] - 36:25, 38:10, 41:18, 51:13, 64:12, 65:13, 65:14, 75:9, 82:23, 87:12, 87:13, 89:6, 141:24, 155:10, 207:12
**speculating** [6] - 40:4, 74:4, 75:13, 104:4, 120:22, 157:12
**speculation** [9] - 18:24, 38:16, 50:20, 53:15, 82:12, 89:2, 96:24, 137:7, 165:23
**speculative** [5] - 36:22, 41:25, 90:15, 117:5, 119:10
**speech** [15] - 12:22, 138:2, 139:5, 140:2, 140:4, 140:8, 140:10, 140:18, 140:19, 141:4, 154:9, 154:11, 154:12, 156:10
**speeches** [1] - 53:1
**spell** [4] - 105:5, 145:9, 202:17, 202:20
**spirit** [2] - 75:10,

194:12
**spoken** [1] - 99:4
**sponte** [1] - 189:16
**spot** [2] - 106:16, 163:19
**sprayed** [1] - 48:14
**squad** [2] - 43:4, 48:13
**square** [1] - 188:12
**stabbed** [1] - 211:17
**stacked** [1] - 93:10
**stage** [6] - 17:8, 66:15, 107:14, 108:9, 108:10
**stairs** [20] - 17:10, 35:10, 116:6, 199:6, 199:23, 205:1, 205:15, 205:16, 207:23, 208:25, 211:8, 214:15, 214:17, 214:19, 216:5, 216:6, 218:1
**stall** [2] - 196:23, 197:3, 198:2, 200:1, 201:3, 205:4, 206:20
**stalling** [1] - 214:5, 214:6
**stance** [2] - 24:18, 216:4
**stand** [6] - 9:17, 27:25, 78:13, 90:7, 186:23, 195:5
**standard** [3] - 80:23, 82:8, 220:14
**standards** [1] - 83:13
**standing** [10] - 14:17, 19:19, 37:18, 47:8, 66:19, 166:19, 167:21, 171:22, 210:10, 215:14
**standpoint** [4] - 17:20, 18:3, 127:9, 127:11
**stands** [1] - 6:2
**Star** [2] - 147:5, 148:21
**start** [32] - 4:22, 5:2, 5:9, 11:11, 20:5, 20:17, 28:25, 37:7, 37:12, 55:17, 57:23, 69:14, 72:2, 72:5, 72:7, 97:2, 97:4, 97:14, 97:15, 97:21, 97:25, 117:10, 120:18, 120:22, 127:6, 153:21, 158:10, 174:13, 180:4, 187:18, 196:25
**started** [13] - 43:10, 43:14, 47:7, 47:18,

69:21, 89:18, 110:14, 143:10, 144:14, 144:17, 149:12, 149:18, 206:7
**starting** [3] - 4:6, 97:16, 219:5
**starts** [1] - 155:10
**state** [18] - 38:5, 52:23, 63:17, 75:21, 93:8, 101:16, 127:16, 140:13, 141:6, 141:22, 141:23, 142:7, 145:9, 153:3, 155:10, 189:7, 189:8
**statement** [11] - 6:6, 51:21, 51:23, 53:7, 63:12, 63:20, 127:20, 128:3, 169:21, 177:20, 192:21
**statements** [9] - 161:18, 187:17, 187:18, 187:20, 187:22, 190:15, 194:13, 194:19, 194:20
**States** [33] - 2:2, 4:2, 4:8, 5:2, 6:24, 9:20, 10:19, 16:1, 16:17, 44:16, 47:5, 55:8, 67:4, 90:10, 140:11, 140:16, 144:13, 170:4, 174:20, 181:13, 181:15, 185:14, 186:19, 187:7, 190:23, 219:9, 220:14, 220:23, 221:1, 221:8, 222:17, 224:8, 226:13
**states** [2] - 6:22, 111:14
**STATES** [4] - 1:1, 1:3, 1:11, 1:15
**stating** [10] - 20:2, 67:5, 75:13, 80:22, 88:11, 88:14, 88:16, 95:1, 95:22
**status** [1] - 70:5
**statute** [3] - 5:21, 6:2, 6:7
**statutory** [1] - 5:25
**stay** [6] - 34:24, 37:17, 131:16, 131:18, 186:22, 215:16
**stayed** [1] - 116:2
**stenographic** [1] - 226:5
**step** [3] - 58:12, 213:3, 218:14
**steps** [42] - 30:23,

31:8, 32:10, 33:10, 33:13, 38:24, 48:23, 61:3, 108:19, 110:8, 110:11, 110:13, 110:15, 111:2, 111:7, 111:19, 111:21, 111:22, 115:21, 115:23, 116:2, 116:4, 122:3, 122:9, 122:11, 123:5, 123:18, 125:15, 126:13, 138:17, 175:22, 182:12, 183:9, 190:17, 196:19, 197:10, 205:8, 206:5

**stick** [5] - 9:13, 45:11, 114:8, 126:2, 139:24

**still** [22] - 4:23, 22:3, 24:25, 46:11, 48:9, 56:21, 62:3, 82:11, 84:8, 92:7, 107:16, 115:4, 121:15, 130:22, 131:23, 150:3, 191:6, 194:23, 201:11, 210:18, 214:25, 215:22

**stonewalled** [1] - 49:16

**stood** [4] - 47:3, 154:16, 166:21, 178:25

**stop** [33] - 15:23, 24:12, 27:16, 30:13, 31:12, 33:6, 36:6, 40:18, 42:25, 43:20, 47:9, 70:19, 71:12, 72:12, 72:14, 72:15, 73:5, 73:23, 73:25, 97:3, 109:13, 118:5, 156:15, 162:2, 163:1, 164:23, 167:18, 206:1, 208:4, 208:19, 211:5

**stopped** [11] - 33:8, 35:1, 40:18, 73:11, 89:20, 93:25, 109:18, 123:17, 164:11, 203:25, 207:16

**story** [4] - 21:4, 49:16, 53:20, 54:10

**straight** [5] - 11:21, 108:16, 108:19, 222:16, 224:1

**strangely** [1] - 38:4

**strategic** [2] - 57:13, 129:3

**strategy** [1] - 129:8

**Street** [3] - 1:16, 1:19, 1:22

**street** [3] - 16:2, 91:14, 147:9

**strike** [16] - 41:1, 42:4, 42:7, 46:15, 49:20, 49:24, 51:25, 107:25, 151:16, 151:25, 154:21, 165:25, 166:12, 172:24, 178:17, 183:6

**strikes** [1] - 73:24

**string** [1] - 170:2

**strong** [1] - 54:22, 222:25

**strongly** [1] - 193:16

**struck** [1] - 153:13

**struggle** [1] - 21:13

**struggling** [1] - 194:23

**stuck** [2] - 51:6, 176:5

**students** [2] - 55:20, 224:12

**study** [1] - 150:4

**stuff** [2] - 15:2, 15:24

**sua** [1] - 189:16

**submitted** [4] - 10:8, 153:10, 222:8

**subpoena** [6] - 58:24, 60:24, 62:4, 128:9, 130:9, 130:13

**subpoenaed** [1] - 65:21

**subpoenas** [1] - 4:24

**subsequent** [1] - 141:13

**substance** [1] - 191:4

**substantial** [1] - 164:14

**substantially** [6] - 12:9, 14:5, 23:5, 80:25, 81:2, 92:3

**successful** [3] - 213:14, 216:13, 216:22

**such-and-such-and -such** [1] - 85:18

**sufficient** [2] - 141:20, 220:17

**sufficiently** [1] - 221:4

**suggest** [3] - 23:14, 36:4, 66:2

**suggested** [2] - 36:13, 175:12

**suggesting** [3] - 17:15, 20:5, 63:19

**suggestion** [1] - 65:17

**suggestions** [2] -

5:3, 8:20

**Suite** [1] - 1:23

**Sumrall** [7] - 10:17, 12:1, 12:8, 12:11, 13:24, 14:2, 153:9

**sunglasses** [2] - 44:14, 45:8

**supervisor** [1] - 112:22

**support** [4] - 55:2, 64:20, 197:6, 214:6

**supporting** [3] - 9:15, 41:17

**suppose** [1] - 88:19

**supposed** [7] - 25:3, 87:13, 87:14, 90:25, 93:18, 153:17

**Supreme** [9] - 8:11, 8:18, 8:20, 8:23, 9:1, 9:3, 106:15, 107:20, 109:4

**surge** [4] - 212:23, 213:12, 213:14, 218:1

**surgical** [1] - 131:3

**surprised** [1] - 210:9

**surrounded** [6] - 199:6, 209:1, 211:16, 215:13, 216:7, 218:5

**suspect** [1] - 10:24

**sustained** [1] - 80:18

**swear** [6] - 104:19, 143:8, 144:20, 144:24, 195:6, 202:9

**sworn** [4] - 44:16, 55:16, 76:5, 104:13

**SWORN** [7] - 28:14, 100:7, 104:25, 143:16, 145:5, 195:7, 202:12

## T

**table** [2] - 90:13, 91:23

**tack** [1] - 95:4

**tactic** [9] - 196:23, 197:3, 198:2, 200:1, 201:3, 205:4, 206:21, 214:3, 214:5

**tactical** [4] - 127:10, 213:4, 213:7, 213:8

**tactics** [2] - 81:21, 81:22

**talented** [1] - 174:2

**talks** [1] - 12:9

**tall** [3] - 204:8, 213:7, 215:17

**tallest** [1] - 204:6

**target** [1] - 18:6

**team** [1] - 78:12

**tearing** [1] - 43:23

**tech** [1] - 98:9

**technical** [5] - 68:23, 71:23, 131:16, 158:3, 194:10

**techniques** [2] - 25:4, 82:6

**temporarily** [2] - 216:22, 216:23

**temporary** [1] - 113:18

**Ten** [1] - 150:25

**ten** [11] - 14:9, 15:14, 18:13, 18:25, 24:14, 33:8, 86:6, 149:19, 164:16, 173:14, 212:15

**tens** [1] - 154:11

**TERENCE** [1] - 1:15

**Terence** [2] - 4:7, 121:22

**term** [2] - 9:25, 89:16

**terms** [18] - 7:22, 23:1, 25:19, 34:25, 38:22, 75:5, 75:6, 83:11, 154:25, 159:6, 171:9, 177:13, 193:7, 221:24, 222:7, 222:13, 223:21

**terrace** [2] - 13:14, 13:15

**territory** [1] - 115:9

**test** [2] - 98:8, 203:6

**tested** [1] - 203:7

**testified** [14] - 29:1, 50:15, 51:7, 79:4, 83:22, 119:13, 119:15, 120:10, 120:11, 124:11, 147:12, 178:2, 200:17, 216:12

**testifies** [3] - 12:13, 26:20, 129:10

**testify** [59] - 10:18, 10:23, 13:23, 16:15, 18:3, 18:8, 18:22, 19:18, 20:3, 23:11, 23:23, 24:2, 25:16, 37:1, 37:7, 40:6, 41:22, 41:24, 50:23, 50:25, 51:9, 64:5, 64:13, 81:13, 82:5, 82:11, 92:5, 92:11, 96:19, 96:20, 96:21, 104:6, 118:22, 120:6, 123:24, 129:5, 129:9, 137:3, 137:7, 141:2, 141:6, 142:6, 142:7, 142:9, 142:10,

143:21, 144:4, 146:21, 155:6, 159:16, 160:5, 177:24, 188:2, 191:23, 192:15, 223:22, 223:24

**testifying** [10] - 18:13, 22:5, 51:9, 100:18, 150:15, 169:22, 171:5, 177:22, 200:6

**testimony** [81] - 11:9, 12:4, 12:17, 13:25, 15:2, 18:17, 19:6, 19:9, 23:4, 24:21, 28:10, 37:13, 46:1, 49:7, 52:19, 53:15, 56:17, 56:20, 62:13, 66:25, 68:8, 74:3, 74:6, 74:25, 75:2, 75:4, 75:25, 79:9, 80:19, 81:16, 81:19, 81:25, 82:22, 83:12, 83:24, 84:1, 88:4, 92:1, 92:23, 93:3, 93:6, 95:19, 96:5, 96:6, 96:14, 97:16, 100:13, 119:1, 119:7, 119:23, 120:12, 120:14, 121:3, 128:22, 139:13, 143:20, 147:22, 152:21, 153:9, 153:10, 155:15, 155:17, 155:18, 158:18, 159:2, 170:12, 171:5, 180:23, 187:13, 188:17, 188:19, 188:21, 189:23, 192:18, 193:13, 194:6, 198:21, 198:22, 222:15, 223:21, 223:24

**testing** [1] - 18:10

**Texas** [2] - 105:9, 105:23

**thanking** [3] - 172:11, 172:17

**that'll** [1] - 72:3

**THE** [538] - 1:1, 1:10, 1:14, 1:16, 1:18, 3:4, 4:1, 4:16, 4:18, 4:21, 5:9, 7:14, 9:10, 10:10, 10:14, 11:2, 11:11, 11:18, 14:6, 14:14, 14:17, 16:16, 16:22, 16:25, 17:4, 18:7, 19:4, 19:23, 20:1, 20:22, 21:23, 24:11,

26:6, 26:8, 26:18, 27:14, 27:18, 27:21, 27:25, 28:6, 28:8, 28:9, 28:22, 29:13, 32:13, 32:22, 32:24, 33:23, 33:25, 34:9, 34:16, 34:22, 35:23, 36:8, 36:18, 37:23, 38:6, 39:2, 39:6, 40:2, 40:9, 40:10, 40:11, 40:13, 40:24, 41:1, 41:3, 41:18, 41:22, 42:7, 42:18, 45:9, 45:10, 45:11, 45:12, 45:20, 45:24, 46:6, 46:10, 46:15, 49:3, 49:6, 49:18, 49:24, 50:11, 50:14, 50:17, 50:20, 51:4, 51:20, 51:24, 52:10, 52:14, 53:14, 53:25, 54:8, 54:9, 54:13, 54:16, 54:19, 55:5, 55:7, 55:8, 55:9, 56:4, 56:16, 57:18, 57:20, 57:22, 58:1, 58:2, 58:5, 58:6, 58:9, 58:11, 58:13, 58:15, 58:18, 58:21, 59:3, 59:5, 59:15, 59:25, 60:4, 60:10, 60:13, 60:19, 61:11, 61:17, 61:22, 61:25, 62:3, 62:11, 63:10, 66:12, 66:23, 67:15, 68:2, 68:7, 68:13, 68:23, 69:2, 69:16, 69:23, 69:25, 70:5, 70:9, 70:17, 71:3, 71:11, 71:15, 71:20, 71:24, 72:4, 72:7, 72:13, 72:21, 72:25, 73:4, 73:16, 73:20, 73:23, 74:10, 74:15, 74:18, 74:22, 76:3, 76:8, 76:15, 76:22, 77:1, 77:11, 78:5, 78:7, 78:8, 78:21, 84:22, 86:20, 86:21, 86:23, 88:21, 88:24, 89:5, 89:14, 89:17, 89:24, 89:25, 90:3, 91:6, 93:24, 94:3, 94:23, 95:11, 97:11, 97:20, 97:25, 98:4, 98:5, 98:18, 99:3, 99:13, 99:15, 99:16, 99:23, 99:24, 100:1, 100:5, 100:8, 100:9, 100:10, 101:2, 101:4, 101:6, 101:7, 101:11,

101:13, 101:15, 101:18, 102:2, 102:7, 102:9, 102:11, 102:17, 102:19, 102:23, 103:2, 103:5, 103:6, 103:11, 103:19, 104:2, 104:3, 104:7, 104:8, 104:11, 104:12, 104:15, 104:18, 104:23, 105:1, 105:2, 105:11, 105:15, 105:16, 105:18, 105:24, 107:7, 107:23, 108:24, 109:1, 109:3, 110:1, 112:3, 112:10, 112:24, 113:4, 113:20, 113:24, 113:25, 114:7, 114:8, 114:10, 114:23, 114:24, 114:25, 115:3, 115:6, 115:15, 116:24, 117:7, 117:21, 118:15, 118:16, 118:17, 118:21, 119:18, 120:8, 120:10, 121:11, 122:21, 123:12, 123:20, 123:21, 123:24, 124:9, 124:21, 125:12, 125:17, 125:23, 126:1, 126:5, 126:16, 126:23, 126:25, 127:3, 127:15, 128:2, 129:2, 129:17, 131:14, 131:22, 131:25, 132:4, 136:25, 137:16, 137:22, 138:4, 138:10, 138:12, 138:18, 138:22, 138:25, 139:4, 139:23, 140:15, 140:24, 142:18, 142:24, 143:2, 143:4, 143:7, 143:12, 143:14, 143:17, 143:18, 144:5, 144:6, 144:12, 144:13, 144:16, 144:19, 144:23, 145:3, 145:6, 145:15, 145:17, 145:18, 145:20, 145:21, 146:16, 146:19, 146:23, 147:10, 147:20, 148:2, 148:5, 148:9, 149:10, 149:12, 149:15, 149:18, 149:24,

150:11, 150:12, 150:15, 150:23, 151:6, 151:16, 151:24, 152:12, 152:15, 152:23, 153:8, 154:20, 154:21, 155:2, 155:5, 155:19, 155:25, 156:14, 156:15, 156:24, 157:3, 157:25, 158:6, 158:9, 158:15, 158:24, 159:11, 160:4, 160:22, 162:12, 162:13, 162:15, 162:21, 163:10, 163:11, 163:15, 163:20, 164:9, 165:1, 165:8, 165:17, 165:19, 165:23, 166:11, 167:2, 167:3, 167:4, 167:12, 167:13, 167:14, 167:23, 168:8, 168:21, 169:2, 169:10, 169:16, 169:19, 170:5, 170:25, 171:7, 171:15, 172:6, 172:13, 172:16, 172:23, 173:4, 173:9, 173:13, 173:22, 174:23, 175:2, 175:11, 175:16, 175:20, 176:12, 177:3, 177:6, 177:9, 178:5, 178:11, 178:16, 178:20, 179:17, 179:22, 179:23, 180:25, 181:25, 182:15, 182:18, 183:2, 183:6, 183:20, 183:22, 184:3, 184:5, 184:13, 184:16, 185:7, 185:10, 185:16, 185:21, 185:23, 186:3, 186:5, 186:8, 186:14, 187:2, 187:6, 187:14, 188:7, 188:13, 188:15, 188:21, 189:25, 191:2, 192:14, 192:25, 193:9, 193:22, 194:17, 195:4, 195:8, 195:9, 196:4, 197:16, 197:21, 198:5, 198:19, 199:8, 199:12, 199:13, 199:17, 200:5, 200:8,

200:9, 200:10, 200:11, 200:21, 201:7, 201:9, 201:13, 201:16, 201:18, 201:20, 201:21, 201:23, 202:2, 202:3, 202:8, 202:9, 202:10, 202:13, 202:20, 202:22, 203:17, 203:20, 203:21, 205:10, 205:11, 205:14, 206:14, 207:7, 207:12, 209:24, 210:4, 210:22, 217:9, 217:14, 217:20, 218:9, 218:13, 218:14, 218:16, 218:18, 218:21, 219:4, 219:8, 219:13, 220:10, 222:2, 222:7, 222:19, 222:24, 223:4, 223:14, 225:16
**themselves** [2] - 21:8, 39:14
**then-knowledge** [1] - 96:23
**theory** [16] - 10:4, 25:19, 57:9, 119:7, 120:2, 141:20, 159:25, 189:1, 220:12, 220:16, 220:18, 220:20, 220:21, 221:3, 221:17, 222:7
**theory-of-defense** [2] - 220:12, 220:16
**theory-of-the-case** [2] - 10:4, 220:20
**thereabouts** [1] - 108:6
**Thereupon** [7] - 4:19, 27:23, 57:24, 62:1, 97:23, 186:25, 195:2
**they've** [6] - 39:6, 39:8, 85:25, 86:14, 92:17, 141:15
**thin** [1] - 16:12
**thinking** [11] - 41:24, 88:9, 142:9, 142:12, 143:25, 144:1, 159:9, 159:10, 209:17, 213:2, 213:10
**thinks** [3] - 36:21, 119:9, 170:7
**Third** [2] - 1:20, 221:9
**third** [2] - 180:14, 218:1

**thirteen** [2] - 72:6, 72:7
**thoughts** [1] - 94:24
**thousand** [2] - 141:11, 141:12
**thousands** [1] - 154:11
**threatened** [1] - 55:6
**three** [12] - 7:7, 11:10, 11:14, 65:25, 92:14, 111:13, 116:5, 137:19, 149:23, 164:16, 164:23, 216:5
**three-minute** [1] - 164:16
**three-plus** [1] - 111:13
**throughout** [3] - 8:12, 68:18, 76:16
**tight** [1] - 76:10
**time/practical** [1] - 10:25
**timeline** [1] - 14:6
**timely** [1] - 130:9
**today** [20] - 5:7, 10:11, 12:12, 56:20, 58:12, 96:6, 98:3, 99:6, 99:19, 130:16, 130:21, 130:22, 131:4, 141:14, 146:22, 183:23, 184:19, 186:6, 218:24, 219:20
**together** [10] - 52:20, 57:1, 59:23, 82:14, 138:16, 138:17, 170:2, 186:16, 225:3
**took** [6] - 32:1, 41:10, 44:17, 204:18, 207:1, 210:12
**top** [10] - 29:21, 33:13, 93:10, 199:6, 208:25, 211:8, 214:19, 216:4, 216:6, 218:1
**tore** [1] - 44:13
**torture** [1] - 222:12
**totally** [8] - 20:1, 23:12, 51:24, 96:7, 112:20, 113:1, 130:11, 151:5
**touch** [1] - 37:22
**toward** [1] - 29:24
**towards** [4] - 38:24, 46:4, 47:7, 48:12
**traced** [1] - 138:16
**track** [2] - 60:21, 193:18
**traffic** [1] - 185:7, 186:2

**training** [2] - 18:9, 82:6

**transcript** [3] - 10:16, 226:5, 226:6

**TRANSCRIPT** [1] - 1:10

**transparent** [1] - 196:23

**traveled** [1] - 12:23

**travels** [1] - 150:17

**treat** [3] - 87:7, 147:14, 224:22

**treated** [2] - 55:22, 151:4

**trees** [1] - 212:16

**tremendously** [2] - 14:4, 224:20

**trench** [1] - 70:12

**trial** [46] - 4:4, 8:1, 8:8, 12:19, 27:10, 55:11, 55:14, 56:1, 63:13, 63:17, 63:24, 64:3, 64:7, 65:18, 65:22, 66:4, 69:12, 77:17, 91:24, 95:12, 95:16, 116:11, 127:10, 128:1, 128:4, 129:8, 130:9, 151:8, 151:9, 153:9, 157:4, 157:10, 157:18, 159:3, 159:8, 179:10, 179:12, 180:5, 182:5, 219:17, 221:7, 224:4, 224:24, 225:12

**TRIAL** [1] - 1:10

**trial's** [1] - 16:7

**trials** [7] - 8:11, 8:23, 8:25, 63:8, 141:13, 159:13

**tried** [8] - 13:24, 48:3, 49:14, 59:13, 92:17, 92:18, 98:23, 213:13

**trigonometry** [1] - 32:1

**trivial** [1] - 8:22

**true** [5] - 51:4, 92:9, 115:11, 226:4, 226:5

**Trump** [8] - 49:15, 62:25, 138:1, 140:10, 140:22, 158:12, 159:4, 159:7

**Trump's** [5] - 12:21, 139:5, 140:2, 140:4, 159:1

**Trumper** [1] - 63:1

**trust** [1] - 95:7

**truth** [9] - 37:6, 42:2, 190:14, 191:6, 191:8, 191:10, 192:7,

192:10, 194:14

**truthful** [1] - 189:14

**truthfulness** [1] - 37:8

**try** [16] - 17:16, 48:25, 51:11, 60:5, 60:6, 61:22, 73:20, 105:13, 129:25, 130:17, 197:5, 197:10, 204:20, 205:18, 209:6, 218:6

**trying** [40] - 11:4, 15:23, 22:19, 23:14, 25:6, 37:8, 47:4, 60:14, 62:3, 66:21, 83:5, 98:19, 127:13, 128:14, 131:15, 131:19, 139:21, 153:15, 155:10, 157:8, 170:13, 170:17, 190:23, 197:2, 197:21, 200:3, 204:23, 204:24, 206:23, 209:1, 209:4, 210:14, 211:15, 212:23, 214:1, 214:20, 214:22, 216:7, 216:19, 218:2

**Tulsa** [1] - 149:6

**turn** [1] - 80:7

**turnaround** [1] - 128:9

**turned** [2] - 46:23, 69:17

**turning** [2] - 175:21, 175:22

**Twelve** [1] - 151:1

**two** [33] - 5:10, 9:25, 10:3, 10:21, 16:8, 26:12, 29:17, 31:11, 45:6, 53:12, 53:13, 61:17, 70:19, 82:14, 92:1, 93:10, 102:8, 103:8, 103:15, 130:7, 139:4, 139:6, 141:9, 141:12, 141:15, 142:4, 142:5, 170:2, 186:13, 215:5, 218:24, 219:5, 219:16

**type** [1] - 209:18

## U

**U.S** [11] - 9:1, 9:22, 9:23, 13:12, 101:20, 109:4, 110:8, 110:11, 150:9, 156:3, 156:22

**ultimately** [14] - 8:4, 8:6, 44:19, 45:4, 45:5, 47:23, 48:5, 48:23,

56:13, 57:12, 65:12, 84:5, 87:5, 164:14

**umbrage** [1] - 65:17

**unclear** [1] - 91:1

**under** [12] - 12:8, 58:23, 80:24, 82:8, 83:12, 94:22, 119:2, 125:6, 125:14, 164:3, 199:22, 213:17

**undercover** [1] - 24:5

**undercovers** [1] - 24:4

**undercutting** [1] - 148:11

**underlying** [2] - 40:8, 188:3

**underneath** [1] - 85:7

**understood** [7] - 8:9, 35:4, 38:17, 93:22, 153:5, 164:25, 193:17

**undesignated** [1] - 96:3

**undue** [1] - 81:4

**unduly** [1] - 84:13

**unexpected** [1] - 224:1

**unfair** [11] - 14:15, 14:19, 14:20, 16:11, 16:14, 21:22, 23:6, 56:15, 81:3, 86:13, 86:19

**unfairly** [1] - 88:12

**unfortunately** [4] - 51:6, 54:24, 127:18, 198:23

**UNIDENTIFIED** [1] - 105:17

**uniform** [3] - 22:4, 22:10, 213:5

**uniformed** [1] - 116:4

**uniforms** [1] - 21:19

**unintentionally** [1] - 115:8

**uniquely** [1] - 92:21

**united** [1] - 2:2

**United** [32] - 4:2, 4:8, 5:2, 6:24, 9:20, 10:19, 16:1, 16:16, 44:16, 47:4, 55:8, 67:4, 90:10, 140:11, 140:16, 144:13, 170:4, 174:20, 181:13, 181:15, 185:14, 186:19, 187:6, 190:23, 219:8, 220:14, 220:23, 221:1, 221:8, 222:17,

224:8, 226:13

**UNITED** [4] - 1:1, 1:3, 1:11, 1:15

**unless** [3] - 137:13, 168:4, 198:12

**unlike** [1] - 153:8

**unnecessary** [4] - 12:5, 50:19, 221:10, 221:21

**unobjectionable** [1] - 170:2

**unpublish** [1] - 72:16

**unshare** [1] - 104:9

**untrue** [1] - 190:15

**up** [100] - 10:10, 15:25, 16:3, 17:9, 27:21, 27:25, 28:2, 28:20, 30:22, 30:23, 32:8, 32:10, 33:10, 37:15, 42:9, 43:10, 43:14, 44:5, 48:7, 51:11, 57:13, 59:14, 59:16, 60:14, 60:22, 67:13, 70:2, 71:16, 72:8, 77:16, 82:3, 82:12, 89:3, 99:6, 101:20, 102:15, 106:9, 106:13, 107:5, 110:12, 110:15, 110:17, 110:18, 111:7, 111:18, 111:20, 111:22, 111:24, 113:21, 115:21, 115:23, 116:3, 116:6, 116:19, 117:24, 120:18, 121:12, 122:8, 122:11, 123:17, 124:4, 124:18, 125:5, 125:15, 125:19, 126:10, 126:12, 126:21, 128:18, 130:6, 131:3, 131:19, 149:10, 160:20, 160:21, 161:22, 167:8, 169:7, 170:14, 175:17, 183:12, 186:16, 190:20, 195:4, 195:20, 203:25, 205:7, 206:5, 214:17, 214:18, 215:1, 215:2, 216:15, 223:3, 223:9, 224:25, 225:1

**updated** [1] - 102:10

**uphold** [3] - 9:25, 224:14, 224:16

**upholding** [1] - 10:1

**uploaded** [1] - 69:19

**upper** [7] - 13:14,

13:15, 102:23, 108:20, 110:13, 216:16, 216:21

**ups** [1] - 192:10

**upstairs** [1] - 91:13

**urge** [1] - 77:16

**USA** [4] - 30:4, 176:19

**USAfx** [1] - 69:19

**useful** [1] - 67:13

**uttered** [1] - 94:6

## V

**vague** [1] - 169:20

**valuable** [4] - 27:12, 81:25, 119:7, 120:13

**value** [6] - 81:1, 81:2, 92:3, 95:22, 96:19, 164:14

**vantage** [1] - 17:8

**various** [1] - 148:22

**Varnell** [1] - 145:11

**VARNELL** [1] - 145:12

**vast** [1] - 17:23

**veer** [1] - 115:8

**Venkata** [1] - 220:24

**VENKATA** [1] - 220:24

**Venn** [1] - 51:11

**venue** [1] - 154:15

**venues** [1] - 23:17

**verbs** [1] - 6:2

**version** [1] - 200:21

**versus** [10] - 4:2, 6:24, 9:20, 9:22, 9:23, 63:24, 220:14, 220:23, 220:25, 221:8

**veteran** [4] - 147:1, 147:5, 147:6, 148:12

**via** [5] - 73:21, 74:13, 76:13, 100:3, 143:1

**vicinity** [2] - 13:17, 186:2

**video** [103] - 10:25, 12:3, 12:4, 12:13, 15:17, 29:21, 32:9, 32:10, 32:17, 32:18, 32:19, 42:14, 42:15, 43:1, 53:10, 56:8, 67:5, 67:8, 67:9, 67:20, 67:21, 68:11, 68:14, 69:18, 69:20, 70:1, 71:2, 76:3, 98:8, 98:10, 100:23, 101:8, 101:10, 102:22, 103:3, 103:7, 103:12, 103:13, 103:14,

107:9, 108:20, 109:10, 116:19, 117:8, 117:15, 122:1, 127:22, 127:25, 129:15, 138:4, 138:10, 138:12, 139:2, 139:12, 140:1, 140:19, 142:5, 142:20, 161:1, 161:6, 163:17, 167:8, 168:13, 168:22, 171:24, 172:2, 187:3, 187:13, 188:4, 189:21, 190:6, 191:19, 191:20, 191:22, 192:19, 193:2, 193:20, 193:22, 193:23, 194:5, 194:21, 195:12, 195:23, 198:19, 198:25, 200:18, 200:20, 201:5, 201:11, 201:17, 203:15, 203:19, 204:2, 204:11, 205:19, 208:16, 208:20, 211:1, 211:16, 212:12, 214:7

**videoconference** [4] - 74:14, 76:14, 100:4, 143:1

**Videoconference** [1] - 184:4

**videos** [19] - 11:10, 11:14, 11:16, 11:24, 15:1, 57:6, 67:12, 100:20, 102:8, 103:15, 109:12, 116:18, 117:2, 137:16, 137:18, 137:19, 137:23, 139:4, 160:11

**Vietnam** [1] - 147:5

**view** [2] - 83:7, 98:8

**viewed** [1] - 7:24

**viewpoint** [1] - 17:9

**violated** [1] - 6:7

**violation** [1] - 6:16

**violence** [5] - 57:11, 75:7, 157:14, 159:6

**violent** [2] - 15:21, 36:14

**Virginia** [1] - 130:1

**visible** [4] - 73:12, 74:23, 112:8, 113:15

**vision** [1] - 153:14

**visit** [1] - 150:9

**visited** [1] - 150:7

**vividly** [1] - 216:3

**voice** [7] - 8:4, 15:9, 44:2, 44:4, 44:8, 44:9, 90:11

**voices** [1] - 36:16

**voluntary** [1] - 99:7

**volunteer** [2] - 21:1, 146:6

**volunteered** [2] - 146:7, 147:11

**vs** [1] - 1:5

# W

**W-A-R-N-E-R** [1] - 202:19

**wait** [4] - 4:16, 68:9, 98:1, 128:22

**waiting** [9] - 61:1, 76:7, 76:10, 98:3, 98:6, 126:19, 130:7, 137:1, 183:23

**waived** [1] - 130:16

**waiving** [1] - 128:12

**walk** [7] - 111:7, 116:3, 122:8, 122:11, 163:3, 178:14, 178:20

**walked** [11] - 43:6, 111:9, 111:18, 116:6, 116:9, 138:16, 156:18, 166:20, 166:22, 179:3

**walking** [7] - 53:8, 110:14, 111:23, 163:5, 163:6, 163:8, 175:22

**walks** [3] - 15:13, 15:14

**wall** [3] - 211:20, 214:21, 214:22

**Walters** [9] - 59:10, 59:16, 60:6, 184:7, 184:10, 184:18, 185:13, 186:10, 186:22

**WALTERS** [7] - 185:6, 185:12, 185:18, 185:24, 186:4, 186:7, 186:12

**wants** [11] - 14:24, 38:7, 45:20, 73:12, 141:2, 152:18, 159:16, 169:24, 170:25, 189:11, 191:19

**warn** [1] - 223:19

**Warner** [18] - 3:8, 58:20, 61:23, 83:23, 98:16, 129:14, 185:19, 186:8,

186:25, 193:18, 193:21, 195:2, 195:15, 202:6, 202:17, 204:8, 207:19

**WARNER** [3] - 185:22, 195:7, 202:12

**warrant** [1] - 130:24

**Washington** [14] - 1:6, 1:17, 2:4, 106:3, 106:7, 113:21, 150:5, 150:7, 150:17, 152:4, 152:7, 154:14, 171:21, 226:14

**waste** [1] - 12:9

**wasting** [2] - 81:4, 170:4

**watch** [1] - 47:5

**watched** [1] - 111:7

**watching** [4] - 12:21, 28:19, 171:22, 225:3

**waters** [1] - 6:9

**Watts** [1] - 9:23

**WATTS** [1] - 9:23

**waved** [1] - 193:14

**waving** [3] - 83:22, 111:22, 111:23

**ways** [1] - 144:10

**weaponized** [1] - 62:24

**weapons** [2] - 148:22, 148:23

**wearing** [6] - 21:16, 22:9, 31:14, 44:14, 147:7

**week** [1] - 164:11

**weekend** [3] - 220:2, 220:7, 223:11

**weeks** [1] - 16:8

**welcome** [5] - 55:19, 56:22, 76:24, 121:4, 200:15

**well-being** [2] - 209:3, 215:12

**west** [18] - 12:24, 13:13, 13:14, 13:15, 108:15, 139:12, 139:16, 161:21, 161:22, 162:6, 163:6, 181:3, 181:6, 194:4, 207:1, 212:18, 212:20

**Westlaw** [2] - 6:25, 220:24

**whatnot** [1] - 76:18

**whereabouts** [1] - 162:4

**whereas** [1] - 24:2

**whichever** [1] - 5:7

**white** [4] - 139:3, 168:1, 196:12, 204:17

**whole** [8] - 15:17,

38:2, 93:1, 101:2, 111:10, 207:2, 214:2, 214:7

**wife** [4] - 24:16, 149:19, 149:22, 149:25

**willful** [1] - 5:22

**willfully** [1] - 6:4

**William** [1] - 8:11

**willing** [2] - 129:24

**wilting** [1] - 26:25

**window** [17] - 35:18, 38:2, 41:8, 43:6, 43:7, 43:15, 43:23, 44:10, 44:13, 44:15, 44:19, 44:23, 45:7, 47:3, 47:8, 56:12, 63:2

**wing** [1] - 13:2

**winning** [1] - 148:12

**wish** [1] - 185:16

**wishing** [2] - 209:19, 209:20

**withdraw** [2] - 17:2, 17:3

**withdrawn** [1] - 141:17

**withheld** [1] - 86:19

**Witness** [1] - 29:17

**witness** [81] - 5:7, 14:4, 14:23, 18:4, 21:7, 21:24, 25:24, 26:21, 27:5, 28:12, 32:15, 36:15, 38:19, 39:22, 40:21, 42:12, 50:22, 52:19, 53:19, 54:2, 56:9, 57:3, 58:17, 58:18, 59:15, 60:14, 60:21, 61:7, 62:4, 62:7, 66:9, 74:8, 77:10, 78:11, 78:12, 79:5, 84:8, 86:13, 86:14, 87:7, 87:8, 88:8, 90:4, 90:6, 90:16, 92:16, 96:15, 96:25, 104:20, 112:4, 115:8, 116:25, 117:1, 118:7, 126:24, 128:6, 129:4, 131:15, 137:8, 139:15, 141:19, 142:1, 144:24, 153:13, 159:21, 163:17, 171:3, 174:15, 176:12, 182:24, 184:5, 186:20, 189:21, 191:12, 193:21, 194:8, 195:5, 197:20, 202:3, 204:3, 218:17

**WITNESS** [70] - 3:4, 28:14, 29:13, 33:23,

34:9, 40:9, 40:11, 41:3, 45:10, 45:12, 51:20, 54:9, 54:16, 55:5, 55:8, 58:13, 100:7, 100:9, 101:6, 101:11, 101:13, 101:15, 101:18, 102:19, 102:23, 103:2, 103:5, 103:11, 104:7, 104:25, 105:15, 109:3, 113:20, 113:24, 114:7, 114:10, 114:24, 118:16, 123:20, 126:23, 143:16, 144:5, 144:12, 145:5, 149:12, 149:18, 150:11, 154:20, 156:14, 162:12, 162:15, 163:10, 165:19, 167:3, 172:16, 178:20, 179:22, 184:3, 195:7, 196:4, 199:13, 200:8, 200:10, 202:8, 202:12, 202:22, 205:10, 205:14, 218:13, 218:16

**witness's** [2] - 34:18, 152:16

**witnessed** [10] - 23:24, 40:22, 41:3, 111:8, 111:19, 111:21, 111:23, 116:7, 120:7, 140:20

**witnesses** [36] - 16:19, 21:16, 21:18, 21:20, 22:13, 27:9, 57:2, 61:18, 62:21, 64:4, 64:11, 64:13, 65:14, 65:21, 65:25, 66:24, 79:2, 80:16, 84:10, 87:9, 87:12, 92:10, 92:15, 132:3, 137:2, 137:6, 137:8, 141:15, 147:7, 147:8, 147:12, 147:15, 218:25, 219:6, 219:16, 225:6

**WL** [1] - 6:18

**woman** [2] - 16:6, 90:22

**women's** [1] - 166:24

**wonderful** [4] - 74:18, 143:7, 143:11, 147:7

**Woodland** [1] - 1:20

**word** [3] - 66:22, 125:22, 172:15

**words** [7] - 68:19, 94:6, 108:20, 114:6, 175:11, 185:3, 192:13

**works** [2] - 91:24, 92:12

**world** [2] - 184:25, 192:5

**worried** [2] - 215:22, 215:23

**worse** [2] - 198:23, 225:12

**worship** [1] - 108:11

**wrap** [1] - 149:10

**wreck** [1] - 128:19

**writ** [1] - 169:23

**write** [5] - 64:15, 77:14, 82:14, 176:4, 198:24

**writing** [3] - 66:18, 66:20

**written** [2] - 64:16, 148:1

## Y

**year** [7] - 39:15, 39:16, 85:8, 85:9, 146:8, 149:22

**years** [16] - 9:4, 18:14, 18:25, 19:1, 22:12, 24:15, 86:6, 88:15, 89:10, 94:17, 106:18, 106:21, 149:19, 149:20, 149:23, 151:2

**years'** [1] - 205:2

**yelling** [3] - 48:10, 112:22, 173:21

**yellow** [1] - 31:2

**yes-or-no** [2] - 89:9, 175:3

**yesterday** [16] - 6:11, 6:19, 12:1, 12:8, 12:11, 14:2, 20:21, 25:23, 26:19, 29:7, 30:15, 56:17, 59:17, 83:22, 98:24, 131:3

**yourself** [12] - 29:16, 30:6, 56:25, 91:8, 109:10, 110:24, 122:7, 122:25, 156:6, 195:24, 199:4, 204:1

**yourselves** [2] - 4:5, 224:16

## Z

**Zia** [1] - 82:17

**ZIA** [1] - 1:10

**Zoom** [15] - 5:7, 10:24, 11:1, 11:24, 61:9, 66:1, 73:17, 73:21, 74:11, 74:13, 76:13, 126:18, 137:9, 142:18, 143:1