**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-66-ZMF** |
| **v.** | : | |
| | : | |
| **REBECCA LAVRENZ,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Rebecca Lavrenz to 10 months' incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution. That recommendation is justified, in part, because Lavrenz, promoting herself as the "J6 praying grandma," has been one of the loudest public voices calling the prosecution of January 6 rioters a corrupt exercise. Although Lavrenz certainly has a First Amendment right to publicly espouse her views, her unrepentant promotion of the riot is powerful evidence that she continues to pose a threat to future acts of political violence like that which engulfed the nation on January 6.

The government also intends to recommend a fine to account for Lavrenz's profiting off the celebrity of her conviction. The government will make a specific recommendation about the fine amount as soon as Lavrenz provides an accounting of her January 6-related fundraising, as the Court has ordered. *See* Aug. 5, 2024 Min. Order, *United States v. Lavrenz*, 1:23-cr-66-ZMF.

I.    **Introduction**

Lavrenz, a bed and breakfast operator from Colorado, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's

1

certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Lavrenz was convicted at trial of violations of 18 U.S.C §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (2)(G). The government's recommendation is supported by Lavrenz's (1) positioning herself at the front of the mob on the East Front; (2) attempt to reach the Senate Chamber once inside the U.S. Capitol; (3) numerous false statements during her trial testimony; and (4) many post-trial interviews expressing pride in her criminal conduct and complete lack of remorse.

The Court must also consider that Lavrenz's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Lavrenz's crime support a sentence of 10 months' imprisonment and 12 months' supervised release. Her actions also support the imposition of a fine—the size of which should be determined based on Lavrenz's ability to account for the hundreds of thousands of dollars that she has raised online.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1.

*Lavrenz's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Lavrenz arrived on the east side of the U.S. Capitol at approximately 9:30 a.m. or 10:00 a.m. There, she positioned herself in the center of the East Plaza, directly behind a line of bike racks arranged as a barricade by United States Capitol Police ("USCP") officers to keep unauthorized individuals outside the restricted area. *See* Government Trial Exhibits ("GX") 103, 105. Throughout that morning, Lavrenz stayed on the East Plaza near the bike racks, except for a brief period when she was on the House Egg.

Around 1:59 p.m., rioters breached the bike rack barriers. Lavrenz watched as rioters who were mere feet away from her pulled apart a set of bike racks as a USCP officer attempted to push the bike racks back into place. *See* Figure 1. In a later media interview, Lavrenz stated that the crowd on the East Plaza got "riled up" because they realized that Vice President Pence was going to certify the election for Joe Biden. GX 504.



*Figure 1: Capitol CCTV showing Lavrenz (yellow) during the 1:59 p.m. breach (GX 104)*

Joining the crowd of rioters who had just breached the bike racks, Lavrenz advanced across the East Plaza toward the Capitol building. GX 104B. As she approached, Lavrenz looked toward the Rotunda Steps where a group of USCP officers had formed a line to prevent rioters from advancing closer to the building. Despite the obvious signs that she was not permitted to do so, Lavrenz continued to the front of the group of rioters, standing only two or three rows of rioters behind the police line. *See* Figure 2. As other rioters in front of her pushed the police line further up the Rotunda Steps towards the Capitol building, Lavrenz moved up the steps with the mob. *See* GX 107A.



*Figure 2: Lavrenz at the front of the group of rioters (GX 302)*

At approximately 2:06 p.m., rioters just feet in front of Lavrenz overran the police line on the Rotunda Steps, forcing the USCP officers to retreat. GX 107A. As the officers retreated up the steps—trying to prevent rioters from reaching the Rotunda Doors—Lavrenz continued with the crowd of rioters as they swarmed closer to the Capitol building. *See* GX 107A, 306. At the top of the steps, Lavrenz went onto a balcony on the south side of the Rotunda Steps and looked toward the Rotunda Doors. *See* GX 311, 312. While on the balcony, Lavrenz chanted "It's our house, you can't take our house."[2] *See* Figure 3. She stood feet away as rioters in front of the Rotunda Doors assaulted officers with flagpoles and chemical spray. Amidst this chaos, a USCP officer set off a flash bang near the Rotunda Doors in an unsuccessful effort to deter the rioters that Lavrenz had joined from entering the Capitol. GX 311.

---

[2] Figure 3 is a screenshot from a video in which Lavrenz was identified after trial. It has been submitted as an exhibit for sentencing as Government Sentencing Exhibit 1.



*Figure 3: Lavrenz chanting "It's our house"
on the balcony next to the Rotunda Steps*

After other rioters breached the Rotunda Doors, Lavrenz unlawfully entered the Capitol

building through the Rotunda Doors at approximately 2:43 p.m. *See* Figure 4.



*Figure 4: Lavrenz pushing past a USCP officer to enter the U.S. Capitol (GX 108)*

Lavrenz entered the Rotunda of the U.S. Capitol, walking around and appearing to take

photos or video on her cell phone among the large group of rioters who had overtaken the Rotunda.

*See* GX 111. From there, Lavrenz walked toward the Senate Chamber. She made it down the North

Hallway at least as far as the Small Senate Rotunda. *See* GX 310. A short distance away, rioters were violently assaulting police officers. *Id.* On cross examination, Lavrenz testified that she walked down that hallway because she was looking for members of Congress. It was only when another rioter told her the members of Congress had already been evacuated, that Lavrenz turned back and left the Capitol building through the Rotunda Doors. April 1 Tr. 150:22–151:8. She did so at approximately 2:53 p.m. GX 108.

<em>Lavrenz's False Testimony at Trial</em>

At trial, Lavrenz testified falsely at least five times:

1.   Lavrenz testified falsely that she did not know how the bike racks on the East Plaza were moved. April 1 Tr. 153:25–154:2; *see also* 41:3–21. The video evidence proved she was standing feet away from, and facing toward, rioters who breached the bike racks at 1:59 p.m. *See* Figure 1 (GX 104). And even before the 1:59 p.m. breach, Lavrenz saw other rioters attempt to push down the bike racks before USCP officers stopped them. *See* Figure 5 (GX 301). Lavrenz's false testimony about the bike racks proved her consciousness of guilt, as well as her knowledge of the location of the restricted perimeter and her own disorderly conduct.



*Figure 5: Lavrenz (yellow) watching rioters (red) breach the bike racks (GX 301)*

2.   Lavrenz testified falsely that no police officers tried to prevent her from entering the East Plaza. April 1 Tr. 152:4–9. But the video evidence showed that a USCP officer who was only a few feet away from Lavrenz tried to push the bike racks back into place during the 1:59 p.m. breach. *See* Figure 1; GX 104A. Even before that breach, Lavrenz saw USCP officers stop rioters from entering the East Plaza during isolated breaches. Figure 5; *see* April 1 Tr. 118:23–119:24 (Lavrenz testifying about the video shown in Figure 5 above).

3.   Lavrenz testified that she did not hear a flash bang go off outside the Rotunda Doors. April 1 Tr. 136:7–16. That was a lie. The flash bang in question went off feet away from Lavrenz. GX 311; April 1 Tr. 136:7–11 (Lavrenz admitting she was feet away from the flash bang as shown in GX 311). As USCP Lt. David Van Benschoten testified, the flash bang produced a loud sound, Mar. 27 Tr. 34:2–13, and a video admitted at trial captured its explosive boom, as well as the chaos in the crowd that it created, GX 311. Lavrenz has offered no evidence to suggest that she has hearing issues so severe that she could not hear the explosion of a flash bang several feet away from her. Moreover, the evidence showed that Lavrenz managed to hear a phone call with her daughter on January 6, *see* Mar. 26 Tr. 185:17–25 (testimony of Jennifer Lavrenz), and heard someone playing President Trump's speech on a loudspeaker, *see* April 1 Tr. 110:21–111:9 (testimony of Rebecca Lavrenz). The idea that Lavrenz could hear a phone call or a speaker, but not a flash bang a few feet away is a lie, plain and simple—one that proved her consciousness of guilt and was material to Lavrenz's knowledge and intent.

4.   Lavrenz testified falsely that no police officers tried to prevent her from entering the U.S. Capitol building. April 1 Tr. 152:10–12. All of the available evidence showed the USCP officers repeatedly tried to stop the mob of rioters from reaching the Rotunda Doors, first by forming a police line on the steps, GX 107A, 302, 305, and then in front of the doors once the rioters overran

the line on the steps, GX 107A, 311. Lavrenz was in a position to observe the USCP officers'

actions, Figure 6, but lied about what she saw them do.



*Figure 6: Lavrenz feet away from the police line on the Rotunda Steps (GX 304)*

5.   Lavrenz testified that she did not witness any violence on January 6, 2021. April 1 Tr.

80:18–21; 86:23–87:6; 88:10–16. That was plainly false. Lavrenz stood a few yards away from

the 1:59 p.m. breach of the bike racks during which rioters assaulted officers, GX 104A, and that

Lavrenz described in a media interview as the crowd getting "a little riled up," GX 504. She

watched at the base of the Rotunda Steps as rioters overran the police line. GX 107A. She stood

feet away as rioters beat USCP officers with flag poles in front of the Rotunda Doors. GX 311.

Inside the Capitol, she looked down a hallway as rioters attempting to reach the door to the Senate

Chamber violently clashed with police. GX 310. Her false testimony on this point was further

proof of her consciousness of guilt and material to her knowledge and intent to commit the charged

offenses, and to her disorderly and disruptive conduct.

*Lavrenz's Post-Trial Statements and Fundraising*

Following her trial, Lavrenz has used her participation in the January 6 riot and her

convictions to raise large sums of money and has sought celebrity based on her criminal conduct.

Lavrenz has two GiveSendGo accounts that she has used to raise money. The webpage for one account (hereinafter, "the Lavrenz Account") is titled "Rebecca Lavrenz January 6th Related Expenses," and states that "[t]he funds from this campaign will be received by Rebecca Lavrenz."[3] As of July 18, 2024, the Lavrenz Account contains $162,769. On the Lavrenz Account webpage, Lavrenz specifically uses the prospect of a criminal fine in her fundraising requests, writing "I will be appealing my case as well as facing the possibility of additional fines of up to $200,000." (emphasis in original).

The second GiveSendGo account associated with Lavrenz is titled "Rebecca Lavrenz Legal Defense Fund" (hereinafter, "the NCLU Account"),[4] and states that "Campaign funds will be received by National Constitutional Law Union." The National Constitutional Law Union ("NCLU") is chaired by Lavrenz's defense attorney, John Pierce, and lists Lavrenz's case on its website as one of its cases.[5] The NCLU Account, as of July 18, 2024, contains $67,691.

In total, between both the Lavrenz Account and the NCLU Account, Lavrenz has fundraised at least $230,460 related to her criminal case. The majority of the funds raised in the Lavrenz Account and a significant portion of the funds raised in the NCLU Account were received after Lavrenz's guilty verdicts.

Since her trial, Lavrenz has given at least two dozen media interviews, in which she fundraised off her criminal convictions, questioned the fairness of her trial, and showed no remorse for her criminal conduct. Those interviews are listed below, and links to the interviews can be found in Attachment 3 to this memo.

---

[3] https://www.givesendgo.com/rebeccalavrenz (last visited Aug. 5, 2024); *see* Attachment 1 to this memo.

[4] https://www.givesendgo.com/rebeccalavrenzJ6 (last visited Aug. 5, 2024); *see* Attachment 2 to this meo.

[5] https://nclu.org/#cases.

- April 5, 2024 — Newsmax.
- April 5, 2024 — War Room with Steven Bannon.
- April 7, 2024 — Colorado Free Press with Ashe Epp.
- April 8, 2024 — Richard Randall Show.
- April 8, 2024 — America First with Sebastian Gorka.
- April 8, 2024 — The Absolute Truth with Emerald Robinson.
- April 10, 2024 — America's Mom with Sheronna Bishop.
- April 10, 2024 — CannCon Brian Lupo.
- April 10, 2024 — The Tamera Scott Show.
- April 11, 2024 — His Glory TV with David Scarlett.
- April 12, 2024 — Lou Dobbs Tonight.
- April 16, 2024 — Conservative Daily with Joe Oltmann and David Clements.
- April 17, 2024 — Wall Builders Show with Rick Green.
- April 18, 2024 — Flashpoint with Gene Bailey.
- April 23, 2024 — AssemblexIowaX.
- April 23, 2024 — Joe Hoft Show.
- April 26, 2024 — Flashpoint with Rick Green (event in Virginia Beach, VA).
- May 2, 2024 — Kim Monson Show Podcast.
- May 5, 2024 — Gateway on Mt. Zion Church.
- May 8, 2024 — The Mat Christiansen Hour.
- June 2, 2024 — Super Woke News on X (with John Pierce and Roger Roots).
- June 2, 2024 — Liberty Counsel with Mat Staver.
- June 12, 2024 — The Truth & Liberty Show.
- July 9, 2024 — Iowa Liberty Network Twitter Spaces.

Lavrenz's post-conviction interviews include at least one show hosted by an individual who has repeatedly called for political violence. In an April 16, 2024, interview that Lavrenz gave to Conservative Daily host Joe Oltmann, Oltmann bragged about having the "warrior spirit" and being "ready at all times" with a "battle axe" in his studio, adding "sometimes evil will not relent without force, not violence, but force." Nodding along, Lavrenz responded: "the weapons of our . . . warfare aren't carnal, but mighty, you know, and whether it's prayer, *whether we do have to take action whatever it looks like*, we each have a different calling to that." Then to dispel any

doubt about what she was referencing, Lavrenz added: "obviously because of my arrest, I can't even have a firearm."[6]

Just as concerning, Lavrenz has used her post-conviction interviews to question the legitimacy and fairness of her trial. In multiple interviews, Lavrenz has questioned the integrity of the jury that convicted her. In a speech, Lavrenz said "I knew that if I was going to D.C. it was corrupt," adding that all potential jurors were "Democrat motivated."[7] In another interview, Lavrenz, reflecting on her verdict, said "I knew that . . . a D.C. jury, that's not a jury of my peers."[8] In other interviews, she impugned the fairness of the presiding judge. Talking about discussions between the parties and the Court, Lavrenz said she and her daughters were "appalled of what corruption [was] in" the courtroom.[9] In a July 9, 2024, interview, Lavrenz said "they have an agenda to prosecute you, and the judges and the prosecution just want to silence us," before going on to say that January 6 defendants face "fake trials."[10] She also used her interviews to minimize the severity of the riot, saying that the attack on the Capitol was a "setup," that she has no regret

---

[6]  Conservative Daily at 55:39 (Apr. 16, 2024) (emphasis added), https://rumble.com/v4pox82-16-march-2024-joe-oltmann-and-david-clements-live-12pm-est.html.
[7] Gateway on Mt. Zion Church at 2:59:35 (May 5, 2024),
https://vimeo.com/showcase/8328175?video=942560171.
[8] His Glory TV at 28:08 (Apr. 11, 2024), https://rumble.com/v4ovymw-rebecca-lavrenz-the-j6-praying-great-grandma-and-jd-rucker-joins-his-glory-.html.
[9] Conservative Daily at 41:50 (Apr. 16, 2024), https://rumble.com/v4pox82-16-march-2024-joe-oltmann-and-david-clements-live-12pm-est.html.
[10]    Iowa    Liberty    Network    Twitter    Spaces    at    34:20    (July    9,    2024),
https://x.com/iowalibertynet/status/1810839489016738274?s=46 (accessible through mobile app). *See also* Flashpoint with Rick Green (April 26, 2024) (referencing Judge Faruqui, "pray for him he's a Muslim. First and only Muslim judge, but he was very kind, but pray for him."); Gateway on Mt Zion Church (sermon) (noting that Judge Faruqui is Muslim and that she is praying for his Christian salvation).

for what happened that day, and that she would not do anything differently.[11] Lavrenz further encouraged people to "live dangerously" when fighting for freedom.[12]

Lavrenz also used the interviews to further her fundraising efforts, often directing viewers and listeners to donate to the Lavrenz Account to help her pay a potential fine. For example, in an April 11, 2024, interview with "His Glory TV," Lavrenz told viewers how to donate to the Lavrenz Account and stated, "I could be facing up to maybe three years in prison or *$200,000 in fines, so I still need more funds for that*."[13]

Lavrenz has also used money in the Lavrenz Account to embark on a cross-country speaking tour. Since trial, Lavrenz has travelled to Virginia, Georgia, Tennessee, North Carolina, Minnesota, and Iowa, where she has spoken at events to defend the mob that attacked the U.S. Capitol and lie about her own conduct. In a June 12, 2024, interview, Lavrenz said of the money in the Lavrenz Account, "I am using some of it for J6-related expenses, I'm travelling . . . because I am being able to speak at different places."

Since her conviction, Lavrenz has also promoted her website, Restoringgodlyculture.com, which features links to the Lavrenz Account and her post-trial media interviews, as well as a daily newsletter that she had circulated from March 1, 2024, through July 10, 2024.[14] As with her media interviews, Lavrenz uses the daily newsletter to proudly display her criminal conduct on January 6, question the legitimacy of her trial, and to promote other January 6 defendants. A sampling of Lavrenz's newsletters is included below:

---

[11] Matt Christiansen Hour at 39:30 (May 8, 2024), https://www.youtube.com/live/NduUgSa5Lqc.
[12] *Id.* at 56:46.
[13] His Glory TV at 29:22 (Apr. 11, 2024), https://rumble.com/v4ovymw-rebecca-lavrenz-the-j6-praying-great-grandma-and-jd-rucker-joins-his-glory-.html (emphasis added).
[14] Although the entries in the newsletter section of Lavrenz's website appear dated on or about the time that they were written, the majority of the entries were not posted to the website until June 2024. *See* https://restoringgodlyculture.com/newsletter (last visited Aug. 5, 2024).

- May 17, 2024 — Reflecting on watching closing arguments at her trial, "I knew, as I watched [the prosecutor] address the jury that day, that I had, 3 and a 1/2 years ago, made the RIGHT decisions all along that way because I had looked to the One who loved me and gave His very life for me, to decide what I would do that day. And look where it has led me… into being a voice to wake up 'We the People', the average American, who doesn't know what's really going on, so a movement of Patriots can arise to bring our country back from the brink of destruction for future generations!"[15]

- June 12, 2024 — Talking about Jeremy Rodgers, a defendant charged with assaulting an officer with a flagpole on January 6, Lavrenz wrote: "I want to take today's letter and share with you about another Patriot who loves God and our country and is on the frontline taking the hit from a corrupt Department of Justice run by the Deep State to destroy the America we love and the Constitutional Republic that our founding fathers so beautifully and courageously established for us."[16]

In addition to her website, Lavrenz set up an X account (formerly Twitter), @J6prayinggrandma, where she has promoted her fundraising accounts and advocated the righteousness of her criminal conduct on January 6. She has also used her X account to promote a post from a supporter that likens the treatment of defendants in January 6-related cases to the internment of Japanese-Americans during World War II and that of victims of the Holocaust,[17] *see* Figure 7, as well as promoted a post that called those convicted of crimes related to the attack on the Capitol "[p]olitical [p]risoners" who faced "corrupt judges & a tainted jury pool in DC," *see* Figure 8.

---

[15] https://restoringgodlyculture.com/newsletter/f/may-17-2024 (last visited Aug. 5, 2024).

[16] https://restoringgodlyculture.com/newsletter/f/june-12-2024 (last visited Aug. 5, 2024).

[17] The post that Lavrenz promoted in Figure 7 invokes Martin Niemöller's famous quote about Nazi Germany. *See Martin Niemöller: "First They Came For . . .",* U.S. Holocaust Memorial Museum, https://encyclopedia.ushmm.org/content/en/article/martin-niemoeller-first-they-came-for-the-socialists. Lavrenz's post linked to an article written by a supporter who had attended a portion of her trial. *See First, They Came for the J6ers: When a judicial system hell bent on destroying MAGA came for the J6ers, Congress said nothing,* Jack Cashill (June 2, 2024), https://spectator.org/first-they-came-for-the-j6ers/. In her June 3, 2024 newsletter posted to her website, Lavrenz quoted the article in full, including a paragraph that likened the prosecution team in her trial to "Nazi executioner-in-chief Adolph Eichmann." *See* https://restoringgodlyculture.com/newsletter/f/june-3-2024 (last visited Aug. 5, 2024).



*Figure 7*                                              *Figure 8*

*The Charges and Convictions*

On April 4, 2024, Lavrenz was convicted following a jury trial on all four Counts of the Information: 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds) (Count One); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds) (Count Two); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds) (Count Three); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating,  or Picketing, in a Capitol Building) (Count Four).

### III.   Statutory Penalties

Lavrenz now faces sentencing on Counts One through Four. On each of Counts One and Two, Lavrenz faces up to one year of imprisonment and a fine of up to $100,000. 18 U.S.C. §§ 1752(b)(2), 3571(b). On each of Counts Three and Four, Lavrenz faces up to six months of imprisonment and a fine of up to $5,000. 40 USC § 5109(b); 18 U.S.C. § 3571(b).

**IV.      The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. Although the PSR only includes a guidelines calculation for Count Two—which is the highest count—the government has set out calculations for Counts One and Two below:

Count One (18 U.S.C. § 1752(a)(1)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B2.3(a)): Trespass | +4 |
| Special Offense Characteristic (U.S.S.G. § 2B2.3(b)(1)(A)(vii)) | +2 |
| Adjustment (U.S.S.G. § 3C1.1): Obstruction | +2 |
| Adjustment (U.S.S.G. § 4C1.1): Zero-Point Offender | -2 |
| **Total Adjusted Offense Level** | **6** |

Count Two (18 U.S.C. § 1752(a)(2)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4(a)): Obstructing Officers | +10 |
| Adjustment (U.S.S.G. § 3C1.1): Obstruction | +2 |
| Adjustment (U.S.S.G. § 4C1.1): Zero-Point Offender | -2 |
| **Total Adjusted Offense Level** | **10** |

*See* PSR ¶¶ 39–48.

The Probation Office determined that the two-point § 3C1.1 obstruction adjustment applies due to Lavrenz's false testimony at trial. *See* PSR ¶ 27. For the reasons outlined earlier in this memo, the government agrees that the obstruction adjustment applies.

16

Lavrenz's convictions in Counts Three and Four are for Class B misdemeanors and, therefore, the Guidelines do not apply to them. *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

The PSR correctly states that Counts One and Two group, PSR ¶ 36; U.S.S.G. § 3D1.2(a), and that because Count Two provides the higher offense level, it provides the offense level for the group, PSR ¶ 37; U.S.S.G. § 3D1.3(a).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

While the government concedes that Section 4C1.1 applies to Lavrenz—and thus her total offense level is 10—the Court should vary upward by two levels to account for the reduction under § 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g.*, *United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13. Thus, Lavrenz's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. 48 (varying upward by two levels to offset the Section 4C1.1 reduction). Moreover, Lavrenz's utter lack of remorse, her false statements during and after trial, and her eagerness to raise hundreds of thousands of dollars after her conviction counsel in favor of an upward variance.

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G

COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated Lavrenz's criminal history as a Category I. PSR ¶ 51. Accordingly, the U.S. Probation Office calculated Lavrenz's total adjusted offense level, after factoring in § 4C1.1, at 10, and her corresponding Guidelines imprisonment range at 6 to 12 months' imprisonment. PSR ¶ 100.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines surely provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the

Section 3553(a) factors weigh in favor of 10 months' incarceration, 12 months of supervised release, 60 hours of community service, $500 in restitution, and a fine to be determined once Lavrenz accounts for her finances and fundraising.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Lavrenz's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Lavrenz, the absence of violent or destructive acts is not a mitigating factor. Had Lavrenz engaged in such conduct, she would have faced additional criminal charges.

Some of the most important factors in Lavrenz's case are (1) her decision to position herself at the front of the mob; (2) her attempt to get close to the members of Congress inside the Capitol on January 6; (3) her complete and utter lack of remorse, as demonstrated by her highly inflammatory post-January 6 statements in the media; and (4) her decision to fundraise off her own criminality. Far from a mere praying grandmother—a moniker she appears to relish and promote—Lavrenz contributed to the chaos that took place on January 6, and she continues to advocate—loudly—for lawlessness today.

In fashioning an appropriate sentence, this Court can and should give substantial weight to Lavrenz's persistent post-January 6 statements that she did not commit any crimes and that the criminal proceedings against her were corrupt. Particularly damning are her claims that the jurors

who sacrificed their time so she could exercise her constitutional rights were biased against her, even though she had every opportunity to remove any biased venire persons from the jury. Regardless of whether Lavrenz's statements were protected by the First Amendment, this Court can properly consider them at sentencing. A sentencing court "has always been free to consider a wide range of relevant material." *Payne v. Tennessee*, 501 U.S. 808, 820–21 (1991). "[T]he Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Dawson v. Delaware*, 503 U.S. 159, 165 (1992). Instead, "conduct protected by the First Amendment may be considered in imposing sentence" if it is "relevant to the issues in a sentencing proceeding." *United States v. Alvarez-Nunez*, 828 F.3d 52, 55 (1st Cir. 2016). For example, such conduct "may be used to evaluate the degree of the defendant's remorse, . . . the likelihood of reoffending, . . . or the extent of punishment needed for deterrence." *Id*. at 56 (citations omitted); *see also, e.g.*, *United States v. Fell*, 531 F.3d 197, 228 (2d Cir. 2008); *Kapadia v. Tally*, 229 F.3d 641, 648 (7th Cir. 2000) ("Nothing in the Constitution prevents the sentencing court from factoring a defendant's statements into sentencing when those statements are relevant to the crime or to legitimate sentencing considerations."). "In many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society." *Dawson*, 503 U.S. at 166.

Lavrenz's post January 6 remarks are not only relevant to her criminal conduct but are fully integrated into it. They certainly demonstrate "the degree of [her] remorse," which is *zero*. *See Alvarez-Nunez*, 828 F.3d at 55. They also demonstrate the very strong "likelihood of [her] reoffending" and "the extent of punishment needed for deterrence." *See id.* Lavrenz's highly publicized drumbeat of denunciations of this proceeding and claims of corruption are intended to

and very well may have diminished public faith in our criminal justice system. She has done nothing less than mount a frontal attack on the rule of law and this Court. As such, those remarks are entirely fair game under controlling precedent, and strongly support the government's sentencing recommendation.

Accordingly, the nature and the circumstances of this offense call for a sentence of 10 months' incarceration.

### B.  Lavrenz's History and Characteristics

Lavrenz is 72 years old, lives in Peyton, Colorado, and runs a bed and breakfast out of her home. PSR ¶¶ 57, 64. Lavrenz has no dependents and reports being in good health. PSR ¶¶ 61–62, 66–74. Lavrenz previously worked as a nurse and managed a mobile home park. PSR ¶¶ 77, 80.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two ideas: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B)–(C), *United States v. Russell*, 600 F.3d 631 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide for specific deterrence weighs heavily in favor of a serious term of incarceration.

First, although she has no prior criminal history, Lavrenz is proud of her criminal conduct on January 6 and completely undeterred from repeating it. She has loudly proclaimed that she made the "right" decisions on January 6, 2021.[18] In her many interviews since her trial, she has never expressed an ounce of remorse for her criminal conduct on January 6. Thus, her mere lack of criminal history before January 6 does nothing to assuage fears that she will repeat her criminal conduct.

Second, Lavrenz has used her celebrity to cast doubt the legitimacy and fairness of her trial, which suggests that a conviction without a meaningful sentence will not offer much, if any, deterrence. Lavrenz has said "I knew that if I was going to D.C. it was corrupt," and that all

---

[18] https://restoringgodlyculture.com/newsletter/f/may-17-2024 (last visited Aug. 5, 2024).

potential jurors were "Democrat motivated."[19] On X, Lavrenz has amplified posts that claim "corrupt judges & a tainted jury pool in DC" prevent defendants charged with crimes related to January 6 from having a fair trial. *See* Figure 8. In reality, Lavrenz's jury deliberated for nearly three days before returning its verdict, yet her post-trial interviews and statements show that she does not view the jury or process that led to her conviction as legitimate. All that makes her unlikely to see a conviction without a meaningful sentence as any sort of deterrent.

Third, Lavrenz refuses to acknowledge even the most basic facts that were proven at her trial. Instead, during her post-trial media tour, she has chosen to use her newfound celebrity to rewrite the history of January 6, leaving out the officers assaulted by the violent mob that she joined, the damage to the U.S. Capitol that she witnessed, and the interruption of the peaceful transfer of power that she helped cause. Because Lavrenz has shown absolutely no willingness to grapple with her criminal conduct and that of the violent mob that she joined, there is no reason to believe that she has reflected on the harm that she caused and dedicated herself to ensuring the horrors of January 6 never happen again.

Fourth, Lavrenz has fundraised hundreds of thousands of dollars off the notoriety of her criminal conduct. As the government set out in detail above, since her convictions Lavrenz has travelled the country and given dozens of media interviews, during which she has solicited donations to the Lavrenz Account. The hallmark of her fundraising pitch is that her actions on January 6 were righteous and her trial was corrupt. In other words, she has turned her criminal conduct on January 6 into a business—one she fuels by selling lies about what she and the mob did on that day.

---

[19] Gateway on Mt. Zion Church at 2:59:35 (May 5, 2024), https://vimeo.com/showcase/8328175?video=942560171.

Fifth, Lavrenz continues to champion the willfully wrong belief that her conduct on January 6, and that of her fellow rioters, was protected by the First Amendment. In interview after interview, she claims that she had a First Amendment right to enter the Capitol, through a breached door, as part of a violent mob, in order to disrupt Congress's carrying out an essential step in the peaceful transfer of power. The Court, on several occasions throughout trial and outside the presence of the jury, explained to Lavrenz why the First Amendment was not a defense to her charges. Rather than engage with the reality of the law, Lavrenz has decided to instead preach that the First Amendment protects whatever she finds personally convenient. Her post-trial statements demonstrate a complete lack of respect for the law, and nothing short of a meaningful term of incarceration will offer specific deterrence.

Lavrenz did not accept the results of the 2020 presidential election, so on January 6 she made sure she was front and center as part of the mob dead set on stopping the peaceful transfer of power. Since then, nothing has changed. The Court should take Lavrenz's post-trial statements as the warning sign that they are: if given the opportunity, Lavrenz would gladly repeat the events of January 6 all over again. It is the Court's duty to sentence Lavrenz in a manner sufficient to deter her specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[20] This

---

[20] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Court must sentence Lavrenz based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her role in the January 6 riot.

Lavrenz was found guilty of all four counts in the Information. Counts One and Two, violations of 18 U.S.C. § 1752(a)(1) and (a)(2), respectively, are Class A misdemeanors. 18 U.S.C. § 3559. Counts Three and Four, violations of 40 U.S.C. § 5104(e)(2)(D) and (G), respectively, are Class B misdemeanors. Although the Sentencing Guidelines apply only to Counts One and Two, the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply to all four counts.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See* Sent. Hrg. Tr. 24–25, *United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Russell Alford*, 21-cr-263-TSC, the defendant was convicted of the same charges as Lavrenz following a jury trial. Like Lavrenz, Alford walked past the violence that was occurring in an attempt to get deeper into the Capitol. And, like Lavrenz, Alford showed no remorse for his actions. Alford earned a two-level enhancement of his offense level because of his false trial testimony. Lavrenz similarly gave false testimony under oath and the Court should apply the two-level obstruction enhancement. Alford was 62 years old at the time of sentencing; Lavrenz is 72. But Alford did not articulate a relentless attack on his prosecution as Lavrenz has, and that attack is one of the most aggravating features of this case. Judge Chutkan sentenced Alford to 12 months' incarceration followed by 12 months of supervised release.

In *United States v. Anthony Vo*, 21-cr-509-TSC, the defendant was convicted of the same charges as Lavrenz following a jury trial. Like Lavrenz, Vo entered the U.S. Capitol after watching a mob of rioters overrun the outnumbered police, though Vo was on the west side. And like Lavrenz, after Vo was convicted at trial, he made several statements on social media and in interviews that misrepresented his conduct and attacked the integrity of his jury and the Court. Vo was inside the Capitol for approximately twenty-seven minutes, which is slightly longer than Lavrenz's approximately ten minutes. But again, the sheer volume of Lavrenz's post-trial statements calling the court and jury corrupt and defending the mob that attacked the Capitol sets her apart. Judge Chutkan sentenced Vo to 9 months of incarceration followed by 12 months of supervised release.

In *United States v. Nancy Barron*, 22-cr-89-ZMF, the defendant was part of the breach of the bike racks on the East Plaza and entered the Capitol through the Rotunda Doors. This Court

sentenced Barron to 6 months of home detention and 36 months of probation—a downward variance from her guidelines range of 6 to 12 months' incarceration. But that case was significantly different from this one. Most significantly, in stark contrast to Lavrenz, Barron expressed remorse for her conduct at the sentencing hearing. The Court expressly noted that Barron's need to care for her young, disabled child played a role in its downward variance. Lavrenz has no such familial obligations. And while the Court viewed unfavorably Barron's post-trial media interview where she questioned the fairness of her trial, the evidence at the hearing showed only one media interview, which pales in comparison to Lavrenz's at least twenty-four interviews, cross-country speaking tour, daily newsletter, website, fundraising pages, and X posts that show her continued belief that her actions on January 6 were acceptable. This Court could readily conclude that, without a significant term of incarceration, Lavrenz would pose a far greater risk of recidivism than Barron did. While the Court can and should consider *Barron* as a possible comparator, it is by far not the only comparator. And perhaps more importantly, each case and set of facts is different, and should be treated differently. In other words, a single comparator should not drive the entire sentencing process.

In fact, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—

differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Lavrenz was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use

the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23–24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[21]

Because Lavrenz engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Lavrenz responsible for her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476–77, 485 (D.C. Cir. 2019) (affirming $7,500

---

[21] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf*. 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court . . . may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Lavrenz to pay $500 in restitution for her convictions on Counts One and Two. This amount fairly reflects Lavrenz's role in the offense and the damages resulting from her conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $500 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.   Fine

Lavrenz has raised over $230,000 based, in part, on the prospect of this Court imposing a substantial fine at sentencing. Since she has explicitly raised money on the premise of paying a fine, it would be a perverse result to allow her to keep those funds rather than pay a fine. Accordingly, as explained below, the Court should impose a significant fine.

Lavrenz's convictions for Counts One and Two each subject her to a statutory maximum fine of $100,000, and her convictions for Counts Three and Four each subject her to a statutory

maximum fine of $5,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, this court should consider Lavrenz's financial resources, particularly the money she has raised from online fundraising, along with her income and earning capacity. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).

The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that she is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e). The burden is on Lavrenz to show her present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

Here, Lavrenz has not shown an inability to pay. It was her burden to do so and she has plainly failed—she refused to submit the Net Worth Statement, Monthly Cash Flow Statement, or any supporting documentation of her income, assets, liabilities, and debts to the Probation Office. *See* PSR ¶ 85. The Court ordered Lavrenz to provide "a full accounting of the two GiveSendGo fundraising accounts associated with her by not later than August 8th at 12:00 PM." Aug. 5, 2024 Min. Order, *United States v. Lavrenz*, 1:23-cr-66-ZMF. The United States will supplement its fine request after Lavrenz complies with the Court's order.

The guidelines fine range is $4,000 to $40,000. PSR ¶ 125; U.S.S.G. § 5E1.2(c). The Guidelines provide factors that the Court should consider when determining the amount of a fine.

U.S.S.G. § 5E1.2(d). Three of those factors are particularly relevant to Lavrenz's case and weigh heavily in favor of a substantial fine.

First, § 5E1.2(d)(1) states that the Court must consider "the need for the combined sentence to reflect the seriousness of the offense . . . , to promote respect for the law, to provide just punishment and to afford adequate deterrence." For the same reasons stated earlier in the context of the 18 U.S.C. § 3553(a) factors, this factor counsels in favor of a substantial fine.

Second, § 5E1.2(d)(2) tells the Court to consider "any evidence presented as to the defendant's ability to pay the fine . . . in light of [her] earning capacity and financial resources." As explained above, between her two GiveSendGo accounts—the Lavrenz Account and the NCLU Account—Lavrenz has raised $230,460. Since it is Lavrenz's burden to show that she is unable to pay a fine, her refusal to provide the Probation Office with any evidence should be dispositive.

Far from being unable to pay, the best available evidence—the Lavrenz Account and NCLU Account—demonstrates her *ability* to pay a substantial fine. While the NCLU Account uses the title "Rebecca Lavrenz Legal Defense Fund" and indicates that the funds will go to an organization affiliated with Lavrenz's attorneys, the Lavrenz Account uses the vague title "Rebecca Lavrenz January 6th Related Expenses" and states that "funds will be received by Rebecca Lavrenz." Since being convicted, Lavrenz has gone on a speaking tour during which she has defended the mob that attacked the Capitol, proclaimed the unfairness of her trial, and declared that she will not be deterred. All this supports a significant fine.

Third, § 5E1.2(d)(8) requires that the Court consider "any other pertinent equitable considerations." Perhaps the strongest basis for imposing a substantial fine is Lavrenz's explicit use of a potential fine when she has solicited money. On the Lavrenz Account webpage, she uses the prospect of a "fine[] of up to $200,000" in her fundraising appeal. Her website likewise notes

that she faces a fine of to $210,000. In interviews, she similarly highlights the prospect of a substantial fine and directs viewers to her website and the Lavrenz Account. Moreover, she has used portions of the money that she raised in the Lavrenz Account to fund her speaking tour. It would be inequitable, and completely contrary to the purposes of sentencing, to allow Lavrenz to keep money fundraised off of the notoriety of her criminal conduct.

Lavrenz has turned herself into one of the most prolific fundraisers among all January 6 defendants, and thus it is useful to look at how Courts handled fines in some of those cases. As a comparator case, in *United States v. Ryan Nichols*, 1:21-cr-117-RCL, the defendant raised $237,443 on GiveSendGo at the time the government filed its sentencing memo. Like Lavrenz, Nichols refused to provide any financial information to the Probation Office. *See* Gov't Sent. Memo at 35, ECF No. 307, *United States v. Ryan Nichols*, 1:21-cr-117-RCL. Nichols, who pleaded guilty to two felonies, faced a guidelines range of $15,000 to $150,000 on one count and $25,000 to $250,000 on the other. Judge Lamberth imposed a fine of $200,000. *See* Judgment, ECF No. 314, *United States v. Ryan Nichols*, 1:21-cr-117-RCL.

Put simply, because Lavrenz has used the prospect of a fine to raise huge sums of money, she should be required to pay a substantial fine. Accordingly, at a minimum, the Court should impose a fine.

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Lavrenz to 10 months' incarceration, 12 months of supervised release, 60 hours of community service, $500 in restitution, and a fine to be determined when Lavrenz accounts for her finances and fundraising.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ *Terence A. Parker*
Terence A. Parker
Trial Attorney (Detailee)
U.S. Attorney's Office for the
District of Columbia
NY Bar No. 5775192
Email: Terence.Parker3@usdoj.gov
Phone: (202) 252-7859

/s/ *Brendan Ballou*
Brendan Ballou
Special Counsel (Detailee)
U.S. Attorney's Office for the
District of Columbia
DC Bar No. 241592
Email: Brendan.Ballou-Kelley@usdoj.gov
Phone: (202) 431-8493